H1HPLUM1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
   UNITED STATES OF AMERICA,              New York, N.Y.
3
                  v.                      16 Cr. 483(JSR)
4
   STEFAN LUMIERE,
5
                  Defendant.
6  ------------------------------x
                                          January 17, 2017
7                                         9:34 a.m.

8  Before:

9                      HON. JED S. RAKOFF,

10                                         District Judge

11
                          APPEARANCES
12
   PREET BHARARA
13      United States Attorney for the
        Southern District of New York
14 BY:  JOSHUA A. NAFTALIS
        P. IAN McGINLEY
15      DAMIAN WILLIAMS
        Assistant United States Attorneys
16

17 CREIZMAN, LLC
        Attorneys for Defendant
18 BY:  ERIC M. CREIZMAN
        MELISSA MADRIGAL
19      AMANDA C. SHOFFEL

20

21 ALSO PRESENT:

22 HOLLY MEISTER, Paralegal, U.S. Attorney's Office

23 SARAH PYUN, Paralegal, U.S. Attorney's Office

24 JONATHAN MICHAELSON, Paralegal, Creizman, LLC

25 MATTHEW CALLAHAN, F.B.I.


                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

H1HPLUM1

1              (Trial resumed; jury not present)

2              THE DEPUTY CLERK:  May I bring in the jury?

3              THE COURT:  Please.  Good morning.  Please be seated.

4              MR. NAFTALIS:  Judge, before the jury comes in, we're

5     going to read a long stipulation.  I've just talked to

6     Mr. Creizman about it.  We may just offer a bunch to say they

7     are all authentic and/or are business records, and we'll just

8     offer them rather than go through them.

9              THE COURT:  Okay.

10             MR. CREIZMAN:  No objection.

11             (Jury present)

12             THE COURT:  Please be seated.  Morning, ladies and

13    gentlemen, and thank you once again for your promptness.

14    Counsel was here as well.  I had to take up, unexpectedly,

15    another matter; so I apologize for the delay.  It was entirely

16    because of that, and I thought, should I hold myself in

17    contempt?  But I made an incredible mercy pitch to myself and

18    it was totally persuasive, but I am sorry that we are starting

19    late.  So we will move quickly.  Let's swear in the next

20    witness.

21     THOMAS CAROCCI,

22         called as a witness by the Government,

23         having been duly sworn, testified as follows:

24             THE DEPUTY CLERK:  Please be seated.  State your name

25    and spell it slowly for the record.

H1HPLUM1

1              THE WITNESS:  Thomas Carocci, C-a-r-o-c-c-i.

2              THE COURT:  Counsel.

3              MR. NAFTALIS:  Thank you, your Honor.

4              Before I begin my examination, I'm just going to read

5     a quick stipulation, and I say quick, that's with hope.

6              This is Government Exhibit 1411.  In the summary it

7     says that the parties stipulate that Government Exhibit 701 and

8     701A are business records from FINRA; that Government

9     Exhibit 816 is a true and correct copy of certain FINRA rules;

10    that Government Exhibits 702, 703, 750 and 751 are Visium

11    business records; that Government Exhibits 710 and 746 through

12    749 are business records from Bloomberg; that Government

13    Exhibits 737, 738 and 753 through 758 are authentic records

14    from JVB Financial Group; that Government Exhibit 745 is a

15    business record from Interactive Data Corporation; Government

16    Exhibit 752 is an authentic record from Janney Montgomery;

17    Government Exhibit 759 is a business record from Markit; and

18    Government Exhibits 742, 743, 760A through 761K, 768, 769 and

19    1500 through 1599C are authentic records from Morgan Stanley;

20    742, 743 and 760 through 761K, 768, 769 and 1500 through 1599C

21    are business records as well.

22             The parties also stipulate that the stipulation may be

23    received in evidence.  Your Honor, the government offers the

24    exhibits I just and Government Exhibit 1411.

25             THE COURT:  Received.

1          (Government's Exhibits 701, 701A, 816, 702, 703, 750,

2     751, 710, 746 through 749, 737, 738, 753 through 758, 745, 752,

3     759, 742, 743, 760A through 761K, 768, 769 and 1500 through

4     1599C and 1411 received in evidence)

5     DIRECT EXAMINATION

6     BY MR. NAFTALIS:

7     Q.  Mr. Carocci, where do you work?

8     A.  I work at FINRA, the Financial Industry Regulatory

9     Authority.

10    Q.  And can you explain to the jury what FINRA is?

11    A.  Right.  We are what's called a private self-regulatory

12    organization; so we're not government.  We're a regulator of

13    the securities industry, and we're funded by the industry, and

14    we have rules and regulations that we apply to the industry.

15    Q.  When you say you're a private regulator of the industry,

16    can you explain a little more what you mean?

17    A.  Right.  So again, our budget comes from the industry.  The

18    industry members, those would be firms and individuals who sell

19    securities to the investing public, agree to be members, as a

20    condition for doing that, and agree to abide by the rules and

21    regulations that FINRA has.

22    Q.  How long have you worked at FINRA for?

23    A.  For approximately 17 years.

24    Q.  What is your current position?

25    A.  I'm an attorney with the criminal prosecution assistance

1     group.

2     Q.   What is the criminal prosecution assistance group?

3     A.   Right.  So we assist federal, state and local prosecutors

4     with their white-collar criminal investigations and trials

5     involving basically securities fraud.

6     Q.   How long have you been a member of this criminal

7     prosecution assistance group for?

8     A.   For about 14 years.

9     Q.   Have you had any involvement in the investigation of the

10    defendant?

11    A.   I have not, no.

12    Q.   And prior to working at FINRA, did you work anywhere else?

13    A.   Yes.  I had a stint at Goldman Sachs, in the compliance

14    department, and I also helped start a mutual fund in the late

15    '90s.

16    Q.   Now, Mr. Carocci, does FINRA have certain rules that govern

17    the behavior of professionals who work in the securities

18    industry?

19    A.   Yes.  It's called a code of conduct.

20            MR. NAFTALIS:  At this time, your Honor, I'd like to

21    publish Government Exhibits 816.

22            THE COURT:  All right.

23    Q.   Can you read this, Mr. Carocci?

24    A.   Yes.  This is FINRA conduct rule 2010, Standards of

25    commercial honor and principles of trade.  And the rule is:  A

1    member, in conduct of its business, shall observe high

2    standards of commercial honor and just and equitable principles

3    of trade.

4    Q.  Mr. Carocci, is the mismarking of securities permitted

5    under this rule?

6    A.  No.

7    Q.  Let's go to the next page of this, and this is rule 2020?

8    A.  Correct, rule 2020 is the Use of manipulative, deceptive or

9    other fraudulent devices.  It says:  No member shall effect any

10   transaction in, or induce the purchase or sale of, any security

11   by means of any manipulative, deceptive, or other fraudulent

12   device or contrivance.

13   Q.  What does this generally mean?

14   A.  It basically means when you're executing a transaction for

15   the purpose of sale of a security, a stock, a bond, that you

16   have to be honest and fair and have fair dealings.  You can't

17   be manipulative, deceptive or misleading.

18   Q.  Is the mismarking of securities permitted under this

19   rule --

20        MR. CREIZMAN:  Objection.

21   Q.  -- to your understanding?

22        THE COURT:  Wait, wait.  Hold on.  Ground?

23        MR. CREIZMAN:  It invades the province of the Court to

24   interpret the laws and regulations.  It's also irrelevant.

25        THE COURT:  Well, you'll need to come to the sidebar.

1                  (Continued on next page)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1          (At the side bar)

2          THE COURT:  So first, why have you not waived these

3     objections by not objecting to the previous questions?

4          MR. CREIZMAN:  Well, the previous question, it kind of

5     woke me up, and this one, actually.  I also find it, by the

6     way, 403, prejudicial.

7          THE COURT:  So I will overlook the waiver, since it

8     was only one previous question.  I have grave doubts about the

9     relevance and, assuming relevance, the 403 aspects of this.

10    These are not criminal statutes.  They are not even statutes,

11    period.  They are rules of a quasi-private organization, and if

12    one were to violate those rules, it shows nothing about whether

13    one is or is not guilty of a criminal offenses, as far as I can

14    see.

15         Moreover, it has a great tendency to potentially

16    mislead the jury into believing that because he may have

17    violated some private rule, he is, therefore, guilty of a

18    crime.  So I don't see why I should remotely consider admitting

19    any of this.

20         MR. NAFTALIS:  Your Honor, the reason why we're

21    offering them is the defense opened argument that he, in good

22    faith, believed that everything he was doing was okay.  What

23    we're going to do with this witness and these rules --

24         THE COURT:  No.  I think the argument was that he

25    failed to have the criminal intent because he was operating in

1    good faith.  I don't see how this shows -- by the way, there's

2    no showing that he even knows these rules.

3           MR. NAFTALIS:  I'm going to get to that, your Honor,

4    but the point is --

5           THE COURT:  And how are you going to show that,

6    because he's registered?

7           MR. NAFTALIS:  He took seven exams.  He is licensed

8    and studied, which requires knowledge of this these rules.

9           THE COURT:  We've already been through that with

10   another witness, in effect, and there was no objection to that,

11   and that might have been another waiver of this witness, but

12   I'm going to exclude this witness.  At a minimum, I think it

13   presents 403 problems.

14          MR. NAFTALIS:  Your Honor, we offered the exhibits.

15   The defense, if they were going to argue that -- you'll recall

16   some of the argument was, well, is he a portfolio manager?  Is

17   he an analyst?  They're trying to make the defendant look like

18   he's a naive babe in the woods.  What we're trying to prove is

19   he was a sophisticated individual.

20          This has come in in numerous trials.  Mr. Carocci, we

21   can do a voir dire if you want, has testified.  I know it

22   doesn't matter for your Honor, but --

23          THE COURT:  It doesn't matter.

24          MR. NAFTALIS:  -- we're trying to show that this

25   individual is totally unnoticed, and has been tested on these

1    materials and knows exactly that you cannot give fake broker

2    quotes.

3              THE COURT:  If the question had ever been put to him

4    in any of these exams or in the rules here about is mismarking

5    of securities permitted or not or something, you know,

6    reasonably close to the allegations in this case, then I could

7    see it.

8              MR. NAFTALIS:  That's next.

9              THE COURT:  But this is all about manipulative and

10   general, you know.  It's also, by the way, will be covered, in

11   effect, by 10(b)(5) or the mail fraud or wire fraud statutes or

12   the security fraud statutes, which the jury, of course, will be

13   instructed on; so --

14             MR. NAFTALIS:  Can I tell you the testimony?  The next

15   page of this exhibit is literally a rule that says you cannot

16   use fake broker quotes.

17             THE COURT:  Okay.  That I will --

18             MR. NAFTALIS:  And then there's a study guide, that

19   says you cannot use fake broker quotes, you cannot do portfolio

20   pumping.

21             THE COURT:  That, I think, would be relevant.  So

22   we'll strike this particular one and go on to that.  Now, as to

23   that, I'll have to hear it, but at least that sounds to me much

24   closer to something directed at the good faith defense.

25             MR. CREIZMAN:  Perhaps, and I would comment, here's my

1    argument.  We opened on the idea, and I think our defense is

2    not that Mr. Lumiere thinks it's okay to mismark securities or

3    even obtain necessarily fake broker quotes --

4              THE COURT:  He didn't think what he was doing was

5    that?

6              MR. CREIZMAN:  He didn't think what he was doing was

7    that.

8              THE COURT:  I think it's not irrelevant to show that

9    he was on prior warning, if you will.  From what they say,

10   they're going to introduce in a minute, that this is an area

11   where one has to pay attention to what's going on, or words to

12   that effect.  But let's see what the specifics are, but I will

13   strike the previous question.

14             MR. NAFTALIS:  Your Honor, just so we're all --

15             THE COURT:  I sustain the objection.

16             MR. NAFTALIS:  -- on the same page, I'm going to go to

17   the next rule, which is fake broker quotes, basically.

18             THE COURT:  Yes.

19             MR. NAFTALIS:  Then I'm going to put in front of him,

20   basically, the defendant has passed a bunch of tests, and I'm

21   just going to jump to the part of the test that deals with

22   broker quotes.

23             THE COURT:  Yes, that sounds good.

24             (Continued on next page)

25

1            (In open court)

2            THE COURT:  We knew you wouldn't want to start the

3    morning with a without a long sidebar.

4            The objection is sustained.  Go to your next question.

5            MR. NAFTALIS:  Can we go to the next page of this

6    exhibit, please.  Let's scroll in on the top.  Perfect.

7    BY MR. NAFTALIS:

8    Q.  What is the title of this rule 5210?

9    A.  Publications of transactions and quotations.

10   Q.  Okay.  Do you see below that it says Supplementary

11   Material, it says Manipulation and deceptive quotations?

12   A.  Yes.

13   Q.  Can you read the second paragraph below that?

14   A.  Similarly, it shall be deemed inconsistent with rules 2010,

15   rule 2020 and rule 5210 for a member, for itself or for any

16   other person, to publish or circulate or to cause to be

17   published or circulated, by any means whatsoever, any quotation

18   for any security without having reasonable cause to believe

19   that such quotation is a bona fide quotation, is not

20   fictitious, and is not published or circulated or caused to be

21   published or circulated for any fraudulent, deceptive or

22   manipulative purpose.

23   Q.  Okay.  So within this rule it references 2010 and 2020,

24   which we just looked at; is that right?

25   A.  Yes.

1    Q.   5210 is the broader rule?

2    A.   Correct, it's this rule, the broader rule.

3    Q.   Was Mr. Lumiere subject to these rules?

4    A.   Yes.

5              MR. NAFTALIS:   We can take that down, please.

6    Q.   Now, Mr. Carocci, does FINRA license professionals

7    associated with Wall Street firms?

8    A.   Yes, we register them.

9    Q.   And are you familiar with the registration process?

10   A.   I am.

11   Q.   What does someone have to do to become registered with

12   FINRA?

13   A.   Generally, they have to pass the examinations that would

14   test their knowledge of securities, the products they would be

15   selling to the investing public, as well as the rules,

16   regulations and the federal securities laws regarding the sale

17   of securities to the investing public.

18   Q.   Does FINRA maintain records of the individuals who are

19   registered with it?

20   A.   We do.

21             MR. NAFTALIS:   Can we bring up Government Exhibit 809

22   in evidence, please, and let's go to Page 11.  First, can we

23   just zoom in on the top portion.

24   Q.   Looking at the line where it says Individual, it says:

25   Lumiere, Stefan Lorca.   What are we looking at here?

H1HPLUM1                          Carocci - Direct

1   A.  So this is a FINRA, what's called a central registration

2   depository report; so this is CRD, for short.  This is the

3   database we use to track individuals and firms that are in the

4   securities industry, where they're working and what

5   registrations they have.

6           So Mr. Lumiere is registered with FINRA, and his

7   number, kind of his Social Security number with FINRA, it's a

8   FINRA number is 2857890.

9           MR. NAFTALIS:  Ms. Pyun, can we go down to the

10  bottom-third of the page and zoom into that, of Page 11.

11  Q.  And this says Exam History.  What are we looking at here?

12  A.  So this would be Mr. Lumiere's exam history; so these would

13  be all the exams that he has taken.  There's different exams

14  for different products, and you get the things within in the

15  industry and this is his exam history.

16  Q.  I want to move through them relatively quickly.  One of

17  them is called S7.  Very briefly, what is that exam?

18  A.  It's the series 7 examination, and it's the general

19  securities registered representative exam.  So it's kind of a

20  basic exam an individual has to pass before they're allowed to

21  sell securities to the investing public.

22  Q.  Did Mr. Lumiere take this exam?

23  A.  Yes, he passed it on March 4th, 1997, with a score of 84.

24  Q.  Now, let's go to the series 55 exam.  What generally does

25  that exam test?

1    A.  That is an equity trader examination.  So to actually be

2    able to execute the trades, you need to pass this examination,

3    and again, it would test the rules and regulations regarding

4    trading and products.

5    Q.  And then below that there is S63; do you see that?

6    A.  Yes.

7    Q.  What is the series 63 then?

8    A.  The series 63 exam is the uniform securities state law

9    examination.  So this exam is administered by FINRA, but so

10   instead of an individual having to take 50 different state

11   exams to be able to sell securities to investors in all those

12   states, the states have gotten together and just created one

13   exam.  FINRA administers the exams on behalf of the states, and

14   it tests knowledge of federal securities laws, rules and

15   regulations.

16          Mr. Lumiere, he passed it twice, once in 1997 with a

17   score of 86, and then again in 2005 with a score of 88.

18   Q.  I may not have asked you this.  Did he pass the series 16,

19   as well?

20   A.  He passed the series 55 with a score of 76, and he passed

21   the series 16 with a score of 82.

22   Q.  We'll come back to the 16.

23          Now, does FINRA publish an outline of topics that are

24   covered on these exams?

25   A.  Yes, it does.

1              MR. NAFTALIS:  Can we bring up Government Exhibit 812

2     in evidence, please.

3     Q.  Is this the study guide for the series 55?

4     A.  This looks like the series 63.

5     Q.  Excuse me, the series 63.

6     A.  Yes, the series 63, the study guide.

7              MR. NAFTALIS:  Can we go to Page 18, please, and let's

8     just zoom in on the top, just the very top.

9     Q.  What is this section titled?

10    A.  Fraudulent and other prohibited business practices.

11             MR. NAFTALIS:  Can we go to Page 19, please, and let's

12    zoom in on the bottom half.

13    Q.  What is No. 3 titled under this section?

14    A.  Misleading or untrue statements, 3(a).  I'm sorry,

15    Prohibited business practices.

16    Q.  And what is (a) titled?

17    A.  Misleading or untrue statements.

18    Q.  Can you read (a)?

19    A.  Yes.  An agent may not make any misleading or untrue

20    statements of material fact in connection with either the

21    purchase or sale of a security.  For example, the following

22    could be untrue statements of material fact.

23    Q.  Okay.  We're going to stop there.  What is the No. 1

24    example of FINRA's outline?

25    A.  Inaccurate market quotations.

1          MR. NAFTALIS:  Let's go to the next page, Page 21 --

2     excuse me, Page 20.  Let's just see what this page is titled.

3     Zoom in on the bottom, please.  Page 20, please, and zoom in on

4     the bottom.

5     Q.  So (e) is Other prohibited business practices; is that

6     right?

7     A.  Yes.

8     Q.  And there's a number.  Let's go to Page 21, and let's see

9     what No.s 12 and 13 are.  What do these say?

10    A.  Participating -- No. 12 is:  Participating in activities or

11    transactions which constitute market manipulation, such as

12    phony market quotations, wash sales, matched purchases or

13    sales, and other transactions which may reasonably be expected

14    to distort the trading in a security.

15         No. 13 is:  Participating in transactions which create

16    the misleading appearance of active trading in a security.

17    Q.  Are you familiar with the term "painting the tape"?

18    A.  Yes.

19    Q.  What does it generally mean?

20    A.  It's generally an attempt to set the market for a security

21    by having a transaction reported to the tape so it can be

22    published so that others can see it.  That's my understanding

23    of it, from my 17 years at FINRA.

24    Q.  So both fake market quotations and -- is painting the tape

25    covered by these rules, provided in these examples?

1   A.  Yes.

2   Q.  So both fake market quotations and painting the tape are

3   examples of things you shouldn't do in these outlines?

4   A.  I think it falls under misleading and deceptive trading.

5   Q.  This outline is the one that was given to Mr. Lumiere when

6   he studied for the exam, or made available to him?

7   A.  Well, it's made available on FINRA's website and for

8   anybody who sits to take these examinations.  I don't know if

9   he personally received one.

10  Q.  Okay.  But this is one of the topics covered?

11  A.  Correct.  These are the topics that are covered on the

12  examination and this section, section 4, the prohibited --

13  fraudulent and prohibited activities, is approximately

14  45 percent of the series 63 exam; so it's a large portion of

15  the exam.

16  Q.  Okay.  Let's go back to Government Exhibit 809, please.

17  Let's look at the bottom again.  So we have the 7, the 55, the

18  63.  What is series 65?

19  A.  Right.  The series 65 is the investment advisors law

20  examination.  Again, this was an examination created by the

21  states so that an individual wouldn't have to take 50 different

22  exams to be an investment advisor in any particular state, but

23  FINRA administers these exams.

24  Q.  What general topic does this exam offer?

25  A.  Again, it's a lot of federal securities laws, rules and

1    regulations regarding securities.

2    Q.   Did Mr. Lumiere pass the series 65?

3    A.   He did on April 3rd of 1997 with a score of 80.

4    Q.   You see at the bottom the series 86, and it says Official

5    Waiver?

6    A.   Correct.

7    Q.   What does that mean?

8    A.   Well, Mr. Lumiere was able to waive the 86 exam when taking

9    an exam to become what's called a research analyst, which is a

10   two-part exam, 86 and 87.  But because he had passed the 65

11   exam, he was able to waive the 86 exam requirement because it's

12   a lot of the same type of knowledge that is tested.

13   Q.   Okay.  Let's go to the next page and see the 87, please.

14   And did Mr. Lumiere take the 87 exam?

15   A.   Yes.  He passed on April 4th of 2005.  He passed the series

16   87 exam with a score of 82.

17   Q.   What are the 86, the 87, again?  What are those tests?

18   A.   They are research analyst examinations.  So they test

19   knowledge of printed research reports, how to research on

20   publicly traded companies and the like.

21   Q.   We saw on the prior page that Mr. Lumiere also took and

22   passed the series 16 exam?

23   A.   Correct.

24   Q.   What is that exam?

25   A.   That's the supervisor's research exam.  So, you know, to be

1   a research analyst, you need to pass the series 86 and 87, and

2   then if you're going to supervise other analysts, you need to

3   pass the series 16.  You need to pass the more-advanced

4   knowledge to supervise individuals, who is supposed to have

5   more advanced knowledge would be the theory behind the

6   additional test, the series 16.

7          MR. NAFTALIS:  We can take that down.

8   Q.  Mr. Carocci, in total, how many tests did the defendant

9   pass from FINRA?

10  A.  I believe it's six tests and the waiver, I believe.  Was it

11  six or seven?  I believe six.  Correct?

12  Q.  We'll call it six.

13  A.  Okay.  Thanks.

14  Q.  Did each test cover the federal securities laws?

15  A.  Yes.

16  Q.  Did each of them cover the FINRA rules we looked at

17  earlier?

18  A.  They covered FINRA rules, some of them.  In particular, the

19  FINRA rules were covered, yes.

20  Q.  Including the ones prohibiting fake market quotations?

21  A.  Yes.

22  Q.  In order to pass these exams, does an individual have to

23  demonstrate his or her understanding of all of these rules?

24  A.  Yes.  I mean, it's supposed to be a comprehensive exam.

25  Like I say, he passed six of them.  You certainly -- to pass

H1HPLUM1                      Carocci - Cross

1    six exams you have to have that knowledge of the rules to pass

2    the test.

3              MR. NAFTALIS:  No further questions, your Honor.

4              THE COURT:  Cross-examination.

5    CROSS-EXAMINATION

6    BY MR. CREIZMAN:

7    Q.  Good morning.

8    A.  Good morning.

9    Q.  You haven't been involved in this investigation, correct?

10   A.  That's correct.

11   Q.  And you didn't investigate any of the relevant facts in

12   this case?

13   A.  That's correct.

14   Q.  You've only been asked to testify here today about FINRA

15   rules, correct?

16   A.  And federal securities laws.

17   Q.  And federal --

18   A.  Yes.

19   Q.  -- securities laws.  Okay.  A violation of FINRA rules, in

20   and of itself, is not a crime; is that correct?

21   A.  Correct.

22   Q.  Now, your testimony today has nothing to do with any

23   facts -- let me strike that.

24              Individual brokers, right, are subject to FINRA rules

25   as well, correct?

1    A.  Yes.

2    Q.  Series 7 would be an example?

3    A.  Well, that's an exam, not a rule.

4    Q.  Right, but it would be an exam that a lot of brokers would

5    have to take?

6    A.  Yes.

7    Q.  And pass?

8    A.  Yes.

9    Q.  All right.  And series 63 would be something that brokers

10   might have to take and pass as well?

11   A.  Yes.

12   Q.  And the brokers too, if they pass those exams, would be

13   familiar with the rules you discussed today, correct?

14   A.  They should be, yes.

15   Q.  Including the rule that a broker must give accurate

16   quotations, if asked, correct?

17   A.  Yes.  Like we went over, yes.

18   Q.  But from a broker's standpoint, that would be something

19   that the broker also has to do, correct?

20   A.  The individual broker would have to understand that rule,

21   these rules that we talked about?  Yes, yes.

22   Q.  And the failure of a broker to provide accurate quotes

23   could result in disciplinary sanctions, correct?

24   A.  By FINRA?

25   Q.  Yes.

1   A.  Yes, we can fine, bar or suspend individuals from the

2   industry for rules violations.

3   Q.  Someone who passes the series 7, like Mr. Lumiere, would be

4   aware of the brokers' responsibilities as well, correct?

5   A.  Yes, hopefully.

6          MR. CREIZMAN:  No further questions.

7          THE COURT:  All right.  Any redirect?

8          MR. NAFTALIS:  No.  Thank you, your Honor.

9          THE COURT:  Thank you very much.  You may step down.

10          (Witness excused)

11          Call your next witness.

12          THE WITNESS:  Thank you, your Honor.

13          MR. WILLIAMS:  Your Honor, the government calls

14   Sudarshan Jain.

15    SUDARSHAN JAIN,

16        called as a witness by the Government,

17        having been duly sworn, testified as follows:

18          THE DEPUTY CLERK:  Please be seated.  State your name

19   and spell it slowly for the record.

20          THE WITNESS:  Sure.  Sudarshan Jain,

21   S-u-d-a-r-s-h-a-n; last name, J-a-i-n.

22          THE COURT:  Counsel.

23   DIRECT EXAMINATION

24   BY MR. WILLIAMS:

25   Q.  Good morning, Mr. Jain.

H1HPLUM1                           Jain - Direct

1    A.   Good morning.

2    Q.   Where do you work?

3    A.   Blackstone Group.

4    Q.   What is Blackstone Group?

5    A.   It's a financial services company.

6    Q.   How long have you been there?

7    A.   Two-and-a-half years.

8    Q.   What do you do there?

9    A.   I'm in the operations group.

10   Q.   Are you familiar with a company called Visium Asset

11   Management?

12   A.   Yes.

13   Q.   How do you know Visium?

14   A.   They were my previous employer.

15   Q.   For about how long?

16   A.   Six years.

17   Q.   Until when?  From when to when?

18   A.   August 2008 until July 2014.

19   Q.   What did you do at Visium?

20   A.   I was in the operations group.

21   Q.   What does that mean, in terms of your duties and

22   responsibilities there?

23   A.   Helping traders and book trades, moderate P and L

24   valuation, and other ad hoc things that come up.

25   Q.   Okay.  You mentioned valuations, what is the valuation

H1HPLUM1                         Jain - Direct

1    process?

2    A.  It's to price corporate securities, corporate bonds and

3    loans.

4    Q.  Do what with that?

5    A.  Send it off to fund admin, who is Morgan Stanley Fund

6    Services.

7    Q.  And who do they send it off to eventually?

8    A.  They use that to price the portfolio and provide investors

9    with P and L statements.

10   Q.  So were you, yourself, an investment professional at

11   Visium?

12   A.  No.

13   Q.  Have you heard the term "front office"?

14   A.  Yes.

15   Q.  What does "front office" mean?

16   A.  It generally means people who are portfolio managers,

17   analysts who work for the portfolio managers, traders and risk

18   group.

19   Q.  And are you familiar with the term "back office"?

20   A.  Yes.

21   Q.  What does that mean?

22   A.  The staff that's supporting portfolio managers, analysts,

23   traders and risk group.

24   Q.  Were you part of the back office at Visium?

25   A.  Yes.

H1HPLUM1                        Jain - Direct

1    Q.  So you mentioned Morgan Stanley Fund Services, what was

2    that?

3    A.  They were the front admin for the fund.

4    Q.  You say the fund admin, what are you referring to?

5    A.  Fund administrators.  They would monitor prices of the

6    portfolio, provide investors their profit and loss statements.

7    Q.  Okay.  So you mentioned earlier that part of your job was

8    to help out with the valuation process.  What funds within

9    Visium did you help with the valuation process for?

10   A.  Visium, part of the master fund, and any positions that

11   that fund held, if they were held in other funds as well.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  So how did you learn how the valuation process worked at

2   Vizeum?

3   A.  It was on-the-job training.

4   Q.  OK.  So let's talk about that valuation process in a little

5   more detail.  How frequently was the credit fund valued at

6   Vizeum?

7   A.  At least every month end.

8   Q.  And how would the process start each month for you?

9   A.  We would receive prices from the portfolio managers or the

10  credit team and then we would input that into the system.

11  Q.  OK.  And you say "prices."  Who would come up with those

12  prices that you would receive?

13  A.  The credit team.

14  Q.  And who was on the credit team?

15  A.  Chris Plaford, Stefan Lumiere and Jason Thorell and Ameesh

16  Shah and Lee Brown.

17          MR. WILLIAMS:  OK.  So can we please publish

18  Government Exhibit 204B, which is already in evidence.

19  Q.  So, Mr. Jain, what are we looking at here?

20  A.  That is the holdings of the credit fund and their

21  supporting prices.

22  Q.  And what month is this from?

23  A.  September 30, 2011.

24  Q.  Now, who would generate this document, Mr. Jain?

25  A.  I would receive that from the credit team.

1    Q.  Now, typically when during a given month would the

2    investment team send you this internal price list?

3    A.  On the day of the month end, usually before 4 o'clock or

4    so.

5    Q.  So let's look at the first couple of securities on this

6    list.  So, please zoom in at the very top.

7            So the first security listed is Ability Acquisition,

8    or ATI, Senior.  And what was the internal Vizeum price for

9    ATI?

10   A.  88.5.

11   Q.  Did the investment team have to provide you with any

12   supporting documentation for the prices on this list?

13   A.  Not on the day of month end.

14   Q.  OK.  So how did you know whether or not this investment

15   team price for ATI was accurate or not?

16   A.  On the next business day, I would send them a bond price

17   comparison, a price that we would receive for the portfolio

18   from Morgan Stanley Fund Services versus the price that we had

19   provided to them on the day of month end.

20   Q.  OK.  At this point, did you know whether or not this was an

21   accurate price?

22   A.  No.

23   Q.  So what would you do with this internal price list that you

24   would get from the investment team?

25   A.  I would input it into the system and also send it over to

H1hdlum2                      Jain - direct

1   Morgan Stanley Fund Services.

2              MR. WILLIAMS:   OK.  So let's pull up Government

3   Exhibit 204A, which is already in evidence.

4   Q.  So, Mr. Jain, what is this document?

5              Can you zoom in on the very top half.

6   A.  That's the bond price comparison that I would send on next

7   business day to the credit team.

8   Q.  To the credit team?

9   A.  Correct.

10  Q.  Who would you get this from?

11  A.  Morgan Stanley Fund Services.

12             MR. WILLIAMS:   OK.  So if we could go to the fourth

13  page of this document.  Zoom in at the very top.

14  Q.  So, for instance, this top row has ATI again?

15  A.  Yes.

16  Q.  So, Mr. Jain, on this document, where can we see the Vizeum

17  price that you got from the investment team?

18  A.  Where this says "Our Price" on the header.

19  Q.  And how much was that price for ATI Senior?

20  A.  88.5.

21  Q.  OK.  And do you see the price that Morgan Stanley Fund

22  Services had for the same security?

23  A.  Yes.

24  Q.  Where is that?

25  A.  Where it says "Market Price."

H1hdlum2                        Jain - direct

1    Q.  And how much did Morgan Stanley have for this same

2    security?

3    A.  $32.50.

4    Q.  And so what source -- what established source would Morgan

5    Stanley use to get that price?

6    A.  Markit is a third-party vendor who provides prices for

7    securities like corporate bonds, loans and etc.

8    Q.  So how much was this ATI Senior security worth based on the

9    Vizeum price?

10   A.  17.6 million.

11   Q.  And how much was the same security worth based on the

12   Morgan Stanley price?

13   A.  6.495 million.

14   Q.  And that's a difference of how many millions of dollars?

15   A.  11.1 million.

16   Q.  OK.  What would you do with this bond price comparison

17   sheet once you got it from Morgan Stanley?

18   A.  I would send it to the credit team.

19   Q.  And what would they do with the document?

20   A.  They would come back highlighting prices that they wanted

21   to override and would have to provide a support for the price

22   that they want to override it with.

23        MR. WILLIAMS:  OK.  So if we could pull up Government

24   Exhibit 204E.

25   Q.  So you mentioned, Mr. Jain, an override.  What is an

1  override?

2  A.   Basically where they wanted to use their own price that

3  they provided, as opposed to using the Morgan Stanley Fund

4  Services provided price.

5  Q.   OK.  So if we look at the -- actually, just looking at this

6  first page, the yellow highlights mean what?

7  A.   That they wanted to override those specific prices.

8  Q.   OK.  And so if we go to the last page of this document.

9  Let's look at "ATI Senior" again.

10       And so what does this yellow highlighting mean?

11  A.   That the credit team wanted to use a price of 88.5 for ATI

12  Senior.

13  Q.   As opposed to what?

14  A.   32.5.

15  Q.   Which was provided by whom?

16  A.   Morgan Stanley Fund Services.

17  Q.   OK.  So what, if anything, did the investment team have to

18  give you in order to override the prices that Morgan Stanley

19  Fund Services had provided?

20  A.   A broker quote, or if we had traded that specific security

21  either on the day or good for a day before month end, we were

22  able to use that for valuation purposes.

23  Q.   OK.  And how many broker quotes were you required to get

24  from the credit team for month-end valuation?

25  A.   One.

1    Q.   OK.   So what were these broker quotes supposed to

2    represent, as far as you understood?

3    A.   A price at which a broker is willing to buy or sell that

4    specific security.

5             MR. WILLIAMS:   If we could pull up Government Exhibit

6    656 and zoom in on the bottom.

7    Q.   So, Mr. Jain, this is a broker quote from Jonathan Brook

8    from Janney Montgomery.   Can you read the line underneath the

9    first line.

10            Yes, if you just highlight that.

11   A.   "These are the levels we are seeing."

12   Q.   Mr. Jain, what did you understand that to mean?

13   A.   That based upon the broker's analysis or talking to other

14   people maybe that trade that specific security or those

15   specifics securities in this case, that they are willing to buy

16   or sell at those levels.

17   Q.   You mentioned based on the broker's own analysis.   What

18   kind of analysis would you expect that to be?

19            MR. CREIZMAN:   Objection.   Foundation.

20            THE COURT:   Sustained.

21            MR. WILLIAMS:   If we can pull up Government Exhibit

22   658, and if we can zoom in on just the body of the quote.

23   Q.   Mr. Jain, who is this broker quote from?

24   A.   Scott Vandersnow of Princeridge Holdings.

25   Q.   And who is this to?

H1hdlum2                         Jain - direct

1   A.  Stefan Lumiere.

2   Q.  And what security is or what securities is Mr. Vandersnow

3   providing prices for?

4   A.  ATI seniors and supplements.

5   Q.  And what did you understand this document to represent?

6   A.  It is a broker quote that we would be using for valuation

7   purposes.

8   Q.  OK.  And how would you typically receive these broker

9   quotes from the investment team?

10  A.  Either I would be getting a printout of the actual broker

11  quote, they could forward me the broker quote, or when the

12  broker is sending it, they could also cc me, if that's what the

13  credit team asked them to do.

14  Q.  Who would you typically receive these quotes from?

15  A.  From the credit team.

16  Q.  Who specifically on the credit team?

17  A.  Either Chris Plaford, Jason Thorell or Stefan Lumiere.

18  Q.  All right.  So are there any other forms of documentation

19  other than broker quotes that were acceptable in order to

20  override a price?

21  A.  Yes.

22  Q.  Can you tell the jury what those were?

23  A.  If we traded in that specific security either on the day or

24  a day prior to month end, a price from Morgan Stanley Fund

25  Services, which is either from Reuters IDC market third-party

H1hdlum2                       Jain - direct

1    vendors or a valuation agent like BRC, who independently valued

2    upon asked -- when you asked them, they will value a security.

3    Q.  So what, if anything, do broker quotes, last trade price or

4    BRC models have in common?

5    A.  They're independent to the portfolio manager.

6    Q.  All right.  If we can go back to Government Exhibit 204E

7    again and go to the last page.  Actually, we can go back to

8    the -- we can stop here.

9         So, Mr. Jain, you testified that the yellow highlights

10   mean that those are overrides.  What if these columns or rows

11   are not highlighted, what does that mean?

12   A.  That the credit team wanted to use a price provided by

13   Morgan Stanley Fund Services.

14        MR. WILLIAMS:  OK.  If we could pull up Government

15   Exhibit 743 now and go to the second page.  Zoom in at the very

16   top for "ATI Senior."

17   Q.  And so, Mr. Jain, there is a new column on the right that

18   says, "Use Vizeum's price."  Who wrote that?

19   A.  I did.

20   Q.  All right.  And so the price that Vizeum is using is what?

21   A.  88.5.

22        MR. WILLIAMS:  OK.  If we can go back to Government

23   Exhibit 658 and go to page 8.

24   Q.  So, Mr. Jain, what price does Scott Vandersnow from

25   Princeridge provide for ATI 1st?

H1hdlum2                          Jain - direct

1    A.  88.5.

2    Q.  And how do you know it is 88.5?

3    A.  It would be the average of the two, the bid and the ask.

4    So 85 plus 92 divided by 2.

5    Q.  Is what?

6    A.  88.5.

7    Q.  OK.  Mr. Jain, you testified that you worked at Vizeum for

8    approximately six years.  How long were you involved in the

9    valuation process for the credit fund?

10   A.  For the time being that I was there.  I think it was more

11   from April or May of 2009 until I left.

12   Q.  And over the course of your work on valuation, did you

13   notice whether any securities were commonly overridden by the

14   investment team?

15   A.  Yes.

16   Q.  Which securities?

17   A.  ATI, C-Med, Sevan, ATI, US On, Nebraska Brook, North

18   Atlantic Trading Corp., Washington Mutual, Savient (SVNT).

19   Those are some of the ones that actually come to mind right

20   now.

21   Q.  Did you notice whether any brokers in particular were

22   providing prices for those securities that you just listed?

23   A.  Yes.

24   Q.  Which brokers?

25   A.  Janney Montgomery and Princeridge would show up more often

H1hdlum2                        Jain - direct

1   than the others.

2   Q.  Have you heard of Janney Montgomery or Princeridge before

3   you started working at Vizeum?

4   A.  No.

5   Q.  Mr. Jain, are you familiar with the valuation committee?

6   A.  Yes.

7   Q.  And what was the valuation committee?

8   A.  Their job was to value Level 3 or harder value securities

9   that the fund actually held.

10  Q.  And as far as you can tell in the process that you have

11  just described to the jury, what role did the valuation

12  committee play in the month-end valuation process?

13  A.  They would decide on the prices, if that was needed.  But I

14  wasn't part of the valuation committee so I can't say what

15  actually went on in there.

16  Q.  Did you notice them ever stepping into the process that you

17  just described?

18  A.  No.

19  Q.  Did you ever speak to anyone on the valuation committee

20  about the patterns that you noticed?

21  A.  No.

22          MR. CREIZMAN:  Objection.  Hearsay.

23          THE COURT:  Well, no, the answer was "no."  So there

24  is no hearsay.  Overruled.

25          MR. CREIZMAN:  I didn't hear it.

H1hdlum2                         Jain - cross

1    BY MR. WILLIAMS:

2    Q.  Did you speak to anyone at Vizeum about the patterns that

3    you noticed?

4    A.  No.

5              MR. WILLIAMS:  I have no further questions?

6              THE COURT:  Cross-examination.

7    CROSS-EXAMINATION

8    BY MR. CREIZMAN:

9    Q.  Good morning.

10   A.  Hello.

11   Q.  The credit group at Vizeum dealt in illiquid securities, is

12   that correct?

13   A.  You said illiquid securities?

14   Q.  Illiquid.

15   A.  Yes.  Some of them were illiquid, not all.

16   Q.  An some of them were illiquid.  "Illiquid securities" is

17   another way of saying securities that are not traded that

18   often, is that correct?

19   A.  Correct.

20   Q.  And the credit group dealt in distressed debt at least in

21   some of its portfolio?

22   A.  Yes.

23   Q.  And examples of distressed debt would include some of the

24   securities you identified earlier -- Savient, correct?

25   A.  Yes.

H1hdlum2                          Jain - cross

1    Q.   Sevan Marine?

2    A.   Yes.

3    Q.   ATI?

4    A.   Yes.

5    Q.   Nebraska Book?

6    A.   Yes.

7    Q.   Now, when securities are illiquid, the market price is not

8    always clear, is it?

9              MR. WILLIAMS:   Objection.

10             THE COURT:   Sustained as to form.

11   BY MR. CREIZMAN:

12   Q.   Illiquid securities are not generally sold on an exchange,

13   correct?

14   A.   Correct.

15   Q.   Like the New York Stock Exchange, correct?

16   A.   Yes.

17   Q.   And, therefore, the price sometimes of a particular

18   illiquid security is not always clear, correct?

19   A.   Sometimes, correct.

20   Q.   And in those times, a -- so, now -- I'm sorry.  For those

21   illiquid securities, there are subscription services that

22   provide price analysis for illiquid securities, is that

23   correct?

24   A.   There could be.  I mean, I'm not aware of any.

25   Q.   What about Reuters?

H1hdlum2                      Jain - cross

1   A.  Yes.  If that's what you mean, yes.

2   Q.  Yes.  Sorry.

3         And Bloomberg is another example of a subscription

4   service that provides price analysis, correct?

5   A.  Yes.

6   Q.  And one -- a fund would have to pay for that service in

7   order to get that pricing analysis, is that right?

8   A.  Correct.

9   Q.  And at the beginning of each month, the pricing that would

10  be assigned to the securities in the credit fund were from one

11  of those kinds of subscription services, correct?

12  A.  Can you repeat that question again?

13  Q.  At the beginning of the month --

14  A.  Yes.

15  Q.  -- when you created the initial report, you talked about a

16  report that you gave to the credit fund, correct?

17  A.  Yes.

18  Q.  That initial report would have a list of the securities in

19  the portfolio, right?

20  A.  Yes.

21  Q.  And there would be prices assigned to each of those

22  securities, is that right?

23  A.  Generally, yes, there were some securities they were not

24  able to find prices for.  So, there was a price not available.

25  Q.  OK.  And so for the securities that had prices and for the

H1hdlum2                          Jain - cross

1    securities that didn't have prices, they were based on what

2    prices or nonprices came from the subscription services,

3    correct?

4    A.  Yes.

5    Q.  And sometimes the portfolio manager in a credit fund -- in

6    the credit fund did disagree with some of the prices assigned

7    by the subscription service, correct?

8    A.  Yes, they did.

9    Q.  OK.  And that was -- according to Vizeum policies, as you

10   understood them, that was perfectly acceptable, correct?

11             MR. WILLIAMS:  Objection.

12             THE COURT:  Ground?

13             MR. WILLIAMS:  As to form.

14             THE COURT:  No.  If the objection is to form, it is

15   overruled.

16             MR. WILLIAMS:  And on foundation.

17             THE COURT:  Sustained as to foundation.

18   BY MR. CREIZMAN:

19   Q.  You worked at Vizeum for six years, right?

20   A.  Yes.

21   Q.  And your role at Vizeum was in operations, is that correct?

22   A.  Correct.

23   Q.  And that role -- one of those roles that you had in

24   operations was basically liaising between operations and

25   accounting and the various portfolios, correct?

H1hdlum2                          Jain - cross

```
1   A.  Correct.

2   Q.  And you had an understanding of the various policies and

3   procedures relating to obtaining pricing of securities --

4            THE COURT:  The reason for the original form

5   objection, which I overruled because I thought it was not -- we

6   should move things along but is the word "policies," which

7   suggests something more formal than may have been involved

8   here.  If you want to talk about practices or procedures, that

9   would be fine.

10           MR. CREIZMAN:  OK.

11  BY MR. CREIZMAN:

12  Q.  Now, you are familiar with the practices and procedures at

13  Vizeum?

14  A.  Yes.

15  Q.  With respect to the pricing of securities?

16  A.  Yes.

17  Q.  And under the practices and procedures of Vizeum, it was

18  acceptable for a fund manager in certain circumstances to

19  override the price quoted by the subscription service, correct?

20  A.  Yes.

21  Q.  And in those circumstances, the portfolio manager would

22  need some kind of backup, is that right?

23  A.  Correct.

24  Q.  And the fact that a fund manager disputed a price provided

25  by a subscription service in and of itself was not a problem;
```

1  or, I'm sorry, a violation of Vizeum's practices and

2  procedures, correct?

3  A.  Correct.

4  Q.  Now, in terms of broker quotes, I want to ask you some

5  questions about the broker quotes.  Do you understand?

6  A.  Sure.

7  Q.  OK.  Now, the members of the credit fund would get broker

8  quotes often to support the overrides of the subscription

9  service prices, correct?

10  A.  Yes.

11  Q.  And those two firms were smaller firms, correct?

12  A.  Yes.

13  Q.  You were asked on direct examination whether you had ever

14  been familiar with the firm Janney before you started Vizeum,

15  correct?

16  A.  Yes.

17  Q.  Or the firm Princeridge before you started Vizeum, correct?

18  A.  Correct.

19  Q.  Vizeum was your first job out of college?

20  A.  No.

21  Q.  What was your first job out of college?

22  A.  I worked at Morgan Stanley for two years.

23  Q.  For two years, OK.  And in what capacity?

24  A.  Operations.

25  Q.  In operations.  And did you deal with credit funds?

H1hdlum2                              Jain - cross

1    A.  No.

2    Q.  So in certain circumstances, it may be that large funds

3    don't deal in illiquid securities, is that correct?

4    A.  Can you repeat --

5              MR. WILLIAMS:  Objection to form.

6              THE COURT:  Sustained.

7    Q.  In your experience as in operations for your two years at

8    Morgan -- I'm sorry, for your six years at Vizeum, were you

9    aware as to whether large firms like UBS dealt with illiquid

10   securities?

11   A.  I don't know if they did or did not.

12   Q.  Sometimes smaller firms could deal with those securities

13   just as easily?

14             MR. WILLIAMS:  Objection.

15             THE COURT:  Sustained.

16   BY MR. CREIZMAN:

17   Q.  Certain smaller firms -- in your experience, were you aware

18   whether certain smaller firms specialized in the area of

19   illiquid securities?

20   A.  Did I know that personally?

21   Q.  Did you know that personally?

22   A.  I mean my experience with credit wasn't -- I'm sorry, I

23   can't say if there were firms that specialized in this.  It

24   could be that they did.

25             THE COURT:  So the answer is you don't know?

H1hdlum2                          Jain - cross

1           THE WITNESS:  Yes.

2    Q.  You don't know.  Now, when you passed on the quotes from

3    Janney and the quotes from Princeridge to operations, did

4    anyone ever tell you that go find some other place to get

5    quotes from?

6    A.  I was in the operations so I'm kind of confused.

7    Q.  Who did you pass the quotes to?

8    A.  I received the quotes from the credit team.  We used those

9    prices for month end, passed it off to the Morgan Stanley Fund

10   Services.

11   Q.  So everyone in operations who you worked with in terms of

12   pricing the securities in the credit fund saw where the broker

13   quotes came from, correct?

14           MR. WILLIAMS:  Objection.

15           THE COURT:  Sustained.

16   Q.  You worked with some other people in operations?

17   A.  Yes.

18   Q.  Josh Rozenberg would be one of them?

19   A.  I believe he was in accounting, not in operations.

20   Q.  OK.  Who did you report to?  Steve Ku, is that who you

21   reported to?

22   A.  I reported to -- when I started, I reported to Steven

23   Gilson.  Once he left the firm -- well, he moved on to a

24   different role in the firm, and from then on I reported to Alan

25   Greenbaum, but ultimately we all reported to Steve Ku.

H1hdlum2                         Jain - cross

1    Q.   Did Alan Gilson -- I'm sorry.  Did Steve Gilson look at

2    the -- was Steve Gilson made aware of where the quotes were

3    coming from?

4    A.   Can you clarify that?  I'm not sure what you are trying to

5    say here.

6    Q.   Were you the only person in operations who saw that the

7    quotes were coming from Janney and Princeridge?

8    A.   No.  They were saved in a shared folder on a shared drive,

9    so the operations team and the accounting team had access to

10   it.  And since it was also sent to Morgan Stanley Fund Services

11   as backup, they had access to that as well, and the group was

12   cc'ed on the emails.

13   Q.   So there was no -- so each one of the -- the broker quotes

14   that were obtained from Janney and Princeridge were distributed

15   to the appropriate parties at Vizeum, correct, in terms of

16   accounting and operations, is that right?

17   A.   I mean, you are asking if I sent them to them personally?

18   Q.   No.  Did you know whether they were distributed to those --

19   to the relevant people in those groups?

20   A.   I mean they were shared on a shared folder on a drive so

21   they had access to it.  I did not send it to every single

22   person.

23   Q.   After you sent it out, there was a process that went

24   further, though, correct?

25   A.   Can you repeat that again?

H1hdlum2                         Jain - cross

1   Q.  Accounting would take a look at the quotes; is that fair to
2   say?
3   A.  I can't speak to that.  I am not sure what else they did
4   after we provide the quotes.
5   Q.  Right.  You don't know what happened after you provided the
6   quotes?
7   A.  Yes.
8   Q.  OK.  Fair enough.
9           You don't know -- now, at the end of the month, were
10  you aware whether Morgan Stanley Fund Services sent any
11  statement to investors about the value of the securities in the
12  fund, the credit fund?
13  A.  I know investors received a P&L statement, but I'm not sure
14  if they received a line-by-line, position-by-position and the
15  price that was used.
16  Q.  To your knowledge, was Chris Plaford an investor in the
17  credit fund?
18  A.  Yes, he was.
19  Q.  To your knowledge, was Stefan Lumiere an investor in the
20  credit fund?
21  A.  Not that I know of.
22          MR. CREIZMAN:  No further questions.
23          THE COURT:  Redirect.
24          MR. WILLIAMS:  No redirect, your Honor.
25          THE COURT:  Thank you very much.  You may step down.

580

H1hdlum2

1                    (Witness excused)

2                    THE COURT:  Counsel, come to the sidebar.

3                    (At the sidebar)

4                    THE COURT:  So who is next, so to speak?

5                    MR. NAFTALIS:  Your Honor, ideally we would like to

6      call Doneth Thomas, who is a very quick witness.

7                    THE COURT:  Yes, but we have issues to discuss?

8                    MR. McGINLEY:  So if your Honor prefers, we can call

9      Chris Plaford.

10                   THE COURT:  Well, there are issues to discuss about

11     him.

12                   So let's deal with Mr. Thomas first.  What is he going

13     to testify to?

14                   MR. McGINLEY:  Ms. Thomas is at Morgan Stanley --

15                   THE COURT:  I'm sorry.  What is she going to testify

16     to?

17                   MR. McGINLEY:  She is going to testify to their role

18     in calculating the NAV for the credit fund.  She is going to

19     testify to reports that they sent to investors.  She is going

20     to testify to --

21                   THE COURT:  Whoa.  Reports that they sent to investors

22     saying what?

23                   MR. McGINLEY:  On the credit fund's behalf about the

24     performance.  Just to back up, Morgan Stanley received the fund

25     administrator for the Vizeum Credit Fund.

H1hdlum2

| | |
|---|---|
| 1 | THE COURT:  All right.  Anything else? |
| 2 | MR. McGINLEY:  Yes, the disparity in prices between |
| 3 | what they were getting from the public feed, which Mr. Jain |
| 4 | just testified to the prices that Vizeum was providing. |
| 5 | THE COURT:  OK.  So now let me hear from defense |
| 6 | counsel.  What are the objections? |
| 7 | MS. MADRIGAL:  Your Honor, in terms of the witness, it |
| 8 | seems that the witness would now characterize her review of |
| 9 | those records and the pricing disparities as extremely |
| 10 | aggressive.  We believe that that's obviously a little bit of a |
| 11 | 403 issue. |
| 12 | THE COURT:  Oh, no.  I'm sorry.  I thought that it was |
| 13 | something other than a 403 issue.  If that is the issue, the |
| 14 | objection is overruled.  So, we can call her. |
| 15 | MR. CREIZMAN:  There is one other issue. |
| 16 | MS. MADRIGAL:  Sorry.  There is an additional issue on |
| 17 | the conversation that the government is going to try to elicit |
| 18 | between the witness and Mark Gottlieb, from Vizeum, where |
| 19 | Morgan Stanley approaches Mr. Gottlieb, if I am understanding |
| 20 | correctly, to indicate that they would like to start requesting |
| 21 | additional broker quotes.  Instead of one broker quote, three |
| 22 | broker quotes.  And Mr. Gottlieb responds, in sum and |
| 23 | substance, that that's not necessary, and that the sources of |
| 24 | the quotes doesn't matter even if they are coming from "crappy |
| 25 | brokers." |

H1hdlum2

1          THE COURT:  So what is the relevance of it?  Let me

2    actual start with how do you overcome the hearsay objection?

3          MR. McGINLEY:  It is not offered for the truth, your

4    Honor.

5          THE COURT:  It is not offered for the truth?

6          MR. McGINLEY:  What happened, your Honor, just to give

7    a little more context -- Ms. Madrigal is not misrepresenting

8    anything, just to give you the full picture.  The investor

9    complained to Morgan Stanley, an investor complained and said

10   what's going on with these broker quotes.  Doneth Thomas, the

11   witness, called Mark Gottlieb and said investors want more

12   transparency on the broker quotes.  He says it doesn't matter

13   and they don't deserve to know anything about it, whether or

14   not the brokers are crappy or not.

15         THE COURT:  So why isn't it being offered for its

16   truth?

17         MR. McGINLEY:  It is being offered for what Morgan

18   Stanley did after that conversation.  It then required three

19   broker quotes from Vizeum rather than two.

20         THE COURT:  I think, without getting into that

21   conversation, which even it sounds to me that the jury would

22   have difficulty not taking it for its truth notwithstanding

23   your disclaimer, moreover, I think it would be a 403 problem,

24   but you can bring out that he had a conversation, period.  Yes,

25   did you have a conversation?  What happened after that?  And

H1hdlum2

1    then you can go into what was said, what happened after that.

2              MR. CREIZMAN:  One additional issue.

3              THE COURT:  Yes.

4              MR. CREIZMAN:  On 403, which is that there are in the

5    3500 material -- and I know the government is not planning on

6    bringing in the actual exhibits, but there are internal

7    concerns back and forth that are expressed between people in

8    the Morgan Stanley Fund Services where they are saying the

9    prices are extraordinarily aggressive, the most aggressive of

10   anyone I've ever seen.

11             THE COURT:  Yes.  So what you are saying is you don't

12   want him saying that?

13             MR. CREIZMAN:  I would rather not.

14             THE COURT:  So it sounds like opinion evidence to me.

15             MR. CREIZMAN:  Yes.

16             THE COURT:  So it would be admissible in any event.

17             MR. McGINLEY:  Well, your Honor, that is not the

18   anticipated testimony.  Ms. Thomas is going to say at some

19   point there were concerns about the disparity.

20             THE COURT:  Yes.

21             MR. McGINLEY:  That's all she is going to say.

22             THE COURT:  I am going to rule that that is

23   permissible.

24                  (Continued on next page)

25

H1hdlum2

1              (In open court)

2              THE COURT:  Please call your next witness.

3              MR. NAFTALIS:  Yes, your Honor.  The government calls

4    Doneth Thomas.

5     DONETH THOMAS,

6         called as a witness by the government,

7         having been duly sworn, testified as follows:

8              THE CLERK:  Please be seated.

9              State your name and spell it slowly for the record.

10             THE WITNESS:  Doneth Thomas, D-o-n-e-t-h T-h-o-m-a-s.

11             THE COURT:  Counsel.

12             MR. McGINLEY:  Your Honor, before I inquire, may I

13   offer a few exhibits?

14             THE COURT:  Yes.

15             MR. McGINLEY:  And I believe these are without

16   objection.

17             Government Exhibits 768 and 769, Government Exhibits

18   302 through 349, Government Exhibits 405 through 413,

19   Government Exhibits 415 through 416, Government Exhibits 417

20   through 438, Government Exhibit 440, Government Exhibits 441

21   through 461, and Government Exhibits 468 through 470.

22             THE COURT:  There is no objection.  Those are

23   received.

24             MS. MADRIGAL:  No objection.

25             THE COURT:  Received.

1              (Government's Exhibits 768, 769, 302-349, 405-413,

2     415, 416, 417-438, 440, 441-461 and 468-470 received in

3     evidence)

4              MR. McGINLEY:  And, your Honor, the government won't

5     read it but there is an authenticity stip accompanying these

6     documents.  It is Government Exhibit 1404, and the government

7     offers that.

8              THE COURT:  Received.

9              (Government's Exhibit 1404 received in evidence)

10    DIRECT EXAMINATION

11    BY MR. McGINLEY:

12    Q.   Good morning, Ms. Thomas.

13    A.   Good morning.

14    Q.   Where do you work?

15    A.   I work for Morgan Stanley Fund Services.

16    Q.   And just briefly, what is Morgan Stanley Fund Services?

17    A.   Morgan Stanley fund services is a fund administration.

18    Q.   And in very general terms, what is fund administration?

19    A.   A fund administration is a company that provides services

20    in support of a hedge fund running its business.

21    Q.   What are some of the types of services you provide?

22    A.   Some of the services include accounting services, which

23    includes calculation of the funds' net asset value, investors

24    supporting services and reporting, as well as regulatory

25    reporting and tax reporting services.

H1hdlum2                          Thomas - direct

1   Q.   And, Ms. Thomas, how long have you been at Morgan Stanley

2   Fund Services?

3   A.   Since September of 2009.

4   Q.   What is your current title?

5   A.   I'm a senior manager.

6   Q.   As a senior manager at Morgan Stanley Fund Services, what

7   do you do?

8   A.   I manage a team of accountants, and I am responsible for

9   the relationship with my clients and also monitoring and

10  ensuring that all deliverables are met.

11  Q.   What is your educational background?

12  A.   I am a -- I have a bachelor's degree in accountancy from

13  Vanderbilt College and I have -- I am a licensed New York State

14  CPA.

15  Q.   Where did you work before you began working at Morgan

16  Stanley Fund Services?

17  A.   Prior to joining Morgan Stanley Fund Services, I worked for

18  Richard A. Eisner & Company, and from 1992 until 2003, when I

19  joined Ernst & Young in their audit practice, and I left Ernst

20  & Young in 2009 and then I joined Morgan Stanley in 2009.

21  Q.   Now, Ms. Thomas, you mentioned some of the services you

22  provide to hedge funds.  Do you also assist them in calculating

23  the valuations of their securities?

24  A.   We are -- our process is to value the securities based on

25  the client's valuation policy as described in the fund's

H1hdlum2                          Thomas - direct

1    documents.  We're not valuation agents.  So based on the

2    policies that were outlined in the fund's documents, we source

3    the prices independently.

4    Q.  Fair to say you are more of a calculations group?

5    A.  We're a calculation agent, not a valuation agent.

6    Q.  Are you familiar with Level 1, 2 and 3 securities?

7    A.  Yes.

8    Q.  Just very generally, what are they?

9    A.  So Level 1 securities are basically securities that are

10   traded, generally exchange traded securities, that are not --

11   the prices are not adjusted.  Level 2 securities are securities

12   that can be priced based on a quote or can be priced using a

13   model, which -- or for which the inputs are observable.  Level

14   3 securities are general securities that are not observable and

15   requires management estimates in determining the valuation.

16   Q.  Now, you mentioned "quotes."  Just briefly, what kind of

17   quotes do you mean?

18   A.  Quotes are typically meaning broker quotes.

19   Q.  And in the case of broker quotes, when you are assisting a

20   hedge fund in calculating the value of their securities, whose

21   job is it to get the broker quotes?

22   A.  The manager usually sources the broker quotes.

23   Q.  When you say manager, do you mean the hedge fund?

24   A.  The hedge fund's manager.

25   Q.  Is it Morgan Stanley's practice to then verify these

H1hdlum2                         Thomas - direct

1    quotes?

2    A.   Morgan Stanley is not required to -- as part of our

3    standard agreement with the fund, is not required to

4    independently verify the quotes.

5    Q.   Do you expect the broker to be familiar with the security

6    he or she is quoting?

7    A.   Yes.

8    Q.   Now, you mentioned, I believe, that you also prepare

9    reports for investors of the hedge fund?

10   A.   Yes.

11   Q.   Do I have that right?

12        What are some of the reports that you prepare to the

13   hedge fund's investors?

14   A.   We prepare an investor statement, which basically shows

15   their value -- the value of their investment in the fund.  And

16   we also prepare a report, which is called a stratum report,

17   which shows the percentage of the fund's assets and liabilities

18   that are confirmed independently by Morgan Stanley, as well as

19   the price input that we're able to confirm independently of the

20   manager, as well as the ASC 820 levels, Level 1, 2 and 3, which

21   we discussed earlier, and the counterparty exposure.

22   Q.   OK.  We'll get to some of those concepts.  But just for now

23   when you say prices Morgan Stanley confirmed independently,

24   what do you mean by that?

25   A.   Meaning to the extent that we were able to obtain a price

1   directly, whether it's from an exchange or from a pricing

2   service, or if it's a broker quote, if it was received directly

3   by Morgan Stanley Fund Services, that is considered

4   independently received.

5   Q.  And do you also assist hedge funds in calculating their net

6   asset value?

7   A.  Yes.

8   Q.  And what is net asset value?

9   A.  Net asset value is basically the value that investors would

10  look at to determine what their -- the worth of their

11  investment is in the fund.

12  Q.  Turning to the Vizeum Credit Fund, did it have an account

13  with Morgan Stanley Fund Services?

14  A.  Yes.

15  Q.  When did Vizeum begin using your services?

16  A.  Vizeum -- I joined Fund Services in 2009, and I believe

17  Vizeum was a client before I joined so I'm not sure of the

18  exact date.

19  Q.  Did you work on the Vizeum Credit Fund account?

20  A.  Yes, I did.

21  Q.  What was your general role?

22  A.  My role was as a senior manager, and I had a team that

23  worked on the Vizeum relationship.  So my role was as a

24  relationship manager.

25  Q.  Now, speaking generally, what were the types of services

1    you provided to Vizeum's credit fund?

2    A.  So we were responsible for calculating the net asset value

3    on a monthly basis.  We were also engaged to distribute the

4    stratum report to the investors on a monthly basis.  And we

5    also provided some additional services that they subscribed to

6    such as support for regulatory reporting.

7           MR. McGINLEY:  Can we please publish Government

8    Exhibit 768.

9    Q.  And, Ms. Thomas, that should be up on your screen.  You

10   also have hard copies before you.  That may be easier.

11          And, Ms. Pyun, if you could just highlight the first

12   two paragraphs.

13          Now, Ms. Thomas, who is this agreement between?

14   A.  This agreement is between Morgan Stanley Fund Services and

15   Vizeum Credit Opportunities Offshore Fund and Vizeum Credit

16   Master Fund Ltd.

17          MR. McGINLEY:  And, Ms. Pyun, if you could please go

18   to page 3.  And if you could highlight.

19   Q.  Now, Ms. Thomas in this area, this describes the duties of

20   the fund, is that right?

21   A.  Yes.

22   Q.  And the fund here is the Vizeum Credit Fund?

23   A.  Yes.

24   Q.  Do you see that one of the duties includes "Provide the

25   administrator with the principles that the administrator shall

H1hdlum2                          Thomas - direct

1  use to compute the net asset value of the fund"?

2  A.  Yes.

3  Q.  "In addition to providing the administrator with the

4  valuations directly from the investment advisor" --

5  A.  Yes.

6  Q.  -- "valuation principles."

7          So, who is responsible for the valuation principles

8  and inputs?

9  A.  The investment advisor.

10  Q.  And the investment advisor is Vizeum?

11  A.  Yes.

12          MR. McGINLEY:  Ms. Pyun, if we could please go to page

13  33.

14  Q.  Now, Ms. Thomas, these are the general valuation

15  principles, is that right?

16  A.  Yes.

17          MR. McGINLEY:  And, Ms. Pyun, if you could please

18  highlight the last paragraph.

19  Q.  Now, this speaks of all other assets, meaning the assets

20  not on exchange traded markets.  And do you see, it says, "All

21  other assets of the funds would be valued in the manner

22  determined by the investment manager, in consultation with the

23  directors of the funds, to reflect their fair market value."

24  A.  Yes.

25  Q.  And "investment manager," is that a particular person or

H1hdlum2                         Thomas - direct

1   the Vizeum Credit Fund?

2   A.   It's an entity that's charged with making investment

3   decisions on behalf of the fund.

4            MR. McGINLEY:   Thank you, Ms. Pyun.  You can take that

5   down.

6   Q.   Now, Ms. Thomas, on a very high level, how did the

7   valuation process work each month?

8   A.   So on a monthly basis, the Vizeum team would provide us --

9   well, let me start over.

10           So at the inception of the relationship, the Vizeum

11  team, like all the clients, would provide us with a copy of

12  their valuation policy, and that would be -- the rules would be

13  set up in our system based on the rules that were established

14  in their valuation policy.  And on a monthly basis, to the

15  extent that securities could be priced based on a feed that we

16  are receiving from an exchange, those securities would be

17  priced directly based on the exchange feed or if we're able to

18  get a price from a third-party source directly.

19           Once the prices came in, there were some instances

20  where Vizeum would also go in and override the prices or they

21  would send an email directing someone on the team to use a

22  specific price to price a security.  The team would generate a

23  report.  It was called a pricing exception report.  And that

24  report -- what that report typically shows is it shows the

25  price that Vizeum had signed off on and the ultimate price that

H1hdlum2                          Thomas - direct

1    we were able to get from an alternate third-party source.  And
2    as a result of looking at that report, there were several
3    discussions that were had with Vizeum based on that.
4    Q.  OK.  So just to break that down on a basic level.  The
5    first step that you would do is usually check a pricing source?
6    A.  Yes.
7    Q.  Is that right?
8              And which sources would that generally include?
9    A.  The sources -- there were a few sources that we would use.
10   We would use IDC, for example, Telekurs, Reuters, and I think
11   we also used Loanex, maybe Pricing Direct, and Market Partners.
12   So, a wide cross-section of online sources.
13   Q.  Then would you let Vizeum know those prices?  Do I have
14   that right?
15   A.  So the way that our process worked is that based on the
16   pricing exception report, it was based on -- the differences
17   were shown in different buckets.  So we used a 2 percent
18   threshold.
19   Q.  Let me just pause you there.  We will get to that.  I'm
20   sorry.  I just wanted to make it clear.
21             So once you have the price from the third party, at
22   some point in the process you let Vizeum know this?
23   A.  Yes.
24   Q.  Did they then have the ability to be override that price?
25   A.  Yes.

H1hdlum2                          Thomas - direct

1    Q.   How did they go about doing that?

2    A.   So they would instruct us and let us know they wanted to

3    change the prices.

4    Q.   And what kind of -- for them to override, what kind of

5    documentation would they have to provide?

6    A.   They would be required -- we'd get an email from them

7    stating that they wanted to override the prices.  We always

8    required an email or some form of written confirmation stating

9    that.

10   Q.   Would they have to provide a broker quote?

11   A.   It could be in the form of a broker quote from them as

12   well.

13   Q.   Now, did Vizeum provide broker quotes for the credit fund?

14   A.   Yes.

15   Q.   Do you remember which brokers Vizeum used -- the credit

16   fund used most often?

17   A.   They used a few but I can't remember all of their names,

18   but I know they used Janney Montgomery was one of the brokers

19   they used.

20   Q.   Does the name Princeridge sound familiar?

21   A.   They also used Princeridge, yes.

22   Q.   Had you ever heard of these brokers before?

23   A.   I'm not familiar with the universe of brokers.

24   Q.   And now when you got these broker quotes, I think you

25   talked about this already, but did Morgan Stanley do anything

H1hdlum2                          Thomas - direct

1    then to verify their accuracy?

2    A.  We're not required to verify the accuracy of the broker

3    quotes.

4    Q.  Whose job is that under the agreement?

5    A.  The investment manager is required to verify the accuracy

6    of the quotes.

7    Q.  And the investment manager in this case?

8    A.  Is Vizeum.

9    Q.  Now, you mentioned these stratum reports that Morgan

10   Stanley sends to investors on behalf of a hedge fund.  Did

11   Vizeum subscribe to that service?

12   A.  Vizeum did subscribe to the service.

13          MR. McGINLEY:  Could we publish Government Exhibit

14   455, please.

15   Q.  Now, Ms. Thomas, what is this document?

16   A.  This is the stratum report which I mentioned before.

17          MR. McGINLEY:  And, Ms. Pyun, if you could just

18   highlight maybe the top half of the document.

19          Thank you.

20   Q.  So, Ms. Thomas, we have this as the stratum report for the

21   Vizeum Credit Fund, is that right?

22   A.  Yes.

23   Q.  And it's November 2012?

24   A.  Yes.

25   Q.  And how often would the stratum reports be sent to

H1hdlum2                         Thomas - direct

1   investors?

2   A.   It was -- I believe in Vizeum's case it was sent monthly

3   but it could also be quarterly.  I can't remember which they

4   did specifically.

5   Q.   And now the top line number there, the first number is the

6   reported fund net asset value.  Do you see that?

7   A.   Yes.

8   Q.   And was that important for investors, in your experience?

9   A.   Yes.

10             MS. MADRIGAL:  Objection.

11             MR. McGINLEY:  Your Honor, I believe there was an

12   objection.

13             THE COURT:  I didn't hear it.  I'm sorry.

14             (Pause)

15             Sustained.

16   BY MR. McGINLEY:

17   Q.   Now, Ms. Thomas, focusing on price input confirmation, do

18   you see that?

19   A.   Yes.

20   Q.   Now, this is November 2012.  Confirmed by MSFS.  That's

21   you, right?

22   A.   Yes.

23   Q.   And almost a hundred percent?

24   A.   Yes.

25   Q.   And, again, what does that mean, confirmed by you?

H1hdlum2                          Thomas – direct

1   A.   It means that MSFS was able to obtain a price from an

2   independent source.

3   Q.   Which would include broker quotes?

4   A.   Which would include broker quotes.

5   Q.   And then the other percentage, .069 percent provided by

6   fund manager?

7   A.   Yes.

8   Q.   What does that mean?

9   A.   It means that Vizeum provided those prices.  We were not

10  able to independently confirm those prices.

11       MR. McGINLEY:   OK.  And if we could just jump down,

12  Ms. Pyun, to the ASC 820 classifications.

13  Q.   Now, Ms. Thomas, what is ASC 820 classifications?

14  A.   ASC 820 is the accounting guidance that proscribes the

15  reporting requirements for the fair value measurement that we

16  talked about earlier, which determines what securities, you

17  know, are classified in Level 1 and Level 2, depending on the

18  pricing inputs that are used.

19  Q.   OK.  And in this case there are no Level 3 assets, is that

20  right?

21  A.   Correct.

22  Q.   Why is there a negative number for Level 1, do you know?

23  A.   I don't know the specifics of this.  I can't remember.

24  Q.   Fair to say that the bulk of the assets are Level 2?

25  A.   Yes.

1            MR. McGINLEY:  Now, Ms. Pyun, could you please publish

2    Government Exhibit 444.  And if you could highlight the top two

3    sections.

4    Q.  So, Ms. Thomas, this is now May 2013, right?

5    A.  Yes.

6    Q.  And do you see under "Price Input Confirmation," provided

7    by fund manager is now 20 percent, about?

8    A.  Yes.

9    Q.  OK.  And if we could move down to the ASC 820.

10           And now in May 2013 there are Level 3 assets; do you

11   see that?

12   A.  Yes.

13   Q.  About 11 percent?

14   A.  Yes.

15           MR. McGINLEY:  Thank you, Ms. Pyun.  You can take that

16   down.

17   Q.  Now, Morgan Stanley Fund Services, did you also prepare

18   investment -- investor statements --

19   A.  Yes, we did.

20   Q.  -- for the credit?

21           OK.  And what is -- what's generally contained in an

22   investment statement?

23   A.  The investment statement typically shows the investor's

24   beginning balance, whatever their income that was allocated to

25   them during the period was, whatever management fees that were

1    charged to their account during the period, and if there were

2    any accrued incentive fees that were charged to them, as well

3    as the return for the period.

4    Q.  And how often would they go out to investors?

5    A.  At the end of each month.

6    Q.  Now, are you familiar with something known as price

7    exception reports?

8    A.  Yes.

9    Q.  What are they?

10   A.  So the price exception report is a report that is part of

11   our month-end process which I had described earlier, and that

12   basically is a report that summarizes the pricing that we --

13   some additional pricing that we do at month end where we try to

14   find an alternate pricing source, and using a 2 percent

15   threshold, we aggregate the price variance.  If there are no

16   price variances that are below 2 percent, then it is bucketed

17   in the no price variance.  And if it is above 2 percent, then

18   it's described as such.  And if -- I forgot the third category.

19   If there are no alternate prices, in other words, we cannot

20   find alternate pricing, then it is also included in that

21   category.

22   Q.  We'll take a look at one so it is not a memory test, but

23   generally what's the comparison being done here?

24   A.  The comparison would be between the prices that were

25   obtained based on the client's pricing rules and ultimate

H1hdlum2                          Thomas - direct

1    pricing source, just for reasonableness purposes.

2    Q.  So Vizeum's prices against independent pricing?

3    A.  Mm-hmm.  Mm-hmm.  It is just a test to see the price that

4    we were getting, that it's reasonable.

5           MR. McGINLEY:  Ms. Pyun, could you please put up

6    Government Exhibit 325.

7           Now, Ms. Thomas, there are a lot of numbers here and

8    piecharts.  We are not going to go into all of that.  But just

9    what is this document?

10   A.  So this is the pricing exception report, which we described

11   before, and it shows the funds.  NAV at the top line, NAV is

12   the fund, NAV.  And below the highlighted section, it also

13   shows the period that's covered, which I believe as of

14   December 31, 2011.  And the piechart just -- it is just a

15   graphical representation of the information that's contained

16   below that shows, you know, the various categories of

17   securities.  For example, you know, based on the NAV, there are

18   some nonsecurity type positions, in other words, those are not

19   investments.  And then there are securities that are no

20   exception, meaning we were able to price the securities using

21   an alternate price within the defined threshold.  And the green

22   section shows alternative pricing, meaning NSF was not able to

23   obtain a price using an independent source.  And then equal to

24   or greater than 2 percent price means that we were able to get

25   a price but it was greater than the 2 percent of threshold that

1    we use.  And then there is a blue section which shows that for

2    a portion of the portfolio there were some securities for which

3    the price variance was greater than 50 basis points of the

4    fund's net asset value.

5    Q.  OK.  So this is the price exception report December 2011

6    for Vizeum, right?

7    A.  Yes.

8              MR. McGINLEY:  OK.  And, Ms. Pyun, if we could please

9    go to page 2.

10   Q.  Now, I do want to focus on one concept here, Ms. Thomas,

11   and that's in the middle there, "Variance equal to or greater

12   than 2 percent having NAV impact 50 basis points or greater."

13   Do you see where I am?

14   A.  Yes.

15   Q.  Let's break that down because it is a mouthful.

16             Now, this is the price comparison of Vizeum's prices

17   against a third-party source?

18   A.  Yes.

19   Q.  Do I have that right?

20             So now variance equal or greater than 2 percent, let's

21   pause there.

22   A.  Mm-hmm.

23   Q.  What does that mean?

24   A.  So it means that the price -- so if you look at the report

25   and you will see where it says "Chosen price of 91" and

1    "Closing price of 70.5," it means that the difference between

2    91 and 70.5 is greater 2 percent, and then the difference

3    between the two numbers is also greater than 50 basis points of

4    the NAV.  So, in other words, it is greater than .50 percent of

5    the NAV.

6    Q.  And we will get to the basis points in one second, but you

7    see here the chosen price, that is the Vizeum price, is that

8    right?

9    A.  Yes.

10   Q.  And the closing price -- and that's 91.  And the closing

11   price is 70 on the NASDAQ, it looks like?

12   A.  Yes.

13   Q.  And it is for -- "security description" says what the

14   security is?

15   A.  Yes.

16   Q.  And that's Nebreska?

17   A.  Yes.

18   Q.  OK.

19                (Continued on next page)

20

21

22

23

24

25

1    Q.  So that's basically saying this price is two percent

2    greater, meaning Visium's price is two percent greater than the

3    NASDAQ price?

4    A.  Yes, more than two percent.

5    Q.  More than two percent, right.  Now, let's just talk about

6    the second concept, having NAV impact 50 basis points or

7    greater.  What does that mean?

8    A.  It means that the difference is also, if you were to take

9    the NAV of 469, which is at the top, 469,617,746.88, times

10   .50 percent, it's greater than that.  As you can see, if you

11   look all the way to the right, percentage impact on NAV is

12   .53 percent, which means it's greater than .50 percent.

13   Q.  So that's the impact this pricing disparity has on the NAV

14   of the fund?

15   A.  Yes.

16   Q.  Now, if we could focus on Page 3?

17           THE COURT:  Counsel, how much more do you have in your

18   direct?

19           MR. McGINLEY:  Probably five minutes.

20           THE COURT:  Okay.  Because we'll take our mid-morning

21   break, then, right after you finish.

22           MR. McGINLEY:  Okay.

23   BY MR. McGINLEY:

24   Q.  So just quickly, Ms. Thomas, this is also part of the price

25   exception report?

1    A.  Yes.

2    Q.  When it says:  No alternative prices, up top there in

3    highlight, what does that mean?

4    A.  It means that we were not able to get a pricing feed

5    directly.  So in these instances, we would typically engage a

6    different team that would go and -- you know, utilizing the

7    various pricing firms that I mentioned before Telekurs,

8    Reuters, IDC, et cetera, to see if they could get, you know, a

9    price from them, and if not, then they would still be

10   considered the alternative price.

11        But to the extent that they are a price override, it

12   means that the manager overrides them; so they would be

13   required to provide supporting documentation from the manager.

14        MR. McGINLEY:  Okay.  Ms. Pyun, if we could please

15   move to Page 8.

16   Q.  And the highlighted section says, Equal to or greater than

17   two percent variance?

18   A.  It means that we were able to obtain a price.  As you can

19   see, in the column where it says Closing Price, we have a price

20   listed, and in the column where it says Exchange Name, this is

21   showing the source of where we're able to get a price

22   independently.  And you can see what the price difference is in

23   the next column over, as well as the -- and the last column

24   shows the percentage impact on that.

25   Q.  Okay.  These reports, they were issued monthly; is that

1    right?

2    A.   These reports were for internal purposes that we use on a

3    monthly basis.

4    Q.   Were there securities that were commonly equal to or

5    greater than the two percent variance?

6    A.   There would typically be -- depending on -- if these were

7    not regularly traded, then they would typically be recurring.

8    The manager held them on a recurring basis.

9    Q.   As to the Visium credit fund, were there names that kept

10   referring?

11   A.   Yes.

12   Q.   Which names, if you remember?

13   A.   I don't remember everyone, but I remember seeing C-Med, and

14   I think there was another one called SVNT that I remember.

15   Q.   What about ATI?

16   A.   ATI also, yes.

17            MR. McGINLEY:  Thank you, Ms. Pyun.  You can take that

18   down.

19            THE COURT:  All right.  So --

20            MR. McGINLEY:  There's just a very little left.

21            THE COURT:  I'm sorry.

22            MR. McGINLEY:  But we can break.  Whatever you want.

23            THE COURT:  No, I thought when you said "thank you,"

24   you were --

25            MR. McGINLEY:  Oh, no, I was talking to Ms. Pyun.

1              THE COURT:  Right.

2      BY MR. McGINLEY:

3      Q.  Now, as part of Morgan Stanley's work on their credit fund,

4      did you ever compare Visium's prices for an asset to the prices

5      of other credit fund clients, meaning other hedge funds?

6      A.  So as part of our -- as part of the month-end process, we

7      had a report called, I think it was, price inconsistency

8      report, and that report -- yes.  So yes, to answer your

9      question.

10     Q.  Okay.  What were your general findings?

11     A.  The general finding was that Visium prices tend to be a

12     little bit higher -- be higher, generally higher, than the

13     other clients.

14     Q.  Now, at some point, did you become aware of concerns about

15     Visium's valuations of the credit fund?

16     A.  So the team that was reviewing the funds on a monthly

17     basis, prior to releasing the NAV, did raise questions.

18     Q.  What were those concerns, as you understood them?

19     A.  The questions were centered around the fact that their

20     valuation tended to be higher.

21              MS. MADRIGAL:  Objection.

22     A.  There was also a question that was raised when they changed

23     from the broker --

24              MS. MADRIGAL:  Your Honor?

25              THE COURT:  -- that we had been getting because no one

H1HPLUM3                         Thomas - Direct

 1   was familiar with them.

 2              MS. MADRIGAL:  Objection.

 3              THE COURT:  Overruled.

 4   BY MR. McGINLEY:

 5   Q.  Okay.  So you mentioned --

 6              THE COURT:  I'm sorry.  What was the objection?

 7              MS. MADRIGAL:  It called for hearsay.

 8              THE COURT:  Well, that was an objection to the entire

 9   question.  It was clearly waived.

10              MS. MADRIGAL:  I did object, your Honor.  I'm sorry,

11   you did not hear me, and I apologize.

12              THE COURT:  You objected at the beginning of the

13   question?

14              MS. MADRIGAL:  I did.

15              THE COURT:  You'll have to speak much louder.  I'm

16   sorry.

17              All right.  We'll give the jury their mid-morning

18   break, and we'll take up that question.  So we'll take a

19   15-minute break at this time.

20              (Jury excused)

21              THE COURT:  Please be seated.  Ms. Thomas, as a result

22   of the conversations that you just testified about, did you do

23   anything?

24              THE WITNESS:  Oh, yes.

25              THE COURT:  What did you do?

1                    THE WITNESS:  So the team, we did --

2                    THE COURT:  No, no.

3                    THE WITNESS:  I'm sorry.

4                    THE COURT:  My question is, did you do anything?

5                    THE WITNESS:  So we had conversations -- I had

6      conversations with the Visium team and my team, and we --

7                    THE COURT:  No, please.  Forget about "we."  After,

8      that what did you do, if anything?

9                    THE WITNESS:  Escalated it internally to my senior

10     manager, performed additional procedures to look at -- to see

11     if we can -- for example, back-testing procedures, which is not

12     something we typically do.

13                   THE COURT:  I don't want to get into the details right

14     now.  But after that, did you do anything?

15                   THE WITNESS:  I'm not sure I understand.

16                   THE COURT:  So you did these further procedures, and

17     they presumably had some results.  What did you find out, if

18     anything?

19                   THE WITNESS:  Oh, based on the fact -- we're not

20     valuation agents --

21                   THE COURT:  I understand that.

22                   THE WITNESS:  We're not valuation agents.  We were

23     relying on third-party sources to get more color on the values

24     that Visium was using.

25                   THE COURT:  Yes, but I'm a very simple-minded judge.

 1    I just want to know what you, Ms. Thomas, did in succession.

 2    So you told me that after the conversations that you just

 3    testified about, you escalated some of the procedures, certain

 4    procedures you directed to be done that you wouldn't normally

 5    do.  Do I have that right?

 6              THE WITNESS:  Yes.

 7              THE COURT:  Then what, if anything, else did you do?

 8              THE WITNESS:  So we shared some of these valuation

 9    results that we got with Visium.

10              THE COURT:  And when you say "we," who?  Do you mean

11    you?

12              THE WITNESS:  Myself and other members of the team had

13    conversations --

14              THE COURT:  The law has a very weird thing called the

15    hearsay rule.  I only want you to testify about what you did.

16              THE WITNESS:  Okay.

17              THE COURT:  Okay.  So you did some other things?

18              THE WITNESS:  I did some other things.

19              THE COURT:  You can go on outside, and I'll discuss

20    all this with counsel.

21              THE WITNESS:  Okay.  Thank you.

22              (Witness temporarily excused)

23              THE COURT:  So first of all, the objections to the

24    last question and answer are overruled because the hearsay is a

25    necessary predicate to what the witness then did, and what she

                  H1HPLUM3                    Thomas - Direct

1    then did is relevant and the jury would not understand why she

2    did what she did if they did not have that predicate; so the

3    objection is overruled.

4           I would ask counsel, I know that all New York lawyers,

5    by nature, are soft-spoken and shy, but if you could speak your

6    objection a little bit louder, it would be helpful to the

7    Court.

8           MS. MADRIGAL:  Of course, your Honor.

9           THE COURT:  Now, is there anything else we need to

10   take up before the break?

11          MR. McGINLEY:  Your Honor, after this witness, and

12   there is literally not much more, our next witness will be

13   Christopher Plaford.  There is the issue that defense counsel

14   raised about the subpoenas.

15          THE COURT:  All right.  We'll get to that in one

16   second.  Let me see if there's anything other than that from

17   defense counsel.

18          MS. MADRIGAL:  There isn't.

19          MR. CREIZMAN:  No, your Honor.

20          THE COURT:  So you've been trying to serve him with a

21   subpoena, and subpoenas for what?

22          MR. CREIZMAN:  The subpoena is for materials relating

23   to a company that Mr. Plaford started after Visium called

24   Claravant and Claravant is sort of a consulting company that

25   advises investment firms about actual --

1              THE COURT:  Okay.  So you were unsuccessful in serving

2       him?

3              MR. CREIZMAN:  Very much so.

4              THE COURT:  What efforts did you make?

5              MR. CREIZMAN:  Well, I had searched -- first of all, I

6       had a private investigator provide me with home addresses,

7       office addresses.  I did my own search on Westlaw for these

8       office addresses.

9              THE COURT:  You knew that the government had him on

10      its witness list, yes?

11             MR. CREIZMAN:  I did know that, yes.

12             THE COURT:  Did you ask the government whether they

13      could help facilitate your service?

14             MR. CREIZMAN:  The answer is only, did I ask them?

15      Only yesterday I asked them and --

16             THE COURT:  That might have been the easy way to --

17      Let me ask.  Is his counsel here?

18             MR. NAFTALIS:  He is, your Honor.

19             THE COURT:  Could he come forward?

20             MR. NAFTALIS:  We're retrieving him.  If I may?

21             THE COURT:  Yes.

22             MR. NAFTALIS:  Just two things.  The government has

23      not seen the subpoena.  My understanding --

24             THE COURT:  Well, we're all going to see it in one

25      second, but let's deal with the service first.

1              MR. NAFTALIS:  I think Mr. Plaford's counsel can best

2      do that.

3              THE COURT:  Yes.

4              Sir, just go up to the microphone and identify

5      yourself for the record, please.

6              MR. SMITH:  Yes.  Good afternoon, your Honor.  David

7      Smith.  I'm counsel for Christopher Plaford.

8              THE COURT:  By the way, just so we all know, is it

9      Plaford or Plaford?

10             MR. SMITH:  It's Plaford.  I always get it wrong.

11             THE COURT:  So defense counsel says he's been trying

12     to serve him with a subpoena and has not had success.  There

13     are two possibilities.  Tell me which you prefer.  One is, you

14     can accept service for him right now.  The other is, while he's

15     on the stand in front of the jury, I would have defense counsel

16     serve him with a subpoena and explain to the jury that this had

17     to be done because he, otherwise, had not made himself

18     available for service of a subpoena.  Which would you prefer?

19             MR. SMITH:  Your Honor, if I may, Mr. Creizman and I

20     had an opportunity --

21             THE COURT:  Which would you prefer, counsel?

22             MR. SMITH:  Your Honor, I'll accept service at this

23     point.

24             THE COURT:  Very good.  Do you want to hand him the

25     subpoena.

1           MR. CREIZMAN:  Yes, I actually e-mailed it to him.

2           THE COURT:  Fine.  Do you have a copy of it?

3           MR. SMITH:  Your Honor, I received a copy of it last

4    night by e-mail.

5           THE COURT:  Okay.  So now, the next question, service

6    now having been accomplished, is are there any objections to

7    the subpoena?  I haven't seen the subpoena.

8           MR. SMITH:  Your Honor, there are numerous objections

9    to it, and first, again, I'm accepting service of it.  This was

10   a subpoena that is addressed and directed towards a company,

11   not to my client.

12          THE COURT:  I'm sorry.  Forgive me.  Can someone

13   breakdown and provide me with a copy of the subpoena.

14          MR. CREIZMAN:  Yes.  May I hand it up?

15          THE COURT:  Yes.  All right.  So this is a subpoena to

16   Claravant, C-l-a-r-a-v-a-n-t, Analytics, Attention:

17   Mr. Plaford.  And let me ask Mr. Plaford's counsel, if you

18   know, what is his relation to Claravant Analytics?

19          MR. SMITH:  He's the majority shareholder.

20          THE COURT:  Okay.  Let me ask defense counsel.  What's

21   the relevance of the -- By the way, is this a New York company?

22          MR. SMITH:  It's a Delaware company.

23          THE COURT:  So you could have served it to the

24   Secretary of State of Delaware, if you otherwise had been

25   unable to serve the company personally, but in any event, so we

H1HPLUM3                          Thomas - Direct

1    have here an attachment A, a request for the capitalization

2    table, the list of shareholders, all executed agreements

3    relating to investments, all executed agreements relating to

4    loans, all loan applications made by Claravant Analytics,

5    records of amounts invested or loaned, all executed agreements

6    and disbursements to any round of financing raised by Claravant

7    Analytics either directly, indirectly or through one of its

8    affiliates, whether by equity transaction debts, convertible

9    debts, subscription agreements or any other vehicle from

10   January 2014 through June 2016, all marketing and presentation

11   materials relating to soliciting capital investment, equity

12   investments or debt investments, the company's operating

13   agreements and records reflecting payments.

14            So I'm surprised, that's ten items, I thought there

15   would be an 11th entitled simply the kitchen sink.  But this is

16   clearly a very substantial and onerous subpoena, which you made

17   insufficient efforts to serve.  You could have asked the

18   government, you could have asked the Court, you did none of the

19   above.  You could have even asked the Court ex parte because

20   that's one of the exceptions permitted by law.  You had asked

21   the Court and the Court had granted each and every request for

22   subpoenas in advance of trial, which I signed, and there were

23   numerous such subpoenas and the records were then directed to

24   your office, but none of that was done with respect to this.

25            So why isn't this, on its face, untimely, overbroad,

1   burdensome and quashable?

2           MR. CREIZMAN:  Well, in terms of the scope of the

3   subpoena, and I spoke with Mr. Smith about this outside, I'm

4   certainly willing to and ready to offer a very limited version

5   of the --

6           THE COURT:  What is it you want?

7           MR. CREIZMAN:  The capitalization table and --

8           THE COURT:  Why, and what's the relevancy of it?

9           MR. CREIZMAN:  The relevance is that based on my

10  investigation of the case and people who I've spoken with, my

11  understanding is that Mr. Plaford raised money for Claravant

12  from investors who had, obviously, no idea that he had been

13  cooperating with the government; that he would use Claravant as

14  a vehicle to basically provide proactive cooperation for the

15  government and that --

16          THE COURT:  Well, I'm not sure he had any obligation

17  to disclose to any investor that he was cooperating with the

18  government, but what do you mean by he was using it as a

19  vehicle?

20          MR. CREIZMAN:  Well, I think that, through Claravant,

21  he reached out to certain people who were involved in the

22  insider trading component of the Visium investigation.

23          THE COURT:  Not relating to your client?

24          MR. CREIZMAN:  Not relating to my client at all.

25          THE COURT:  So what's the relevance?

 1          MR. CREIZMAN:  Well, the relevance is also, I mean,

 2     this is -- he understood, I think, that he was going to plead

 3     guilty at some point to crimes, including insider -- you know,

 4     trading on insider information, mismarking securities while at

 5     Visium.  He raised money from investors, and when he did end up

 6     pleading guilty, these people lost their money.

 7          THE COURT:  Well, all right.  That may or may not be

 8     fertile ground for cross-examination, but we'll take that up

 9     before cross-examination begins.  In terms of, though, the

10     capitalization tables, assuming there is such a thing existing,

11     any problems with turning that over?

12          MR. SMITH:  Your Honor, I'd have to find out if it

13     does exist.

14          THE COURT:  You've already told me, and presumably you

15     can ask him, he is the majority shareholder.  I mean, I'm

16     saying "you" and the record transcript will be confusing.

17          Mr. Plaford's counsel has told me that Mr. Plaford is

18     the majority shareholder in this company.  So you have a basis,

19     obviously, to ask were you the majority shareholder.  What else

20     do you want?

21          MR. CREIZMAN:  Right.  Only the capitalization tables

22     to see how much he raised, when he raised it.  I mean, my

23     interviews with --

24          THE COURT:  Well, my guess is there may not be any

25     such document, other than the one when the company was first

1    formed, which would typically have like a $1, you know, share

2    or something like that, but I don't know.  You could, of

3    course, have sought that, again, from the Secretary of State of

4    the State of Delaware.

5         But assuming you had it right in front of you now,

6    what are the questions you would put to Mr. Plaford about it?

7         MR. CREIZMAN:  Well, first of all, just to address the

8    first point, I mean, based on my interviews with people who

9    were investors in Claravant, there was a capitalization.

10        THE COURT:  I mean, isn't the question you want to

11   put:  How much money, overall, did you raise from investors in

12   Claravant corporation?  Right?

13        MR. CREIZMAN:  Right.

14        THE COURT:  So is your witness, Mr. Smith, in a

15   position to answer that?

16        MR. SMITH:  I can certainly discuss that with him and

17   have him in a position to discuss it on examination.

18        THE COURT:  So then you would only need the record, if

19   there is such a record, if it contradicts what he says.

20        MR. CREIZMAN:  Right.  I mean, it would be

21   preferrable, though, if I could ask:  You raised $200,000 from

22   Mr. X on January 16th; you never told Mr. X that you had

23   committed insider trading, that you were likely to plead

24   guilty, that you were using the company's resources to

25   proactively cooperate with the government, you raised money

1    from these people.  That sort of thing.

2              THE COURT:  I'm not totally sure about some of those

3    questions, but there may be some that are permissible.  I'm not

4    going to rule on that right now.  We'll get to that on cross.

5    I'm just trying to move along.  Well, why don't we do this, how

6    long is the government going to be on direct of Mr. Plaford?

7              MR. McGINLEY:  Probably about four hours, your Honor.

8              THE COURT:  That's what you think.  In any event, we

9    will at least get to lunch break.  So this is it, if you can

10   ask -- your witness will probably be taking the stand in about

11   15, 20 minutes or so -- A. how much money did this company

12   raise overall; and, B, is there a record that reflects that?

13   And then we can go further on that.  All right?  Anything else

14   we need to take up?

15             MR. CREIZMAN:  No.  Thank you.

16             MR. SMITH:  Understood, your Honor.  Thank you.

17             THE COURT:  We'll take five minutes, and then we'll

18   get the witness.

19             The government should consider that four hours is

20   bound to bore the jury, and we don't want to bore the jury; do

21   we?

22             MR. McGINLEY:  No, your Honor.

23             (Recess)

24             THE COURT:  Let's get the witness back on the stand,

25   and let's bring in the jury.

1              MR. McGINLEY:  Your Honor, when we get to the portion

2      of the conversation that I'm not eliciting, may I lead a little

3      bit?

4              THE COURT:  Yes.

5              THE DEPUTY CLERK:  Jury entering the courtroom.

6              (Jury present)

7              THE COURT:  Please be seated.  All right, counsel.

8      Let me tell the jury the objection is overruled.  So please

9      continue.

10             MR. McGINLEY:  Thank you, your Honor.

11     BY MR. McGINLEY:

12     Q.  Now, Ms. Thomas, before we broke, you were saying that

13     there were two concerns, you had an understanding of, with the

14     marking of Visium securities; do you remember that?

15     A.  Can you repeat the question?

16     Q.  You mentioned that there were two concerns.  I believe it

17     was that the values that you were seeing -- your team was

18     seeing and the brokers?

19     A.  Yes, the brokers, correct.

20     Q.  Do you want to describe each just briefly?

21     A.  Yes.  So the team had raised concerns or questions because

22     they noticed that, based on some of our internal procedures

23     that we did, that the marks that were used by Visium tended to

24     be higher than the independent prices that we received.

25             And there was also a change from one broker to the

1    other, and I don't think -- we were not able to -- my team and

2    I did not get an explanation as to why, and I was not familiar

3    with the broker.

4    Q.  Do you remember the broker?

5    A.  I believe it was Janney Montgomery.

6    Q.  Now, Ms. Thomas, we're not going to get into the substance

7    of the conversation that you had with Mark Gottlieb, but you

8    had a conversation with him at some point?

9    A.  Yes, I did.

10   Q.  Now, after that conversation, at some point, did Morgan

11   Stanley begin to require more than two broker quotes?

12   A.  Yes.

13   Q.  What did you then require from Visium?

14   A.  So after the conversation that I had with Mark Gottlieb, we

15   changed our policy from receiving, for Stratum reporting

16   purposes only, not for the NAV purposes, in order for a

17   position to be considered confirmed, we needed to receive a

18   minimum of three broker quotes independently.

19   Q.  Now, Ms. Thomas, at some point, did Morgan Stanley and the

20   Visium Credit Fund terminate their relationship?

21   A.  Yes, we did.

22   Q.  Around when?

23   A.  I don't remember the exact date, but it was somewhere

24   around 2013, 2014.

25            MR. McGINLEY:  Nothing further, your Honor.

1              THE COURT:  Cross-examination?

2              MS. MADRIGAL:  Thank you, your Honor.

3    CROSS-EXAMINATION

4    BY MS. MADRIGAL:

5    Q.  Good morning.

6    A.  Good morning.

7    Q.  You've never spoken with Stefan Lumiere?

8    A.  No, I have not.

9    Q.  And you've never discussed Visium's valuation with

10   Mr. Lumiere?

11   A.  No, I have not.

12   Q.  In fact, you don't know whether Mr. Lumiere ever saw a

13   Stratum report while he was employed at Visium?

14   A.  No, I don't.

15   Q.  Or whether he saw price exception reports while he was

16   employed at Visium?

17   A.  No, I don't.

18              MS. MADRIGAL:  Now, I'd like to put up Government

19   Exhibit 443, Mr. Michaelson, in evidence.

20   Q.  And this is a Stratum report, dated March 31st, 2013.  Can

21   you see that?

22   A.  Yes.

23   Q.  Okay.  Particularly looking at the price input confirmation

24   section -- and just to back up one second.  This Stratum report

25   was sent out to investors monthly, correct?

1    A.  Yes.

2    Q.  Now, the Stratum report in this section disclosed the

3    percentage of the fund that was confirmed by MSSS, correct?

4    A.  Correct.

5    Q.  And that would be the blue portion of the pie chart?

6    A.  Yes.

7    Q.  Okay.  It also disclosed a portion of the prices that were

8    provided by the fund manager?

9    A.  Yes.

10   Q.  And that would be the red portion of the pie chart?

11   A.  Yes.

12   Q.  Okay.  So investors knew, based on receiving this Stratum

13   report every single month, that indeed some valuations were set

14   by Visium?

15   A.  Yes.

16          MS. MADRIGAL:  You can take that down.  Thank you.

17   Q.  Now, the prosecutor asked you some questions about broker

18   quotes on direct; do you remember those questions?

19   A.  Yes.

20   Q.  Okay.  Visium provided Morgan Stanley with broker quotes

21   that came from the same subset of brokers; is that fair to say?

22   A.  Yes.

23   Q.  Okay.  Visium regularly provided backup to Morgan Stanley

24   that showed actual quotes that came from brokers?

25   A.  Yes.

1    Q.  Okay.  You also saw quotes you saw from Princeridge?

2    A.  Yes.

3    Q.  And from Janney Montgomery?

4    A.  Yes.

5    Q.  Fair to say Visium never hid the source of these broker

6    quotes from Morgan Stanley?

7    A.  No.

8    Q.  Okay.  You also mentioned a change from two broker quotes

9    to three broker quotes?

10   A.  From one broker quote to three.

11   Q.  I apologize, from one broker quotes to three broker quotes.

12   And that became a firm-wide Morgan Stanley policy, correct?

13   A.  Yes.

14   Q.  It wasn't specific to Visium?

15   A.  Yes.

16   Q.  Now, they asked you a couple of questions about the values

17   used to compute the NAV?

18   A.  Yes.

19   Q.  Do you understand?

20        Okay.  Now, many of the securities held by Visium in

21   the credit fund were valued according to the standard pricing

22   source; is that fair to say?

23   A.  I don't recall, but I'd say we established the pricing

24   rules based on the fund's valuation policy.  To the extent that

25   the prices were available, yes.

H1HPLUM3                          Thomas - Cross

1   Q.  Okay.  Understood.  But I think we can agree that although

2   there is a standard pricing service, that service isn't always

3   the best source for providing certain securities; isn't that

4   true?

5   A.  I'm not a valuation expert; so we rely on the pricing

6   sources, to the extent the prices were available.

7   Q.  Okay.  So for example, to the extent that the security is

8   not trading often, the price would be stale?

9   A.  Yes.

10  Q.  Or perhaps Visium could have had access to better sources

11  for valuation?

12  A.  Again, I'm not a valuation expert.  Our job is not to

13  attest to the quality of the quotes that we're getting.

14  Q.  Okay.  But without testing the quality, would it be

15  possible for Visium to have information available that wasn't

16  otherwise available to Morgan Stanley?

17  A.  Yes.

18          MR. McGINLEY:  Objection.

19          THE COURT:  Sustained.

20  Q.  Now, in calculating the NAV, Morgan Stanley sometimes had

21  questions about the value assigned by Visium for these

22  securities; is that fair to say?

23  A.  Yes.

24  Q.  And Morgan Stanley actually approached Visium with those

25  questions?

H1HPLUM3                          Thomas - Cross

1    A.  Yes.

2    Q.  And Visium provided responses to those questions?

3    A.  Yes.

4    Q.  In fact, you or someone from your team regularly spoke with

5    Josh Rozenberg from the accounting department at Visium?

6    A.  Yes.

7    Q.  And you also spoke with Kim Tong?

8    A.  Yes.

9    Q.  From the accounting department.  And Allen Greenbaum, the

10   director of operations?

11   A.  Yes.

12   Q.  And they provided supporting documentation?

13   A.  Yes.

14   Q.  Such as valuation committee records?

15   A.  Valuation committee records were generally provided at the

16   end of the year.  It was prepared for the auditors as part of

17   the package and they gave us a copy.

18   Q.  And all of the employees that you spoke with stood behind

19   Visium's valuations?

20          MR. McGINLEY:  Objection, your Honor.

21          THE COURT:  Sustained.

22   Q.  Did anyone that you ever spoke with at Visium express

23   concerns about the valuations?

24          MR. NAFTALIS:  Objection, your Honor.

25          THE COURT:  Sustained.  Hearsay.  It's all hearsay.

H1HPLUM3                        Thomas - Cross

1              MS. MADRIGAL:  Your Honor, if it doesn't require a

2    response --

3              THE COURT:  No, no.

4    BY MS. MADRIGAL:

5    Q.  Visium never refused to answer your questions about

6    valuation concerns; isn't that true?

7    A.  I'm not sure how -- what -- I can't say that they refused.

8    Q.  Whenever someone from the valuation committee, either you

9    or someone from your group -- I'm sorry, whenever someone from

10   Morgan Stanley, either you or someone from your group, went to

11   Visium and asked a question about valuations, was a response

12   always provided?

13             MR. McGINLEY:  Objection, your Honor.

14             THE COURT:  It's clever, but still disguised hearsay.

15   Sustained.

16             MS. MADRIGAL:  No further questions.

17             THE COURT:  Redirect?

18             MR. McGINLEY:  No, your Honor.

19             THE COURT:  Thank you so much.  You may step down.

20             THE WITNESS:  Thank you.

21             (Witness excused)

22             THE COURT:  Please call your next witness.

23             MR. McGINLEY:  The government calls Christopher

24   Plaford.

25    CHRISTOPHER PLAFORD,

1          called as a witness by the Government,

2            having been duly sworn, testified as follows:

3                THE COURT:  Please be seated.  State your full name

4      and spell it for the record.

5                THE WITNESS:  Chris Plaford, C-h-r-i-s, Andrew,

6      A-n-d-r-e-w, Plaford, P-l-a-f-o-r-d.

7                THE COURT:  Counsel.

8                MR. McGINLEY:  Thank you, your Honor.

9      DIRECT EXAMINATION

10     BY MR. McGINLEY:

11     Q.  Good afternoon, Mr. Plaford.  How old are you?

12     A.  39.

13     Q.  And how far did you go in school?

14     A.  Bachelor of Science in finance.

15     Q.  Where did you go to school?

16     A.  Indiana University.

17     Q.  Did you continue studying finance after college?

18     A.  I did.

19     Q.  Have you obtained any professional designations?

20     A.  I had a CFA charter holder.

21     Q.  And what is a CFA, please?

22     A.  Charter financial analyst.

23     Q.  How long did it take you to get a CFA?

24     A.  Roughly three years.

25     Q.  What were the topics you studied?

1    A.   Accounting, finance, economics, statistics.

2    Q.   Do you still have a CFA?

3    A.   No.

4    Q.   Why not?

5    A.   It was revoked as a result of this.

6    Q.   We'll get into the specifics in a little bit, but

7    generally, what types of jobs have you held since graduating

8    college?

9    A.   Mostly work on Wall Street.

10   Q.   Where did you first work after college?

11   A.   Spear, Leeds and Kellogg, which was acquired by Goldman

12   Sachs.

13   Q.   What is Spear, Leeds and Kellogg?

14   A.   It's mostly a trading-oriented firm.

15   Q.   How long did you work there?

16   A.   Roughly two years.

17   Q.   What did you generally do?

18   A.   I worked on the floor of the New York Stock Exchange, the

19   American Stock Exchanged, the DC Capital Markets Group.

20   Q.   Did there come a time when you left?

21   A.   Yes.

22   Q.   Where did you work next?

23   A.   WHW Capital.

24   Q.   And what is WHW Capital?

25   A.   It's a hedge fund.

1    Q.  How long did you work there for?

2    A.  Approximately two years.

3    Q.  What did you do?

4    A.  I was a trader and analyst.

5    Q.  What's the difference between a trader and an analyst?

6    A.  A trader executes trades, and an analyst does research.

7    Q.  Where did you go to work next?

8    A.  Balyasny, B-a-l-y-a-s-n-y, Asset Management.

9    Q.  Is that a hedge fund?

10   A.  Yes.

11   Q.  Referred to as BAM, for short?

12   A.  Correct.

13   Q.  How long did you work at BAM?

14   A.  Visium spun out about two years after I had joined BAM.

15   Q.  Okay.  We'll get to that in a moment.  What do you mean by

16   "spun out"?

17   A.  I worked at Balyasny for approximately two years before

18   Visium was created.

19   Q.  So a group from Balyasny formed Visium?

20   A.  Correct.

21   Q.  What did you do when you were still at Balyasny?  What did

22   you do there?

23   A.  I was a trader and a portfolio manager.

24   Q.  And who were your supervisors there?

25   A.  Dimitri Balyasny and Jake Gottlieb.

H1HPLUM3                          Plaford - Direct

1    Q.   Who was Jake Gottlieb?

2    A.   At the time, he was the broker and manager for the

3    healthcare segment.

4    Q.   Did you work in healthcare at Balyasny?

5    A.   I did.

6    Q.   So when did the group at Balyasny become Visium?

7    A.   Around the end of 2005.

8    Q.   And we'll get into your time at Visium in a minute, but how

9    long did you work at Visium?

10   A.   From the inception, in '05, through the end of 2013.

11   Q.   What positions did you hold at Visium?

12   A.   Portfolio manager, largely.

13   Q.   Were you a portfolio manager of a particular fund?

14   A.   The balance fund and the credit opportunities fund.

15   Q.   And what types of securities did you trade in and analyze?

16   A.   In addition to equities, bonds, loans, convertibles, credit

17   default swaps.

18   Q.   And we talked about bonds and loans, but what is a

19   convertible?

20   A.   It's essentially a bond that can be converted to equity as

21   well.

22   Q.   What is a credit default swap?

23   A.   It's basically insurance against a company defaulting.

24   Q.   When was the credit opportunity fund started?

25   A.   In 2009.

631

1    Q.  At its peak, how much money did the fund manage?

2    A.  Approximately 500 million.

3    Q.  What types of securities did the fund invest in?

4    A.  Mostly credit instruments, bonds, loans, CDS, convertibles.

5    Q.  And what was your role as the portfolio manager of the

6    credit fund?

7    A.  I basically oversaw the investment process.

8    Q.  Were you a compliance officer?

9    A.  No.

10   Q.  Now, as the PM of the credit fund, who did you report to?

11   A.  Jake Gottlieb.

12   Q.  And who is he?

13   A.  He is the chief investment officer and founder of Visium.

14   Q.  Now, just briefly, after you left Visium in 2013, what did

15   you go on to do for work?

16   A.  Mostly consulting.

17   Q.  What kind of consulting?

18   A.  Consulting for healthcare companies.

19   Q.  Now, while you worked at Visium, did you commit crimes?

20   A.  Yes.

21   Q.  And did you understand at the time that they were crimes?

22   A.  Yes.

23   Q.  In general, for now, what were the criminal activities you

24   engaged in while at Visium?

25   A.  Insider trading, mismarking and painting the tape.

1   Q.  Let's talk about each briefly.  What does it mean to

2   mismark?

3   A.  It's essentially valuing a security at an artificially

4   inflated price.

5   Q.  And how would you go about mismarking while at Visium?

6   A.  Mostly through obtaining broker quotes.

7   Q.  Were these real broker quotes?

8   A.  No.

9   Q.  Did you commit the crime of mismarking alone or with other

10  people?

11  A.  Others.

12  Q.  Who?

13  A.  Jason Thorell and Stefan Lumiere.

14  Q.  And when you mismarked the value of these securities, did

15  you know it was illegal?

16  A.  Yes.

17  Q.  And do you recognize anyone in the courtroom today who

18  engaged in the mismarking scheme with you?

19  A.  Yes.

20  Q.  Who?

21  A.  Stefan Lumiere.

22  Q.  Would you please point him out and identify him by an

23  article of clothing?

24  A.  He's wearing the blue, in the middle there.

25          MR. McGINLEY:  Your Honor, may the record reflect?

1                    THE COURT:  Yes.

2    Q.  Now, in the mismarking scheme, what was your role?

3    A.  I helped to create the values and also directed the broker

4    quotes.

5    Q.  What do you mean by directing the broker quotes?

6    A.  Essentially helped to get the broker quotes, which was the

7    documentation, and the values that we were using.

8    Q.  So at times, you would get broker quotes?

9    A.  Yes.

10   Q.  And what was the defendant's role this the mismarking

11   scheme?

12   A.  The same, helping to create the valuation, and also getting

13   the broker quotes on a monthly basis.

14   Q.  When you say helping to create the valuation, do you mean

15   pick the prices?

16   A.  Yes.

17                    (Continued on next page)

18

19

20

21

22

23

24

25

1    Q.   Now, who found the brokers that you got the fraudulent

2    quotes from?

3    A.   Stefan did.

4    Q.   What was Jason Thorell's role?

5    A.   He was the trader.

6    Q.   And, again, what does the trader do?

7    A.   Mostly just execute trades.

8    Q.   Now, you mentioned you also committed the crime of painting

9    the tape.  What is painting the tape?

10   A.   It's essentially trading a security at an artificially

11   inflated price.

12   Q.   And did you do that alone or with other people?

13   A.   With others.

14   Q.   Who?

15   A.   Stefan Lumiere.

16   Q.   For what security did you paint the tape?

17   A.   China Medical.

18   Q.   What is China Medical?

19   A.   It's a Chinese medical device company.

20   Q.   And what was the defendant's role in painting the tape?

21             MR. CREIZMAN:  Objection.

22             Your Honor, can we have a sidebar?

23             THE COURT:  OK.

24             (Continued on next page)

25

1          (At the sidebar)

2          MR. CREIZMAN:  I apologize for interrupting, but the

3    government seems to be portraying painting the tape as a

4    separate crime from the mismarking.  Stefan Lumiere is charged

5    solely with a mismarking scheme.  Painting the tape was one of

6    the means by which he accomplished the mismarking, according to

7    the indictment.  I don't want a constructive amendment of the

8    indictment by saying that he is not charged with manipulating

9    securities in appealing the trading.

10         THE COURT:  Well, let me find the indictment.

11         (Pause)

12         Well, the overall scheme, which is stated in paragraph

13   8 of the indictment, is a scheme to "overstate Fund-1's NAV,

14   often by tens of millions of dollars."  So the broad statement

15   would encompass a variety of different means.  That says -- I'm

16   sorry, did I say paragraph 8?  That was paragraph 10 under the

17   heading "The Scheme to Defraud."

18         Paragraph 11 says as part of the scheme, the

19   defendant, and his co-conspirators solicited, obtained, and

20   relied on false and fraudulent price quotes from employees of

21   broker-dealers, and that includes, in part of that same

22   paragraph, typically Lumiere and his co-conspirators would then

23   contact one or two friendly brokers and dictate to the friendly

24   brokers the price quotes that Lumiere needed.  The brokers

25   would then parrot back the price quotes.

1          Then in paragraph 13, "As a further part of the

2     scheme, at the end of certain months, Stefan Lumiere, the

3     defendant, and Plaford purchased additional quantities of

4     certain securities -- in which Fund-1 had an established

5     position -- and a deceptively inflated price, markedly higher

6     than the prevailing market was offering that security, in a

7     practice known as 'painting the tape.'  Plaford would then

8     report that inflated price to Accounting for NAV purposes.

9          "14.  In both cases -- the sham broker quotes and the

10    inflated prices -- it was Lumiere's and Plaford's intent to

11    increase the price of certain securities in order to inflate

12    Fund-1's month-end valuation."

13         So it sounds to me that they clearly -- in the

14    indictment, the Grand Jury clearly treated both the mismarking

15    and the painting the tape as independent means, both designed

16    to ultimately accomplish the misleading of investors that

17    occurred.  So, the objection is overruled.

18         MR. CREIZMAN:  I don't disagree with that.  What I do

19    disagree with is that the scheme was to defraud investors by

20    mismarking the securities, the value of the securities --

21         THE COURT:  No, by overvaluing the securities, which

22    can be done by mismarking and by painting the tape.

23         MR. CREIZMAN:  Absolutely.  But in this situation, he

24    is saying that he committed the crime of painting the tape, and

25    what I'm concerned about is that he could have painted the tape

H1hdlum4                          Plaford - direct

1    for reasons other than the NAV.  In terms of his own 3500, he

2    had told the government --

3              THE COURT:  I really don't understand your argument.

4    In any fraudulent scheme of this sort, there are different

5    kinds of lies and deceptions that are practiced.  Whether or

6    not any one of them is sufficient to support the indictment is

7    something we can take up at the charging conference, but I see

8    nothing that precludes the testimony.

9              Overruled.

10              MR. CREIZMAN:  OK.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2              MR. McGINLEY:  May I, your Honor?

3              THE COURT:  Yes.

4     BY MR. McGINLEY:

5     Q.  Now, you were taking about the crime of painting the tape;

6     do you recall that?

7     A.  Yes.

8     Q.  Did you do that alone or with other people?

9     A.  Others.

10    Q.  And did that include the defendant?

11    A.  Yes.

12    Q.  What was his role in painting the tape?

13    A.  He executed the trades.

14    Q.  And who found the broker to execute the trades that painted

15    the tape?

16    A.  Stefan did.

17    Q.  When you painted the tape with the defendant, did you

18    understand that it was illegal?

19    A.  Yes.

20    Q.  In general for now, what was the purpose in painting the

21    tape?

22    A.  A couple of purposes.  One, we expected that the company

23    could potentially come in with what's called a tender offer,

24    where they offered to repurchase their debt at a premium to the

25    currently traded market price.

1   Q.  So that the company is China Med here?

2   A.  Correct.

3   Q.  So if there is a higher price at the time for China Med,

4   when China Med wants to buy their own bonds, they then have to

5   pay a higher price?

6   A.  Correct.  It also helped for valuation purposes.

7   Q.  What do you mean, it helped for valuation purposes?

8   A.  It was easier to value a bond close to a trade price if one

9   had occurred.  So if we paid a higher price for it, we could

10  more easily value it there also.

11  Q.  How would a higher valuation help you and the defendant?

12  A.  Well, that essentially goes into the NAV calculation.

13  Q.  Now, you mentioned that you also committed insider trading.

14  In general for now, how did you do that?

15  A.  So it was around FDA approval of the generic enoxaparin, a

16  drug called Lovenox, and getting information from one of our

17  consultants at the time for Vizeum, which is a former FDA

18  employer, around that generic approval, and also around the

19  Center for Medicare and Medicaid Services' announcement of

20  reimbursement rates for home health companies.

21  Q.  So the FDA insider trading, who did you commit that crime

22  with?

23  A.  Sanjay Valvani and Gordon Johnston.

24  Q.  Who was Sanjay Valvani?

25  A.  He was a portfolio manager at Vizeum.

640

1   Q.   Who is Gordon Johnston?

2   A.   He was a consultant to Vizeum.

3   Q.   Now, you said you also traded on confidential information

4   from CMS?

5   A.   Correct.

6   Q.   Who did you commit that crime with?

7   A.   David Blaszczak.

8   Q.   Who is David Blaszczak?

9   A.   He was another Vizeum consultant.

10  Q.   What do you mean by "consultant"?

11  A.   Vizeum would pay them for their insight and knowledge,

12  essentially.

13  Q.   Now, have you pled guilty to the crimes you committed while

14  at Vizeum?

15  A.   Yes.

16  Q.   In general, what charges have you pled guilty to?

17  A.   Conspiracy to commit securities fraud, conspiracy to commit

18  mail fraud, conspiracy to defraud the U.S. government,

19  conspiracy to convert property, two charges of insider trading,

20  and conversion of property.

21  Q.   And are those charges based on their criminal activity you

22  just described?

23  A.   Yes.

24  Q.   Are you testifying today because of an agreement with the

25  government?

1   A.  Yes.

2   Q.  What type of agreement?

3   A.  Cooperation agreement.

4   Q.  And have you been sentenced yet for the crimes that you

5   have pled guilty to committing?

6   A.  I have not.

7   Q.  Now, in general terms, what do you understand the

8   cooperation agreement to require of you?

9   A.  That I cooperate, that I tell the truth, and that I don't

10  commit any further crimes.

11  Q.  And what is your understanding as to what the government

12  will do if you fulfilled your obligations under the cooperation

13  agreement?

14  A.  Provide a 5K letter to the judge.

15  Q.  And what's your understanding of what a 5K letter is?

16  A.  It includes things like my background, my level of

17  cooperation, that sort of stuff.

18  Q.  And who receives the 5K letter?

19  A.  The judge.

20  Q.  If you were to violate your cooperation agreement by not

21  telling the truth, what do you understand would happen to that

22  agreement?

23  A.  There would be no agreement.

24  Q.  What would be the maximum sentence that you would face?

25  A.  85 years.

H1hdlum4                    Plaford - direct

1    Q.  Have you received any promises about what sentence you will

2    receive?

3    A.  No.

4    Q.  Fair to say you hope to receive a reduced sentence as a

5    result of your cooperation?

6    A.  Of course.

7    Q.  And what is your understanding as to whether the government

8    will recommend a specific sentence to the judge?

9    A.  They don't recommend a specific sentence.

10   Q.  And who decides what sentence you receive?

11   A.  The judge.

12   Q.  And to your understanding, does your receiving a 5K letter

13   depend one way or another on the defendant being convicted?

14   A.  It does not.

15   Q.  Mr. Plaford, you have before you a number of exhibits.

16   Now, the first one is 3503-71.  Do you see that?  It should

17   be -- if you could just display that just to the witness.

18           Do you see that?

19   A.  Yes.

20   Q.  What is it?

21   A.  My cooperation agreement.

22   Q.  And if you could -- Ms. Meister, if you could please turn

23   to the last page.

24           And is that your signature, Mr. Plaford?

25   A.  It is.

```
1    Q.  Is it a true and correct copy of your cooperation
2    agreement?
3    A.  Yes.
4              MR. McGINLEY:  Your Honor, the government offers
5    3503-71.
6              MR. CREIZMAN:  No objection.
7              THE COURT:  Received.
8              (Government's Exhibit 3503-71 received in evidence)
9              MR. McGINLEY:  Now, Ms. Meister, if you could just
10   publish the first page and just highlight the first few
11   paragraphs.
12   Q.  Mr. Plaford, what are we looking at here, just generally?
13             (Pause)
14             Is this your cooperation agreement?
15   A.  It is.
16             MR. McGINLEY:  And, Ms. Meister, if you could please
17   move to page 3 of the cooperation agreement.
18             And, Ms. Meister, if you could focus on -- yes, that
19   paragraph.  That would be great.
20   Q.  Now, Mr. Plaford, do you understand that these are your
21   obligations under the agreement?
22   A.  I do.
23   Q.  And do you see number -- letter E, "Shall truthfully
24   testify before the Grand Jury and at any trial and other court
25   proceeding with respect to any matters about which this office
```

644

1    may request this testimony"?

2    A.  Yes.

3          MR. McGINLEY:  Thank you, Ms. Meister.  You can take

4    that down.

5    Q.  Now, have you also been charged civilly by the SEC?

6    A.  I have.

7    Q.  Is that for essentially the same criminal conduct you have

8    described today?

9    A.  Yes.

10   Q.  And what is the status of that case?

11   A.  That case was stayed pending the outcome of the criminal

12   case.

13   Q.  What does "stayed" mean?

14   A.  It was put on hold.

15   Q.  Did there come a time, Mr. Plaford -- just to back up now,

16   did there come a time when you were approached by an FBI agent?

17   A.  Yes.

18   Q.  And when was that?

19   A.  In the fall of 2014.

20   Q.  Did you have any notice that the agent was coming?

21   A.  No.

22   Q.  And where were you when the FBI agent approached you?

23   A.  At home.

24   Q.  Did you agree then to speak with the FBI agent about your

25   activity at Vizeum?

1    A.  I did.

2    Q.  Did you tell the truth to the agent then?

3    A.  I did not.

4    Q.  What did you lie about?

5    A.  I don't remember the specifics of that conversation, it was

6    a couple of years ago now, but I just in general remember not

7    being truthful.

8    Q.  Did you tell the truth about the mismarking scheme?

9    A.  I don't remember the specifics but probably not.

10   Q.  And why did you lie?

11   A.  I was scared.  The FDA -- the FBI came into my house.

12   Q.  Now, after that approach, did there come a time when you

13   met again with the government, including prosecutors?

14   A.  Yes.

15   Q.  Did you have a lawyer present then?

16   A.  Yes.

17   Q.  And in meetings with the government, were you truthful?

18   A.  Not entirely, no.

19   Q.  And why was that?

20   A.  I think it took a while -- it took a while for me to come

21   to terms with what I had done.  It took a while to have these

22   conversations in full with the government and cover all the

23   ground also.

24   Q.  Now, when did you first tell the government about

25   committing insider trading with Sanjay Valvani?

H1hdlum4                          Plaford - direct

1   A.  It was probably in 2015.

2   Q.  And why did you wait that long?

3   A.  Well, that one I didn't -- I didn't remember.  It was a

4   small position.  It happened a very long time ago.

5   Q.  You mentioned you also committed insider trading based on

6   information from David Blaszczak; do you recall that?

7   A.  Yes.

8   Q.  Did you want to plead guilty to that charge?

9   A.  No.  Of course not.

10  Q.  And why not?

11  A.  Generally I didn't want to plead guilty to any felonies, if

12  I could avoid it.

13  Q.  You recognized it was still a crime?

14  A.  Yes.

15  Q.  Now, in addition to meeting with the government, did you

16  also -- have you also assisted the government in its

17  investigations?

18  A.  Yes.

19  Q.  And in general, what kind of assistance have you provided?

20  A.  Basically whatever they've asked me to do, had

21  conversations with people, tape things.

22  Q.  So have you recorded phone conversations with other people?

23  A.  Yes.

24  Q.  Now, have you met with -- since you entered into the

25  cooperation agreement we just saw, have you met with the

647

H1hdlum4                         Plaford - direct

1    government?

2    A.   Yes.

3    Q.   Approximately how many times?

4    A.   A number of times, maybe ten.

5    Q.   And how long would these meetings last?

6    A.   Hours.

7    Q.   And were you given any promises in these meetings?

8    A.   No.

9    Q.   And have you seen all the evidence in this case?

10   A.   No.

11   Q.   Now, when you left Vizeum in 2013, did they owe you money?

12   A.   Yes.

13   Q.   Why?

14   A.   They didn't pay my deferred compensation.

15   Q.   What is deferred compensation?

16   A.   It is basically money that's earned and paid several years

17   later.

18   Q.   How much deferred compensation were you owed?

19   A.   Approximately $1.3 million.

20   Q.   Did Vizeum eventually agree to pay back some of that money

21   to you?

22   A.   Yes.

23   Q.   How much?

24   A.   A bit over $600,000.

25   Q.   And as part of receiving that payment, did you enter into

H1hdlum4                              Plaford - direct

1    an agreement with Vizeum?

2    A.  Yes.

3    Q.  Now, you mentioned you pled guilty to insider trading.

4    Let's just discuss that briefly in a little bit more depth.

5         When was the first time you remember committing

6    insider trading?

7    A.  Around 2009.

8    Q.  What was the inside information you received?

9    A.  That was in reference to the FDA's approval of generic

10   Lovenox.

11   Q.  So you received inside information that the FDA was going

12   to approve a generic drug?

13   A.  Correct.

14   Q.  Who gave you this information?

15   A.  Sanjay Valvani.

16   Q.  Where did he get the information from?

17   A.  Gordon Johnston.

18   Q.  What did you do with the information?

19   A.  Used it to purchase credit default swaps in Sanofy Aventis.

20   Q.  Just briefly, you mentioned before, what is a credit

21   default swap?

22   A.  It is basically insurance against a company going bankrupt.

23   Q.  And why did you purchase CDS in Sanofy as a result of the

24   insider information?

25   A.  So if generic Lovenox is approved, that weakens Sanofy's

H1hdlum4                          Plaford - direct

1   credit profile, which would cause the CDS to increase in value.

2   Q.  About how much money did you spent on the CDS's?

3   A.  The market value was probably somewhere around 25/$30,000,

4   give or take.

5   Q.  Now, had you received inside information from Gordon

6   Johnston before the enoxaparin information?

7   A.  Probably, yes.

8   Q.  Now, when was the second time you remember committing

9   insider trading?

10  A.  This is in 2013, ahead of CMS's announcement for

11  reimbursement rates on home health.

12  Q.  OK.  What is CMS again?

13  A.  Center for Medicare and Medicaid Services.

14  Q.  And what did they announce -- well, what information did

15  you get about what their announcement would be with regard to

16  reimbursement rates?

17  A.  Basically that reimbursement rates would likely be cut.

18  Q.  Who gave you this information?

19  A.  David Blaszczak.

20  Q.  What did you do with the information that David Blaszczak

21  gave you?

22  A.  Used it to inform trading in a couple of home health

23  companies, Gentiva and Amedysis .

24  Q.  And what types of companies are these?

25  A.  Those are home health companies.

H1hdlum4                              Plaford - direct

1    Q.   And how did you expect them to be impacted?

2    A.   Negatively.

3    Q.   Now, did Vizeum have a compliance manual?

4    A.   Yes.

5    Q.   Did the compliance manual, as you understood it, prohibit

6    the mismarking of securities?

7    A.   Yes.

8    Q.   Did it prohibit painting the tape?

9    A.   Yes.

10   Q.   Did it prohibit insider trading?

11   A.   Yes.

12   Q.   And were you required to certify that you complied with the

13   policies in this manual?

14   A.   Yes.

15   Q.   Approximately how often?

16   A.   Maybe quarterly or annually.

17   Q.   Now, during the time you were mismarking securities, did

18   you certify that you were in compliance with the compliance

19   manual?

20   A.   Yes.

21   Q.   Was that true?

22   A.   No.

23   Q.   And when you were committing insider trading, did you

24   certify that you were in compliance with the manual?

25   A.   Yes.

1   Q.  Was that true?

2   A.  No.

3   Q.  Now, let's talk about Vizeum.

4           MR. McGINLEY:  Ms. Meister, if you could please put up

5   what's in evidence as Government Exhibit 106 and page 6.

6           And if you could highlight, Ms. Meister, the credit

7   team column.

8   Q.  Now, just first of all, who is at the top -- this is not on

9   the screen right now, but who is at the top of the order chart?

10  A.  Jake Gottlieb.

11  Q.  Who is he again?

12  A.  He is the chief investment officer.

13  Q.  Now, you are at the top of the chart of the credit team.

14  What, again, was your role?

15  A.  The portfolio manager.

16  Q.  And as portfolio manager, did you direct investments?

17  A.  Yes.

18  Q.  Now, right below you is -- and it notes you are CFA there,

19  is that right?

20  A.  Correct.

21  Q.  Right below you is the defendant, is that right?

22  A.  Yes.

23  Q.  Now, what was the defendant's role in the credit team?

24  A.  He was a senior analyst/portfolio manager.

25  Q.  Could he make trading decisions, and by that I mean a

H1hdlum4                        Plaford - direct

1   decision to buy or sell a security?

2   A.  Yes.

3   Q.  For how long did he have that power?

4   A.  A year or two.

5   Q.  Was that taken away?

6   A.  Yes.

7   Q.  Why?

8   A.  Poor performance.

9   Q.  Did he have a role, as you understood it, in other Vizeum

10  funds while he was working in the credit fund?

11  A.  He did.  He was also the portfolio manager for one of the

12  global -- the Global Fund, one of their accounts.

13  Q.  Who is older, you or the defendant?

14  A.  Stefan is older.

15  Q.  And you see at the bottom Jason Thorell is listed?

16  A.  Yes.

17  Q.  And what was his role in the Credit Fund?

18  A.  He was the trader.

19  Q.  And can a trader make -- could he make his own investment

20  decisions?

21  A.  No.

22  Q.  Who had to give him instructions?

23  A.  One of the people above him.

24  Q.  Did all the people on the credit team have the ability to

25  instruct Mr. Thorell?

1   A.  Most of them did, yes.

2   Q.  And, by the way, when was the last time you spoke with

3   Jason Thorell?

4   A.  It would have been on his departure from Vizeum I think in

5   2013 sometime.

6   Q.  Now, very generally, these nonhighlighted names, who are

7   they?

8   A.  They were analysts.

9   Q.  And what does an analyst do?

10  A.  They do research.

11  Q.  And we'll get to this a little bit later, but were certain

12  analysts responsible for certain companies?

13  A.  Yes.

14          MR. McGINLEY:  Thank you, Ms. Meister.  You can take

15  that down.

16  Q.  Mr. Plaford, how did Vizeum assess fees on investors?

17  A.  They charged a 2 percent management fee, that's 2 percent

18  on net asset value, and a 20 percent performance fee, which is

19  essentially the change in asset value from one period to the

20  next or, in other words, the money that they made.

21  Q.  And who received the management fee?

22  A.  Jake Gottlieb.

23  Q.  Who received the performance fee?

24  A.  Jake and the rest of the credit team.

25  Q.  Would it go directly to you or to someone else?

1   A.  I had a portion of that, and the analyst would get paid out

2   of that as well.

3   Q.  Who decided what the analyst would get paid?

4   A.  Mostly me and Jake.

5   Q.  Now, what was your -- what was your general compensation

6   during the time you were the PM of the credit fund, what was

7   your base salary?

8   A.  Around $250,000.

9   Q.  And all told, how much money did you make as PM of the

10  Credit Fund?

11  A.  From start to finish, probably $5 or $6 million.

12  Q.  Who determined your compensation?

13  A.  Jake Gottlieb.

14  Q.  Now, you mentioned that you had a role in determining the

15  compensation of other employees.  How would you go about making

16  that determination?

17  A.  They got paid a percentage of the P&L of the names that

18  they were involved with over the previous year.

19  Q.  OK.  Let's just break that down for a second.

20          What is P&L?

21  A.  That's your profit and loss, basically how much money you

22  made or lost.

23  Q.  That's basically how you performed?

24  A.  Yes.

25  Q.  And you said for their names.  What do you mean by that?

A.  So those are the companies that they were the point person

on.

Q.  So certain people in the fund were responsible for certain

securities?

A.  Correct.

Q.  Did you have a role in determining the defendant's

compensation for the Credit Fund?

A.  To some degree, yes.

Q.  Now, you mentioned you look at P&L to make that

determination.  What securities were part of the defendant's

P&L?

A.  ATI, Sevan Marine, Nebraska Book, FriendFinder, China

Medical, to name a few.

Q.  And you mentioned that when someone covers a position,

they're the point person.  What do you mean by that?

A.  They do the majority of the research.  They create the

model.  They talk to management.  They are on their earnings

calls, things like that.

Q.  What is someone who is covering a position in the Credit

Fund expected to report to you as portfolio manager?

A.  Basically their overall thesis, their conviction level in

the idea and why they feel that way.

Q.  Now, as PM of the Credit Fund, are you yourself able to

cover every single security held by the fund?

A.  No.  There's way too many.

H1hdlum4                          Plaford - direct

1    Q.  About how many?

2    A.  We probably have on average at least 50 companies, maybe a

3    couple hundred line items.

4            MR. McGINLEY:  Ms. Meister, if you could please

5    publish Government Exhibit 733, and if you could focus just on

6    the text.

7    Q.  Now, Mr. Plaford, do you see this is from Stefan Lumiere,

8    the defendant?

9    A.  Yes.

10   Q.  And it is to you?

11   A.  Yes.

12   Q.  Subject Lumiere Weekly?

13   A.  Yes.

14   Q.  What is a weekly?

15   A.  It's basically everyone's responsible for sending out on a

16   weekly basis a snapshot of their ideas and convictions on the

17   ideas.

18   Q.  And you see down there in the footer, "Stefan Lumiere,

19   CFA"?

20   A.  Correct.

21   Q.  "Portfolio Manager"?

22   A.  Yes.

23   Q.  "Distressed and special situations"?

24   A.  Yes.

25   Q.  What are distressed and special situations?

1    A.  It could be mostly companies going through some kind of

2    restructure, like a bankruptcy process.

3              MR. McGINLEY:  OK.  And, Ms. Meister, if you could go

4    to the next page.

5    Q.  Now, this is the weekly, which is the attachment.  What are

6    some of the names we see here?

7    A.  ATI, Sevan, Great Atlantic, Rotech, Medco Health.

8    Q.  If you could go to the next page, please.

9    A.  Nebraska Book, FriendFinder, US Oncology.

10   Q.  Let's just pause right there.

11             Now, who was the point person on Nebraska Book?

12   A.  Stefan.

13   Q.  Did you and the defendant mismark the value of the Nebraska

14   Book securities?

15   A.  Yes.

16   Q.  Who was the point person on FriendFinder?

17   A.  Stefan was.

18   Q.  Did you and the defendant mismark the value of

19   FriendFinder?

20   A.  Yes.

21             MR. McGINLEY:  Ms. Meister, if you could please put up

22   what's in evidence as Government Exhibit 1164.  Do you want to

23   just do the "to" and "from" and "subject" to start.  Thank you.

24   Q.  Mr. Plaford, you see this is from the defendant Stefan

25   Lumiere?

1    A.  Yes.

2    Q.  To Josh Rozenberg?

3    A.  Yes.

4    Q.  Who is Josh Rozenberg?

5    A.  He was a member of the accounting team.

6    Q.  And it says P&L contribution for 2009, 2010, 2011 and 2012.

7    Do you see that?

8    A.  Yes.

9    Q.  What is "P&L contribution"?

10   A.  Your profit and loss.

11           MR. McGINLEY:  Ms. Meister, if you could zoom out and

12   now and just highlight the body, then, of the email.

13   Q.  Now, Mr. Plaford, what are some of the securities here that

14   the defendant wants included in his profit and loss?

15   A.  ATI, FriendFinder, Sevan, Nebraska Book.

16           MR. McGINLEY:  OK.  Thank you, Ms. Meister.  You can

17   take that down.

18   Q.  Now, when did the defendant leave the Credit Fund?

19   A.  This is the spring of 2013.

20   Q.  Do you have an understanding as to why?

21   A.  Poor performance, I believe.

22   Q.  If you could just speak up just a little.

23   A.  Sure.

24   Q.  Thank you.

25           Now, are you familiar with the concept of liquidity in

H1hdlum4                         Plaford - direct

1    finance?

2    A.   Yes.

3    Q.   And what does it mean for a security to be liquid?

4    A.   It means that you can get your money back.

5    Q.   That means you can buy and sell it --

6    A.   Yeah.  You can trade it in the marketplace.

7    Q.   And illiquid?

8    A.   That is the opposite of liquid.

9    Q.   Did the Credit Fund hold liquid or illiquid positions?

10   A.   Both.

11   Q.   What types of investors were the main investors in the

12   Credit Fund?

13   A.   Mostly wealthy individuals and institutions.

14   Q.   Are you familiar with what are known as fund to funds?

15   A.   Yes.

16   Q.   What are they?

17   A.   It's essentially a hedge fund for hedge funds.  They accept

18   money from large institutions and they allocate it to hedge

19   funds and they charge a fee.

20   Q.   And who are their investors, generally?

21   A.   Very large investors, pension funds, endowments, that kind

22   of thing.

23   Q.   What is a pension fund?

24   A.   A pension fund invests money on behalf of their retirees.

25   Q.   And were fund-to-funds investors in the Vizeum Credit Fund?

H1hdlum4                    Plaford - direct

1    A.  They were.

2    Q.  Now, as PM of the Credit Fund, did you interact with

3    investors?

4    A.  Yes.

5    Q.  What kinds of interactions did you have with investors?

6    A.  For me mostly investors wanted to know about the investment

7    methodology, our process, our research, the types of positions

8    we would have, examples of trades that we had made, that kind

9    of thing.

10   Q.  Now, how would one go about investing in the Credit Fund?

11   A.  They would probably want to do some diligence on the

12   process we just discussed, and then they would submit a

13   subscription agreement which had the dollars that they were

14   investing and the liquidity terms for the fund, that sort of

15   stuff.

16   Q.  You mentioned diligence that investors would do before

17   investing.  What do you mean by "diligence"?

18   A.  They'd usually want to do research on the fund and our

19   methodology before coming to an investment determination.

20   Q.  And you mentioned you would provide investors with

21   subscription agreements before they invested?

22   A.  Yes.

23   Q.  What is a subscription agreement?

24   A.  It outlines the amount of money that the investor is

25   investing and a number of legal things, largely liquidity

1    terms, the fees that Vizeum would charge, that sort of stuff.

2    Q.  After an investor committed money to the Credit Fund, did

3    they receive performance updates periodically?

4    A.  Yes.

5    Q.  How often?

6    A.  Weekly and monthly.

7    Q.  What would they receive weekly?

8    A.  A snapshot of the fund's performance.

9    Q.  And then was there something different they got monthly?

10   A.  It was the same, similar, but it contained a bit more

11   information.  It had the NAV, a brief description, usually

12   commentary about the last month performance.

13   Q.  How did the mismarking scheme impact the performance

14   information provided to investors?

15   A.  Well, it directly increased the performance.

16   Q.  And were you an investor yourself in the Credit Fund?

17   A.  Yes.

18   Q.  Are you familiar with something called a stratum report?

19   A.  Yes.

20   Q.  And what is it?

21   A.  It's a document that takes a high level snapshot of the

22   types of exposures the fund has in a current period of time.

23   Q.  What do you mean by kind of exposures?

24   A.  Sector classification, types of assets, long and short, and

25   net exposure.

H1hdlum4                         Plaford - direct

1   Q.  And would the stratum reports go to investors?

2   A.  Yes.

3   Q.  And, by the way, where were your investors located?

4   A.  All over the country -- all over the world, actually.

5   Q.  Do you know of investors that were international?

6   A.  Yes.

7   Q.  And how would you communicate with these investors that

8   were all over the world?

9   A.  The marketing department would send emails and hard copies

10  by mail, I believe.

11  Q.  Hard copies of what?

12  A.  Performance.

13  Q.  And that was during the time of the mismarking scheme?

14  A.  Correct.

15          MR. McGINLEY:  Ms. Meister, if you could please

16  publish what's in evidence as Government Exhibit 442.

17          Ms. Meister, if we could focus on the top all the way

18  down through "Price Input Confirmation."

19  Q.  Now, Mr. Plaford, this is the stratum report for

20  December 2012?

21  A.  Correct.

22  Q.  And do you see the NAV there?

23  A.  Yes.

24  Q.  What does that mean?

25  A.  It is the net asset value, which is -- which is if you

H1hdlum4                    Plaford - direct

1    liquidated all the positions, you added all the positions up,

2    all the fair values for all the positions plus the cash, that's

3    what you would get.

4    Q.  And why is that important to investors?

5    A.  Well, the NAV was the metric by which the funds computed

6    the management fees.  Also, the change in NAV was the metric by

7    which you would report the performance and the performance

8    fees.  Also, investors need to have the NAV of a minimum amount

9    so they can invest in a fund.  They don't want it to be too

10   large a percentage.

11            MR. McGINLEY:  And, Ms. Meister, if you could please

12   scroll down to the ASC 820 classification.

13   Q.  Now, Mr. Plaford, what are ASC 820 classifications?

14   A.  The classification is largely based on liquidity of the

15   asset.

16   Q.  And what are the different levels?

17   A.  Level 1 is the most liquid and Level 3 is the least liquid.

18   Q.  And why are these classifications important to investors?

19   A.  Because liquidity is important to investors.  It's the ease

20   of which they can get their money back.

21            MR. McGINLEY:  Thank you, Ms. Meister.  You can take

22   that down.

23   Q.  Now, what role did broker quotes play in determining the

24   Credit Fund's net asset value?

25   A.  We would get broker quotes in a number of cases where we

H1hdlum4                        Plaford - direct

1    wanted to -- we didn't have an available price or we wanted to

2    override a third-party market price.

3    Q.  So the higher the broker quote, the higher the net asset

4    value?

5    A.  Essentially, yes.

6    Q.  How did higher returns impact your compensation?

7    A.  It would increase my compensation.

8    Q.  How about the defendant's compensation?

9    A.  It would also increase his compensation.

10   Q.  Were investors permitted to withdraw money from the Credit

11   Fund?

12   A.  Yes.

13   Q.  Does that have a name?

14   A.  Redemption.

15   Q.  And how would an investor go about redeeming their money

16   from the Credit Fund?

17   A.  It was a quarterly 90, which means that they would have to

18   give notice 90 days in advance and they would get their money

19   back quarterly, after the following quarter.

20   Q.  Now, during the time of the mismarking scheme, did you have

21   conversations with the defendant about his positions and the

22   fund's performance?

23   A.  Yes.

24   Q.  Now, in about 2011 and 2012, how much money was the

25   defendant responsible for managing?

```
 1   A.  It varied.  It probably averaged over a hundred million
 2   dollars.
 3   Q.  And what was the nature of your conversations with the
 4   defendant about his positions and the fund's performance?
 5   A.  Basically that his performance was detrimental, that he was
 6   largely losing money on a number of positions, which was
 7   detrimental to investors, and also some of the liquidity of his
 8   positions were problematic in that he tended to have less
 9   liquid types of positions.
10   Q.  Did you discuss investor redemptions with him?
11   A.  Yes.
12   Q.  What did you discuss?
13   A.  That redemptions were in part because of Stefan's
14   performance related to those two issues.
15   Q.  We saw all the members of the credit team.  Would you all
16   have meetings to discuss the fund's performance?
17   A.  Yes.
18   Q.  And was the defendant at these meetings?
19   A.  Yes.
20   Q.  Now, I'd like to talk a little bit about the fund's
21   valuation -- the Credit Fund evaluation.
22         So, for illiquid assets, how would you generally go
23   about valuing it?
24   A.  Mostly through broker quotes.
25   Q.  And when did you consult independent pricing services?
```

1   A.  So we had a couple of independent sources, Reuters and

2   Markit, that provided third-party valuations.  So we used those

3   for some of the portfolio, and for some we would provide broker

4   quotes directly.

5   Q.  Did Vizeum have an operations department?

6   A.  Yes.

7   Q.  And what was the role of that department, as you understood

8   it?

9   A.  Mostly back office support.

10  Q.  And what is back office support?

11  A.  Clearing of trades, mostly that.

12  Q.  Did Vizeum have any internal committees set up for

13  valuation?

14  A.  Yes.

15  Q.  What committee?

16  A.  It was called the valuation committee.

17  Q.  Did you ever interact with the valuation committee as a

18  whole?

19  A.  I don't believe directly on valuation matters.

20  Q.  Do you know who the members were of the valuation

21  committee?

22  A.  I believe so, yes.

23  Q.  Did they have backgrounds in credit instruments?

24  A.  They did not.

25  Q.  As far as you know, from 2011 through 2012, did the

1    valuation committee ever change a level that you and the

2    defendant had decided on?

3    A.   Probably not.  That would be fairly unusual.

4    Q.   Did the Credit Fund have an administrator?

5    A.   Yes.

6    Q.   What is an administrator?

7    A.   They provide administrative support, I believe.

8    Q.   Who was the Credit Fund's administrator?

9    A.   Morgan Stanley.

10   Q.   Did you ever interact -- do you recall ever interacting

11   with Morgan Stanley as part of the valuation process?

12   A.   I do not.

13   Q.   Now, for the month-end valuation process of the Credit

14   Fund, what was your understanding of how it was supposed to

15   work?

16   A.   For Vizeum, operations would send a spreadsheet to the

17   investment team.  The investment team would highlight the names

18   of which we were going to be providing broker quotes.  And then

19   we would send that back to operations along with the supporting

20   documentation, which were the broker quotes for those names.

21   Q.   OK.  So you had the ability to override a price?

22   A.   Yes.

23   Q.   Now, what type of broker quote were you supposed to obtain?

24   A.   One that was indicative of the fair market price for the

25   security in question.

H1hdlum4                      Plaford - direct

1   Q.  And why was it important to get a broker quote that was a

2   fair market price for the security in question?

3   A.  Because that was the valuation that we were using on that

4   security, that would translate directly into the fund's NAV and

5   be reported to investors.

6   Q.  And were the brokers you were using during the mismarking

7   scheme obtaining real indicative quotes?

8   A.  In a number of cases, no.

9   Q.  Well, how about for the distressed names?

10  A.  No.

11  Q.  Now, as far as getting the -- dictating the levels and

12  getting the broker quotes, what level of involvement did the

13  defendant have in both of those activities?

14  A.  Sorry.  Can you repeat?

15  Q.  What was the defendant's role in the mismarking scheme?

16  A.  He would, again, help to create the valuations that we

17  would be using for his securities, at least, and, also, he

18  would -- he would be the one who would have a dialogue with the

19  brokers on a monthly basis to get those broker quotes.

20          MR. McGINLEY:  And, Ms. Meister, if we could please

21  publish Government Exhibit 721, and if you could just highlight

22  the text.

23  Q.  So, Mr. Plaford, do you see that?

24  A.  Yes.

25  Q.  So this is from the defendant to you --

1    A.  Correct.

2    Q.  -- in January 2012?

3         Is that during the time you were both committing the

4    mismarking scheme?

5    A.  Yes.

6    Q.  And he says, "Almost done.  Should be complete soon.

7    Looking for a couple of more quotes."

8    A.  Correct.

9    Q.  What did you understand him to be telling you there?

10   A.  That he was getting broker quotes for the month-end

11   process.

12   Q.  And who was getting the quotes, you or him?

13   A.  Stefan was.

14         MR. McGINLEY:  Ms. Meister, if you could please

15   publish Government Exhibit 723.

16         (Pause)

17         THE COURT:  Counsel, find a spot in the next couple of

18   minutes to give the jury their lunch break.

19         MR. McGINLEY:  Your Honor, after this exhibit would be

20   good.

21         THE COURT:  OK.

22         MR. McGINLEY:  Thank you.

23   BY MR. McGINLEY:

24   Q.  So, Mr. Plaford, do you see the email chain up there?

25   A.  Yes, sir.

H1hdlum4                       Plaford - direct

1    Q.  So the first email is from you to the defendant saying to

2    call him on your cell?

3    A.  Yes.

4    Q.  And then just skipping up to the top, the defendant writes

5    to you, "Prince is sending the quote to you and Jason."

6    A.  Yes.

7    Q.  So what do you understand that to mean?

8    A.  Princeridge.

9    Q.  And what is Princeridge?

10   A.  Their broker-dealer.

11   Q.  Did you use them during the mismarking scheme?

12   A.  Yes.

13   Q.  And the quote to you and Jason, who is Jason?

14   A.  Jason Thorell.

15         MR. McGINLEY:  Your Honor, now would be a good time.

16         THE COURT:  All right.  Very good.

17         So, ladies and gentlemen, we're going to resume at

18   maybe about five after 2, and then because I have other matters

19   at 4 o'clock, we are going to go from 2 to 4 without a break.

20   So keep that in mind.

21         And we'll see you at 2 o'clock.  Thanks a lot.

22         (Continued on next page)

23

24

25

1          (Jury not present)

2          THE COURT:  Mr. Plaford, you can step down.  We'll see

3    you at 2 o'clock.

4          Anything counsel needs to raise with the Court?

5          (Pause)

6          OK.  We'll see you at 2 o'clock.

7          Oh, I would anticipate, as I'm sure government counsel

8    does, that we will be at least 98 percent through the direct

9    testimony by 4 o'clock.

10          MR. McGINLEY:  Your Honor, we are ending -- just to be

11    clear, we are ending the entire -- we are not coming back.

12          THE COURT:  No.  If you would like to come back, I

13    will be teaching in Columbia, but you can come back and it is a

14    public court.  Feel free.  You will have until 4 o'clock.

15          MR. McGINLEY:  Thank you.

16          MS. MADRIGAL:  I think Eric wants to add to the record

17    that you were actually his professor in his evidence class at

18    Columbia.

19          MR. CREIZMAN:  Not evidence, white collar crime.

20          MS. MADRIGAL:  White collar crime.

21          THE COURT:  So --

22          MS. MADRIGAL:  Any mistakes that any of us make are

23    attributable --

24          THE COURT:  Not only that, but my recollection is that

25    he was a very bright, attentive student who got a very high

H1hdlum4                          Plaford - direct

1    grade, but, you know --

2              MS. MADRIGAL:  You don't know what happens.

3              THE COURT:  Past performance is no indicator of

4    future.

5              (Luncheon recess)

H1HPLUM5                        Plaford - Direct

```
 1                    A F T E R N O O N   S E S S I O N

 2                              2:13 P.M.

 3              THE DEPUTY CLERK:  May I bring in the jury?

 4              THE COURT:  Please, and let's get the witness back on

 5     the stand.

 6              I'm delighted that the government won't need the full

 7     two hours to complete the direct.

 8              (Jury present)

 9              THE COURT:  Please be seated.  Counsel.

10              MR. McGINLEY:  Thank you, your Honor.

11     BY MR. McGINLEY:

12     Q.  Now, Mr. Plaford, focusing on the defendant, Stefan

13     Lumiere, when did you first meet him?

14     A.  Around 2005, 2006 probably.

15     Q.  That's when you first met him?

16     A.  Well, I -- I may have known him just as an acquaintance, on

17     a very, very high level, back to as little as 2000 and I

18     probably didn't even meet him and have a conversation with him

19     until those in '05, '06.

20     Q.  What occasioned those conversations in '05 and '06?

21     A.  Social.  I believe he was Jake Gottlieb's wife's -- at that

22     time dating, but ultimately Jake married his sister and Stefan

23     became his brother-in-law; so social.

24     Q.  When did the defendant join Visium?

25     A.  Probably shortly after that.  I don't remember exactly.
```

1    Maybe '06.  '06, something like that.

2    Q.  And in what capacity did he join?

3    A.  He was hired by Jake as a portfolio manager.

4    Q.  In any particular fund?

5    A.  I don't know if that was the -- it would have been the

6    balance fund or the global fund.

7    Q.  When did the defendant join the credit fund?

8    A.  He was put on the credit fund's team in around 2009, early

9    2010, probably.

10   Q.  How did you find out the defendant was joining the credit

11   fund?

12   A.  Well, it was a little unusual because I was just told, in

13   this case, by Jake.  As I said, he was Jake's brother-in-law;

14   so I didn't interview him or anything like that.  Jake just

15   told me he'd be joining the credit team.

16   Q.  Now, when did you and the defendant begin mismarking the

17   credit fund?

18   A.  2011.

19   Q.  Briefly, for now, how did the scheme begin?

20   A.  So Stefan had some of his positions that were going against

21   him.

22   Q.  Just to pause you there, what do you mean by "going against

23   him"?

24   A.  He was losing money, you know, bad news or whatever.  The

25   securities prices were going against us; so it was losing

1    money, and Stefan felt that some of those were not accurate,

2    that, you know, our business should be valued higher than he

3    saw in the marketplace.  And he endeavored to find some brokers

4    that he could explain what was going on, in an effort to get

5    them to give a different quote than we were seeing in the

6    marketplace.

7    Q.  How did it evolve from there?

8    A.  More and more, more of his positions ended up going against

9    us and, you know, he ended up doing more and more explaining.

10   And ultimately, it evolved from, you know, that to an instance

11   where, just on a monthly basis, we were getting prices parroted

12   back; that there weren't any substantive, at all, conversations

13   happening, and the broker would just give us the prices back

14   that we wanted.

15   Q.  So eventually no educating the brokers; is that right?

16   A.  Yeah.  And to be clear, I don't know how much educating was

17   at the start of that process.  That's what's supposed to be

18   happening, but over hundreds of securities over this

19   couple-year time period, there was not one change to the price.

20   So I don't believe there could have been any substantive

21   conversations.

22   Q.  Meaning the brokers never once came back and said, you got

23   it wrong?

24   A.  They never changed the price, not once.

25   Q.  Now, you mentioned the process on month end, and the

676

1  documents exchanged between you and ops.  Would operations ask

2  for backup broker quotes?

3  A.  On occasion, yes.

4  Q.  Okay.  What are backup broker quotes?

5  A.  The second quote.  They wanted another quote from a

6  different broker.

7  Q.  For valuation purposes?

8  A.  Correct.

9        MR. McGINLEY:  Ms. Meister, if you could please

10 publish what's in evidence as Government Exhibit 724, and just

11 the -- yes, the top e-mail, the whole thing.  Yes, that's

12 great.

13 Q.  So now, Mr. Plaford, this is an e-mail from Sudarshan Jain;

14 do you see that?

15 A.  Yes.

16 Q.  And who's that again?

17 A.  He's in operations.

18 Q.  It's to you, the defendant and Mr. Thorell?

19 A.  Yes.

20 Q.  Who did you commit the mismarking scheme with?

21 A.  Stefan and Jason.

22 Q.  It says:  Please provide backup for the below.  Do you see

23 that?

24 A.  Mmm, hmm.

25 Q.  What does backup mean?

H1HPLUM5                        Plaford - Direct

1   A.   Broker quotes.

2   Q.   What are some of the securities that he asked for broker

3   quotes for?

4   A.   FriendFinder and Nebraska Book, ATI, to name a few.

5   Q.   And who was the point person on FriendFinder?

6   A.   Stefan.

7   Q.   Who was the point person on ATI?

8   A.   Stefan.

9   Q.   Who was the point person on Nebraska Book?

10  A.   Stefan.

11           MR. McGINLEY:  You can take that down, Ms. Meister.

12  Thank you.

13  Q.   Now, you talked earlier about how each month you would send

14  prices to operations.  In the beginning, you sent those prices?

15  A.   Yes.

16  Q.   At some point, did you, yourself, stop sending prices to

17  operations?

18  A.   Yes.

19  Q.   And why was that?

20  A.   Steve Ku asked me to have Jason Thorell send them instead.

21  Q.   Do you remember what he said to you?

22  A.   He said it just looks better if the prices aren't coming

23  directly from the portfolio manager.

24  Q.   What did you understand Mr. Ku to mean by that?

25  A.   That if a third party was looking at the process, the

1    portfolio manager should not have that much influence over the

2    pricing process in general.

3    Q.  Did you then instruct Jason Thorell, the trader, to send

4    the prices to operations?

5    A.  I did.

6    Q.  Did he follow your instructions?

7    A.  He did.

8              MR. McGINLEY:  Ms. Meister, if you could publish

9    what's in evidence as Government Exhibit 111, and just the top

10   e-mail.  The top, yes, just that.

11   Q.  And we're not going to go into too much detail here,

12   Mr. Plaford, but what are we looking at here?

13   A.  An e-mail from myself to Jason describing what he should do

14   in sending this to ops.

15   Q.  You wanted him to send basically a clean e-mail from him to

16   ops without you on it?

17   A.  Correct.

18             MR. McGINLEY:  Ms. Meister, if you could publish

19   what's been marked as Government Exhibit 202B.

20   Q.  This is an e-mail from you to Jason Thorell with prices?

21   A.  Yes.

22             MR. McGINLEY:  Ms. Meister, if we could jump to the

23   Attachment 202A.

24   Q.  Now, these are the prices that Visium is picking; is that

25   right?

H1HPLUM5                              Plaford - Direct

1    A.  Yes.

2    Q.  And this is for ATI, C-Med, FriendFinder, as well?

3    A.  Yes.

4           MR. McGINLEY:  Thank you, Ms. Meister.

5    Q.  Now, we touched on this briefly, but at what time each

6    month did you generally get broker quotes?

7    A.  Around the end of the month.

8    Q.  Who got the broker quotes?

9    A.  Usually it was Stefan.

10   Q.  Did you ever?

11   A.  After Stefan's departure from the firm, I did for a brief

12   time.

13   Q.  Do you recall generally when the defendant left Visium?

14   A.  It was in the spring.  I think it was April, April 2013.

15   Q.  At that point, did you reach out to brokers on your own?

16   A.  One broker, yes.

17   Q.  And that was while the scheme was still going; so you

18   expected to get the prices parroted back?

19   A.  Yes.

20          MR. CREIZMAN:  Objection.

21          THE COURT:  Sustained.

22   Q.  After the defendant left, did you get broker quotes?

23   A.  Yes.

24   Q.  Who did you get them from?

25   A.  Princeridge.

H1HPLUM5                         Plaford - Direct

1   Q.  And which broker did you reach out to?

2   A.  Princeridge.

3   Q.  And why did you reach out to Princeridge?

4   A.  Because I knew that he was one of the friendly brokers that

5   Stefan used.

6   Q.  How did you know that?

7   A.  Because of what Stefan told me.

8   Q.  Did Princeridge send back every quote that you asked them

9   to?

10  A.  They did.

11  Q.  Do you remember the particular broker at Princeridge that

12  you got the quotes from?

13  A.  Scott Vandersnow.

14  Q.  When was the last time you spoke with Scott Vandersnow?

15  A.  It would have been at some point before my departure from

16  the firm at the end of 2013.

17  Q.  Now, once you told the brokers what prices to give you, by

18  what means would they send that back?

19  A.  Usually Bloomberg e-mail.

20  Q.  Typically, how long would it take from when you dictated

21  the prices to the brokers to when they sent them back to you?

22  A.  Usually pretty quickly.

23  Q.  Ever almost instantaneous?

24  A.  Probably.

25  Q.  Which brokers did you and the defendant use to mismark the

1    securities?

2    A.   Princeridge and Janney Montgomery.

3    Q.   Who found these brokers?

4    A.   Stefan.

5    Q.   Do you know if he had a relationship with them?

6    A.   I assume so, but I don't know.

7    Q.   Is Princeridge a large or small brokerage?

8    A.   Small.

9    Q.   What was Mr. Vandersnow's role at Princeridge?

10   A.   He was a sales trader.

11   Q.   We talked about what a trader does.  Is a sales trader

12   different or are they essentially the same?

13   A.   They basically interface with clients.

14   Q.   Janney Montgomery, is that a large or small brokerage?

15   A.   Smaller.

16   Q.   Now, in any given month that you and the defendant were

17   deciding on prices, how would you communicate about the prices?

18   A.   So we had a weekly meeting where we would talk about all of

19   Stefan's names that he was the point person on.  We would talk

20   about things like the valuation and other things, fundamentals

21   of the companies, et cetera.

22        And then at every month end, I would give Stefan a

23   long list, in some cases, which would include his names that we

24   were getting broker quotes for and eventually other names in

25   the book that weren't his as well.

H1HPLUM5                          Plaford - Direct

1   Q.  Did the defendant ever supply brokers with thumb drives

2   with prices on them?

3   A.  He did.

4   Q.  Now, have you heard recordings of yourself telling the

5   defendant prices for securities?

6   A.  I have.

7   Q.  When did you hear these calls?

8   A.  As part of my cooperation with the government.

9   Q.  Did you record these conversations?

10  A.  I did not.

11  Q.  Did you know you were being recorded?

12  A.  I did not.

13  Q.  You have before you, Mr. Plaford, a CD marked as Government

14  Exhibit 1235.

15  A.  Yup.

16  Q.  Do you see that?

17  A.  I do.

18  Q.  What is it?

19  A.  It's a recording of some of these conversations.

20  Q.  How is it that you recognize it?

21  A.  I initialed it.

22  Q.  Okay.  There should be a batch of transcripts up there with

23  you as well, if you want to grab those.  So you should have

24  before you Government Exhibits 1208T, 1212T, 1216T, 1228T,

25  1229T, 1230T and 1231T.  Just let me know when you've seen

1    those.

2    A.  I believe I have all of them.

3    Q.  Okay.  Do you recognize those transcripts?

4    A.  I do.

5    Q.  How is it that you recognize them?

6    A.  I read them as part of my cooperation process.

7    Q.  Do those transcripts fairly and accurately represent the

8    conversations you heard on the CD that you initialed?

9    A.  They do.

10   Q.  And do you recognize the voices on those transcripts?

11   A.  I do.

12   Q.  Do the transcripts fairly and accurately identify the

13   speakers on the recordings?

14   A.  They do.

15          MR. McGINLEY:  Your Honor, the government offers

16   Government Exhibit 1208T, 1212T, 1216T, 1228T, 1229T, 1230T and

17   1231T as aids to the jury.

18          MR. CREIZMAN:  No objection as to aids for the jury.

19          THE COURT:  I'm sorry, what?

20          MR. CREIZMAN:  No objection to the admission as an aid

21   for the jury.

22          THE COURT:  Okay.  Received.

23          (Government's Exhibits 1208T, 1212T, 1216T, 1228T,

24   1229T, 1230T and 1231T received in evidence)

25          MR. McGINLEY:  Now, your Honor, if I may ask the jury

1  to pull out their transcript binders and please turn to 1229T.

2  BY MR. McGINLEY:

3  Q.  And, Mr. Plaford, if you could do the same.  It's also up

4  on the screen, if that's easier.  And just focusing on the

5  first page before we play it, do you see the file title:  CP

6  dictating levels month end?

7  A.  Yes.

8  Q.  And if we could turn to the first page of the text.

9         MR. McGINLEY:  And if we could please play that.

10         (Audio played)

11  Q.  Now, Mr. Plaford, just generally who's talking in this

12  conversation?

13  A.  Stefan and I.

14  Q.  And what are you discussing?

15  A.  Month-end levels.

16         MR. McGINLEY:  Ms. Meister, if you could please

17  highlight that first paragraph of Mr. Plaford's statement.

18  Q.  Now, you say:  I just need some broker quotes for month

19  end, which was yesterday.

20         And you say: Just let me know, I'll, you know -- you

21  know the drill.

22         What did you mean by "you know the drill."

23  A.  This is the process we went through every single month.

24  Q.  And you say to him, I'll tell you where I think they are

25  around, and you let me know if any of these are dramatically

1   different.  Do you see that?

2   A.  Yup.

3   Q.  And why did you say that to him?

4   A.  Well, I would want to know if they were different.

5   Although, over hundreds of securities, nothing was ever

6   different.  Although, I think that just sounded a lot better

7   than:  I'm just going to tell you the level, the broker, to get

8   and you get that level.

9   Q.  And the quotes were never dramatically different?

10  A.  I'm not sure they were different at all.

11  Q.  Now, just generally, just to understand and we don't need

12  to delve into the intricacies of bond trading, but when you say

13  wrapped around, what do you mean?

14  A.  That means approximately.

15  Q.  Does that mean if you give him two numbers, it's usually in

16  the middle?

17  A.  Well, there would be a bid and offer; so that would be

18  probably in the midpoint.

19         MR. McGINLEY:  If we could jump, Ms. Meister, to the

20  last page.  This is Page 2.  If you could just highlight the

21  text.

22  Q.  So you say:  Yeah, these are the Euro tranches.  Do you see

23  that part, Mr. Plaford?

24  A.  Yes.

25  Q.  And then you end by saying:  And the USON escrow wrapped

1  around five and a quarter?

2  A.  Yes.

3  Q.  And the defendant responds:  Got it.  Just so you know,

4  some of those traded yesterday at two-and-five-eights.  Do you

5  see that?

6  A.  Yes.

7  Q.  So your quote was five-and-a-quarter, and they had just

8  traded at two-and-five-eighths?

9  A.  Yes.

10  Q.  Let's flip to Government Exhibit 1216T.  And, Mr. Plaford,

11  the file title here is:  CP levels FFN 12.5; do you see that?

12  A.  Yes.

13  Q.  FFN, is that a ticker for a particular security?

14  A.  FriendFinder.

15          MR. McGINLEY:  If we could turn to the first page of

16  the transcript, Ms. Meister, and play the recording.

17          (Audio played)

18  Q.  Now, who's talking in this record, Mr. Plaford?

19  A.  Stefan and I.

20  Q.  And what are you discussing?

21  A.  Month-end prices.

22  Q.  Just turning back to Page 1, just the top half.

23          MR. McGINLEY:  If you could please focus on that,

24  Ms. Meister.

25  Q.  You say:  All right.  FriendFinder.  Do you see that?

1   A.  Yes.

2   Q.  Whose position was FriendFinder?

3   A.  Stefan's.

4   Q.  Why would you need to tell him the price in these

5   recordings even though it's his position?

6   A.  Well, we -- I tell him the price for everything because I

7   wouldn't trust him to do hardly anything on his own, first of

8   all, but we already talked about a lot of these.  We would do a

9   weekly meeting and we would talk about valuations for the

10  companies, loans for the companies, what it's worth, that kind

11  of thing.  So we have already pre-discussed at least his names

12  that are part of this month-end process, in most cases.

13  Q.  When you say, further down:  I'm going to tell you where I

14  think they are, why did you say that?

15  A.  Again, that sounded a lot better than, I'm just going to

16  tell you the levels to have the broker quote it.

17  Q.  Let's skip to GX 1208T, and the file title there is:  CP

18  levels prices.  Do you see that?

19  A.  Yes.

20         MR. McGINLEY:  If we could flip to the first page of

21  the recording, and if you could play that, please, Ms. Meister.

22         (Audio played)

23  Q.  Okay.  Just who is speaking on this call, Mr. Plaford?

24  A.  Myself and Stefan.

25  Q.  And this UM2, is that you?

1    A.  I'm sorry?

2    Q.  Just on the transcript, does yours have your name on it?

3    A.  It does not.

4    Q.  Okay.  So the person that says:  But can you take care of

5    this first thing, is that you or the defendant?

6    A.  Me.

7    Q.  And you say:  You haven't sent me the sheet yet.  What do

8    you mean by that?

9    A.  Operations hadn't sent the sheet that we know which broker

10   quotes we would need to be getting ourselves versus what we

11   would be taking a third party for.

12   Q.  You say:  I don't know which prices we're picking.  I just

13   want to get those to make sure we're covered on everything.

14          Do you see that?

15   A.  Yes.

16   Q.  And the defendant replayed:  Yeah?

17   A.  Yes.

18   Q.  Let's go to Government Exhibit 1230T.  Mr. Plaford, do you

19   see for the file title it says:  CP levels for month-end

20   January 2013?

21   A.  Yes.

22   Q.  Now, is this during the time that you and the defendant are

23   mismarking securities?

24   A.  Yes.

25   Q.  Okay.  If we could flip to the first page of the

```
 1    transcript.
 2            MR. McGINLEY:  And, Ms. Meister, please play the
 3    exhibit.
 4            (Audio played)
 5    Q.  Okay.  So, Mr. Plaford, who's talking in this conversation?
 6    A.  Stefan and I.
 7    Q.  What are you generally discussing?
 8    A.  Month-end levels.
 9    Q.  Looking at the first page of the transcript, starting where
10    you say:  I just need, and going through his response?
11    A.  Yes.
12    Q.  You say:  I just need -- we just need to get a couple.
13    Month end was yesterday.  We just need a couple of quotes from
14    Princeridge, or somebody, close to some of these names?
15    A.  Mmm, hmm.
16    Q.  Do you see that?
17    A.  Yes.
18    Q.  What do you mean there?
19    A.  I -- basically, that's how we talk.  I just say, get these
20    from Princeridge.
21    Q.  Why do you say Princeridge?
22    A.  Because I knew from Stefan that they were one of the
23    friendly brokers.
24    Q.  His response is:  All right.  I got it on.  I'll just type
25    it up on one hand.  Do you see that?
```

1   A.  Yes.

2   Q.  When you told the prices to the defendant, did he ever push

3   back?

4   A.  No.

5   Q.  Let's turn to Government Exhibit 1228T.  Mr. Plaford, do

6   you see there the file title is:  CP month end?

7   A.  Yes.

8   Q.  Let's turn to the first page.

9           MR. McGINLEY:  If you could please play the exhibit,

10  Ms. Meister.

11          (Audio played)

12  Q.  Now, Mr. Plaford, this is you and the defendant talking?

13  A.  Correct.

14  Q.  Who is "Scott" in this conversation?

15  A.  Scott Vandersnow.

16  Q.  What was his role in the mismarking scheme?

17  A.  He was one of the friendly brokers.

18  Q.  Is this part of the month-end process?

19  A.  It is.

20  Q.  What are you hoping to get from Scott?

21  A.  Broker quotes.

22  Q.  Okay.  If we could jump to the final recording, which is

23  GX 1212T, and the title here is:  CP Jason needs month-end

24  stuff.  Do you see that?

25  A.  Yes.

1   Q.  What are your initials?

2   A.  CP.

3   Q.  Okay.  If we could go to the first page of the transcript,

4   and you can play that.

5           MR. McGINLEY:  Thank you, Ms. Meister.

6           (Audio played)

7   Q.  Okay.  Mr. Plaford, when you say:  Jason needs the

8   month-end stuff, what do you mean by that?

9   A.  Jason Thorell.

10  Q.  Why did he need the month-end stuff?

11  A.  He needed to get quotes for operations.

12  Q.  And the defendant replies:  Yeah, I sent it over to

13  Princeridge.  I'm still waiting for them to come back with it.

14  Do you see that?

15  A.  Yes.

16  Q.  And who, again, is Princeridge?

17  A.  One of the friendly brokers.

18          MR. McGINLEY:  Thank you, Ms. Meister.  You can take

19  that down, and we're done with the transcripts.

20  Q.  Now, Mr. Plaford, for how many months did you and the

21  defendant have conversations like the ones we've just heard?

22  A.  Around a couple of years.

23  Q.  What were some of the securities that were most

24  consistently mismarked?

25  A.  ATI, FriendFinder, Nebraska Book, Sevan Marine, C-Med, to

1    name a few.

2    Q.  Let's focus on ATI.  Whose position was that?

3    A.  Stefan's.

4    Q.  What kind of company was ATI?

5    A.  It's an education company.

6    Q.  How did the ATI position get into the credit fund?

7    A.  Stefan's idea.

8    Q.  At some point, did you become concerned with the

9    performance of ATI?

10   A.  I did.

11   Q.  Around when?

12   A.  This would have been sometime in 2011.

13   Q.  What caused you concern?

14   A.  There were a couple of things.  One, the education sector,

15   as a whole, was facing significant reimbursement pressure.  And

16   also, ATI specifically had been overreporting their placement

17   rates, and the impact of that was there was essentially -- they

18   were reporting fraudulent placement rates, which impacted their

19   ability to get reimbursement for those canvasses.

20   Q.  How did that negative news affect the value of ATI?

21   A.  Very negatively.

22   Q.  How did the defendant react to this news?

23   A.  Not as negatively as the rest of the street.

24   Q.  Did you immediately change your valuation of ATI?

25   A.  Probably not.

H1HPLUM5                    Plaford - Direct

1    Q.  And why not?

2    A.  You know, as was typical, Stefan had an excuse for

3    everything.  He still thought there was a lot of value in the

4    company.  He thought that people weren't getting it, that the

5    street was mismarking it, that, you know, just generally

6    speaking, he disagreed with everyone.

7                MR. CREIZMAN:  Objection to the narrative answer.

8                THE COURT:  Hang on.  Sustained.  The jury will

9    disregard the last answer.

10   Q.  Now, Mr. Plaford, you mentioned that you don't believe that

11   you marked the value down of ATI as quickly as you should have;

12   is that right?

13   A.  Right.

14   Q.  What role did broker quotes play in maintaining that value?

15   A.  Well, we had to use broker quotes because we didn't want to

16   change this to a Level 3 asset.  So the only way to do that was

17   to continue to get broker quotes.  So we had to get broker

18   quotes to come up with the valuation, if we wanted to be

19   different than what we were seeing in the street, which we did.

20   Q.  We're going to come back to that in a minute, but why did

21   you not want it to become a Level 3 asset?

22   A.  Because Level 3 assets are less liquid and are more

23   problematic for our investors.  Visium investors didn't want

24   Level 3 assets.

25   Q.  What ultimately happened to the investment in ATI?

1  A.  It was side-pocketed.

2  Q.  Before I ask you about that, when you say "the street,"

3  what do you mean by that?

4  A.  The rest of the market.

5  Q.  Is it Wall Street?

6  A.  Yes.

7  Q.  Now, back to ATI.  What ultimately happened?

8  A.  The company went through a restructuring process and our

9  investment was side-pocketed.

10 Q.  What do you mean by "side-pocketed"?

11 A.  So a side pocket is basically removing a fund from the rest

12 of the securities and accounting for it separately.

13 Q.  Let's talk about FriendFinder, whose position was that?

14 A.  Stefan's.

15 Q.  What kind of company is FriendFinder?

16 A.  It's basically a pornography company.

17 Q.  How did FriendFinder get into the credit fund?

18 A.  Stefan's idea also.

19 Q.  At some point, did you become concerned with the

20 performance of FriendFinder?

21 A.  Yes.

22 Q.  Why was that?

23 A.  Because they were missing expectations.  The enterprise

24 value was declining.  The value of the company, as a whole, was

25 declining.

1   Q.  Did you immediately mark down the value of Friend Finder?

2   A.  Probably not.

3   Q.  Why not?

4   A.  That one I remember very specifically.  I asked Stefan one

5   day why I was seeing quotes significantly lower, and his

6   response was:  That's BS.  It's not really there.  It's an

7   irresponsible broker.  That's not the right value.  That's not

8   the right level.  I'll get to the bottom of it and get a quote

9   from somebody who basically knows where he thought it should be

10  more accurately.

11  Q.  What role did broker quotes play in maintaining the value

12  of Friend Finder?

13  A.  Again, that was the only way -- we didn't want to change it

14  to Level 3, as we did with any asset -- that would enable us to

15  use our internal valuations.  We had to get broker quotes.

16  Q.  Let's turn to Nebraska Book.  Who's position?

17  A.  Stefan's also.

18  Q.  What kind of company is Nebraska Book?

19  A.  It's a book company.

20  Q.  How did it get into the credit fund?

21  A.  Stefan's idea.

22  Q.  How large of a position did you hold in Nebraska Book?

23  A.  It varied.  It was pretty sizeable, 20-plus million.

24  Q.  Do you remember what the thesis or the idea was behind

25  investing in Nebraska Book?

1    A.  Originally Stefan's thesis was that it was just an

2    arbitrage position, which means that he thought the debt was

3    about to be called and replaced with new debt; so we would make

4    small amount of money buying it today, getting the coupon, plus

5    any small differential between the current market price and the

6    call price.

7    Q.  So just to break that down very simply, because you used

8    the word arbitrage position, what do you mean?

9    A.  So basically, he thought that the company's debt was going

10   to be called in the near future, and we would make a little bit

11   of money over a short period of time.

12   Q.  You mean by "call," you mean the company would buy it back?

13   A.  Yes.  The debt was close to maturity; so the company needed

14   to replace that debt with debt of a longer maturity.

15   Q.  At some point, did Nebraska Book begin performing poorly?

16   A.  It did.

17   Q.  And did you have an understanding of why?

18   A.  The company was unable to call their debt at that time; so

19   they ended up going through a restructuring instead.

20   Q.  Did you have any concerns about the business' viability

21   generally?

22   A.  I did.

23   Q.  Why is that?

24   A.  Well, this is a company that makes textbooks, old, big,

25   cumbersome textbooks.  There's a lot of new technologies that

H1HPLUM5                          Plaford - Direct

1    can replace those.

2    Q.  Despite these concerns, did you and the defendant

3    immediately mark down the value of Nebraska?

4    A.  Probably not.

5    Q.  Did you talk with the defendant about marking down the

6    value of Nebraska?

7    A.  I did.

8    Q.  What did he tell you?

9    A.  He said, don't worry about it; it's going to be called.

10   It's going to happen, you know, at that time.  And, obviously,

11   it didn't.

12   Q.  What became of the credit fund's position in Nebraska?

13   A.  We ended up owning it through a restructuring process and

14   got part of our stake converted to equity in the company.

15   Q.  In total, did you make or lose money on it?

16   A.  We lost a substantial amount of money.

17   Q.  Do you know about how much?

18   A.  I don't.

19   Q.  Now, focusing on the prices that you and the defendant

20   would pick.  How would you go about determining those prices?

21   A.  Well, as I said, Stefan and I did weekly meetings where we

22   were supposed to talk about the names, at least his names, the

23   names that he was the point person on, the names that he was

24   working on, every week.

25               And we would talk about, you know, the value of the

1    company, anything that's changed over the course, you know,

2    between then and our last discussion, and the other thing --

3    anything else that's relevant.

4    Q.   What role did models have in helping you pick the price?

5    A.   A significant role.

6    Q.   Just very generally, what's a financial model?

7    A.   So it's usually an Excel spreadsheet that outlines a number

8    of accounting metrics for a company, usually forecasts,

9    earnings into the future, puts what's called a multiple on

10   those concerns, and ultimately tries to arrive at a fair value

11   for the company as a whole.

12   Q.   Were there assumptions built into these models?

13   A.   There were.

14   Q.   For the distressed assets, the ATIs, the C-Meds, who came

15   up with -- who made those models?

16   A.   Stefan did.

17   Q.   Who came up with the assumptions?

18   A.   Stefan did.

19   Q.   Was there ever a third party evaluating these models until

20   December 2012?

21   A.   There was not.

22   Q.   What about after that?

23   A.   A couple of the assets, at that time, were moved to Level 3

24   and simultaneously side-pocketed, and at that time, there

25   started to be a third-party valuation that would review the

1    model.

2    Q.  Did you ever tell operations that you were dictating prices

3    to brokers?

4    A.  No.

5    Q.  Why not?

6    A.  They would have frowned on that.

7    Q.  Did you ever tell the valuation committee that you were

8    dictating prices to brokers?

9    A.  No.

10   Q.  Why not?

11   A.  Because the same.

12   Q.  And how about the fund administrator?

13   A.  No.

14   Q.  At times, would you send prices to operations before you

15   even got the broker quotes?

16   A.  Yes.

17   Q.  And why is that?

18   A.  Because, as I said, over the course of hundreds of these

19   data points, the prices never changed; so we were pretty

20   confident that we could just get the price that we wanted.

21   Q.  Now, did you continue the mismarking scheme after the

22   defendant left Visium?

23   A.  For a short period, yes.

24   Q.  And why did you do that?

25   A.  It had become part of our process.  It was easy to do.  I

1  knew that I could, from Stefan's interaction with them over,

2  you know, years prior to that.

3  Q.  When you did it after the defendant left, which broker did

4  you use, again?

5  A.  Princeridge.

6  Q.  And why?

7  A.  Because I knew from Stefan's relationship with them that

8  they were one of the friendly brokers.

9  Q.  You used Scott Vandersnow; is that right?

10 A.  Correct.

11 Q.  How would you get the quote from Mr. Vandersnow?

12 A.  Usually on Bloomberg e-mail.

13 Q.  What would you say to him, generally?

14 A.  Similar to the recordings with Stefan, can I get quotes,

15 you know, for these securities.  This is the levels that I

16 think they should be at.

17 Q.  And would he send them right back?

18 A.  He would.

19      MR. McGINLEY:  Ms. Meister, could you please publish

20 Government Exhibit 725.  It's a little hard to see on the

21 monitor, but if you could highlight the text.  If you could

22 back up just so they see who it's from.  Okay.

23 Q.  So now, Mr. Plaford, this is from you to Mr. Vandersnow; is

24 that right?

25 A.  Correct.

H1HPLUM5                          Plaford - Direct

 1   Q.  You asked for month-end indications for these names?

 2   A.  Yes.

 3   Q.  What are the names that you asked for?

 4   A.  USON, FriendFinder, NTRC, Savient.

 5   Q.  And how would Mr. Vandersnow send the levels back to you?

 6   A.  Usually Bloomberg e-mail.

 7           MR. McGINLEY:  Ms. Meister, if you could please

 8   publish Government Exhibit 726, and just if you could highlight

 9   the entire text.

10   Q.  What are we looking at here, Mr. Plaford?

11   A.  Looks like a message from Scott to Jason Thorell, Lee Brown

12   and myself, month-end levels.

13   Q.  How did he know these levels?

14   A.  I had probably had a conversation with him prior to that.

15           MR. McGINLEY:  Ms. Meister, if we could jump down to

16   Government Exhibit 735.

17   Q.  Now, Mr. Plaford, do you see this is a Bloomberg message?

18   A.  Yes.

19   Q.  And it's from Mr. Vandersnow to you?

20   A.  Yes.

21   Q.  He writes:  Hey, Chris, just checking to see if you need

22   anything for month end?

23   A.  Yes.

24   Q.  Would Mr. Vandersnow sometimes reach out to you before you

25   reached out to him month end?

1    A.  Yes.

2    Q.  And why is that?

3    A.  It's a process that we had used at the end of every month

4    for a multiyear period.

5    Q.  Did you come to depend on him?

6    A.  Yes.

7    Q.  Now, once you got the quote, if you got it directly, what

8    would you do with it?

9    A.  Send it to operations or Jason to send to operations.

10   Q.  Why would you sometimes send it to Jason to send to

11   operations?

12   A.  Well, again, the CFO, Steve Ku, said it's better to not

13   come from me directly.

14   Q.  Why was that again?

15   A.  Because he said that it looks bad if the portfolio manager

16   is the one that's sending the price levels.

17          MR. McGINLEY:  Ms. Meister, if you could publish

18   what's in evidence as Government Exhibit 727.

19   Q.  This is an e-mail from you to Mr. Thorell?

20   A.  Yes.

21          MR. McGINLEY:  Ms. Meister, if you could go to the

22   next page.  If you could just highlight that.

23   Q.  What are we looking at here, Mr. Plaford?

24   A.  Month-end levels from Scott again.

25          MR. McGINLEY:  Thank you, Ms. Meister.  You can take

H1HPLUM5                         Plaford - Direct

1    those down.

2    Q.  Now, at some point, did Visium change its valuation

3    process?

4    A.  It did.

5    Q.  When?

6    A.  This was probably mid-2013.

7    Q.  Before or after the defendant left Visium?

8    A.  After.

9    Q.  And how did the process change?

10   A.  Basically the firm endeavored to take out the investment

11   team for valuing the prices.

12   Q.  Your understanding, how were they then to be priced?

13   A.  The operations group would try to get the pricing directly,

14   I believe.

15   Q.  Now, I want to switch topics and talk about Levels 1, 2 and

16   3 classifications.  Okay?

17          Now, in the early years of the credit fund, what

18   percentage of the credit fund's holdings were classified as

19   Level 3?

20   A.  Zero.

21   Q.  Was that a point of pride?

22   A.  Well, I don't know about pride, but it was important for

23   investors not to have Level 3 assets.

24   Q.  Why is that, again, just briefly?

25   A.  Well, Level 3 is associated with illiquidity; so investors

1    don't want illiquidity in the portfolio.

2    Q.  Did there come a time when it went from zero to a larger

3    percentage of Level 3 assets?

4    A.  Yeah, in December of 2012.

5    Q.  And we'll talk about that time frame in a minute.  Did you

6    feel any pressure to classify assets as Level 2?

7    A.  I did.

8    Q.  What was the source of that pressure?

9    A.  Jake Gottlieb.

10   Q.  What did he say to you?

11   A.  Try to price everything at Level 2, if you can.

12   Q.  Did you have an understanding of why?

13   A.  Because, as I said, it was important for investors not to

14   have Level 3 assets, if possible.

15   Q.  Did you and the defendant discuss the need to keep assets

16   at Level 2?

17   A.  We did.

18        MR. McGINLEY:  Ms. Meister, if you could publish

19   Government Exhibit 1162.

20   Q.  Now, this is an e-mail from the defendant to you; is that

21   right?

22   A.  Correct.

23   Q.  He says:  Spoke to Kim.  Do you know who Kim is?

24   A.  I believe it is somebody in the finance department or

25   accounting department.

H1HPLUM5                          Plaford - Direct

1    Q.   This is in early 2011?

2    A.   January of 2011.

3    Q.   The defendant writes:  So Level 3 would be only names with

4    no market and single quote.  All of the names we would be

5    looking at are Level 2, which means they have multiple quotes

6    from dealers and markets.  This opens up plenty of additional

7    opportunities for us that we had previously been blocked out of

8    participating.

9           Do you remember having this discussion with him?

10   A.   I don't remember specifically this, no.

11   Q.   What do you remember about the general discussions you had

12   with him about keeping assets Level 2?

13   A.   Well, just that, the investors don't want Level 3 assets;

14   so we really can't transact intentionally Level 3 assets.

15   Everything has to be Level 2 or better.

16           MR. McGINLEY:  Ms. Meister, if you could publish

17   what's in evidence as Government Exhibit 1161, and if you could

18   focus just on the cannot.

19   Q.   So now, this is an e-mail from you to the defendant, and

20   you write:  There has to be someone else we can ask.  We

21   absolutely cannot let this become Level 3?

22   A.   Yes.

23   Q.   And he responds:  Two thoughts.  We ask Jeffries trader to

24   come up with quote, since it is their deal, or two, we ask the

25   company CFO or auditor to quote it.  Only other option is to

1    put out bids and offers to actually lay a market with a broker.

2              Do you see that?

3    A.  Yes.

4    Q.  What is the general topic that you are discussing here?

5    A.  Level 2, Level 3.

6    Q.  When you tell him, this absolutely cannot become Level 3,

7    had you had those discussions before?

8    A.  Yes.

9              MR. McGINLEY:  You can take that down, Ms. Meister.

10   Q.  Now, I think you explained this.  How did broker quotes

11   help maintain assets as Level 2 assets?

12   A.  Well, we didn't want to use the prices that were in the

13   marketplace because they were lower than what we wanted; so

14   there's only two options if you don't want to use the prices in

15   the market.

16             You can move it to Level 3.  If you move it to Level

17   3, you can use your own internal valuation.  We can use our

18   model and other fundamental metrics to make the price what we

19   wanted, but we didn't want to do that because investors didn't

20   want Level 3.  So the only other option was to continue to get

21   broker quotes and keep them marked as Level 2 assets.

22   Q.  Now, you mentioned that, at some point, Visium moved some

23   securities to Level 3.  When was that, again?

24   A.  In December of 2012.

25   Q.  Which securities were moved to Level 3?

H1HPLUM5                         Plaford - Direct

1   A.   Mostly ATI and China Medical.  There may have been another

2   small one.

3   Q.   During the mismarking scheme, who obtained the broker

4   quotes for ATI and China Med?

5   A.   Stefan.

6   Q.   Why were these securities moved to Level 3?

7   A.   Well, they probably were Level 3 assets to begin with.

8   They weren't trading, or were trading very little.  And as I

9   said, we didn't -- we didn't want to use the quotes that were

10  in the marketplace for those securities because they were

11  lower.

12        So we had to -- you know, we had to get broker quotes

13  before, but then when they were moved to Level 3, it was really

14  the side pocket would make them much more visible to investors.

15  And so the visibility of that necessitated that the firm also

16  move them to Level 3 because there really was no other choice.

17  Investors could then look and see that they weren't, in fact,

18  Level 2 if we tried to keep them at Level 2.

19  Q.   How did investors react when they were moved to Level 3?

20  A.   Negatively.

21  Q.   Do you believe ATI should have been moved to Level 3

22  earlier?

23  A.   Yes.

24  Q.   And same question for C-Med?

25  A.   Yes.

708

1    Q.  We talked about your concerns with ATI earlier, but

2    briefly, what were your concerns with C-Med as a company?

3    A.  The simplistic version is that the CEO disappeared with a

4    lot of the company's money.

5    Q.  Okay.  And the company is located where?

6    A.  China.

7    Q.  So that you had learned that the CEO of the company went

8    missing with the company's money?

9    A.  Yes.

10   Q.  After learning that news, did you mark down the value of

11   the company right away?

12   A.  Probably not, no.

13   Q.  How did you maintain that value?

14   A.  We had a model that justified a higher valuation.  You

15   know, we would use e-mail, or whatever documentation was

16   available, to point to a higher valuation.

17   Q.  Would you also rely on broker quotes?

18   A.  Yes.

19   Q.  Who got those broker quotes for C-Med?

20   A.  Stefan did.

21   Q.  Now, you mentioned that you committed the crime of painting

22   the tape; do you remember that?

23   A.  Yes.

24   Q.  What security did you paint the tape?

25   A.  China Medical.

1   Q.  What kind of company is that again?

2   A.  It's a Chinese medical device company.

3   Q.  And who did you paint the tape with?

4   A.  Stefan.

5   Q.  And why did you do it?

6   A.  Because it helped if there was a tender offer coming, as we

7   believed there would be, to set a higher initial valuation, and

8   it also helped for valuation purposes.  We could more easily

9   market at something akin to the last trade price.

10  Q.  Okay.  How would marking something at the last trade price

11  help you?

12  A.  So it would increase the NAV, which would increase the P

13  and L, which would ultimately earn us more money.

14  Q.  Now, where were you when you decided to paint the tape?

15  A.  In the Visium office.

16  Q.  Who were you with?

17  A.  Stefan Lumiere and Ameesh Shah.

18  Q.  What did you discuss?

19  A.  Very similar to what I just outlined, the benefits of

20  having a higher initial starting price if the company came with

21  a tender offer.

22  Q.  How did the defendant react?

23  A.  He agreed.

24  Q.  Then how did you go about actually painting the tape?

25  A.  Stefan executed the trade at a level that was above the

1   current valuation in the market price.

2   Q.  Did you instruct him to execute the trade?

3   A.  Yes.

4   Q.  And why him?

5   A.  He's the one with the -- that had relationship with the

6   types of brokers who would execute a trade like that.

7   Q.  Do you know which broker he used for the trade that painted

8   the tape?

9   A.  I don't.

10  Q.  Did the defendant then go out and buy C-Med above market

11  price?

12  A.  He did.

13  Q.  How do you know that?

14  A.  He told me afterwards.

15  Q.  What did he tell you?

16  A.  That -- he gave me the fill, which is basically the

17  execution details, the level that he had purchased the bonds.

18  Q.  How did you react?  Were you surprised?

19  A.  I was.

20  Q.  Why?

21  A.  Because it was a level that significantly exceeded the

22  current market price.

23  Q.  Do you remember generally what C-Med was trading for at the

24  time?

25  A.  I believe the low 30s, 30-ish, low 30s.

1           MR. McGINLEY:  Ms. Meister, if you could publish

2    what's in evidence as Government Exhibit 732.

3    Q.  Mr. Plaford, we can do this just quickly.  You have a hard

4    copy there before you.  Do you want to just quickly leaf

5    through that?

6    A.  Sure.

7           (Pause)

8           I think I have the idea.

9    Q.  Okay.  Are those broker quotes?

10   A.  They are.

11   Q.  Do they include quotes for C-Med?

12   A.  They do.

13   Q.  General range?

14   A.  25, 30, 27, 33, wrapped around approximately 30.

15   Q.  They are sent from different banks?

16   A.  They are.

17   Q.  What kind of banks?

18   A.  Barclays, Jeffries, another one from Barclays.

19   Q.  Okay.  Just focusing on the first page, the quotes are to

20   you?

21   A.  They're to a number of -- myself and a number of other

22   members of the credit team.

23   Q.  Okay.  Including the defendant, Stefan Lumiere?

24   A.  Correct.

25   Q.  Do you know what price the defendant ultimately bought

H1HPLUM5                          Plaford - Direct

1    C-Med at?

2    A.  I believe it was 43 and change.

3              MR. McGINLEY:  You can take that one down,

4    Ms. Meister, and if you could publish Government Exhibit 707.

5    If you could, just highlight the text, Ms. Meister.

6    Q.  Can you see here March 23rd, 2012, up at the top:  Message

7    sent?

8    A.  Yes.

9    Q.  That's from John Brook at Janney Montgomery?

10   A.  Yes.

11   Q.  The subject is:  Trade ticket?

12   A.  Yes.

13   Q.  Now, Janney is the brokerage.  They would sell you a

14   security you wanted to buy?

15   A.  Correct.

16   Q.  Okay.  So if you go down, trader:  Jonathan Brook?

17   A.  Yes.

18   Q.  It sells, issuer is China Med; do you see that?

19   A.  Mmm, hmm.

20   Q.  The price is 43.25?

21   A.  Yes.

22   Q.  I think you mentioned this already, but what was the

23   price -- the quotes you were getting at the time for C-Med?

24   A.  Around 30.

25             MR. McGINLEY:  Ms. Meister, if you could please put up

1    what's in evidence as Government Exhibit 708, and Ms. Meister,

2    can you focus on the top, the "from" and "to."

3    Q.  This is from John Brook at Janney to Lee Brown; do you see

4    that?

5    A.  Correct.

6    Q.  Who is Lee Brown, again?

7    A.  It's another member of the credit team.

8         MR. McGINLEY:  Ms. Meister, if we could jump to

9    page --

10   Q.  And the date there, that's March 23rd, 2012; is that right?

11   A.  Yes.

12   Q.  Is that the same date we just saw for the trade being

13   executed?

14   A.  I believe so, yes.

15        MR. McGINLEY:  If we could jump, please, to Page 6.

16   Will you start at the last line and just highlight that.

17   Q.  Now, Mr. Plaford, this is March 23rd, 2012.  It's from John

18   Brook, and it says:  I just want to talk to Lumi.  Do you see

19   that?

20   A.  Yes.

21   Q.  If we could continue onto the next page.  We bought these

22   things at 42.5.  It's illiquid off the run.  I am assuming we

23   are working for a point, but not sure?

24   A.  Yes.

25   Q.  About what price did you paint the tape of C-Med at?

1   A.  43-and-a-quarter.

2   Q.  Why the difference between 43 and 42.5?

3          MR. CREIZMAN:  Objection, foundation.

4          THE COURT:  Overruled.

5   A.  That's the commission the broker gets.

6   Q.  Brook says he's trying to talk to Lumi.  Do you have an

7   understanding of who Lumi is?

8   A.  I assume that means Stefan.

9          MR. McGINLEY:  Now, you can take that down,

10  Ms. Meister.

11  Q.  Now, was the above-market price the defendant purchased

12  C-Med at used for valuation?

13  A.  It was.

14         MR. McGINLEY:  If you could publish, please,

15  Government Exhibit 710.

16  Q.  Just starting at the top, this is a conversation between

17  you and Sudarshan Jain?

18  A.  Correct.

19  Q.  You would have to relay the prices to Mr. Jain for the

20  month-end process?

21  A.  Yes.

22         MR. McGINLEY:  If you could go down to the text, and

23  if we could focus on the 18:46:52.  Just blow it up.

24  Q.  You tell Mr. Jain:  Think we traded small C-Med today.

25  Mark 13s wherever we traded.  Do you see that?

H1HPLUM5                          Plaford - Direct

1   A.  Yes.

2   Q.  13, is that a type of bond?

3   A.  That's the bond that we had just purchased.

4   Q.  And Mr. Jain says:  With whom?  And you said:  Don't know.

5   Think Stefan did trade?

6   A.  Yes.

7           MR. McGINLEY:  You can take that down.  Thank you.

8   Q.  There is one last recording, and that is Government

9   Exhibit 1231T.  And while we're getting to that, Mr. Plaford,

10  do you remember anyone at Visium who had the initials PB?

11  A.  Phil Broenniman.

12  Q.  And who is Phil Broenniman?

13  A.  He was a portfolio manager on the global fund.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1    Q.  And did he leave Vizeum at some point?

2    A.  He did.

3    Q.  And do you see here on this transcript -- this again is

4    1231-T?

5    A.  Yes.

6    Q.  Do you see, the file says "conv with PB 4.14.13"?

7    A.  Yes.

8    Q.  And 4.14.13, do you know if the defendant was still at

9    Vizeum at the time or he had left?

10   A.  I am inferring from this conversation that he was still

11   there.

12   Q.  OK.  And if we could turn to the first page of that

13   transcript, and please play it.

14           (Audio played)

15   Q.  Now, Mr. Plaford, just focusing on the first things the

16   defendant says here, starting with "Yeah," the defendant says:

17   Yeah.  Hey, by the way, don't mention anything about what I

18   told you about, you know, the way that Vizeum portrays their

19   P&L and stuff like that.  Do you see that?

20   A.  Yes.

21   Q.  And what is P&L again?

22   A.  Profit and loss.

23   Q.  Is that performance, essentially?

24   A.  Yes.

25   Q.  Is performance important to investors?

H1hdlum6                    Plaford - cross

1    A.  Of course.

2          MR. McGINLEY:  And, Ms. Meister, if we could jump down

3    to the next two statements.

4    Q.  Phil responds:  Oh, well, which piece?  But of course I

5    wouldn't.  Whatever you and I talk about is between us.

6          And the defendant states:  Yeah.  No, yeah, the, the

7    BS marking of the book.

8          Do you see that?

9    A.  Yes.

10   Q.  The phrase, "the book," what does that mean?

11   A.  Portfolio.

12   Q.  And did you mismark the credit fund book?

13   A.  Yes.

14   Q.  Who did you mismark it with?

15   A.  Stefan.

16         MR. McGINLEY:  Nothing further, your Honor.

17         THE COURT:  Cross-examination.

18   CROSS-EXAMINATION

19   BY MR. CREIZMAN:

20   Q.  Good afternoon.

21   A.  Good afternoon.

22   Q.  I want to ask you some questions about the surprise visit

23   by the FBI agents in the fall of 2014.  Do you understand?

24   A.  Yes.

25   Q.  Now, fair to say that this was a live-changing event for

H1hdlum6                     Plaford - cross

 1   you?

 2   A.  Yes.

 3   Q.  And to that point in time, your life -- your adult life had

 4   been basically a major success, correct?

 5   A.  OK.

 6   Q.  Yes or no?

 7   A.  Successful, yes.

 8   Q.  By your mid-30s, you were a multimillionaire; fair to say?

 9   A.  Yes.

10   Q.  And in 2010, you bought a house in Westchester about 8,000

11   square feet; fair to say?

12   A.  Yes.

13   Q.  Worth $2 million?

14   A.  I -- yes.

15   Q.  And it's worth more now?

16   A.  Yes.

17   Q.  There is a swimming pool in the backyard?

18   A.  Yes.

19   Q.  And there is five acres of land?

20           MR. McGINLEY:  Objection, your Honor.

21           THE COURT:  Sustained.

22   BY MR. CREIZMAN:

23   Q.  You have a family?

24   A.  Yes.

25   Q.  Now, the FBI agents, when they came by your house, you

H1hdlum6                          Plaford - cross

1    hadn't invited them over, correct?

2    A.  Correct.

3    Q.  And they didn't tell you they were coming?

4    A.  Correct.

5    Q.  Pretty shortly after their visit, once they visited you

6    knew you were in trouble, correct?

7    A.  That's fair.

8    Q.  They asked you about mismarking, is that right?

9    A.  Yes.

10   Q.  And they warned you not to answer questions without a

11   lawyer present, is that right?

12   A.  I don't remember all of the details of that conversation.

13   It was a couple of years ago.

14   Q.  Could I show you something that might be able to refresh

15   your recollection?

16   A.  Sure.

17            (Pause)

18   Q.  I would just like you -- I am showing the witness Exhibit

19   3503-1.  Please read this to yourself, not out loud.

20            You can read as much as you want, but I am focusing

21   your attention on the second paragraph, the third sentence.

22            (Pause)

23   A.  OK.

24            THE COURT:  So now the question is this, and this will

25   be true of any such document put in front of you.  We don't

H1hdlum6                          Plaford - cross

1    want you to say what's in the document, at all.  It is not in

2    evidence.  If it refreshes your memory up here as to something

3    that you otherwise hadn't remembered that's responsive to the

4    question that was put, then you may give us the benefit of that

5    memory.  If it doesn't refresh your memory, it doesn't refresh

6    your memory.  That's the only question that is there.

7            Counsel is allowed to put any document in the world in

8    front of you for the purpose of refreshing recollection, but it

9    doesn't mean that document comes into evidence, and this won't

10   come into evidence.

11           So, with that background, does it refresh your

12   recollection?

13           THE WITNESS:  No.  I don't remember the specifics of

14   the conversation.

15           THE COURT:  OK.  All right.

16   BY MR. CREIZMAN:

17   Q.  Now, you tried to talk your way out of the situation, is

18   that right?

19   A.  Yes.

20   Q.  You told the FBI that you weren't trying to mislead them;

21   do you recall that?

22   A.  Well, as I said, I don't remember the specifics of the

23   conversation, but, generally, yes, I did try to mislead them.

24   Q.  OK.  And generally speaking, do you recall them accusing

25   you of trying to mislead them?

H1hdlum6                        Plaford - cross

1   A.  No.  As I said, I don't remember the specifics of the

2   conversation, but I did try to mislead them.

3   Q.  OK.  And they also asked you about trading on inside

4   information, is that fair?

5   A.  I believe so, yes.

6   Q.  OK.  And that was information that you received from a

7   government agency official, is that right?

8   A.  I believe that's correct, yes.  I'm not clear on all of

9   these details at this point.

10  Q.  OK.  If you don't recall something, I could direct your

11  attention to the same document and just without reading out

12  loud --

13          THE COURT:  If it's easier, counsel, just come up and

14  point him to what you want him to read; that's fine.

15          MR. CREIZMAN:  That will be great.  Thank you.

16          (Pause)

17  A.  OK.

18  Q.  Does this refresh your recollection -- does reviewing that

19  document refresh your recollection as to whether the agents

20  asked you about insider trading?

21  A.  What I just read was --

22  Q.  No.

23          THE COURT:  No.

24  A.  Not --

25          THE COURT:  The only question is whether -- you know,

1    sometimes -- I'll give you a simple example.  You don't

2    remember the color of what someone was wearing, you have a

3    vague memory but you don't remember whether he was wearing a

4    blue sweater or red sweater.  Then you see a photograph and

5    then it dawns on you, oh, yes, it was a red sweater.  So that's

6    the purpose here.  If there is something in this document that

7    generates an independent recollection up in your head, then we

8    need to have you tell us that.  If it doesn't, it doesn't.

9              THE WITNESS:  OK.

10             MR. CREIZMAN:  So it does not.

11   Q.  Now, at this point you pretty much knew you had a problem

12   on your hands, is that accurate?

13   A.  Yes.

14   Q.  So eventually, after that meeting with the FBI, you hire a

15   lawyer, is that right?

16   A.  Yes.

17   Q.  And with that lawyer, you met with the government a number

18   of times over the past two years, is that correct?

19   A.  Yes.

20   Q.  Over 15 times, fair to say?

21   A.  I don't remember the exact number of times.  It was a

22   number of times.

23   Q.  OK.  And at some point -- and do you remember the purpose

24   of those meetings with the government were to obtain a

25   cooperation agreement, isn't that right?

1    A.  Yes.

2    Q.  And the purpose -- and the cooperation agreement is what

3    was shown to you in your direct testimony, correct?

4    A.  Yes.

5    Q.  And under the cooperation agreement, you agree to a number

6    of -- to provide substantial assistance to the government; is

7    that part of your agreement?

8    A.  I don't know if it's characterized as "substantial."  It

9    was to provide assistance to the government, that's correct.

10   Q.  OK.  And provide assistance to the government in the

11   investigation and prosecution of others, is that right?

12   A.  I believe so, yes.

13   Q.  And it's also a responsibility under the agreement to tell

14   the truth, is that right?

15   A.  Yes.

16   Q.  Now, under the agreement, who decides whether or not you

17   provided substantial assistance to the government?

18   A.  The government, I guess.

19   Q.  And who decides whether you told the truth under the

20   cooperation agreement?

21   A.  I guess that would be the government.

22   Q.  Now, the purpose of your initial meetings with the

23   government for several years, actually, were done under a

24   proffer agreement.  Are you familiar with that term?

25   A.  Yes.

H1hdlum6                          Plaford - cross

1    Q.  And the proffer agreement basically is an agreement signed

2    by you, your lawyer, and the attorneys for the government in

3    which you are basically protected -- you have some protection

4    for what you say in those meetings, correct?

5    A.  I believe so, yes.

6    Q.  And the proffer agreement is not a cooperation agreement in

7    and of itself, correct?

8    A.  I believe so, yes.

9    Q.  Yes, it is, or --

10   A.  The proffer agreement is not a cooperation agreement?

11   Q.  Yes.

12   A.  That is correct.

13   Q.  OK.  It's an interim period; is that a fair

14   characterization, in your opinion?

15   A.  Yeah, I believe so.  Yes.

16   Q.  And during these proffer agreements, part of what you're

17   doing is you're answering the government's questions, is that

18   right?

19   A.  Yes.

20   Q.  And they're evaluating whether or not you're telling the

21   truth, correct?

22   A.  Yes, part of it.

23   Q.  And whether or not you have information to provide the

24   government in order to substantially assist them, correct?

25   A.  I believe so, yes.

H1hdlum6                           Plaford - cross

1    Q.  And it's only after those meetings and the government makes

2    the decision can you get a cooperation agreement; is that

3    right?

4    A.  I believe so.

5    Q.  Now, you said before that you didn't want to plead guilty

6    to any felonies at all, is that right?

7    A.  That's correct, yes.

8    Q.  And short of pleading guilty to any felonies, your hope is

9    that you get a reduced sentence; is that what you said in your

10   direct testimony?

11   A.  Yes.

12   Q.  In fact, your hope is that you don't get a day in jail, is

13   that right?

14   A.  Well, yes, I would certainly hope not to go to jail.

15   Q.  At all?

16   A.  Yeah.  I mean, I don't want to go to jail, of course.

17   Q.  And that's a possibility, is it not?

18   A.  I hope so.

19   Q.  And you haven't been to jail at all, correct?

20   A.  I have not.

21   Q.  And it is fair to say that over the last five years or so,

22   your life has included committing crimes, correct?

23   A.  Correct.

24   Q.  Mismarking the Credit Fund, the value of the Credit Fund

25   securities?

H1hdlum6                          Plaford - cross

1   A.  Correct.

2   Q.  Trading on insider information?

3   A.  Correct.

4   Q.  Painting the tape?

5   A.  Correct.

6   Q.  Lying to federal agents?

7   A.  Correct.

8   Q.  And your understanding is you are not going to be sentenced

9   at least until after this case is over, correct?

10  A.  I believe that's correct.

11  Q.  Because the government is still evaluating whether you're

12  cooperating or not; is that right?

13  A.  I'm not -- I'm not sure exactly the timeline of what

14  happens.  I know it's going to happen after this.  I'm not

15  clear after that.

16  Q.  During direct examination weren't you asked what happens if

17  you don't tell the truth?  Were you asked that question?

18  A.  Yes.

19  Q.  And what does happen?  The government rips up the

20  agreement, is that correct?

21  A.  Yes.

22  Q.  And you don't get your -- the letter that the government

23  writes to the judge?

24  A.  Correct.

25  Q.  And if you don't provide substantial assistance to the

H1hdlum6                        Plaford - cross

1    government in the government's own analysis, do they rip up the

2    agreement as well?

3    A.  If I don't provide substantial assistance, the government

4    rips up the agreement?

5    Q.  Correct.

6    A.  I'm not -- I'm not aware of that, no.  I think it's that I

7    tell the truth, that I cooperate and that I don't commit more

8    crimes.  I'm not sure about the substantial assistance part.

9    Q.  In the last two weeks, about how many times did you meet

10   with the government?

11   A.  A lot, a lot of times.

12   Q.  When I say "the government," I mean the prosecutors and FBI

13   agents involved in this case.

14   A.  A lot of times.

15   Q.  A lot of times?

16   A.  Mm-hmm.

17   Q.  More than five?

18   A.  Probably, yeah.

19   Q.  And you went in there with your lawyer?

20   A.  In some cases, yes.

21   Q.  OK.  And in some cases you went in without a lawyer?

22   A.  Correct.

23   Q.  And these meetings lasted sometimes from 9 in the morning

24   until 5 in the evening?

25   A.  Approximately in some cases, yes.

H1hdlum6                        Plaford - cross

1   Q.  And there were situations in which you were sitting in a

2   conference room, and did you have -- did you have something --

3   did you and the government basically engage in something called

4   a mock direct examination?

5   A.  Yes.

6   Q.  And that involves them asking you questions just as if you

7   were in court, correct?

8   A.  Correct.

9   Q.  And you answering questions just as if you were here?

10  A.  Correct.

11  Q.  At any time during these mock direct examinations, did the

12  government ever suggest to you how to answer a question?

13  A.  No.  My words are my own.

14  Q.  And let me be specific.  Question, what is your obligation

15  under the cooperating agreement?  Answer, to tell the truth.

16  Did the government ask you to say that?

17  A.  The government provided me documents.  Like if I wasn't

18  sure exactly what some of them said, they could provide me the

19  document, I could read it, and then I could answer the

20  question.  They never told me explicitly what to say, no.

21  Q.  You said today that Stefan Lumiere was responsible for the

22  position in C-Med.  Isn't it true that you told the government

23  numerous times during your proffer meetings that it was Ameesh

24  Shah that was responsible for the C-Med position?

25  A.  I believe what I said was that Stefan worked on C-Med.

H1hdlum6                              Plaford - cross

1    Ameesh Shah did work on C-Med as well.  Stefan did also.

2    Q.  And Stefan was brought in on C-Med, right, later on, after

3    Ameesh Shah had already been working on it; isn't that fair to

4    say?

5    A.  I don't -- that's probably true.  I don't remember the

6    exact timeline of when Stefan started working on it.

7    Q.  You did year-end reviews for Stefan Lumiere during -- for

8    his bonus review, correct?

9    A.  In part, yes.

10   Q.  And what part no?

11   A.  Well, Stefan was also portfolio manager on the Global Fund.

12   I did not do his review for that.

13   Q.  But in the Credit Fund, you did do his review?

14   A.  Correct.

15   Q.  And his base salary in the Credit Fund, do you know what

16   that was?

17   A.  I don't know exactly, no.

18   Q.  Now, in -- for these years that you committed crimes with

19   Mr. Lumiere, this mismarking scheme, did you ever once give him

20   a bonus?

21   A.  I don't remember exactly what his bonuses were in 2011, in

22   2012.  I believe he got some deferred bonus in one or more of

23   those years.  I don't recall exactly.

24   Q.  Are you denying that you didn't give him a bonus?

25   A.  As I said, I don't remember exactly what Stefan's

H1hdlum6                    Plaford - cross

1  compensation was.  I believe that in 2011 he probably did get

2  some kind of a deferred bonus.

3  Q.  From 2010?

4  A.  Well, that would have been for 2011, I thought.  I don't

5  believe he received a bonus in 2012 because his performance was

6  not good.

7  Q.  And 2013 he didn't receive a bonus either, right?

8  A.  Well, so if you're talking about for the retrospective

9  year, that he would have gotten a bonus in 2011 and he would

10  have gotten a bonus I believe that is deferred in 2012 but not

11  in 2013.

12  Q.  OK.  So for the year 2011, you would get paid your bonus in

13  2012, is that right?

14  A.  It would be around the end of the year, early next year,

15  usually.

16  Q.  You don't know whether -- which one is which?

17  A.  You would usually get your bonus around the end of that

18  year or the beginning of the next year.

19  Q.  Or early the next year, OK.  We'll get back to that.

20         Now, your earnings per year, approximately what did

21  you earn in 2011 at Vizeum?

22  A.  I don't remember exactly.  I think my base salary was

23  around 250-k'ish, and I probably received a bonus of -- I don't

24  remember exactly what it was.

25  Q.  Over $800,000?

1    A.   The bonus or total comp?

2    Q.   Total comp was over a million dollars?

3    A.   I don't remember exactly.  It could have been.  I don't

4    remember exactly.

5    Q.   OK.  Do you remember if it was over $800,000?

6    A.   I was going to say that it was probably less than a million

7    dollars, so maybe around 800 would be correct.

8    Q.   Fair enough.  And in 2012?

9    A.   It was more.  It was probably closer to several million.

10   Q.   Several million dollars?

11   A.   I believe so.

12   Q.   So about -- so definitely more than a million dollars?

13   A.   I believe so, yes.

14   Q.   OK.  And 2013, total compensation?

15   A.   Just my base salary.

16   Q.   And deferred comp, or no?

17   A.   So just to be clear, we're talking about the money earned

18   in that year, not when the bonus was paid, because that I don't

19   remember specifically?

20   Q.   OK.  Fair enough.  In that year?

21   A.   In 2013, I believe I just got my base salary.

22   Q.   Fair enough.

23            (Pause)

24            Now, you've listened to audiotapes made of meetings --

25   made of calls between you and Mr. Lumiere, is that right?

1   A.  Correct.

2   Q.  And during those calls you told Mr. Lumiere what prices to

3   ask the brokers for; is that fair to say?

4   A.  Yes.

5   Q.  But your testimony is that there were other meetings in

6   which Mr. Lumiere dictated those numbers to you?

7   A.  We talked frequently about the value of his positions in

8   his companies, correct.

9   Q.  Well, that's not what I asked.

10          Did he dictate the numbers to you or did you dictate

11  the numbers to him?

12  A.  Well, the month-end process is where the dictating happens.

13  What I said was Stefan and I had a lot of conversations every

14  week actually about the value of his companies.

15  Q.  And when it was time -- but at no time -- so you guys would

16  talk about -- you said that you had weekly meetings about the

17  value of these securities, but these were never something you

18  heard recorded; is that what you are saying?

19  A.  I have heard recordings of Stefan and I having discussions

20  about fundamental valuations coming to exist.

21  Q.  And you didn't believe in those valuations whatsoever?

22  A.  No.  I, you know, early on in the process, I did believe.

23  I think, you know, I was deceived by Stefan, you know, on that

24  in part as well.  But toward the end of the process, when a lot

25  of Stefan's stuff didn't come to fruition, no, I lost faith in

H1hdlum6                              Plaford - cross

1    a lot of those.

2    Q.  You were deceived by Stefan on China Med?

3    A.  Well, I was talking about ATI and FriendFinder and --

4    Q.  Not China Med, right?

5    A.  Stefan worked on China Med.  He wasn't the point person on

6    China Med.

7    Q.  But you believed in China Med, isn't that right?  You

8    believed in the pricing for China Med, isn't that correct?

9    A.  No.  I think the price was too high on China Med.

10   Q.  Looking back.  But at the time, did you believe in the

11   price in China Med?

12   A.  I think that the prices were overflated in China Med that

13   we used.

14   Q.  Didn't you explain to Josh Rozenberg, from accounting, that

15   you valued Vizeum's stake in China Med higher because of the

16   preferential rights it had in bankruptcy, is that right?

17   A.  Yes, it did have preferential rights.  It should have been

18   valued a bit higher because of that.

19   Q.  So you did think it should be valued higher; is that fair

20   to say?

21   A.  It is fair to say that I thought it should be higher than

22   the C tranche.  What I'm saying is I don't think it should have

23   been valued as high as a multi-value--

24   Q.  OK.  All right.  But you did justify the price that you

25   assigned to C-Med based on where you thought it was valued,

H1hdlum6                         Plaford - cross

1    isn't that right?

2    A.   Could you repeat that?

3    Q.   You assigned the price to C-Med based on your fundamental

4    evaluation of what rights C-Med had -- what rights Vizeum had

5    in the C-Med bankruptcy, correct?

6              MR. McGINLEY:  Objection, your Honor.

7              THE COURT:  Ground?

8              MR. McGINLEY:  Form.

9              THE COURT:  Overruled.

10   A.   Can you repeat that, please?

11   Q.   Sure.  You reviewed a lot of research reports on C-Med

12   during your time period at Vizeum, correct?

13   A.   Correct.

14   Q.   There was something called a Glaucus report, is that right?

15            (Pause)

16            Is that the right language?

17   A.   I am not familiar with that.

18   Q.   There was a report about C-Med that was positive; am I

19   right about that?

20   A.   There was one that was positive and there was several that

21   were negative.

22   Q.   There were several that were negative and there were some

23   that were positive.

24            Vizeum spent a good amount of money on attorneys,

25   correct, to basically pursue assets in C-Med; is that fair to

1  say?

2  A.  Yes.

3  Q.  And including a firm called Stroock, Stroock & Lavan,

4  correct?

5  A.  Correct.

6  Q.  And that's a very prestigious firm, is that right?

7  A.  I believe so, yes.

8  Q.  And it's involved in these kinds of restructuring and

9  bankruptcy sort of litigations, correct?

10  A.  Correct.

11  Q.  And you also hired an investigation group called Kroll,

12  isn't that right?

13  A.  That's correct.

14  Q.  And Vizeum put a lot of money into both Stroock and Kroll

15  to determine whether C-Med had assets or not, correct?

16  A.  Correct.

17  Q.  So that it could recover those assets for its investments,

18  is that right?

19  A.  Correct.

20  Q.  And because of the amount of money it put in as compared to

21  other investors or lenders to C-Med, it had preferential

22  rights, that's correct?

23  A.  That's correct.

24  Q.  And it also had in some instances greater visibility into

25  the company, isn't that right?

736

H1hdlum6                              Plaford - cross

1   A.  That's correct.

2   Q.  OK.  So there was a tier structure in which the firms that

3   put in the most money, including Vizeum, would have the

4   greatest recovery or the first dibs on the recovery; is that

5   correct?

6   A.  That's correct.

7   Q.  And those at the lower end who kind of went along for the

8   ride would get less, is that right?

9   A.  That's right.

10  Q.  And when you saw a Reuters quote or a Bloomberg quote on

11  those C-Med securities during the period where Vizeum was

12  pursuing these assets, your words, am I right, this is not the

13  security that we own, is that correct?

14  A.  Well, that was the fallacy, right, because that's what we

15  were representing to investors, that it was a security that we

16  owned.  If we wanted to say that it wasn't, we would have had

17  to move to Level 3, which we didn't want to do.  So what we did

18  was get quotes on Level 2, and if we were getting quotes and

19  keeping it Level 2, then we should have moved them to where the

20  market was actually transacting them.

21  Q.  Because the Level 3 would have been more based on your

22  assumptions and modeling, is that right?

23  A.  If we wanted to pursue the tiering structure, as you are

24  implying, we would have had to move to Level 3.

25  Q.  But your justification to Josh Rozenberg as to why Vizeum

H1hdlum6                        Plaford - cross

1    should value C-Med at the price it valued C-Med was essentially

2    because of what you viewed as Vizeum's rights to recovery in

3    that company?

4    A.  So I don't remember the specific conversation with Josh

5    Rozenberg that you are referring to.  There was a tiering

6    structure in C-Med, and the Class A tier was due more recovery

7    should it transpire than the Class C was.  So I'm agreeing with

8    you that the value should have been probably a bit higher than

9    what we were seeing trading in the marketplace.  But, again,

10   the problem with that is that we were representing it as a

11   Level 2 asset, and we were saying this is what we owned.  It is

12   apples and oranges.

13   Q.  But you're saying "we" and you're the portfolio manager,

14   right?

15   A.  Stefan worked on C-Med and Ameesh Shah was the point person

16   on C-Med.

17   Q.  But you earned millions of dollars in 2012, isn't that

18   right?

19   A.  That is correct.

20   Q.  OK.  And that's many more millions than Stefan earned,

21   correct?

22   A.  Well, I would say that's because Stefan had a negative P&L,

23   but, yes, that's correct.

24   Q.  He had a negative P&L and you had a positive P&L because of

25   China Med?

H1hdlum6                          Plaford - cross

1    A.  No.  China Med was not the reason I had a positive P&L.  Is

2    that what you're saying?

3    Q.  No.  Are you saying that you were looking after Stefan when

4    you inflated these prices; is that what you were doing?

5    A.  All I said was that Stefan worked on C-Med and he worked on

6    a number of other things.  I have been clear Ameesh Shah also

7    worked on C-Med.

8    Q.  And did Ameesh Shah, was he a part of inflating the value

9    of the securities?

10   A.  He didn't -- he might have been part of the conversation on

11   the painting the tape.

12   Q.  Do you believe in the tiering structure?  Did you tell him

13   about why you thought the security was where it was because of

14   that tiering structure?

15   A.  There was a tiering structure.  I'm not arguing with the

16   tiering structure.  I'm just saying that doesn't necessarily

17   justify the value that was ultimately used by Vizeum.  In other

18   words, there can be a positive effect because of the tiering

19   structure.  That doesn't mean than the value Vizeum used was

20   therefor justified.

21   Q.  You made a decision where to price C-Med, correct?

22   A.  I was one of the decision makers for pricing.  As I said, I

23   wasn't the point person.  I didn't build the model.  I didn't

24   go to the valuation committee.  I was the portfolio manager

25   that analysts in all cases, C-Med including, did the lion's

H1hdlum6                    Plaford - cross

1   share of the work and the modeling and the research, but I was

2   involved in that decision, as I've said, yes.

3   Q.  Let me break this down.

4        You told Stefan Lumiere what price you believed C-Med

5   should be at, correct?

6   A.  Correct.

7   Q.  You asked him to go to certain brokers and explain to them

8   why you viewed the price the way you viewed it, correct?

9   A.  Correct.

10  Q.  You were -- and, in fact, you told them at one point do we

11  trust Janney not to disclose the fact that we're basically

12  building this tiering structure, correct?

13  A.  I don't remember that specifically, no.

14  Q.  But you do recall telling -- explaining to Stefan why you

15  viewed the security where it was, correct?

16  A.  There was a tiering structure in C-Med.  That's not open

17  for --

18  Q.  Did you tell Stefan Lumiere "but we know that we're valuing

19  this way too high"?  Is that something that you said to him?

20  A.  I don't recall saying that, no.

21  Q.  And do you recall -- and so basically -- and when you got

22  push -- did you ever get pushback from anyone inside Vizeum?

23  When the prices came back from the same brokers at the price

24  you asked Stefan to tell the brokers where it was, did you get

25  any pushback from anyone at Vizeum?

1    A.  Probably so.  And that really is -- again, that's a part of

2    the big issue here, right?  It's apples and oranges.  We

3    needed -- you can't just say we're valuing it based on our

4    model.  To do that we would have needed to move it to a Level

5    3.  C-Med and ATI and Sevan and Nebraska, all those positions

6    we were saying it was a Level 2 position.  We were going out.

7    Stefan was, you know, getting the broker quotes.  We were

8    saying it was a Level 2.  But it wasn't a Level 2.  To use the

9    model that you're implying for C-Med with the tiering

10   structure, we would have needed to move it to Level 3.  We

11   didn't do that.

12   Q.  You bought the -- you were able to purchase -- what makes

13   it a Level 3 in your mind?

14   A.  You can't use a model and you're coming up with the

15   valuation and say that it's still Level 2 assets.  You're going

16   to need broker quotes suggesting it is a Level 2 asset and yet

17   you are coming out with your own valuation.  That is apples and

18   oranges.  You either have to move it to Level 3; then you can

19   use your own model.  Right?  Or you have to keep it at Level 2,

20   and then you can use broker quotes.

21   Q.  These are thinly traded securities, though, correct?

22   A.  In most cases, yes.

23   Q.  In C-Med's case?

24   A.  Well, varying degrees of liquidity over time.  It got less

25   liquid.

1    Q.  It got less liquid but it did trade, the security traded?

2    A.  It did trade.

3    Q.  And there are some -- and for you to say that it should

4    have been a Level 3 would mean that it would be illiquid,

5    right?

6    A.  No, that's not what I'm saying.  What I'm saying is you can

7    keep it at Level 2.  If we kept it at Level 2, because if you

8    could justify that it was trading enough to be a Level 2, which

9    at times C-Med was, you can say it's a Level 2 security, but to

10   do that you have to use the actual price in the marketplace.

11   You can't use your own model and come up with your own value

12   and still call it a Level 2.  Then you have to use -- then you

13   have to move it to Level 3.  That's part of the process for

14   Level 3.

15   Q.  And you were able to fool everybody at Vizeum in Ops and in

16   Accounting?

17   A.  Well, I would say Stefan and I were able to fool a number

18   of people, yes.

19   Q.  Stefan joined your cause?

20   A.  Recall, Stefan is the point person on most of these names

21   in discussion.

22   Q.  Not C-Med, correct?

23   A.  Stefan was not the point person on C-Med.

24   Q.  So Stefan, because of the amount of money he was making

25   every year, he just joined on to your team to help you lie

H1hdlum6                              Plaford - cross

1    about C-Med?

2    A.   Stefan's -- Stefan's P&L would have been a lot worse if we

3    weren't inflating the value of these securities.  He could have

4    easily lost his job.  I'm not saying Stefan made a lot of money

5    but that's because his performance was very poor.

6    Q.   You asked Stefan to get on C-Med, didn't you?

7    A.   I asked Stefan to work on C-Med, probably.

8    Q.   Because of his experience in distressed securities, isn't

9    that right?

10   A.   Yes.  That was -- he was the only person in our team that

11   had any experience in restructuring.

12   Q.   And not because of his ability to charm brokers into

13   getting the price that you wanted, isn't that right?

14   A.   That's a separate -- I asked Stefan to be involved in C-Med

15   because of his -- his knowledge about restructuring.  He was

16   the only one on the team that had virtually any experience at

17   all in restructuring.

18              THE COURT:  Counsel, we need to break for today.

19              So, ladies and gentlemen, I know you will be here at

20   9 o'clock tomorrow, and I will also be here at 9 o'clock

21   tomorrow.  So we will reconvene then.

22              Have a very good evening.  We'll see you then.

23              (Continued on next page)

24

25

H1hdlum6

```
 1              (Jury not present)

 2              THE COURT:  Mr. Plaford, you can step down.  We'll see

 3      you at 9 o'clock tomorrow.

 4              THE WITNESS:  Thank you.

 5              THE COURT:  I think you may already know this, but you

 6      cannot talk to the government between now and when you resume

 7      the stand tomorrow.

 8              THE WITNESS:  Understood.

 9              (Witness excused)

10              THE COURT:  Very good.

11              Please be seated.

12              So, first, my law clerk is just in the process of

13      inputting my edits into the latest draft of the proposed

14      instructions to the jury, which requires him to read my

15      handwriting -- a task that I wouldn't wish on my worst enemy.

16      But, nevertheless, we should have a version ready for you in

17      the next half hour.  We'll email it to both sides.  Read it

18      over tonight because we'll have a charging conference sometime

19      tomorrow.

20              Secondly, how long does defense counsel want for the

21      completion of cross-examination of Mr. Plaford?

22              MR. CREIZMAN:  I am going to keep it quite brief.

23      There are not -- I mean, I would say another hour --

24              THE COURT:  OK.

25              MR. CREIZMAN:  -- to an hour and a half.  But I
```

744

H1hdlum6

1    have -- there are a couple of recordings that I have to get

2    into.

3              THE COURT:  An hour to an hour and a half is perfectly

4    reasonable.  An hour and 31 minutes would be grossly excessive.

5              MR. CREIZMAN:  Understood.

6              THE COURT:  OK.  Then we have on the government's list

7    five other witnesses.  Are any of them long?

8              MR. McGINLEY:  I think the longest is probably the

9    last witness, who is about an hour, but I think we anticipate

10   about two and a half hours of testimony.

11             THE COURT:  OK.  All right.  So we'll see how it goes,

12   but defense counsel should have his witness available because

13   we conceivably might reach him in the afternoon tomorrow.

14             MR. McGINLEY:  Your Honor, just very briefly.

15             THE COURT:  Yes.

16             MR. McGINLEY:  The defense lawyer did mention that he

17   plans to play recordings to impeach Mr. Plaford.  We are not

18   aware of those.  So if he could provide them to us?

19             THE COURT:  OK.  I think he should.

20             MR. CREIZMAN:  Sure.

21             THE COURT:  OK.  Then how long does the government

22   want for the entirety of both your opening and rebuttal

23   summations?

24             MR. NAFTALIS:  An hour and 45 minutes in total, your

25   Honor.

H1hdlum6

```
 1              THE COURT:  An hour and 45 minutes is fine.  How do
 2     you want to break that up between the two parts?
 3              MR. McGINLEY:  A half hour for rebuttal, your Honor,
 4     an hour and 15.
 5              THE COURT:  OK.  That is fine.
 6              So defense counsel, you will be given an hour and 45
 7     minutes for your summation.  I don't know if you want all of
 8     that, but you can have up to an hour and 45 minutes.
 9              MR. CREIZMAN:  OK.  I appreciate that.
10              THE COURT:  Then I think the only other thing, which
11     is really a bit down the road but just to alert you, after
12     summations are over, we need to send all of the exhibits except
13     for the recordings into the jury, and that means that in
14     advance of summations the parties have to put together all the
15     exhibits and show them to each other to make sure there are no
16     disputes as to what was received or not received.
17              Then you can of course use copies on your summation,
18     but you can have the originals all set to go in the traditional
19     cart.  So just keep that in mind because that's something you
20     will have to work on probably tomorrow evening or something
21     like that.
22              All right?
23              MR. McGINLEY:  Your Honor, just briefly.  We do
24     have -- I don't know what your Honor's practice is.  We do have
25     a clean laptop.  If the recordings -- I know the transcripts
```

1    don't normally go back, but if your Honor is inclined to send

2    the recordings back, we have it on a clean laptop.

3           THE COURT:  All right.  That's new and this hasn't

4    been done in my cases before, or it hasn't been offered in my

5    case before, so let me think about that.  That might be a good

6    idea.

7           MR. McGINLEY:  Just finally, your Honor, do you

8    anticipate summations tomorrow?

9           THE COURT:  Well, I repeat that when the evidence is

10   completed, we'll take a 15-minute break and then we'll start

11   summations.  I think realistically that's not likely, but I

12   can't give you an absolute guarantee.

13          So I assume that you spent the weekend writing your

14   summation.  So, anyway --

15          MR. McGINLEY:  Mr. Naftalis did.

16          THE COURT:  Yes.  He's been a bit of a stranger the

17   last few hours.  The jury is wondering what happened to Mr.

18   Naftalis.

19          OK.  Anything else we need to take up?

20          (Pause)

21          Very good.  We will see you at 9 o'clock tomorrow.

22          THE CLERK:  All rise.

23          (Adjourned to 9 a.m., Wednesday, January 18, 2017)

24

25

```
 1                        INDEX OF EXAMINATION
 2   Examination of:                              Page
 3   THOMAS CAROCCI
 4   Direct By Mr. Naftalis . . . . . . . . . . . 537
 5   Cross By Mr. Creizman  . . . . . . . . . . . 554
 6   SUDARSHAN JAIN
 7   Direct By Mr. Williams . . . . . . . . . . . 556
 8   Cross By Mr. Creizman  . . . . . . . . . . . 570
 9   DONETH THOMAS
10   Direct By Mr. McGinley . . . . . . . . . . . 585
11   Cross By Ms. Madrigal  . . . . . . . . . . . 621
12   CHRISTOPHER PLAFORD
13   Direct By Mr. McGinley . . . . . . . . . . . 627
14   Cross By Mr. Creizman  . . . . . . . . . . . 717
15                       GOVERNMENT EXHIBITS
16   Exhibit No.                              Received
17    701, 701A, 816, 702, 703, 750, 751, . . . . . 537
18              710, 746 through 749, 737,
19              738, 753 through 758, 745,
20              752, 759, 742, 743, 760A
21              through 761K, 768, 769 and
22              1500 through 1599C and 1411
23    768, 769, 302-349, 405-413, 415, 416, . . . . 585
24              417-438, 440, 441-461 and
25              468-470
```

1  1404      . . . . . . . . . . . . . . . . 585

2  3503-71   . . . . . . . . . . . . . . . 643

3  1208T, 1212T, 1216T, 1228T, 1229T,   . . . . . 683

4          1230T and 1231T

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25