UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

UNITED STATES OF AMERICA,         :

                                     :        Docket No.: 1:16-CR-00483-JSR

              v.                  :

                                     :

STEFAN LUMIERE,                  :

            Defendant.        :

-----------------------------------------------------X

# Memorandum of Law in Support of Motion of Defendant Stefan Lumiere to Extend the Time to File Rule 29 and 33 Motions to March 31, 2017

# TABLE OF CONTENTS

SUMMARY OF  ARGUMENT ............................................................................. 2

RECEIPT AND REVIEW OF THE CASE FILES ............................................. 4

SUMMARY OF PROCEDURAL HISTORY.......................................................... 4

APPLICABLE LEGAL PRINCIPLES................................................................. 5

ISSUES IDENTIFIED TO DATE WARRANTING  FURTHER INVESTIGATION
    AND REVIEW .......................................................................................... 7

1.     Federal Rule of Evidence (FRE) 106 and Questionable Prosecutorial Conduct ............... 7

2.     Improperly Elicited and Unfairly Prejudicial Testimony Under FRE 701 and 403 ......... 10

      a.     Unfair Prejudice: Improper Testimony of Christopher Wiese -- 2008
            Financial Crisis .................................................................................. 12

      b.     Inadmissible: David Keily's Testimony ................................................ 13

3.     Attribution of Purported Extortion to the Defendant:  Violation of FRE 403 and
      404(B) .................................................................................................. 13

4.     Defendant's Good Faith Defense ............................................................... 14

      a.     Defense Witnesses ............................................................................ 15

            i.     Expert Testimony – David Tawil, Maglan Capital (Designated But
                 Not Called)................................................................................ 15

            ii.    Witness Issues .......................................................................... 18

            *Visium-Related Witnesses* .................................................................. 18

            *Other Possible Witnesses*.................................................................... 19

5.      The Defense Case:  FBI SA Matthew Callahan.................................................................. 20

6.      The Court's Bar of Any Further Trial Adjournment May Have Had the
        Unintended Consequences of Aiding the Prosecution's Dilatory Production and
        Impeding the Defense's Trial Preparation ......................................................................... 20

7.      No Prejudice to the Government..................................................................................... 21

        CONCLUSION................................................................................................................. 22

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Phoenix Assocs. III v. Stone*,
   60 F.3d 95 (2d Cir. 1995) ................................................................8, 9

*United States v. Brown*,
   623 F.3d 104 (2d Cir. 2010).................................................................6

*United States v. DiPietro*,
   278 F. App'x 60 (2d Cir. 2008)............................................................6

*United States v. Frederick*,
   868 F. Supp. 2d 32 (E.D.N.Y. 2012) ..................................................6

*United States v. Johnson*,
   2014 U.S. Dist. LEXIS 165428 (S.D.N.Y. Nov. 17, 2014) ....................5

*United States v. Lesniewski*,
   No. 11 CR 1091, 2013 WL 3776235 (S.D.N.Y. July 12, 2013), aff'd ....................9

*United States v. Robinson*,
   430 F.3d 537 (2d Cir. 2005)................................................................6

*United States v. Rutigliano*,
   614 F. App'x 542 (2d Cir. 2015) .........................................................9

*United States v. Sabir*,
   628 F. Supp. 2d 414 (S.D.N.Y. 2007)..................................................6

*United States v. Stukes*,
   2004 WL 2397194 (S.D.N.Y. Oct. 26, 2004) .........................................5

*United States v. Urena*,
   2008 WL 2229847 (S.D.N.Y. May 29, 2008) ........................................6

*United States v. Velazquez*,
   2016 WL 3561704 (E.D.N.Y. June 24, 2016) ...................................6, 7

*United States v. Watts*,
   934 F. Supp. 2d 451 (E.D.N.Y. 2013) ..................................................9

**Other Authorities**

FRE 106 ...............................................................................7, 8, 9, 19

FRE 403 ....................................................................................9, 11

4835-2691-9490.1

FRE 404 ................................................................................................................13, 14

FRE 701 ............................................................................................................10, 11, 12

FRCP 29 ..................................................................................................................1, 5, 22

FRCP 33 ...................................................................................................................... *passim*

FRCP 45 ......................................................................................................................1, 5

iv

Defendant Stefan Lumiere, by his newly appointed counsel, Foley & Lardner LLP, hereby respectfully submits this memorandum of law in support of his motion to extend the time to file to March 31, 2017, a motion for a new trial, pursuant to Federal Rule of Criminal Procedure ("Rule")  33(b)(2) and Rule 45(b).  The defendant's application for relief is to permit newly appointed counsel post-verdict ("New Counsel") a reasonable and appropriate opportunity to review the case files – both within and outside the trial and other public records -- investigate fact and legal issues and prepare a motion for new trial under Rule 33.[1]

The requested extension, when timely presented to the Court January 31, 2017[2], totaled 59 days. From today's submission, the request becomes a bit more modest, reduced to 53 days. Under the original request, the government would have two weeks to respond, and the defendant's reply would be due a week later.[3]

The government consented to a one-week extension, until February 9, 2017, "[a]s a courtesy."

Defendant Lumiere makes this submission in accordance with the briefing schedule the Court set:  the defendant's motion is due February 6th; and the government's response is due by February 8th.  The Court stated that it anticipates ruling the following day; in the event it denies

---

[1] Although the principal reason for the requested relief concerns a Rule 33 motion, as identified in the January 31st teleconference, the defendant hereby also respectfully requests the opportunity to preserve his right to renew prior Rule 29 by March 31st as well (also pursuant to Rule 45).

[2] Even if New Counsel had been retained as the jury was being discharged, and an application was then made to the Court, similar relief to that requested on January 31st and herein would have been warranted.

[3] In light of this detailed and substantive preview of the defendant's Rule 33 motion, a proposed schedule modification is in order. This is especially so if the defendant's requested deadline is cut short. Under the circumstances here, the government should be required to submit its response one week after the defendant's motions are filed. With the instant filing, the government now possesses a blueprint of the issues identified to date. It has a full opportunity to prepare its response – starting from today and extending through whatever additional time is added after the defendant's motion is filed. As originally requested, the date for the defendant's  reply (April 21, 2017) is more than a month before the scheduled sentencing, on May 23rd. To the extent that the Court harbors concerns about timing -- any abridgement in the proposed briefing schedule should, in fairness, be borne by the government.  Having had extensive familiarity with the issues for more than three years, the government  now enjoys an extended  opportunity to consider and address the issues.  And, unlike the defendant, it will not be prejudiced by the suggested modification.

the motion, the defendant would have one week (at least) from the Court's ruling to file its motions.

The requested motion schedule will not delay the scheduled sentencing, which is scheduled for May 23, 2017. (Set/Reset Hearings as to Stefan Lumiere, Dkt. Entry, Jan. 20, 2017.)

### SUMMARY OF ARGUMENT

There is good cause for the defendant's request to extend the time to file his motion for a new trial to March 31, 2017.  The requested extension to March 31st -- a relatively modest extension of time -- is necessary to:  (i) permit New Counsel a reasonable opportunity to review the extensive files; (ii) have the opportunity to engage with trial counsel about case files, the trial, and related issues; (iii) identify and analyze the facts and law; and (iv) submit appropriate claims for a new trial to the Court.

The undertaking for New Counsel to prepare a Rule 33 motion first entails having further substantial discussions with defendant Lumiere, among others, and reviewing the extensive files to allow a diligent investigation and analysis of the facts and applicable law. The scope of the review is expected to encompass the trial record, including lengthy tape recordings and transcripts, exhibits, discovery, *Brady* and 3500 material, *in limine* and pre-trial motions, investigation, pre-indictment and trial issues (both within and outside the trial record), including trial strategies, defenses considered and extensive communications.

As discussed *infra*, the files timely received from trial counsel four days ago (February 2, 2017) are voluminous and have required substantial and ongoing review to account for and assess the categories and documents in the case files; identify documents believed missing or inaccessible; and continue to engage with trial counsel about the files.  (Trial counsel has been

2

highly professional, diligent, and cooperative in arranging for the transfer of files, and immediately responsive in addressing record-related issues; additional ongoing communication regarding these issues is anticipated.)

New Counsel's Rule 33 motion review is expected to address the following issues, as identified to date:  the defendant's defense of good faith; the presentation to the jury of the evidence of the defendant's good faith[4]; the government's conduct during trial, including the inadmissible, gratuitous, and unfairly prejudicial evidence that was elicited and admitted; improper summation arguments; the government's delayed or untimely production of trial material; legal rulings and other actions of the Court; and other issues that may have affected the defendant's ability to defend himself at trial. Especially in light of New Counsel's recent engagement, new or unanticipated issues obviously may arise that warrant examination. (Indeed, this submission is necessarily limited and based on a preliminary and an incomplete review only.)

The requested relief is measured and appropriate under the circumstances and the standards that courts generally apply, especially where, as here, newly appointed counsel has timely applied for extended time to file Rule 33 motions. In addition, there is no prejudice to the government.

Permitting the defendant a reasonable opportunity to review and present claims for a new trial also serves the public interest.  Granting a request for an appropriate review and consideration helps to ensure the fairness of criminal trials and assure the public that justice has been fairly administered.  The government understandably is not, nor for obvious reasons should it be, well-positioned to assess the strategies, circumstances, and communications regarding the

---

[4] During rebuttal summation [Trial Tr. 1058-59], the government argued there was no evidence of the defendant's good faith, just argument from defense counsel.

defendant's defense at trial.  It is, however, in the public's and government's interests that a defendant who stands on his constitutional rights and proceeds to trial be afforded a reasonable opportunity, with new counsel, to review the issues and present appropriate claims to the court before sentencing. To do otherwise would risk abridging the defendant's right to a fair and impartial trial and constitutional, statutory, and other protections.

## RECEIPT AND REVIEW OF THE CASE FILES

On February 2, 2017, New Counsel received from trial counsel several hard drives, including one marked "Case Files," approximately 20 CDs and hard documents.   Additional supplemental materials were provided the following day, as counsel immediately responded to follow-up inquiries. It appears that at least one hard drive remains outstanding, and other records may be forthcoming or are not yet accessible. *See* Decl. of Jonathan N. Halpern.

Significant work remains to correctly identify files and match cover letters and passwords with protected files. For example, some government productions (in CDs) appear to be missing and some cover letters still are to be located and matched with CDs so that their contents may be accessed. Certain categories of documents have not been located, including productions in response to document requests. (*Id*.)

Case files are stored on one hard drive, and file folders relating to pre-trial and trial matters contain approximately 17,000 documents consisting of approximately 22.3 GB of data.

## SUMMARY OF PROCEDURAL HISTORY

The government's investigation began at least as early as February 2014 [*see* Dkt. 42]. On or about June 15, 2016, the defendant was arrested on a complaint and retained counsel who continued to represent him through trial [Dkt. 1]. Indictment 16 Cr. 483 (JSR) was publicly filed July 14, 2016 [Dkt. 6], and it charged the defendant in three counts, with conspiracy to commit

securities fraud and wire fraud and substantive counts of securities fraud and wire fraud. At his arraignment, on July 18, 2016, the defendant pled not guilty, the court scheduled a final pre-trial conference for August 31, 2016. On August 15, 2016, after a trial date had been set,  at defense counsel's request and with the government's consent, the court adjourned trial to January 9, 2017.  The court ordered that "[n]o further extensions will be granted on any grounds whatsoever." [Dkt. 9]  Jury selection began January 11th; trial proceeded over five trial days of testimony, and a verdict of guilty on the three charged crimes was returned January 19, 2017. Sentencing is scheduled for May 23, 2017.

## APPLICABLE LEGAL PRINCIPLES

Upon a defendant's motion, a court may vacate a judgment and grant a new trial if the interest of justice so requires.  Rule 33(a).  Except on the grounds of newly discovered evidence, a motion for a new trial is to be filed within fourteen days after the verdict.  Rule 33(b)(2). Before the deadline expires or within an authorized extension, "the court on its own may extend the time, or for good cause may do so on a party's motion."  Rule 45(b)(1)(A).

A comprehensive search to date has not identified a case in which the court addressed, much less denied, a timely Rule 33 motion (*i.e.*, within 14 days of verdict) made by substitution, or newly appointed, counsel.  Indeed, courts routinely grant requests to provide reasonable and appropriate adjournments to file Rule 33 motions.  *See, e.g., United States v. Johnson*, 2014 U.S. Dist. LEXIS 165428, at *2-3 (S.D.N.Y. Nov. 17, 2014) (total of three months provided to trial counsel to file Rule 29 and 33 motions).

In *United States v. Stukes*, No. 03 CR.601(RWS), 2004 WL 2397194, at *1 (S.D.N.Y. Oct. 26, 2004), the court initially granted an extension of 37 days to trial counsel with an imminent one-week trial.  Ultimately, the court granted extensions totaling 85 days more. *See*

*also United States v. Sabir*, 628 F. Supp. 2d 414, 417 (S.D.N.Y. 2007) (trial counsel granted 45 days); *United States v. Robinson*, 430 F.3d 537, 541 (2d Cir. 2005), where the Second Circuit affirmed the district court's grant of extensions totaling 38 days to trial counsel upon defendant's timely requests. *Cf. United States v. Urena*, No. S305CR.0760 (PKC), 2008 WL 2229847, at *2 (S.D.N.Y. May 29, 2008) (extension denied where new counsel failed to adequately explain why filing five months after appointment and eight months after original deadline was excusable). *See also United States v. DiPietro*, 278 F. App'x 60, 61 (2d Cir. 2008) (affirming district court's denial of trial counsel's request for extension, opposed by the government, when request and motion filed ten months late); *United States v. Frederick*, 868 F. Supp. 2d 32, 44 (E.D.N.Y. 2012) (extension denied where new counsel had full knowledge of grounds for motion, but delayed filing for more than a year).

Unlike in the instant case, where a timely request was made, even where the deadline had long passed, excusable neglect has been recognized where substitution counsel acted in good faith. For example, under such circumstances, the court allowed a motion for a new trial <u>eight months</u> after filing a notice appearance and <u>15 months</u> after verdict. *United States v. Velazquez*, No. 11-CR-639 (JFB), 2016 WL 3561704, at *21 (E.D.N.Y. June 24, 2016) (court granted time to permit substitution counsel to become familiar with the case and gather necessary information for a claim of ineffective assistance). In *United States v. Brown*, 623 F.3d 104, 113 n.5 (2d Cir. 2010), the court held that "the proper procedural avenue for defendants who wish to raise ineffective assistance claims after conviction but prior to sentencing is a motion for a new trial pursuant to [Rule 33]."

In *Velazquez*, notwithstanding its ordering a new trial, the court, which had presided over the trial, found that defense counsel was "prepared during the course of the trial, conducted

thorough cross-examinations of the government's witnesses and gave effective opening and closing statements to the jury." 2016 WL 3561704, at *23. In addition, the court recognized the defense lawyer's experience and talent was used to "substantially undermine the government's case" and obtain acquittals on several counts, and it made note that the lawyer's "professionalism was at the highest level" and courtroom performance was effective in many respects.  *Id*.[5]

ISSUES IDENTIFIED TO DATE WARRANTING
FURTHER INVESTIGATION AND REVIEW

Based on its limited and preliminary review, New Counsel's investigation and review are expected to encompass the following issues.

**1.** Federal Rule of Evidence (FRE) 106 and Questionable Prosecutorial Conduct

Defendant sustained irreversible and unfair prejudice when the jury was precluded from hearing exculpatory statements in the recorded excerpts that the government played at trial. During trial, the government emphasized selective statements the defendant made in a conversation immunized witness Jason Thorell secretly recorded.  The government relied on the passages to argue that the defendant  knew since 2011 that securities were being improperly marked. (Trial Tr. 978,  997-98, 1051.)  An excluded portion of the same recording provided strong evidence that the defendant did not come to understand until near the end of his tenure at Visium that the marking was improper. (GX 1202T at 43, 44, 45.)  In objecting to admitting only partial statements of the recording, the defense moved under FRE 106 to add related portions for context.  The government's introduction of the excerpted conversations followed the Court's ruling.

---

[5] So, too, a review of the issues here, including the Court's rulings and the parties' roles, is undertaken openly with due recognition of trial counsel's impressive credentials, professionalism, and the high regard in which counsel is held in the legal profession, as well as counsel's extensive trial experience and sophisticated legal talents.

7

FRE 106 is intended to protect defendants in situations like this one where "a principle of fairness requiring the introduction of an entire or related document is necessary for the 'fair and impartial understanding of the admitted portion' or document." *Phoenix Assocs. III v. Stone*, 60 F.3d 95, 102 (2d Cir. 1995).  Government Exhibits 1223T and 1225T are excerpts from a single recorded conversation in which, according to the government, the defendant asserted that Chris Plaford was "mismarking shit egregiously . . . right from the beginning" in 2011.  As the defense submitted, however, the same recording includes statements by the defendant as to why he did not realize in 2011 that Plaford's markings were incorrect and how he came to this realization in 2013—powerful evidence that Mr. Lumiere, in fact, lacked the requisite knowledge until nearing the end of his tenure at Visium.

Defense counsel sought to introduce under FRE 106 a portion of the same recording in which the defendant, discussing his lack of knowledge during an earlier period, stated that, "when it came to ATI, everything kind of made sense." GX 1202T at 43.  In this segment of the recording, the defendant expressed concrete reasons that the valuation made sense at that earlier point: "The fact that we were in a control position kind of like made more sense. And we kind of backed into the price based on estimates of EBITDA and value for the company because we knew we had bidders bidding for sale so we knew more than RBC did about it. So that kind of was okay." *Id*. The recording then includes the defendant's detailed discussion of how he came to learn, in 2013, that the markings were "bogus"—when he learned that the company had made a big mistake on EBITDA, told Plaford that the major downward adjustment in EBITDA required an adjustment to valuation, and was overruled by Plaford.  *Id*. at 43, 44, 45. The defendant explained that, at this point, he "got in [Plaford's] face" and started making plans to leave Visium. *Id*. at 45.

8

According to the defendant, this realization was "kind of like the impetus for the timing" of his departure." *Id.* at 45.  Counsel for the defendant sought to introduce these additional portions of the transcript under FRE 106, and to explain that, after the excerpted government exhibit, "Mr. Lumiere goes on later in this transcript to explain why, at the time, he didn't think Mr. Plaford was lying and why he did come to --." (Trial Tr. 269.) The Court denied this request, asserting the principle that, to come in under the rule of completeness, a portion "has to be reasonably close to the statements that were made." (*Id.*).

Rule 106, however, requires that an adverse party be permitted to present the entire document "when it is essential to explain an already admitted document, to place the admitted document in context, or to avoid misleading the trier of fact."  *United States v. Watts*, 934 F. Supp. 2d 451, 480 (E.D.N.Y. 2013); *see also Phoenix Assocs. III v. Stone*, 60 F.3d 95 at 102. The Second Circuit recently made clear that "mere proximity is a poor metric in deciding 'fairness' under the rule." *United States v. Lesniewski*, No. 11 CR 1091, 2013 WL 3776235, at *4 (S.D.N.Y. July 12, 2013), aff'd sub nom. *United States v. Rutigliano*, 614 F. App'x 542 (2d Cir. 2015).  Detailed discussions of when and how the defendant became aware of the mismarking provides essential context for—and, indeed, dramatically refutes—the government's position that the defendant knew from the start that the securities were mismarked. Disallowing their introduction under FRE 106 wiped away the context and, by doing so, doubtless misled the jury under FRE 403.

The devastating product of these errors was heavily exploited by the government – and the harm to the defendant was compounded repeatedly during trial and in argument to the jury. Specifically, the prosecutor made improper assertions in its rebuttal summation that there was no evidence that the defendant had not understood that the markings were incorrect. (Trial Tr.

9

1059.)  For example, the government argued in rebuttal submission, "You know what he doesn't

say there? He doesn't say, ah, I didn't realize the Credit Fund was mismarked 'til later." (Trial

Tr. 1052.) The government repeated this assertion in rebuttal summation, despite knowing full

well that on the very recording on which it relied was evidence that the defendant had been

unaware of the mismarking until near the end of his tenure at Visium. (Trial Tr. 1052-53; 1066.)

Pressing these improper arguments in rebuttal, when the defense had no opportunity to reply,

exacerbated the unfair and irreversible prejudice to the defendant.

    After this rebuttal summation, defense counsel objected on the grounds that the jury was

being misled in light of the excluded portion of the transcript. The Court denied the argument but

noted the exception, stating that "the jury is well aware of the way the two sides differently

interpret all of those recordings." (Trial Tr. 1070.)  But, of course, even the most observant jury

would be incapable of interpreting the portion of the recording that was <u>not</u> in evidence. The

exclusion of this evidence, and the government's improper use of making an argument to the jury

in rebuttal contrary to statements it knew existed, dramatically and unfairly prejudiced the

defendant.  The conduct provides additional grounds to review in considering a motion for a new

trial.

    **2.**    <u>Improperly Elicited and Unfairly Prejudicial Testimony Under FRE 701 and 403</u>

    At various times during the course of the trial, improper evidence was presented to the

jury. As a result, the defendant was unfairly prejudiced by improper evidence the government

elicited at trial. For example, during the direct examination of Jason Thorell, the government

witness who testified subject to court-ordered immunity, the government introduced selective

parts of a recorded conversation with the defendant (Trial Tr. 238.) GX 1223-A.  An excerpt

from the corresponding transcript was attributed to the defendant: "Chris has been mismarking

shit since the beginning," and Thorell identified Chris as Chris Plaford, his former boss at

Visium and portfolio manager of its credit fund. (Trial Tr. 237.) The prosecutor read more excerpts attributed to the defendant: "Originally in 2011, he was marking them too low." "He's been mismarking shit egregiously outside context of what was right from the beginning." (Trial Tr. 937-38.)

When asked what the defendant said about who was mismarking since 2011, Thorell responded, "Plaford." (Trial Tr. 938.) Then the prosecutor elicited from Thorell that both Plaford and the defendant did so. (*Id*.) However, the prosecutor was still unsatisfied, but determined. He then proceeded to present improper but also incredible, unsubstantiated, unfair, and devastating testimony. This feat was accomplished by eliciting the witness's understanding as to the defendant's state of mind and criminal intent. Here is what the prosecutor asked the witness directly: "[]when you spoke to Mr. Lumiere, and he "used the word 'Chris did this,'" what did you understand him to mean?" The witness responded that his understanding, for purposes of the entire transcript of the recorded conversation, was that the defendant intended to refer to himself as well whenever he simply said "Chris" did something. As Thorell testified, he understood that the defendant was referring not only to "Chris, but also himself" (Lumiere). (*Id*.) The testimony is highly improper lay opinion testimony under FRE 701; it also is absurd and irreversibly and unfairly prejudicial (FRE 403).

There apparently was no objection to the question or the response, no *sua sponte* objection, no motion to strike, and no motion to strike the testimony. (*Id*.) Nor was there a motion to strike all of the witness's testimony or for a mistrial. Unlike other times in the trial, the court here did not comment about the impropriety of the evidence. (*Id*.) Overwhelming and irreversible unfairness to the defendant resulted. There simply was no justification for the prosecutor's question. No foundation was laid; nor could one plausibly be made.

11

It also is irrelevant and improper to elicit inferences the witness made from the defendant's statements as to the defendant's intent or mental state. Especially so when there is no demonstration of complexity, no coded language, no technical jargon or demonstrable need for interpretation to assist the jury. That the defendant's reference to incriminating conduct involving "Chris" actually means not just "Chris," but "Chris and me" for each reference to Chris Plaford in the entire conversation is preposterous, and an apparent violation of FRE 701 and 403. It is unclear what if any prior notice the government provided to the court and the defendant of its intentions to elicit such inflammatory and improper FRE 701 testimony. The circumstances and related issues warrant review and consideration.

      a.    Unfair Prejudice: Improper Testimony of Christopher Wiese -- 2008 Financial Crisis

The government called Christopher Wiese to testify, among other things, about professional standards in finance, and elicited testimony that veered way out of bounds to unfairly prejudice the defendant. The witness embarked on a soliloquy about the importance of trust. He continued about the importance of trust in finance among investors. who have little choice other than to trust that information about the risks and potential return is being accurately conveyed. (Trial Tr. 346.) And then the witness extended his views, testifying that the when trust is violated, "you can start to see problems such as 2008, where we had a financial crisis, and a lot of that was built around lost trust." (*Id*.) At that point, the Court *sua sponte* sustained a "no-call" objection and summoned counsel for a side bar. As the Court observed, "[h]ere we have a witness who, in effect, is suggesting that the entire financial crisis of 2008 is a function of the breakdown in trust attributable to the kinds of violations that are alleged against the defendant in this case, a grossly prejudicial form of testimony." (Emphasis added.) Despite the "grossly" and

12

unfairly prejudicial treatment of the defendant, no motion to strike was lodged.  The

unmistakable and destructive testimony remained unstricken.

         b.     Inadmissible: David Keily's Testimony

The government's first witness, David Keily, testified about compliance issues at Visium.

Significant portions of Keily's testimony constituted inadmissible evidence.  The Court

registered its "concern[] that a great many what would appear to be objectionable questions are

being asked…"  (Tr. 107.)  As the Court remarked, "there were numerous questions asked of the

witness about his reaction to something or other," which the Court did not view as "admissible

evidence," but recognized that "now it is part of the evidence in this case." (*Id.*)  Finally, the

witness "was also frequently asked for hearsay, sometimes double hearsay". . . "so that's part of

the evidence in this case." (*Id.*)

      **3.**    Attribution of Purported Extortion to the Defendant:  Violation of FRE 403 and 404(B)

During Jason Thorell's direct testimony, the government played a tape segment in which

the defendant purportedly expressed the desire to extort $100 million from Chris Plaford and

Jake Gottlieb, Visium's founder and the defendant's future ex-brother-in-law.  (Trial Tr. 399.)

The government compounded the harm by eliciting testimony from Thorell that he understood

the defendant's phrase, "first, we can extort him" to mean illegally blackmail Plaford and

Gottlieb.  (*Id.*)  Extortion was not charged in this case, and neither is Gottlieb. The crime has no

place in this case. No context was examined,  and no connection with the facts of the case was

made. Nor does there appear to be any attempt to test the seriousness of the outlandish

suggestion.

To the extent there is any probative evidence of defendant's knowledge, it is substantially

outweighed by the unfair prejudice to the defendant. Apparently no objection was lodged, and no

13

motion to strike was made. The inflammatory segment, and the testimony, the tape and the transcript as an aid were all received as evidence -- improperly. The prosecutor compounded the erroneous and devastating injury in summation arguments to the jury, characterizing the recording as "shocking" and -- for good measure – "chilling." (Trial Tr. 1007.)  Even assuming for here the utterance was not fanciful, it does not follow that an extortion threat would implicate the extortionist in the conduct giving rise to the extortion.    (Trial Tr. 1007.) Review of the entire recording would make clear that the back and forth on this topic was foolish, but not serious.

In any event, even if true, such a scheme would not be consistent with defendant's knowledge or participation in a criminal securities fraud.  In addition, because the defendant is not charged with extortion the risks of jury confusion, unfair prejudice, and improper propensity evidence mount further.

Nor is it clear from a preliminary review that the government provided FRE 404(b) notice and the defense had a fair and reasonable opportunity to challenge the improper introduction of evidence of other crimes or bad acts.  The propensity aspect of the evidence by itself may well be sufficient to create irreversible error. Any relevance as to the defendant is significantly outweighed by the unfair prejudice and confusion. As noted *supra*, and with other improper evidence, the government exacerbated the injury to the defendant by emphasizing to the jury that which should have been excluded. (Tr. 1065.)  These actions by themselves and collectively with other deficiencies warrant close attention in the upcoming review.

4.    Defendant's Good Faith Defense

A principal defense argued at trial was the defendant's good faith.  New Counsel intends to dedicate significant attention to how the defense was presented to the jury and what factors, if any, improperly prevented or interfered with the presentation or effectiveness of the defendant's defense, the jury's consideration of the evidence and the overall fairness of the trial -- whether by

14

rulings or actions of the court, actions by the government, or otherwise. The review to be

undertaken will examine both the evidence presented and that which was not presented.  Indeed,

the government itself took the position in court and before the jury in rebuttal summation that the

defendant presented no evidence of good faith – zero – and that the defendant offered only a

lawyer's argument of good faith. Of course, as standard jury instructions make clear, a lawyer's

argument is not evidence, and the jury is not to consider it as evidence.

> a.    Defense Witnesses

New Counsel intends to review what defense witnesses were available, but not called to

testify.

> i.    Expert Testimony – David Tawil, Maglan Capital (Designated But
> Not Called)

One witness the defense identified and produced disclosures for, but ended up not calling,

was its designated expert, David Tawil. Initially, the defense provided notice of expert testimony

of David Tawil, president of a hedge fund, to testify, among other things, about:  (i) the

classification of securities, including its liquidity and value in connection with ASC standards;

(ii) value of securities; (iii) general structure and general practices of large hedge funds,

including the roles of officers and committees.  The defense also disclosed that the expert would

testify that the responsibility for classifying a security rests only with the fund, administrator, and

auditor; that the topic would not be discussed with a broker providing an indication; and that the

responsibility of classification runs from the fiduciary duties of the fund directly to the investors.

He also would testify that the "broker has no relationship with the investors," and "no duties to

the investors of the fund." (Trial Tr. 320-21.)

The government objected to expert testimony on the process of classifying securities

under ASC 820 and general practices at large hedge funds.  The defense countered that the

expert's "testimony about the classification system, which measures the liquidity and value of any given security and corresponds to the Input Levels in the ASC 820, is relevant and admissible," especially since the government was "intend[ing] to offer ASC 820 as an exhibit at trial." [Dkt. 51, at 2, 5]. In addition, the defense cited Second Circuit authority for the proposition that opinions on value in the securities field appropriately lie within the scope of an expert's knowledge, and it also noted the recognized complexity of the codification. [*Id*. at 6.)] The defense also rebuffed the government's objections to testimony about general practices at large hedge funds, including the general roles of officers and committees, with authoritative case law and statutory authority. [*Id.* at 5-6]

The matter proceeded to a *Daubert* hearing. There, outside the jury's presence, the expert testified that the broker is no better than the fund to classify an asset, that it would be "quite odd" to confer with the broker, and that the fund would not ask or seriously consider the broker's view on classification. "I've never asked a broker, where did you classify this?" (Trial Tr. 322). Tawil's expert opinion testimony on "custom and practice" would have helped to explain to the jury that the defendant was going about his daily duties in good faith, unaware that his actions would be relied on to value securities, much less that the product of his work would be conveyed to investors.

The court raised a question about relevance. But rather than address or cite to its supporting brief filed days earlier, the defense inexplicably withdrew the area of expert testimony and pivoted to state "that the purpose of Mr. Tawil's testimony is really to provide background for the jury on distressed debt." (Trial Tr. 325.) The defense continued, unprompted, that "Mr. Tawil will not be rendering any opinion about whether or not any security in the credit fund was properly valued." (Trial Tr. 32526.)

16

The next topic of proposed testimony was the general practice at large funds and the roles of the valuation committee, auditors, CFO, administrator, operational staff, and others. (Trial Tr. 326.)  The Court then defined the issue for defense counsel in a way that would effectively preclude the expert's testimony – and inconsistent with permissible testimony for expert witnesses, especially in the securities industry.  The Court stated that "the question in this case is not how hedge funds in general are.  The question is how this hedge fund [Visium] operated." (Trial Tr. 327.)  There was no objection or legal rejoinder.  Instead, defense counsel quickly surrendered:  "We would be happy to exclude that from the testimony."  (Trial Tr. 327.) The legal issue regarding permissible areas of this expert's testimony warrants further review and analysis – including the effect, if any, on the defense's decision not to call the expert to testify.

The defense ended up not calling David Tawil or any other expert to testify. Tawil had unimpeachable credentials and should have testified and opined on processes of institutional checks involving the administrator, prime broker, valuation committees, auditors etc.  The expert also would have been able to testify about middle market investments, pricing, valuation and separation of classes of securities throughout restructuring.

At least as important, and subject to further consideration, it appears that Tawil was well-positioned to effectively contest the testimony the government elicited on a variety of issues, including market terms; separations; and pricing – or at least the jury should have had both presentations to consider. Tawil also would have been expected to testify about the nature and size of the Princeridge and Janney brokerages in a way that was inconsistent with how they were portrayed.  He would have been a key witness positioned to debunk the claims and characterizations that the government elicited and embraced.

17

In considering evidence at trial of the defendant's conduct, the jury also should have been able to consider that the defendant's understanding regarding internal uses was consistent with industry custom and practice.  The expert's opinion could have been valuable to support the defense that his conduct was consistent with a different purpose – to gather information for internal purposes, not ultimately to affect the classification. Consistent with practice and custom, the defendant was entitled to elicit expert opinion that supported his defense that broker information would not affect the determination by the fund, administrator, or auditor. Also absent was the evidence through expert testimony as to the general procedures of a large hedge fund – relevant information to consider in assessing the defendant's day-to-day knowledge. (Inappropriately, the government argued that the expert's testimony would be permissible on the condition that the defendant also testified that he was aware of the general practices at other funds. (Tr. 326.))  Nor was there testimony about procedures involving valuation of the questioned securities – they would be relevant to assess against what the defendant understood. The jury was deprived of evidence to challenge the characterizations that the government portrayed through its witnesses. Circumstances regarding the withdrawal of key areas of expert opinion -- especially after well-founded legal arguments had been advanced -- as well as the ultimate decision not to call the expert to testify warrant substantial review.

ii.      Witness Issues

*Visium-Related Witnesses*

An important focus is expected to be the assistance that witnesses from Visium, including representatives of the valuation committee member, might have been able to provide.  Of course, an appropriate assessment will be subject to a review first of case files and conferences, one hopes, with trial counsel.  One potential witness that the defense did not call was counsel for Visium who reportedly had stated that the month-end pricing information that Thorell, at

18

Plaford's direction, "submitted to Visium's operations and accounting personnel was not used to calculate the Credit Fund's NAV."  [*See* Dkt. 46-1 at 16 n.4]

*Other Possible Witnesses*

Employees from (i) large financial institutions that traded in the same securities at issue in the trial and (ii) other broker-dealers should have been considered to testify on the defendant's behalf.  A representative from Morgan Stanley, the administrator, also merited consideration for testimony on pricing and valuation, including mathematical models and minimum number of brokers, as well as fund relationships with investors.  It is anticipated, subject to further review, that through such witness testimony the jury would have received a different narrative to assess against the sole version it received.

Finally, the circumstances regarding the defendant's failure to testify warrant examination. The analysis is not simply a review of a strategic decision; the non-testimony and other non-evidence assume greater significance in light of the defense's rebuffed efforts to introduce evidence of the defendant's good faith.  Attempts to include exculpatory statements in the same recording the government introduced were unavailing notwithstanding a strong legal argument pursuant to FRE 106.  The decision not to call David Tawil, the hedge fund expert, to testify is baffling under the apparent circumstances.  Of course, at this preliminary stage, a comprehensive review obviously has not been undertaken.  So, too, a greater review of the defense's cross-examinations may reveal additional evidence of existing or additional defenses. Finally, the efforts, as discussed *infra*, to earn consciousness of innocence credit from the jury through the testimony of the government's case agent, FBI SA Matthew Callahan, did not pan out.  Under the circumstances that developed during trial, it would appear that the likelihood of defendant's testimony grew stronger.

19

5.      The Defense Case:  FBI SA Matthew Callahan

The defense called one witness to testify – not the defendant. The sole defense witness was FBI SA Matthew Callahan, the case agent for the government. At the start of the examination, the defense previewed the importance of the testimony by announcing that the direct examination would consist of four questions. Six ended up being asked – five by defense counsel, one by the Court. The examination did not offer suspense. (Just days before trial, the defense had filed a motion in limine to admit evidence of consciousness of innocence. Dkt.  60.

The apparent purpose of the testimony was to elicit evidence of the defendant's innocence – or good faith:  that the defendant had volunteered to turn over to the FBI certain tape recordings it overlooked when it raided his apartment and seized other tapes and other evidence.

On direct, Agent Callahan resisted the characterization that the defendant had "voluntarily" provided the tape.  He testified instead that the defendant had "complied with [the] request" and turned over the recordings. (Trial Tr. 953.) (The jury was left to wonder what was contained in these recordings.)

6.      The Court's Bar of Any Further Trial Adjournment May Have Had the Unintended Consequences of Aiding the Prosecution's Dilatory Production and Impeding the Defense's Trial Preparation

In consideration for securing a few weeks' adjournment in the trial date, defense counsel was required to certify that under no circumstances whatsoever would he request a further adjournment in the trial date. [Dkt. 9; trial adjourned to January 9, 2017; "No further extensions will be granted on any grounds whatsoever"]. In advance of  trial, it became apparent that the government's promised production of *Brady* material, an exhibit list and 3500 material was falling short of the direction the Court issued in August 2016.  Just days before trial, the defense submitted a motion to compel the government to produce *Brady*, *Giglio* and 3500 material,

discovery and a "good-faith exhibit list." The nature, order and manner of production appeared to place defense counsel in a vulnerable position that could have compromised his ability to timely prepare for trial, which was days away.  Ordinarily, relief for the government's dilatory production would be an adjournment of the trial, but in light of the absolute commitment counsel had made his right to be adequately prepared for trial on the defendant's behalf has been abridged. The government's voluminous and untimely production of 3500 material and perhaps other materials may have improperly interfered with the defendant's preparation for trial. For example, defense counsel asserted that "the government produced a 13-pafe exhibit list consisting of thousands of documents, any with no bates stamps identifying where defense counsel can locate the documents." Dkt 53.  While much irrelevant material was readily turned over, key documents reportedly withheld from production just days before trial. (*Id.*) The issue warrants investigation.

  **7.** <u>No Prejudice to the Government</u>

  The government's familiarity with the facts of the investigation and case issues dates back at least three years.  Here, the defendant was tried within six months of the government's three-count felony indictment alleging a securities fraud scheme involving the false valuation of securities. The jury's guilty verdict was returned January 19, 2017 – less than three weeks ago. The defendant's sentencing is scheduled for May 23rd. By contrast, defendant Chris Plaford, defendant Lumiere's former boss and Visium portfolio manager who testified at trial as a cooperating witness for the government, apparently still has not been sentenced.  He pled guilty to seven felonies, including four conspiracies, almost eight months ago, in June 2016.

CONCLUSION

For all the reasons set forth herein, it is respectfully submitted that defendant Lumiere, through his New Counsel, has established good cause and that the defendant be permitted to extend until March 31, 2017,  the time to file a Rule 33 motion for a new trial and a motion to renew a Rule 29 motion.


Respectfully submitted,

FOLEY & LARDNER LLP


/s/ Jonathan  N. Halpern
Jonathan N. Halpern
Jonathan H. Friedman
90 Park Avenue
New York, NY 10016
(212) 682-7474
jhalpern@foley.com
jfriedman@foley.com

22