Petitioner Stefan Lumiere v. United States of America

Case No. 18-CV-9170 (JSR)

SL00001 Cover Page

# UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

**STEFAN LUMIERE,**
       **Petitioner**

                                    **Case No. 18-CV-9170 (JSR)**

**V.**

**UNITED STATES OF AMERICA.**
       **Respondent**

                             **First Amended 2255**

                             Petition submitted October 10th 2018

                             (Pages 1-411)

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170 (JSR)

SL00001 Cover Page

## UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

**STEFAN LUMIERE,**

   **Petitioner**

**v.**            **Case No. 18-CV-9170 (JSR)**

**UNITED STATES OF AMERICA.**

   **Respondent**

## MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE AND CONVICTION PURSUANT TO 28 U.S.C. @2255 OR TO CONSTRUE AS SUCCESSIVE RULE 29 TO DISMISS INDICTMENT AND CONVICTION DUE TO AN INSUFFICIENCY OF EVIDENCE CLAIM, IN LIGHT OF ALL OF THE EXCULPATORY EVIDENCE SUBMITTED HEREIN OR A SUCCESSIVE RULE 33 MOTION

[1]

---

[1] Petitioner Lumiere respectfully submits with this 2255 motion, a motion for extension of time of at least 90 days from when he is released to home confinement and has access to computers, to file an amendment. Petitioner has been imprisoned at Otisville Camp with no access to computer or word processing where he worked on this Petition Pro Se using an email system with limited availability and capacity. The Bureau of Prisons has denied him access to his Discovery claiming BOP policy required a manual review of every file before turning over contents to inmate. Further, given the enormous number of files accounted for at close to 18 million, although Petitioner had made continuous attempts through the administrative process to get approval to access his Discovery, the government blocked inmate's access and still has no access to this while in halfway house where he is currently residing since his release from Otisville Prison on October 2, 2018.

1

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170 (JSR)

PROCEDURAL HISTORY

On February 26th, 2014, a warrant was issued to search the Petitioner's home and safety deposit box which was executed by FBI agent Matthew Callahan.

On March 17th, 2014, Petitioner entered into a Proffer agreement attended by himself, attorney Jeff Udell, Associate Renee Zaytsev and representatives from the SEC and from the United States Attorney's office.

On June 15th, 2016, a complaint was unsealed charging Stefan Lumiere of 3 counts. Count 1: Conspiracy to commit securities fraud and wire fraud in violation of Title 18 U.S.C. Section 371. Count 2: Securities Fraud in violation of Title 15 U.S.C. Section 78(J)(B) and 78(F/F) and Title 17 of the Code of Federal Regulations Section 240.10(b)(5). Count 3: Wire Fraud in Violation of Title 18 U.S.C. 1343

On July 14th, 2016, an indictment was unsealed charging Petitioner Stefan Lumiere for the same violations as in the Complaint filed on or about June 15th, 2016. At the arraignment the same day, Petitioner entered a plea of Not Guilty.

On or about January 23rd, 2017 after a five-day Trial, the jury returned a verdict of guilty on all three counts. On January 19th, 2017, Petitioner fired Trial counsel, and hired new counsel from Foley & Lardner who appeared to represent him in Rule 33, Motion for a Re-Trial.

Shortly thereafter New Counsel petitioned the Court for an extension of time of 90 days to file Rule 33 Motion from the standard 7-day rule, in order for new counsel to familiarize themselves with the case and the arguments. Shortly after submission, the Court rejected petition for an extension of time to file Rule 33 Motions, and instead granted a 9-day extension.

Foley & Lardner filed Rule 33 Motion by the deadline imposed by the Court with footnote that they did not have time to explore ineffective counsel claims, but preserving this right.

On April 18th, 2017, the Court denied the Rule 33 Motion based on a preponderance of the evidence viewed in the light most favorable to the government and set a sentencing date of May 15th, 2017.

2

---

[2] The Petitioner respectfully requests that the Court orders the Government to turn over complete and uncorrupted Discovery which he has never received in full although requested multiple times to his attorneys, to the government and finally to the Court at sentencing. Additionally, the Petitioner respectfully requests that the Court intervene in requiring the Government to turn over copies of complete Discovery for his case and any other outstanding case related to Visium including SEC cases. Petitioner additionally respectfully requests that the Court order the Government to provide all Discovery in a format that is text-searchable as opposed to the "Tif" picture format that was provided to Defense Counsel in preparation for trial. Additionally, the Petitioner respectfully requests that the Court order the Government to provide all recordings that they are in possession of or know may exist made by Thorell with full transcripts which were never turned over to Petitioner in preparation for trial

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170 (JSR)

---

including the 18+hours of Thorell recordings provided 1 week before trial and recordings that Petitioner believes
that Thorell made which he may or may not have turned over to the Government.

3

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170 (JSR)

On or about May 15th, 2017, Petitioner appeared for sentencing with counsel, and requested a Fatico hearing on the alleged losses that the government had initially claimed were in the tens of millions, but when challenged Government admitted that Visium had made payments to investors that they did not account for and were not aware of.  Therefore, Petitioner challenged the allegations of losses and the Court found the challenges reasonable and ordered the government to demand the actual data from Visium.  The Court then stated that the "Amount of losses is inconsequential to his sentencing, as losses in financial fraud cases can be enormous and inflate the actual bad acts of the individual."  Court set a new sentencing date on or about June 12th, 2017 where it was expected that the loss calculation would be settled.

On or about June 12th, 2017, Petitioner appeared for sentencing hearing, whereby the government still could not produce the actual losses, but presented to defense counsel documents that demonstrated that their loss calculations were materially overstated by tens of millions of dollars.  Petitioner agreed at the advice of counsel, given the Court's comments that it would not sentence the defendant based on any losses and therefore assume the losses to be zero for the purposes of sentencing, and further that the Court did not want to have a Fatico hearing as to the losses, to agree, for the purposes of this sentencing only and not in any admission of fact or substance, to a number of approximately $3 million of Visium earnings from the credit fund over the period in question.  Petitioner was then sentenced to an 18-month term of imprisonment followed by 3 years supervised release and One Million Dollar fine and a $300 special assessment fee.

On September 12, 2017, Petitioner self-surrendered as per court order to Otisville Prison Camp where he has been since.
On October 2nd, 2018, Petitioner was moved to a halfway house in the Bronx, NY where his is presently residing.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170 (JSR)

SL00002 Table of Contents

## TABLE OF CONTENTS

**COVER PAGE**                                **PAGE 1**

**PROCEDURAL HISTORY**                        **PAGE 2-3**

**TABLE OF CONTENTS**                         **PAGES 4-13**

**APPENDIX TABLE OF CONTENTS**                **PAGES**

**TIMELINE**

**BACKGROUND**

**DISCUSSION**

**MAIN BODY AND ARGUMENTS**

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170 (JSR)

# I.  MISCONDUCT FALSELY CONFLATING PORTFOLIO MANAGER TITLE FROM GLOBAL FUND TO THAT OF CREDIT FUND

### A.  DEFENSE COUNSEL CREIZMAN ALLOWED MISCONDUCT TO FALSELY CLAIM THAT LUMIERE WAS PORTFOLIO MANAGER OF THE CREDIT FUND

1. Government Falsely and Continuously Referred to Lumiere as Hedge Fund Manager of Credit Fund

### B.  CONVICTION WAS OBTAINED BY USE OF FALSE, ERRONEOUS AND PERJURED TESTIMONY BY WITNESSES

1. Thorell Misconduct (Portfolio Manager)
2. Plaford Perjury (Portfolio Manager)
3. Vandersnow Perjury (Portfolio Manager)
4. Jindra Perjury (Responsible for all securities)
5. Keily Perjury (Portfolio Manager)

### C.  CONVICTION WAS OBTAINED BY PLAIN ERROR OF FACTS PROMOTED BY WITNESSES WITH ULTERIOR MOTIVES

# II.  MISCONDUCT FALSELY STATING THAT LUMIERE KNEW THAT PRICES AND VALUATIONS USED BY VISIUM WERE INFLATED AT THE TIME

### A.  DEFENSE COUNSEL CREIZMAN ALLOWED MISCONDUCT TO FALSELY CLAIM THAT LUMIERE KNEW PRICES USED BY VISIUM CREDIT WERE FALSE

1. Government Falsely and Continuously Referred to Lumiere as "Mastermind" of Pricing and that Lumiere Knew that Prices used by Visium were False by Leaving out Evidence that Supported the Prices and Valuations

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170 (JSR)

B.  CONVICTION WAS OBTAINED BY USE OF FALSE, ERRONEOUS AND PERJURED
    TESTIMONY BY WITNESSES

    1.  Thorell Perjury (Prices)
    2.  Plaford Perjury (Prices)
    3.  Jindra Perjury (Prices)
    4.  Vandersnow (Prices)
    5.  Keily Perjury (Prices)

## III. MISCONDUCT FALSELY INFLAMING PASSIONS OF JURY WITH GENERAL DEFAMATION OF PETITIONER

A.  DEFENSE COUNSEL CREIZMAN ALLOWED MISCONDUCT

B.  PERJURY- GENERAL LIES TO MISLEAD COURT, ASSIST GOVERNMENT CASE AND
    DEFAME PETITIONER

    1.  Thorell (Lied to Defame and for the Motive of Greed and a Vendetta)
    2.  Plaford (Lied to Defame and Motivated to Avoid Jail for Insider Trading)
    3.  Vandersnow (Lied to Defame and Motivated to Prevent Prosecution)
    4.  Jindra (Lied to Defame showing bias of SEC which Stood to Profit from a Guilty
        Verdict)

## IV. GOVERNMENT IN "BAD FAITH" COMMITTED PERJURY AND MADE MATERIAL MISSTATEMENTS TO MISLEAD THE COURT AND JURY

C.  FBI AGENT CALLAHAN COMMITTED PERJURY AND MISLEAD THE COURT IN
    EFFORT TO ILLEGITIMATELY ATTACK PETITIONER'S "GOOD FAITH DEFENSE"

Petitioner Stefan Lumiere v. United States of America              Case No. 18-CV-9170 (JSR)

D. PROSECUTORS ASKED PREJUDICIAL AND MISLEADING QUESTIONS SOLICITING
   PERJURED TESTIMONY AND MADE MISSTATEMENTS OF EVIDENCE AND FACTS
   NOT INTRODUCED INTO EVIDENCE

E. FBI AGENT CALLAHAN PERJURED HIMSELF DURING MOTION TO SUPPRESS
   HEARING TO PREVENT SUPPRESSION OF EVIDENCE

## V. CONFLICT OF INTEREST OF DEFENSE COUNSEL

## VI. DEFENSE COUNSEL CREIZMAN FAILED WITH RESPECT TO KEY EXPERT WITNESS

A. FAILED TO CALL EXPERT WITNESS

B. FAILED TO ATTEND DAUBERT HEARING TO ARGUE SCOPE OF EXPERT
   TESTIMONY

## VII. INEFFECTIVE ASSISTANCE OF COUNSEL

A. PETITIONER FIRST TO REPORT CONCERN ABOUT VALUATION PRACTICES TO
   ROBERT KNUTS (FORMER SEC ATTORNEY)

B. DEFENSE COUNSEL UDELL FAILED TO MAKE AN INDEPENDENT DETERMINATION
   OF FACTS TO MAKE INFORMED DECISIONS
   1. Failure of Attorney Udell to be Present at Signing of Consent to Search
   2. Failure to Properly Prepare to Speak with Government at Attorney Proffer

C. DEFENSE ATTORNEY FAILED TO PURSUE OR EVEN COMMUNICATE COOPERATION
   AGREEMENTS

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170 (JSR)

1. Abramson & Morak Failed to Communicate Cooperation Agreement to Petitioner in 2014

2. Creizman Failed to Pursue Offered Cooperation Agreement on Lesser Charges of Misprision of Felony

## D. DEFENSE COUNSEL FAILED TO SUBMIT EXCULPATORY EVIDENCE

1. ATI

    a. VRC Report
    b. Ernst & Young Report
    c. Valuation Committee Memo
    d. Rozenberg Email to MSAIP-Explain that Loan Prices Reflected Shell
    e. Rozenberg 3500 Material- Valuation Committee Valued ATI
    f. Year-End Review on ATI- Lumiere Assigned to ATI not responsible
    g. Recording-Plaford Excited about Taking ATI Private

2. China Medical (C-Med)

    a. VRC Reports Valuing Visium's Directing Class Position in C-Med
    b. Ernst & Young Reports Signing off on C-Med Valuation and Methodology
    c. Year-End Review Transcript Where Cooperating Witness Plaford States C-Med is not Petitioner Lumiere's Position
    d. Valuation Committee Memos Providing for Valuation of C-Med Position
    e. Recorded Transcript with Shah (Analyst) and Plaford Where Plaford Insists His Valuation is Correct
    f. Recorded Transcript where Plaford Gives Explanation of Valuation of C-Med
    g. Recorded Transcript with Brook (Broker) Discussing Different Classes of C-Med Bonds

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170 (JSR)

      h.  C-Med Trade Data from Other Broker and Fund and Quote Data on the Following Trading Day

      i.  Petitioner Lumiere Airline, Hotel and Concert Tickets in Miami when Plaford Perjured Himself on Lumiere's Discussion with Him and Ameesh in his Office

3. Nebraska Book

      a.  Alvarez and Marsal Report Identifying $50 Million in Credit Memos

      b.  Disclosure Statement Identifying Banker Valuation Estimate of ($300 Million Valuation)

      c.  Witness from Brown Rudnick who held Meeting with Bondholders where 85% Private Equity Offer Made.

4. Sevan Marine (Voyageur)

      a.  Failure to Comment or Introduce Evidence of Buyout of Sevan Marine by Teekay Shipping, which Paid Bondholders 74%

      b.  Company Filings Disclosing Buyout Terms Months After Made.

5. US Oncology (USON Escrow)

      a.  Failure to Comment on Buyout and Settlement Offers of USON Escrow by McKesson

      b.  Documents from Law Firm Stroock identifying Settlement Offers and Terms

      c.  Recorded Transcripts of Plaford and Lumiere Discussing Updated Settlement and Valuation

6. Failure of Defense Counsel Creizman to Show Conclusively with Absolute Evidence the Simple Provable Fact that Lumiere was not in any Form a Portfolio Manager in the Visium Credit Fund and that the Government Manipulated Witness Testimony and Conflated Lumiere's Position in Visium Global and Balanced Fund in Order to Make False Allegation

10

Petitioner Stefan Lumiere v. United States of America            Case No. 18-CV-9170 (JSR)

7. Failure of Defense Counsel Creizman to Call Myriad of Witnesses that Could Have Testified in Lumiere's Defense

   a. Alexandra Gottlieb (Defendant's Sister and Jake Gottlieb's (Visium Founder's Wife
   b. Jason Huemer- President of Visium Funds
   c. Josh Rozenberg- Visium Accounting Department / Member of Valuation Committee
   d. Vinny Natarajan- Visium Business Development
   e. Tom Cahill- Visium Head of Marketing
   f. Amol Sahasrabudhe- Visium Chief Risk Officer
   g. Bob Kim- Visium Global Fund Director of Research
   h. Lesley Keily- Visium Funds Head Trader
   i. Lee Brown- Visium Credit Fund Analyst
   j. Ameesh Shah-Visium Credit Fund Analyst
   k. Itai Baron- Ex-Visium Credit Fund Analyst
   l. Nilesh Patel- Ex-Visium Credit Fund Analyst
   m. John Czapla - Valuation Research Company (VRC) Analyst
   n. Ben Jones- Conway del Genio, restructuring Advisor-Interim CFO ATI Schools
   o. Paul Leand- AMA Advisors- Deep Sea Rig Specialist- Advised on Sevan Marine  *(A134)*
   p. Steve Pohl- Brown Rudnick Attorney- Represented Creditors on Nebraska Book  *(A135)*
   q. Jacob Gottlieb- Visium Funds Founder/Chief Investment Officer Visium Credit Funds
   r. Steven Ku- Visium Funds Chief Financial Officer/Partner
   s. Robert Knuts- Former-SEC Attorney from Park & Jensen- Sought Legal Advice on Valuation Issues in May 2013
   t. Jayme Goldstein- Attorney Stroock, Stroock & Lavan (Worked on ATI, C-Med, USON for creditors)

8. Defense Counsel Creizman Failed to Competently Prepare for Trial with Documentation and Analysis

   a. Failed to Hire Forensic Accounting Firm
   b. Failed to Convert Voluminous (Millions of files) Discovery into Text-Searchable Format
   c. Failed to Review Discovery

11

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170 (JSR)

     d.   Failed to Analyze the Painting the Tape Allegation on C-Med

     e.   Failed to Ensure that Discovery was Complete and Readable

     f.   Failed to Subpoena Materials Necessary for Defense of Misvaluations

     g.   Failed to Review and Correct Material Plain Errors in Government Exhibits

          1)   Failure to Review Transcripts of Recordings and Correct Errors and Manipulations by Government Aided by Thorell Perjury

          2)   Failure to Analyze Phone Records and Emails to and from Brokers

          3)   Failure to Explain USB use at Year-End 2011

          4)   Stipulated to and Allowed Privileged Material into Trial and Then Failed to Object or Call for Mistrial

9. Defense Counsel Creizman was Completely Incompetent at Trial Performance

    a.   Failure to Cross Examine Witnesses with Relevant Questions

    b.   Failure to Recall Material Facts and State Arguments During Motion to Suppress Hearing

    c.   Defense Counsel Creizman Unprofessionally and Illegally Threatened Petitioner

    d.   Defense Counsel Creizman Failed to Prepare Defendant to Testify

    e.   Failure to Present Actual Defense During Opening and Closing Statements

10. Defense Counsel Failed to Object to Materially Prejudicial, Leading Questions, or Those that Lacked Foundation, Subject to Plain Error and to Object to Long-Winded Prejudicial Answers Outside the Scope of the Matter

11. Defense Counsel Lackluster and Obviously Unprepared and Incompetent Rule 29 Motion

12. Defense Counsel Failed to Prepare, Understand, and Argue for Discovery.

    a.   Defense Counsel Irrationally Stayed SEC Civil Case which Would have Benefitted Defense from Increased Discovery

    b.   Defense Counsel failed to Argue for More Time.

    c.   Defense Counsel failed to Execute Subpoenas.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170 (JSR)

d.  Failure of Defense Counsel Creizman to Competently Argue for Inclusion of Exculpatory/Explanatory Evidence in Recordings and Transcripts

## VIII.   DEFENSE COUNSEL CREIZMAN FAILED TO ACT AS PETITIONER'S ADVOCATE WHEN HE DID NOT ESTABLISH THE GOOD FAITH AND INTEGRITY BEHIND ALL OF PETITIONER'S AND COOPERATING WITNESS PLAFORD'S ANALYSIS.

A.  DEFENSE COUNSEL FAILED TO ESTABLISH PROOF OF PETITIONER'S INTEGRITY USING YEAR-END REVIEW RECORDINGS

B.  DEFENSE COUNSEL FAILED TO ESTABLISH EVIDENCE IN SUPPORT OF PETITIONER'S ANALYSIS ON ATI POSITION

1.  Conway del Genio Projection Model
2.  Cross Roads Projection Model

C.  DEFENSE COUNSEL FAILED TO ESTABLISH PROOF OF PETITIONER'S GOOD FAITH BELIEF IN THE PRICES AND VALUES USING BC PARTNERS LENDER'S CALL TRANSCRIPT AND PITCHBOOK PROPOSAL TO ATI LENDERS.

D.  DEFENSE COUNSEL FAILED TO ESTABLISH PROOF THAT CREDIT FUND PORTFOLIO MANAGER, PLAFORD, AGREED WITH CREDIT ANALYST AMEESH SHAH'S ANALYSIS OF C-MED POSITION THROUGH RECORDING.

E.  DEFENSE COUNSEL FAILED TO ESTABLISH GOOD FAITH IN BROOK BROKER CALL ON C-MED.

F.  DEFENSE COUNSEL FAILED TO ESTABLISH EVIDENCE IN SUPPORT OF PETITIONER'S ANALYSIS ON NEBRASKA BOOK POSITION

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170 (JSR)

G. DEFENSE COUNSEL FAILED TO INTRODUCE AND COMMENT ON CROSS THE NEXT LINE OF A RECORDING WHERE LUMIERE CLEARLY STATES A PLAN TO LEAKING INFORMATION TO THE SEC IN DISCUSSION WITH PHIL BROWNIAN WHERE THE CONTEXT IS DISCUSSING A RESIGNATION AND DEPARTURE FROM VISIUM.

IX.  **PREPONDERANCE OF EVIDENCE PROVES THAT PETITIONER LUMIERE WAS SET UP AND FRAMED BY CONCERTED EFFORTS OF JAKE GOTTLIEB, CHRIS PLAFORD AND JASON THORELL WITH THE AID OF DEFENSE COUNSEL CREIZMAN**

X.  **EXCESSIVE FINES PLACED ON PETITIONER LUMIERE**

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170

SL00003 Appendix Table of Contents Final pt

## APPENDIX TABLE OF CONTENTS

PART I: A1-A35

PART II: A36-A55

PART III: A56-A133

## APPENDIX PART I (A1-A35)

A1 (1-4)              Visium 20120 Annual Investor Day with Presenting Managers (4-4-12)

A2 (1-8)              Visium Marketing Material-Balanced Fund- March 2012

A3 (1-17)             Visium Marketing Material- Global Fund- March 2012

A4 (1-18)             Visium Marketing Material- Balanced Fund

A5    (1-9)           Visium Marketing Material-Credit Opportunities Fund (Partial)

A6    (1-6)           Visium Marketing Material-Balanced Fund (Partial)

A7                    Visium Marketing Material-Credit Opportunities Fund Investment Team Organization
                      (~2009-2010)

A8                    Visium Marketing Material- Balanced Fund Investment Team Bios

A8.1                  Visium PNL Sheet- Daily PNL Report CC1-Risk Arb Pad that Lumiere managed
                      (8-30-12)

A9                    Visium-Lumiere Business Card with title Portfolio Manager Visium Funds (Not Credit)

A10 (1-2)             Visium Funds Management

A10.5                 Visium Memorandum to employees about SEC Investigation into Visium about
                      Amylin Trading (7-19-12)

A11 (1-2)             Visium Credit Opportunities (No Mention of Separate Strategy Distressed/ Special
                      Situations Portfolio)

Petitioner Stefan Lumiere v. United States of America                Case No. 18-CV-9170

A11.1          Abramson Email: Proffer schedule with Government letter Oct 2014

A12 (1-3)      Visium Global Fund 2-29-12 (Identified Multiples Investment Managers)

A13 (1-23)     Visium Credit Opportunities Offshore Fund, Ltd Oct 2010 (partial)

A14            Lumiere Chart- Multiple Roles and Varying Times at Visium

A15 (1-15)     Visium Employment Agreement- Dated 2007 (Pre-exists Credit Fund)

A16            Visium Email- Risk Arb Pad Discussion- (Signature Page: Portfolio Manager Special
               Situations)

A17 (1-2)      Transcript- Government Opening- Tr P3-4 (Government Claims that Visium is
               Lumiere's Hedge Fund)

A18 (1-2)      Transcript- Government Opening-Tr P5-6 (Government Claims that Lumiere is Hedge
               Fund Manager)

A19 (1-2)      Transcript- Government Opening-Tr P9-10 (Government Claims that Lumiere is
               Hedge Fund Manager)

A20            Transcript- Government Summation-Tr P975 (Government Claims Lumiere was
               Portfolio Manager of Credit)

A21   (1-2)    Transcript- Government Summation-Tr P976-977 (Government Claims that Lumiere
               was Portfolio Manager)

A22   (1-2)    Transcript- Keily Direct- Tr P45-46 (no separation of Lumiere's role by fund)

A22.1          Transcript- Government Opening Statement- Tr P11 (Gov. Claims Visium is Lumiere's
               Hedge Fund)

A22.2 p1       Transcript- Milgram Cross-Tr P806 (Claims that Manager has No Say in Pricing)

A22.2 p2       Transcript- Milgram Cross-Tr P807 (Milgram States that Administrator Solely Prices
               Marblegate Tr P807

A22.3          Transcript- Government Misstatement-Tr P80 (Lumiere is saying he is going to be
               focused on ATI 100%)

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

A22.4            Transcript- Thorell Direct- Tr P384 (Discussion of Prices with Ku as Initial Estimates
                 only and not going into NAV)

A23   (1-97)     Transcript Corrected: Lumiere-Thorell #1: (12-19-2013)

A24   (1-131)    Transcript Corrected: Lumiere-Thorell #2: (Jan 3rd 2014)

A25   (1-17)     Ability Acquisition (ATI)-VRC Report (3-31-13)

A26   (1-10)     Ancora Education, (ATI Schools Newco)-VRC Report (9-30-13)

A26.1            Visium Email: J Gottlieb to Keily on ATI: "talked to Chris..company doing better.need
                 to fund..solidify  our place in the cap stack." (1-7-13)

A26.2            Visium Email: Ku and Gottlieb prepare info asap on ATI for Morgan Stanley (MSAIP)
                 6-26-13

A27 (1-9)        Ancora Education, (ATI Schools Newco)-VRC Report (6-30-14)

A27.1            ATI- Visium Valuation Committee Rozenberg-MSAIP Discussing Old Loans used as
                 Shell for Valuation 6-30-13

A27.2            ATI-Visium's Valuation Committee's Rozenberg Email on Budget (3-22-13)

A27.3 (1-3)      ATI-Visium Valuation Committee's Rozenberg Email

A27.4 (1-5)      ATI-MSAIP Report identifying the new capital structure and valuations; Pricing on
                 LoanX which is feed to Markit varies from Large Dealer Citigroup by 10 3/4 points.

A27.5 (1-2)      ATI Diligence meeting w/ Marblegate, Visium, Stroock and Versa and ATI Newco
                 Pro-Forma Capital Structure (9-14-12)

A27.6            Visium Email: Gottlieb Email to Plaford on Visium Funding (7-19-12)

A27.61           Visium Email: Rozenberg to Plaford- ATI Valuation Committee meeting (3-22-13)

A27.62           ATI-RBC Email: ATI Weekly Cash Flow Scenarios and meeting with Financial advisors
                 (8-5-11)

A27.7            Visium Email: Plaford to J Gottlieb discuss all the work done on ATI for improved
                 economics (1-7-13)

17

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

A27.8          Visium Email: Keily to J Gottlieb-File Lawsuit C-Med "Champing at the bit"

A27.9 (1-3)        Visium Email: Plaford asked Lumiere to prepare sheet for Josh and new capital
                   structure (4-4-13)

A27.91             Visium Email: Lumiere asking if Plaford's positions on ATI are the old positions
                   pre-restructuring (4-2-13)

A28 (1-5)          China Medical - VRC Report (9-30-13)

A29 (1-5)          China Medical - VRC Report (12-31-13)

A30 (1-5)          China Medical - VRC Report (6-30-14)

A30.1 (1-2)        China Medical - Email Stroock Attorneys on Tiering Structure (12-18-2012)

A30.2 (1)          China Medical- Email Stroock Directing Class Holders (9-27-12)

A30.3 (1-3)        China Medical- Joint Liquidators (10-20-12)

A30.4 ( 1)         China Medical- Offer to Bondholders Communicated by Advisors Borelli Walsh for
                   $105 Million (11-26-12)

A30.5 (1-6)        China Medical- Liquidator Agenda- with advisors Stroock and Borelli Walsh 8-10-12

A30.6 (1-6)        China Medical- Wilmington Trustee notice to bondholders 8-10-12

A31 (1-20)         Ernst & Young Internal Memorandum (3-12-13)

A31.1 (1-3)        Ernst & Young Email ATI and CMED Valuation Discussion (1-21-13)

A32 (1-4)          Ernst & Young Internal Memorandum (12-31-12)

A33 (1-20)         Visium Valuation Committee Private Investment Memo (12-31-12)

A34 (1-3)          Visium Valuation Committee Agenda- Q1 2014 (7-1-14)

A35 (1-2)          Visium Valuation Committee Agenda-Q4 2014 (12-30-14)

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

**APPENDIX PART II (A36-A55)**

A36 (1-16)          Nebraska Company Update-September 2011

A37 (1-17)          Nebraska- Company Update-December 2011

A38 (1-24)          Nebraska-Alvarez & Marsal Liquidity Analysis and Credit Memos

A39 (1-24)          Nebraska- Alvarez & Marsal-Presentation to Steering Committee-May 2012

A40 (1-96)          Sevan- Sevan Restructuring Business Plan (8-21-11)

A41                 Sevan- Interim Financial Report Third Q 2011

A42                 Sevan-Teekay agrees to acquire 3 FPSOs from Sevan 9-30-11

A43                 Sevan-First Completion of restructuring Update 11-30-11

A44                 Sevan-Restructuring Update (4-16-12)

A45                 Sevan-Sail Away of DPSO "Voyageur Spirit"

A46                 Sevan-Norske Indenture Trustee

A47                 Sevan-Letter of Intent FPSO Voyageur (7-1-10)

A48                 Sevan- Voyageur Spirit Delivered (5-2-13)

A49                 Sevan- Continuing Dialogue Long-term Financial Update and FPSO Sevan Voyageur
                    7-11-11

A49.1               Sevan Expense Report Sevan (9-4-11)

A50 (1-28)          ATI-Presentation of Qualifications Conway Del Genio (10-10-11)

A51 (1-27)          ATI- Materials Prepared for Discussion Miller Buckfire/Stifel Nicholas 1-6-12

A52 (1-22)          ATI-restructuring Discussion Document Jan 6, 2012

A52.1 (1-22)        ATI- Informational Memorandum Summer 2012 (Stifel Nicholas sets bid auction date
                    for ATI sale with EBITDA forecasts of 13 Million for 2013 and 21 Million for 2014)

A53 (1-44)          ATI- Informational Memorandum (9-21-12) (Foreclosure of assets set for Nov 2012)

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170

A53.1 (1-2)          ATI-Apollo Quarterly Update with X-Roads projections for Run Rate EBITDA

A53.2 (1-2)          ATI-Apollo Quarterly Update with CDG Projections and Estimates for EBITDA

A53.3 (1-4)          ATI- Apollo Quarterly Update with 3 Valuation methodologies used to come up with

                      portfolio managers recommended price which overrides the broker quote by 3

points.

A54          ATI- Article from Forbes (1-17-13)

A54.1          ATI- The Street Report on Foreclosure purchase of Assets in Foreclosure by Ancora

Holdings (Owned by Marblegate and Visium)

A54.2          ATI- PR newswire Article- Foreclosure of assets and purchase by Ancora Holdings

A55          ATI- PR newswire Article-BC Partners Buy ATI from Riverside 11-10-09

**APPENDIX PART III (A56-A133)**          *Appendix IV to be submitted at a later date - A134, A135*

A56 (1-80)          Visium Compliance Manual- March 2011

A57 (1-6)          Visium Compliance Manual- September 2013 (Partial)

A57.1          GAAP ASC 820 Excerpt excluded from document provided by government which

Creizman stipulated to without reviewing (Market Approach, Cost Approach, Income

Approach)

A58          Visium Email- From MSFS to Mark Gottlieb- Discussion of Manager Marks **(Insert

date)**

A59          Visium Email- From Jason Huemer to Vinny Natarajan- Thorell Compensation only

between Plaford and Ku **(insert date)**

A60 (1-2)          Visium Email- From MSFS- Deeper dive Credit Fund *(insert date)*

A61 (1-3)          TIAA-CREF Asset Management Report- Investing in Middle Senior Secured Market

Loans

Petitioner Stefan Lumiere v. United States of America                     Case No. 18-CV-9170

| | |
|---|---|
| A62 | Creizman Letter to Paul Weiss indicating FedEx Letter from Creizman to Jake Gottlieb's Attorney at Paul Weiss: sending Hard Drive according to "Common Interest Privilege" |
| A63 | Visium Initial Indemnification offer of advancement for Lumiere limiting to $25,00 (4-22-16) |
| A64 | Visium Subsequent Indemnification Letter for Lumiere with Creizman (11-1-16) |
| A65 (1-6) | Creizman Invoices- uncovered identifying "Joint Defense Agreement" with Visium Counsel Seward & Kissel |
| A65.1 (1-4) | Creizman Emails demonstrating his conflict with Lumiere |
| A66 | DOJ Letter-Co-Conspirators "Under Seal" including Jacob Gottlieb and Steven Ku |
| A67 (1-2) | Transcript- Judge Rakoff Order: "Co-Conspirators must come out at Trial" |
| A68 (1-10) | Creizman Emails denying sending anything to Paul Weiss |
| A69 (1-8) | Creizman Memorandum- Secret meeting between Creizman and Government on 9-8-16 where Government offers Lumiere reduced charge of "Misprision of Felony" and wanting Lumiere to cooperate with Government to help build case against Jake Gottlieb who they want to prosecute. (9-8-16) |
| A70 (1-3) | Park & Jensen Email- Meeting to schedule to discuss Visium valuation issues (5-15-13) |
| A71 (1-4) | Park & Jensen- Attorney Knuts meeting notes of Lumiere's concerns about valuation practices at Visium and recommendation with no indication of concern (5-17-13) |
| A72 | Olshan Frome- Udell notes on discussion with Park & Jensen's Knuts about meeting on 5-17-13 and Attorney Knuts stating that his recommendation to Lumiere was "not to whistleblow" |
| A73 | Park & Jensen Email: Lumiere not wanting to forget about Visium matter (5-20-13) |
| A74 | Park & Jensen Email: Lumiere asking if he had made any progress on Visium matter assessment (8-1-13) |

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

A75            Park & Jensen Email: Lumiere asking about Whistleblowing to SEC (12-19-13)

A76            Park & Jensen Email: Lumiere asking to report Visium Matter to SEC (1-6-14)

A77            Park & Jensen Email: Lumiere stating that upset that they did not advise him on
               reporting Visium issue almost a year prior when he wanted to help the SEC with
               investigation (3-3-14)

A78 (1-4)      Park & Jensen Retainer Agreement Lumiere on government investigation


SL00004 Appendix Table of Contents Final Pt2


A79  (1-4)     Attorney Udell Proffer Notes March 12, 2014 (Discusses Privileged Material in Seized
               Documents with AUSA and FBI Agent Matt Callahan; Prosecutor erroneous leading
               question as "overtime" and not corrected whereas Udell said: "Lumiere left a "short
               time" after he became suspicious about incident about Plaford's cagy response to
               forwarding new EBITDA Budget to Valuation Committee)

A80 (1-11)     Lumiere Proffer Notes March 17, 2014

A81 (1-5)      Udell Proffer Notes March 20, 2014

A81.1          Delivery of Equipment to FBI Agent Callahan (3-20-14)

A82 (1-2)      FBI Consent to Search Agreement and Rider-Attorney Udell not present for signing
               and did not advise as to language (4-15-14)

A82.1          FBI Return of some computer equipment to Lumiere (4-15-14)

A83 (1-12)     Attorney Abramson & Morak Notes with AUSA Discussing Government wanting
               Lumiere to Cooperate and as Subject then progressing to target if does not
               cooperate (July 2014 to Feb 2016)

A83.1          Abramson & Morak: Letter to send summaries and files to Sher Tremonte (3-9-16)

A84            Painting the Tape- Airfare March 21-March 25th to Miami proving that not in office
               during alleged Trade

Petitioner Stefan Lumiere v. United States of America            Case No. 18-CV-9170

| | |
|---|---|
| A85 | Painting the Tape- Hotel Room Invoice in Miami March 21-March 25th proof not in office during alleged Trade |
| A86 | Painting the Tape- Lumiere Concert Tickets in Miami on March 23rd, 2012 during alleged trade |
| A86.1 | China Medical Article- China Medical is a Mystery that Most investors can't explain (3-28-12) |
| A87 (1-2) | China Medical- Seeking Alpha report: "Evidence Suggests China Medical is taking itself private via 3rd party" (4-5-12) |
| A87.1 | China Medical- Trade 2-24-12 Thorell with Gleacher: Bought 500M at 37.5 |
| A88 | China Medical- Trade 3-23-12 Charles Engle with Happoalim Securities at 42.5 @5:31pm |
| A89 | China Medical- Trade 3-23-12 Charles Engle with Grammercy Fund at 42.5 at 5:31pm |
| A90 | China Medical- Trade 3-23-12 Sudarshan Jain with Brook from Janney at 43.25 |
| A91 | China Medical- Stock Chart (Shows stock price increasing from 1.35 to $3 by 3-23-12 then peak at $12 in July 2012 |
| A92 (1-5) | China Medical- Stock Price & Volume Tables identifying increase in stock price on volume over this period from $1.35 to $12 per share |
| A93 | China Medical "Painting the Tape": Lee Brown Chat with Janney Montgomery stating that Thorell finalized Trade in C-Med and difficulty in buying bonds due to illiquidity. Additionally, they needed to involve multiple parties to get to 1 million face amount. Discussion is hours after Trade was booked with Visium by Sudarshan Jain (3-23-12) |
| A93.5 | China Medical- Bond Quotes and Markets from Banc of America, Albert Fried, Jefferies in the 40's (3-26-12) |
| A94 | China Medical- Ameesh Shah Email invitation for lender call scheduled for 3-26-12 (3-21-12) |
| A95 | China Medical- Email: Plaford to Ameesh Shah "moving forward with CMED (4-23-13) |

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

| | |
|---|---|
| A96 | China Medical- Email: Ameesh Shah to Rozenberg-Discussion of C-Med and value (7-16-12) |
| A97 | China Medical- Email Thorell to Plaford- C-Med difficult to buy at any level (No Sellers) (2-26-12) |
| A98 | Creizman- Email from Lumiere with list of witnesses to call and statements would make (12-13-16) |
| A99 (1-9) | Recordings summary- Prepared by Abramson & Morak shows Lumiere's Good Faith, Discussions with Brokers as to research on the unique situations such as C-Med Tiering, discussion with Plaford who set prices based on Analysis, Plaford stating that J. Gottlieb asking Plaford to get someone to mark down a bit and Plaford stating that it had to be backed by analysis and not arbitrary. |
| A99.1 | Abramson Email: With DOJ Conference (6-16-14) |
| A99.2 | Abramson Email: With DOJ to discuss Lumiere (9-11-14) |
| A99.3 | Abramson Email: with Lumiere: Discuss next steps with Government (9-16-14) |
| A99.4 | Abramson Email: with DOJ: Proffer cancelled (10-15-14) |
| A99.5 | Abramson Email: With Lumiere: Actions are not in dispute but knowledge is (2-24-16) |
| A99.6 | Abramson Email: with Lumiere: Fire Abramson & Morak (3-4-16) |
| A99.7 | Abramson Email: with Lumiere: "We're Out Baby" (3-4-16) |
| A99.8 | Abramson Email: with Lumiere: Apology to Lumiere (3-4-16) |
| A100 (1-40) | Creizman- Emails where he threatened Lumiere illegally. |
| A101 | Creizman- Email identifying Trial Errors for Motion for New Trial including: Mistrial based on Prosecutor inclusion of privileged material in Trial, Prosecutorial Misconduct by making materially misstating evidence; Prejudicial Errors in testimony. |
| A102 | Creizman- Lumiere Email that he told Creizman that he wanted to testify and to discuss this if permitted |

Petitioner Stefan Lumiere v. United States of America                                    Case No. 18-CV-9170

| | |
|---|---|
| A102.1 | Foley & Lardner Email: Lumiere asking for incomplete discovery and subpoena information requested of Visium (4-18-17) |
| A103 | Creizman- Email stating that he is not properly arguing for more discovery time for complex case |
| A104 | PNL Contribution Email for 2009, 2010, 2011, 2012 (Many on this list were from names that existed in portfolio in 2009 and 2010, prior to Thorell's joining firm, yet he states that they were all misvalued committing perjury; Additionally, email chain shows Lumiere was denied access specifically proving he is not a Portfolio manager in credit with no authorities or control. |
| A105 | Outten Email: "Cease and Desist" for J. Gottlieb's disparagement of Lumiere |
| A106 | Visium "Claw back" documents from government alleging Visium asserting privileged yet that may have contributed to innocence of Lumiere 2 documents of which were internal audits of Visium Credit with one stating no fault found and recommending no action finding no fault in Trading activity. (VAM 000228974, VAM 000228975, VAM 000228976; VAM 000650848; VAM 000650849; VAM 000650850) |
| A107 (1-4) | Stroock Email-Stroock Referral to Employment Attorney Outten (4-13-13) |
| A108 (1-2) | Outten Email: Advice to Lumiere on how to leave Visium 4-16-13 |
| A109 | Outten Email: Advised to continue working until a settlement is reached |
| A110 | Visium Email-Scheduled call with David Keily 4-18-13 |
| A111 | Outten Email-Strategy for discussion with Gottlieb 4-17-13 |
| A112 | Visium Email-Huemer Email on scheduling call to discuss departure 4-18-13 |
| A113 | Visium Email-Call with Huemer and Keily 4-18-13 |
| A114 | Lumiere seeks advice from Outten after Visium locked him out during settlement discussions 4-30-13 |
| A115 | Outten Email: Lumiere Locked Out from Visium During Settlement Discussions |

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

| A116 | Visium Email- Keily stating that Visium is interpreting Lumiere's dissatisfaction with Visium as a voluntary resignation that Lumiere initiated and not the other was around. |
| --- | --- |
| A117 | Oscar Gruss Contract-Lumiere offer Special Situations Analyst for Minimum Guarantee of $250k (3-2-05) |
| A118 | Brencourt Advisors Contract with $400k "Minimum Guarantee" (8-4-06) |
| A119 | Brencourt Advisors: Lumiere total compensation of $879,150 for 2006 |
| A120 | Nomura Contract- Director Head of Special Situations Research with $800k 2-year contract. |
| A120.1 | Wall Street Letter- Lumiere hired as Director Special Situations at Nomura (5-15-06) |
| A121 | Plaford/Vandersnow discussion with Vandersnow over Bloomberg requesting quotes and mentioning USON Settlement offer. |
| A122 (1-3) | Princeridge Corporate information- Sizable operation and subsidiary of UFMI public company |
| A123 | Princeridge announcement naming McNamara as MD reporting to Vandersnow COO of Corporate Bonds. |
| A124 (1-13) | Janney overview describing sizable business subsidiary of Penn Insurance with $65 Billion in Assets |
| A125 | Broker Quote samples from Vandersnow and Janney to both Thorell and Lumiere and not just Lumiere as Thorell and Jindra falsely testified; Also quotes in 11 names per month were sent and not 50 to 75. |
| A126 | Visium Price Exception Report |
| A127 | Vandersnow quotes versus other brokers showing not a significant disparity given that no evidence of actual markets in many of the bonds. |
| A128 | Visium Document Identifying CMED and ATI Marked by Valuation Committee |

A129        Janney Montgomery discussion that CMED is restricted shortly after the alleged
            painting the tape Trade and other party is restricted in discussions identifying the
            steering committee meeting.

A130 (1-3)  Tawil's (Defense Expert Witness) disclosure of what he would testify to pursuant to
            Rule 16 (b)(1)(c) (Comments on reasons for getting broker quotes apart from
            marking, why using smaller brokers for less liquid names made more sense, why an
            investor that was not committed to price based on pricing sources would be
            obligated to provide a fair value for the security, and that markets, indications, levels
            and quotes are different and not the same especially in less liquid markets).

A131 (1-2)  Creizman Email to Government demanding call with Judge Rakoff on Rule 16
            violations:   Government provided 18-hours of Thorell recordings approximately 1
            week before trial and exhibits list failed to identify "Bates Numbers".

A132 (1-2)  Visium Email: Plaford asks Lumiere to help Lee Brown work with Lifecare as
            distressed experience lacking (5-31-12)

A133 (1-2)  Creizman discussion in Chat about redacted John Brook 3500

      **Appendix IV to be continued**


A134    Affidavit From Paul Leand Jr. Managing Director and CEO od AMA Capital concerning Sevan Marine
A135 Affidavit from Steven D. Pohl, Partner of the law firm Brown Rudnicjk, LLP, concerning Nebraska Book

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

SL00005 Timeline reference

Timeline:

Oct 2007- Lumiere joined Visium as Portfolio Manager in Balanced Fund as Portfolio Manager of Distressed/Special Situations "Book".

End of 2008- Visium asked Lumiere to liquidate liquid positions as he does all the "books" in Balanced Fund when Visium Balanced Fund redemption requests are large taking the fund from $2.5 billion to $800 Million.

May 2009- Visium Credit Fund Launched with Cooperating Witness Plaford as Portfolio Manager and Jacob Gottlieb (Visium Funds Founder) as Chief Investment Officer.  Lumiere was asked to join this fund to help as an Analyst.

May 2009- Visium Launches Visium Global and Petitioner Lumiere's residual positions in Distressed/Special Situations moved to Visium Global.

June 2010- Visium President Jason Huemer and Jacob Gottlieb asked Petitioner Lumiere to manage 2 books: "Merger Arbitrage" (Special Situations) and Book 2: "Distressed" and tells them that he would offer to help Plaford in the Visium Credit Fund on an as needed basis but his focus will be on his new portfolios in Visium Global Fund. (During this period Plaford continued to ask Lumiere for ideas that he is looking at for Global Fund to attempt to take ideas for his own fund.)

End of 2010- Lumiere notified by his sister Alexandra Gottlieb that Jacob Gottlieb had been slandering Lumiere and stated that he would never pay him prompting Lumiere to begin to look for other opportunities outside Visium.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

January 2011- January 2011- Plaford notified Lumiere that there would be no more non-healthcare investments in the Credit Fund prompting Lumiere to cease offering new ideas to Plaford.

January 8th, 2013 - Lumiere met with sister, Alexandra Gottlieb and her attorney Bill Beslow to discuss Petitioner Lumiere's employment contract with Visium.  Lumiere is advised that Gottlieb is Trying to set Lumiere up so that he never works on wall street again and advised to document all work done for Visium and all processes that they have Lumiere doing for them. This is what prompts Lumiere to start recording Plaford and processes at Visium for protective measures. (evidence to be submitted in amended appendix)

April 15th, 2013- Lumiere consulted with Employment Counselor Larry Moy from Outten to seek advice on leaving Visium

April 16th, 2013-Lumiere called Jacob Gottlieb (Visium Founder) to announce desire to leave Visium

April 29th, 2013- Lumiere left Visium-Deemed as resignation after Lumiere asked to be released from contract

May 5th, 2013- Lumiere attended Stroock Event and discusses C-Med with other member of Directing Class

~May 8, 2013- Lumiere warned Immunized Witness Thorell about concern that Cooperating Witness Plaford is misvaluing some positions in Visium

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

May 14, 2013- Lumiere Spoke to Stroock Attorney Goldstein to ask about where other Directing Class members are valuing C-Med and stressed concern about Plaford's Valuation of C-Med and ATI and Other esoteric situations.

May 17, 2013- Petitioner Lumiere met with Park & Jensen Attorney Rob Knuts to discuss concerns about valuation at Visium and asks him to give the information to SEC if there is a concern to which Knuts says that he does not believe there is any criminality in the valuation as hedge funds have wide latitude in valuation and he recommended dropping the issue, but promised he would review further.

May 25th, 2013- Petitioner Lumiere asked Attorney Knuts to continue evaluating Visium valuation concern

July 10th, 2013- Petitioner Lumiere contacted Employment Attorney Larry Moy to state that he has learned that Gottlieb had been disparaging him and to notify via counsel of cease and desist order.

July 31st, 2013- Petitioner Lumiere met with Thorell to discuss the new information he has gathered at Visium about Gottlieb and Steven Ku and Plaford.

August 1st, 2013- Petitioner Lumiere contacted Attorney Knuts and tells him to have the SEC look into the Visium valuation issue.

December 19th, 2013- Lumiere contacted Knuts again about his further review of the Visium matter and considers with the new information received from Thorell, if it would be appropriate to consider whistleblowing to the SEC but Knuts was non-responsive.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Jan 6, 2014- Lumiere contacted Knuts again to discuss the Visium matter, but Knuts did not respond to Lumiere's inquiry.

Feb 26, 2014- FBI Executed Search Warrant- Agent Callahan stated that they were investigating Visium Credit Funds and wanted Lumiere's help in their investigation. Agent Callahan told Lumiere that he knew Lumiere was represented by Counsel Robert Knuts from Park & Jensen and that he was free to call him when they had completed their search. After the search, Lumiere noticed that 2 external hard drives remained and had been left behind by FBI Agents. Lumiere stated to FBI Agent Callahan in this meeting that he needed "his belongings back" (All of them) and asked when could he get them back, to which Agent Callahan stated after they are imaged, but that he would be able to get the phone back the next day while the rest of equipment would take longer to be imaged.

Feb 26, 2014- Lumiere met with Park & Jensen Counsels Robert Knuts and Doug Jensen to discuss the search and that they have spoken with the US Attorney's office about the matter and that they viewed Lumiere as a Subject not a Target but wanted to proffer with him. Robert Knuts announced "coincidently" on this day that he was leaving the firm to go to Sher Tremonte.

Feb 27, 2014- FBI agent Callahan communicated with Attorney Robert Knuts to coordinate the return of Lumiere's IPhone and returns phone to Lumiere.

Feb 27th, 2014- Lumiere called Rob Knuts to discuss the proffer and what his limitations are as he is planning to launch a hedge fund shortly, to which Knuts states that Lumiere has done nothing wrong and that he should go through proffer and this would be resolved and clarified. He also told Lumiere that it is was ok to launch his fund and to simply tell investors if asked that he was assisting the government with an investigation of Visium, but that Lumiere has done nothing wrong.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

March 11, 2014- FBI Requested Imaging of 3 computers and thumb drives seized in search (took 1 to 2 weeks to complete and did not review prior to imaging) so which would be first available to review March 18th to March 25th, 2014 timeframe.

March 12, 2014- Attorney Udell Proffer with Government whereby Udell erroneously states that Lumiere became suspicious "shortly prior to his departure" which was ambiguous and vague enough for the government to misstate that Udell said that Lumiere became suspicious "over time".  This was false but Udell never properly corrected the government's "purposeful" error but simple attempted to correct it by clarifying that there was a "Trigger" to Lumiere becoming suspicious and then leaving and reporting the issue to Robert Knuts a former SEC attorney.  However, AUSA Feingold at the time focuses on his own "convenient" interpretation of Udell's prior statement that Lumiere learned of potential wrongdoing "over time" or "Shortly before".  At this meeting, additionally Attorney Udell notifies AUSA Zach Feingold and FBI Agent Callahan that there are privileged documents in the evidence that was seized and that he needs to go over them with them. Both the government and the FBI Agent Callahan perjured themselves in court by stating they did not know of any other attorneys besides Udell and were not notified about any privileged content in the property seized from Petitioner Lumiere.  Additionally, Udell sent the government a list of attorneys that Petitioner Lumiere had dealings with.

March 17, 2014 Lumiere Proffer with Government with Udell and Renee and the SEC and AUASA's involved in case led by Zach Feingold.  Lumiere mentions during proffer session to agent and to government and SEC officials that the FBI agent left behind 2 hard drives that contained recordings and when asked if they were hidden, Lumiere states that they were in plain sight one on desk in bedroom and 1 next to printer.  This is where FBI agent perjured himself by stating that he knew there were other recordings when in fact he could not have as he had not even completed imaging of the USBs, computers and hard drives by this time.  He also lied by saying that neither Lumiere nor his attorneys told him of other drives or recordings when questioned by Judge Rakoff during the Trial and during the pre-trial motions to suppress.

March 20, 2014 – Attorney Udell Proffer with Government

Petitioner Stefan Lumiere v. United States of America                              Case No. 18-CV-9170

April 3rd, 2014- Attorney Udell sent Government list of attorney's names and law firms with who Lumiere had privilege as mentioned in his proffer with Government on March 12th, 2014

April 15, 2014 – Lumiere meets with FBI agent Callahan who returns only "certain" equipment out of all the equipment that Lumiere had asked to be returned from those seized in execution of search warrant. Additionally, Lumiere is misadvised by his Attorney Udell who instructed Lumiere to sign Consent to Search form and not to enter commentary discussions with the FBI Agent. Udell was not present during Lumiere meeting with Agent Callahan and Udell failed to properly advise Lumiere that he was giving up his constitutional rights to suppress by signing the Consent to Search form.  Petitioner only after Indictment saw the rider which was "allegedly attached" to the document Agent Callahan had Lumiere sign, however this was not presented to Lumiere or explained to Lumiere.   Agent Callahan did not verbally explain to Lumiere what constitutional rights he was giving up by signing the Consent to Search form.  Attorney Udell did not inform Lumiere that signing the Consent to Search Form was not part of the Proffer agreement that Lumiere had with the Government one month prior and that the contents given to the Government were not under the same protections as the Proffer.  Lumiere voluntarily offered the hard drives in "Good Faith" to assist the Government in their investigation.

May 18th, 2014 - Lumiere fired Olshan Frome and hired Abramson & Morak as counsel

June 14, 2014 – Abramson & Morak conference call with DOJ

September 11, 2014 – Abramson & Morak called the DOJ to discuss Lumiere

September 16, 2014 – Abramson & Morak contacted Lumiere to discuss next steps with Government

Petitioner Stefan Lumiere v. United States of America                           Case No. 18-CV-9170

October 15th, 2014- Abramson & Morak decided to cancel proffer stating that the Government wanted
Lumiere to admit to have knowingly participated in a fraud while at Visium meeting with Jacob Gottlieb
(Visium Fund's Chief Investment Office/Founder) and Government cooperating witness Chris Plaford
(Visium Credit Fund Portfolio Manager/Partner) regularly to discuss ways to defraud investors which
Lumiere insisted was not the truth and was not willing to lie.

October 16th, 2014- Abramson & Morak scheduled 2nd proffer with government

February 24, 2016 – Abramson & Morak call with Government asking Lumiere to cooperate and that
"the Train is leaving this is his last chance to get onboard".

March 4, 2016 – Lumiere fired Abramson & Morak

March 26, 2016 – Lumiere hired law firm Creizman LLC

June 15, 2016- Complaint filed and Petitioner Lumiere Arrested and processed during which time Agent
Callahan tells Lumiere: "It is not too late to work with us."

July 14, 2016 – Petitioner Lumiere Indicted

September 8th, 2016- Secret meeting between Government and Defense Counsel Creizman where
Creizman asks why the Government finds the need to prosecute Lumiere as he believes that he is Truly
innocent.  The Government states that the point is that they just really want Lumiere to cooperate with
them to help them build a case against Jake Gottlieb.  The Government offers to reduce Lumiere's
charges and allow him to plea to lowest possible Felony such as "Misprision of Felony".  Government
then asks if Petitioner Lumiere's sister and wife of Jacob Gottlieb would have information as he states

34

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

that he is "sure there must have been some interesting pillow talk".  Government entertains a possible third-party cooperation although unusual after acknowledging that Petitioner Lumiere was not close to the Visium processes.


January 11, 2017 to January 19, 2017 – Lumiere is found guilty on 3 counts after a 5-day Trial


### BACKGROUND:

Petitioner, Stefan Lumiere (Visium Credit Fund Analyst), was hired in 2006 under a 2-year contract at $400,000 per year minimum at financial institution Nomura Securities as a Director and Head of Special Situations Research. Shortly thereafter when Petitioner Lumiere (Visium Credit Fund Analyst) was recruited to join Brencourt Advisors as Head Trader, Nomura had countered offering $800,000 per year guarantee to keep him.  Petitioner Lumiere declined and moved to Hedge Fund, Brencourt Advisors, on a $400,000 minimum guaranteed contract which they surpassed with a total compensation of $700,000 on or about August 2006. In September 2007, he had discussed leaving Brencourt Advisors to join hedge fund Visium Asset Management as a Portfolio Manager of a "Book" called Special Situations/Distressed in the Visium Balanced Fund and did so in October 2007.

Petitioner Lumiere will herein be referred to solely as Visium Credit Fund Analyst to avoid confusion over Petitioner Lumiere's multiple other roles at the various other funds none of which were subject to any alleged wrongdoing.  Petitioner Lumiere (Visium Credit Fund Analyst) had multiple roles at various points in time throughout his career working at The Visium Funds.  The government, aided with perjury from Cooperating Witness, Immunized Witness, Non-Prosecuted Witness did continuously and with malicious purpose conflate Petitioner Lumiere's titles, roles and capital allocation from other Visium Funds specifically the Visium Balanced Fund and the Visium Global Fund where he did work as a portfolio at various times and claiming these titles, roles, and capital allocation were part of the Targeted Visium Credit Fund.

Petitioner Lumiere (Visium Credit Fund Analyst) first joined Visium Asset Management and assigned a "Book" (an allocation of capital to manage) within the Visium Balanced Fund according to the strategy Special Situations/Distressed.  Petitioner Lumiere's management of this "Book" in the Visium Balanced Fund has never been questioned as he at the helm managed the "Book" faithfully and diligently.  When

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

the financial crisis of 2008 hit, Visium Balanced Fund had significant redemptions and most of the "Book" portfolios outside of healthcare were Trimmed significantly or shut down including Petitioner Lumiere's. Jake Gottlieb (Visium Funds Founder) agreed to maintain Petitioner Lumiere's best positions while given discretion to decide on the appropriate time to liquidate these residual positions.

In May 2009, Jake Gottlieb (Visium Funds Founder) asked Petitioner Lumiere (Visium Credit Fund Analyst) to help the newly launched Visium Credit Fund (Target) managed by Cooperating Witness Plaford (Visium Credit Fund Portfolio Manager/Partner) until there would be an opportunity to continue investing on his own. Petitioner Lumiere went to work in the Visium Credit Fund as "an Analyst" and as a credit Trader shortly after its launch in May 2009.  In the early years of the Visium Credit Fund, Petitioner Lumiere helped to generate investment ideas in healthcare and other industries as an analyst and performed much of the Trading execution. Plaford stated that the Targeted Visium Credit Fund could invest up to 30% of the capital into non-healthcare issues. The Visium Credit Fund did very well in the first year and a half with Lumiere's ideas contributing to a large portion of the profits. As a result, the assets in the fund grew very quickly.  Plaford stated that the team should seek out and report to him on all the attractive "New Issue Credit Deals" pitched by the banks. This was a large part of the Targeted Visium Credit Fund's focus at this time and he gave analysts standing instructions to place orders to buy all "hot" new issues in bonds and bank debt. This was the only quasi discretion to place orders that the analysts were given as part of a Fund mandate to invest in new issues.

### Government Focused Investment in ATI Schools:

Visium Credit Fund's (Target) investment in the Government Focused bank debt of company ATI Schools, was one of hundreds of new issues that Visium participated in. Goldman Sachs had pitched Investment ATI new issue loans to Targeted Visium Credit Fund which Petitioner Lumiere (Visium Credit Fund Analyst) reported to Cooperating Witness Plaford (Visium Credit Fund Portfolio Manager/Partner), as instructed the terms and his general impression just like he and the rest of the analysts did for hundreds of other new issues. Petitioner Lumiere did place the order for this new issue but only at Plaford's instruction. Petitioner Lumiere (Visium Credit Fund Analyst) was given instructions to place an order with Goldman Sachs for $13 Million Bank Debt, ATI Term Loan B, and $7 Million ATI Mezzanine debt. Government Cooperating Witnesses and Immunized witnesses claiming that Petitioner Lumiere was responsible for Visium Credit Fund Investment in ATI Schools is ludicrous and symbolic of

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Cooperating Witness Plaford's modus operandi of blaming others when his ideas go wrong, stealing ideas from others and claiming that he is the mastermind for anything that works out well.


    In addition to new issues, Cooperating Witness Plaford (Visium Credit Fund Portfolio Manager/Partner) asked the Visium Credit Team for short term investment ideas with reasonable IRR's (Internal rate of return) to allocate capital to as the fund assets grew quickly from $50 Million to over $300 Million due to great returns in 2009 and 2010.  On this request for short-term oriented investments, Petitioner Lumiere (Visium Credit Fund Analyst) recommended several general strategies to meet the fund's current objectives.  One was to be redeemed in the short term.  The second strategy was to purchase secured debt of companies that were a bit more risky with the expectation that they would either be refinanced entirely or they would be partially refinanced with a potential for equity of the company via a bankruptcy restructuring.  Petitioner Lumiere mentioned a multitude of situations that fit the then investment objectives of the fund at the time.  Five of the many investment recommendations were Great Atlantic and Pacific secured debt, US Oncology secured notes, Nebraska Book secured notes, Sevan Marine secured notes, Friendfinder Secured Notes (the latter 4 of which the government focused on during Trial):


    1) US Oncology bonds (Government Exhibits) were being bought out by McKesson and the bonds were to be redeemed at completion with a make-whole premium.

    2) Nebraska Book Company (Government Exhibits) had hired Goldman Sachs to help them raised money for a new issue to refinance existing secured and unsecured debt.

    3) Sevan Marine (Government Exhibits) was prepping for a new equity issue to pay for the completion of the re-outfitting of an FPSO that was under a lucrative contract with Premier Oil Company after which the bonds would be replaced with a bank facility.

    4) Friendfinder (Government Exhibits) was to be redeemed with the proceeds of an initial public offering which would be used to redeem the secured notes at 110.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Although Petitioner Lumiere (Visium Credit Fund Analyst) did do research on these companies to meet the then investment objectives of the Targeted Visium Credit Fund, it was solely Cooperating Witness Plaford's (Visium Credit Fund Portfolio Manager/Partner) decision to buy these.   Petitioner Lumiere had no discretion to invest in the Targeted Visium Credit Fund apart from some "hot" new issue allocations, and furthermore only contributed to new ideas to help the Targeted Visium Credit Opportunities Fund in the first 2 years which ended in early 2011 before the alleged misconduct began.

After Visium launched the Visium Global Fund, the executives at Visium gave Petitioner Lumiere (Visium Credit Analyst) a "Book" to manage dedicated to special situations investments (Merger Arbitrage).  Additionally, Petitioner's residual positions from the Visium Balanced Fund were moved into a "Distressed Book" in the Global Fund which Petitioner Lumiere was to manage as well.  Jason Huemer (Visium Funds President/Partner) asked Petitioner Lumiere of he wanted to solely manage these two books in the Visium Global Fund or whether he wanted to simultaneously continue to work for the Visium Credit Fund (Target) managed by Cooperating Witness Plaford (Visium Credit Fund Portfolio Manager/Partner).  Petitioner Lumiere agreed to help out with the Visium Credit Fund when needed but that his priorities would be to manage the "Books" in the Visium Global Fund.

After another great performance year in 2010, the Targeted Visium Credit Fund had decided to focus solely in the healthcare space which Petitioner Lumiere (Visium Credit Fund Analyst) was not happy with as it was too limiting and as such ceased to make recommendations for the Targeted Visium Credit Fund.  Cooperating Witness Plaford (Visium Credit Fund Portfolio Manager/Partner) sold off the majority of Petitioner Lumiere's recommendations without requesting for any analytical work before doing so simply because the firm decided to remove all exposure to non-healthcare investments.  Petitioner Lumiere resolved to work primarily for Visium Global Fund and to assist the Targeted Visium Credit Fund minimally only when needed or when he was specifically asked to assist with a distressed position or a special situation.

**Topic: Beginning of the Change in Process Due to Immunized Witness Thorell Complaint that Reuters Pricing Service was Inaccurate and Unreliable:**

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

One of the situations that Petitioner Lumiere (Visium Credit Fund Analyst) recommended to Cooperating Witness Plaford (Visium Credit Fund Portfolio Manager/Partner) was GAPT 11 3/8 secured bonds. Great Atlantic & Pacific Company was in bankruptcy, but Petitioner Lumiere had offered his analysis that these bonds would likely be bought out at a make-whole premium as they were well secured by real estate assets. The bonds continued to accrete with interest while Trading flat while in default and were ultimately redeemed for about 118. This is most likely the situation that Plaford was referring to when he stated ambiguously that "it started with Lumiere". Plaford used this ambiguity to mislead the government and the Court. The prosecutors either misunderstood Plaford's deception, or fabricated an argument around this ambiguous statement to falsely infer that Petitioner Lumiere started the alleged scheme, when in fact "It started with Lumiere" does not mean anything. The fact that Thorell admits that Plaford came from a meeting with Visium executives about changing the pricing process and that Plaford met with Thorell in his office and was instructed to tell no one at Visium what they had discussed. Thorell admits that he never told Lumiere about what was discussed. Then Plaford admits that Lumiere was not part of the override process. Plaford further admits that he was the one who picked the prices as he could not Trust Lumiere to do anything. The Prosecutors inference that Petitioner Lumiere was the Mastermind of the scheme is completely false, unsupported and a plain error and defies any rational logic to the point of impossibility. How could the alleged "Mastermind" not be involved in the most essential part of the process which is the "override" which Plaford admits? How could Lumiere be the alleged "Mastermind" if Plaford admittedly the one that picked the prices as evidence shows? It simply does not make sense. The Government either did not put the evidence together in a rational framework or they simply did not care to when they made the false allegations toward Lumiere. Defense counsel's inability to communicate the impossibility of the Government's allegations and theory is beyond any basic level of competence.

Immunized Witness Thorell (Visium Credit Fund Trader) in an email to operations complained that Reuters was not accurate as it quoted a price of 90 for GAPT 11 3/8 bonds while they were actively Trading in large volume at 111. Thorell recommended that Visium Operations needed to find an alternative way to price the bonds for his purpose which was risk management. This is likely the even that Triggered the Visium Credit Team and Visium Operations Department to work together to make sure that bonds were correctly priced on a daily basis for risk management as Reuters was not accurate and dependable especially for distressed securities and less liquid securities. The Visium Credit Team

Petitioner Stefan Lumiere v. United States of America                                    Case No. 18-CV-9170

was asked to assist in reviewing prices and getting broker quotes especially as it related to less liquid or esoteric situations where the pricing services had proved to be extremely unreliable. This effort of assistance from the Visium Credit Fund Investment Team had nothing to do with finalizing securities prices or portfolio valuation for Net Asset Value ("NAV") purposes. This function remained the role of the accounting department, valuation committee working with Administrators and auditors. Steven Ku (Visium Funds CFO/Partner) and David Keily (Visium Funds Compliance Officer) state this exactly to Thorell in his secret recorded meeting after he has alleged that the Targeted Visium Credit Fund Portfolio was mispriced. These executives clearly stated that Immunized Thorell had done nothing wrong and that the prices given by the Visium Credit Fund Investment Team were simply estimates and did not go in Net Asset Value ("NAV") calculations.

Additionally, just before this meeting, Immunized Witness Thorell (Visium Credit Fund Trader) surreptitiously recorded his private meeting with Visium Founder Jake Gottlieb (Visium Funds Founder) whereby after Thorell makes his alleged complaint and mentions that he has consulted with an attorney, Jake Gottlieb asks him specifically what is misvalued. Immunized Witness Thorell states that Government Focused Investments in companies ATI and China Med (C-Med") were egregiously misvalued. Jake Gottlieb (Visium Funds Founder) stated that Immunized Witness Thorell is not an analyst and would not know this and besides these investments were valued by an external valuation company therefore Thorell did not know what he was talking about but agreed to have him speak with Steven Ku (Visium Funds CFO/Partner).

Cooperating Witness Plaford (Visium Credit Fund Portfolio Manager/Partner) wanted a quote for one of the investments in his portfolio and asked Petitioner Lumiere (Visium Funds Credit Analyst) to call a broker for it. Petitioner Lumiere made 2 such attempts of asking for a quote once from Broker Dealer Jefferies and once from Broker Dealer Goldman Sachs. On both occasions the salespersons were distracted and had forgotten. It was then that Plaford told Petitioner Lumiere that the Visium Credit Fund (Target) wanted to get multiple quotes on a list of securities on a regular basis. Petitioner Lumiere asked Plaford what these quotes were for to which he stated it was a new internal requirement and that Jake Gottlieb (Visium Funds Founder) "just wanted them". He also insisted they were for internal purposes only and not for audit purposes or anything like that. Petitioner Lumiere asked why he was being asked to do it as this should be a back-office function. Plaford responded that he was not going to Trust operations with understanding what the proper levels were. Petitioner Lumiere then asked why he did not simply send the request out to Banc of America or Imperial Capital's pricing department.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Plaford responded by stating that Visium did not want to wait for the lengthy turnaround time.  Then Plaford stated that "Jake Gottlieb said this was your job".

It was at this point that he told Petitioner Lumiere (Visium Credit Fund Analyst) to call Non-Prosecuted Witness Vandersnow (Princeridge Broker) to ask if he would be able to help with this function.  Cooperating Witness Plaford (Visium Credit Fund Portfolio Manager/Partner) lied when he testified that Petitioner Lumiere selected Vandersnow as he was the one that made the selection for quotes.  Petitioner Lumiere told Plaford that this would be difficult as the brokers were not focused on this function and were more focused on selling than quoting as they did not like to waste their time getting quotes for clients.  This is what Petitioner Lumiere meant he told Immunized Witness Thorell (Visium Credit Fund Trader) that "Brokers don't typically quote things" and not Immunized Witness Thorell's longwinded, purposely prejudicial and false version that Petitioner Lumiere (Visium Credit Fund Analyst) "needed to give the brokers the levels or they would not know where things were." (Insert Tr Pages).  With this pushback, Plaford went to speak with Jake Gottlieb (Visium Funds Founder) and Steven Ku (Visium Funds CFO/Partner) about the situation.

Cooperating Witness Plaford (Visium Credit Fund Portfolio Manager/Partner) told Petitioner Lumiere (Visium Credit Fund Analyst) that he had spoken to Jake Gottlieb (Visium Funds Founder) and Steven Ku (Visium Funds CFO/Partner), and that these executives of Visium proposed giving the brokers Visium's estimates for the prices if that would aid the brokers in the requested function.  Petitioner Lumiere noted that this sounded unconventional who had never been asked to give estimates to brokers in any prior position in his career, however Plaford insisted that Jake Gottlieb (Visium Funds Founder) and Steven Ku had authorized this procedure and insisted that there was nothing wrong with discussing levels with brokers and giving them Visium's estimates.  He then stated: "Look, we are not telling them what to come back with, they can come back with anything they want, this may just help them with identifying the right quote context."

With that, Cooperating Witness Plaford (Visium Credit Fund Portfolio Manager/Partner) told Petitioner Lumiere (Visium Credit Fund Analyst) to call Non-Prosecuted Witness Vandernsnow (Princeridge Broker) to ask if he would be able to provide Visium with quotes on a monthly basis for a handful of securities.  Vandernsnow immediately agreed.  Plaford then interjected and further explained that these quotes were for "internal purposes only and not for audit or anything like and that Visium could even give him their estimates if that would be helpful."  Vandersnow simply stated that that would be great.  Plaford lied when he said that Petitioner Lumiere recruited Vandernsnow to solicit

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

quotes. Immunized Witness Thorell (Visium Credit Fund Trader) lied when he testified that Petitioner Lumiere (Visium Credit Fund Analyst) had a close personal friendship with Vandersnow. Vandersnow lied when he testified that he socialized with Petitioner Lumiere at bars, benefits and strip clubs. The fact is that Petitioner Lumiere had only met him on 1 single occasion at a meet and greet at a restaurant bar. These lies of friendship and selecting brokers were told to falsely claim that Petitioner Lumiere was "Sketchy" and corrupted the alleged "friendly brokers".

Petitioner Lumiere (Visium Credit Fund Analyst) from then followed the authorized procedure that his superiors had instructed him on. Petitioner Lumiere to simplify the task for Non-Prosecuted Witness Vandersnow (Princeridge Broker) to research the quotes by sending him the bond identifiers and Visium's estimates by email so that he could check them for reasonableness. However, he called stating that it was preferable if Petitioner Lumiere would send him the Bond Identifiers without the estimates and to call him on the phone with Visium's estimates. Vandersnow stated that sending Visium's estimates may be simply be misinterpreted by his firm. Petitioner Lumiere then understood that sending quotes over email could be misinterpreted therefore did as Vandersnow had instructed him. Petitioner Lumiere was still confident nothing was wrong with this since Jake Gottlieb (Visium Funds Founder), Steven Ku (Visium Funds CFO/Partner), and the Cooperating Witness Plaford (Visium Credit Fund Portfolio Manager/Partner) (who were all partners of Visium) and Vandersnow saw nothing wrong with the procedure.

### US Oncology (USON Escrow)

The first instance where Petitioner Lumiere (Visium Credit Fund Analyst) questioned Cooperating Witness Plaford (Visium Credit Fund Portfolio Manager/Partner) who insisted on valuing the position higher the general marketplace giving full rational explanation was in Government Focused Investment US Oncology Bonds. These bonds were being redeemed by McKesson which had acquired US Oncology in a merger. As a result of the bond indenture, the bonds would be bought at a make-whole premium which is a mathematical computation based on a chosen discount rate. McKesson had attempted to short-change bondholders of USON by paying $40 million less than was due by claiming that their lawyers interpreted the language of the indenture in a manner that was inconsistent with standards of practice but used an ambiguous term in the indenture to claim a lower price. Visium contacted Stroock, Stroock and Lavan who was hired to represent bondholders as they litigated this $40 million that was due. In this position, Visium was restricted and received advanced knowledge of settlement offers that

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

were made by McKesson.  The escrow bonds had been quoted at approximately 2 1/8 prior to this
settlement offer.  The steering committee had received a settlement offer of approximately 5 pts.

Cooperating Witness Plaford (Visium Credit Fund Portfolio Manager/Partner) insisted that he was the
portfolio manager and that his investors Trusted him to price his positions based on all the current
information that Visium had and that it was stated in the investment mandate of the Targeted Visium
Credit Fund.  He also said that the investors did not want him to rely on brokers that had no idea of the
current developments and that he did not even need a broker quote to price anything. He said he only
had to use his best judgment as an investment manager to assign prices to his investments.  This was a
new mandate to Petitioner Lumiere (Visium Credit Analyst) who was not an accountant and had never
been involved in any quoting function prior to this, but Trusted that Plaford was telling him the Truth
and that the broker quotes were not necessary at all, but simply that Jake Gottlieb (Visium Funds
Founder) wanted them anyway.

It made rational sense to Petitioner Lumiere (Visium Credit Fund Analyst) at the time in the context
of his boss' argument about the investor mandate and fair value and that brokers that are not aware of
what is happening on the steering committees would not be able to price things correctly.  When
Cooperating Witness Plaford (Visium Credit Fund Portfolio Manager/Partner) asked him to get a quote
on USON Escrow Bonds from Non-Prosecuted Witness Vandersnow (Princeridge Broker) and to tell him
that Visium's estimates were 4-5, Petitioner Lumiere asked Plaford how a broker would know that.  It
was then that Plaford instructed Petitioner Lumiere to tell the brokers the information so they could
assess and review it and comment on the value.  Lumiere described to Vandersnow and Brook (Janney
Broker) the settlement offer, told him that Law firm Stroock, Stroock & Lavan represented the
bondholders in the litigation and gave him the other members of the steering committee so that he
could confirm the information.  He communicated all the relevant information that he believed they
needed to make a fair assessment of the value and determine if Visium's estimates were reasonable.
Therefore, Petitioner Lumiere had every reason to believe that the brokers were doing their due
diligence when Petitioner Lumiere asked for price indication confirmation.  Petitioner Lumiere was not
tasked with checking the quotes received or comparing them to the Administrator prices or arguing why
a price was being overridden as this was handled by Plaford who perjured himself by stating
ambiguously that "it started with Lumiere" when in fact it was his decision solely and he had given full
rationalization to Petitioner Lumiere, to the rest of the investment credit team, to operations, to the
accounting department, to the executive committee, to Administrators and to investors.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

## Government Focused Investment in Nebraska Book Company:

Nebraska Book Company was the second situation where Visium served on the creditor committee and as a result received information that most of the marketplace would not have been aware of. Cooperating Witness Plaford (Credit Portfolio Manager/Partner) wanted to buy Nebraska Book bonds on the anticipation that they would be redeemed through a refinancing effort that was being pitched by Goldman Sachs middle market investment bankers. The bankers indicated that they believed this refinancing would be achievable. However, the refinancing did fail, but Petitioner Lumiere (Visium Fund Credit Analyst) was still confident that investment bank JP Morgan who owned the subordinated bonds would not walk away from their investment and contribute additional financing and take over ownership. A creditor's committee representing the secured bondholders formed to discuss strategy for the company's capital structure. Petitioner Lumiere attended the first meeting of the creditor's committee on behalf of Visium which was sponsored by bankruptcy attorney Steven Pohl from Brown Rudnick. Brown Rudnick began the meeting with an introduced offer from private equity investment firm Cyrus Capital, who had extended an offer of 85 for all of the Nebraska Book 2nd Lien bonds.

The bondholders rejected the initial offer stating that it undervalued the company and expected Cyrus Capital (Private Equity firm) to make a superior offer of full value at the make-whole price. If Cyrus Capital did not come back with an increased offer, the creditor committee looked forward to maximizing value by taking control of the company. This offer from Cyrus Capital was reported immediately to Cooperating Witness Plaford (Visium Credit Fund Portfolio Manager/Partner) who proceeded to value the bonds back up insisting like with USON escrow, that he was obligated by the investment mandate to value in the new information that had been received by the creditor's committee. During this period, the creditors visited the headquarters of Nebraska Book and met with management and then hired restructuring advisor, Alvarez and Marshal to do an operating assessment of the business. It was here that Visium and the members of the creditor committee and new board members learned that $50 million in credit memos had been uncovered that had not been accounted for. This was significantly positive for the company as this credit was the equivalent to cash and would help pay down debt very quickly. Plaford again said he needed to value that additional information into

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

the Targeted Visium Credit Fund position.  Lumiere explained the situation to various brokers including Non-Prosecuted Witness Vandersnow (Princeridge Broker) and Brook (Janney Montgomery Broker)

Visium Credit Fund (Target) had made an initial investment in ATI in late 2009.  This investment was the result of Cooperating Witness Plaford's (Visium Credit Fund Portfolio Manager/Partner) decision to invest in all new issues that were attractive.  This was a Goldman Sachs New Loan issue that Cooperating Witness Plaford (Visium Credit Fund Portfolio Manager/Partner) instructed Petitioner Lumiere (Visium Credit Fund Analyst) to place Visium Credit Fund in the order books for $13 million of the Secured Term Loan B and $7 Million of the Mezzanine debt.  Any allegation that Petitioner Lumiere was responsible for Government Focused ATI investment is purely false.  Petitioner Lumiere was assigned to be the analyst on the New Issue after Cooperating Witness Plaford decided to hold on to the investment while the firm grew in size.  Analysts were not compensated for new issues or doing preliminary analysis and placing an order in New Issues.  Lumiere was given responsibility to monitor this investment because it initially dropped in price slightly on news of Gainful Employment act which Lumiere advised Plaford that based on his understanding, would not impact the programs at ATI given the high recorded placement rates and the types of programs that they offered.

When Government Focused Investment in ATI had announced that they had uncovered an error stemming from their marketing department through their internal audit, ATI management held a lender call stating that it would not have a significant impact and that the issue was only isolated to 2 of its campuses.  On this call, ATI management stated that the issues were easily resolved, that the impact to cash flow would only be $5 Million dollars from $65 Million Projected EBITDA for the year.  This did not appear to be a serious issue at the time.  Later as TWC had placed the Texas campuses on probation which then led to being placed on HCM2 (Heightened Cash Management 2), the outlook was still not so dim as it was deemed by ATI management and BC Partners (Owners of ATI Schools), to be simply a working capital issue and a temporary problem and would be resolved as soon as lifted from HCM2 to HCM1.  HCM2 signified that ATI would have to submit each completed student application and wait for Department of Education (DOE) approval before the students' tuition was paid for based on 90/10 rule, where the 90% came from the DOE.  BC partners (Owners of ATI Schools) made a proposal to Visium to assist with getting lenders to an out-of-court restructuring to be pre-emptive to reduce the debt load and convert some of the issues to equity.  This still had a par recovery for the 1st Lien debt and a good recovery for Mezzanine debt and equity in the company.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

The bondholders decided to fund a $40 million debt facility to support the immediate cash flow needs of the schools while on HCM2.  The investors would be compensated with a success fee of $20 million and receive a high coupon of interest and receive reimbursement as soon as taken off of HCM2.  Additionally, approximately 50% of the Term Loan B holders agreed to alter the terms of interest in order to allow ATI to fix itself whereby the bank debt separated into 2 different classes of securities.  The Participating Term Loan B were to receive a step up (Increased coupon interest pay-in-kind) while the Non-Participating would receive only 1% cash coupon.  This separation and the increased information received by the participating class that were part of the first creditor committee was not brought up by defense counsel, nor by the Government nor SEC Jindra or nor any of the witnesses which made the comparisons of the charts used in the government exhibits flawed.

After the Texas Workforce commission placed ATI Texas schools on HCM2, Goldman Sachs the ATI banker, stopped coverage of the name and stopped providing quotes.  As far as Lumiere knew at the time, there were no other banks that would know the issue or that Traded or quoted the name.  Visium made the decision at that point to have the valuation committee value the holdings based on "Fair Value using an alternative methodology".  This analysis was performed by Josh Rozenberg on the Valuation Committee.  Additionally, the firm had hired Valuation Research Company (VRC) to begin work on the analysis shortly thereafter and provided their analysis of the value of Visium's holdings in ATI at $29.6 million which was consistent with the value that the Valuation Committee had come up with using as inputs EBITDA Estimates and peer group comparable analysis which was in accordance with GAAP ASC 820 which was discussed in the Ernst & Young Audit report.  The confusing issue was that the bank debt did not Trade therefore since the new capital structure had not been finalized yet, Visium Accounting used the old securities as shells or plugs to value the new anticipated holdings.  It was an extremely complicated situation as discussed by Ernst & Young Auditors, but who agreed that Visium's valuation methodology was proper given the circumstances.  Also the valuations were not done by Petitioner Lumiere (Visium Credit Analyst) or by Cooperating Witness Plaford (Visium Credit Portfolio Manager/Partner) as alleged, but by the Valuation Committee and then by VRC which auditors Ernst & Young discuss.

This was also discussed with MSAIP by Josh Rozenberg (Visium Funds Accountant and Valuation Committee Member) with Jacob Gottlieb (Visium Funds Founder) on the email chain which was in the discovery but never introduced as evidence.  Petitioner Lumiere had asked Cooperating Witness Plaford

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

(Visium Credit Fund Portfolio Manager/Partner) why he chose to set prices on bank debt as there was no evidence of Trading or pricing and asked if it would it not make more sense to come up with a new capital structure and just value it with a new equity holding. Plaford told Petitioner Lumiere (Visium Credit Fund Analyst) that Visium accounting was working on this, but until then, they said it was not a problem to use the old securities as plugs. He stated that the only important thing was that the cumulative Net Asset Value (NAV) of the position was the same. This appeared to be sound to Petitioner Lumiere who followed up by asking Plaford what the SEC's opinion was on this as the SEC was in the offices reviewing Visium's application as Investment Advisor Registration. Plaford responded that the SEC was fine with it. Lumiere hence believed that it was completely proper and communicated these results to Non-Prosecuted Witness Vandersnow (Princeridge Broker) and to Brook (Janney Montgomery Broker) and told them to speak to the Visium accounting department about this to confirm.

There were several steps that followed, but the bottom line was that things did get worse for the company as it took longer to get back to HCM1 than expected, but with that, Visium Credit Fund (Target) and Marblegate (Hedge Fund) had entered into several private discussions to take ATI Schools private (Buy the company), first with Palm Ventures and then between Visium Credit Fund (Target) and Marblegate. Throughout this period, Visium and Marblegate because of their continued financial support of ATI Schools and its majority holdings in the priming debt facility and new working capital facility, had a completely different outlook, information and economic interest than Apollo management did. Visium and Marblegate set up a new entity called Ancora Holdings which they used to buy out best assets of ATI and continued ownership with a much larger stake in a smaller company.

Based on details from the VRC reports and evidence in Discovery, Visium Credit Funds (Target) continued to increase the value of Visium's position in ATI Schools and then Ancora well after Petitioner Lumiere (Visium Credit Analyst) left Visium in April 2013. When Petitioner Lumiere (Visium Credit Fund Analyst) left, the firm had valued ATI position at $22 million. They then subsequently raised it to $25 Million and then to $29.6 million based on the completion of the restructuring. The government's argument and presentation that the Net Asset Value of the holdings is worthless based on Government Witness Jindra who did no work on the investment and relied on a pricing service "Markit" to value the Term Loan B is without merit as explained by Ernst & Young and VRC in their reports. The firm had been using the old securities as shells to value its holdings and it would not have been proper to value them at

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

close to zero as the government indicated based on the information that Visium had and based on the responsible valuation methodologies used.


    Ernst & Young and Valuation Research Company write about this in their reports and discuss the valuation used and the accounting methodology which they signed off on. There is no strategic reason why these reports and witnesses from these firms would not have been discussed or entered into evidence in order to educate the jury and demonstrate that ATI was not being misvalued as the Government continuously alleged. The charts used by the government were flawed and highly prejudicial and acted to attack any semblance of the good faith that Petitioner Lumiere (Visium Credit Fund Analyst) had in the valuations being used at that time. It is beyond reason why these reports, the analysts that wrote the reports, the valuation committee that valued ATI Schools, would not have been called as witnesses. Petitioner Lumiere had thought there were potential red flags at Visium based on Cooperating Witness Plaford's (Visium Credit Fund Portfolio Manager/Partner) reaction to Petitioner Lumiere learning that Acting CEO of ATI from restructuring advisory firm Conway del Genio said that there was an error in their ATI forecast model for EBITDA (cash Flow metric.) Petitioner Lumiere brought it to the attention of Cooperating Witness Plaford in order to tell the Valuation Committee so that they could take it into account in their valuation. But Cooperating Witness Plaford suspiciously said: "Don't tell Josh. The investors don't have a right to have this new information yet. It's backward looking. We have it valued based on estimates as of Year-end 2012. It's part of the investment agreement with investors." Petitioner Lumiere found this contrary to what he had been told by Plaford previously with USON, Nebraska Book, and Sevan Marine whereby Plaford insisted that they had a fund investor mandate to value things based on all current information. This arose a suspicion by Petitioner Lumiere which then was addressed by Plaford stating that he disclosed to Steve Ku (Visium Funds CFO) and they took care of it. There were no broker quotes requested by this time as valued by Valuation Research Company and Visium Valuation Committee. When Thorell at recorded meeting stated that: "He [Steve Ku] said that Visium does not use "NAV" to value positions", Lumiere interpreted this as meaning that Visium did not use peer group multiple valuation to value positions which was what Visium Valuation Committee had been doing. This is what Triggered Petitioner Lumiere to state that "Chris has been mismarking shit since the beginning." Because Chris meaning Plaford and not Plaford and Lumiere as Thorell and Government insisted, had been using this concept to value multiple positions since 2011 beginning with USON.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Defense Counsel was inept at bringing out any of this evidence and issues or even discussing them in opening statements or summation.  He did not even mention these issues while Cooperating Witness Keily (Visium Funds Compliance Officer) Cooperating Witness Plaford (Visium Credit Fund Portfolio Manager) and Marblegate Founder Milgram, Immunized Witness Thorell (Visium Credit Fund Trader), Non-prosecuted witness Vandersnow (Princeridge Broker) were being cross examined.  This lack of sense by defense counsel, robbed Lumiere of a fair Trial and allowed plain error that were grossly prejudicial to be introduced at Trial.  The erroneous and mistakenly distorted values that the government portrayed at the time acted to inflame the passions of the jury beyond any recovery for defense.  Petitioner Lumiere (Visium Credit Fund Analyst) was first notified of these government exhibits well into the Trial, the evening before Government Witness Jindra was to present and testify.  Defense counsel did not review these exhibits that were sent to him only the only the evening before Trial with no time to review the data, the assumptions and the thousands of spreadsheets that the charts referenced.  Petitioner Lumiere told defense counsel that he could not stipulate to the exhibits as they were erroneous and did not measure the correct securities.  Defense counsel showed no understanding and stipulated to everything placed in front of him by the government greatly prejudicing defendant.

**Government Focused Investment in China-Med Bonds (C-Med):**

C-Med Bonds were an investment that was made and authorized by Cooperating Witness Plaford and recommend by Ameesh Shah (Visium Credit Fund Analyst).  Visium Credit Fund (Target) had built a sizable position in C-Med bonds in 2011.  At some point, fear permeated at wall street investment firms that "all Chinese companies" were frauds in the wake of Sino Forrest alleged fraud which caused the company to fall into chapter 11 bankruptcy protection.  Cooperating Witness Plaford (Visium Credit Fund Portfolio Manager/Partner) and Ameesh Shah did not believe that C-Med was a fraud, but its bonds fell nevertheless in the wake of the fear alongside its stock.  Plaford did believe that the bonds would be repurchased by company management given the opportunity created by the Trading discount.  Plaford asked Petitioner Lumiere (Visium Credit Fund Analyst) if he knew of any investigators that could look into C-Med for peace of mind.  He recommended Kroll and Associates which Target Visium Credit Fund hired to investigate the business in China.  The report came back with positive feedback which further emboldened Plaford.  Plaford asked Petitioner Lumiere how to set up a steering group so he

49

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

referred Plaford to Jayme Goldstein (Attorney from Stroock, Stroock and Lavan) who hosted a
bondholder's call to discuss how to commence a dialogue with management after the company missed a
coupon payment for no apparent reason as the balance sheet showed $300 million in cash while the
coupon payment due was only approximately $4.5 million.


C-Med stock was halted at approximately 75 cents after dropping from over $4 per share as the
Nasdaq reached out to C-Med to find out why they missed a coupon payment.  The stock started
Trading again approximately a month later, and large volume of purchases were driving the price up
over 373%.  Deutsche Brothers (Billionaire wine family) was accumulating the stock through an
investment firm, had been accumulating a large amount of the C-Med stock within a short period of
time to over 43% of the outstanding.  There was also a rumor that the Chinese company CEO missed the
coupon payment on purpose to panic the stock market permitting the purchase of a large amount of
stock at a discount and perhaps coordinated with Deutshe Brothers for a management buyout of the
company.  The stock was then halted again, and there was no evidence of Trading so Plaford after
coordinating with the Valuation Committee determined that the appropriate value would be to value
the convertible bonds (the convertible bonds were convertible into stock of C-Med) on an as converted
basis at parity (Equal to the stock that it would be converted into multiplied by the price).


The steering committee began to contemplate next steps and ultimately hired Cosimo Borelli from
Borelli Walsh (Chinese Bankruptcy Specialist) to assist the bondholders with filing the company for
bankruptcy in order to seize the assets of the company.  In return for funding the litigation in china,
Bondholder attorneys Stroock, Stroock and Lavan assisted in setting up a structure whereby a new
Directing Class of bonds were created that would fund this litigation. In return for the funding of this and
steering this process, it was agreed that the Directing Class would receive approximately, based on what
was designated as Tier 1 Bonds in C-Med, 80 to 85% of the proceeds from the seizure of assets in China
while the Tier 3 Bonds would only receive 5% of the proceeds.  Ameesh Shah (Visium Credit Fund
Analyst) and Cooperating Witness Plaford (Visium Credit Fund Portfolio Manager/Partner) were the
ones that interacted with the valuation committee and VRC for assessing the value of Visium Credit
Funds position in C-Med.  The firm first used its valuation committee assisted by Plaford and Shah and
information from attorneys Stroock, Stroock and Lavan to value the position, then had external

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

valuation firm, Valuation Research Company (VRC), value C-med whose values were consistent with what the Visium Valuation Committee had assessed. This was also described in the VRC reports on C-med and the Ernst & Young reports. Valuation Research Company (VRC) and the Valuation Committee continued to value the Directing Class C-Med Bonds at a significant premium to the C-Med Tier 3 bonds at a range of 19 to 20x the value of Tier 3 bonds well after Petitioner Lumiere left Visium and well after Plaford left Visium. The position was taken over purely by Ameesh Shah who continued to follow the name as an analyst for Visium. There can be no strategic reason to leave this essential facts out of the defense case except that Defense Counsel Creizman was prioritizing Visium and Jacob Gottlieb exposure over his own client. As a result, the jury and the court was not able to see the Truth and executed their decision based on misstatements, mistaken facts and perjury aided by an ineffective and conflicted Defense counsel.


### Painting the Tape Allegation in C-Med:


From March 21st to March 25th, Lumiere Travelled to Miami. Plaford perjured himself under oath by stating that Lumiere was in his office with Ameesh Shah on March 23rd, 2012 discussing purchasing the C-Med bonds. This was clearly a lie as Lumiere took no part in such discussion if there were such discussions between Mr. Shah and Mr. Plaford. The governments allegation and Plaford's testimony of the C-Med Trade fail on multiple levels:

a) Lumiere was clearly not in the office where Plaford said the Trade strategy was discussed as he was in Miami from March 21st to March 25th and in addition was at a concert after 12pm so not accessible.

b) The government shows no other instance where this occurred during Lumiere's tenure at Visium

c) If the government's allegation that Visium could pick any price they wanted based on a broker quote to mark a security, then why would they need to place an allegedly inflated trade to confirm it? It defies logic.

d) The Trade was done on March 23rd, 2012 and not on March 31st, 2012 which would be month end. There was no reporting NAVs to investors on a daily basis or weekly basis.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

e) The Trade occurred at 5:31pm while Lumiere had no telephonic communication with anyone from Visium or with Janney since 12pm.

f) The Trade ticket was sent to Thorell, Sudarshan Jain and to Lumiere which does not mean that Lumiere accepted it or placed the Trade or agreed to any price.

g) Anyone could have executed this Trade and the allegation that it was Lumiere does not make sense as there was no evidence of communication between Lumiere and Brook around the time of the execution of the Trade and Lumiere was unavailable, on vacation at a concert at the time. Defense counsel refusal to incompetence in preparing for the defense of this allegation when he had phone records that showed that Lumiere and Brook had not communicated anytime leading up to the execution and failed to introduce evidence of Lumiere's whereabouts which consisted of airline tickets, hotel room invoice and concert ticket is beyond any below any reasonable level of competence especially in light of the fact that Plaford perjured himself claiming that Lumiere was in his office at the time.

h) Even if Lumiere had placed an order with Janney Montgomery, who did Traffic in C-Med Bonds, it would have been purely at the order of Cooperating Witness Plaford (Credit Fund Portfolio Manager/Partner). The order may have simply been "Visium wants to buy 1 Million Notional amount of C-Med bonds, I am out of office but coordinate with Thorell or Plaford if you are able to locate any bonds for sale." And the price could have simply been 43.25 with the markup (Commission). There is sufficient evidence to support that there was very limited liquidity in the bonds. There was no evidence of any True market at that time. Janney Montgomery had been attempting to contact Lumiere to no avail from noon on and was not able to communicate with Petitioner Lumiere. All we know is Janney Montgomery stated that the bonds were tough to find as they were very illiquid. Unfortunately, Brook from Janney Montgomery was deceased and could not be cross examined by defense to what definitively occurred and a long amount of time had passed from March 2012 to Jan 2017 that it is more than likely that most people would not remember the details of the Trade or what was said. As a result of these issues, Petitioner Lumiere was deeply prejudiced as he was not able to confront the witness.

i) C-Med stock had moved up 273% over the two-week period leading up to the Trade. This would lead any market participant to understand that there is correlation between bonds and equities, even

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

greater in convertible bonds which these were and therefore, it is highly likely that the bonds had moved up significantly but due to illiquidity the levels (not markets) were stale and not updated. This essential fact was not even brought up by defense counsel Creizman in Trial who had no understanding of the basic principles of securities that defendant had communicated to him numerous times and alleged to understand. It was clear that he had no understanding during the Trial.

j) Deutsche Brothers had accumulated a 43% stake in the C-Med stock during a short period of time and rumors and reports were being released that they were likely working with management to take C-Med private and buy the company out. The ultimate impact of this would have been a full (Par) recovery on the bonds at 101 due to change of control features in the bond indenture. This would further explain why it was difficult to locate any bonds for sale and why levels sent out by brokers were likely very stale which is typical for illiquid securities.

k) Two other Trades occurred on this same day at 42.5. One was from Broker Hapaolim and the other from another Hedge Fund, Grammercy Partners. These were conveniently excluded by Government Witness Jindra (SEC Economist) who should have provided an unbiased analysis yet, it was clear that he was presenting a completely biased report and was equally motivated to aid the government in a conviction due to the parallel complaint by the SEC, whereby the SEC stood to make money on any fines extracted from Petitioner Lumiere and/or Visium as a result of this Trial. Petitioner Lumiere was only made aware of this Trade allegation and the details of such during Trial and was not able to prepare any defense as a result. Defense counsel did not review the exhibits until the night before Jindra testified so did not prepare any investigation or defense. Petitioner Lumiere during Trial did tell the Defense Counsel associate about the excluded Trades which the associate did not understand and did not communicate to Defense Counsel.

l) Bond runs (Broker levels released throughout day as an advertising tool for brokers to generate order flow) from March 23rd, 2012 did have bonds quoted 30-33, but they were stale and not a single one was marketable. This means they were not real markets and they were not updated for the recent events which were stock price move up and the news reports of a potential buyout of C-Med.

m) Bond runs updated the following Trading day showed levels updated to 40-45 from several

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

prestigious broker/dealers including Goldman Sachs which Defense counsel failed to investigate and bring into evidence. As a result of Jindra concealing these refreshed runs from the court and jury and concealing the events that led up to C-Med stock increase and news reports, the court and the jury were deprived of essential information to learn about the nature of this particular Trade and how markets in distressed bonds that are illiquid operate. Defense Counsel Creizman failure to investigate these facts and address them in Trial was below any level of competency deeply prejudicing Petitioner Lumiere at Trial.


Petitioner Lumiere had been told by his sister, Alexandra Gottlieb, also wife of Jake Gottlieb (Visium Funds Founder) that Gottlieb had made various threats toward Lumiere stating that he was going to make sure Lumiere never worked on wall street again. With that Petitioner Lumiere met with Alexandra Gottlieb and her divorce attorney Beslow in mid 2012. Beslow had told Lumiere that his job was safe given that Gottlieb would likely not do anything to Lumiere during the divorce as he would not want to be sued. Petitioner Lumiere told his sister and her attorney Beslow that he wanted to leave Visium and was preparing to leave anyway and had hoped Visium would let him go and release him from his contract which contained a non-compete provision. Both Alexandra Gottlieb and Beslow said that Petitioner Lumiere should documents everything that Visium had him doing for them including all processes, procedures and work done by Lumiere. It was this instance where Lumiere began recording processes at Visium, conference calls, analytical discussions as well as the process he had been told to follow to request broker quotes and Plaford going through his monthly pricing estimates with Lumiere to communicate to brokers. This last part Petitioner mentioned was the only thing that Visium had him doing that was unconventional, but that it was the recommended procedure by Jake Gottlieb and Steven Ku (Visium Funds CFO and Cooperating Witness Plaford (Visium Credit Funds Portfolio Manager/Partner) and Beslow recommended that Petitioner Lumiere continue with all processes but to just document everything which Petitioner Lumiere did when he could. Government alleged that Lumiere recorded for the purpose of recording a crime that he was committing in order to blackmail Jake Gottlieb. They believed this theory was supported by a recording where they alleged that Lumiere said:

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

> "First, we must extort Visium. I would love to go get them and say, Jake, Chris, Give us 100 Million
> between the both of you."

However, this statement was incorrect and Transcribed incorrectly. The actual statement corrected
stated the following which was in a joking manner and showed zero actual intent:

> "Well of course we can't extort them. I would love to be able to go to them and say: Jake, Chris,
> give us $100 million between the both of you."

The actual statement is not only in a joking manner with zero intent, but it actually means the direct
opposite of what the government alleged and stated throughout Trial. Additionally, in a recording
between Lumiere and Thorell he clearly states that he has made recordings for the specific purpose of
protecting himself and not for any surreptitious plans. Petitioner Lumiere in this recording advised
Thorell to leave Visium, and that Plaford is not Trustworthy and that he is at risk for being set up as the
Fall Guy for Plaford. He advised Thorell to record everything if he stays to protect himself. All the
evidence, proves that the government's allegations and theory are not only wrong, but they are
completely irrational and provably false.

In another recording between Lumiere and Thorell, Thorell insinuates that he wants to buy Petitioner
Lumiere's recordings from him and asks him if he wants to make money. Petitioner Lumiere is confused
and states you are not talking about blackmailing Visium, because you can't do that. That would be an
offense.

Armed with all this evidence, the government still chooses to proceed with their irrational, mistaken,
false theory which deeply and irreparably prejudices Petitioner Lumiere's defense. Defense counsel says
nothing throughout, did not review and correct the Transcripts which were clearly wrong, did not bring
in supporting evidence to impeach Thorell and prove that Thorell's stipulation to the recorded
statement was perjury. Defense counsel had every opportunity to make these corrections but chose to
do nothing which has zero strategic value.

Just before hiring employment counsel Larry Moy to assist with negotiating departure terms with
Visium and announcing his desire to leave Visium, Lumiere speaks to Phil Broenniman. The context of
the discussion is to get his advice on how to leave Visium and what to expect as he had done this shortly

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

before. After this discussion, Lumiere tells Phil that he believes something is wrong with Plaford's valuation of certain securities but does not have a solid understanding of the process. He tells Phil not to mention it to anyone as Lumiere is still working on a departure from Visium and does not want Visium to know of his complaint just yet.  But Lumiere will not let it go and reveals his plan to leak the issue to the SEC to investigate.

The Government ignores this last part and presents only the first part to the jury and the court, appearing that Lumiere is asking Phil to keep this quiet, when in fact Petitioner's statement is just the opposite in that he is going to leak this to the SEC, but he simply does not want to mess up his departure with Visium at this moment.  The government had Plaford testify to this recording to show that Lumiere was still employed at Visium at the time, so therefore admitted to know something was wrong while at Visium.  However, what is lost in the government's argument is the context of the discussion which is Lumiere is leaving Visium, the fact that Lumiere has just learned of this issue and he is 1 day away from meeting with employment counsel Larry Moy to negotiate a departure from Visium and he reports to Jake Gottlieb his desire to leave Visium 2 days. (See Email from Keily Dated 4/29/13 Subject: Your Resignation from Employment with Visium Asset Management).

Petitioner Lumiere spoke to Attorney Jayme Goldstein from Stroock, Stroock and Lavan just after he left Visium to consult about the reasonableness of Visium's valuations specifically about C-Med after Petitioner Lumiere learns that another fund had C-Med Bonds valued at a significantly lower price than Visium.  Attorney Jayme Goldstein stated that he did not know how they should be valued and Petitioner Lumiere indicated that he was concerned that in light of a discussion with another member another C-Med holder and a situation with ATI that Plaford had possibly been valuing some positions incorrectly.  Jayme Goldstein then spoke to Joel Cohen Attorney from Stroock who referred Petitioner Lumiere to Park & Jensen attorney Tai Park.  Petitioner Lumiere scheduled to meet with Attorney Tai Park who then could not make the meeting but referred Lumiere to Robert Knuts who Lumiere met with that day in early May 2013.  Petitioner Lumiere met with Attorney Knuts and prepared documents and recordings of Visium's procedures for him to review and told Knuts the processes and valuations of certain positions and his immediate concerns.  Petitioner Lumiere asked Knuts if he could forward the information to the SEC for him if he thought there was something of interest to them to which Knuts stated that he would: "let sleeping dogs lie".  He further stated that the SEC would not be interested in a valuation case as they were interested primarily in insider Trading issues.  He further stated that Hedge Funds have wide latitude in how they value their assets.  Petitioner Lumiere left the meeting by stating

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

they he would like Knuts to further review the information he left and to send to the SEC if warranted. He additionally asked Knuts if he could speak to Thorell to discuss any concerns or any additional information he may have which Thorell admits to speaking with him on the recorded conversation he has with Petitioner Lumiere. (Insert language and Transcript reference)

Lumiere recorded a conversation with Thorell right after he left Visium stating that he was concerned with Plaford's pricing of several positions. In this conversation Thorell admitted to Plaford having him send prices to operations pretending that it was from him but that the prices really came from Plaford. Lumiere noted in this recording that this was some other level of egregiousness by Plaford that he had not seen before. Thorell conveniently uses Lumiere's own words in his reaction to what Thorell had told him during Trial, in the context of Visium Credit Fund and Plaford's decision to send a USB to brokers with the list of securities that Visium Credit Funds wanted quotes for which included Plaford's estimates. However, Thorell claims that he was shocked by this after the fact, however in reality he perjured himself as he was the one who made the call to Odeon broker Callaghan and was on speakerphone when Lumiere told him he was going to send a USB with all the quotes Visium wanted and that it included the Visium's estimates as well as a benchmark and to quote what he could. This call was not done surreptitiously in the stealth of the night as the government alleges. It was made on Thorell's desk phone on speakerphone in the middle of the day. The USB was then sent to Odeon via Visium Messenger service and billed to the Visium Credit Fund. Lumiere also disclosed to Thorell that he should make recordings to protect himself from being set up as fall guy by Plaford if there was anything wrong, just as Lumiere had done. Lumiere did not notice anything wrong until just before his departure and was recording simply because he had learned of threats from Gottlieb disclosed by his sister Alexandra Gottlieb.

Petitioner Lumiere followed up with Immunized Witness Thorell (Visium Funds Credit Trader) several times after this discussion where they discussed whistleblowing if they could gather enough information and facts to support a further inquiry by the SEC about what was happening at Visium under Plaford's helm. Petitioner told Thorell that he would not bother making a report to compliance as they would act to protect themselves and would do anything Jake Gottlieb told them. Lumiere instead advised a direct report to the SEC if Thorell could confirm that there was anything materially wrong at Visium. Petitioner Lumiere met with Thorell to discuss reporting to the SEC in July 2013 and learned additional information from Thorell about happenings at Visium and statements made by Steven Ku (Visium Funds CFO) and Jacob Gottlieb (Visium Funds Founder). Petitioner Lumiere was not concerned about what Thorell told

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

him as Thorell testified during Trial which would have been apparent if anyone had listened to the recordings in entirety. The tone was one of excitement about Thorell's allegedly preparing to confront Jake Gottlieb and that he was confident he could outwit Gottlieb and was looking forward to this meeting. Thorell in this recorded meeting disclosed that he met with Steven Ku (Visium Funds CFO) who had told him that Visium did not use NAV to value its securities. It is here that Lumiere to this new revelation in shock stating: So, Chris has been manipulating the valuations of the portfolio. Thorell perjured himself and the government states that Lumiere said: Even though Chris has been manipulating valuations" which is both incorrect and has a completely different meaning as the correct version is a statement of previous unawareness, while the falsified Transcript is that infers at least a prior confirmation.

Petitioner Lumiere then emails Knuts that he has learned additional information in July 2013. In this email, Petitioner Lumiere asked Knuts to make a report to the SEC as they should investigate now. Knuts ignored all of Petitioner Lumiere's emails while he continued to work on other matters for Petitioner Lumiere. Petitioner Lumiere continues to discuss in good faith a whistleblower complaint with Thorell and in the recording with Thorell, recommends that Knuts and Thorell's attorney should get together to discuss why Knuts believes there is nothing criminal, whereas Thorell alleges his attorney states there is criminality.

When Lumiere meets with Thorell several more times, it is to in good faith discuss a potential whistleblower complaint if indeed there is something wrong. Thorell has alleged to have something on Gottlieb but suspiciously will not disclose what it is, leading Lumiere to distrust Thorell. Lumiere states that Chris mismarked shit since the beginning was in the context of everything Lumiere had learned and this is the only logical conclusion. Lumiere had become suspicious when Plaford stated that everything was backward looking when Lumiere reported the new EBITDA forecasts for investment ATI which ran contrary to what Plaford had alleged was in the investor mandate which he had stated since 2011 that Visium was required to value positions based on all the current information that they had. This followed when in May 2013, he ran into a Steering Committee member of C-Med who valued C-Med position based on drastically.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

## DISCUSSION

Title 28 U.S.C. 2255 allows a prisoner in custody under a sentence of a federal court to move the sentencing court to vacate, set aside, or correct a sentence.  To obtain relief pursuant to 28 U.S.C. 2255, a federal prisoner must establish: (1) the sentence imposed in violation of the Constitution or laws of the United States; (2) the court was without any jurisdiction to impose such sentence; (3) the sentence was in excess of the maximum authorized by law; or (4) the sentence is otherwise subject to collateral attack.  See, Hill v. United States, 368 U.S. 424, 426-27 (1962).  Thus, collateral relief under Section 2255 is only available for "a Constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a 'fundamental defect which inherently results in a complete miscarriage of justice'."  United States v. Bokun, 73 F.3d 8,12 (2d Cir. 1995) (quoting Hill v. United States,368 U.S at 428).

A defendant in a criminal proceeding has a right under the Sixth Amendment to effective assistance from his attorney at all critical stages in the proceedings, which include work on case, investigation the case, bringing on specialists in the area where expertise is needed, investigate and find witnesses, experts, review all discovery and present any exculpatory evidence or entering into a plea of guilty, See Hill v. Lockhart, 474 U.S. 52,58 (1985) and Missouri v. Frye, 132 S. Ct. 1399, 1405 (2012), and sentencing, see Glover v. United States, 531 U.S. 198, 202-04 (2001) and Mempa v. Rhay, 389 U.S. 128, 134 (1967).  The precedents of these holdings is contained in the seminal case in this area, Strickland v. Washington, 466 U.S. 668, 688 (1984), wherein it is stated that a Trial attorney has an overarching duty to advocate the defendant's cause."

In order to succeed on a claim of ineffective assistance of counsel, a claimant must meet the two-pronged test that was established in Strickland:(1) he "must show that counsel's performance was deficient" id. at 687, so deficient that, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance", id. at 69 or 690 Check; and (2) he must show "that the deficient performance prejudiced the defense", id. at 687, in the sense that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different", id. at 694.  This "test" was clarified in Bennett v. United States, 663 F. 3d 71, 84 (2d Cir. 2011), ""[B]oath the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact,'.....and we review a district court's conclusions on those issues de

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

novo". Id. at 85 (quoting Strickland, 466 U.S. at 698).  "The IAC claim must be rejected if the defendant

fails to meet either the performance prong or the prejudice prong." Bennett, 663 F.3d at 85; see,

Strickland, 466 U.S. at 697.

In ruling on a motion under Section 2255, the district court is required to hold a hearing "[u]nless

the motion, files, records of the case conclusively show that the petitioner is entitled to no relief".  See,

Pham v. United States, 317 F.3d 178, 185 (2d Cir. 2003) (2255 does not permit summary dismissals of

motions that present facially valid claims).  The prevailing standard is that to warrant a hearing. the

motion must set forth specific facts supported by competent evidence, raising detailed and

controverted issues of fact that, if proved at a hearing, would entitle him to relief.  See Machibroda v.

United States, 368 U.S. 487, 495; United States v. Aiello, 814 F.2d 109, 113-114 (2d Cir. 1987).

To warrant a hearing on an ineffective assistance of counsel claim, the defendant need establish

only that there was a "plausible" claim of ineffective assistance of counsel, not that "he will necessarily

succeed on the claim".  Armienti v. United States, 234 F. 3d 820, 823 (2d. Cir. 2000) (quoting United

States v. Tarricone, 996 F.2d 1414, 1418 (2d Cir. 1993)).  The general procedure is for the district court to

determine whether, viewing the evidentiary proffers, where credible, and the record, in light most

favorable to the petitioner, he may be able to establish at a hearing a prima facie case for relief.  If

material facts are in dispute, a hearing should usually be held, and relevant finding of fact made.  See

Armienti, 234 F.3d at 825 (remanding for a hearing where applicant alleged several specific instances of

attorney's deficiencies that were the product of specific conflicts of interest); Aiello, 814 F.d at 113

(holding that hearing is appropriate when application includes "assertions of fact that a petitioner is in a

position to establish competent evidence").  The United States Supreme Court, in Von Moltke v. Gillies,

332 U.S. 708, 721 (1948), held that "[P]rior to Trial, an accused is entitled to rely upon counsel to make

an independent determination of the facts, circumstances, pleadings, and laws involved, and then offer

his informed opinion as to what plea should be entered".  The Supreme Court then, in Townsend v.

Burke, 334 U.S. 736,68 S. CT. 1252 (1948), held that due process requires that a convicted person not be

sentenced on "materially untrue" assumptions or "misinformation".  See Townsend v. Burke, 334 U.S. at

741 (1948) In Hill v. Lockhart, 474, U.S. 52, 58 (1985), the Supreme Court held that the Strickland test

applies to advice given by counsel in the context of guilty plea discussions.  This determination was

reaffirmed in Lafler v. Cooper, 132 S. CT. 1376 (2012), where the Supreme Court stated that the Sixth

Amendment requires effective assistance of counsel at all critical stages of a criminal proceeding,

including the pre-Trial phase.  See Lafler at 1381.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

## I. CREIZMAN ALLOWED THE PROSECUTORS TO USE A) MISCONDUCT, B) FALSE, ERRONEOUS, AND PERJURED TESTIMONY TO SHOW ERRONEOUSLY THAT LUMIERE WAS A PORTFOLIO MANAGER GIVING HIM CONTROL AND INFLUENCE OVER MARKING AND SETTING PRICES OF THE VISIUM CREDIT FUND.

Law: the role of the Prosecutor is to seek Truth and Justice.  To knowingly allow perjured testimony into the Trial is a crime on the court and on the Constitutional rights of the accused. In the interest of protecting the rights of the accused, it is extremely important that the prosecutor does not, intentionally or unintentionally misstate facts in evidence or mislead the jury with misleading or false statements to simply gain an advantage to win a case.  The prosecutor is held to a higher standard than any other counsel and is supposed to have an ethical and moral acumen.  His role is to ensure justice for society which also entails respecting the principles of the presumption of innocence and due process afforded by the Constitution.

The prosecutors allowed knowingly perjured testimony from cooperating witnesses and immunized witnesses, FBI Agent, and other witnesses at Trial and allowed purposely misleading statements from same and from other witnesses at Trial. Additionally, the prosecution team failed to properly investigate the facts and purposely denying the facts that were available through every channel.  The prosecution team's introduction of knowingly perjured statements from witnesses, its own introduction of know false facts and implausible fabricated theory brought onto the record in opening and closing statements and throughout Trial by using manipulative tactics such as prejudicial questioning, inflammatory statements, leading questions and questions from witnesses that lack any foundation. This so infected the Trial causing irreparable harm to defendant and an utter denial of his due process rights.  For a prosecutor to use devious and underhanded means, cheating, burying facts deep into 18 million non-searchable documents in discovery, hiding facts and evidence, denying obvious facts, knowingly taking recorded statements out of context, leading witnesses to lie while offering them deals for the sole purpose of winning a case and ignoring the required protections afforded to the accused by the laws of the Constitution is an utter an complete aberration of the Constitution and of the United States system of Justice.  As a result of any material perjury in Trial, whereby the Prosecutors "knew or should have known of the perjury.", the conviction must be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Id. at 456. In United States v. Agurs 427, U.S. 97, 103, 49 L. Ed. 2d, 342, 96 S. Ct. 2392 (1976).

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170

Mr. Lumiere was a portfolio manager in the Visium Global Fund in which he managed a perfectly legal and legitimate operation. Prior to this he managed a perfectly legal and legitimate operation in the Balanced Fund dedicated to Special Situations/Distressed which moved to the Global Fund. These portfolios had absolutely nothing to do with the Credit Fund.

Mr. Lumiere was neither expressly nor implicitly a Portfolio Manager in the Credit Fund which contained the securities that the prosecutors alleged were inflated (A1-A16; Proof Petitioner is solely Credit analyst in Credit fund, but Portfolio Manager of a different, unrelated fund).

I.A. CREIZMAN ALLOWED THE PROSECUTORS TO USE MISCONDUCT TO FALSELY SHOW THAT LUMIERE WAS A PORTFOLIO MANAGER IN THE CREDIT FUND.

The Prosecutors may not make material misstatements of law (United States v. Cruz, 797 F.2d 90, 93 (2d Cir. 1986) or fact (United States v. Forlorma, 94 F. 3d 91, 96 (2d Cir. 1996) (Prosecutor's repeated reinforcement that defendant was aware of heroin concealed in bag improper because there was no evidentiary basis for this misstatement of fact).

The Prosecutors repetitively made clear and obvious misstatements of fact to the jury and the Court. Numerous and repetitive statements such as "Lumiere's hedge fund" (A18-A21; Tr P6 ln1, P6 ln4, P6 ln20, P9 ln20, P975 ln15-16, P975 ln18-19, P975 ln21-22, P976 ln24-25, P976 ln2, P976 ln13, P977 ln3), references to Lumiere being a portfolio manager (A17-A18; Tr P5 ln16-17, P4 ln13, P3 ln19-20, P4 ln20, P5 ln7, P5 ln21, P5 ln23) pervaded the Trial. This acted to inculcate, brainwash, and infect a non-specialized jury and was especially improper because there was no evidentiary basis behind these material misstatements of fact apart from pointing to perjured testimony of witnesses. Lumiere was not the hedge funds manager or a portfolio manager and did not report to investors. These misstatements of fact were done intentionally and maliciously to confuse a jury uneducated in this field. These "improper methods calculated to produce a wrongful conviction.", proves prosecutorial misconduct that justifies a mistrial because it "so infect[ed] the Trial with unfairness as to make the resulting conviction a denial of due process." (Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643(1947)).

Petitioner Stefan Lumiere v. United States of America                Case No. 18-CV-9170

**Facts of Perjury:**

During Trial, the prosecutor knowingly allowed and even solicited prepped perjured testimony, misleading responses from immunized witness Thorell, and cooperating witnesses Vandersnow and Plaford. The facts are black and white and when examined are not subject to ambiguity. On cross examination, the initial spins and distortions of testimony on direct examination begin to unfold and making the obvious apparent. Had defense counsel been more competent and asked more relevant questions, each of these witnesses would have been impeached by the jury and the Court.

However, due to Creizman's lack of attentiveness and focus, without a thorough understanding of vernacular and enough preparation and expertise of the specifics of a highly complex case, he failed to identify and clarify the misleading responses and perjured testimony. As a result, he failed to communicate the case to the Court which left the Court and the jury, with confusion to specific and complex issues that would only have been clearly noticeable to the someone with specified financial expertise in the area of distressed restructurings and markets for these securities.

**#1: Perjury Plaford:**

*Direct:*

Plaford: Plaford first response to prosecutor's question of "what was Lumiere's role in the Credit Fund, Plaford perjured himself by stating that: " He was an analyst and a portfolio manager." However, this is false.

*On Cross:*

Creizman: He was an analyst in the credit fund.

Plaford: Correct.

Creizman: He was a portfolio manager in the Global Fund, Correct

Plaford: Correct.

Prosecutor: Did Lumiere work for a particular fund at Visium.

Petitioner Stefan Lumiere v. United States of America                Case No. 18-CV-9170

Keily: Visium Credit Fund


This is a response was purposely misleading and obviously meant to assist Prosecutors with their case. Keily knew very well that Lumiere worked for the Global Fund as a Portfolio Manager which he admits under cross examination


Prosecutor : "What was Lumiere's role at Visium"

Keily:  "he was both Portfolio manager and an analyst".

But this answer was a response to question of Lumiere's role at Visium which consists of all of its funds and not of the Visium Credit Opportunities Funds.  However, Lumiere's role was crystal clear and without question, no if and or buts or allusions of anything different.

Creizman: Lumiere was an analyst in the Credit Fund, correct.

Keily: Yes

Creizman: Lumiere was a portfolio manager in the Global Fund, correct.

Keily: Yes.

Further Evidence supports this:

-Visium Credit Opportunities Funds Marketing Book 2011: Lumiere: Analyst (page )

-Visium Credit Opportunities Offering Memorandum: Portfolio Manager: Chris Plaford; Analysts (none named, but mentions one with MBA from INCAE, which is Lumiere)

-Visium Global Funds Marketing Presentation:

-Visium Credit Opportunities Self-Evaluation:

-Visium Global Funds Self Evaluation


Additionally, there were no sub-books in the Visium Credit Opportunities Funds, there was only one portfolio and one portfolio manager:

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170

Further evidence supports this:

-Visium Credit Opportunities Offering Memorandum does not list any sub-accounts

-Visium Credit Opportunities did not have any sub-account numbers as the Global Funds did or the Visium Balanced Funds did.

- No mention of any sub-accounts in the Visium Credit Opportunities Funds in the Marketing Material, the due diligence questionnaire, the offering memorandum.


Lumiere's alleged securities that government used words to describe as in charge of, responsible for, covering all which have different connotations and lack any basis or foundation as to what level of responsibility, control, or potential payout or level of work done would entail.


Additionally, Lumiere was one of many Portfolio Managers in the Visium Global Fund where he was a manager of a "book" (Not a fund) of merger arbitrage situations also known as "special situations" where he had a $50 million allocation.  Additionally, Lumiere was responsible for a residual number of securities in a distressed book also in the Visium Global Fund which was initiated temporarily in 2010 and then restricted again shortly thereafter.  Lumiere was previously a portfolio manager from 2007 to 2008 of a "Book" called Special Situations/Distressed which was shut down towards the end of 2008 due to investor redemptions during the financial crisis with residual positions for which he was responsible moved into Visium Global.  There is an immense amount of documented evidence in the form of marketing material, SEC registration documents, Offering Memorandums, Internal memos, Risk Management spreadsheets, Internal Evaluation reports, spreadsheets, recordings which all point to the Truth of this and all in the possession of prosecutors.  Additionally, a Note to Memo written by Trial counsel memorializes a meeting with a lead member of the prosecution team where prosecutor acknowledges these facts, however, in complaint, indictment and through sentencing, the prosecutors do not change their position knowing that it is 100% incorrect.  Instead, prosecutors choose to ignore the actual proven facts and instead rely on perjured cooperating witness testimony given with the promise of a deal or monies, false facts, and arguendo and inflammatory statements to prove that Lumiere was also a portfolio manager in the credit Fund, which cannot be farther from the Truth.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Plaford states that Lumiere was responsible for CMED and ATI and the rest of the securities on Lumiere's email request for P&L contribution.

Perjury: Thorell: (Email from Lumiere to Josh Rozenberg for Request PNL Contribution for the following securities for the years 2009, 2010, 2011, 2012.)

Additionally, the prosecutors in an attempt to further distort Lumiere's role in the Visium Credit Fund for the purposes of assigning responsibility to a slew of securities to fabricate/create a theory of motive and also to allege that Lumiere was greedily requesting to be paid on these securities that were his and the email proves it. However, what the prosecutor failed to mention in his argument was what the email stated. He restated it to suit his own needs of assigning responsibility.  The email is clear and stated "Request for PNL for the following securities for the years 2009, 2010, 2011, 2012." Now the clear difference between the clear fact and prosecutor arguendo and follow up misleading statements to mislead the court for its own purpose is that nowhere does Lumiere claim that these are his securities and nowhere is he indicating that he wants to be paid on these securities as the government falsely alleges.  It is falsely and not mistakenly which will be clarified shortly.  First of all, one would not argue many years later as in 2013 for a payment for work in 2009. Industry standard would be to request it in the same year.  Secondly, the government failed to admit into evidence the remaining Trail and responses from this same email which are very interesting and would alone destroy the prosecutor's theory and case altogether.  The Trail of responses and replies to this email go on for more than a month, where his request for access and visibility into the P&L is denied by Rozenberg (Accounting), Steven Ku (CFO and Partner at Visium), and Chris Plaford (Portfolio manager Credit Fund and Partner at Visium).  Now this is interesting and from an investigative position should warrant attention since Lumiere is not given access to this information he cannot be the Portfolio Manager and it shows that Lumiere had no access to P&L or Pricing.  This appears clearly to show that Lumiere was not in fact a portfolio manager in the Visium Credit Fund.  It also appears to show that Lumiere was not given any preferential Treatment due to being Gottlieb's soon to be ex-brother as insinuated by perjured and misleading testimony of Plaford when he stated under Plaford stated that: "Lumiere was Special" because he was Gottlieb's brother-in-law to mislead the court to attempt to present that Lumiere could do anything he wanted at Visium because he was Jake brother-in-law.  The direct opposite is actually true, because the relationship was poisonous as Jake Gottlieb and his sister Alexandra were in a contentious divorce since early 2012. Lumiere was mistreated at Visium and Jake Gottlieb had

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

constantly slandered him to his colleagues.  This slander continued after Lumiere asked to be let go as
he wanted to leave Visium where Gottlieb slandered Lumiere to Family Offices.  An additional point of
fact that Lumiere was threatened continuously by Gottlieb where Gottlieb slandered Lumiere,
threatened to ruin him, and found a way to set Lumiere up as a Fall guy.  The evidence of these threats
and slander are available in deposition under oath in the divorce proceeding of Gottlieb, in testimony
from his sister, and others at Visium who heard Gottlieb slander Lumiere in the office.

Additional evidence in support of this is a recording and Transcript of Lumiere and Plaford which is in the
possession of the prosecutors so they cannot deny it.  In the recording, Plaford clearly states that
Lumiere cannot have access to the P&L for these securities listed on this email, because he is not the
portfolio manager nor is Lumiere the primary analyst assigned to monitor most of these securities.
Plaford further states that he did not even recognize that Lumiere was working for the Credit Fund and
did not consider him a member of the team.  However where Plaford perjures himself again is stating
that Lumiere left for poor performance however, it is clear that Lumiere is restricted to limited work on
the Credit Fund to solely help with the restructuring of ATI so is not even able to make investment
decisions or recommend positions for the fund.

Plaford who claims that Lumiere is a poor performer, however, has nothing but positive feedback for
performance of Lumiere's ideas in 2009 and 2010 and his help with CMED and ATI which are not
performing that badly.  Plaford then extends an invitation to Lumiere that should he decide to return to
the Credit Team he would be welcomed with open arms if he agreed to commit to it.


Summaries of Portfolio Manager topic:


1) The prosecutors purposely misused differentiated terms for such as "Responsible", "Covers",
"Manage" "Helped with Valuation" which have different meanings to confuse a financial markets
unsophisticated jury. An analyst that is "responsible" for a position is simply made responsible for
following the fundamentals, news, building models for a company and not for making the investment
decision, Trading decision or pricing the security.  Stating that Lumiere was responsible for a security to
infer that he is the portfolio manager or managed the security is clearly erroneous and prejudicial. (Tr)

Petitioner Stefan Lumiere v. United States of America                     Case No. 18-CV-9170

2) Lumiere was not a portfolio manager in the Credit Funds and did not have any portfolio management responsibilities or controls of these funds.  Government failed to investigate this prior to filing a complaint.

3) Lumiere did not reap millions in the alleged fraud. Lumiere did not make a single penny as a result of any actions of the Credit Funds.

4) Confusion over terms pricing the securities in the portfolio and discussing valuation and fundamental outlook was purposely conflated by biased witnesses for the purpose of aiding the prosecution.

5) Government asked Thorell what a portfolio manager that covers a company does?  This is an erroneous question as a portfolio manager does not cover a company.

6) Prosecutor claimed that Lumiere was mastermind of fraud and overrides were his idea, yet, it was Plaford that recruited Thorell to assist with Overrides at the bequest of Steven Ku and Gottlieb. And Plaford admits Lumiere is not part of this process.  So how is Lumiere involved?  Makes no rational sense. p982 Ln15-24)

SL00101 [I.B1 Pt1] Perj Thorell-PM

I.B. A CONVICTION WAS OBTAINED BY THE FAILURE OF CREIZMAN TO PROPERLY CROSS EXAMINE WITNESSES AND HIS FAILURE TO OBJECT TO BIASED WITNESSES FOR THE USE OF FALSE, ERRONEOUS, AND IMPEACHING PERJURED TESTIMONY WITH RESPECT TO CONTROL, INFLUENCE AND PARTICIPATION IN SELECTING AND SETTING PRICES FOR SECURITIES IN THE CREDIT FUND.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

The commentary to 3C1.1 is explicit, that the phrase "impede or obsTruct the adminisTration of justice" includes perjury.  Perjury is committed when a witness testifying under oath or affirmation gives false testimony concerning a material matter with the willful intent to provide false testimony.  The witnesses committed Oates' crime, "bearing false witness against another with an express premeditated design to take away his life, so as the innocent person be condemned and executed,' had at one time, been Treated as a species of murder, and punished with death. 4 Blackstone, supra, at *196

SL00101 [I.A Pt2] Perj Summary

A. Perjury During Trial: Trial and Motions were infected with Knowingly Leading Cooperating Witnesses to Lie and further the Government itself making knowingly false statements to the court. Prosecutors knowingly allowed 4 key witnesses to perjure themselves repeatedly throughout the Trial.  The prosecutors not only failed to identify the perjury to the court, but the prosecutors continued to promote the lies, lead the lies, and repeated them as fact throughout summation while ignoring the True opposite facts exTracted on cross examination, available in discovery and available through other witnesses that the government chose not to utilize.

Perjury cannot be allowed in a Trial, because allowing it into Trial makes the Trial illegal.  No conviction can stand where perjury of witnesses exists.  Prosecutors "knew or should have known of the perjury.", the conviction must be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." id. at 456. In United States v. Agurs 427, U.S. 97, 103, 49 L. Ed. 2dd. 342, 96 S. Ct. 2392 (1976).

1. Mr. Thorell's Testimony was Riddled with Perjury, Misstatements of Facts, and was Purposely Misleading.

During testimony the following colloquy occurred:

Q. So let's talk about Lumiere, the defendant.  What was his role at Visium between 2011 and 2013?

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

A. It was my understanding that he was a portfolio manager in charge of a section or a subsection of the credit fund with a certain strategy specific to him, which included special situations anddistressedinvesting.  (Tr P244 ln7-12)

Q. And you mentioned he managed a portion of the Credit Fund.

A. Yes (Tr P245 ln9-10)


Several questions prior to above colloquy, Thorell stated about Mr. Plaford:

Q. Let's talk about each of these people.  You mentioned Mr. Plaford.  What was his position between 2011 and '13?

A.  He was the portfolio manager for the Credit Fund. (Tr P243 ln16-17; A4 P4, 5; A2 P17, 4; A5 P3, 5; A6 P4; A7 P 1; A8; Proof Petitioner is not a Portfolio Manager of Credit Fund)


Further General Counsel Keily clarifies his statement that Lumiere was a portfolio manager/analyst at Visium as being due to Mr. Lumiere's multiple assigned roles within the various Funds at Visium. He thereby corrects the government's mistaken concept that follows Thorell's perjurious assertion that Mr. Lumiere was a portfolio manager of a subsection of the Credit Fund.  He does so with his testimony on cross:


Q. Okay.  You testified that he had two separate titles at Visium, is that right?

A. Yes.

Q. One was in the Global Fund as a portfolio manager, is that right?

A. Yes

Q. And one in the Credit Fund as an analyst, is that right?

A. Yes. (Tr P154 Ln8-15)

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Q. Okay. The portfolio manager of the credit fund portfolio was Christopher Plaford, correct?

A. Yes.

Q. No dispute about that?

A. None. (Tr P147 Ln18-22)


On cross in reference to Plaford, Keily states:

Q. He was the portfolio manager and had responsibility for everything related to the investment management of the credit fund.  In other words, he, as I understood it, had final responsibility for making buy and sell decisions with respect to the securities in the credit fund held. (Tr P148 Ln1-5)


Q. So do recall how many people worked under Chris Plaford during the time that you were there, at any given time?

A. There's John Shoemaker and Ameesh Shah, Lee Brown, Andrew Han, Stefan Lumiere, Jason Thorell...

Q. Seven, okay.  Now six of those individuals were analysts; is that right?

A. That's not correct.  Mr. Thorell was a credit Trader and Mr. Shoemaker was responsible for Trading options....

Q. So five of those seven individuals were analysts; is that correct?

A. Yes. (Tr P149 Ln24-25 to Tr P150 Ln1-14)


Thorell firmly and unambiguously states with confidence that Chris Plaford is "The" portfolio manager of the Credit Fund.  When asked about Lumiere, he hid from an affirmative statement to avoid being implicated in perjury, the false statement that Lumiere was a portfolio manager in the Credit Fund.  This statement was clearly prepared by the prosecutors to mislead the jury and the Court to allege responsibility and therefore some control over the Credit Fund.  However the statement is clearly false. The Credit Fund had only one portfolio manager, one person in control, one person in charge and that

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

was by Thorell's own admitted words, "He (Plaford) was "the portfolio manager". (A4-P3, marketing

material, Keily Cross P147 Ln16-25 and P148 Ln1-5; Plaford Cross P756 Ln6-9 and Plaford Direct P651

Ln25, P652: Ln11-18; Credit Fund Offering Memorandum. Lumiere did not manage any part of the

Credit Fund (This evidence exists, but is unable to currently be attained under the Petitioners current

circumstances, A4-P3) Any statement to the contrary was perjury and intended to mislead the court and

the jury. (Tr P245 Ln9-10)


   As for Thorell's claim that Lumiere was a portfolio manager in the Credit Fund in charge of managing

an allocation of $50 -$75 Million in the fund and that Lumiere was the only one with Plaford that had

the ability to make investment and Trading decisions is a complete fabrication likely to help the

government make their case so he has a higher potential to his whistleblower fee, as Keily states that

Lumiere was simply an analyst in the Credit Fund and hence had no portfolio management

responsibilities or capital allocation. Keily follows with the statement on cross:


   Q. Okay, the credit fund had only one portfolio, is that fair to say?

   A. I'm not able to answer that question because I don't recall whether there were sub-portfolios in

the credit fund or not.  Based on what I recall as of this minute, I believe there just might have been one

credit portfolio." (Tr P147 ln12-17)


   Later in Thorell's direct he states:

   Q. Could anyone other than Mr. Plaford or the defendant make the decision to buy or sell a

security in the Credit Fund?

   A. No. (Tr P246 ln5-7)


   Plaford on Cross refutes this by stating:

   Q. As portfolio manager, you had to approve the investment decisions in the fund; is that fair to

say?

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

A. Well, actually, the way it worked is that the analysts, including Stefan --and, remember, Stefan was also a portfolio manager as well, but some of the --all of the people who are saying "analyst," Stefan included, had the ability to put on positions in varying sizes on their own without my approval" (Tr P755 ln1-7)

Plaford on Direct: also challenges his own testimony about Lumiere's having the ability to make investment or Trading decisions during the period where the alleged mismarking occurred by stating the following with respect to Lumiere:

Q. Could he make Trading decisions and by that I mean a decision to buy or sell a security?

A. Yes

Q. For how long did he have that power?

A. A year or two.

Q. Was that taken away?

A. Yes

Q. Why?

A. Poor performance

Given that this ability was taken away due to poor performance according to Plaford which began in 2011, we can infer that the since the fund started in May 2009 that Plaford said he had this ability from May 2009 to May 2010 or May 2011 at the latest, which was before any of the alleged misconduct. Therefore, Plaford in so stating and the Prosecutor in leading this line of questioning, admits that by no means Lumiere was a Portfolio Manager of the Credit Fund and had no amount of capital allocation that he managed during the years in question at the very least. The ability to make investment decisions defines a portfolio manager as per Keily. Tr (Keily direct Tr: ln18-19 pg45, A22) This refutes the following:

73

Petitioner Stefan Lumiere v. United States of America       Case No. 18-CV-9170

- Thorell's statement that Lumiere managed $50 to $75 million in a subsection of the Credit Fund

- Thorell's statement that Lumiere directed him to Trade

- Thorell's statement that Lumiere was a portfolio manager


SL: So, I was originally supposed to be the PM of the, of the Credit fund

CS: Right.

SL: [u/i]. And then Chris kinda pushed me out.

CS: I, I, I don't know that specifically. What I, what I've heard is, you know...

SL: (overlapping) [who ran me - u/i].

CS: [Kyle - u/i] Kinda said the same thing, it doesn't matter.  It's the fact that somebody with credit experience [u/i].

SL: Exactly.  So, they just kinda put him in there, because he [u/i] health care.

CS: (overlapping) Yeah, I heard that. And Itai told me, ok... I mean, not Itai.  Nilesh told me. (A23, P 63)

Therefore, it becomes clear that all of Thorell's testimony is a fabrication, starting from his allegation of Lumiere's position in the Credit Fund, Lumiere's direction of him to do Trade, and alleged statements of Lumiere about Janney and Princeridge being "bucket shops" and allegations that Lumiere had meant to extort Visium which was a complete fabrication aided by altered Transcripts, perjury of Thorell, and all this for the single motive of getting one step closer to a big payday whistleblower fee even if it means framing Mr. Lumiere.


Thorell on cross:

Q. And not only that, you potentially, down the road, if the SEC is successful in its investigation, based on the information you have provided, you might be able to collect 10 to 30 percent of any recovery correct?

A. Under the SEC whistleblowing program

Petitioner Stefan Lumiere v. United States of America                     Case No. 18-CV-9170

Q. Yes.

A.  That falls in lines with the terms of the program.  There is a potential there, yes.(Tr P430 Ln16-23)

(Email warning from SEC that Thorell is unusually avaricious and cares only about profiting from whistleblowing; this evidence exists but Petitioner is currently unable to provide it under current circumstances).


What follows is a barrage or re-interpretation and re-invention and fabrication using bits and pieces of recorded statements taken out of context and taking jokes to mean serious action which make no sense whatsoever in context and in plain language.  These can be demonstrated in the following all of which show a simple fact, that Thorell lied, he committed perjury continuously and he framed Mr. Lumiere.  He did it for one reason.  Greed.  He wanted that Whistleblower fee all to himself.


On direct, Thorell states:


Q. And, again, the defendant says: You know, Trusting that Chris knew the levels, what did you understand this phrase, the brokers Trusting that Chris knew the levels meant?

A. He is--he's effectively--he's saying that the brokers need to Trust that Chris knew the levels, that's what he states. Q. What did you understand that to mean?

A. My understanding was that Stefan was communicating to the brokers that these are the levels and giving the brokers guidance on behalf of himself. (Tr P356 Ln23-25 to P357 Ln1-7)


Q. Where did you get the securities and the prices you wanted from?  Where did you get that information?

A. Stefan

Q. Did you communicate that information to the brokers?

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

A. Yes

Q. What did the brokers do?

A. They provided the prices and followed the instructions as Stefan had directed me and as I had then, in turn, provided to them with instructions, exactly how I just mentioned them.

Q. Did you do any research to verify the prices before you called the brokers?

A. No, I did not

Q. Do you know if the brokers did any research to come up with the numbers they sent back to you?

A. No, I do not know that. (Tr P359 ln18-25 to P360 ln1-7)


SL00103 [I.B1 Pt2] Perj Thorell PM


However, Plaford refutes Thorell's statement that Lumiere came up with prices and that they were from him and that instructions came from Lumiere, where he states that it was him that instructed Thorell:

Q: Now you talked earlier about how each month you would send prices to operations. In the beginning, you sent those prices?

A. Yes

Q. At some point, did you, yourself, stop sending prices to operations?

A. Yes.

Q. And why was that?

A. Steve Ku asked me to have Jason Thorell send them instead.

Q. Do you remember what he said to you?

A. He said it just looks better if the prices aren't coming directly from the portfolio manager...

Q. Did you then instruct Jason Thorell, the Trader, to send the prices to operations?

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

A. I did.

Q. Did he follow your instructions?

A. He did. (Tr P 677 ln13-25 to P 678 ln3-7)

SL00101 [I.B1 Pt3] Perj Thorell PM

Cross: Source of pressure

During Direct, Thorell states:

Q. In the middle of 2011, did there come a time when you spoke to Mr. Plaford in his office?

A. Yes...

Q. Was anyone else present for this meeting?

A. No...

Q. What did Mr. Plaford say to you during this meeting?

A. ...He had just come out of some meeting that had to do with the pricing process and making
   some changes to it... And he concluded the meeting with "Do not tell anyone else at the firm
   about this conversation."

On cross, Thorell admits that Lumiere was not involved in this conversation:

Q. And June 2011, you leave his office.  Did you tell anyone about it?

A. No.

Q. Did you tell Mr. Lumiere about it?

77

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170

A. No. (Tr P 417 Ln24-25 to P 418 Ln1-3)


On cross Plaford also admits that Lumiere is not part of this process therefore how is it that Lumiere is possibly a knowing member of this conspiracy which revolves around overrides if he is not part of the override process.  Which is interesting, because nowhere on the record does anyone state that Lumiere is a knowing member of this conspiracy.


Q. Now you were also the one who made Jason Thorell send the override list to operations, correct?

A. Correct.

Q. And you had him do that for 2 years, correct?

A. I don't remember the exact timeframe.

Q. From Mid-2011 it started, fair to say?

A. I'm not sure of the timeframe. That sounds reasonable.

Q. Ok.  You had him pretend that the emails were coming from you, right?

A. Correct.

Q. Stefan Lumiere didn't do that correct?

A. Stefan wasn't involved in that part of the process. No.  (Tr P 759 Ln22-25 to P 760 Ln1-11)


And then Plaford admits that it was he that lead the override process and decided which securities to override:

Q. It was you who decided every month which securities would be overriden, correct?

A. Correct.

Q. And you were the one that highlighted the names on the spreadsheet, correct?

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

A. Correct. (Tr Pa 758 Ln14-19)


   And Thorell commits additional perjury in furtherance of his crimes against the court in order to

frame Mr. Lumiere.  He attempts to use the Organization Chart in the Visium Credit Fund to make a case

that there was some sort of hierarchy to the organization chart that directed his belief in Lumiere's

higher position by selecting the organizational chart designed for March 2013, where Mr. Lumiere is

listed as the first analyst on the chart to claim that Lumiere is the 2nd highest member of the Credit

Fund which is what the government asserts.  This assertion is pure speculation and actually knowingly

false as Thorell knew that Lumiere's role in the Credit Fund was extremely limited.  The preponderance

of the evidence on the record and off the record will show that this was an intentional fabricated theory

and that the chart was designed by Visium's Jacob Gottlieb to specifically frame Lumiere.


   A. Government Exhibit 106 is a marketing presentation for the Visium Credit Opportunities Fund

dated March 2013....It's an organizational chart of Visium.

   Q. Who is at the top in the black box?

   A. Jacob Gottlieb.

   Q. Who is he?

   A. He is--he was the founder and CIO of the firm...

   Q. What is in the left column?

   A. That is the list of members of the credit team structured as a hierarchy of the team.

   Q. Who is at the top?

   A. Chris Plaford.

   Q. Who is number two?

   A. Stefan Lumiere

   Q. Where are you?

   A. I am at the bottom. (Tr P 242 Ln13-25 to P 243 Ln1-14)

Petitioner Stefan Lumiere v. United States of America                        Case No. 18-CV-9170

However, Plaford, on cross examination in reference to the organizational chart of the Credit Opportunities Fund States:

A. I don't draw a big distinction in the order that these are presented either. (P 756 Ln15-16)

Therefore, Thorell's statement of the hierarchy is perjury and the Government's assertion that Lumiere was "Number Two" as asserted by the Government in summation is a false statement and without merit.

Thorell attempts to claim also that Lumiere had his own office:

Q. At that time, around the middle of 2011, did anyone else on the credit team have their own office, besides the defendant and Mr. Plaford?

A. No. (Tr P 252 Ln11-14)

Mr. Lumiere had an office previously for his role as Portfolio Manager as part of Balanced Fund and Global Fund and his office was soon removed and he was sent to sit on the desk beside the other analysts on the credit team and directly facing Thorell. This was an attempt by prosecution to insist that Lumiere was the 2nd highest ranking member of the credit team and therefore must have had control. Evidence supported that Lumiere was subsequently moved to the desk and out of office and failed to address this on cross due to his ineffectiveness. (See Desk Layout of Visium; This evidence exists, but is unable to be obtained under Petitioners current circumstances)

Summary of other Perjured Statements of Thorell:

On direct, Thorell stated that Lumiere referred to Princeridge and Janney Montgomery as Bucket Shops

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Q. How did the defendant describe these firms?

Creizman: Objection

The Court: Ground?

Creizman: Foundation, form, ambiguity.

The Court: Well, what did the defendant say? I'm asking you.

A. You're asking me? Among other terms, the term "bucket shop" was used.


This is perjured testimony since this never happened.  Lumiere and Thorell discussed the impact to wall street if they blew the whistle on Visium.  Given that Visium was not a significant payor of commissions, Lumiere stated that the only firms that would lose would be bucket shops.  Lumiere never stated that Janney Montgomery, Princeridge or Odeon were bucket shops and regardless they are absolutely not. Janney Montgomery has been around for 180 years and has multiple offices and employs thousands of employees and Princeridge is a subsidiary of IFMI and has hundreds of employees and asset management and is well known in the bond Trading community.  Any indication that these are bucket shops is pure slander, perjury and prejudicial to Lumiere.   Thorell has methodically taken words that Lumiere has used throughout the material and recordings the government received from Thorell and Lumiere to take words used in one context and insert them elsewhere.  In other words, the preponderance of the evidence shows that Thorell is manipulating the information to suit the government's story and likely helped the government create their storyline with a pile of perjury.


Q. What was your reaction when you heard that the defendant had sent a USB drive with prices to Mr. O'Callaghan, and that Mr. O'Callaghan had then sent back the broker quotes to the defendant?

A. I was mostly surprised because, given the context if what I had learned was going on, this was another level that I did not know existed..."


This is false as Mr. Thorell was on Thorell's speakerphone with Thorell when he told Mr. O'Callaghan that he would send him the USB to his office so that he could look over and see what he could provide

Petitioner Stefan Lumiere v. United States of America            Case No. 18-CV-9170

quotes for.  He did not find this out after the fact as he states under oath.  He also is using Lumiere's words verbatim when Lumiere learned after he left Visium, that Thorell admitted to forwarding prices from Plaford representing that they were his (See recording May 2013; This evidence exists, but is unable to be obtained due to Petitioner's current circumstances). (Tr P 365 Ln18-24)

Thorell perjured himself that Deboise was the first attorney he had spoken with.  In fact Lumiere was the first person to make report of Visium in Mid 2011.  Thorell knew that Lumiere had made a report to Attorney Robert Knuts in Mid-May 2011 and even referred Robert Knuts to speak to Thorell about the issues are Visium. (See recording May 2013) (July 2013 recording; This evidence exists, but is unable to be obtained due to Petitioners current circumstances) (Dec 2013 recording where Thorell admits to having spoken to Robert Knuts, A23 pg. 74 ln3-13)

Thorell perjured himself when he said, that he had no intent to whistleblow with Lumiere as he had already made a report to the SEC.  This was perjury as he had several discussions with Lumiere in May and June and July of 2013 before he had even made a report to SEC or to Visium compliance.

(See Thorell Bar Tape July 2013)

Q. When did you go to the SEC?

A. I went to the SEC--Oh, initially, in terms of making the report?

Q. When did you first report anything to--

A. Oh. I first reported it September 2013.

Q. Did you subsequently make recording of the defendant?

A. I did

Q. When did you do that?

A. Late 2013, to--starting point to start in early '14, in that timeframe.

Q. When you met with Mr. Lumiere, did you discuss potentially reporting to the SEC together?

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

A. Yes

Q. That's called blowing the whistle?

A. Yes

Q. Had you already blown the whistle to the SEC?

A. Yes

Q. Why did you say this to Mr. Lumiere

A. It was a decision made, as brought up by myself and in discussion with the FBI...given that on a

limited basis prior to that, we had already discussed it anyway, so it was bound to come up

regardless.

Q. Did you actually intend to blow the whistle with Mr. Lumiere?

A. No

Q. In fact, had you already blown the whistle?

A. Yes. (Tr P228 ln21-25 to P229 Ln24)

Q. Did there come a time when you reported your concerns about the mismarking of securities?

A. Yes

Q. Who did you report your concerns to first?

Q. First I reported internally to Jacob Gottlieb....

A. I think overall, in general, they neglected to address them or were generally dismissive of my

concerns. (Tr P 224 ln14 to 25 to P 225 Ln1.


Reference 1223-A

Q. Okay, Mr. Thorell, looking at this Transcript, as an aid, Mr. Lumiere says that " Chris has been

mismarking shit since the beginning." Do you see that?

Petitioner Stefan Lumiere v. United States of America                     Case No. 18-CV-9170

A. Yes

Q. Who is Chris?

A. Chris Plaford, my former boss at Visium. Portfolio Manager.

Q. Of which fund?

A. Visium.

Q. The credit fund?

A. The credit fund.

Q. And then Mr. Lumiere continues "originally in 2011, he was marking them too low."  And moving

   down to line 15, Mr. Lumiere again says "He's been mismarking shit egregiously outside context of

   what was right from the beginning."  So who was mismarking since 2011 and who was egregiously

   mismarking? What does Lumiere say?

A. Lumiere states that Chris Plaford was.

Q. Was it just Chris Plaford who was egregiously mismarking things since 2011?

A. No, it was not.

Q. Who else was doing that since 2011?

A.  Stefan

Q. When you spoke to Mr. Lumiere and he used the word " Chris did this, " What did you understand

him to mean?

A. I understood him to mean that, in the context of this Transcript, that he's speaking for Chris, but also

himself.


    Thorell stating that Lumiere meant that Chris meant Chris and Lumiere is simply perjury.  It did not fit

the context of the conversation whatsoever as Lumiere and Thorell had been discussing blowing the

whistle since May 2013 and Lumiere was simply attempting to be certain that Plaford and Visium were

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

absolutely in the wrong before filing an official report.  Lumiere had multiple discussions with attorneys about the subject and had not come to a conclusion beforehand that something was indeed wrong.  It is only after Thorell described his interactions and meetings with Gottlieb and Ku where Ku denied that NAV was used for valuation purposes that Lumiere had finally understood that there was an absolute basis to state that practices at Visium were questionable.  It was the responses by executives of Visium as porTrayed by Thorell that confirmed this determination and this came about many months after Lumiere left Visium.  Thorell was aware of this, yet in effort to get himself the best payout possible, chooses to make up lies and frame Lumiere.


SL00105 [I.B1 Pt4] Perj Thorell PM


Thorell on Direct states:

    Q. What, if anything did he say about being your boss?

    A. He said on numerous occasions that he was my boss. (TR P 247 Ln1-4)


   This question and comment is not only a lie, but sounds completely ridiculous.  He is not stating that Lumiere was his boss, but only that Lumiere "said on numerous occasions that he was my boss".  The question and answer are irrelevant and do not make any sense.


   Then the leading line of questioning which defense counsel continues to allow without stop continues. It circles around who decided on Thorell's compensation which his answer sounds like a complete fabrication because it was:

    Q. Who determined your compensation?

    A. Chris Plaford.

    Q. Just Chris Plaford?

Petitioner Stefan Lumiere v. United States of America                Case No. 18-CV-9170

A. Well, Chris Plaford, but I had sTrong reason to believe--in fact, it may have even--I think almost positive it was said to me by Stefan that--in fact, I know now, thinking about it, that he had input and discussed my compensation with Mr. Plaford. So, I think the best way to state it is Plaford had the ultimate decision, but was influenced by Stefan. (Tr P 247 ln4-13)

Plaford refutes this ridiculous perjured statement by stating that he and Gottlieb determined how much the subordinates on the Credit team were paid. Additionally, in evidence there is an Email from Huemer (President from Visium Funds) stating that only Plaford and Ku could discuss Thorell's compensation (A59)

Lumiere told Thorell to give Princeridge and Janney Montgomery as many orders as possible to compensate them for giving

Lumiere the quoted price that he wanted

Reuters is the defacto benchmark

Lumiere had told Thorell to get quotes and tell brokers what quotes to send back and to use his cell phone

That Lumiere had directed Thorell to Trade.

Lumiere friendship with Vandersnow:

What was your understanding of the relationship, if any, between Mr. Lumiere and Mr. Vandersnow?

A. Upon starting at Visium, they knew each other, and it's likely they knew each other before then. How long before then. I don't know. They have a good, tight relationship, friendly, appear to be friends. (TR P 285 ln10-15)

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Lumiere told Thorell to Trade with them:

Q. Now, what, if anything, did Mr. Lumiere say about whether you should Trade with Mr. Vandersnow?

A. He, on at least one occasion, pointed out to me that I should concenTrate on directing Trades to Mr. Vandersnow at Princeridge and, accordingly, also the other brokers involved, the other two.  And the premise behind the comment was that they're helping out with--and this was articulated by Stefan. The premise was that they're helping out with the monthly pricing, you know, providing the backup for the overrides and, in turn, they should be rewarded with some business, Trading business from Visium. (Tr P 285 LnIn16-15 to P 286 Ln1-2)

Q. Okay. And Stefan tells you to then Trade with Mr. Vandersnow?

A. Yes

Q. Okay. Did you Trade with him?

A. Very seldom, and only one aligned on those few occasions with best practice in terms of Trading. (Tr P 286 ln6 - 11)

On direct, Thorell stated perjured himself when he described his fear about meeting with Gottlieb to report the pricing concerns:

Q. And did you contact Mr. Gottlieb

A. Yes, I did.

Q. How did you feel before you contacted him?

A. Very nervous, terrified. (Tr P 374  Ln15-18)

On Cross the picture is admitted to be quite different:

87

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Q. Okay, that's fair.  During your conversation with Mr. Lumiere, you told Mr. Lumiere that you believed--you were looking forward to meeting with Jacob Gottlieb calling you into his office because you thought you could outwit him; is that correct?

A. That seems correct.  I think I did say it, correct.

Q. Do you recall Mr. Lumiere saying, Jacob Gottlieb studies the art of manipulation?  Do you remember that?

A. Yes, I do.

Q. And that he should be careful, correct?

A. Yes, he likely said it during that time, but he had, I think, previously said it as well; so yes.

Q. And you said something, in sum and substance, that he could read all of the books he wants, but you have to be born with those instincts and I am.  Do you recall saying that?

A. Yes.

   Thorell shows here a complete different picture to the nervous, terrified person he stated he was to the government on direct.  He committed perjury here and the only reason he admitted to what he admitted on cross is because, he would have been impeached with evidence of the recording he had made when he met with Lumiere, which the government claimed that they had just learned about it the Friday before Trial.  Additionally, in this recording, Thorell made an offer to buy Lumiere's recordings so that he could blackmail Gottlieb to which Lumiere stated that he could not do that because it would be an offense.  It is clear that the government made a mistake Trusting Thorell and his stories whose only motive was to make money.

( Tr: Bar Recording on July 31st 2013: This evidence exists but is unavailable at the moment due to Petitioner's current circumstances)


SL00102 [I.B2 Pt1] Perj Plaford PM

I.B

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

2.  Cooperating Witness Plaford Incessantly Testified with False, Misleading, and Perjured Statements Regarding Influence and Control Over Setting or Marking Prices Prejudicing the Court and Jury Resulting in a Miscarriage of Justice.


   Plaford was brought up on charges of insider Trading that likely runs deeper than what he has disclosed to the government, given his history of Trading on inside information from the FDA, the suspicious fact that his new company Claravant advised clients on drug approvals and had several ex-FDA officials on his board of directors, and because of his penchant for lying. Because of these facts, the charges he faced, and the risks of all the other illegal activity coming to light, he entered into a cooperation agreement with the Government to avoid further unravelling of his illegal enterprise in Claravant.  He received no prison time for his conduct.  At the time of the Trial, he would have had motive to mislead the government as he has admittedly done many times before during discussions with the FBI which would amount to even more charges if he did not aid the government in their case.


        On direct, Plaford States:


        Q. Now, just first of all, who is at the top--this is not on the screen right now, but who is at the top of the order chart?

        A. Jake Gottlieb.

        Q. Who is he again?

        A. He is the chief investment officer.

        Q. Now, you are at the top of the chart of the credit team.  What, again was your role?

        A. The portfolio manager

        Q. And as portfolio manager, did you direct investments?

        A. Yes. (Tr P 651 Ln8-17)

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170

Q. Now, what was the defendant's role in the credit team?

A. He was a senior analyst/portfolio manager.

Q. Could he make Trading decisions, and by that I mean a decision to buy or sell a security?

A. Yes

Q. For how long did he have that power?

A. A year or two.

Q. Was that taken away?

A. Yes.

Q. Why

A. Poor performance. (Tr P 651 Ln23-25 to Tr P 652 ln1-8)


   Plaford on Direct, admits that he is "The" Portfolio manager of the Credit Fund and directed the investments.  He also admits that Lumiere did not have investment/Trading discretion or decision making power in the Credit Fund after a year or two from when the Credit Fund started.  Therefore Plaford admits that Lumiere had no control in the Credit Fund nor did he have any ability to make Trading or investment decisions in the Credit Fund since May 2010 or May 2011 at the latest given that the Credit Fund launched in May 2009.  Given that the allegations of the mismarking and painting the tape occurred after June 2011, this was at a point in time where Plaford admits that Lumiere had not control or authority.


   Plaford admits what fund or funds was referring to when he made the statement that Lumiere was an analyst/portfolio manager.  It is clear that the answer is like Keily also testified that Lumiere was a Portfolio Manager in Balanced and Global Fund.

   See Plaford's statements below on Direct:


   A. Maybe '06. '06, something like that.

90

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Q. And in what capacity did he join?

Q. He was hired by Jake as a portfolio manager.

Q. In any particular fund?

A. I don't know if that was the --it would have been the balance fund or the global fund.(Tr P 674 ln1-6)


Plaford on Cross:

Q. Stefan Lumiere was not a portfolio manager in the Credit Team--Fund, Correct?

A. He was a portfolio manager in the Balanced Global Fund.

Q. Correct. (TR P 756 Ln6-9)


Plaford lies about the securities that were part of Lumiere's primary responsibility where he alleged first that Lumiere was the point person for CMED:


Plaford on Direct:

Q. Now you mentioned you look at P&L to make that determination.  What securities were part of

    the defendant's  P&L?

A. ATI, Sevan Marine, Nebraska Book, Friendfinder, China Medical, to name a few.

Q. And you mentioned that when someone covers a position, they're the point person.  What do

    you mean by that?

A. They do the majority of the research.  They create the model.  They talk to management.  They

    are on their earnings calls, things like that.

Q. What is someone who is covering a position in the Credit Fund expected to report to you as

        portfolio manager?

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

A. Basically their overall thesis, their conviction level in the idea and why they feel that way.

(TR P 655 ln9-22)

Plaford on Cross slowly admits that he is deflecting responsibility and attribution of CMED:

Q. But you're saying "we" when you're the portfolio manager, right?

A. Stefan worked on C-Med and Ameesh Shah was the point person on C-Med. (Tr 737 ln15-16)

Q. You made the decision where to price C-Med, correct?

A. I was one of the decision makers for pricing.  As I said, I wasn't the point person.  I didn't build the model.  I didn't          go to the valuation committee.  I was the portfolio manager that analysts in all cases, C-Med including, did the          lion's share of the work and the modeling and the research, but I was involved in that decision, as I've said, yes.          (Tr P 738 Ln21-25 to Tr P 739 Ln1-3)

Plaford then comes to terms that Lumiere was indeed not the point person on CMED therefore was not responsible for the models or valuation analysis even.  This was Mr. Shah's role:

A. Stefan was not the point person on C-Med. (Tr P 741 ln23)

Plaford then dilutes the comment by stating that Lumiere worked on a number of things.  Which he did as an analyst to aid the other analyst with their positions in anything that needed his expertise in restructuring.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

A. All I said was that Stefan worked on C-Med and he worked on a number of other things.  I have been clear that Ameesh Shah also worked on C-Med. (Tr P 738 Ln5-9)

But Plaford, has a directive and that is to point the finger only at Lumiere because he is the defendant and looks to protect Mr. Shah who was the point person on C-CMED and developed the models and analysis and followed the developments for C-MED by his own words above.  It is clear that CMED was not Lumiere's position, but rather it was Plaford's position as he was the portfolio manager and Mr. Shah as analyst would have contributed his ideas and fundamental analysis to Plaford just as all other analysts that contributed ideas to Plaford including Lumiere.  Still the positions are not the analysts.  The positions are the responsibility of the Portfolio manager as Keily stated. (A22 TrP45 ln7-19)  And the government admitted that there is nothing wrong with an analyst to give his opinion or analysis. (Government Opening: A22.1 Tr P11 ln17-18).  Plaford adds Lumiere's responsibility to this simply to aid the government's case, but the bottom line, is Lumiere was brought onto CMED to help when it became distressed because of his expertise to help recover the best outcome for investors.  And now, when problems arise at Visium, Lumiere was set to be the Fall guy for the firm.  The conspiracy of setting up Lumiere is clear.

Q. And did Ameesh Shah, was he a part of inflating the value of the securities?

A. He didn't--he might have been part of the conversation on the painting the tape. (Tr 738 Ln5-11)

Plaford further discounts the government's assertions that Lumiere had control and that the investors were his and he lied to the investors and that the hedge fund was Lumiere's:

A. I don't believe Stefan had much, if any interaction with investors. ( TR P 757 ln6-7)

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

It is clear from the Government's mistaken theory and the Trial in which they continuously asserted that Lumiere was a portfolio manager and managed investments in the Credit Fund to the point of exhaustion, that the point was indeed material.  One would need to be the portfolio manager and have control of the fund in order to be able to mismark securities in this portfolio.  One would need to have access to Administrators to demonstrate that the price being overridden required it to be so to represent fair value. One would have to have access to investors to explain why you valued things a certain way.  One would have to have a high enough position to have influence over the accounting team, operations team, valuation committee.  One would essentially need to be a partner and portfolio manager in order to accomplish this and a simple analyst or Trader could not possibly have the access to do this.  This is the reason why it was so important for the government to convince the court and jury that Lumiere was a Portfolio Manager.  They succeeded in doing so, but they were 100% wrong.  As the evidence clearly shows, if one can sift through the manipulation of Plaford's testimony, that Lumiere not a portfolio manager in the Credit Fund, but was a portfolio manager in the Balanced and Global Fund. Therefore, he could not have managed assets in the Credit Fund.  The government's ambiguous question of how much did Lumiere manage does not refer to the Credit Fund and therefore Plaford can confidently state approximately 100 million in order to mislead the jury.  Lumiere did have a $100 million allocation in Balanced Fund in 2008 and a $50 Million allocation in global in 2010, 2011 but these books and funds never had any instance of impropriety.


It is also clear that the Government is Trying to create the illusion that CMED was Lumiere's name and that he was the point person on it and played a major role in it.  However Plaford's testimony on cross clearly shows that this is not True.  It is clear that CMED was his and Ameesh Shah's position and Ameesh Shah's model was used to help with the analysis that went to Plaford and the Valuation Committee and ultimately to VRC. Lumiere did some work on it as he had adistressedbackground such as introducing the firm to Stroock, and Kroll and Associates and sitting on a couple of creditor committee meetings early on.


Plaford clearly describes the functions of a point person that covers a name clearly revolves around building models, keeping Track of conference calls and earnings, speaking to management and doing the majority of the research.  These are the functions of an analyst not a portfolio manager.  Additionally the

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

analyst is not responsible for pricing.  The analyst will give his opinion, his assessment of the situation, his valuation based on fundamentals and research, but he is not involved in the pricing.  The discussions that Plaford refers to with respect to Lumiere meeting with him to discuss the companies are simply the role of an analyst keeping him up with what is going on.  The analytical models and valuations done by an analyst have nothing to do specifically with pricing as this is the role of the Portfolio Manager and the Investment Manager and the Valuation Committee that discusses all this with Administrators and investors.  The analyst's role is to give his opinion.  But he does not sign off on pricing that is used by management.  This is clearly why, it was not acceptable for their case that Lumiere was simply an analyst for the credit fund, so they conflated Lumiere's position in other Visium Funds to mislead the jury and the court.  The ineffectiveness of counsel in protecting defendant from this extreme and erroneous prejudice was more than apparent throughout the record.

The various instances of material perjury and misleading testimony include but not limited to the following:


a) Prosecutor: What was Lumiere's role in the Credit Fund?

   Plaford: Analyst and Portfolio Manager. Tr p  This was perjured testimony.  Plaford later admits that Lumiere was only allowed to make investment decisions for a year maybe 2, which would be from May 2009 to May 2010 or May 2011 at the latest.  So since Lumiere could not make investment decisions during the years of the alleged fraud, he was Not a portfolio manager of the Credit Funds.


b) Plaford: "It started with Lumiere": Plaford used this ambiguous phrase to purposely mislead the court into believing that he was stating that Lumiere was the "Mastermind" of the fraud as the government then states in summation and in sentencing, when in fact the statement does not mean anything.  It was in reference to a position that Lumiere was following for the Credit Funds called USON whereby Lumiere had received information from attorneys from Stroock, Stroock and Lavan about a settlement offer made by McKesson which would result in payment of greater than 50% of amounts being litigated.  This was the first time that Plaford stated to Lumiere the following: " I am the portfolio manager of the fund.  The investors Trust me to price things correctly and not based on where some brokers that do not know the information we have.  I don't need any broker quotes to value the portfolio.  Our investment mandate states they we have to value in all the "Current Information" that we have.  So if we know that

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170

the bondholders are receiving a settlement offer, I have to value that in." Lumiere then stated: "well you are asking for a broker quote on that, but the brokers don't know what we know so how would they possibly check that." Plaford then responded: "Well we can tell them what we know." This is the conversation that took place and what Plaford meant when he said it started with Lumiere.

c) Lumiere "helped create the values" and "helping create valuation". (TR p 633 2-3...15-16): Plaford used the fact that Lumiere as an analyst would share information he learned from the creditor committees and shared EBITDA estimates from company management and looked up peer Trading multiples and shared his analytical models as a way to purposely mislead the court into believing that Lumiere assisted Plaford with picking the overrides and selecting the prices used that were sent to operations. So the government then stated Pick Prices. Plaford said yes. This was flat out perjury as Lumiere had not once picked a price or selected what would or should be overridden. The argument is easily countered by someone that is attentive to what is being said and conversant in the technical jargon of wall street investing which is clear the government, the jury and the court was not. Plaford admits that Lumiere was not part of the override process. So if he is not part of the override process, he has nothing to do with selecting which security prices to override. All Lumiere did, was give his opinion to value and communicate new information to Plaford which Plaford then used to pick a price by himself.

d) Plaford stated that Lumiere and the rest of the analysts were allowed to place positions into the Credit Funds in a limited quantity without his permission. This was perjured as Plaford later admits that Lumiere was able to make investment decision for a year or 2 so therefore from May 2009 to May 2010 or May 2011 maximum before the alleged fraud began. Therefore since Lumiere could not make investment decisions or put on positions during the alleged period of the fraud, it was obvious that Lumiere was not a portfolio manager and did not put any positions on during this period. This also looks conflicts with Thorell's testimony that stated that only Lumiere and Plaford could put on positions in the Credit Funds. Thorell started at Visium in 2011, so since Lumiere could not put on positions, Lumiere could not have possibly been unique with Plaford in being able to put on positions in the Credit Funds. Thorell in his perjured testimony states that none of the other analysts could put on positions without approval from Plaford, yet Plaford states that all analysts could in limited quantity, except Lumiere could

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170

not after 2010 or Mid 2011 at the latest.  So the argument fails and with this testimony both Thorell and Plaford are easily impeached.  This clearly also establishes that Lumiere never directed Thorell to Trade anything for himself and at best, Lumiere may have on seldom occasion Transmitted a message from Plaford to Thorell on what Plaford wanted.

SL00102 [I.B2(e-h) Pt2] Perj Plaford-PM

e) Plaford states that Lumiere was responsible for $50 to $100 Million of the Credit Funds' investments which varied over time.  So this statement is ambiguous at best.  It does not mean that Lumiere was a portfolio manager overseeing any positions.  It may have at most meant that Lumiere as an analyst likely in the 2009 to 2010 or mid 2011 timeframe was responsible for following these names for Visium. However we already saw that Plaford admitted that Lumiere could no longer make investment decisions after may 2010 or May 2011 at the latest.  And recordings show Plaford stating that he did not consider Lumiere a part of the Credit team for some time.  And Plaford telling Lumiere that he has not come up with any investment ideas for a long time, to which Lumiere responds because you have restricted me to working out ATI and you don't allow any non-healthcare name in the fund.  Lumiere in 2011 was asked to concenTrate on assisting to restructure ATI to get the best possible outcome for investors while all other positions that Lumiere had recommended were liquidated in early 2011. As a result, Lumiere stopped giving any recommendations to the Credit Funds.  Therefore during the years of the alleged fraud to even claim that Lumiere was responsible for 50 to 100 million is perjured and the 50 to 100 million was the result of Lumiere's investment recommendations to the Credit Funds in 2009 and 2011 which largely contributed to the Credit Funds success in the early years.


f) Plaford stated that Lumiere selected the brokers to call.  This was a perjured statement.

After Plaford convinced Lumiere that there was nothing wrong with giving Visium's estimates to the broker to help facilitate their task and that the process had been cleared by both Gottlieb and Ku, Plaford had Lumiere call Princeridge right there and then.  Lumiere asked Princeridge if he would mind providing quotes on about 10 names a month to Visium to which Vandersnow said; " No problem". Plaford then interrupted by adding that "the quotes were for internal purposes only and not for audit or anything like that.  And we can even give you our views and estimates if that would be helpful." Vandersnow responded that it would be helpful and agreed without stating that there was anything nefarious in the request or the procedure.  So it was Plaford that selected Princeridge to call on for

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

quotes and not Lumiere even though Lumiere dialed the number at Plaford's order.  Lumiere had
requested that defense counsel subpoena Princeridge calls and recorded conversations to prove the
content of the call and all calls made to Princeridge desk phones not solely cell phones, but Creizman
declined by stating that he spoke to Princeridge and they did not record their conversations.


g) Plaford purposely leaves out and Defense counsel fails to bring up and government fails to bring up
was the conversation that began Plaford's order that Lumiere get quotes on a monthly basis.  On or
about July or August 2011, Plaford asked Lumiere to ask a broker for a quote on a specific company's
bonds.  Lumiere called Jefferies broker to ask if he could provide a quote which he responded to in the
affirmative, but failed to recall to provide it.  Plaford asked Lumiere 2 days later if he could call another
broker to get a quote on the same company's bonds to which Lumiere called the Goldman Sachs broker
who also responded in the affirmative but failed to recall to get it.  Then Plaford told Lumiere that the
firm needed to get "additional" quotes for a handful of names that Plaford had selected.  Lumiere asked
Plaford to call the Bank of America or Imperial capital pricing department and advised Plaford that it
would take 2 to 3 days to receive them back.  Plaford stated: "That's too long, we need them the same
day".  Lumiere then asked why he did not ask operations to get them to which Plaford stated: "I am not
going to Trust operations to find the correct quotes.  They won't know which brokers are most
involved".  Lumiere then asked why he needed them anyway to which Plaford responded: : They are for
internal purposes only and Jake just wants them.  Lumiere then asked why he doesn't have Thorell work
on it, to which Plaford stated: "Jake says this is your job."  Lumiere explained that brokers are not going
to be happy about wasting their time getting quotes.  They are paid to sell not to get quotes.  Plaford
then speaks to Gottlieb and Ku about the issue and comes back and says: " What if we shared Visium's
estimates with the brokers."  Lumiere questioned this, asking if that was ok.  To which Plaford stated: " I
just spoke to Gottlieb and Ku about it and it is approved.  They said there was nothing wrong with telling
brokers what Visium's estimates are.  We are not telling them what to come back with."  With this
Plaford asked Lumiere to call Princeridge which leaves to f) above.


h) Plaford states that Lumiere was a terrible investor.  However what Plaford leaves out is that the ideas
that contributed the bulk of profits for the Credit Funds were Lumiere's ideas.  Plaford is a known liar.
He even claimed in his evaluation notes that most of the successful ideas were his own in 2009 and

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

2010. Then when 2011 came around, he did not take any blame for the poor performance. Plaford takes full credit for ideas that are not his and claims they were his and then assigns blame to analysts when ideas do not work out. Plaford continuously assigns blame to Lumiere for ATI, yet ATI was an investment that Plaford had directed the entire credit team to be on the lookout for all new issues to buy into. This was a Credit Fund mandate and not Lumiere's investment idea. Lumiere gave the details to Plaford as communicated to him by Goldman Sachs and Plaford told Lumiere how much of an allocation he wanted. It only became Lumiere's responsibility when there was a fraud uncovered at ATI that Lumiere did his best to help workout the best he could. Lumiere was no longer investing for Credit by the time, Plaford decided to add to the ATI position that Thorell had pitched to Plaford. Lumiere told Plaford that he was not really following the situation as he was focused on his own portfolio in Global. CMED had nothing to do with Lumiere. CMED was a position that Plaford built up based on his own and Ameesh Shah's research. It was only when problems developed with a CEO that was attempting to take advantage of US fear of Chinese company fraud, that Plaford and Shah asked for Lumiere's help to contactrestructuringlawyers and Kroll to investigate CMED's operations. Even though Lumiere states in his evaluation that most of his time in 2012 is dedicated to ATI and CMED, in reality ATI was the majority of Lumiere's time for the credit fund and CMED was a very minor portion. ATI did require a lot of meetings and site visits and decision making at the operational and corporate level which Visium had made Lumiere the person responsible for following it. Lumiere however was never responsible for pricing ATI or any of the Credit Funds securities. Most of Lumiere's work was for his own portfolio in Global. ( See recording from PNL in Discovery)

SL00102 [I.B2(i-k) Pt3]Perj Plaford


i) Plaford states that Lumiere is responsible for CMED. Plaford then backTracks and states that he believes he stated that Lumiere also worked on it and that Ameesh was the primary analyst on CMED. Plaford then admits that Lumiere was brought onto help Visium with CMED because of hisdistressedexpertise. However, the decision to invest in CMED, the analysis done on CMED was done by Plaford and Ameesh Shah. Lumiere's help was limited to assisting early on with therestructuringof CMED. Plaford even states in a recorded conversation that CMED is not being atTributed to Lumiere because it is Ameesh Shah's position as context for why Lumiere is being atTributed the loss from ATI which Lumiere rejects as ATI was made to be his responsibility after the fraud at ATI was uncovered. Plaford had given a mandate to the Credit Fund in 2009 2010 and on to invest in all new issues. ATI was

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

one of these new issues that he was asked to look at for a quick flip investment.  (See recording PNL, See PNL conTribution sheet CMED not even listed there)


j) Plaford stated that Lumiere was in his office when they discussed the CMED Trade on 3/23/12. Lumiere was not in the office, he was in Miami, Florida and he was at a concert at the time.  Lumiere presented his hotel tickets, airline tickets and concert tickets to Creizman who refused to submit. Therefore this discussion which Ameesh Shah and Plaford allegedly discussed buying ahead of a tender, was not discussed with Lumiere as Plaford mentioned. It is not even clear that Lumiere knew what the price of CMED should have been, whether Plaford simply gave him an order to execute while he was on vacation, what was discussed with broker if anything.  Additionally the quotes that Lumiere would not have bothered to look at while on vacation, were just quotes that appeared to be stale as they had no markets assigned.  Additionally given the issues with CMED discussed in Brady violations and SEC Jindra Perjury and Plain error, significant circumstances and information was left out which were materially relevant and would indicate a higher price would have been necessary to find a seller of these bonds at that time. (See Jindra Perjury, See Plain Error, See Tickets Airline, See Hotel Ticket, See Concert Ticket)


k) Plaford states that Lumiere was part it" (meaning the conspiracy): However nowhere does he state that Lumiere was a knowing participant of the alleged conspiracy.  Plaford admits that Lumiere did not select the prices.  Plaford admits that Lumiere was not part of the override selection and process that Thorell and Plaford secretly discussed and planned in Plaford's office as Thorell admits.  Plaford states on a recorded conversation that Lumiere should tell the brokers about the CMED directing class.  This discussion refutes Vandersnow's statement that he does not recall if Lumiere ever discussed his analysis or research with him. (See Vandersnow perjury).  Plaford simply states that it "started with Lumiere" which is highly ambiguous and explained (Plaford Perjury b).  Plaford states that Lumiere was only part of soliciting quotes.  Soliciting quotes is not an illegal act nor is giving brokers Visium's estimates as per Gottlieb, Ku, and Plaford's insTruction.  See Plaford Perjury g) ).  Additionally Plaford admits that Lumiere believed in the levels and believed his valuations ahead of the markets.  This proves the Good faith assumption as well. Being wrong is not a crime.  Lumiere reported fundamentals and Creditor Committee information, built models, etc.  This is what he helped with valuation meant.  Nothing to do with selecting prices or making representations. (See Plaford Perjury c)).  The court and possibly the

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

court was hoodwinked by lying manipulative witnesses looking to make a deal for themselves and implicate the one person who was lied to and played a role that he did not realize was part of a conspiracy.

As a result, Cooperating Witness Plaford's motivation to cooperate with the Government even if it meant lying and persecuting an innocent man is crystal clear and would not be beneath him or out of character. Plaford would have stated anything to reduce his own exposure and he did so by lying to the Government about Lumiere's involvement in Visium Credit Funds. This would have been obvious from any expert witness or if anyone from the Government had bothered to contact any executives at Visium about Lumiere's role in the Visium Credit Fund which was minor at most which the Government specifically avoided learning. It is also clear from the evidence that Cooperating Witness Plaford did believe in the values assigned which were corroborated by the Visium Valuation Committee and external valuation companies and auditors at Ernst & Young which came up with the same values as those provided by broker quotes for issues such as ATI and C-Med.

SL00103 [I.B3] Perj Vandersnow PM

I.B.3. Vandersnow Perjured Testimony

Vandersnow committed perjury during his testimony clearly in reference to Petitioner's role as a portfolio manager.  Vandersnow lacked the foundation to answer this without it being speculation which comes to material perjury.

In Transcript he states:

Petitioner Stefan Lumiere v. United States of America                      Case No. 18-CV-9170

Q.What was your understanding of what Stefan Lumiere was doing with the prices that you were providing him?

A. He was using them to help prices--price the securities in his portfolio. (Tr P491 ln9-11)


Non-prosecuted witness Vandernsnow has no foundation to believe that the request for quotes were for Petitioner Lumiere's portfolio.  Lumiere did have a conversation with Vandersnow when the Credit Fund started in 2009, whereby Vandersnow asked what the roles were between Plaford and Lumiere. Lumiere told Vandersnow that Plaford ran the Credit Fund which is substantiated by "all" evidence and documentation, and Lumiere managed a book in Global and Lumiere shared his ideas with Plaford.  He did not tell Vandersnow that he acted officially as an analyst in the Credit Fund because it was not his full-time position as his focus was on his portfolio in the Global Fund.  Defense counsel Creizman was ineffective in bringing out the specifics of these conversations to refresh Vandersnow's memory.  It is clear that Vandersnow that Vandersnow was prepped for this to aid the government to avoid prosecution and the term " What was your understanding" allows Vandersnow to say anything he wants as it does not need to be accurate or True.


Mr. Vandersnow, can you please read what Mr. Lumiere's signature block says?

...

A. Stefan Lumiere, CFA, PM: distressed and special situations. Visium Asset Management.

Q. That's enough.  So is that consistent with your understanding of his title and role at Visium?

A. It is? (Tr P500 ln1-13)


In this instance, Vandersnow is led by the Government with the famous signature page argument.  The Government's entire case is based on a chosen signature page, when there are multiple versions of Petitioner Lumiere's signature page, depending on which one's he has updated.  The signature page was designed when he managed a $100 Million sleeve in the Balanced Fund before the Credit Fund even existed as the Government is well aware of.  Lumiere never changed it because he continued to manage

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

sleeves indistressedand arbitrage in the Global Fund.  There are additionally other Signature pages that Lumiere had:


Stefan Lumiere, CFA

Portfolio Manager

Special Situations

Visium Asset Management


Stefan Lumiere, CFA

Portfolio Manager

Special Situations Investments

Visium Asset Management


Stefan Lumiere, CFA

Special Situations Investments

Visium Asset Management


What you don't see in any of these signature pages is a reference to Visium Credit Funds.  The government's argument on this point, is the equivalent to finding a janitor at IBM who also has a hot dog company on the side where he has a business card that states President of Hot Dog Company.  And by the same logical sequence stating that he is the President of IBM.  It simply does not make sense and is knowingly false as every piece of evidence apart from lying testimony supports.  Defense Counsel Creizman failed to make this point and to impeach any witness that stated otherwise.  As a result of defense counsel Creizman's incompetency's, Petitioner Lumiere was deeply prejudiced at Trial

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

SL00104 [I.B4] Perj Keily-PM

I.B.4. David Keily Testimony

David Keily committed perjury a couple of times where he had no basis or foundation and as the man on one of Thorell's secret recordings laughing at Thorell for thinking he did something criminal, it is understandable how he would have helped the government with their case against Lumiere to avoid being targeted and prosecuted.

a) Keily was prepped by the Government to testify and lead him to say that Petitioner Lumiere worked solely for the Visium Credit Opportunities Fund and that he had 2 roles Portfolio Manager/Analyst. He stated this knowingly false information to assist the government with their case knowing full well that it was a lie and he was misleading the non-financial sophisticated jury.

On direct:

Q. Between the years 2011 and 2013, what was his title?

A. His title was both portfolio manager and analyst. (Tr P 45 Ln5-6)

Q. Did Mr. Lumiere work for any particular fund within Visium?

A. Yes. He worked for the Visium Credit Opportunities Fund.(Tr P 46 Ln16-17)

Yet when he references Plaford he states:

104

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

.....

Q. Between 2011 and 2013, what was his title and role?

A. Portfolio Manager.

Q. Was he working in a particular fund or funds?

A. He worked primarily for the Visium Credit Opportunities Fund.  He also ran a portfolio in the Visium Balanced Fund. Tr P 46 ln18-P 47 ln1)

And on cross, Keily is forced to clarify his perjured and/or misleading testimony with intent to mislead the jury by leaving out that Lumiere worked as a portfolio manager but for a completely difference fund called the Visium Global Fund which had nothing to do with the Visium Credit Fund (Target).  Yet with Plaford he chooses to be very exact with his references that Plaford was "Portfolio Manager" of two funds one in the Visium Credit Opportunities Fund and the other in the Visium Balanced Fund.

Q. Okay. you testified that he had two separate titles at Visium, is that right?

A. Yes.

Q. One was in the Global Fund as a portfolio manager, is that right?

A. Yes.

Q. And one in the Credit Fund as an analyst, is that right?

A. Yes. (Tr P. 154 Ln8-15)

Q. When you joined Visium, Mr. Lumiere was a portfolio manager; is that correct?

A. It was never entirely clear to me whether he was a portfolio manager, slash analyst.  It seemed to me that he was both.

Q. Okay.  He was an analyst in the credit fund; is that fair to say?

A. Yes

105

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Q. He was a portfolio manager in the global fund, correct?

A. I believe so, yes.

b) Keily offers that he does not know if there were sub-portfolios but then reTracts by saying that "he did not believe" there was a sub portfolio in the Credit Fund.

Q. Okay. The credit fund had only one portfolio; is that fair to say?

A. I'm not able to answer that question because I don't recall whether there were sub-portfolios in the credit fund or not. Based on what IU recall as of this minute, I believe there just might have been just one credit fund portfolio.

Q. Okay. The portfolio manager of the credit fund portfolio was Christopher Plaford, correct?

A. Yes.

Q. No dispute about that?

A. None.

Q. To the extent that there were additional portfolios in the credit fund, Christopher Plaford was in charge of those as well?

A. He was the portfolio manager and had responsibility for everything that related to the investment management of the credit fund. In other words, he, as I understood it, had final responsibility for making buy and sell decisions with respect to the securities that the credit fund held. (Tr P 147 Ln2-25 to P. 148 Ln1-5)

Fact: There were no sub portfolios as evidenced by the fund documents including (Offering Memorandum A13 P18 not named as manager), Marketing materials (A4 P3), Due Diligence questionnaire (Evidence in discovery yet not available due to Petitioner's existing circumstances). Additionally the Balanced fund and Global funds were very clear in delineating the sub-portfolios of the funds (A2 P3: Shows Balanced Fund had 3 sleeves where each manager is mentioned and titled Portfolio Manager, A2P5). Credit had no such delineation and would have been fraudulent to misrepresent this

to investors. Additionally there were no sub accounts in the Credit Fund to delineate any separate sub portfolio which is easily checked by Risk Management.

c) Keily lies in saying with leading questions from the Government that the Visium Credit Opportunities Fund began to shut down in March 2013 soon before Petitioner Lumiere decides to leave Visium, when he previously testified that the Visium Credit Fund had some redemptions.  A redemption is not the same as a fund shutting down, yet Keily answers the leading question in the affirmative perjuring himself.

Q. Is the credit fund still in operation?

A. Technically it is still in operation, but it is really in liquidation.

Q. Can you explain what happened to it?

A. Yes.  In 2011, as a result of redemptions by investors--

Q. Let me just stop you.  What  year do you think this happened?

A. I'm sorry, in 2013. Yes.

    In 2013, as a result of redemptions by investors, the decision was made that it was no longer economically viable to operate the fund.  The fund, accordingly, began to sell its liquid assets and to return the proceeds of those sales to investors, leaving a small number of illiquid assets which the fund is still Trying to liquidate.

Q. How was the fund performing at the time that Visium began to shut down?

A. The fund began 2013 with, as I recall, positive months in January, February, and March; and then began to lose money as I recall.

d) Keily perjured himself or falsely led the jury to believe that Lumiere was in charge of Visium's investment in ATI.  The investment in ATI was made prior to his joining the firm therefore he would have no foundation or basis to identify whose idea it was, or who was in charge and the varying levels of

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

responsibility surrounding the ATI investment, the decision to buy more, the assignment to Petitioner
Lumiere to focus his time onrestructuringthe investment for the best possible outcome for investors.


Q. To your understanding, who was in charge of Visium's investment in ATI?

A. Mr. Lumiere.


Evidence supports that Plaford was responsible for this investment and Lumiere simply relayed the
information from Goldman Sachs to Plaford about ATI as part of Plaford's orders to invest in all the good
new issues.  Evidence supports that Plaford was placed on the board of directors when Visium and
Marblegate took ATI private through its acquisition of the best assets in bankruptcy via the vehicle
Ancora Holdings.  Evidence supports that Plaford was the principal involved in all decisions for ATI where
Lumiere was even asked to leave the meeting with Marblegate so that Plaford and Milgram could hash
out how to handle a  resTructuring.  Video of meeting (Not available due to Petitioner's current
circumstances) , Transcript (A22.2 p2 Tr Ln4-18), and ATI discussion with Plaford YE Review (Not
available due to Petitioner's current circumstances).


David Keily had no visibility into the processes of the valuation committee.  Referencing

Q. You, as of July 2011, had no visibility into the process of the valuation committee; is that correct?

A. Yes.

Q. You didn't know precisely how they came up with prices; is that right?

A. No, I did not.

Q. And you didn't know how they determined various inputs in coming up with prices to represent to
Visium's investors, correct?

A. In July 2011, no, I did not.

Q. As of June 2013, you still did not have any visibility into Visium's valuation committee; is that correct?

A. That's correct.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Q. And you still didn't know, in July 2013, how Visium's valuation committee came up with its prices, correct?

A. That's correct

Tr P 124 Ln19 - 25 to P 126 Ln1-9)


On Cross Keily States:

Q. The only people that could testify as to how they were implemented were the people on the valuation committee?

A. With respect to these matters, yes. (Tr P 201 Ln4-6)


Q. Did you have an understanding as to whether he had a final say on how to price the securities in the portfolio?

A. The valuation procedures that we had examined yesterday, that we have talked about, do not give a portfolio manager final say over the pricing or valuation of any security.

Q. That's correct.  The final valuation would be the valuation committee, correct?

A. That's correct.

Q. But the portfolio manager's input is taken into account, in some circumstances, by the valuation committee?

A. In some circumstances, yes

Q. In those circumstances, for the credit fund, it would be Chris Plaford who had that authority, correct?

A. I'm sorry, what authority?

Q. The authority over price input and information to the valuation committee.

A. There's nothing in the policies and procedures who has final authority for something like that, but Chris Plaford would have the final say on matters relating to the management of that portfolio.

Q. That's fair to say.  So, in laymen's terms, he was the boss?

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

A. Yes. (Tr P 148 Ln16-25 to Pa 149 ln1-16)


David Keily never gave compliance instructions on valuation practices and policies.


Q. --Correct? Did you provide guidance, though, on valuation practices and policies?

A. Without reviewing the educational materials that we provided to employees and in the course of compliance Training, I can't say whether we did or did not.

Q. You never told anyone on the credit desk about which kind of brokers to approach for quotes; is that correct?

A. That's correct.

Q. You never talked to analyst on the credit desk about what kind of broker quote you need to get; is that correct?

A. That's correct. TR ( P 127 Ln8-18)


Q... There was never any compliance insTruction to the people on the credit desk as to what kind of broker quote to obtain, in terms of whether it would be an indicative quote or one that would be representative of an actual purchase and sale in the marketplace; is that correct?

A. That's correct.

Q. There was never any education to any analysts on the credit desk about what one could talk to brokers about during conversations in obtaining quotes, and what one couldn't talk to brokers about during conversations in obtaining broker quotes?

A. That's correct.

Q. So for example, the compliance department never provided any advice or education to anyone on the credit desk about whether it would be permissible to educate a broker about where the credit desk believed the price of a particular security in its portfolio was?

A. We did not address that issue....(Tr P 128 Ln3-20)

110

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170

Keily perjured himself when he said that the fund documents did not permit the investment manager to override prices. (see Visium Compliance Manuals A56 and A57)


Q...So let's go on back to page 34.  I'm going to focus on Paragraph 1, under Fair Value. I'm going to focus on the beginning of the sentence, "however," and that sentence did.

However if there are circumstances where a hedge fund manager believes that the application of fair value would not produce an accurate or fair valuation for a given insTrument, it may employ alternative means to value an instrument as permitted by agreement.

Okay. Now, is it fair to say that investors, sophisticated investors who read Visium's disclosures, understand that if there are circumstances where a portfolio manager believes that fair value would not produce an accurate or fair valuation for a given insTrument, it may produce alternative means to value an insTrument? Is that fair?

  Mr. Naftalis:  Objection.

A. No--

The Court: Well, the objection was well taken, but since the answer was blurted out, I think we'll just leave it as is.  But I would caution the witness to wait, if there's an objection before answering. Go ahead.(Tr P 196 Ln20-25 to Tr P 197 ln1-15)


SL00105 [I.B5] Perj Jindra PM


I.

B.

111

Petitioner Stefan Lumiere v. United States of America                  Case No. 18-CV-9170

I.B.5. SEC Witness Jindra Perjured Testimony

    SEC Witness Jindra committed perjury during his testimony about Petitioner Lumiere's position and his responsibilities by stating that Lumiere was responsible for the securities that the government mentioned.  Government Witness Jindra had no basis and no foundation to know what securities Lumiere was responsible for and what responsible for a security meant.  Being responsible for a security as an analyst only meant that he is responsible for following earnings and being on conference calls and rendering an opinion to keep the portfolio manager, cooperating witness Plaford ( Credit Fund Portfolio Manager/Partner) up to date on the occurrences with the company.  The portfolio is the only one responsible for the investment decision and for communicating his position to the valuation committee and investors as they decide on pricing.


 But SEC Witness Jindra states unknowingly that Lumiere is responsible for these as follows:


Q. And based on your review of documents in this case, who was responsible at Visium for ATI as an investment?

A. Mr. Lumiere. (Tr P912 ln14-16)


Q. And who at Visium was responsible for Nebraska Book in terms of P&L?

A. It was Mr. Lumiere ( Tr P917 ln11-13)


Q. And who at Visium was responsible for Friendfinder in terms of P&L?

A. It was Mr. Lumiere (Tr P919 ln17-19)


And how much did Visium pay for those China Medical Bonds?

A. 43.25

And based on your review of documents, who was responsible for that Trade?

Petitioner Stefan Lumiere v. United States of America                          Case No. 18-CV-9170

A. It was Mr. Lumiere (Tr P922 ln3-7)


Q. And of those over 70 securities, what percentage, roughly, was Stefan Lumiere responsible for?

A. Based on my review, it was about....

Q. Mr. Jindra, did you review certain document which set forth securities for which Stefan Lumiere was responsible?

A. Yes I have.

Q. And did you compare those securities--

    The Court: When you say that he was responsible, what do you mean by that in terms of those documents?

    The Witness: Those were emails where--where the title had P&L

    The Court: These were emails from him?

    The Witness: That's correct.

    The Court: All right. Go ahead, counsel.


By Mr. Williams:

I'd ask you of the 70 securities, approximately how many was he responsible for?

About a third. (Tr P923 ln19-25 to Tr P924 ln1-23)


 The witness has zero basis again for making this statement.  The Court accepted in good faith the Witness's response that the email from Petitioner Lumiere had P&L in the title.  However this email is clearly not a work email.  It comes from his personal email.  And the email has a continued email chain, where Lumiere is being specifically denied access to the numbers that he is requesting because Steven Ku ( Visium Funds CFO) and Plaford (Visium Credit Funds Portfolio Manager) block Lumiere's access to the P&L or the pricing for these securities for a simple reason.  Because Lumiere is not a portfolio

113

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

manager in the Visium Credit Fund and he is not even the primary analyst for most of the securities on the list. The recording of Plaford and Lumiere annual review confirms Lumiere being denied access as well, which the Government is well aware of. Additionally, the request for PNL is for a multiple year period and in no way implies Lumiere is attempting to be paid for these investments years after they were made and no longer in the Visium Credit Portfolio. Most of the investments were from 2009 and 2010 before Thorell joined the firm and before any alleged mispricing occurred. Lumiere had given recommendations for some of them or helped the primary analyst out on some of them. Lumiere was simply attempting to extractan reasonable estimate of ideas or work he had done for the fund from 2009 to 2012 since he was preparing to leave the firm and wanted to come up with an estimated Track record for his ideas or things he worked on over the years. This is obvious from the document and the chain of emails that follows which proves that Lumiere is not a portfolio manager for the Visium Credit Funds and is not even the primary analyst for the bulk of securities on the list.


It is obvious that Jindra working for the SEC has something to gain from a successful prosecution of Petitioner Lumiere as there is a parallel civil complaint against Lumiere and a civil action against Visium from which it stood to profit. The fact that the government chose a biased witness who feigned to be an expert and represented as such to the jury, caused extreme prejudice to Lumiere and as a it was largely a result of Jindra's testimony that Lumiere was convicted. The Government should not have had Jindra who was biased testify and if they Truly wanted an expert that was needed for a case of this complexity, they should have gotten one. Additionally, the government did not disclose the bias of SEC witness Jindra to the court which was a due process violation.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

SL00106 [I.C (1-18)] Misconduct-Plain Error

I.C. Pre-Trial and Trial Plain Error of Fact: The Prosecutor either ignored obvious facts and preferred to
argue irrational and non-sensical theories while failing to investigate and understand the issues and in
several cases preferring to simply ignore known Truths.


There were numerous factual plain errors in pre-Trial and Trial that caused the court and the jury to
make decisions based on erroneous factual information.  Prosecutors had an obligation to research and
learn the facts of a case before filing a complaint and indictment and taking a defendant to Trial.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

However, due to their lack of investigation, the defendant has suffered irreparable harm and had his constitutional rights to due process violated.  Due process requires that a convicted person not be sentenced on "materially unTrue" assumptions or "misinformation" (see Townshend v. Burke, 334 U.S.736, 68 S.CT 1252 (1948) (at 741). Additionally as a result of defense counsels lack of knowledge and lack of education into complex securities issues surrounding accounting, Trading, technology platforms, areas of risk management, processes involved in pricing in audits, and even a basic understanding ofrestructuringand simple understanding of the plain facts and his refusal to hire counsel with this specialization to work alongside him on the case, which this case required, the defendant suffered extreme prejudice which caused him a violation of his constitutional rights to effective assistance of counsel.  Lumiere had indemnification from Visium which should have gone towards hiring additional counsel with expertise.  Lumiere found such legal experts with knowledge of complex finance, yet, defense counsel ignored Lumiere's repeated requests (Strickland v. Washington).

The United States Attorney is the representative not of an ordinary party to a conTroversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.  As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. Berger v. United States, 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 (1935).

1) Prosecution claimed that Lumiere corrupted brokers.  This is false. Plaford initiated the call to Princeridge to simply request quotes and offered to give them Visium's estimates.  It was not Lumiere that initiated this process but Plaford at the recommendation and approval of Jake Gottlieb and Steven Ku.  Lumiere did not have a friendship with Vandersnow and had met him on only one occasion and only spoke to Odeon broker on 1 single occasion.

2) Prosecution told Judge that Lumiere never made any effort to report issues until FBI raided his apartment. This is false.  Prosecution knew that Lumiere had been the one that initiated an investigation of the issues by reporting the incident to several attorneys and asking for advice on how to proceed.

3) Prosecution alleged that Lumiere had compliance issues at Visium, and did not honor expense requirements, stopped showing up to work, and did not report Trading with his brother.  This was all false and Lumiere did not receive any disciplinary action or even an indication of a notice for any of

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

these false allegations until after Lumiere had left Visium and was requesting settlement of deferred compensation and then accused Jacob Gottlieb of slander.

4) Prosecutor brought in employee from FINRA claiming that Lumiere was regulated by FINRA and subject to their broker rules.  This is false as Lumiere was not regulated by FINRA and not a broker and not subject to any of their rules.

5) Prosecutor brought in witness from CFA whose purpose was to describe Training in the CFA program, and alleged that use of pricing services were included in the study program however they were not.  CFA program is a general program for analysts and portfolio managers but does not go into compliance, law, regulatory issues, audit, hedge fund management.

6) Motion to suppress hearing from Oct 19th, 2016: Prosecutor asked if agent knew that there were other recordings based on his investigation and the agent replies yes.  This would have been impossible to know by the proffer session.

7) Agent Callahan Review of evidence was suspect as he went over it in several hours over 2 day period.  However it is not likely he would have been able to thoroughly review the material within folders, subfolders and files that represented millions of files in several hours.  However defense counsel failed to question on this.  Also why were no protocols followed.

8) Agent Callahan claim that he did not know of any other attorneys except for Udell

9) Agent Callahan was notified to return Lumiere's belongings multiple times and not never as the government stated.

10) Agent Callahan stated that government was in cooperative posture with Defendant through April 15th, 2014.  This is false.

11) Princeridge and Janney Montgomery firm size was irrelevant as most brokers that Trade smaller less liquid issues are smaller brokers. (Affidavit from expert witness)

12) Princeridge and Janney Montgomery had every ability to check pricing on most issues through customers, their Traders, and interdealer brokers like ICAP and GFI ( Affidavit from expert witness)

13) Lumiere did not call Princeridge and Janney Montgomery bucket shops.  Calling a firm a bucket shop does not make them one regardless as Princeridge are not small brokers but medium sized institutions.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Recording where Lumiere mentions bucket shops would be the only ones hurt if Visium shut down and does never reference Janney and Princeridge as such)

14) Lumiere did not attempt to extort Plaford or Gottlieb ever. The statement was stated in jest to get Thorell to disclose what information he had. It never should have been allowed in and then rephrased in error. (Transcript government; Corrected Transcript)

15) Government statement that Lumiere told Broenniman that he wanted him to keep quiet about how the firm represents pricing, was cut short and out of context. Lumiere in the next sentence insinuated that he would just leak it to the SEC. (Transcript Trial; Transcript, Transcript Trial where leaves out leak to SEC)

16) Government submitted, displayed and discussed privileged material into Trial. (TR P 980 Ln20-24; Exhibit 1010 in Trial and in summation; email from Creizman on points of privilege and misTrial)

17) Reuters and other pricing services are not defacto benchmarks as Thorell said repeatedly and they are not exchanges and pricing is not to be relied upon especially with less liquid, or restructured securities. (Reuters disclaimer; Reuters white paper; Email Thorell to operations in June 2011 on Reuters errors and example of bonds of GAPT and Reuters pricing 23 points off from market)

18) Trial Exhibits were flawed and thus wrongly prejudicial and incomplete and Creizman should never have stipulated to them. (Trial exhibit page ATI reference not available, CMED Trade 2 Trades excluded from broker and other fund)

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

SL00200 [II.A Pt1] Misconduct Argument Prices

**II. CREIZMAN ALLOWED PROSECUTORS TO UTILIZE A) MISCONDUCT, B) FALSE, ERRONEOUS, AND PERJURED TESTIMONY AT TRIAL TO FALSELY CONVINCE THE JURY THAT LUMIERE: KNOWLINGLY INFLATED THE VALUE OF POSITIONS USING PHONY BROKER PRICES, PICKED THE PRICES, CORRUPTED "FRIENDLY BROKERS".**

Discussion of What Actually Happened and Why with Respect to Broker Prices.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Lumiere explained to the independent brokers where Visium thought the prices were in good faith and to have the brokers check if they saw anything different or if Visium's estimates were reasonable. There is nothing illegal or unethical about this procedure as corroborated and recommended by the executives of Visium, Gottlieb and Ku and Lumiere's supervisor at the time, Plaford. There is a substantial statement between telling brokers to regurgitate prices back, and sharing figures calculated for internal purposes with the brokers to gain an understanding of where the prices were in the context of that time. (Exhibit 3500 Vandersnow and 3500 Brook (Not available due to Petitioner's current circumstances), A22.4: Tr Ln9-16). These procedures and processes were told to Lumiere and to brokers to be for internal purposes, not for audit and simply intended to give the brokers a context for where Visium came out. Additionally with respect to esoteric situations such as with ATI, CMED, Sevan, Nebraska Book, Friendfinder, USON, Lumiere did discuss these complex situations with the brokers and gave them access to information from which to assess the fair value, including the lawyers involved, the other creditors involved on the committees, access to accounting department at Visium, the fundamentals of the companies and any new information that Visium learned by sitting on these various committees. Discussions between hedge fund professionals and brokers, Traders, analysts from both sell-side and buy-side firms is a standard of practice in the industry and serves multiple purposes all meant to increase visibility and get an idea for other professionals' thoughts. The reason why Visium would use the same two brokers because of the complexity of the situation which would be too strenuous to repeat to multiple brokers over and over again. It would not make sense to educate a single broker on the situation and then go back to different brokers each time to restate the situation that the first broker is already familiar with. This is a concept on wall street known as educating a broker, or giving someone an "Axe" meaning they have learned the new information in order to re-educate other customers about the situation.

II.A. CREIZMAN ALLOWED THE PROSECUTORS TO UTILIZE MISCONDUCT TO MAKE EGREGIOUS MATERIAL MISSTATEMENTS OF FACT THROUGHOUT THE TRIAL

The Prosecutors may not make material misstatements of law ( U.S. v. Cruz) or fact (U.S. v. Forlorma) (Prosecutor's repeated reinforcement that defendant was aware of heroin concealed in bag improper because there was not evidentiary basis for the misstatement of fact.)

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

The Prosecutors repetitively made clear and obvious misstatements to the jury and the Court. Numerous and repetitive statements such as "Spit back the quotes that Lumiere wanted", "Tell the prices that you wanted and have the brokers spit them right back"(Exhibits), in reference to Lumiere calling brokers to request a quote and asking them to check Visium's numbers for reasonableness, pervaded the Trial.  This acted to inculcate, brainwash, and infect a non-specialized jury and was especially improper because there was no evidentiary basis behind these material misstatements of fact apart from misstating actual facts of what was done and why.  Lumiere did not ever ask the brokers to spit back prices.  Lumiere did educate the brokers about what was happening in the more esoteric companies as is an industry practice.  Lumiere did believe the prices that Plaford gave him at the time based on Plaford's explanation of Visium's mandate to price based on all of Visium's current private information.  These misstatements were done intentionally and maliciously to confuse a jury uneducated in the practices at hedge funds.  These "improper methods calculated to produce a wrongful conviction.", proves prosecutorial misconduct that justifies a misTrial because it "so infect[ed] the Trial with unfairness as to make the resulting conviction a denial of due process." (Darden v. Wainwright)

Summaries of Pricing Topic Prosecutorial Misconduct.

SL00201 [II.A Pt2] Government misstatements II prices

In summation the government made material misstatements that were proven to the contrary on the record as well as in all of the evidence in Discovery, and within reach via Visium's files never delivered to Petitioner Lumiere which they ignored.  The prosecutors also allowed their personal beliefs and opinions into the Trial, by insinuating that any jury member would be naive to believe anything defense said and making statements such as "give me a break", setting up to prejudice the defense.  Creizman allowed these misstatements to go on throughout Trial without intervention and only in summation mentioned the government's strategy after false and perjured statements had been allowed into the court. Additionally, the government alleged that key facts in the case were undisputed whereas they were disputed by defense creating a false impression on the jury that the government had proven their case which they had not:

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Government made false statements during summation and rebuttal stating that there were no disputes about certain false facts telling the jury that they did not even need to consider these as they were fact when they were not, as they were all disputed:


"Now, before I walk through these three categories of evidence, let's be clear about what's in dispute and what's not in dispute, what you have to decide and what you don't have to decide.  There can be no dispute that the defendant was secretly pulling the strings behind the scene, pulling the sTrings with the valuation process to inflate the valuation of the fund.  There can also be no dispute that the defendant knew that Visium had promised investors that the valuation process was going to be independent from the investment team, and that Lumiere knew that using inflated values undermined this process and caused Visium to lie to its investors." (Tr P 974 ln8-19)


The only thing that you need to decide is whether Lumiere knew what he was doing was wrong, whether he knew he was cooking the books or whether, as defense counsel said during his opening statement, he was somehow acting in good faith all along.  Ladies and gentlemen, that's an easy question.  You're New Yorkers.  You have common sense. Of course the defendant knew what he was doing was wrong.  You heard it from witness after witness.  You saw that in document after document. You heard the defendant, in his own voice on those recordings, admitting he knew what he was doing. And as I said, all of this evidence points to one conclusion, the defendant was acting in total bad faith. He knew what the process should have been.  He ignored it.  He corrupted it.  He egregiously mismarked securities, and because of that, he is guilty." (TR P 974 Ln20-25 to P975 ln1-9


"...Lumiere and the credit fund fraudulently overrode independent third-party prices to boost the fund's performance."P 973 Ln10-12)


" lies and misrepresentations that were told to investors and potential investors in the fund.  This includes what Visium told its investors about how the valuation process would work and how the fund would be valued, and how these representations, again, were critical and material to investors' decisions to invest in the fund." (Tr P 973 ln15-21)

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

"Indeed, there can be no doubt that Lumiere, an educated and experienced hedge fund professional, understood what my colleague, Mr. Williams told you at the beginning of this Trial...The evidence shows that Lumiere knew full well that he and other members of the credit team were not supposed to be the source of the valuations and that their undermining the valuation process and falsely boosting the performance was wrong." Tr P973 ln24-25 to P974 Ln1-7)

"There can be no doubt that the defendant was secretly pulling the sTrings behind the scene, pulling the sTrings with the valuation process to inflate the valuation of the fund. (Tr P 974 Ln11-14)

"There can also be no dispute that the defendant knew that Visium had promised investors that the valuation process was going to be independent from the investment team, and that Lumiere knew that using inflated values undermined this process and caused Visium to lie to its investors." (Tr P 974 ln15-19)

Government misstates the facts by stating that Lumiere had actually admitted to what he was doing by using recordings almost a year after he left Visium that have the defendant looking to possibly whistleblow accuse Plaford of mismarking. This belief also becomes more pronounced with Thorell feeding information of statements that Ku, and Keily and Gottlieb tell him which further enforce Lumiere's belief that started with a simple question and red flag, and escalated to a belief in the confirmation of what his suspicions thanks to Thorell's stories of his meetings with executives at Visium that denied that overrides existed, denied that NAV was used to value securities and that prices estimates that investment team came up with went into NAV.  Further Gottlieb told Thorell that there was no misvaluation and that Thorell was not an analyst and did not know what he was talking about specifically in relation to ATI and CMED, especially given that they were valued by external valuation companies.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

" First, he manipulated and corrupted the independent valuation process at Visium's credit fund; second, he misvalued securities in that fund to inflate their values, and as he told you in his own words during this Trial, he did that egregiously from 2011 through 2013." (Tr P 972 Ln1-5)

You heard the defendant, in his own voice on those recordings, admitting he knew what he was doing." (Tr P 975 Ln3-5)

"Now, you know that Lumiere and Plaford were mismarking the value of securities from the beginning because the defendant actually told you that in his own words.  Remember Government Exhibit 1238....The defendant said that he and Plaford were mismarking stuff from the beginning, since 2011.  There's just no ambiguity there.  He said they were "mismarking shit egregiously including ATI and China Med and, you know that the defendant was in charge of ATI and played a large role in China Med."(Tr P 978 Ln5-17)

"Lumiere also told you that he and Plaford falsified marks, levels and performance." (Tr p 978 Ln23-25)

"First, you have his own words.  We listened to these already.  He said he'd been "mismarking the shit since 2011,"  that it was all "egregious" that he was doing with ATI and China Med, and that he falsified marks, levels and performance.  The defendant really can't argue with a sTraight face that he had a good faith belief that what he was doing was legit when he said he's been doing this since 2011 and it was egregious." (Tr P 997 Ln25 to P 998 Ln1-8)

"You also heard the defendant admit on various recordings that he would dictate prices to brokers, and these were brokers who did not Traffic in the securities." (Tr P 998 Ln18-20)

Petitioner Stefan Lumiere v. United States of America                              Case No. 18-CV-9170

"What does the defendant admit in this conversation? He's dictating the prices. He knows those dudes, the brokers, didn't price the things; that they were just spitting it back; that they didn't know anything about the securities and they were just relying on him; that they weren't doing any research. Why does it matter if the defendant knows that they didn't Trade in the securities? Because that means that he knows that the prices are all fake." (Tr P 999 ln2-9)

Government stated things that were proven false during Trial by other witnesses and evidence, yet choose to repeat them as fact and not subject to dispute after it was uncovered that it was false:

1) Lumiere was No 2 and Portfolio manager of Credit Fund and Managed $100M of distressed assets which was 20% of Credit Fund:

"Lumiere was the No. 2 guy. He was also a portfolio manager and an analyst. (Tr P 975 ln15-16)

"They were running around from his title of portfolio manager. Why? Because they're Trying to convince you that he wasn't involved and that he didn't know what he was doing. You know that's totally ridiculous. Lumiere was a portfolio manager too. Look at this slide. Lumiere advertised it on all of his e-mails from 2011 to '13. You also heard evidence that he managed a hundred million dollars on his own, a hundred million dollars worth of distressed debt." (Tr P 975 ln18-25)

2) The Fraud Started with Lumiere and he manipulated the valuation process and misvalued securities:

"So let's talk about how the fraud began. It started with the defendant. Let me say that again. This scheme started with the defendant, Stefan Lumiere. He needed a way to make it look like he was doing better than he actually was. He needed a way to override those independent prices that showed the Truth, the independent prices from Reuters. So he corrupted the valuation process."

3) Lumiere picked the prices that he wanted.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

" And then Lumiere told them the prices or the levels that he wanted, and the brokers just shot those prices right back        to him in Bloomberg messages.  Lumiere used those fake prices to override these independent Reuters and Bloomberg        prices.  The fake prices were used to calculate the NAV, and that was sent to investors and, magically, Lumiere's        positions started to look like they were doing better.... Plaford loved what Lumiere had figured out." (Tr P 977 Ln5-15)

4) Lumiere lied to investors

"...the defendant lied to investors about the fund's valuation process and about the fund's actual performance." TR P972 Ln6-8)

5) Lumiere lied to line his own pockets

" He told lies to investors to line his own pockets, which resulted in the fund investors paying millions and millions of dollars in fees to Visium" (Tr P 972 ln18-20)

" This includes that Lumiere and the credit team were secretly the source of the valuation of securities in the fund.  All, again, in direct violation of what the investors were told." TR P 973 ln6-9

6) Lumiere played a large role in CMED

7) Lumiere knew that the brokers did no research

9) Claimed that Lumiere did not provide the brokers with his own research

10) Lumiere did not believe the values

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

11) Claimed that Lumiere's buddies were Vandersnow, Brook and O'Callaghan

SL00202 [II.B1] Perj-Thorell-Prices

II.B. A CONVICTION WAS OBTAINED BY FALSE, ERRONEOUS AND PERJURED TESTIMONY OF WITNESSES
PERTAINING TO BROKER PRICING REQUESTS.

The commentary to 3C1.1 is explicit, that the phrase "impeded or obstruct the administration of
justice includes perjury".  Perjury is committed when a witness testifying under oath or affirmation gives
false testimony concerning a material matter with the willful intent to provide false testimony.

1. Thorell's statement that Lumiere provided the pricing to brokers for the purpose of getting them
to spit them back is simply false, erroneous and prejudicial.

Thorell states:

Petitioner Stefan Lumiere v. United States of America                          Case No. 18-CV-9170

A. My understanding was that Stefan was communicating to the brokers that these are the levels and giving the brokers guidance on behalf of himself. (Thorell Direct: P 357 Ln5-7)

During the Plaford cross:

Q. And during those calls you told Mr. Lumiere what prices to ask the brokers for; is that fair to say?

A. Yes. (Tr P 732 Ln2-4)

Later in Plaford Cross:

Q. Let me break this down. You told Stefan Lumiere what prices you believed CMED should be at, Correct?

A. Correct.

Q. You asked him to go to certain brokers and explain to them why you viewed the price the way you viewed it, Correct?

A. Correct. (TR P 739 Ln3-9)

Thorell's erroneous understanding that Stefan was communicating to the brokers that these are the levels that Lumiere wants is completely conTradictory to Plaford testifying that not only that Plaford himself told Mr. Lumiere Visium's estimates of prices but also to explain to them why Visium viewed the prices a certain way.

Additionally Thorell admits that he did not know if the brokers did research or checked the prices:

Q. Do you know if the brokers did any research to come up with the numbers they sent back to you?

A. No, I do not know that. (Tr P 360 Ln5-7)

Petitioner Stefan Lumiere v. United States of America                Case No. 18-CV-9170

SL00203 [II.B pt2] Thorell and Jindra Perjury Pr

Thorell Perjury on Stating Repeatedly that Reuters was Defacto Benchmark.

   Thorell repeatedly stated that Reuters was the defacto benchmark for Bonds.  However, he has no
foundational basis for making this statement and additionally Reuters is not the standard for bonds as
Bloomberg is used by corporate bond salesmen and Traders rather than Reuters.  None of these services
are exchanges and pricing is not reliable when the securities are less liquid or restructured as
demonstrated in the letter from Thorell to operations showing the error in pricing of GAPT 11 3/8 bonds
which Reuters had priced 22 points lower than the actual Trading price.  Creizman failed to challenge
this point with Thorell.  A competent attorney would have been able to assess that would be the
government's argument however flawed, and done research on Reuters, Markit, IDC pricing services and
shown that they are for portfolio managers to aid in decision making but they are not to be relied on for
pricing, audit or legal issues.  The reason is that they are not exchanges.  They are feeds that parse
pricing from various brokers that may be stale ( Not updated for months).  It is an automated platform
that does not independently research the specific issues to the security as it restructures and is not a
representation of a market price or representation of liquidity.  Creizman failed to understand this and
educate himself whereas a competent attorney would have learned about the pricing services, shown
the errors they make when securities are less liquid, understood how pricing is generated and objected
to Thorell's mention of this term.  However Creizman failed to do this and only in sidebar, outside of the
purview of the jury does he mention his concern with Thorell continuously giving the de facto
benchmark term and his state of the union address meant to harm Lumiere.  As a result, Lumiere's 6th
amendment rights to effective assistance of counsel were violated.  Additionally the government's
allegation that these were the correct prices was an error and a violation of Lumiere's 5th amendment
right to due process.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

SL00204 [II.B2] Perj Plaford-Prices

II.B.2. Defense Counsel allowed Mr. Plaford to Incessantly Testify with False, Misleading and Perjured Statements Prejudicing the Court and Jury Resulting in a Miscarriage of Justice.

   The Government's entire argument is predicated on assertions that Mr. Lumiere mismarked, misrepresented, and inflated prices in the credit fund.

   a) Mr. Plaford testified under oath the following:

   Q. Now, in the mismarking scheme, what was your role?

   A. I helped to create the values and also directed the broker quotes.

   Q. What do you mean by directing the broker quotes?

   A. Essentially helped to get the broker quotes, which was the documentation, and the values that we were using? (TR P    633 Ln2-7)

   Q. And what was the defendant's role this the mismarking scheme?

   A. The same, helping to create the valuation, and also getting the broker quotes on a monthly basis.

   Q. When you say helping to create the valuation, do you mean pick the prices?

   A. Yes. (TR P 633 Ln10-16)


   Q Why would you need to tell him the price in these recordings even though it's his position?

   A. Well, we--I tell him the price for everything because I wouldn't Trust him to do hardly anything on his own...

                                        130

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

687 Ln4-7

Later on Plaford Cross:

Q. You've admitted that you agreed to defraud investors by mismarking securities, is that True?

A. That's correct.

Q. But you also said it was Stefan Lumiere's idea, correct?

A. I said Stefan also was involved in this I believe is what I said.

Q. Was it Stefan's idea or was it your idea?

A. I'm sorry can you repeat it?

Q. Was it your idea to mismark securities or was it Stefan's?

A. It started with Stefan and over time i went along with it.


Q. And during those calls you told Mr. Lumiere what prices to ask brokers for; is that fair to say?

A. Yes (TR 729 ln2-3)


Q. Let me break this down.  You told Stefan Lumiere what price you believed C-Med should be at, correct?

A. Correct.

Q. You asked him to go to certain brokers and explain to them why you viewed the price the way you viewed it, correct?

A. Correct. (Tr P 739 Ln3-9)


Q. It was you who decided every month which securities would be overridden, correct?

A. Correct.

131

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Q. And you were the one that highlighted the names on the spreadsheet, correct?

A. Correct. (Tr 758 Ln14-19)


Plaford is Tremendously misleading the court and jury by stating that Lumiere "Helping to create the valuation" of securities when in fact Lumiere simply acted as any analyst and provided Plaford with the fundamentals of the companies that Plaford asked for and any new developments that Lumiere monitored as an analyst.  Acting as the analyst, Lumiere provided his thoughts and opinions and projections for the company.  This has nothing to do with "helping to create the values" which is a term that Plaford makes up here to incriminate Lumiere and confuse the jury since he knows that Lumiere had nothing to do with picking prices as he admits that he would not Trust Lumiere to do anything which is why he told Lumiere on recorded calls the prices and not the other way around.  He also commits perjury with the government's leading and prejudicial question which changes here as well by stating that "helping to create values" he really means "Pick prices" to which he answers in the affirmative which is perjury.  Later in cross Plaford admits to that he gave Visium's estimated prices and with respect to CMED, that Plaford told Lumiere the price that he believed to be the proper value.  Plaford additionally admits here that he was the one that directed Lumiere to go to certain brokers and very materially tells Lumiere to explain to the brokers why Plaford viewed the prices when he discussed his estimates.


Summary of Plaford Misstatements false

 TR P 732 5-14  Plaford refuses to answer the question but attempts to divert the question to something else with the intent to deceive the court and the jury.


  Plaford provided false and perjured testimony that prices in the Credit fund were mismarked

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Q. Did you commit the crime of mismarking alone or with other people?

A. Others.

Q. Who?

A. Jason Thorell and Stefan Lumiere

Plaford admits lying to a Federal Agent:

Q. Did you tell the Truth to the agent then?

A. I did not.  (Tr Pg. 645 Ln2-3)

The statement that there was mismarking was utter perjury.  Plaford has a motive to lie because
he has been indicted on insider Trading charges and lacks any credibility because he has admitted lying
to the government before (Tr pg. 650 Ln17-25, pg. 651 Ln1-2, ).  Plaford clearly has a history of lying to
authority figures such as federal agents, which are crimes punishable by imprisonment.  It is also clear
that he would have no compunction against lying under oath to protect his image and lower his
culpability with respect to guilt.  In the event that the prices were mismarked, there would be a
discrepancy between the prices marked in the credit fund and an the prices found by outside 3rd party
companies VRC, Ernst and Young, and an independent hired auditor hired by Visium.  The prices found
by VRC and Ernst & Young found the prices established in the Credit Fund to be resoundingly correct
{VRC Exhibits  ( VRC ATI: A25 P4, A26 P3, A27 P2; VRC CMED: A28 P3, A29 P3, A30 P3 and Ernst & Young
valuations (E&Y ATI: A31 P4); E&Y Rural MeTro (A32 P2) and Independent auditor(Not available due to
Petitioner's current circumstances), Valuation Committee Memos (CMED: A33 P 16-17; A35 P1-2), (ATI:
A35 P1-2)}.

Plaford on Direct referencing exhibit 1161:

Q. So now this is an email from you to the defendant, and you write: There has to be someone
else we can ask.  We              absolutely cannot let this become level 3?

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

A. Yes.

Q. And he responds: Two thoughts.  We ask Jefferies Trader to come up with quote, since it is
their deal, or two, we            ask the company CFO or auditor to quote it.  Only other option is to put
out bids and offers to actually lay a                    market with a broker.


Lumiere in this is simply offering advice to Plaford.  He is not proposing anything illegal. Plaford is
looking for a quote and tells him some ideas very simply including calling Jefferies who acted as banker
on the deal or ask the company CFO or auditor to assist or to enter valid markets.  Nowhere does
Lumiere state that they should just make a quote up.  If it were as simple matter of going to the alleged
friendly brokers, why did Plaford simply not call one of them?  The story does not make sense.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

SL00205 [II.B.3] Perj Jindra Prices

II.B.3. Jindra perjured himself as a witness by making biased prejudicial and unfounded statements and misled the court by failing the basic investigation process of any analysis by ignoring the essential circumstances surrounding the specific securities that the government claimed were misvalued. Government was aware of these facts, was aware of VRC valuation reports and that Valuation Committee had valued these securities.  However, Jindra did not seek the Truth or even rational basic inquiry which was necessary in order to explain the variances that Visium had from Reuters, Markit, IDC, Bloomberg for certain securities.  This clear avoidance and ignoring of the basic investigative process that should have been a given, was done with a clear purpose. To mislead the Court.

On Direct, Jindra Perjures himself by claiming that his first contact with the government was just prior to Trial so that would explain why the exhibits were not provided to defense counsel until the day before Trial.

Q. So when did you start working with the government as part of this Trial?

A. My first contact with the government was in October, late October/early November of 2016? (Tr P 907 ln4-7)

Q. All right, Mr. Jindra, before you there is a document that has been marked as Government exhibit 18. What is that document?

A. It is a document that summarizes the analysis that I have performed in this case....

Q. And, Mr. Jindra, were those documents that you reviewed voluminous?

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

A. Yes.

Q. Ok.

Mr. Williams: You honor, we offer Government Exhibit 18.

Ms. Madrigal: No Objection.


However evidence shows that SEC Economist Jindra had been working on this analysis as part of the SEC investigation as early as 2015.


Q. And based on your review of documents in this case, who was responsible at Visium for ATI as an investment?

A. Mr. Lumpier (Tr P 912 Ln14-16)


Q. And who at Visium was responsible for Nebraska Book in terms of P&L?

A. It was Mr. Lumiere. (Tr P 917 ln11-13)


Q. And who at Visium was responsible for Friendfinder in terms of P&L?

A. It was Mr. Lumiere (Tr P 919 Ln17-19)


Q. And how much did Visium pay for those China Medical Bonds?

A. 43.25

Q. And based on your review of documents, who was responsible for that Trade?

A. It was Mr. Lumiere. (Tr P 922 Ln3-7)

Petitioner Stefan Lumiere v. United States of America                          Case No. 18-CV-9170

Q. Ok. So we've now looked at your analysis of ATI, Nebraska Book, Friendfinder and China Medical.
Have you reviewed other securities that exhibited similar price divergence?

A. Yes I have.

Q. How many other securities reflected similar divergence in prices from established pricing sources?

A. It was slightly over 70 securities were affected.

Q. And of those approximately 70 securities, what percentage, roughly, was Stefan Lumiere responsible
for?

A. Based on my review, it was about--

    Ms. Madrigal: Objection.

    The Court: Ground.

    Ms. Madrigal: Foundation.

    The Court: Lay a foundation.

By Mr. Williams:

Q. Mr. Jindra, did you review certain document which set forth securities for which Stefan Lumiere was
responsible?

A. Yes I have/

Q. And did you compare those securities--

    The Court: When you say that he was responsible, what do you mean by that in terms of those
documents?

    The Witness: Those were emails where he--where the title had P&L

    The Court: These were emails from him?

    The Witness: That's correct.

    The Court: All right. Go ahead, counsel.

By Mr. Williams:

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Q. I'd asked you of the 70 securities, approximately how many was he responsible for?

A. About a third. (Tr P 923 Ln19-25 to Tr P 924 Ln1-23)

Q. Ok. And you have no personal knowledge of whether or not Mr. Lumiere was actually in charge of those positions?

A. I have not talked to them, if that's what you mean, that's correct.

Q. For example, in your testimony you referred the P&L that you reviewed, and that P&L contained certain positions, is that correct?

A. It contained a list of issuers, meaning name of companies and securities, correct.

Q. Ok. And you have no knowledge of whether Mr. Lumiere assisted on those positions or whether he was in charge of those positions, isn't that correct.

A. That's correct." Tr P 928 Ln24-25 to Tr P 929 ln1-11)

These questions should have been objected to but counsel chose to be more sedentary than a potted plant and remained silent throughout."  There was no foundation for Jindra to respond to these questions with anything but, "I don't know".  Because he did not know.  On cross his only response was that Lumiere was on the email.  But there were others on the emails as well.  Theorell, Ops ( operations). When did receiving an email automatically identify one's responsibility.

He failed to investigate CMED and did not know there was a Tiering structure in place.  He did not know that the bonds that Visium owned even though they maintained the same Cusip, had by agreement due to funding a litigation and bankruptcy in china, economic interests that were many multiples greater than the other securities.  In the range of 14x more than the ones he chose to compare on Reuters.

Petitioner Stefan Lumiere v. United States of America                                    Case No. 18-CV-9170

He failed to investigate ATI. That Visium was on the Creditor committee and had restructured the Loans into 2 different Tranches also by contractual agreement. One Tranche was to be paid out first and at much greater interest payment in return for differing immediate coupon payments. He did not bother to look into this or caveat this further prejudicing and inflating the output of his exhibits. Defense counsel failed to identify these facts due to lack of understanding and preparation which also led to the court not benefitting from the correct information. Additionally, Jindra did not investigate the highly complex nature of this investment in particular which was different from most bankruptcy reorganizations because as an education company, they would not be able to file for bankruptcy protection. The creditors needed to restructure the company outside of bankruptcy or the funding for students would be shut out. This is the process that Visium took alongside several other creditors primarily Marble gate. In the end, Visium owned ATI with Marblegate into a company they set up to by the performing assets of ATI called Ancora Holdings. This was never discussed or explained by Jindra or anybody in the Trial which was also a defect of the defense and government and served to misled the court.

Jindra's whole premise was that if it deviated from Reuters than it was not the correct price. Jindra did not read the manual to understand it, he presented flawed data without investigating or even providing footnotes to demonstrate that he performed no basic investigative process. Jindra misunderstood the compliance manual section which stated examples of pricing services that Visium could use as a requirement and an order. This was incorrect by any standard read or logical conclusion and had no basis in standard market practice. The compliance manual was clear. They did not need to use a single pricing service, ever. The pricing services could be used to the extent that it was fair and represented fair value which occurs with very liquid securities. But the obligation of Visium like any fund, needed to be to represent fair value above all else which is what Lumiere believed that Visium and Plaford was doing while he was there.

Q. Ok. And so your criteria for labeling something higher, neuTral or lower was simply if it exceeded the price on one of these established pricing sources , correct?

A. Correct.(Tr P 932 ln9-12)

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Q. OK. And when you prepared this chart, you knew that Visium had the authority to value its portfolio, correct?

A. I am aware of that, that's correct.

Q. And you are aware that Visium is not required to value pursuant to an established pricing source such as Reuters, IDC, Bloomberg or Markit?

A. I take your word for it.  I didn't study it in great detail.

Q. You reviewed the documents.  I'm asking you what you understood from your review of the offering memorandum.

A. I have not reviewed it for that particular case fact. Tr P 932 ln16-25 to P 933 ln1)

...

Q. Did you take any--did you undertake any analysis here of these--let's say 357 were favorable quotes, right, 92%?  We are looking all the way on the left-hand side of slide 2.  Did you undertake any analysis to see in fact how much the established pricing source varied from Visium's price?

A. No, I have not.

Q. Ok, So we don't know whether it was an insignificant amount?

A. You mean within the pricing sources?

Q. ... did you undertake an analysis to determine what the variance was?

A. I have--well, I have performed an analysis.  I have not calculated an average, if that's what you are asking.  I had calculated the aggregate impact on the fund. ( TR P 932 ln19-25 to Tr P 934 Ln1)


Q. You looked at different sources, correct--Reuters, Bloomberg, Markit and IDC, I believe?

A. That's correct.

Q. And is it fair to say that among those standard pricing services, there are differences in prices for a security?

A. In some months there are differences, that's correct. (Tr P 934 ln21-25 to P 935 ln1)

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

---

Q. And I know you've briefly covered this in your direct.  How did you actually determine which was the best of these four sources?  How did you determine which ones to use?

A. I followed an ordering or ranking which was if price was available from Reuters, I relied on Reuters.  If price from Reuters was not available and price from IDC was available, I used IDC.  And if neither Reuters nor IDC was available, I was relying on Bloomberg.

And that--why did you choose to look at them in that order?

I believe the compliance manual listed Reuters and Bloomberg, And IDC is a well-accepted source of pricing for hedge funds as well.

Q. But the compliance manual didn't dictate an order in which those should be looked at, did it?

A. It listed the sources in order but did not necessarily imply that the order is to be followed, that's correct.

Q. Fair enough. So you took the sources out of the compliance manual just as they came?

A. That's fair, yes. (Tr P 935 ln3-22)


Q. OK. Understood. And do you know where Markit gets its data from?

A. No.

Q. Ok. So you don't know how Markit determines its prices?

A. I have a general understanding, but I do not know exactly how they determine the price of ATI senior debt to be 32.5.(Tr P 938 ln22-25 to P 938 ln1-2)


Q. And isn't it True that sources such as Markit, Bloomberg and Reuters each have their own methodology for determining value?

A. That's-- I would agree with that , that's correct.

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170

Q. But, again, you have a basic understanding but you don't know how each of those services ultimately reach a price?

A. So to give you a full answer, I have asked, and it is a proprietary technique that they do not share."
(TR P 939 ln14-21)


Q. Now, you can't call up Markit or Bloomberg or Reuters and purchase a bond at the price that they indicate through that services, isn't that True?

A. I do not know but assume that's correct.

Q. It's fair to say it is just a pricing service?

A. It's a pricing service yes? (Tr P 938 ln3-8)

SL00207 [II.B3 Pt2] Perjury Jindra


Q. Do you see where it says right below that "C-Med Directing Class"?

A. Yes, I do.

Q. Ok. And in this case you used an IDC quote. I believe it was either on the previous slide or the one--

A. It would be the next slide, 24

Q. So here we have it.  IDC 7.5

         Can we go back to slide 23

Q. Now, do you know whether the IDC quote reflects the exTra rights that Visium was entitled to by virtue of being part of    the directing class that it indicates here on the email?

A. I'm sorry. Could you repeat that questions?

Q. Yes. Do you know whether the IDC price reflects the exTra rights which Visium was entitled to by virtue of being part of    the directing class of creditors in C-Med?

         Mr. Williams: Objection. It assumes facts not in evidence.

142

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

The Court: Sustained.(P 941 Ln

Q. It was solely based on comparison to market--standard market prices from the pricing services?

A. From established pricing services, correct. (P 948 Ln3-21)

SL00206 [II.B3 Pt1] Perj Jindra Trial exhibits

Prosecutors provided the main Trial exhibits used in Jindra testimony the night before Trial to defense counsel, well too late for defense to effectively evaluate, review, and check the accuracy of and stipulate to given that these which were tied to data of tens of thousands of spreadsheets.  Additionally, many of the references were flawed, incorrect, or incomplete significantly prejudicing Lumiere at Trial.  The government claimed that they had just hired Jindra to do this, yet the evidence shows that Jindra had worked on these models and exhibits likely for the SEC since 2015 which means that the prosecutors purposely dumped this on defense a such a late period to make it impossible for a small team like Creizman to effectively prepare for.  Examples of the flaws and misstatements in the exhibits:

1) The chart of the CMED Trade on March 23rd 2012, excludes 2 other Trade parties neither of which was an alleged co-conspirator. One was Hapoalim and the second was another hedge fund both executing at above 40.

2) The charts of ATI failed to demonstrate that Visium had a different position than the one indicated in the chart, as the bank loans had been Tranched out into 2 separate classes with different economics. This was not mentioned in the chart, or in any direct examination or cross examination.

3) The reference to ATI prices allegedly provided by Markit referenced an exhibit in discovery, except the exhibit contained no data on ATI whatsoever.

4) The Markit price should also have been explained was not an actual "Market Price" even if Markit did have a price.  This was a plain error that went into a total confusion of how non-exchange Traded securities Trade or how pricing data works.  Markit receives data from a feed from Loanx which even

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Apollo documents in discovery stated that they stopped using Loanx and went to alternative methods as there was no evidence of actual Trading or markets and could not be Trusted for accuracy.

5) The charts fail to identify that CMED bonds reflected in charts were a completely different class of bonds than those owned by Visium as Visium owned the Directing Class or Tier 1 bonds while the chart reflected the price of Tier 3 bonds. Jindra was not told by prosecutors to examine the larger distortions for explanations which a little due diligence would have showed that it was explainable. Yet the government chose to ignore this aspect completely in presenting prejudicial and false data to the court for 1 obvious reason. It was easier to win their case to leave out the Truth.

6) Charts failed to identify the amount of the variance in the securities for which they claimed were 90% misvalued versus Reuters. This was plain error because Jindra made a mistake in interpretation of the compliance manual. He erroneously assumed that the prices that had to be used were supposed to be Reuters first, then if no Reuters price was available, then go to Bloomberg. However this is incorrect. The language states that they would use pricing services such as Reuters, Bloomberg, etc. to the extent possible and only if they reflected the fair value. Therefore as an example if Visium used a price of 93 based on broker quotes and decided to override the data feeds because they did not reflect the fair market value and Reuters had a price of 92.236 and Bloomberg had a price of 93.25, then the exhibit would classify Visium as having overvalued the security which is clearly incorrect and prejudicial. It is known that data feeds can be flawed by definition when securities are less liquid which means that they are not Traded often therefore likely to be "stale prices" and not reflective of fair value. It is the responsibility not the option of the manager (Visium) to override the data feed (Reuters, Bloomberg or Markit) if it believes that the price that they identify is stale or does not reflect the fair value of the position. This was the case for CMED and for ATI as exhibited by the VRC reports and Ernst & Young reports, yet ignored here.

Trial Exhibits were flawed and Creizman stipulated to these without reviewing. See Brady Violation Trial Exhibits and Jindra Perjury. Since these exhibits were flawed their inTroduction constituted plain error and was highly prejudicial to Lumiere in violation of Lumiere's 5th amendment right to due process. The government's late submission of these exhibits a day before Trial did not aid in defense counsel's review as he was unprepared and had not even begun to write opening statements until the evening before Trial giving him no time to review. However, Creizman should not have stipulated to these exhibits that

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

were flawed and that he did not check.  A competent counsel would have requested these exhibits which proved to be one of the top three most prejudicial issues of the Trial well in advance of Trial given that they were tied to thousands of reference spreadsheets that Creizman never checked.  A competent counsel would have expected prejudicial and erroneous exhibits and pushed the government to produce them way in advance.  The government misstated that Jindra had only begun working with the government 2 weeks prior to Trial, however this was not a True statement.  The files that provided the reference cells that Jindra had worked off of were dated from 2015 over a year before Trial.  So therefore, perhaps Jindra was working on this study for the SEC which is also a government agency therefore the statement would have been perjury.  A competent counsel would have questioned Jindra on these issues, and would have recognized that the reference pages that ATI Markit price had in exhibit did not exist, that 2 Trades from other parties on the CMED Trade from 3/23/12 were excluded, and that ATI and CMED prices were for different securities than the ones that Visium held.  Creizman's incompetence led to a violation of Lumiere's 6th amendment right to effective counsel.


CMED Trade exhibit, Jindra left out Trades in C-Med bonds at over 40 by Hapolim and by hedge fund Grammercy at above 40. He notes this in footnote the exhibit where he states: Excludes Trades.  Why did he choose to exclude these Trades?  Did the government ask him to?  Everything else he did excluded any level of investigation or research but yet he chooses to remove other Trades to prejudice defendant.  Perhaps it was because Jindra worked for the SEC who had a parallel  complaint and therefore was biased and choose to display a biased exhibit.  Jindra and the Government additionally leave out the fact that the Trade occurred on a Friday and the following Monday many brokers and dealers were quoting CMED above 40.  He also failed to demonstrate and investigate that CMED stock was up over 90% (Check % Increase)>>>> over the prior 2 weeks and that rumors circulating about AER's increasing stake in C-Med common stock speculating that they could be working with management in a buyout.  AER had acquired at 42% stake in the stock in a short period.  If this had happened, the bonds would have gone to 101in price based on a change of control in the bonds.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

SL00208 [II.B4 Pt2] Perj Vandersnow Prices

On Direct:

146

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Q. Generally speaking, did you have an understanding, based on the work that you did at Princeridge, whether the prices you were providing were accurate?

A. I had no understanding. I just sent back what he told me.

Q. When you say "he," who do you mean?

A. I'm sorry , I just sent back what Stefan told me. PP490 Ln24-25 to 491 Ln1-4

Q. What was your understanding of what Stefan Lumiere was doing with the prices that you were providing him?

A. He was using them to help prices--price the securities in his portfolio. Tr P 491 ln9-11)

Q. So were you personally familiar with BIOS 10.25 at the very top?

A. No, I was not. TR P 492 ln13-15

Q. What about USON Escrow? Do you know what kind of company that is?

A. I don't.  I don't know what it is TR P 492 Ln16-18

Q. Let's look at CMED Directing Class.  Do you know what that is?

A. I don't Tr P 492 ln19-21

Q. Let's go down, SVNT 3, do you know what that is?....

  Mr. Creizman: Objection: Cumulative

  The court: Excuse me?

   Mr. Creizman: Cumulative

The Court: Sustained.  I think he already indicated, unless I misunderstood, that he only had familiarity with two, yes?

Mr. Williams: Your Honor, I had asked whether they Traded any of them.  I have been asking what kind of companies these are.

The Court: I see.

Did you have any familiarity with these other than the two you mentioned before?

The Witness: I did not

The Court:  Okay Tr P 492 ln22-25 to 493 ln1-11

Q. And between 8:08 and 8:23 pm. did you do any research on any of these prices before you gave it back to him?

A. I did not. TR P 494 ln9-11

Q. Mr. Vandersnow, what is Government Exhibit 718?

A. It is a Bloomberg from Stefan to myself with a list of securities on it

Q. And this was sent at 2.03pm.

Q. And the two Transcripts that are in front of you that are marked Government Exhibits 1209T and 1227T, have you seen those before?

A. I have.

Q. And are those Transcripts fair and accurate representations of the conversations that are on the government exhibit that is the CD?

A. They are

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Mr. Williams: Your Honor, we offer Government Exhibits 1209T and 1227T as aid to the jury.

The Court: Any objection?

Mr. Creizman: No, no objection.

Government Exhibit 658 page 44

Tab 1227T

Exhibit 658 P38

Q. Mr. Vandersnow, can you please read what Mr. Lumiere's signature block says?

....

A. Stefan Lumiere CFA, PM:distressedand special situations. Visium Asset Management.

Q. That's enough. So is that consistent with your understanding of his title and role at Visium?

A. It is? TR P 500 ln1-13)

Q. Did you ever tell Stefan Lumiere that you disagreed with his price?

A. I did not ( P 501 ln9-11)

Q. Now, over the years in which you were engaged in this scheme, do you recall ever refusing to give Stefan a price that he asked for?

A. I don't recall.

Q. Now Mr. Vandersnow, do you recall ever speaking to Stefan Lumiere about any of the models that he may have worked on these securities

A. I do not.

149

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Q. Do you recall ever speaking with Stefan Lumiere about any research that he personally had done backing up the price that he was telling you to provide him?

A. I do not.

Q. Do you recall ever having a conversation with Stefan Lumiere in which he ever discussed why he believed a security was worth a certain amount of money?

A. I do not. (Tr P 502 ln6-21)


Q. What was the purpose of this exchange from Ernst & Young, as far as you recall?

A. It was in response to a question that he asked.

Q. Which was what, if we can zoom out?

Q. Are these prices listed in the attachment based on indicative prices or Trade prices? Tr p 505 Ln19-24


Q. How did that thumb drive arrive?

A. I found it in a UPS, or some sort of envelope, on my desk when I came in to the office in the morning. TR P 506 ln19-21


Q. What did you understand that Stefan Lumiere wanted you to do with those prices that he provided you on that thumb drive?

A. My understanding was he wanted me to send them back to him.

Q. For what purpose?

A. To use to price the securities in his portfolio. Tr p 507 ln16-20


Q. Who became your primary contact after Stefan Lumiere was no longer your primary contact?

A. Jason Thorell and Chris Plaford

Petitioner Stefan Lumiere v. United States of America                Case No. 18-CV-9170

Q. Did Chris Plaford contact you at all about month-end valuations?

A. He did

Q. What would happen with him at month-end for valuations?

A. It was the same process, where he would call and give me securities and their prices, and I would send them back to them.

Q. What, if any, research or due diligence would you perform before giving Chris Plaford the prices he requested?

Zero. (Tr P 508 ln3-15)


On Cross:

Q. Now, fair to say that Stefan Lumiere never told you to lie about--provide a false quote, never said I need you to provide a false quote or else, right?

A. I don't believe I was ever threatened by Stefan

Q. Fair enough.  And you never said to him, I refuse to provide this quote to you, correct?

Correct.

Q. You never told Mr. Lumiere you had any disagreement with the price at which he believed the security to be, correct?

A. Correct.

Q. Or that he represented Chris Plaford to see the security where it was?

A. I'm sorry?

Q. Chris Plaford.

A. Can you repeat?

Q. I believe we heard a call--

        The Court: No, he doesn't understand the question.

Petitioner Stefan Lumiere v. United States of America                 Case No. 18-CV-9170

A. I don't understand the question. Thank you.

Q. Oh, I'm sorry.  Do you recall there was a recorded conversation between you and Mr. Lumiere?

The Court: I think the question was, you never expressed any disagreement with the prices that were suggested from                 Mr. Lumiere, regardless of whom he said the price was coming from.  Is that the question?

Mr. Creizman: Yes.

Q. That's right.

Q. You never told Mr. Lumiere that you did no research on the quotes he asked you to provide?

A. I never told him that.

Q. Okay. You did socialize on occasion?

A. We did

Q. And you socialized with Mr. Jason Thorell??

A. I did.

Q. Mr. Lumiere never pressured you to say--never pressured you, in terms of coming back with the quote that he wanted,    correct?

A. I do not recall ever being pressured.

Q. And you don't--STrike that

Mr. Creizman: No Further questions. Thank you. (Tr P 511 ln23-25 to P 512 ln)


SL00209 [II.B] Perj Wit Plaford and Vandersnow


Does it make sense that Lumiere told Brook from Janney Montgomery about the various situations and situations to aid in their evaluation of the levels but did not tell Princeridge.  Or is it likely, Lumiere did as he was instructed, but Vandersnow agrees to mislead by a clever question by the prosecutor to feign lack of actual knowledge by stating in reference to instances that occurred 4 years prior to Trial: " Do

Petitioner Stefan Lumiere v. United States of America                     Case No. 18-CV-9170

you recall if Lumiere ever discussed his models or how he came up with valuations and prices?"
Vandernsnow: No. Now the response is asking the question whether he recalls and not a factual answer
that states that he knows he did not. This misleading questioning and misleading answer helps to
formulate the perception that Lumiere did not discuss the situations of ATI, CMED, Nebraska Book,
USON Escrow with Vandersnow when in fact the evidence supports that he did. The evidence of this is
in the recording where the discussion with Plaford is to educate the brokers if they can be Trusted not to
tell everyone else about it as it was private. The evidence of this is in the 3500 material of Brook,
another broker that assisted with checking levels and sending "Indications, levels to Visium". The
prosecutor and Vandersnow continue with this charade until they find a phone call that follows several
emails back from Vandersnow. Vandersnow, already dismissed as a witness by then, with defense
counsel, unprepared to ask any pertinent questions, is not able to respond to the questions that should
have been asked about the dynamic, the relationship with Visium, how much business Princeridge did
with Visium and about this date where the prosecutor and FBI agent allege that the return quotes came
to Visium instantaneously and it would be impossible to check and send back quotes in good faith.

However, the answer is simple. The quotes came back hours later. There was a phone call to
Vandersnow several hours prior where Lumiere recites the list of securities that Plaford has instructed
him to request quotes on and Visium's indications according to procedure authorized by Visium. The
quotes came back while on a phone call and with enough time to be checked by Vandersnow and not
instantaneously as alleged. Lumiere's conversation with Vandersnow on the second phone call was not
about the quotes and Lumiere subsequently mentioned to Vandersnow that he did not need to send
them back one at a time, that he could include them all on a single email.

Additionally, Vandersnow was never asked, Plaford was never asked by either the Prosecutor or defense
counsel, when the first request for quotes came in and what was the request. In 2011, Plaford had
asked Lumiere for a quote on a specific security so he called Jefferies bond salesman if he could get the
quote on a specific security. Jefferies bond salesman had said yes and then forgot to send it. Lumiere
again asked Jefferies who again forgot to send. Lumiere recognized that bond salesmen are disTracted
and are paid by their firms to Transact and work orders and not to send quotes. This was discussed in
the FBI Thorell tape yet apparently Thorell choose a more sinister explanation to support the
government's theory than the simple Truth. Plaford then addresses Lumiere and states that he needs to
get additional quotes on a more regular basis. Lumiere suggests that Plaford call Bank of America or
Imperial Capital Pricing department who had performed this service for funds at his prior job at

Petitioner Stefan Lumiere v. United States of America                Case No. 18-CV-9170

Brencourt but told Plaford it could take several days to get.  Plaford stated that he could not wait that
long that Jake Gottlieb and Ku stated that they need them on the last day of month.  Lumiere asked
what for?  And Plaford stated that it was just for internal purposes and that Gottlieb just wanted an
exTra set.  Lumiere explained the difficulty in this and then Plaford left to speak with Gottlieb in
Gottlieb's office.  Plaford came back to Lumiere later in the day and said what if we gave the broker an
indication where Visium thought they were.  That might make the job easier for them and make them
more willing to assist.  Lumiere never having been asked this before asked if this procedure was
authorized.  Plaford stated: "Jake and Ku said there was nothing wrong with letting a broker know where
Visium thought they were.  We are not telling them what to come back with.  They can come back with
anything they want."  Lumiere then stated why doesn't operations do this.  It seems that this would be
their job.  Plaford interrupted by stating: "Jake said this is your job.  Besides, I am not going to Trust
operations to do it as they don't know where bond levels are and which ones are stale and who is most
involved."  Plaford then said:"  Call Princeridge and ask them if they would help.  Lumiere accepting
Plaford's explanation dialed Princeridge at Plaford's insTruction and asked Vandersnow if he would be
able to help out with getting monthly quotes.  Vandersnow stated: " No Problem".  Plaford then
interjected by stating: " we are going to send you a list of securities we would like levels for and we can
even tell you where we think they are if that helps.  It's just for internal purposes and not for auditing by
the way."  Vandersnow again responded: " Sure".  This is a far cry from the prosecutors' allegations of
Lumiere corrupting brokers, asking brokers to spit back prices that were fraudulent.  The Truth is more
realistic than the canned lies of prosecutors desperate for a win by any means necessary.  Vandernsnow
and Thorell and the prosecutor lied about his relationship with Princeridge.  Lumiere had only met
Vandersnow once in his life at a meet andgreet with Vandersnow's team of salesmen and Traders at a
restaurant bar in Manhattan.  Lumiere had never seen him after that.  Lumiere never attended benefits,
sTrip clubs, bars or Vandersnow's private home.  Lumiere knew nothing about Vandersnow except that
Vandersnow told him that he worked at UBS as a portfolio manager in bonds and that Princeridge was
setting up a large asset management division.  It was Thorell who had an active relationship with
Vandersnow and socialized with Vandersnow, not Lumiere.  Defense counsel knew about this, but failed
to cross examine him on this alleged friendly relationship.  Why was it important for the government to
lie about Lumiere's relationship with Vandersnow, but to bring in a character denigration of corrupting
friendly brokers.  Vandersnow and Thorell were perjurers of this lie.  Lumiere had asked Creizman to
subpoena phone records, phone recorded conversations from Princeridge and receipts that Vandersnow

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170

submitted to prove that he had no relationship with Vandersnow, but defense counsel made statements such as Princeridge said that calls are not recorded and dismissed the receipt request.

SL00300 [III.A] Perj Summary Argument

## III. MISCONDUCT FALSELY INFLAMING PASSIONS OF THE JURY WITH GENERAL DEFAMATION OF PETITIONER

III.A. DEFENSE COUNSEL ALLOWED MISCONDUCT BY GOVERNMENT WHO DEFAMED LUMIERE THROUGHOUT TRIAL PREJUDICIAL STATEMENTS, LEADING QUESTIONS PROMPTING COOPERATING WITNESSES TO COMMIT PERJURY TO ASSIST WITH THEIR CASE.

Defense counsels lack of attention and failure to object throughout Trial led the government to take advantage of a specifically weak attorney who was disorganized, ill-prepared, and could not think on his feet and as a consequence objected very seldom and when he did it was late prompting Court to state that he had waived the leading and prejudicial objections due to his failure to object to the same statements made earlier. Prosecutorial misconduct was flagrant throughout pre-Trial and Trial denying the defendant of his due process rights under the 5th Amendment to a fair and unbiased Trial with a constitutional right to a presumption of innocence. The prosecutor was relentless in the abuses which went largely unchallenged as a result of defense counsel Creizman's lack of Trial experience and gross ineffectiveness and gross negligence. "The United States Attorney...Innocence suffer." Berger v. United States, 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed 1314 (1935). The prosecutor's duty in a criminal prosecution is to seek justice. Therefore, the prosecutor should prosecute with earnestness and vigor," but may not use improper methods calculated to produce a wrongful conviction." Prosecutorial misconduct justifies declaring a mist18) rial where it "so infect[s] the Trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) quoting Donnelly v. DeChristofolo, 416 U.S. 637, 543 (1947). A claim of prosecutorial misconduct requires proof of improper conduct by the prosecutor that, taken in the context of the Trial as a whole, violated the defendant's due process rights, U.S. v. Whitten, 610 F. 3d 168, 202-03 (2d Cir. 2010) (Court considered whether prosecutor's remarks improper and whether remarks affected the outcome or fairness of Trial.)

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170

Courts review de novo whether a challenged statement by a prosecutor is improper.  A prosecutor may not express personal opinions about the defendant's guilt or credibility, and must avoid potentially unfair or improper remarks about the defendant  (U.S. v. Farmer, 583 F. 3d 131, 146-47 (2d Cir. 2009). Nor may the prosecutor express opinions about matters requiring personal experience or expert knowledge.  The prosecutor may not appeal to jurors to act as a conscience for the community or make remarks likely to inflame the passions of the jurors if the remarks are intended to lead to conviction for an improper reason ( U.S. v. Elias, 285 F. 3d 183, 190-2 (2d Cir 2002)

SL00300.5 [III.A] Misconduct Rebuttal

In rebuttal summation, the prosecutor made material misstatements of facts in evidence, material misstatements of facts not in evidence purposely not placed into evidence and claiming that they did not exist and used highly prejudicial, inflammatory language alleging conduct that Lumiere did not do by taking a joke that Lumiere had made and alleged evil and sinister character and intentions doing so to inflame the passions of the jury.

Law:" Prosecutors may not properly use arguments calculated to inflame the passions or prejudices of a jury.  It is inappropriate for prosecutors to vouch for their witnesses Truthfulness by expressing their personal belief or opinion as to the Truth of the testimony...An appellate court will reverse on this ground only if there was misconduct that caused the defendant substantial prejudice by so infecting a Trial with unfairness as to make the resulting conviction a denial of due process."..."intentional misrepresentation of the facts where the basis of the misrepresentations is unknown to the court or defense, may constitute plain error."

In rebuttal summation, the prosecution incorrectly and with purpose prejudicially mis-phrased the words to twist the meaning and tone of a recorded statement made by Lumiere that had it been properly corrected by defense counsel, would have obviously have been deemed a one off joke of a statement.  But instead, with the error of Creizman's lack of response and review, and then further exacerbated by allowing the erroneous Transcript into the courtroom and jury room, the commentary

made by government in summation went from a joke to a sinister plot instantaneously, enraging the passions

of the jury and making Lumiere seem like an evil extortionist while all evidence, supports that the opposite is True.  If listened to in the context of the prior and ensuing statements analyzing not only the words but the tone without the prejudice of erroneous and mis-worded text, the statement was clearly meant as a joking quantifier of what Thorell alleged to possess which was incriminating recordings of Gottlieb, Ku and Keily.  These recordings as Thorell had described, had Gottlieb giving Thorell orders to sell bonds where the firm was restricted.  They also allegedly contained recordings of Thorell telling Gottlieb that he believed that the Credit Fund was grossly and egregiously misvalued by Plaford and Gottlieb denying it.  Additionally, Thorell had stated that he spoke to Ku and Keily and they denied that there was anything wrong with the values and that the firm did not use valuation to value the price of positions which was a complete contradiction to what Plaford had told Lumiere.  Yet however, Thorell had told Lumiere that he would not let Lumiere hear the recording until he was ready.  So clearly, the statement was not serious but meant to puff Thorell into showing what he had in the context of doing a whistleblower suit against Visium and absolutely not to attempt in any way to extort them.  This allegation contradicts every statement that Lumiere had made to Thorell and to Rahul another employee that indicated that he wanted to use the information to leverage Visium into dropping a lawsuit.  Clearly the corrected wording means nothing like what the prosecution portrayed in the most sinister and evil of tones which clearly infuriated the jury.  It is quite obvious the prosecution knew that they still had a problem with motive to convince the jury since Lumiere made no bonuses for work done in the Credit Fund, they knew that he made twice as much to 4 times more in prior jobs which was however never introduced into evidence by either defense attorney or acknowledged or revealed by prosecutors.  So the prosecution fabricated the finishing touch to their storyline, one than defied logic, but was surrounded by concepts that a jury could understand.  Greed.  So the prosecution came out with an allegation that Lumiere had a motive all along.  His long term goal was to extort Visium.  Yet this again defies any logic.  How would what the government alleged make any sense whatsoever? Lumiere, who prosecution claimed to be the mastermind of the plot to inflate the value of a sub-portfolio within the Credit Fund, that inflated the portfolio unbeknownst to Plaford the Portfolio Manager of the Credit Fund and hiding it from accounting, Administrators, auditors, prime brokers, investors so that he could make an enormous base salary and avoid being fired so that in the end, the could use his plan to extort money from Visium. This is a tough and incredulous pill to swallow by any stretch of any imagination. However, there are so many twists and turns in this storyline that make no sense:

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

1) There was no sub-portfolio in Visium Credit Fund

2) There was no Special Situations/Distressed book or portfolio in Visium Credit Fund

3) Lumiere did not receive a single dollar of bonus from the Credit Fund in the years that the alleged misvaluation occurred

4) Lumiere was preparing to leave Visium for some time and was in the midst of setting up a hedge fund for which he had an indication of funding so he was not desperate to stay at Visium as alleged

5) Lumiere asked to be let go and initiated his own departure and was not fired as alleged, which was a resignation while requesting to retain his deferred compensation

6) Lumiere was not friends with 2 of the 3 brokers that Visium used to receive quotes and had only met Vandersnow 1x and never met Calhan

7) Lumiere never had access to Visium Credit prices and P&L and was denied access to these

8) Lumiere never had access to Administrators to discuss the overrides which Plaford admitted that Lumiere was not part of the override process

9) Lumiere had no interaction with investors to represent the positions, the NAV or the liquidity of the fund

10) Lumiere had no interaction with the valuation committee, executive committee, or the prime brokers or auditors to discuss the valuations or pricing.


With evidence to support all of this, it is absolutely clear that the entire case against Lumiere was a fabrication.  Why would the prosecution fabricate a case against Lumiere.   The answer is simple.  Prosecutors wanted Lumiere to cooperate against Gottlieb and Ku and believed that he or his sister would have access to information they could use to indict Gottlieb and Ku.  Lumiere was told by prior counsel that they saw Lumiere as a subject not target, but they needed him to cooperate.  And that if he did not tell the version of the story that they wanted, they would build a case against him.  Government on their finishing touches decided to run with the most obscene thing they could.  Claim that Lumiere was an extortionist based on a single line which was most obviously a joke that ran contrary to all other evidence.  How did they do this?  The prosecution devised a plan to change the wording of the Transcript to make it more believable.  Defense

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170

counsel never bothered to check the accuracy of the Transcripts so failed to recognize the corrections.

Prosecution claimed that Lumiere's statement was: "***Well, first*** we ***can*** extort them.  I would love to be able to go ***get*** them and say: " Chris, Jake, give is $100 million between the both of you." But prosecution did not think that was strong enough so they rephrased it again in summation stating that the statement was : " ***First***, we ***must*** extort them."  An actual corrected Transcript however reads: (with a joking tone) " Well ***of course we can't*** extort them.  I would love to be able to go ***to*** them and say: Chris, Jake, give us $100 Million between the both of you." (followed by a mild snicker by Thorell)

Both the tone and the corrected version even grammatically shows absolutely zero intent of following through with the statement, and the fact that there was zero reference to it again, throughout proves that it was nothing more than a lighthearted joke.  There is no follow up.  Not a one.  Also in light of prior comments of Lumiere warning Thorell and other ex-employee not to Try to use any leverage on Visium with this information, clearly shows that it is nothing but a joke.  This would be equivalent to a person that was angered by being cut off by another car, stating that :"I would love to punch that guy out"  There is no real action or intent, just an expression of emotion.  The fact that the prosecutor used this outlandish accusation that was most obviously a joke, change the wording and state the seriousness and how sinister and evil it is on rebuttal with no possibility to counter by defense who should have addressed it when it was first brought up by prosecution on direct examination of Thorell, however, defense counsel failed at most things.  The fact that the prosecution actually went through the effort of misstating it as well, shows prosecutorial misconduct was intentional.  This had an extremely prejudicial impact on the defendant and followed an entire Trial of misleading, prejudicial and perjured and inflammatory statements and questioning by prosecution and denied defendant of his due process rights.

The following is a summary of Perjured testimony from government witnesses:

1. Thorell, immunized witness and whistleblower action claimant perjured himself to "make money" from the SEC action which would have a higher potential payout with Lumiere's conviction as the concept of collateral estoppel prevented Lumiere from litigating the false allegations that the government made again in the SEC civil suit.  The following is a list of Thorell's perjured statements:

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

a) Lumiere was a portfolio manager in the Credit Fund:

b) Lumiere was responsible for betwee3nb $50 to $75 Million in the Credit funds

c) Lumiere was No. 2 in the Credit Fund

d) Lumiere was Thorell's boss

e) Lumiere and Plaford were the only ones in the credit fund that had Trading and investment discretion in the Credit Fund

f) Lumiere had told Thorell to get quotes and to tell them what we wanted back and to do this over the cell phone

g) Lumiere had some influence over Lumiere's bonus

h) Lumiere had his own office and did not sit with the other analysts and Traders

i) Reuters is the de facto benchmark

j) Lumiere told Thorell to give Princeridge and Janney Montgomery as many orders as possible to compensate them for giving Lumiere the quotes he wanted

2. Plaford cooperating witness perjured himself in order to reduce his exposure to his own errors and conduct which included multiple serious offense of insider Trading from information acquired from FDA Officials while he was at Visium and with the operation of his subsequent company, Claravant, which had former FDA members on the board of directors which Lumiere believes was a hotbed of insider information fed to hedge funds. As a result, Plaford would have begged to cooperate and frame Lumiere agreed to lie for the government by assigning blame to Lumiere for his own actions to avoid an further investigation into his illegal conduct at Claravant and other non-disclosed instances of insider Trading while at Visium. Additionally, Plaford's firm, Claravant, which defense counsel waited until the last minute to subpoena information from, it was uncovered likely also had a relationship with Visium and Jacob Gottlieb among others, where Gottlieb's closest friend, Brad Hoffman, also simultaneously worked with Claravant as well as an investment banker for... Plaford had a significant incentive to frame Lumiere and to leave Gottlieb and Claravant out of any investigation.

a) Lumiere was a portfolio manager of the Credit Fund

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170

b) The fraud "Started with Lumiere" and that Lumiere was the mastermind of the fraud but he just noticed it later and when Lumiere left, continued it.

c) Lumiere "helped create the values" and "helping create valuation" (TR P 633 ln2-3 to 15-16)

d) Stating that Lumiere and the rest of the analysts were allowed to place their own Trade ideas into the Credit Fund without permission from him in a limited amount.

e) Stated that Lumiere was responsible for between $50 million to $100 Million of the Credit Funds' investments which varies over time.


3. Vandersnow had been given non-prosecution status in return for his perjured testimony.  During the Trial, he perjured himself repeatedly and made material misstatements in order to aid the prosecution and in so doing made material misstatements of fact that prejudiced Lumiere greatly:

a) Vandersnow stated that he formed Princeridge with some former colleagues from UBS

b) Stated that Princeridge was a small startup with only 15 customers

c) Stated that Princeridge did not Trade healthcare names and only focused on Retail and Consumer bonds

d) Stated that Princeridge did not Trade loans

e) Stated that Princeridge did not have access to Reuters because they could not afford it.

f) Stated that quotes, indications, levels and markets are all the same

g) Stated that he "did not recall" discussing any of Lumiere's analysis, models, research on the names that he was being asked to quote.

h) Did not know what the companies that he was asked to quote did

i) Stated that he knew the quotes Lumiere was requesting were being used to mark Lumiere's portfolio

j) Stated that Lumiere was a Portfolio Manager of the Credit Fund

j) Vandersnow cold called Lumiere as his introduction to the firm

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

  k) Stated that he socialized with Lumiere at bars, benefits and strip clubs


4. Jindra was an economist that works for the SEC who had a definite bias in the Trial as a "Win/Conviction of Lumiere in the Criminal Trial" would solidify a win for the SEC in the civil Trial due to Collateral Estoppel which prevents Lumiere from litigating any false allegations made in the criminal Trial again in the civil Trial.  In addition the government misled defense counsel by insisting that they would not bring on any experts as witnesses and attempted to dissuade defense counsel from bringing on an expert of their own.  However the government snuck Jindra into this position, who to the jury seemed like an expert in finance although he had no experience in distressed securities, did not know how pricing services come up with prices and did not know that pricing services were not exchanges. Not only was Jindra extremely biased, but his exhibits were flawed, failed any level of required analysis, overstated issues and provided false and purposely misleading data.  The partial and incomplete analysis fell below any reasonable standard to the point where the analysis was not unbiased but derived to extracta desired result to aid in case.  Here is a list of perjured statements by Jindra:

  a) stated that Lumiere was responsible for every security that he was asked about simply because Lumiere was one of the recipients of the email. The government took advantage of this situation by using repetition and cumulative and erroneous facts to plant a false statement into the Court's mind.

  b) Stated that the pricing service estimate of ATI and CMED which were undergoing complex restructurings reflected the "Market Value" however did not independent analysis of the reason for the variance between pricing service and Visium values.

  c) Stated that on measurement date of 3/23/12, the market price of CMED was 30, however there were no publicized markets in the bonds on this date.

  d) In chart exhibit, excluded to Trades in the 40's that occurred on the same date from another dealer and another hedge fund.

  e) Double counted the quotes as opposed to identifying the number of overrides resulting in an exaggeration of number of total overrides.  Additionally, these overrides were mostly on the same securities therefore the monthly breakdown exaggerates the instances of overrides.

  f) Did not measure the variance of Visium's prices relative to pricing services and other independent brokers to demonstrate a True measure within a reasonable standard of error of Visium's estimates.

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170

5) Prosecution states that Lumiere never made any effort to report issues until the FBI raided his apartment. This was a knowingly false statement. Prosecution was well aware that it was Lumiere that was the first to announce there may be a problem at Visium and then took steps to report.


This statement was a complete misstatement meant to prejudice Lumiere and as a result was a violation of his 5th Amendment rights to due process as reporting the steps that Lumiere did take would have shown the good faith that Lumiere had which the prosecution wanted desperately to block. Defense counsel failed to argue the points to the Judge failing Lumiere which was also a violation of his 6th amendment rights to effective assistance of counsel. Had the good faith argument and Truth come in, the jury and the Court would have further questioned Thorell's bias and motives and perjury.


Lumiere first reported the issues to a colleague at Visium just prior to his departure where he indicated that he would just leak it to the SEC. The government conveniently left out this fact during Trial. Then Lumiere reported the issue to another colleague that had wanted to use this information to help him to influence Visium to drop a lawsuit against him. Lumiere advised against this as it would be viewed as extortion, and advised that he simply report it SEC if there is something wrong as that would be the appropriate party. Lumiere then warned Thorell that something might be off with Plaford and that Lumiere did not believe or Trust Plaford, and that Thorell should leave the firm because of the risk that Plaford attempt to scapegoat him and set him up as a fall guy. Lumiere then spoke to Park & Jensen attorney Robert Knuts who was a former SEC attorney and gave him all the information that he knew and asked Knuts to evaluate the issues and to give to the SEC if there was something Truly wrong. Lumiere was not familiar with the whistleblower program at this point and was not looking to make money off of the situation. Lumiere simply wanted to make sure investors were Treated properly. After being advised by Knuts to "let sleeping dogs lie", Lumiere continued with Knuts to ask him to further evaluate the material. Then when Lumiere received more confirmation of Visium's alleged mishandling of valuation based on Thorell's communicated allegations of Ku and Gottlieb denials in July of 2013, Lumiere instructed Knuts to contact the SEC as if there was something happening at Visium, that would be the time to investigate as Thorell told Lumiere he had addressed concerns to Ku and Gottlieb who did not seem to acknowledge anything was wrong. Lumiere made every necessary attempt to report the

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

issue, but Knuts failed to address the concern and act in Lumiere's interest which Lumiere took to mean there was not enough substance to the allegation and more information was needed which prompted Lumiere to work with Thorell on possibly whistleblowing responsibly once all the facts are straight which is why Lumiere wanted to have Thorell's attorney meet with Knuts to discuss the issues so there was some confirmation.  Prosecutors misstatement in light of all of Lumiere's steps is a simple lie meant to deceive the court into believing that Lumiere had no "Good Faith".


6) Prosecution claimed that Lumiere had compliance issues at Visium by not honoring the expense agreement, did not report Trading with his brother, did not provide his outside Trading accounts, and did not report Trading with his brother and that they were preferential Trades.  These allegations lacked substance, investigation and were completely and entirely false.


Stating these issues in open court and to the judge was highly prejudicial to Lumiere during Trial both because the jury heard the statement and the yes answer from witness David Keily, while the issues were explained and fabricated only after Lumiere left Visium for the purpose of threatening Lumiere. This question should have never been allowed in and prosecutors should not have inflated the meaning of it at sidebar to influence and prejudice the Judge against Lumiere.

This was misconduct and plain error and resulted in unfounded prejudice to Lumiere that resulted in a violation of his due process rights under the 5th amendment and his 6th amendment rights to effective assistance of counsel for failing to object in a timely manner, failing to clarify the issues to the Judge that he was made aware of and counter the prosecutor's arguments.


Lumiere never received a compliance letter or notice from Visium and the only allegation that ever surfaced was never reported to Lumiere yet Lumiere uncovered in discovery that was a letter that was never received by Lumiere from Visium counsel after he had left Visium and was still awaiting a settlement offer.  The letter was written only after Lumiere accused Jacob Gottlieb of slandering him to a large family office and sent Gottlieb a cease and desist order and was completely fabricated for the purpose of threatening Lumiere to take no further action against Gottlieb.  The expense allegation was a simple misunderstanding that was immediately clarified to compliance after Lumiere submitted

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

expenses for a business Trip. There were 2 hotels that were booked for the same day. Lumiere had not known that the hotel that he had booked was under renovation and there was construction noise throughout the day, so he left the hotel to go to another hotel. He requested a refund from the management company but Lumiere was not reimbursed for 1 of the 3 or 4 nights. Compliance was completely fine with this explanation and the firm agreed to cover the expense. Visium had a system called Elf, for inputting account information for outside brokerage and bank accounts. There were times where there would be glitch and the automatic sending of broker to statements would need to be reinput which Lumiere did every time he was notified of the issue. This was a firm wide issue. As for not reporting that Lumiere's brother worked at a brokerage firm as head of sales for the merger arbitrage desk that the firm did business with. This was never concealed, Jacob Gottlieb and the Head Trader were well aware of this and all reports were made. There was a rating sheet that was firm wide where each investment personnel ranked in terms of percentage of 100 how valued added each brokerage firm was. Lumiere made an election based on these and all equity Trades were then allocated and handled by the Visium Trading desk. Lumiere did additionally give some bond orders to his brother's brokerage firm to compensate for the value his firm contributed. Lumiere was told at one point that all equity order must go through the Visium Trading desk who would then allocate the Trades to brokers based on the value-added election form. Lumiere's brothers account was never shut down by the firm and Lumiere does not recall any compliance form that identified specifically to report any family members that were employees of another brokerage firm. Lumiere thinks this applied to situations where there was a family member that was a principal or major shareholder of the brokerage firm, but this was not the case with Lumiere's brother.


7) Confusion over terms "pricing the securities" and "discussing valuation and fundamentals" in court. Plaford used the lack of financial sophistication of defense counsel and of the jury to conflate the terms to attempt to make Lumiere look like he was a participant in the conspiracy or responsible for pricing which is completely false, misleading and perjury.


This case was a complex financial matter, and the conflation of these two distinct concepts blurred the facts. This is one of the reasons why Creizman should have hired another attorney with expertise in securities as Lumiere had insisted he do but failed to do. The concepts sound the same to the layperson,

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

but they have completely different meanings and the inference by the government, the jury and the court, was 100% incorrect, and defense attorney failed to clarify and make a point of this.  As a result Lumiere's 5th amendment rights to due process and 6th amendment rights to effective assistance of counsel were violated.

The discussion that occurs when an analyst describes the fundamentals of a company he is asked to follow and the analyst's valuation or opinion on valuation is typical of any investment firm.  That is the role of the analyst to attempt to value a business or security and lay out the risks and opportunity as well as discuss the recent news, fundamentals, etc.  These meetings were what Plaford was referring to when he stated that we went over the company values.  There was never a single meeting where Plaford and Lumiere discussed Visium's pricing of the Credit Funds positions.  The meeting that Lumiere participated in was describing the fundamentals of the company and his view of the expected value and any other new information that was learned.  Lumiere had zero involvement in the decision on pricing or NAV or representation of liquidity to investors.  The allegation was completely false and Plaford's testimony conflating the concepts is plain perjury meant to help the government with their case and avoid responsibility.

8) Government asked what a portfolio manager that covers a company does?  This was a plain error and did not make sense, yet Thorell who was biased, did not move to correct the error, but responded describing an analyst's responsibilities and not that of a portfolio manager.

The purpose of this question was clearly to allege that Lumiere was the portfolio manager and that the responsibilities he had were those of a portfolio manager, but then Thorell described the role of an analyst thereby confusing the job functions to the Court and the jury.  As a result, of this confusion, the Court and jury were misinformed and led them to decide that Lumiere was a portfolio manager and that he covered the securities.  These were both false.  First of all, the evidence shows that Lumiere was not a portfolio manager of the Credit Funds.  Secondly, a portfolio manager does not cover a position.  A portfolio manager is responsible for investment decisions that are based on his own views using all the information available to him including his own readings, his analysts, the analysts and salesmen from other brokerage firms' views, etc.  The analyst at a hedge fund has no more responsibility to pricing or

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

NAV selection than the analyst of an outside brokerage firm.  Thirdly, a buy-side analyst does not cover a security.  Covering a security is a term used on the sell-side for sell-side analysts that cover a bond or stock, such as the Goldman Sachs analyst covers Google assigning price targets and following earnings and new developments. On the buy-side, the analyst may be assigned by the portfolio manager to follow a sector or to follow or a situation.  An analyst may also be brought on to help work-out a situation such as a company going into bankruptcy that will need more hands-on attention and organization.  This latter was Lumiere's role in the Credit Funds for the years in question.

9) Prosecutor called a witness from FINRA claiming that Lumiere was a member of FINRA and therefore regulated by FINRA and subject to their broker rules even though Lumiere was not a broker and not a member of FINRA therefore not subject to any of their rules.

FINRA regulates brokers and dealers and does not regulate hedge funds or their employees. To bring on a FINRA employee and claim that Lumiere was a FINRA member was purely false and an error and acted to prejudice Lumiere's Trial.  This error was a violation of Lumiere's 5th Amendment rights to due process and to his 6th amendment rights to effective counsel who failed to recognize the error and remove the witness based on irrelevancy.

FINRA regulated brokers and dealers and Lumiere had not worked for a broker dealer since 2006 when he served as an analyst not a broker at Nomura Securities International.  Lumiere while at Visium did not ever act as a broker and therefore the claim that Lumiere violated FINRA rules that do not pertain to Lumiere was simply prejudicial and irrelevant.  Vandernsnow was subject to FINRA rules and should have acted according to his area of responsibility.  Vandersnow should have checked the quotes that he now at Trial states that he did not do.  But he also admits that he never told Lumiere that he did not check them.  So to hold Lumiere liable for a rule that does not apply to him and allege that he violated such rules is a plain error.

10) Prosecutor called witness from CFA institute to allege that those that pass the program and awarded charter would be Trained in regulatory matters, pricing rules, hedge fund organization which is false.

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170

The program is purely analytical such as a math class would be.  The fixed income section revolves around valuing securities using yield, duration, convexity and figuring out price movements per change in basis point of yield. It has nothing to do with pricing services or the use of pricing services which is solely parsed from brokers and sometimes stale or erroneous.  The calling of said witness was completely irrelevant, prejudicial and flawed.  Additionally, the witness's allegation that the financial crisis of 2008 was due to issues that defendant was accused of was so highly prejudicial that the Judge had to stop the testimony while both the prosecutor and defense counsel failed to stop the state of affairs testimony which seemed more like a marketing pitch for CFA than a testimony.  As a result, Lumiere's rights were violated both 5th amendment due process and 6th amendment right to effective counsel who did not object and continued to be as sedentary as a potted plant as he was throughout the Trial.

11) Motion to suppress hearing from October 19th, 2016: Prosecutor on direct examination asked FBI Agent Callahan if he knew there were any other recordings based on his investigation.  The reply was "yes".  However, this question was purposely ambiguous as it does not mention timeline, or how he came to learn that he believed there were other recordings, while still being able to simply answer yes.

The fact is that based on Agent Callahan's testimony and an examination of the timeline, it would have been impossible for Mr. Callahan to know at the time that Lumiere's attorney turned over additional hard drives that were missed in the execution of the search warrant.  Therefore Mr. Callahan and the prosecutor mislead the court and the jury both in pre-Trial hearing and at Trial further demonstrating the misconduct of the government and the disrespect for the constitution and the sanctity of the court and the rights of the accused.  The Government did not request the hard drives that Agent Callahan left after executing the search of Lumiere's apartment until he spoke with defense counsel Udell after the proffer session on March 17th, 2014.  Additionally, there was an attorney proffer on March 12th, 2014, between Lumiere's attorney, Udell and Agent Callahan and the prosecutor at the time, and there was no mention of additional recordings or drives then.  The evidence is clear that Agent Callahan only came to learn of the missing hard drives because Lumiere, not his attorney mentioned it during his proffer session on March 17th, 2014 while he was being cooperative with the government and was asked to aid them in their investigation of Visium and during which time the government stated that Lumiere was a

Petitioner Stefan Lumiere v. United States of America                      Case No. 18-CV-9170

subject not a target of their investigation.  This issue also points to defense counsel Creizman's lack of preparation and failure to recall important details and understanding of the basic facts of the case which led Agent Callahan to take advantage of Creizman's ineffectiveness by misleading the court instead of correcting Creizman:

TR p. 28 Mr. Udell telling us that there were other recordings?  No.  The question that Creizman asked during cross examination was flawed on 2 major fronts.  1) There was no mention of other recordings, only of other hard drives.  2) It was Udell, Lumiere's attorney who stated that the Agent missed 2 hard drives during the search.  It was Lumiere who mentioned it to the entire panel during the proffer in Lumiere's good faith effort to assist the government.  This was the "Good Faith" that the prosecutor Tried to diminish as much as possible to further prejudice Lumiere to the point where the prosecutor and Agent Callahan lied and misled the court. (See FBI Agent Perjury for timeline and analysis)


12) Agent Callahan "review" and "look" at evidence was cursory at best.  Did not meet the Ganias standards of review or any protocol whatsoever.  This supposed review which government misstated that the review was done over almost a 2-month period was only done over 2 days if that and only for several hours total as Agent Callahan testified then no further review was done by him.  Yet the government held on to this material for over 2.5 years even though Lumiere asked for all of his belongings back on multiple occasions whereby the government again misstated that Lumiere never requested them back.


The Metter case as Creizman attempted to bring as an example, was indeed the most similar situation.  However, Creizman failed to identify and communicate the facts to the Court and the Prosecutor acted to take advantage of the weakness of defense counsel to mislead the court.  In Metter, the government seized files and held on to them for over 2 years without reviewing.  Defendant in the Metter case requested the files back and government had failed to review these over the 2 years.  This is more similar to Lumiere's case than the Ganias case which the government Tried to claim.  In Ganias, computer files were seized, imaged and reviewed while Ganias was not a target of the investigation. The protocols included having a computer expert imaging the computers, separating responsive from non-responsive files.  The government then years later used the original search as a basis for securing a 2nd search warrant to review the files they already had.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

In Lumiere's case, there was no protocol followed by agent Callahan, no computer specialists who separated responsive from non-responsive, and Callahan although denied that he knew of any other attorney representing Lumiere, lied and knew very well that Lumiere had been represented by Robert Knuts for the Visium matter. (See FBI Agent Callahan Perjured testimony).  His review ignored that the government had been given a list of attorneys with attorney names that would constitute privilege yet did their alleged "review" of several hours with no regard to privilege issues.  Given that the files in content included Lumiere's life work in finance included millions of files broken into thousands of folders and subfolders, it is doubtful that Agent Callahan Truly reviewed even a small sample of the files or had the ability to parse out what was responsive or non-responsive from this.  Yet defense counsel, failed to challenge or get more specifics about his review.  Additionally, prosecutor attempted to mislead the court by having the FBI agent describe the review process that an agent generally does, where the agent spoke at lengths about the platform and the ability to mark responsive versus non-responsive. However, what we learn is that he did not do this here.  He followed no protocol or separation or took no notes whatsoever.  (See further Agent Callahan Perjured testimony).  Creizman failed to hone in on this which was typical of Creizman's lack of diligence, and ineffectiveness throughout all representation of Lumiere.

SL00300.8 [III.A] Agent Call Lied

13) Agent Callahan claimed that he did not know of any other of Lumiere's attorneys besides Jeff Udell who was hired for Lumiere to proffer while in cooperative position with the government.  This was an outright lie. (See FBI Agent Callahan Perjured Testimony)

It is a fact that Agent Callahan did have knowledge of other attorneys that Lumiere had representing him, including Robert Knuts from Park & Jensen.  Agent Callahan additionally had the benefit of receiving a list of lawyers' names that Udell sent to the government.  (See email of list evidence and FBI Agent Callahan perjured testimony).  The prosecutor misrepresented this fact to the court and agent lied and misled the court.  Creizman also failed to remember the facts of the case to demonstrate that Agent

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Callahan knew about Robert Knuts and had been notified by attorney Udell of potentially privileged material in the evidence and that Udell had sent the government a list of all the attorneys where Lumiere asserted privilege that may have been in the folders.  The government knowing this, disregarded the privilege issue, used files years later to pursue their investigation and disregarded any protocols or separation.  The would fall under "Fruit of the poisonous Tree doctrine" where the government used privileged material to build their case and had anticipated using privileged material at Trial.  Creizman failed to file a motion on this point as well exemplifying Creizman's ineffectiveness further.

The bad faith of the government, refusal to follow any protocols was an infringement on Lumiere's 5th amendment right to due process and his attorney's failure to identify plain facts and identify discrepancies in testimony and further inquire to specifics of the search and knowledge, which should have been used to impeach FBI Agent Callahan at Pre-Trial hearing and in Trial, would have likely ended with total suppression of the files.  Yet, as a result of the lies and ineffectiveness of counsel which contributed to additional violation of Lumiere's 6th amendment right to effective counsel, Lumiere's Trial was significantly prejudiced.


14) Agent Callahan was notified to return "all of Lumiere's belongings" multiple times and not never as the government misstated to the court.  (see Agent Callahan Perjury)


    Udell was ineffective in court filings requesting all seized material back, but Lumiere did verbally ask FBI agent Callahan directly for all of his belongings back immediately during the search, to which Agent Callahan stated that he would rush the phone back as soon as it was imaged, but the rest of his belongings would take longer to image but would be returned after they were.  Lumiere did ask for all his belongings back and not just his personal iPhone and the 2 computes and laptop as the government now misstates.  When Lumiere went to pick up his belongings on April 15th, 2014, only the 2 computers and laptop and a blackberry cell phone were returned.  He did not only request the computers back.  He asked for everything back.  If he had only requested the computers back why would the blackberry cell phone be included.  It was part of everything he asked for back.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

TR P 5 ln21-29 "Lumiere wanted it back" (Referring to Personal Cell phone)

TR P 6 21-22: " Mr. Lumiere requested them back" (referring to the 3 computers returned on April 15th, 2014)

An effective counsel would have prepared, had the facts of what was requested back and the dates, and sought an affidavit from Udell ahead of the hearing or had Udell testify to the facts. Yet he was completely unprepared.

Creizman failed to identify the misleading testimony of Agent Callahan and the misstatements of the government because he did not prepare and did not know the facts. This exhibited a violation of Lumiere's 5th amendment rights to due process and 6th amendment rights to effective counsel.


15) Agent Callahan testified that the government was in cooperative posture with Lumiere until April 15th, 2014. This is false as Lumiere after firing Udell, hired Abramson and Morak to represent him and the cooperative posture continued as the government scheduled a second proffer session. This last proffer session was cancelled due to Abramson and Morak ineffectiveness in disclosing any cooperation agreement to Lumiere and lack of understanding of the specifics of the case and then communication ceased for 2 years. After that, the government came back to Lumiere seeking cooperation anew but due to Abramson and Morak's lack of understanding of the matter and failure to investigate, Lumiere sought out alternate counsel. Even after Lumiere was arrested, FBI agent Callahan approached Lumiere to tell him " It's not too late to help us" obviously seeking Lumiere's cooperation. And then on September 8th, 2016, government prosecutor met with Creizman to discuss the fact that the government really just wanted Lumiere to work with them to go after Jake Gottlieb and Steven Ku and would offer Lumiere a reduced charge of Misprision of felony. (See letter memo Creizman 9/8/16). Later it was learned that prosecutor contacted Creizman yet again to discuss cooperation, but Creizman told prosecutor that he was going to Trial. This lie as well as all other lies by Agent Callahan, infected the sanctity of the court with no regard for the Truth in complete violation of Lumiere's 5th amendment rights to due process. Creizman's failure to address the facts that he knew in court, was ineffective in violation of Lumiere's 6th amendment right to effective counsel. A competent attorney would have challenged FBI agent's statement and impeached him before the court removing the prejudice to Lumiere.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

16) Princeridge and Janney Montgomery were not small bottom of barrel bucket shops with only 15 clients that could not afford Reuters as Vandersnow intimated and the government represented to the Court.

Princeridge was a newly formed investment bank and broker dealer set up in 2008-2009 period but it was not set up by Vandersnow which he stated.  It was set up by the former CEO of UBS where Vandersnow previously worked and had hundreds of employees.  It also merged with JVB and became a very large outfit as a result with billions in assets under management, over 800 institutional clients and Traded all fixed income products in all sectors including loans and healthcare bonds and had access to many methods to identify bond prices from Bloomberg, to other institutional clients, Traders, and institutional brokers.

Janney Montgomery was a mid-sized firm with sector research coverage in every sector including healthcare and Traded all products.  It also had thousands of employees and offices around the United States.  To claim that they were bottom of the barrel bucket shops was highly prejudicial to Lumiere and was plain error attributable to perjury on the part of Thorell and Vandersnow and the prosecutor who took advantage of ineffective Creizman to bully these statements that were false into the courtroom .  Creizman had been given access to the statistics and the size of the businesses yet failed to bring them in showing that he was significantly ineffective. Any barely competent attorney would have introduced exhibits identifying the size of the firms, how many runs they sent out, the sectors they covered, the number of bonds they Traded, the revenues generated, the research of the firm.  Creizman did none of this causing a violation of Lumiere's 6th amendment rights to effective counsel and 5th amendment rights to due process.  The government knew the facts of Janney Montgomery and Princeridge but choose to mislead the court instead in order to solidify prejudice to Lumiere.

17) Princeridge and Janney Montgomery and Odeon just like any broker or dealer had the same ability to check on prices as JP Morgan or Goldman Sachs.  The concept that a firm smaller than JP Morgan could not access pricing information on bonds is principally flawed.  All of these brokers had many institutional clients and their own Traders to check on pricing as well as accessing information from institutional brokers such as ICAP and GFI that act as intermediary between brokers.  For example, if JP Morgan has a seller of XYZ bonds and cannot identify a buyer internally, they would go to ICAP or GFI as

Petitioner Stefan Lumiere v. United States of America                     Case No. 18-CV-9170

brokers broker to get indications if Goldman Sachs, UBS, Princeridge, Janney Montgomery or Odeon

may have a buyer.  They would send out a run to all these firms indicating they are looking for a buyer.

This concept was lost in Trial and Creizman never brought it up because he failed to understand how

bond sales and Trading worked, how pricing is accessed.  Any reasonably competent attorney would

have learned everything he could about the process and introduced it into Trial to impeach Thorell and

Vandernsnow and Plaford and show that the government was wrong.  If he could not learn it on his own

his obligation was to hire an attorney with this level of expertise to assist him.  He did neither thereby

allowing erroneous concepts to come into Trial and lacked the ability to counter any false statements

which impacted Lumiere's Trial significantly in violation of Lumiere's 6th amendment right to effective

counsel and his 5th amendment right to due process.


Additionally, both Vandersnow and Brook had skills having previously been portfolio managers and

analysts therefore had the skills necessary that Lumiere Trusted would be useful in evaluating more

complex situations such as CMED and ATI and USON Escrow.  Those skill sets are not typical for bond

salesmen which was even more reason why Lumiere in good faith believed that Vandersnow and Brook

did their diligence and were capable to assessing the situations.


18) Lumiere did not ever call Princeridge or Janney Montgomery bucket shops.  Thorell lied about this

perjuring himself under oath.  Lumiere once referred to what would happen if Visium shut down in the

context of whistleblowing to the SEC.  Lumiere stated that bucket shops would be the most impacted

but Visium did not pay out significant amount of commissions so would not be very impactful to most

firms.  The recording that Thorell made states this, but Thorell and the prosecutor decided to twist this

statement into referring to Princeridge and Janney Montgomery creating more prejudice to Lumiere

with false statements which was a violation of Lumiere's 5th amendment right to due process.

Additionally, armed with the Transcript to prove what Thorell was saying and what the government

stated was false, Creizman said nothing.  Any reasonably competent attorney would have been prepared

to refute false statements and perjury, yet Creizman said nothing and did nothing in violation of

Lumiere's 6th amendment right to effective counsel which prejudiced Lumiere significantly at Trial.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

19) Lumiere did not ever attempt to extort Plaford or Gottlieb and did not make recordings over the year to set himself up to do so.  The recorded statement was stated one time and obviously was in jest to Thorell's statement that he had some information on Gottlieb.  It never should have been allowed in court to prejudice Lumiere. Additionally, the prosecutor not only changed the actual words used in the Transcript but then changed it again in summation to appear even more sinister.

Lumiere in a joking tone actually stated: Well of course we "can't" extort them.  I "would love to" go to them and say: Plaford, Jake give us $100M between the both of you."

However, the government in a clear effort to solidify a false win, decided that they needed to change the wording of the recording and presented Transcript to further infuriate the court and the jury:

"First we should extort them."  Then in summation, the government changes it further to mislead the jury and court that Lumiere said: " First we must extort them".  These were plain errors that were devastating to Lumiere's Trial and prejudiced him Tremendously and in error.  There was enough indication that Lumiere would never do this as he actually told Thorell you can't extort them, as that would be an offense.  And that he told another employee that he can't use the information as leverage against Visium in his lawsuit as that could be considered extortion and that if something is wrong, you need to simply report it to the SEC."  All these statements are evident in the recordings, yet the prosecution ignored the Truth and chose to fabricate a plot as Lumiere had no motive and nothing to gain from any of it.  Creizman failed by not objecting to these statements and not correcting the Transcripts and not refuting any of it.  Any reasonably competent attorney would have reviewed the Transcripts, corrected them and not allowed them into courtroom by insisting that it was out of context, misrepresented, and could be prejudicial to Lumiere's Trial.  However, Creizman did none of that and only after Trial did he say that the government cheated and that he should have called for a mistrial. Creizman's incompetence on this point was so ineffective that it alone lost the Trial for Lumiere.  This was an extreme violation of Lumiere's 5th amendment right to due process and 6th amendment right to effective assistance of counsel.

   20) Lumiere played a large role in CMED:

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170

"The defendant was in charge of ATI and played a large role in China Med." (Tr P 978 ln15-16)

21) Lumiere never discussed his research with the brokers:

" He also said, this is key, the defendant never told him anything about his own research. The defendant never said, I know this is worth X because I've done all this work. He just was reading list after list of prices. And you heard the very same thing from Plaford." (Tr P 981 Ln24-25 to P 982 Ln1-3)

22) Claimed that Lumiere knew the brokers did no research because they shot it right back:

Then you see on the right, the broker quote that matches it exactly gets shot right back to him." (Tr P 981 Ln1-3)  " Because he was dictating the prices, and we showed you evidence that the Bloomberg messages with the quotes were sent back literally while they're on the phone or minutes later. Here's just one example. The call starts at 1:28. They're on the phone for nine minutes, and a series of e-mails come from Vandersnow. The first one, two minutes later. So literally while they're on the phone, Vandersnow was typing up the quotes that Lumiere wants and shooting them right back to mismark the book and send on to investors."

'This one's with Brook and Lumiere. The same basic pattern. A series of phone calls that Lumiere initiates, and then broker quotes sent shortly after the call ends. Lumiere knew that the brokers were just parroting back to him what he wanted to hear. Use your common sense. Do you think that he believed or expected that they had done any research or homework before they sent the quotes back? How could they? They're literally sending them back while they're on the phone." (Tr P980 ln11-19)

Lumiere positions

Lumiere told them the prices he wanted

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

23) Lumiere did not have good faith and believe in values

24) Claimed that Lumiere's buddies were Vandersnow, Brook and O'Callaghan and he recruited them: "Lumiere called his buddies at those friendly brokers you heard all about.  Remember, John Brook at Janney Montgomery, Scott Vandersnow at Princeridge and Matt O'Callaghan at Odeon" Tr P 976 Ln23-25 to 977 ln1)

"Thorell told you that Lumiere was close friends with Vandersnow and Brook going back years."986 11-12

"All of these broker quotes were solicited by Mr. Lumiere.  he was getting them from his friends."Tr P987 ln5-7)

25) Claimed that Plaford , Vandersnow and Thorell had no idea what these securities were worth.

" You also heard from Plaford, Vandersnow and Thorell that these brokers had literally no idea what the securities were worth.  Thorell said he never Traded with them" (TR p 981 ln6-8)

The record shows that both Plaford and Thorell stated that they did not know what Vandersnow and other brokers had done in order to corroborate the prices thus the Government's statement that Plaford and Thorell said that they had no idea what these securities were worth is false and a material misstatement.

Claimed that brokers were bucket shops:

"These brokers worked at small, bottom-of the barrel Wall Street firms that were happy that a big-time portfolio manager was willing to talk to them." Tr P 977 ln1-4)

" These three brokers worked at so-called bucket shops, the exact opposite of JP Morgan, Goldman Sachs and firms like that.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

These firms were not bucket shops. They were not bottom of the barrel firms. They were not the exact opposite of JP Morgan and Goldman Sachs. The Government's statements were highly prejudicial to Petitioner and inherently false. Both Princeridge and Janney Montgomery are mid-sized investment bank broker/dealers. Because they are not the same size as JP Morgan or Goldman Sachs does not mean that they are not reputable firms. The actual evidence available through the company websites, the financial filings they are by no means buckets shops and the Government using those terms were false and highly prejudicial to defendant.

Falsely claimed that: Could not trade the bonds and had no idea where they were and could not investigate

Claimed that Lumiere used his own cell phones to call brokers personal cell phones

"He generally called these brokers using his personal cell phone on their personal cell phones. Why? because he didn't want to leave a Trail..."(Tr P 979 ln11-13)

"He Tried to keep it secret. Think about it. He didn't use his work phone. He didn't use his work cell phone.

...He used his personal cell phone to call these brokers, and he called the brokers, not on their work phone, not on their work cell phone, but on their personal cell phones."

Claimed that the PNL email were for Lumiere's PNL and that he wanted credit for them and they were all mismarked.

"It was the e-mail that Lumiere sent to Rozenberg said his P and L contribution for a number of years. P and L, you now know is profit and lost. That just means the securities that he was in charge of and that he wanted credit for. Thorell told you that after looking at that list, remember he went through it with you, the majority of them were mismarked. Who mismarked them? The defendant. There were almost two dozen names on that list, and the names you've hear throughout this Trial, ATI, Nebraska Book, Sevan Marine, Friendfinder and many, many more.

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170

      Claimed that Misvalued all of them

      Claimed that the misvalued securities were all Lumiere's and he wanted credit for them

      Claimed that Lumiere wanted to extort Visium

"Then there was the valuation policy. It's dense, but it's pretty easy" P991 Ln17-18

"It's like when you buy a house or a car.  You don't want to pay more than it's worth, and in this case, that's what happened an that's fraud". 992 Ln4-6.

"The numbers from Reuters and Bloomberg are really no different from the IBM stock in the New York Times". P992 Ln16-17

"The goal is for Visium to price securities like everyone else, not to be the outlier.  They're supposed to be in the same ballpark, but the defendant, you know, wasn't even close.  He wasn't even in the same universe.  You saw that ATI Slide.  The defendant overvalued ATI by 1600 percent.  The only thing that that is representative of is fraud". P992 Ln20-25 993 ln1-

"Once in a blue moon the third-party prices might be wrong.  There could be a typo.  They could be just off.  But when Lumiere finds errors 50 times a month, that's not exceptional.  That's just making it up." P993 Ln19-23

"So the default rule is to use independent prices.  Then there was the override process.  Visium was allowed to override its independent prices when it believed, in good faith" P 993 Ln25- P 994 Ln1-2 --

"But since the defendant was mismarking the book month, after month, after month, they were told that the portfolio was doing better than it actually was". P 994 Ln25- 995 Ln1-2

"Now, you also heard a lot about Level 2 and Level 3 securities, liquidity, ASC 820.  That's all I'm going to say about that.  All you need to know is that investors care about what types of securities are in their

funds because they want to know if they're of good quality.  And because of what the defendant was doing, Visium was lying to them about the types of securities that were in there". P995 Ln20-25 and 996 Ln1

"He told you that the defendant believed, in good faith, the prices he was getting were right. After sitting through this Trial, you know that is completely ridiculous.  You saw mountains of evidence that show that the defendant knew exactly what he was doing.  He knew he was lying to investors.  He knew everything he was doing was wrong, and again, like everything we've gone through, it should line up with your common sense". P996 Ln16-25

"He was certifying he understood what he was allowed to do and what he wasn't allowed to do; that he understood the process; that he understood investors were entitled to accurate prices; that he wasn't allowed to manipulate the prices" P997 Ln5-8


P997 ln12-13

He agreed that he knew that investors cared about the valuation policy


It's meant to be evidence, evidence for a Trial just like this. To prevent the defendant, like Lumiere, from doing what he's doing here, arguing that he believed that everything that he was doing was okay, even though the compliance policy said the exact opposite.


"Ladies and gentlemen, you should see the defense's argument for what it is. It's a fictional story worth no more than the broker quotes that Stefan Lumiere made up for years." (Tr P997 ln20-22)


"First, you have his own words.  We listened to these already.  He said he'd been "mismarking this shit since 2011, " that it was all "egregious" that he was doing with ATI and China Med, and that he falsified marks, levels and performance.  The defendant really can't argue with a sTraight face that he had a good faith belief that what he was doing was legit when he said he's been doing this since 2011 and it was egregious." (Tr P998)

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

"What does he say? Not to mention the way Visium porTrays their P&L and the fucking bullshit marking of the book".  Ladies and gentlemen, the defendant could not be more clear in this recording.  He knows what he's (Tr P998 ln12-15)


"You also heard the defendant admit on various recordings that he would dictate prices to brokers and these were brokers who did not Traffic in the securities.  And when you don't Trade in a security, you have absolutely no idea what a security is worth." (Tr P998 ln18-23)


"What does the defendant admit in this conversation? He's dictating the prices. He knows those dudes, the brokers, didn't; price the things; that they were just spitting it back; that they didn't know anything about the securities and they were just relying on him that they weren't doing any research.  Why does it matter if the defendant knows that they didn't Trade in the securities? Because that means that he knows that the prices are all fake." (Tr P999 ln1-9)


"The defendant didn't do this out in the open. He Tried to keep it secret.  Think about it.  He didn't use his work phone.  He didn't use his work cell phone." (Tr P999 ln13-15)


"He used his personal cell phone to call these brokers, and he called the brokers, not on their work phone, not on their work cell phone, but on their personal cell phones.  If the defendant really believed that what he was doing was on the up and up, why use cell phones at all?  You do this when you're Trying to avoid getting caught." (Tr P999 ln17-2)


"You know that the defendant was dictating the quotes because, as I told you, they were coming right back to him literally while they're on the phone, or shortly thereafter." (TR P1000 ln3-9)

Petitioner Stefan Lumiere v. United States of America                Case No. 18-CV-9170

"You also heard the defendant admit it in his own voice. Let's listen to Government Exhibit 1234. There it is. Remember, Thorell was told by Lumiere to make the calls on his cell phone. Lumiere was out of town.  There he is admitting that that's the way he was told to do it, and that's the way he did it." (Tr P1000)

"And O'Callaghan told Thorell, remember that meeting at the bar in the Time Warner Center, he thought all of this was just totally sketchy.  Of course it's sketchy.  Why would someone ask you for independent prices, be putting all this on a thumb drive and then messengering it over in the dead of the night" (Tr P 1001 ln5-6)

"He used cell phones.  He used USB drives because he didn't want to get caught." (Tr P) (INSERT PAGE)

"As I mentioned earlier that's why the defendant on cross-examination kept running away from his title.  He's a portfolio manager.  He managed a -hundred million dollars.  Do you honestly believe that someone with that sort of authority and experience didn't know that he couldn't dictate fake broker quotes.  That he didn't know that he couldn't paint the tape." (Tr P1002 ln4-10)

"You also heard the defendant has this fancy CFA charter designation." (Tr P1002 ln14-15)

"But exhibits 1219 and 1221- In the top one, the defendant says the valuation committee is Josh Rozenberg--remember that the guy from accounting who the defendant says has never taken fucking finance classes."  So what's the deal with --what's the deal with the valuation committee? what does Lumiere say? It's just Josh." (Tr P1003 ln12-19)

"Thorell even told you his understanding of the valuation committee.  He didn't even know it existed. (Tr P1003 ln20-21)

Petitioner Stefan Lumiere v. United States of America                Case No. 18-CV-9170

"Ladies and gentlemen, it was the wild west at Visium.  Lumiere and his partners in crime exploited the total lack of oversight at Visium. They drove a Mack Truck through it. (Tr P1004 ln6-8)

" And you recognize all those names--ATI, Nebraska, Friendfinder, Sevan-- those are all the defendant's positons." (Tr P1004 ln12-14)

"You head from multiple witnesses, ATI was the defendant's position. (Tr P1004 ln 20-21)

"Milgram said that at one point ATI was literally selling the tables and chairs to keep the lights on. (Tr P1005 ln2-3)

"In September 2011, Apollo says the first liens were 33; the defendant says it's worth three times that.  He says the mezzanine is--Apollo says it is worth 5.  The defendant says the mezzanine is worth basically we'll call it 65.  Over ten times that. (Tr P1005 ln8-12)

"Mr. Girardi, ultimately Apollo got $5,000 for its investment.  They invested $55 Million in ATI and they got $5,000. (Tr P1005 ln18-20)

"Does the defendant really believe that he knew something that everyone else didn't? That somehow something that was worth $55 million one day and 5,000 in another was actually worth $55 million? Give me a break. (Tr P1005 ln21-24)

"Lumiere knew, just like everybody else, that ATI was totally worthless.  He just covered it up. (Tr P1005 ln25- P1006 ln1)

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

"Now during this Trial you heard from Plaford, Thorell and Vandersnow, the defendant's co-conspirators, and it was clear to each of them that what they were doing was wrong. There is absolutely no way that only Lumiere was in the dark. (Tr P1006 ln2-6)

"The defense counsel asked a number of questions about when Thorell figured out that what he was doing was wrong, when it was illegal. It was all very confusing. Ladies and gentlemen, it's a total distraction. Thorell told you that within months of joining the scheme he knew that he was doing was wrong, and that's all that matters. Thorell owned that. So keep that in mind during defense counsel's summation." (Tr P1006 ln8-16)

P 1006 ln17- P 1007 ln2-Now one last point. There is this recording. Lumiere said he wanted to extort Jacob Gottlieb, the head of Visium, and Chris Plaford for a hundred million dollars. Let's listen to this.

This recording is shocking. It's chilling. And it reveals exactly what's going on... So while he was still working at Visium, he started to put together the insurance policy. Blackmailing people at Visium for a hundred million dollars.

P 1007 Ln7-10"Ask yourself, why would Lumiere record himself if he thought he was playing everything by the book. You only tape people if you're Trying to gather evidence of wrongdoing."

And the evidence shows in spades that there was a conspiracy. Thorell, Vandersnow and Plaford told you they agreed to be involved in the scheme with Lumiere. Plaford told you that he and the defendant agreed to mismark the Credit Fund in 2011 and continued to do so. Vandersnow told you that he agreed to give phony broker quotes to Lumiere. Thorell told you that Lumiere gave him the broker quotes to support the overrides and on and on and on. That count is easy.

"The defendant making untrue statement to Visium's investors in the credit fund.... the mountains of evidence showing the defendant knew exactly what he was (Tr P1008 ln8-23)

Petitioner Stefan Lumiere v. United States of America                     Case No. 18-CV-9170

"Visium's investors were all over the country and in fact all over the world and that Visium communicated with them by email and regular mail." (Tr P1009 ln1-3)

"The evidence shows that Lumiere and Plaford engaged in a scheme to Try to make a ton of money and to keep their jobs, and they did this by telling lies to investors about the investment process and the performance of the fund." (Tr P1009 ln13-16)

## Conflict Obstruction Visium insisted on affidavit

Visium's holdup of indemnification and advancement until Lumiere would agree to an affidavit stating that Jacob Gottlieb was not involved in any illegal activity or in any of the government allegations.

Defense counsel from Gibson Dunn who Lumiere had met with introduced Lumiere to attorneys that specialized in seeking insurance funds for advancement of legal fees. Visium refused to turn over the Visium Partnership Agreement that would have held the indemnification clauses for employees and refused any advancement of fees greater than $30K and refused to give defense counsel the name of Visium's insurance carrier. When Lumiere contacted another law Firm Kobre & Kim when problems with Creizman's lack of capacity and representation surfaced, Kobre and Kim called Visium's counsel at Seward & Kissel to request the indemnification to which Seward & Kissel stated that before any indemnification would be provided, they wanted Lumiere to interview with them under oath which defense counsel found highly unusual and not recommended. Then Visium Counsel later added to Kobre & Kim that they would only discuss indemnification with Lumiere's current counsel Creizman. Lumiere contacted Creizman about this, since Kobre & Kim appeared to be blocked by Visium. Lumiere without the necessary funds to defend himself had no choice but to stay with Creizman who offered Lumiere a significant discount in representation even though Creizman showed that he was failing in his representation duties. The request for advancement for indemnification went protracted dialogues

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

with no resolution.  When Visium continually asked for an interview with Lumiere, they then turned to
what they really wanted.  In return for advancement for a legal defense, Visium stated that they wanted
Lumiere to sign an affidavit testifying that Jacob Gottlieb had no knowledge and no involvement with
any of the alleged conduct.  This was obviously to prevent Lumiere from cooperating with the
government against Gottlieb.  Lumiere refused to such an affidavit and as a result, Visium's promised
indemnification and advancement went nowhere for many months further debilitating Lumiere's
defense.  Lumiere finally received advancement for defense fees just before Trial and with not enough
time to build the defense necessary with experts, reviewing the securities, analyzing pricing.  Creizman
sat and did nothing for defense as he waited for funds before he expended anything but minimal work
on the case which did not include discovery review or analysis or even basic understanding of the facts
of the case.  As a result of Visium's obstruction, Lumiere's due process rights were impaired in violation
of his 5th amendment rights and his 6th amendment rights to effective counsel were violated.  Any
reasonable attorney would have not taken a complex securities case if he did not understand the
dynamics of the case and was not willing to spend to time to understand and perfect this knowledge so
that he could prepare for Trial and communicate the concepts to the court.  Creizman did none of this
and the obstruction by Visium, likely further led to the conflict and side secret agreements that
Creizman entered into with Gottlieb and Visium. Further evidence shows in Gottlieb's handwriting that
he was Trying to frame Lumiere, and keep Creizman on because Creizman would just go through the
motions, and that they did not want Lumiere to hire Kobre & Kim as they would "not be friendly to the
firm."  Other data that point to Lumiere's framing were statements by Gottlieb not knowing whether
Lumiere was "a friend of a foe", and benefits to the firm for making it look like this issue was isolated to
the Credit Team meaning to Lumiere and Plaford.  Additional statements that he made are:

Making political donations to the Clintons

Finding someone in politics that can help him

Lumiere believed in the numbers that Plaford gave him, but he will be in Trouble just because he is
Gottlieb's brother in law

And notes which are instructions to Creizman stating: "Pretend he is your friend, then screw him
over in the end."

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

"You could convict the defendant based on the words of just one of them alone.  You have all three of them." (insert Page)

"It doesn't follow that just because someone has committed a crime they can't tell the Truth to you under oath. (Tr P1010 ln10-12)

"And most importantly, look at how what they said lines up with all of the other evidence you've heard, the documents and the other witnesses. (Tr P1010 ln18-20)

P 1010 Ln24-25- P 1011Ln1-5 But what went on at Visium is simple.  What the defendant did was simple. He told lies to investors.  He corrupted a process that investors relied on, and he egregiously inflated the value of the Credit Fund. He corrupted a process that investors relied on, and he egregiously inflated the value of the Credit Fund.  And he did that for the very same reason that people have been committing fraud since the beginning of time--money

1051 Listening to defense counsel's summation reminded me of a famous quote, and the quote is when someone shows you their True colors, don't Try to paint another picture.

P 1051 Ln13-18 He told you, he said the fund was mismarked.  He said it was BS.  Those were his words back then.

He wants you to take your eye off the ball and he wants to distract you. Do not let him.

P 1051 Ln7-9 And you have seen so much evidence that he did, and it starts with his own words.  He said, the Credit fund was mismarked from the beginning.

187

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

P 1052 LN11-12 You know what he doesn't say there?  He doesn't say, ah, I didn't realize the Credit Fund was mismarked 'til later.

P 1052 Ln15 And he acknowledged that the brokers did no work--no work--to verify their quotes.

P 1052 Ln16-22

P 1052 Ln23-24 And this notion that he didn't understand 'til after the fact, there is no evidence of that."

P 1052 Ln24-25 - UASA:  "Keep in mind what I say, what defense counsel says, this is attorney argument. It is not evidence.  If you look in the record, there is no evidence of that."

P 1053 Ln3-5 And just to show you the date, the conversation with PB, that's date April 13th 2013.  The defendant didn't leave Visium until later, until April 27th 2013.

P 1053 Ln7-: "He wanted to help himself, and he wanted PB not to tell anyone about the fraud that he had committed."

P 1053 17-18 Was he dreaming about marking of the fund and it just came to him years later.

P 1053 Ln21-23: "But there is no evidence connecting his anger with Jacob Gottlieb with what he said on the recording.  Nothing.  It's all attorney argument."

Petitioner Stefan Lumiere v. United States of America                     Case No. 18-CV-9170

P 1054 Ln1-5 "He and Plaford picked the quotes and the defendant got the broker quotes. He told you that. Plaford told you that. Thorell told you that. And Vandersnow told you that. And Vandersnow told you he didn't know anything about these securities.

P 1054 Ln8-11 "And the defendant knew that. The defendant knew that Vandersnow wasn't doing any research because one on the of the calls you heard Vander snow's typing up the quotes to send right back to the defendant."

P 1054 Ln12-16 "There is no discussion of research... No discussion of tiering structures, whatever that is. It is just here's the quote, send them back to me, Vandersnow. And he did that"

P1054-Ln19-21 And defense counsel says, well, he called from his desk line sometimes. Ok. You don't have to be perfect at the criminal activity to commit it.

P 1054 Ln22-23 And you know, think about these brokers, Vandersnow and Brook. They're the defendant's friends. They're his colleagues.

P 1055; Ln8-10 He found them. They're his Wall street buddies. And he knew he could corrupt them and get them to do what he wanted.

These were the defendant's securities. He can't run away from that. He sent emails saying these are mine. Because you know why he said these were mine, because he wanted to get paid off of them. But now-- so they're his. They're his when he wants to get paid. But if there is any fraud with them or anything, that's Plaford, that's Thorell right?

Petitioner Stefan Lumiere v. United States of America                     Case No. 18-CV-9170

P 1055 Ln25- P 1056 Ln1-3 He's lucky he had a job, let alone one that paid almost a quarter million dollars. On any other street in America, that's pretty nice scratch for not doing your job well."

P 1056 Ln25-P 1057 Ln2 : " It's not complicated. It's common sense. Don't make up prices. We all know that."

P 1058 Ln3-6 And he was one of Thorell's bosses, responsible for a hundred-million-dollar portion of the fund. He's the one that told Thorell to use cell phones, to get phony quotes.

P 1058 Ln14-17:"So defense counsel would have you believe that the actual low man on the totem pole, Jason Thorell, the Trader, he understood exactly what was going on and that it was wrong. But his boss, the defendant, didn't get it?"

P 1058 ln21-24 "She works at Morgan Stanley Fund Services. She doesn't even work at Visium, and she said these prices were a lot different from the prices that we were seeing."

P 1058 Ln25 to 1059 Ln6:" Defense attorney argues that defendant had a good faith belief in these prices. Again, that is attorney argument. There is not one document, one mode, no shred of paper in this case that shows the defendant had a good faith belief in these prices. But you also know that he didn't have a good faith belief in these prices because look at how astronomically higher they were than where everyone else was."

P 1059 Ln22-25: "Let's just focus on March 31 2012. Apollo has ATI market at zero and the defendant has it at 75-83. And the other loan also at zero by Apollo's standards, the defendant has it at 10 to 22."

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

P 1060 Ln3-4 "His company purchased the ATI bonds for $51 million and then wound up selling them for $5,000."

P 1060 Ln17-19 And if you--If you think he did, by the way, I've got some ATI bonds that I would like to sell you."

P 1060 LN21 to P 1061 Ln4 "And the same thing for ATI, by the way, if you want some of those.  The company's CEO has disappeared with all the company's money, but nothing to see here.  The argument makes no sense.  The argument that there is no market here also makes no sense. Think about it. Would an investor give money over to a fund and say: There's no market.  You guys do whatever you want and price it and then just let me know, Does the world work like that way?

P 1062 ln1-5 : Mr. Plaford, he told you he hasn't seen all the evidence in this case....So they haven't gotten their stories sTraight."

1062 Ln8-9  "Why would he take that risk to frame the defendant?"

Now I submit to you--and don't take my word for it, you saw him, buy Plaford told you the Truth, and he accepted his responsibility.  He told you in detail every crime that he committed.  You saw him. He admitted it.

P 1062 Ln14-22"...defense counsel didn't ask Mr. Plaford about on cross examination?  About painting the tape.  And that' s because like all the other evidence in this case, the evidence if painting the tape is overwhelming..... And you know the defendant received these quotes. His name is on them.  And the defendant went out and bought CMED for 42 when it was in the low 30's."

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

There was a discussion by defense counsel that this wasn't used to value the fund.  The evidence is otherwise. There is a Bloomberg conversation between Plaford and Sudarshan Jain who is in charge of the valuation, and he says mark it where Stefan Traded it.

1063 Ln9-10Lumiere was in Florida, or something like that

1062 Ln12-15 You've seen overwhelming evidence that he p laded that Trade? And that Trade, by the way, just think of how fishy it is.  Why would you buy something at 42 when you can get it for 33?  It's to commit a crime, plain and simple."

They are safe from prosecution, but with one huge exception--if they tell the Truth.  Neither of those witnesses has protection for lying.  So why would they put themselves at risk just to lie about the defendant?  What do they have to gain?

P 1064 Ln4-8: "Thorell told you that Plaford brought him into his office and said, you send the pricing email so its looks better.  Plaford, who hasn't talked to Thorell since 2013, he told the same story about what happened back then--the Truth.

P 1064 Ln9-13 There have been suggestions that he would get paid for his testimony in this case or something like that, that's not True.  He's an SEC whistleblower.  What goes on in this case has no bearing on whether he gets paid or not."

P1064 Ln14-18 Defense counsel said, in summation, that Thorell was feasting his eyes on getting paid. That is also not True.  Because remember the chronology.  Thorell went to Visium first.  He was not a guy running to the SEC to Try to get a quick payday.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

P 1065 Ln7-17 Now defense counsel has also suggested why would the defendant fork over recordings of himself? Well, he had-he basically had no choice.   The FBI knew of them, asked for them, and he turned them over.

And as to why he made them, again, you know--it's chilling-it's to  extort Chris and Jake of a hundred million dollars. By the way, think of that figure. I mean, extortion, that's bad enough.  But think of that, a hundred million dollars.  I mean, think of what you must have your hands on if think you can get a hundred million dollars off of them.  He thinks he's got the goods.

1065 Ln21-23 In a recording with Thorell, the defendant makes it clear this is going to investors...He knows exactly what he was doing?

SL00301 [III.B1(a-g) pt1] Perjury Thorell Defam

III.B.1. Thorell Perjury Defamation

    Thorell, immunized witness and whistleblower action claimant perjured himself without compunction and without remorse in his "false long-winded, state of the world "blame Lumiere for anything but the kitchen sink" testimony, misleading the court and the jury and "likely" the government. It is still unbelievable to Lumiere how the jury or the court found anything credible in his testimony and likely was only given the benefit of the doubt because the alternative was too ridiculous. Could it be possible that the government was wrong about Lumiere and Thorell fooled the government.  But, this is what did happen with respect to Thorell's perjurious accusations of Lumiere which the evidence will prove.  Thorell lied to the court, jury and to the government for several reasons: 1) He wanted to make money for the whistleblower action and did not want to share with anyone; and 2) He wanted to blow up Visium in retaliation for firing him, and not paying the $3 million dollars in extortion that he was demanding from Jake Gottlieb.

The following is a list of "False and Perjured" statements made by Thorell for which the preponderance of the evidence supports as unTrue:

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

a) "Lumiere was a portfolio manager of a strategy specific to him called Special Situations anddistressedwithin the Credit Fund".


Explanation: There was no other portfolio within the Credit Fund and no specific strategy that Lumiere managed within the Credit Funds.  He managed DisTressed, Special Situations Strategy for the Balanced Fund in 2007-2008 which was moved to Global Fund in 2009.  Lumiere managed Arbitrage strategy for Global Fund from 2010-2012.  Lumiere acted solely as an analyst for the credit fund initially sharing his ideas with Plaford from 2009 to 2010, then operated primarily as an ad-hoc analyst helping with resTructurings and bankruptcies and workouts.  The record shows this as both Plaford admits to this and David Keily admits to this.  It is also documented in Visium's filings and documentation, emails, recordings, etc.

Evidence: See exhibit (Visium SEC Filings, Due Diligence questionnaire, Self-evaluation report, PNL Trail email, PNL Recording)


b) "I believes that Lumiere was responsible for between $50 to $75 Million."  This is false as above will show that Lumiere was not a portfolio manager for the Credit Funds, therefore he could not have been responsible for these amounts.  Secondly, Thorell lacks the foundation, the specifics of other employees' employment agreements and responsibilities due to his lack of access as an execution Trader for the Credit Fund. (see evidence from a) above)


c)  "Lumiere was number 2 in the fund."  Plaford admits that there is no hierarchy in the marketing material, an analyst and senior analyst are the same and Lumiere was an analyst. Thorell's statement is a lie and simply meant to bolster the government's case with lies. (Evidence PNL Recording and Plaford Statement on record)


d) "Lumiere was in fact solely responsible for picking the securities to override and the prices came from Lumiere not Plaford."  Thorell admits that Plaford called him into office to go over the new procedure

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

and the overrides and he did not discuss with Lumiere.  Plaford also admits that Lumiere was not part of
the override process.  So there is no consistency in these statements and it is quite obvious that Thorell
is lying as Lumiere is not deciding what to override and not picking prices to use which Plaford also
admits. (Exhibit: PNL recording)

e) "Lumiere was Thorell's boss." (TR P465 Ln3-7) Thorell even back away from this on cross where
Thorell rephrases the answer to: "I recollect that I said that he said he was my boss." (TR P 465 Ln3) So
this statement is not only a lie but ridiculous and Lumiere was not Thorell's boss just like Ameesh Shah
and Lee Brown and Andrew Han who were also analysts were not Thorell's boss. Thorell was the Trader,
the other members of the team were analysts.  They are simply separate functions in investing and
simply to state that Thorell was at the bottom when there is no hierarchy identified is a lie and
misleading. (See Thorell recant, and see Plaford Testimony)

f)  "Lumiere and Plaford were the only ones that had Trading and investment discretion in the Credit
Funds."  This is shown to be a lie with Plaford's own testimony that all the analysts could put on
positions in limited size without approval.  Plaford then states that they however never did.  They always
checked with him.  But at the same time Plaford says that Lumiere could make investment decisions in
the Credit Fund for a year or 2 so from May 2009 to May 2010 or May 2011, before the alleged fraud
began and prior to Thorell's arrival. Keily head of compliance also sends out an email asking why
Lumiere should have "Trading authorization" which gives a person ability to execute on behalf of the
firm with Portfolio manager approval which is not the same as "Trading discretion." So Thorell's
statement is clearly a lie.

(See Plaford testimony, see Keily Email and Trading Authorization form)

g) Paraphrase (Lumiere had told Thorell to get quotes and to tell brokers the prices he wanted them to
send back and that he had told Thorell to use his cell phone to call their cell phone.)  Lumiere perhaps
on a single occasion when he was out of the office, and Plaford had asked Lumiere to find a quote on a
liquid name, Lumiere had asked Thorell to check his Bloomberg or ask for a quote.  Lumiere not once
told Thorell to specify what price to ask for or to tell brokers Visium's estimates.  Thorell had his own list

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

of securities that Plaford asked him to find quotes for, while Plaford had a small list for Lumiere to seek and request.  The statement that is being made is related to a conversation that Lumiere had with Thorell in May 2013 which is recorded by Lumiere and Thorell chooses to take this out of context to help him make a whistleblower fee.  In this conversation, Lumiere warns Thorell that Plaford might be misvaluing securities and lying and that he should call the brokers to let them know not to Trust Plaford. Thorell is apparently afraid of losing his job, so Lumiere, after he has left Visium, tells Thorell not to call from the Visium lines as he might be at risk for losing his job so to call the brokers using his cell phone. Lumiere did not tell Thorell to call the broker's cell phone. In an FBI recording, Thorell makes a statement that on a handful of occasion, Lumiere asked Thorell to get quotes (which was when Lumiere was out of office and was relaying Plaford's orders).  Lumiere says: "Yeah".  Plaford had me call on cell phones too.  Something seems off about the recording. Lumiere uses "yeah" in conversation as a nod to show that he is listening and waiting for the continuation and does not use "Yeah" as "Yes" that is True. This is obvious from the Lumiere's use of "Yeah" such as when Thorell asks Lumiere if only Josh Rozenberg is on the Valuation Committee, Lumiere responds "Yeah". Then Thorell says so no one else is on the committee to which Lumiere states : oh, I have no idea who else is on the committee". So Yeah clearly does not mean "Yes" as the government Tries to infer. ( look into this recording)

SL00302 [III.B1 Pt3 (h-k)] Perjury Thorell Defam


h) "Lumiere had some influence over Thorell's bonus." This was an attempt to convince the court that Lumiere was Thorell's boss and directed him.  However this is a lie as well.  Lumiere had not influence over Thorell's bonus or anyone's bonus. Lumiere was not even considered a member of the Credit team by Plaford ( See recording PNL with Plaford), Lumiere was not a portfolio manager in the fund (See evidence to a).  Lumiere was not Thorell's boss just because Thorell makes up a lie that "Lumiere said he was my boss".  This statement is a lie and ridiculous.  Additionally any call by the government to Visium human resources or to executive team would have confirmed these facts.


i) "Lumiere had his own office separate from the analysts and Traders".   Lumiere did have an office for a period when he joined Visium as a Portfolio Manager of Special Situations/Distressed in 2007. ( Nothing to do with the Credit Funds).  He was moved out of his office to a smaller office later and managed the arbitrage anddistressedportfolios in the Global Fund from there.  When Visium relocated their offices to

Petitioner Stefan Lumiere v. United States of America                      Case No. 18-CV-9170

888 Seventh Avenue, Lumiere had his office sTripped from him and he was positioned on a Trading desk directly next to the rest of the analysts and directly in front of Thorell.  Thorell and the government conveniently leave this out because they used "an office" as an illusion that Lumiere was the boss which was not True. ( See map of desk layout Visium)

j) "Reuters is the de facto benchmark."  This is false and he does not believe this to be True. Not a single other witness made this ridiculous claim apart from SEC Jindra who used Reuters as the primary comparison point because Reuters was mentioned first in a laundry list that had not priority, of ways that Visium would price securities.  This compliance manual was written from the perspective of an equity fund which is how Visium began and was not specific to the Credit Fund.  Reuters is not a de facto benchmark and is not accurate are measuring prices for less liquid securities or restructured securities. There is no de facto benchmark in these circumstances.  (See plain error and see Thorell email to Operations June 2011, and SEC letter)

k) Creizman: "And he directed you to Trade with Janney; is that right?"

A: Yes.  At times, he emphasized that I Try to give them business, and at times, he even directed me to do so." (TR P 465 Ln14-16)

 "Lumiere told me to give as many orders as possible to pay as much in commission as possible to Janney Montgomery and Princeridge."  This statement follows his prior claim that on a single occasion, Lumiere told him to give one of the brokers an order and then later decides to inflate this beyond belief. Thorell however from his alleged boss refuses to do as he was instructed. Thorell is a liar and manipulator as the court must know. The fact that he is giving his state of the union address and inflating the significance of paying as much in commissions as possible does not make any sense.   The fact is that just like any other broker, brokers complain when they are not paid what they believe they deserve. On one occasion Janney Montgomery had told Lumiere that Visium paid the least in commissions out of all of his accounts.  In light of this, Lumiere asked, did not tell Thorell if he could give Brook an order to work on to satisfy.  Lumiere had relayed a similar message to Thorell from Imperial Capital another brokerage firm that complained that they were not being paid enough.  Thorell used a simple business statement and turned it into a nefarious scheme and plot which was ouTrageous, not believable and a lie. ( Proof: Thorell did not give more orders to Janney and Princeridge as he states that Lumiere had allegedly told

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

him; Janney and Princeridge Commission sheets would identify how much they earned from Visium relative to other accounts)

SL00303 [III.B1 (l-r) Pt3] Perjury-Thorell Def

l) "Lumiere and Vandersnow were close friends." Apart from being hearsay, and foundation issues, this is a lie. Thorell attempted to claim that Lumiere corrupted the "friendly brokers" Princeridge and Janney Montgomery which was the government's theory.  However, Lumiere never socialized with Vandersnow and did not have a friendship with him and only had met him on a single occasion with part of the Princeridge team.  Additionally Vandersnow was not Lumiere's contact as shown in Plaford's perjured testimony on who selected Princeridge to call.  Lumiere did not speak to Vandersnow often apart from Lumiere's assigned role of requesting quotes for him to check.  Princeridge had set up the account with Visium not Lumiere.  Lumiere had known of Luke Lawrence a trader at Princeridge who had notified Lumiere that Vandersnow had been assigned to cover Visium.  So Lumiere did not have any relationship with Vandersnow and never socialized with him and never went to his home or vice versa and only met him at a meet and greet one time.  So Thorell's statement is purely false.  Thorell however socialized with Vandersnow just as he did with other brokers.  Thorell however did it not for business relations but to have brokers pay for his extracurricular activities. (a subpoena of Vandernsnow's expense report from Princeridge would show that he only met Lumiere on one occasion with a group of his colleagues at a restaurant/bar; additionally there would be no personal emails or chats between Lumiere and Vandersnow to show that they communicated)


m) Purposely left out that Lumiere had referred him to Attorney Robert Knuts after Lumiere warned Thorell of issues at Visium in May 2013 right after he left Visium.   This was important information that the court should have been made aware of, however Thorell, the government and defense counsel were aware of this and left this out.  Lumiere was the first one to report the Visium issue first to several former colleagues, then to an attorney from Stroock who was knowledgeable about Visium's unique positions in bankruptcy.  Lumiere then spoke to Thorell to warn him of his newfound suspicions and then disclosed the situation to former SEC attorney Robert Knuts before Thorell spoke to anyone about it.  Lumiere in this conversation told Thorell that he was at risk for being set up as a "fall guy" by Plaford and to start recording and documenting everything to protect himself just as Lumiere had done. (See Brady violation and see recordings, Rahul, Lumiere-Thorell May 2013 recording, Knuts emails,. )

n) Thorell and the government and defense counsel hid the fact that Thorell had attempted to blackmail Gottlieb after he had been fired.  He approached a witness who he met at Stone Rose bar and told the witness Matt O'Callaghan that he was going to make Visium pay him $3 million or he was going to report wrongdoing to the SEC.  Additionally Thorell shows this inclination when in July 2013 meeting with Lumiere, he attempts to buy Lumiere's recordings from him, to which Lumiere tells him that if he is thinking of blackmailing Visium, he cannot do that as it would be an offense ( this was confirmed by Bloomberg Reporter information from witness and from Jacob Gottlieb; July 2013 meeting showing that Thorell tried to buy Lumiere's recordings; See recording July 2013 See Brady Violation)


o) Thorell never had an intention to whistleblow with Lumiere.  This is a lie as Lumiere and Thorell had discussed this ahead of the recorded meetings, before Thorell was working with SEC or FBI or had even spoken to another attorney. Lumiere and Thorell subsequently discussed again in Bar in July of 2013. ( See Brady Violation recording Thorell Bar July 2013)


p) Thorell understood Lumiere's statement in 2014 almost a years after he left Visium to mean that Chris meant Chris and Lumiere " Chris has been misvaluing the book since the beginning".  Not once in this recording, does Thorell state or Lumiere state that I knew at the time that they were misvalued. Lumiere makes this statement much later, after he became suspicious, left Visium and after Thorell had given him more information of his secret recorded meeting with Ku, Keily and Gottlieb whereby Lumiere was now led to believe based on Thorell's statements to Lumiere that something was very wrong and much more wrong than Lumiere had suspected.  Thorell said that Ku had denied that they used NAV to value positions which to Lumiere meant that they did not use valuations ( EBITDA multiples) to value their positions.  In is in this context that Lumiere much later made this statement in retrospect.  This conflicted with what Plaford had told Lumiere.( See Bar Recordings July 2013, See Plaford Perjury )


q) Stating that he took Lumiere's (joke) about extorting Plaford and Jake to be real when he knew it was made in jest.  Thorell would have known this by Lumiere's repeated warnings to Thorell that he could not think about extorting Visium and Lumiere's warning another former colleague that he could not

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

think about using the information as leverage against Visium to help with his own lawsuit as that would be seen as an offense.  However, Thorell for the benefit of the prosecutions case agrees to lie for the government. (See transcript change error under plain error) ( See Bar Recording July 2013)

r) Stated that Lumiere and Plaford were part of the conspiracy.  It is obvious from Lumiere's recording that he is not part of any conspiracy. Lumiere warns Thorell of his suspicions of Visium and Plaford in early May 2013 and in this conversation, Thorell becomes worried because it is here for the first time that Thorell discloses that Plaford has him sending prices to prices to operations making believe that they come from him.  Lumiere was not part of this and if there was a conspiracy, Lumiere was left out of the scheme and simply told to do a function which Plaford had told him was authorized by the partners. Plaford additionally rationalized the prices when Lumiere questioned him.  See Plaford Perjury. See Recording.  It does not take a brilliant investigator to figure out that Lumiere was duped and that Plaford and Gottlieb and Ku ran this conspiracy and lied to Lumiere about their intentions. (see recording Thorell May 2013)

SL00304 [III.B1 Pt1] Perj Thorell Defamation

Thorell on Direct:

Q. How, if at all, did Mr. O'Callaghan describe the defendant?

A. I believe the word sketchy" was used or something to that effect, but "sketchy" comes to mind. (Tr. P 365 Ln 15-17)

Thorell on cross:

Q. You discussed a conversation, a recorded conversation that you had with Matt O'Callaghan in which you said that Mr. O'Callaghan said that Stefan Lumiere was, I think you used the word, sketchy?

A. Yes.  I said that he likely is sketchy or some similar term.

Q. Well, I'm saying that Mr.--you said that Mr. O'Callaghan used that term?

A. Yes, or Mr. O'Callaghan used something like that term, yes.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Q. Is it fair to say, though, that you were the first person to say to Mr. O'Callaghan that Stefan Lumiere was sketchy?

A. I don't know.

Q. That conversation that you had with Mr. O'Callghan, was that a conversation that you were recording for the Federal Bureau of Investigation?

A. Oh, recording. No.

Q. You were not recording that conversation for the--

A. Oh, the one that we're referring to at Stone Rose?

Q. Yes.

A. No, I was not.

Q. So that one was not a recorded conversation, the one that you were discussing on direct testimony was not a recorded conversation?

A. No.

Q. You did have two recorded conversations with Mr. O'Callaghan, though, right? Do you recall that?

A. Yes. As part of assisting the government.

Q. Okay. And as part of assisting the government, do you recall discussing whether Mr. Lumiere was shady or not?

A. I'm trying to remember? It's a good possibility. I think I may have. (Tr. P 468 Ln 14-25 to P 469 Ln 1-23)


It is clear that when the government presents its leading questions, Thorell is quick to offer confirmation with his prepared ready to go answers as in here, where he confirms what the government states that Mr. O'Callaghan stated that Lumiere was sketchy. Yet here, Thorell first admits that it was he himself that called Lumiere "sketchy" and not Mr. O'Callaghan. Then he doesn't seem to know who said it first.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

He first states that it was recorded then states that it was not.  Mr. Thorell is all over the place until he quasi admits that he is the one who brought it up.  "Yes. I said that he likely is sketchy".


On direct, Thorell states:

Q. Then Mr. Lumiere says "They're basically just trusting that Chris knows the situation."

   Do you see that?

A. Yes.

Q. What did you understand that to mean?

A. It was my understanding he's saying that the brokers didn't traffic in the names, so because they didn't traffic it, they didn' t know the names, and were unable to price it.  And in turn, they had to rely on Lumiere to get prices from to know, where otherwise they would have no idea what level price to provide.

Q. And again, it is Lumiere who is telling the brokers the number that they trust?

A. That's correct. (Tr. P 315 Ln 7-20)


Mr. Thorell contradicts his own statement by stating on direct:

Q. Do you know if the brokers did any research to come up with the numbers they sent back to you?

A. No, I do not know that. (Tr. P 360 Ln 5-7)


Thorell is talking out of 2 sides of his mouth.  First he states that he states generally that the brokers didn't traffic in the names.  All of the names in the portfolio are securities that any reasonable high yield broker could trade.  He states on direct that Lumiere is telling brokers the number that they trust which does not make any sense.  The record shows that Plarford admitted that he came up with the numbers, not Lumiere. Lumiere is stating that brokers may trust that Chris Plaford knows the situations when Plaford's estimates are at a different level than what some brokers may have.  It is common knowledge

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

that the more illiquid a name is, the more likely there are to be multiple quotes, some stale, some more accurate, and it demands an investigation to figure out which is the most representative.  This is what Lumiere meant, which Thorell knows.  Lumiere additionally jokes with Lumiere that Plaford had told Lumiere to go get a quote from Princeridge as they traffic in the name, which Lumiere thought did not make sense in some circumstances that were very illiquid as some illiquid names do not trade at all.  The ability to price a security does not mean that their must be regular trafficking or trading in a security. Thorell is blending the concepts which are different and not correlated and then prejudicing by further stating they they would have no idea where they are.  Any broker, can investigate pricing by speaking to their traders, checking their bond runds, speaking to brokers brokers, or speaking to other institutional accounts that may be involved.


    Later on Thorell admits that he does not know if the brokers did any research to come up with the numbers.  Therefore, why is he stating that they could not possibly know the prices or investigate.  It does not make any rational sense.


SL00305 [III.B1 Pt2] PerjThorell Transcripts


Perjury on Transcripts:


Presented Transcript from 219T


Q. And then the defendant says: Even though Chris is manipulating the valuation; do you see that?

A. Yes.

Q. What did you understand the defendant to mean there?

A. That the valuation is being manipulated by Chris, and I understood it to mean Stefan as well.

(Tr P 395 ln19-24)

Petitioner Stefan Lumiere v. United States of America                 Case No. 18-CV-9170

Corrected Transcript 219T:

Lumiere: So, Chris has been manipulating the valuation?


There are two problems with this Transcript.

1) It was erroneously Transcribed and does not reflect what was said in the recording.

2) What was actually stated is a final affirmation based on what precedes it which is lost on the erroneously Transcribed recording.


Q. In the first line you say: He said the valuation committee determines the prices?

A. Yes

Q And who's he there?

A. I was referring to Steve Ku.

And you go on to say: Every--we've never had any overrides--he said this to my face...

A He's refuting that overrides exist

Q. And then the defendant says: What do you mean no pricing overrides? With a question mark. Do you see that?

A. Yes

Q. What did you understand the defendant to mean there?

A. He seemed to be as confused as I was.  In other words, in disbelief that Steve Ku was making the assertion that there were no pricing overrides....

Q. And then you say: So he goes it's never going to NAV.  Who is the "he" there?

A. The "he" is Steve Ku. (Tr P 394 ln15-25, P 395 Ln1-18)

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

   Therefore, it is clear that in this conversation, which Thorell has falsely asserted to its accuracy and then then exTracting a completely different interpretation based on a false Transcript. The corrected Transcript is clear that the information that Thorell states is a surprise to Lumiere since Ku is claiming there are no overrides and does not go to NAV.  Lumiere interprets NAV to mean the alternative valuation methodology that Visium had been using for select positions such as CMED and ATI and Ku's denial of this was new information and was a shock to Lumiere and acted as confirmation that indeed something must be wrong. Additionally, Thorell even admits that Lumiere was confused by Ku's responses showing that Lumiere was not involved in any scheme and was just learning new information. It is clear that this recording from July 31, 2013, more than 3 months after Lumiere has left Visium, while Thorell is still working at Visium and before Thorell is working with the FBI, does have a clearly different vibe and he is documenting that there are issues with Gottlieb and Ku and Plaford and not with Lumiere. Thorell only turns on Lumiere and starts to make accusations towards Lumiere after he begins to work with the FBI.  Even in Thorell's initial SEC Submission in September 2013, he does not make accusations of responsibility towards Lumiere, but directs the accusations at Plaford, Ku and Gottlieb.  But with the backing of the FBI, and the government, he changes his position and accusations to direct it at Lumiere since the Government had an easier case to go after Lumiere knowing that Lumiere could not afford a reasonable defense counsel.

   The confirmation by Lumiere that something must be wrong at Visium is a direct result of what Thorell has been telling Lumiere.  Defense counsel failed to communicate the timeline and the facts and acted irresponsibly by not correcting the Transcripts while allowing materially erroneous Transcripts into the court.

Additionally, this recording from July 31, 2013 precedes the FBI Transcripts from December 2013 and January 2014 which clearly explains why Lumiere "Now believes" that Chris, meaning only Chris, had been mismarking shit since the beginning.  This is the foundation that clarifies the later recordings. Taking the recordings of Jan 2014 and ignoring the conversations that preceded it, does the defendant a grave injustice, as it explains his frame of mind at that point.  Defense counsel should have brought this in under Rule 106 or insisted that it come in under (Another rule ) as it completes the frame of mind. Without it, there is no reference to time.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Presented from Transcript Government Exhibit 1222T:

Q. Now, Lumiere says: You've got a lot of stuff to put him out of business. Do you see that?

A. Yes.

Q. What is he referring to there?

A. He's referring to various forms of evidence of wrongdoing.

Q. That you have?

A. That I have.

Q. And then the defendant says: Well, first, we can extort him.  I'd love to be able to go get  him and say,
listen, Jake, Chris, give us $100 million between the both of you.

     What did you understand the defendant to mean when he said "first, we can extort him"?

A. It was clear that he meant illegally blackmailing.

Q. And who did you understand the defendant wanted to blackmail for $100 million?

A. As per his statement there, Chris Plaford, but he mentions Jake as well; so at least those two.

Tr P 398 Ln23-25 to P 399


Corrected version of Transcript 1222T: (A24 P84)

"Of course we can't extort him.  I'd love to be able to go to him and say: Listen, Jake, Chris, give us $100
million between the both of you.


There is a clear difference in these Transcripts that have opposite intent.  It is clear that Lumiere has had
zero intention to extort Gottlieb or Visium or Plaford and quite the opposite had been attempting to
dissuade Thorell from blackmailing Gottlieb and Visium which in the July 31st meeting he indicates by
asking Lumiere if he can buy his recordings and Lumiere confused says: What for?  Are you thinking
about blackmailing Visium.  You can't do that.  That would be an offense.  Therefore with this premise,

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Thorell could not have understood that I would ever mean to blackmail anyone as I argued with him that he could not as it would be wrong.  Yet he states that he understood it to mean that Lumiere had wanted to blackmail Chris and Jake which is knowingly false.

Therefore Thorell is not only committing perjury here, but inserting prejudicial false statements which the government used to solidify a conviction which would not have come had it not been included here and further in summation.

Thorell then goes on to give his understanding of what Lumiere meant interpreting every possible concept into Chris and Lumiere and Lumiere by himself, basically anything that could prejudice Lumiere. He committed perjury throughout this colloquy as he absolutely did not believe or understand what he said at the time as it makes no sense whatsoever especially in the context of what was being discussed and prior discussions.

Example:

On Direct, Thorell states:

Q. ...Mr. Lumiere says that: Chris has been mismarking shit since the beginning." Do you see that?

A. Yes....

Q. And then Mr. Lumiere continues "Originally in 2011, he was marking them too low."

And then moving down to line 15, Mr. Lumiere again says "He's been mismarking shit egregiously outside the context of what was right from the beginning."

So who was mismarking since 2011 and who was egregiously mismarking? What does Lumiere say?

A. Lumiere states that Chris Plaford was.

Q. Was it just Chris Plaford who was egregiously mismarking things since 2011?

A. No, it was not.

207

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Q. Who else was doing that since 2011?

A. Stefan.

Q. When you spoke to Mr. Lumiere and he used the word "Chris did this", what did you understand him to mean?

A. I understood him to mean that, in the context of this Transcript, that he's speaking for Chris, but also himself. (Tr P 237 ln13-25 to P 238 ln1-14)


Here he is lying, by stating that he understood Lumiere to be saying that Chris meant Chris and Lumiere. Chris is not a word subject to interpretation. It is a name. It clearly refers to Chris Plaford and Lumiere is absolutely not referring to himself. Plaford has admitted to setting the prices alone. So it is Plaford who has been providing his prices for marks to be approved by the Valuation Committee. Thorell is simply lying continuously to aid the government in attaining a conviction. Additionally, only Lumiere could interpret what Lumiere meant when he made the statement. Thorell is not an expert in Lumiere language to be able to qualify to state what Lumiere meant.


SL00306 [III.B1 Pt3] Perj Thorell ? Know misval


There was a real question when or if Thorell knew or discovered if at all, Visium had misvalued securities. Thorell having an obvious bias in this Trial as an SEC whistleblower, needed there to be something wrong in order to profit from a whistleblower complaint. However, Thorell never had voiced any concerns to Lumiere and it was in fact Lumiere that first questioned whether Plaford was perhaps lying about the way he was supposed to value securities due to an incident that occurred just prior to Lumiere's departure from Visium. This instance had nothing to do with a broker quote, but had to do with an alert Lumiere received from the then CEO of ATI whereby the company had made a mistake in their financial model which Translated to a small loss for year 2013 EBITDA as opposed to a forecasted profit of $13 Million. Lumiere had then alerted Plaford to this information expecting that he would relay the information to the Accounting department so that they could communicate with VRC who was the independent group valuing ATI. Plaford told Lumiere not to call josh, that he would take care of it. This

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

did not raise a red flag as it Plaford clarified that he would speak to Steven Ku and Josh about the adjustments.  What did raise a red flag to Lumiere, was that Plaford told Lumiere that the investors did not have a right to know the new numbers, and that the valuation was backward looking.  He then stated that the investors only get the forecasted numbers for 2013 based on what the forecasts were in 2012, so that they would not be made aware of it until 1 or 2 quarters out.  This sounded odd to Lumiere and conflicted with Plaford's prior explanations that Visium had to value positions based on real time and current information which prompted Lumiere to leave Visium and to communicate the issue to attorneys and possibly the SEC.

Lumiere told Thorell of his concern only after he left Visium, where Thorell had disclosed for the first time that Plaford had him sending operations a spreadsheet that Plaford put together with pricing and pretending they came from him.

Q. Did you come to have an understanding of what this attachment was?  We'll get to the details, but what was this attachment that you would be forwarding along to operations?

A. Right.  Initially I did not know.  But I did come to have an understanding, and I eventually learned that it was a list of securities within the portfolio and prices, and then eventually I determined that those were overrides. (TR P 255 Ln7-13)

Q. What was your initial reaction to Plaford's request?

A. I was at a loss.  I was overwhelmed.  I--had a lot to take in.  I was very confused.  The concluding remark or request about not mentioning it anyone else was, to put it mildly, unconventional, but raised a bit of a red flag. (TR P 255 Ln21-25)

Did you know that what you were doing at the time was wrong?

I knew it was--I knew it was wrong.

And you knew it was wrong because your mismarking or your--or this mismarking scheme that you participated in would result in inflating the prices of the securities to investors, correct?

A. I knew it was wrong, for starters, and as time went along, it was a logical conclusion that that was a likely scenario, but ultimately, I never knew for certain that the overrides and inputs went into the NAV. Again, it was a logical conclusion, but I never had any direct evidence of that.

Q. So you never believed--

The Court: Wasn't that the purpose of it?

The Witness: that that's what I felt the purpose was it, that that was a likely scenario, I agree.

Q. But at the time, did you know or did you not know?

A. Can you define "know"?

Q. No.  But I can do this.  Did you believe that you were doing something wrong?

A. Yes.

Q. Okay. And when I say something wrong, did you believe that what you were doing was resulting in deceiving investors as to the value of the securities in the credit fund?

A. What I knew was what I was doing was wrong.  As a result of that, it did enter my mind that a likely scenario, the end game, if you will, would likely impact investors as a result of that.  But what I knew for sure was that it was wrong, and it was a mismarking scheme, likely it would result in that.

Q. But you--so you didn't; know that--are you saying that you didn't know what the effect those broker quotes that you were sending on to valuation and operations, you didn't know what effect they would have on month-end pricing to investors?

...

Q. But what was wrong about it>  I'm interested in knowing, what was wrong about it? At the3 time that you were doing it, what did you think was wrong?

A. Well, for starters, alarm going off of initial conversation with Plaford not to discuss this conversation raises obvious signs of red flags.  And then the--again, for starters, the unconventional nature of asking someone to take a spreadsheet, sent from someone else and rather than forwarding it, recreating the

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

spreadsheet and attaching it as if it was your own and sending it along.  For a starting point, that's what I

knew was wrong, and then there was a progression of events, which I didn't know at first but clearly

learned that these spreadsheets, which appeared to be overrides, then there was most likely validation.

I don't have proof, but I was convinced that they were overrides into the prices...."

Q. I totally understand that, as well.  But my question is, at the time you were doing it, did you think that

you--that the effect of misleading investors, at that time?  Not was you came to learn.  We'll get to that.

At the time?

A. Well, can you just clarify what you mean by "at that time," which time?

Q. And this continues to go on.  When does it occur to you in this progression that this may be, as you

called them, overrides?

A. I don't know exactly, but I know initially there were , of course, red flags, given the nature of what we

talked about.

Q. Sure

A. An it was I would characterize it as soon, shortly, most likely within a few months.

Q. Okay. So sometime maybe early 2012, would that be fair to say?

A. That's fair


Q. You didn't know at the time that deceiving investors about the prices of securities was illegal?

A. What I am saying is, it's fair to say, day one, being the Plaford initial conversation, I did not know that

was illegal at that point is what I am saying.

A. Right. Again, as I stated, I grew to learn that there was wrongdoing, and then eventually I grew to

learn that it was illegal, but it took initial steps of seeking counsel to even at that point highly suspect

that there could be securities fraud.  I had to engage external counsel to confirm that, to get ultimate

clarification because, as I believe you mentioned, the seriousness of it.  And using the term "illegal" is

not something that I use lightly.  I needed an attorney's assistance. And eventually I did know but it was

not soon.

Petitioner Stefan Lumiere v. United States of America                Case No. 18-CV-9170

Q. But it is not such a complicated concept. Ripping off investors, you don't necessarily need an attorney to tell you that that's a crime. Am I right?

A. It's not a simple process. In the context you put it possibly, yes. But in the nature of this case, to learn from the beginning that this doesn't seem right; to put a pattern together; to then, in fact, say, yes, there is wrongdoing, to what degree, I don't know; to then growing concerned enough and Troubled enough to consult and attorney without getting into specifics with conversations with the attorney and I, to realize that this was in fact likely, after consultation, again, with the attorney, securities fraud.

        The Court: Wait a minute. What was it that you were participating in doing that was, in your view wrongful?

        The witness: Misvaluing securities?

        The Court: Pardon?

        The witness: Pricing, Mismarking scheme.


Q. When did you first retain any attorney in connection with your concerns about overvaluing securities?

A. looked into a few limited referrals, and that was one firm, I couldn't tell you when , likely early 2013, the first attorney that I engaged with on a formal manner and effectively hired was Joe Hamid at DeBevoise, which as late May/early June of '13, I believe.

Q. Did you ever act with the specific intent to defraud investors?


        The Court: Do you know what is meant by "specific intent"?

        The Witness: Would I--

        The Court: I will put the questions just so we can move this along.

        I think you told us that you knew that the mismarkings that you were participating in were lies and were likely to be furnished to investors, yes?

        The Witness: yes

212

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

> The Court: And you understood that they would make investment decisions, at least in part, on that kind of information, yes?

> The Witness: yes,.

SL00310 [III.B2] Perj Plaford Defame

III.B.2. Plaford Perjury In Testimony To Defame

Falsely made perjured statements during testimony to defame Petitioner Lumiere:

1) Plaford stated that "Lumiere was special." Plaford's insinuation that Lumiere was "special" was made to mislead the Court that Lumiere could get away with anything because his brother-in-law was the founder of Visium. The fact is the opposite is true. Lumiere was not favored within Visium but was in fact mistreated due to Gottlieb's strained relationship and bitter divorce proceedings with Lumiere's sister. For these reasons Gottlieb had it out for Lumiere. Plaford in fact was well aware of the strained situation Lumiere had with Gottlieb.

2) Plaford stated that "Lumiere was a terrible investor"

3) Plaford said "he could not trust Lumiere with anything". While Plaford stated this in Court, in truth Plaford did rely on Petitioner Lumiere.  He relied on Lumiere in 2009 and 2010 when Lumiere's ideas generated the bulk of the profits for the Credit Fund. He also relied on Lumiere to help out on companies that were distressed and underdoing restucturings and to help the analysts that were responsible for these names for the interest of Visium's investors.

4) Plaford said that "Lumiere's investment portfolio blew up in 2008" The fact is that Lumiere's portfolio did not blow up in 2008. Lumiere's portfolio was only down 2% in 2008 when his portfolio was removed at the same time that Visium's main Balanced Fund was receiving large redemption requests during the financial crisis. Lumiere was not down a significant amount and the decision to shut down Lumiere's portfolio was a general business decision that had to do with the overall financial crisis.

5) Plaford stated that "Lumiere was involved in C-Med or worked on C-Med in order to mislead the court and to believing that Lumiere was responsible for C-Med, knowing that Lumiere's only involvement with C-Med was to initially act as a restructuring liaison and making investigation introductions to Kroll & Associates.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

6) Plaford said that "ATI was Lumiere's position" simply because ATI was a new-issue that Plaford himself made that did not work out as planned and that Lumiere, because of his distressed expertise, was assigned to spend time on ATI in order to extract as much value as possible for investors. Lumiere recommended hundreds of new-issues but was never paid on any of those investments. Additionally, it was Plaford that was elected as a Director on the Board of Directors of ATI and not Lumiere.

7) Plaford stated that Lumiere was involved in the paiting of the tape for C-Med stating that Lumiere along with Ameesh Shah were in the office, when in fact Lumiere was in Miami, Florida for several days prior to as well as several days after the trade.

8) Plaford specifically claimed that Lumiere helpe with valuations of securities in Plaford's portfolio in an effort to confuse/mislead the Jury and to believing that Lumiere helped set the prices when in fact the evidence shows that Lumiere did not set any of the prices. Plaford's use of the words "help with values" was purposely ambiguous and meant to mislead the Court. Lumiere's only role in some of these investment positions was to offer his financial analyses and opinions on the investments and nothing more. This had nothing to do with setting the prices that Plaford used for his investment portfolio. Cooperating Witness Plaford's purposeful ambiguity was solely meant to deflect his own responsibility with the ultimate purpose of misleading the Court and the Jury.

9) Plaford falsely claimed that Lumiere was part of his conspiracy when in fact all the evidence shows that Lumiere acted in good faith and was not a knowing participant.

SL00320 [III.B3]

III.B. DURING THE TRIAL, NON-PROSECUTED WITNESS VANDERSNOW'S (PRINCERIDGE BROKER) TESTIMONY WAS RIDDLED WITH PERJURY AND MISLEADING STATEMENTS

SL00323 [III.B3] Perj Vandersnow general

III.B.3. Vandersnow Perjury:

Vandersnow mislead and lied to the Court by the following:

On Direct:

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170

Q. What year did you start working at Princeridge?

A. I started working at Princeridge in 2009

Q. What was your job title there?

A. I was a salesman on the high yielddistresseddesk (Tr P477 ln24-25 to P478 ln1-2).

   However, according to evidence obtained, it is clear that Vandernsnow attempted to dumb himself down to appear like a small shop.  However evidence shows he was the Chief Operating Officer (COO) of Corporate Bonds. (A123)

Q. Compared to UBS, how well resourced was Princeridge

A. Princeridge did not have many resources (Tr P478 ln21-22:A122)

Q. For example, have you heard of Reuters pricing service?

A. I have

Q. And what is it

A. It's a service

   However evidence is clear that Princeridge was a mid-sized Investment bank and broker dealer founded by the former CEO of UBS and was a subsidiary of a publicly Traded company IFMI.  It was also very well resourced and sizable with a focus in fixed income products. (A122)

a. Alluding that the Princeridge start-up firm was a small firm set up by Vandersnow and some of his friends at UBS, hadonly 15 clients, primarily Traded only Consumers and Retail bonds and did not Trade Loans, or healthcare bonds.

 Fact: Princeridge was set up by the Ex-CEO of UBS, had hundreds of employees just in the bond Trading division which is quite large by any standard, had a large asset management division with Billions under management, had investment banking services for middle market companies, had over 800 institutional clients and had access to Bloomberg which is the bond Trader and salesperson standard not Reuters. Reuters is primarily known as an equity platform that costs less than Bloomberg and does not have

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

nearly as much analytics as Bloomberg. Any bond salesman or Trader would testify to Bloomberg being the standard for analytics, sending bond runs ( for advertising, levels, indications which is primarily to drum up business and get involved and actual markets which are sent out by brokers only when they get a firm order). The government claiming this was a bottom of the barrel firm and bucket shop was completely false, and prejudicial.

Additionally, Princeridge sent out bond runs and advertised bonds in every sector including, Technology, Healthcare, indusTrials, Consumers, Financials and not just Retail and Consumer companies. This was a lie that could be proved by simply having access to Princeridge's advertised bond runs. Additionally their website mentions all the sectors that they are involved with. As for the statement that Princeridge did not Trade loans, the website clearly advertises that they do and that every bank and broker has the ability to Trade loans.

b. Stated that he did not recall what the companies did on the list, USON Escrow, BIOS, ATI, CMED and the government then insinuating that they could not possibly look up pricing or check pricing on these. This is completely false an irrelevant and misleading.

Fact: Whether he recalls now what these companies did, 3 years after having left the business is irrelevant. In none of these situations was he asked to do in depth fundamental analysis or ascertain what these companies do for revenues. That is completely irrelevant. A bond salesman does not need to know what a company does for revenue or know their revenues, location, etc. to look up a ticker on their Bloomberg, check with their Trader, check with an institutional brokers broker, speak to other customers involved in the name, or in the scenario where very liquid, simply look to Bloomberg quoting to price it. All a bond salesman needs is to have a phone, a Bloomberg, know the ticker, coupon or Cusip identifier to investigate the price. This is where Creizman proved ineffective by not cross examining him on these issues, or Plaford or Thorell or Milgram from Marblegate. This would be the standard protocol for any reasonably liquid security or slightly illiquid security. (See Plaford Perjury CMED directing class, see Brook 3500, See brook recording on CMED)

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

c. Stated that he "did not recall" whether Lumiere discussed his models, research on this issues with
him such as with USON Escrow, CMED Directing Class, ATI, Nebraska Book, Sevan Marine.  This
statement simply states that he is saying he does not recall.  The government then misstates this fact to
mean that he stated that that Lumiere did not discuss these.  This is a plain error and false statement by
prosecutor and the question was meant to mislead the Court.

Fact: For USON Escrow, and CMED, Vandersnow would not be able to rely on the ticker or identifier as
the pricing services do not Track these situations correctly.  USON Escrow for example was a litigation
right leftover from a merger between USON and McKesson.  Vandersnow was at the time familiar with
the situation that $40 million was left into escrow account for payment to bondholders should they win
the lawsuit.  This was explained to him and he was also given the names of the other creditors on the
committee as well as the lawyers involved from Stroock, Stroock and Lavan in order to fact check.

There was also a public docket that would have Tracked the litigation.  He was also kept apprised of the
new developments such as settlement offers made by McKesson. His lack of recollection now in Court
under a non-prosecution agreement and responding to a question as to his recollection simply misleads
the court.  Vandersnow was also given similar information on ATI and CMED directing Class and
Nebraska book. (Summary)

d. Claimed that he did not have Reuters because he assumed Princeridge could not afford it and made
the allusion that Reuters was the benchmark pricing service for Bonds.  This was perjured and
misleading testimony and prejudicial by the prosecutor.

Fact: Bloomberg ( and not Reuters) is the bond salesman and Traders standard for analytics, sending out
bond runs, getting pricing which comes from bond runs from interdealer brokers (which was never
explained), or communicating with their Traders and other clients as well as looking up company
information, financials, historical pricing, live Trace Trades, etc.  Vandersnow did not mention. the
prosecution failed to alert the court to these facts and defense counsel did not ask any of these
pertinent questions on cross examination because he did not understand the processes or securities
which he admits.  Any bond salesman, especially in high yield ordistressedknows as an expert would

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

have been useful to testify to, that getting an estimate on bond pricing comes from discussions with clients, their Traders and from feeds and/or discussions with brokers brokers such as ICAP which act as a middleman between all brokers and dealers.  Therefore, through this relationship with the largest interdealer brokers ICAP and GFI, Princeridge would have been able to get access to any pricing indications in the matter of seconds for securities that were liquid or slightly illiquid.

Indicated that he did not recall if I shared any models, valuations, analysis with any of the names for which he provided Visium with quotes.

e) He stated that Lumiere was the Portfolio manager of the Credit Funds. This was false.

Fact: Lumiere was not the Portfolio Manager of the Credit Funds.  Lumiere had told him upon asking him in 2009 how it worked between Plaford and Lumiere. Lumiere clearly stated that he had his own portfolio in Global and Plaford's portfolio was the Visium Credit Fund but that Lumiere helped Plaford out as an analyst for the Credit Fund and shared investment ideas with him.

Not once in any of the phone calls did Lumiere ask him to spit back numbers.  Vandersnow was asked to check numbers that Visium and Plaford had determined to be fair value and corroborate whether they seemed reasonable to him and to check on them.  There is a material difference between the two.  If Vandersnow chose not to do his job and investigate the numbers out of laziness that is not a crime if he assumed that the levels indicated by Visium seemed reasonable.  Should he have been more diligent. Yes.  But one cannot go down the chain and blame another person for another one's inaction or laziness which is exactly what the government did do.

f. Vandersnow stated that he cold called Lumiere.  Visium had a relationship with Princeridge already. Lumiere never requested to add Princeridge to its vendor list.  Lumiere had been contacted by a Trader who was at Princeridge that Lumiere had previously dealt with at Morgan Stanley.  It is this Trader that introduced Vandersnow as the new assigned representative to the Credit Fund when Lumiere was helping more actively with Trading for the Credit Funds in 2009.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

g. Vandersnow failed to mention and the government failed to bring up a material fact that Plaford was in room when Plaford asked Vandersnow for quotes and told him that they were for internal purposes only, not for audits and that Visium could even provide him with Visium's estimates as an indication if that would help them, to which Vandersnow responded "that is fine." Vandersnow never said that he thought anything was wrong with it and never told Lumiere that he wasn't checking the numbers.( See Plaford Perjury g)

h. Vandersnow stated that Lumiere asked him for the same prices to be spit back and that he knew they were for marking

Lumiere's Book. This statement is false on 3 points, 1) Not once including the few recorded conversations Lumiere had made, does Lumiere ask him to send the same numbers back. And 2) Lumiere never told him that the Credit Fund was his book, which the evidence supports that it was clearly not, and 3) Lumiere never told him that it was for marking the Credit Fund. (See Plaford Perjury g).

Fact: Lumiere clearly states on every call that Vandersnow should check this prices that Visium determined to be fair value and to let him know if he disagreed with any of them. Only now that Princeridge admits that he did not do his job to check them, does he state that Lumiere asked him to send the same prices back. However, on cross, Vandersnow admits that Lumiere did not pressure him to give the quotes, and Lumiere did not tell him to come back with the same price. So his story changes to suit the government theory which is a lie. Lumiere asked him only to send back quotes for the names while presenting Visium's estimates of fair value as an aid only to check the prices as Lumiere had been instructed by the firm partners. All that is known is what Plaford told Lumiere and Vandersnow which was that the quotes were for Visium's internal purposes and for estimates which was confirmed by Steven Ku, CFO in the Thorell recorded statement. (See Thorell perjury and see Thorell-Ku Recording and Transcript)

i. Vandersnow falsely stated that he and Lumiere socialized regularly at bars, benefits and strip clubs.

This is simply false. Lumiere had only met with Vandersnow on 1 occasion at a meet and greet with members of Princeridge team. See Thorell perjury ()

219

j. Vandersnow falsely stated that an indication, a level and a quote and a market are all the same, the price at which a broker will buy a security and sell a security. A market and an indication, quote, and level have different meanings in the vernacular of wall street which Vandersnow knows all too well having worked at UBS and having the tenure on wall street as he had.

aa) A market is a firm price which in bond runs is identified with the letter M and a size for the side where the broker is axed (meaning has a live order) For example: IBM 4 1/2  101-102  2x2 M would be a market of 101 bid and 102 offer and broker is indicating that he would buy up to 2 million notional at 101 or sell $2 million notional at 102.

bb) an indication is a run that a Trader puts out where he may have been involved in the past or would like to get involved. An example would be: IBM 4 1/2 101-102.  There is no size attached, this means that it could be 101-102 or it could be stale and be much higher or much lower.

cc) A level or quote in bond vernacular: Is similar to an indication but may be stale also or might be in touch with a buyer or seller, but the level is a guess.

SL00322 [III.B3 (k) Pt2]  Perj Vandersnow General


k) Vandersnow falsely stated that he did not Trade the majority of the names on the list of securities that he had given pricing levels to Visium.

Some of the names on the list did not Trade, as they were restricted and had separated classes.  But that does not mean that Vandersnow could not have accessed or determined a fair value to them based on discussions with Visium, with other bondholders, or speaking to interdealer brokers or his Traders or other institutional salespeople at Princeridge.  There were names on the list that he would have at the time been able to price by checking with interdealer brokers, his Traders, Bloomberg runs, etc., which included names such as BIOS 10.25 which he claimed not to know what they did.  This is irrelevant to pricing.  There is no requirement to know what a company does to look up a price in your system or ask around. The function is no different than going to yahoo finance and typing up a stock ticker for a real time quote, except that the quotes or levels in bonds are not live or actionable but just indications. These indications may be stale (old and not updated) or not accurate.  Any professional in thedistresseddebt or high yield area would be able to testify to this.  Defense Expert Tawil who was not

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

called to testify would have been able to explain these issues as facts. (Evidence: Princeridge bond runs

do not have access to as defense counsel failed to subpoena; Expert witness Tawil testimony: See A130)


SL00321 [III.B3]Perj Vandersnow-Thorell Brokers


Defense Counsel failed to Provide Evidence to Contradict Government and Thorell and Vandersnow

Allegations that Princeridge and Janney Montgomery are Bottom of Barrel Firm and Bucket Shop which

was highly Prejudicial and False.


Summary:


  The statements made by the Government and Thorell and assisted by Non-Prosecuted Witness

Vandersnow in reference to Princeridge and Janney Montgomery were outlandish, false and prejudicial.

Defense counsel's failure to object to these perjured statements and introduceevidence to the contrary

cause such extreme prejudice to Petitioner Lumiere as to make his Trial completely unfair. Thorell took

a term that Lumiere used out of context and not at all in reference to Princeridge or Janney

Montgomery and perjured himself by claiming that Lumiere said these words about Janney and

Princeridge. The below evidence supports that these firms are not as Thorell and the Government and

Vandersnow allege. It is also clear by a preponderance of the evidence, that Thorell has examined the

Transcripts of recordings and fabricated a web of lies using select words and phrases that Petitioner

Lumiere had made on the recordings and taken them out of context to restate them in completely

different context.


1) Princeridge Broker Dealer: (A122 P 1-3)


  a. Princeridge was not a small bucket shop as evidenced on their website and by examining the firms

history and financials. Princeridge is a majority-owned subsidiary of Institutional Financial Markets, Inc.

221

Petitioner Stefan Lumiere v. United States of America                Case No. 18-CV-9170

("IFMI") and provides investment banking and capital markets solutions to institutional clients and corporations.  In Europe, Cohen & Company offers clients a full range of financial and asset management services.  IFMI is a NYSE listed financial services company specializing in credit-related fixed income investments.

"Princeridge has a substantial capital base, which supports our Sales & Trading capabilities, as well as our equity and debt underwritings."

b. Princeridge has over 800 institutional clients and specialized in Fixed income and was founded by John Costas, former CEO of UBS.

2) Janney Montgomery Scott Broker Dealer: (A 124 P 1-13)

a. Janney is a sizable firm with over 180 year's experience providing comprehensive financial advice and superior service to individuals, families, corporations and institutions.  It carries an A+ Rating from Standard and Poor's.

"Janney Montgomery Scott LLC is the largest Philadelphia based full-service financial services firm,. Janney is a subsidiary of the Penn Mutual Life Insurance Company, with holdings of over $65 Billion.  We have 107 offices with the majority in various locations along the East Coast."

b. Taxable Sales & Trading which includes corporate bond sales both investment grade and high yield.

"Offices located in Philadelphia, New York, Boston Chicago Dallas and a network of over 700 retail; and institutional Financial Advisors working from over 100 offices, Janney's Taxable Sales & Trading

Petitioner Stefan Lumiere v. United States of America             Case No. 18-CV-9170

Group has unparalleled experience, resources, relationships and depth of knowledge to Transact in all markets"


" Our Taxable Fixed Income Sales and Trading desk provides institutional customers with the tools and support necessary to successfully execute investment sTrategies in a wide range of fixed-income markets including government, agencies, mortgage-backed securities, corporate bonds, preferred and other fixed income insTruments"


" Our research team provides fixed income strategy, commentary and credit research on corporate and municipal bonds to support our institutional client and provide value-added advice and insight"


" Janney Ranked by The Bond Buyer"

   Philadelphia, Pa.-October 15, 2013- Janney Montgomery Scott LLC (Janney"), a leading full-service wealth management, financial services and investment banking firm headquartered in Philadelphia, Pa., today announced that the firm has been named to The Bond Buyer's 2013 list of "Top Senior Managers"; Competitive Issues" and " Top Senior Managers: Small Issues. " published October 2, 2013, ranking #10 and #8 respectively.


   c. Universe: Industry knowledge and sector coverage: Janney has coverage of multiple sectors including healthcare which the Government claimed that Janney would not know where anything is valued.  The Government's arguments are solely based on a lie by Thorell and not based on any evidence of fact.

   Healthcare:

   Biotechnology

   Diagnostics

   Life Sciences Technology

   Specialty Pharmaceuticals

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

III.B.4. The Government witness Jindra (SEC Economist) showed extreme bias, manipulation, and perjury in his testimony. This bias was due to the SEC's outstanding Civil Suit againt Visium and Lumiere.

Jindra purposely lied about when he began working with the government on this case in order to deceive the Court so that the Government could get away with providing Defense with exhibits tied to thousands of Excel spreadsheets and reference cells, only on the day before trial in violationof Rule 16 Discovery Rules and against against Court orders to supply exhibits at least a month in advance. The purpose was clear; to run a trial by ambush giving Defense no idea how to prepare or what to prepare for so that Defense could not counter with research data and his own exhibits. The clear bias of SEC witness Jindra was apparent in two points:

A. claiming that he only began work on data only 2 weeks before trial when in fact records show work was done on data since 2015 almost 2 years prior to the trial.

B. Jindra's obvious parallel work with the SEC investigation

C. Jindra's purposeful exclusion of 2 other trades by unassociated counterparties on the alleged painting the tape trade on 3/23/2012 in C-Med bonds. One being from Hapoalim Securities and one being from Gramercy another hedge fund.

D. Jindra falsely stated that all of the securities that he alleged were mispriced were equally mispriced as the alleged mispricing of the Visium investment in ATI. Jindra's manipulation of the data was clearly in order to inflate the number of instances of alleged overriding of securities by Visium.

E. Jindra's seemingly inattentive and erroneous examination of Visium's compliance manual which formed the basis for all of his erroneous exhibits and charts.

F. Jindra clearly showed bias by only examing Reuters prices when the Visium compliance manual clearly stated that Reuters, Bloomberg and other pricing sources are only some of the services that Visium could use to price their securities. The fact is that the Visium compliance manual, its offerting memorandums and market standards are clear that the investment manager's obligation is to value its securities based on fair value when securities are illiquid and go through structural changes are often and more likely than not wrong. To use such pricing sources would be in violation of the good faith tof the investment manager.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

G. Jindra did not conduct any due dilligence or investigating into the separation of classes or tiering of C-Med bonds.

H. Jindra did not do any investigation or due diligence into the change of terms for ATI, the separation of classes of ATI Term loans, the restructuting discussions that led to the final restricting of ATI where Visium became the primary holder of the entity.

I. Jindra did not do any investigation or due diligence into Sevan Marine. He did not uncover that there was a merger deal by Teekay to buy out all bond holders in Sevan in a pre-determined price whereby Visium would receive an approximate 74 price payout. Because Visium was on the steering committee they had advance knowledge of this situation.

J. Jindra did not do any investigation or due diligence into USON escrows. Jindra should have been able to uncover that USON escrow holders were paid out approximately 6 points according to a settlement agreement with McKesson, the company that bought out US Oncology. Jindra could also have uncovered that Visium was part of the USON steering committee and would have had advance knowledge of various settlement offers that were made post the acquisition of US Oncology.

K. Jindra did not do any investigation or due diligence into Nebraska Book. Jindra could uncovered that Visium was on the steering committee of Nebraska Book and would have had advance knowledge ofa private equity offer to purchase all the bonds at 85% of par, which was rejected by the steering committee and deemed insufficient. Jindra additionally could have uncovered that the steering committee had hired restructuring advisor Alvarez & Marsal who uncovered approximately $50,000,000 in unused and unaccounted for credit memos which would have been use to delever the Nebraska Book very rapidly.

L. All of these instances show Jindra's bias, neglect, lack of due diligence, lack of research which was purposeful in his intent to prejudice Petitioner Lumiere. Had he been responsible and done the bear mimimum of work on these companies and their respective situations, the government would likely not have brought charges against Petitioner Lumiere. At the very least none of Jindra's prejudicial and erroneous exhibits would have been introduced at trial. Jindra's exhibits showed a massive distortion of the truth and were in fact false. The irresponsibility of Jindra in promoting these exhibits and the data combined with Defense counsel Creizman's lack of understanding and failure to examine the data forced Petitioner Lumiere into a deeply unfair trial.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

SL00401 [IV.AB] Perj FBI and Government

## IV. GOVERNMENT PERJURY AND MISSTATEMENTS PERMEATED THE INDICTMENT, MOTIONS, TRIAL, POST-TRIAL MOTIONS AND SENTENCING

Argument: An agent of the FBI is an agent of the United States Government as such must be held to integrity and Truth.  The Prosecutor is also an Agent of the United States Government and held to the same standards and is bound by Truth in seeking justice. [Insert Case Law] However in Petitioner Lumiere's case, FBI agent Callahan and the Prosecutors failed to uphold this standard by using perjury and manipulation to deceive the court about his investigation and about the Petitioner.

## IV.A. FBI AGENT CALLAHAN COMMITTED MATERIAL PERJURY AND PROMOTED MATERIAL MISSTATEMENTS IN THE FILED COMPLAINT, INDICTMENT, DURING PRE-TRIAL MOTIONS, THROUGHOUT THE TRIAL AND POST-TRIAL

1. Examples of Agent Callahan's Perjured and Misleading Testimony

a. Agent Callahan first indicated that all the evidence imaging began on the evening of Feb 26th 2014, then stated that all 3 computers, CD Rooms, and flash drives were imaged on "approximately March 11th, 2014", which was a lie and a show of bad faith by Agent Callahan which was later uncovered on cross (A23: Doc 38-1 TR P 5 Ln14-19; A24 Doc 38-1 TR P 6 Ln2-6)

b. Agent Callahan and Prosecutor stated that Agent Callahan simply "believed that additional recordings existed" based on his investigation on not due to Lumiere telling him that other "hard drives" were missed during the execution of search warrant in an effort to quash Lumiere's Good Faith. These perjurious statements are a show of FBI Callahan's and Prosecutor's bad faith. (A25-A26: Doc 38-1 TR P8

226

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

ln5-25 to Doc 38-1 Tr P9 Ln1-4; A27-A28: TR P 28 Ln18-25 to TR P 29 Ln1; A29-A30: Tr P952 Ln22-25 to
P953 Ln1-; A30: Tr P953 Ln11-13)


   c. Agent Callahan stated that he was not required to follow any protocols and that FBI did not have any
protocols in analyzing electronic evidence and that FBI's practice was to review before imaging of
electronic devices and that he reviewed without before imaged. (A31: Doc 38-1 Tr P10 Ln12-18; A32:
Doc 38-1 TR P 7 Ln15-22; A33: Doc 38-1 P 14 Ln2-7; A34: Doc 38-1:TR P 19 Ln5-7; A34-A35:P 19 Ln19-25
to P20 Ln1-2; A34: Doc 38-1 P 19 Ln11-13 No memorializing ; A36: Doc 38-1 TR P 21 Ln2-5 of USB; A37:
TR p 40 ln18-22; A38: P41 ln3-5; A38:P41 Ln6-10 eliminates Metter; A:39: Ganias Protocol)


   d. Agent Callahan and Prosecutor stated and mislead the court by stating that all electronic evidence
was reviewed fully between from Feb 26th, 2014 to March 20th 2014 where in fact the Agent later
admits that he just went through Lumiere's personal iphone (which contained no files or folders) only on
the afternoon of the search and that he only reviewed the other electronic evidence after they were
imaged which was not complete until after March 18th to March 25th timeframe which was after
Lumiere's Proffer session.  Agent Callahan also admits that he only reviewed the rest of evidence for
several hours over a 1 or 2 day period and not the entire month as alleged by prosecutor (A24, A32, A25
: Doc 38-1: TR P 6 Ln21-25 to  Doc 38-1 TR P 8 Ln1-4; A26, A31: TR P 9 Ln18-25 to TR P 10 Ln1-5; A26: Tr
P9 Ln14-20; A26: Tr P9 Ln22-25; A40: Tr P13 Ln21-23; A41: Tr P15 Ln9-12; A42: Tr P22 Ln12-25; A43: Tr
P23 Ln10-20; A43: TR P 23 Ln22-25; A44: TR P 37 Ln16-25; A37: Tr P40 ln1-17; A38: Tr P41 Ln17-25; Tr
where Agent states that he reviewed the evidence over this period; A: Transcript on cross where he
admits he reviewed all of it over only several hours over one or 2 days after they were imaged)


   e. Agent Callahan stated that he was not notified and was not aware of any other lawyers or potentially
privileged materials in the evidence. (A45-A46: Doc 38-1: Tr P30 Ln5-25 to P 31 Ln1-15; A47-A48: Tr P32
Ln22-25 to Tr P33 1-19; A49: Email from Knuts to AUSA Zach Feingold on Feb 27th, 2014 prior to any
review of files or folders; A50: Email from Udell to AUSA Zach Feingold with list of Attorneys on March
11th, 2014 prior to any review of files or folders: A51: Thorell-Lumiere #1 Recorded Transcript while
working with FBI Dec 2013, A52: Thorell-Lumiere #2 Recorded Transcript while working with FBI Jan

Petitioner Stefan Lumiere v. United States of America                Case No. 18-CV-9170

2014; A53 Thorell Lumiere #3 recorded Transcript A54: Thorell Lumiere Bar Recorded Transcript July
2013)

   f. Agent Callahan stated that Lumiere requested specific belongings back but not all of his belongings

which is false since Lumiere stated to Agent Callahan that he wanted all of it back as soon as possible.

Then Government asserts to the Court that Lumiere never asked for his belongings back by leading

misleading testimony from Agent Callahan  (A23: Doc 38-1 TR P 5 Ln19-22; A24: Doc 38-1 Tr P6 Ln11-13;

A55: Doc 38-1 Tr P11 Ln5-9; A38, A56: Doc 38-1 P41 Ln25 to P42 Ln1-3; A57 P43 Ln4-10)

   g. FBI Agent Callahan and Prosecutor stated that Lumiere volunteered the hard drives and voluntarily

singed Consent to Search during Motion to Suppress hearing, however when he came to Trial told the

court that Lumiere did not volunteer this evidence but that he "had to comply" in order to deny

Lumiere's "Good Faith"  A26: Doc 38-1 TR P 9 Ln1-13;A30: TR P 953 Ln3-9; A58,A59  Consent to Search

Form however Government states that Lumiere delivered and consented them in Pre-Trial motion to

suppress;

   h. FBI Agent Callahan stated that the government was in a cooperative posture with Lumiere only

through April 15th of 2014, the date that Lumiere signed Consent to Search. This is a show of bad faith

on the part of the FBI and a complete lie as the government had set up a proffer session with Lumiere

after that date and had offered Lumiere a reduced plea of Misprision of Felony at least and up to

September 8th, 2016 and later as Lumiere's subsequent counsel stated that the government was simply

Trying to get Lumiere to help them go after Jacob Gottlieb and Steven Ku.  Additionally FBI Agent

Callahan on the date of Lumiere's arrest in 2016 told Lumiere that it was not too late to cooperate with

the government. (A43:TR P 23 Ln22-P24 Ln1-18; A60: Creizman memo with Naftalis 9/8/16

   i. Did not present Lumiere with Rider to Consent to Search Form that Lumiere signed. (A28, A45: Doc

38-1 P29 ln16-25 to P30 Ln1-4;  Consent to Search Document 2nd page with Rider language was never

presented or explained to Mr. Lumiere as counsel Udell was not present)

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170

IV.B. THE GOVERNMENT, PROSECUTORS AND DISTRICT ATTORNEY KNOWINGLY AND
REPEATEDLY MADE MATERIALLY FALSE STATEMENTS OF FACT AND OF EVIDENCE IN THE
COMPLAINT, INDICTMENT, PRE-TRIAL HEARINGS, THROUGHOUT TRIAL AND POST-TRIAL:

IV.B.1. Examples of Prosecutor Misstatements Throughout Prosecution of Petitioner Lumiere

a. Government prosecutors told Lumiere through his attorneys, that they wanted Lumiere to
cooperate with them to go after Gottlieb, Plaford and Ku, but wanted Lumiere to make a false
statement which Lumiere refused to do. It is only then that the government threatened that they would
build a case against Lumiere if he did not cooperate and then made good on their threats and switched
Lumiere from Subject to Target (check notes)

b. Prosecutors doctored a material recording or overlaid a separate recording during Trial with heavy
typewriting in order to falsely claim that Lumiere could not have believed that the brokers were
checking the quotes since alleging that the quotes came back instantaneously which was false. Original
recording had no such audible typewriting and quotes were returned hours after Lumiere had requested
them.

c. Falsely stated that recordings stated things that it did not. (P14 ln21-23; p18 ln1-2; P18 ln3-7; P972
ln4-5; P975 ln3-5; P978 ln5-14; P978 ln23-25; P979 ln2-3)

d. Prosecutors oversimplified the case to the point where their allegations were false and the prices
they said should have    been used would have been a crime. P 972 ln16-18

1) Stated that investors were told that all assets were independently valued with no input from the
investment team

P7 ln6-10;P7 ln23-25;p11 ln19-21; p15 ln9-11; p973 ln2-6; P973 ln15-19; P974 15-19

229

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

2)Stated that "Established pricing sources were reliable and Trustworthy P 958 ln9-15;

e. Stated that Agent Callahan had examined all phone records when in fact he was only instructed to examine cell phone records and claimed Lumiere called brokers personal cell phones from his personal cell phone which was a lie.(Tr P979 Ln11-15; P980 ln1)

f. Lied about Jindra employment by government which started in 2015 and not within weeks of Trial so that they could delay delivery of exhibits with thousands of reference spreadsheets to evening before Trial.

g. Falsely stated that knowingly false facts about Lumiere's position at Visium with respect to Credit Fund:

1) Lumiere was a Money Manager and Hedge Fund manager and that Visium was Lumiere's Hedge Fund and that Lumiere was a portfolio manager in the Credit Fund. (P3 ln16-18; P3 Ln19-21; P3 Ln23; P4 Ln13, P5 Ln21; P5 Ln23; P6 Ln1; P6 Ln4; P6 Ln19-20; P9 Ln10; P9 Ln19-20; P975 Ln14-22; P975 Ln23-25; P976 ln2-4)

2) Investors were his investors and he took people's money and that he lied to these investors (P4 Ln20; P5 Ln7; P11 Ln24; P13 Ln23-24; P972 Ln6-8; P972 Ln18; P972 ln20-21)

3) Lumiere was the Mastermind behind Visium's scheme and "It started with Lumiere" (P976 Ln9-12; P977 Ln14-20)

4) Stated Lumiere's alleged conduct occurred over years and beyond his departure from Visium in April 2013 (P4 Ln4; P10 ln8-9)

5) Stated Lumiere was greedy and his motive was to line his own pockets ( P972 Ln18)

h. Valuation process and Pricing: Prosecutors falsely claimed that

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

1) Lumiere corrupted the valuation process and marked the portfolio and that he originated overrides

2) Lumiere told brokers that he wanted the same prices spit back

3) That Lumiere knew that the brokers did no research whatsoever (P980 ln14-15; 980 ln18-19)

4) That Lumiere did not discuss his research with the brokers

5) That Lumiere did not believe the values that he was giving to brokers P11 ln13-14; P960 ln1-10; P 974 ln2-7; P 974 ln20-25; P975 ln1-3

6) That the brokers sent back the quotes simultaneously

7) That brokers had no idea what assets were worth and no ability to look into them because they worked at bucket shops and that they were not independent brokers since Lumiere controlled the brokers and that they did not make markets in any of the securities.

8) Overstated the number of securities that Visium (not Lumiere) overrode and that Lumiere got all the phony quotes and gave them to Thorrell. 977 ln19-20; 982 ln25 to 983 ln1-7

9) Stated that "Friendly brokers were all Lumiere's buddies and worked at Low level, bottom of the barrel bucket shops that Lumiere controlled as the Puppet master ( P9 ln17-18, P976 ln23-25 to 977 ln1-4; P 979 ln8-10; p9 ln14-16; p11 ln11-24)P9 ln16-17, P 9 ln4; P 9 ln10-14; P 16 ln11; P 981 Ln6-8; P 981 Ln14-17; P 981 Ln22-25 to P 982 Ln1-3)   (P10 ln9-10; P11 ln1-3; P 11 ln23-24, P 972 lnP 12 ln1, P 972 Ln1-4, p972 ln11-12; p974 ln11-14; P975 ln6-9; ln20-23; 976 ln18-21; 976 ln23; 977 ln25-p978 ln1-2; P9 ln 24-25 to P10 ln1, p10 ln24-25, P15 ln15-16; p16 1-4; p16 ln6-13; P 976 ln5-6; 977 ln5-11; 980 ln2-10)

i. Falsely claimed that the value of assets were inflated by tens of millions of dollars and that tens of millions of dollars of losses were incurred by investors as a result of the fraud by pension funds. (P14 ln24-25 to P14 ln1-3)

j. Falsely stated Lumiere's responsibility for all of the mismarked securities and that "phony quotes" was initiated by Lumiere to cover up his losses and wanted to get paid on them and that the securities:

1) It was Lumiere's decision to invest in ATI and Lumiere was in charge and responsible for ATI

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

2) CMED was one of Lumiere's securities and he played a large role in CMED (P978 Ln14-17)

3) Lumiere was looking to get paid on all the securities on the list PNL ConTribution and they were all his and all mismarked and that Lumiere lined his pockets from fraud.  (P14 ln3-5; P972 ln18; P978 ln1-4)

k. Stated that Lumiere valued ATI at $79 when an independent valuation service valued it at $7.50 when in fact this was knowingly false. P10 ln19-22; p11 ln19-20

l. Stated that Lumiere knowingly purchased CMED bonds at inflated values to corrupt the valuation and that CMED Bonds were Trading at 30 when they were purchased at 43 on March 23rd 2012 in order to mark the book (P12 ln17-21; P12 ln23-25 to P13 ln1-2; P13 ln3 to ln9)

m. Falsely stated that Thorell came forward to do the right thing and was the first to come forward to report wrongdoing. (P 14 ln8-16; P16 ln19-21)

SL00402 [IV.B2 Pt2] Misconduct-Fal Statements

IV.B.2. Examples of the Government's Use Ambiguous Questions and Incorrect Responses and Where they Made Material Misstatements in Opening Statement, Summation, Rebuttal about: 1) Lumiere's role in the Credit Fund, 2) Lumiere's Compensation, 3) Statements that Lumiere Made on Recordings, 4) Actual Evidence Presented, 5) Actual Evidence that Exists, 6) The securities for Which Lumiere was Responsible for Monitoring (especially ATI, CMED)

a. "First he manipulated and corrupted the independent valuation process at Visium's credit fund; second, he misvalued scurrilities in that fund to inflate their values, and as he told you in his own words during this Trial

232

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170

By doing so, Defendant lied to investors about the fund's valuation process and about the fund's actual
performance (Tr 972)

b. "But this is really a very simple case.  He told lies to investors to line his own pockets. This includes
that Lumiere and the credit team were secretly the source of the valuation of securities in the fund. (Tr
P972 ln16-17)

c. "Also, that Lumiere and the credit fund fraudulently overrode independent third party prices to
boost the fund's performance.

Now the third category of evidence shows that the defendant knew full well that what he was doing was
wrong.

d. "There can be no dispute that the defendant was secretly pulling the sTrings behind the scene,
pulling the sTrings with the valuation process to inflate the valuation of the fund." (Tr P974 ln11-14)

e. "That Defendant knew that Visium had promised investors that the valuation process was going to
be independent from the investment team." (Tr P974 ln15-17)

f. "He proudly advertised it on all of his e-mails from 2011 to 2013.

You also heard evidence that he managed a hundred Million dollars on his own, a hundred million
dollar's worth ofdistresseddebt." (Tr P975 ln22-23)

g. "Ladies and gentlemen, that's an easy question. You're New Yorkers.  You have common sense." (Tr
P974 ln24-25)

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

h. "Of course the defendant knew what he was doing was wrong.  You heard it from witness after witness.  You saw that in document after document.  You heard the defendant in his own voice on those recordings, admitting he knew what he was doing." (Tr P 975 Ln1-5)

i. "Lumiere was the No. 2 guy.  He was also a portfolio manager and an analyst." (Tr P975 ln15-16)

j. "So let's talk about how this fraud began.  It started with the defendant. Let me say that again. This scheme started with the defendant, Stefan Lumiere.  You heard during this Trial that he was bad at his job.  He was a lousy portfolio manager.

He needed a way to override those independent prices that showed the Truth, the independent prices from Reuters.

Lumiere called his buddies at those friendly brokers you heard about.  Remember Jon Brook at Janney Montgomery, Scott Vandersnow at Princeridge and Matt O'Callaghan.  These brokers worked at small, bottom of the barrel wall street firms that were happy that a big time portfolio manager was willing to talk to them. Then Lumiere told them the prices or the levels that he wanted and the brokers just shot those prices right back to him." (Tr P976  ln-check this)

k. "The fraud grew from there.  Plaford loved what Lumiere had figured out." (Tr P 977 ln14-15)

l. "So Lumiere and Plaford mismarked their positions to Try to make money, to get these huge bonuses and also to keep their high-paying jobs." (Tr P978 ln1-3)

m. "Lumiere and Plaford were mismarking the value of securities from the beginning because the defendant actually told you that in his own words.  The defendant said that he and Plaford were mismarking stuff from the beginning ,since 2011. There's just no ambiguity there." (Tr P 978)

234

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

n. "Defendant was in charge of ATI and played a large role in China Med." (Tr P978 ln16-17)

o. "Lumiere also told you that he and Plaford falsified marks, levels, performance." (Tr P978 ln23-25)
Ex 1220

p. "These brokers worked at so called bucket shops." (Tr you ln8-9)

q. "He generally called these brokers using his personal cell phone on their personal cell phones." (Tr P 979 ln11-13)

r. "It was Lumiere who made the calls to either Brook, Vandersnow or O'Callaghan.  He used his cell phone."

s. "The call starts at 1:28 They're on the phone for nine minutes, and a series of emails come from Vandersnow. The first one two minutes later. (Tr P980 18-19)

t. "They're literally sending them back while they're on the phone." (Tr P980 ln20-21)

u. "We also showed you the series of exhibits and phone calls, on the left is government exhibit 1010. These were the notes that were found in the defendant's apartment."   (Privileged content that the government agreed not to introduce yet Creizman stipulated to it without paying attention)

v. "He also said he did no work, no diligence or research on the prices.  He just sent the prices right back to defendant. He also said, this is key, the defendant never told him anything about his own research."

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

w. "You saw example after example as the SEC economist testified, of the massive manipulation that Lumiere was engineering." (Tr P984 ln13-15)

x. PNL reference (Check this) (Tr P985 Ln15-21)

y. "Who mismarked them? The defendant? (Tr (P 987 Check this) Ln22-25)

z. "387 overrides over just a year and a half" (Tr P 987 ln11-14)

aa." CMED was Trading in the low 30s (Tr P 989 ln13-18: check this)

ab. "When you pay more for something, your doing it to manipulate the price, and that's a crime." (Tr P989 ln22-24)

236

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

SL00403 [IV.C Pt1)] Perjury-FBI Bad Faith

IV.C. FBI AGENT COMMITTED PERJURY AND MISLED THE COURT IN BOTH PRETRIAL HEARING OF
MOTION TO SUPPRESS AND DURING TRIAL FOR THE PURPOSE OF PREVENTING EVIDENCE
SUPPRESSION WELL AS TO ILLEGITIMATELY ATTACK AND QUASH PETITIONER LUMIERE'S "GOOD
FAITH" DEFENSE.

237

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Law: FBI Agent and Prosecutor are upheld to a standard of Truth.  Both of these individuals purposely misled the court by misstating facts and using trickery to trick the court into believing that the FBI agent acted in good faith when it is obvious he did not.  Attorney Creizman failed to pick on distinction of the misleading testimony due to his lack of focus and inattentiveness.  Lumiere told Creizman of the perjury and Creizman admitted stating "I forgot the facts of the story, but we don't want to accuse the FBI of perjury in pre-Trial motions when we can do so in Trial in front of jury".  This issue was paramount for motion to suppress argument yet.

IV.C.1. Motion to Suppress Hearing on Oct 19th 2016, FBI Agent Lied and Misled the Court

 Agent with assistance of the Prosecutor about the search of the files, knowledge of privileged communications and knowledge of any other attorney that Lumiere had worked with.


Direct:

Q: And approximately when were those devices imaged by the F.B.I.?

A: Approximately March 11th, 2014

(Doc 38-1: TR P 6 Ln4-6)


Cross:

Q: Can you approximate when you began reviewing the HP laptop?

A: That would have been within one to two weeks of March 11, 2014, when I submitted the request to have them imaged.

(Doc 38-1:TR P 16 Ln23-25)


FBI agent lied here, because he had only made the "request" to have the computers and hard drives imaged on March 11th, 2014 as seen below on cross examination whereas he states on direct that they "were imaged" approximately May 11th, 2014. (See below on cross)

238

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Cross:

Q: "And all three of those computers were imaged on March 11, 2014, is that correct?

A: The process began on that date

Q: The imaging process began on that date

A: Correct."

(Doc 38-1: TR P 15 Ln21-25)


 Additionally, the FBI agent lied here when he stated that he had begun the review on Feb 26th the day of the search and had gone through files and folders and recordings.  The fact is that there was no review on any files, folders, recordings until after they were imaged if at all which would have been after May 18th, 2014 to May 25th, 2014 time frame at the earliest which would have been after the defendant's proffer on March 17th, 2014.


Cross:

Q. And in this case did you review electronic files before they were imaged?

A. Yes

(Doc 38-1: TR P 14 Ln5-7)


First he says that he did review the electronic files before they were imaged and then he states the direct opposite.  It is likely that Agent Callahan had been coached for these response by the government in an attempt to mislead the court states that he did review them earlier than he later admits:


Cross:

Q: Now did you start to review these seized computers before they were imaged?

A: No

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Q: When did you start to review the three--the computers, any of the computers?

A: When the imaging was complete.

Q: Do you know when that was?

A: Within--probably within a week of March 11, 2014, maybe two weeks.

(Doc 38-1: TR p 16 Ln1-9)


Direct:

Agent Callahan, did there come a time when you began to review the electronic evidence?

Yes

Q. For shorthand, I am going to refer to electronic evidence as the evidence that we just discussed that was taken from the defendant's apartment.

A. Yes

Q. Approximately when did you begin that review?

A. The evening of the search

Q. That's February 26?

A. Yes

....

Q. What general techniques did you use to review the evidence?

A. I was manually going through file folders, looking for documents and other recordings in evidence.

...

Q. Did you locate evidence responsive to the search warrant?

A. Yes

(Doc 38-1 TR P 6 Ln23- P 7 Ln1-25)

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Agent Callahan is not acting in good faith and is purposely deceiving the Court and the defendant.  FBI Agent's likely explanation is that he will likely state that he reviewed the files and folders of Lumiere's personal cell phone only the evening of the search, however the cell phone did not contain files and folders.  It only contained personal emails. Therefore, Agent Callahan was being purposely manipulative and was not forthcoming.

On direct examination by Prosecutor Naftalis, FBI agent stated that he did believe additional recording might exist other than those found, however as per the timeline above, this would have been impossible as Agent Callahan had not even reviewed the computers if at all, until after the proffer session where he stated that he told Lumiere's Attorney Udell that he believed other recordings might exist and that he wanted them.  The only feasible answer is that Agent Callahan learned of the additional "hard drives" that he missed in the execution of the search warrant directly from Lumiere at the proffer session.

Direct:

Q: Based on your investigation, did you believe that additional recordings might exist--

A: Yes

Q: Other than those that you found?

A: Yes

Q: What, if anything did you do with respect to that request and the existence of recordings?

A: Mr. Lumiere came in for a proffer session, we had a conversation with his attorney at the time and let them know that we believed additional recordings existed and asked that they be produced to the government.

Q: And when you said say that Mr. Lumiere came in for a proffer session, do you recall when that was?

A: I believe that was March 17th, 2014

(Doc 38-1:TR P 6 Ln4-6)

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Now as for review of the materials, defense attorney and Petitioner believed that no actual review was actually done given the time Agent Callahan actually allegedly spent, " A couple of hours over a one or two-day period" given the sheer number of folders, subfolders, and files in the seized electronic media being in the millions clearly demonstrated that the government did not in good faith review the material when they said they did and went on to "we moved to other investigative steps" as FBI Agent Callahan later admitted. (Doc 38-1 TR P 22 Ln 25).  When the Government argued that this case was not like the Metter case where the government did not review the materials and led to suppression of all seized evidence given that the Government alleged that he looked at the devices, this was clearly a play on words meant to fool the court.  Agent Callahan may have "looked" at the physical device such as a computer from across the room yet that does not equate to reviewing a single file for evidence responsive to the search.

Had the Government spoken truthfully in court, they would have admitted that Agent Callahan actually did no review of the materials and that they did not begin to review the evidence until years later when they made one last effort to get Petitioner Lumiere to cooperate with them by testifying against Jacob Gottlieb (Visium Funds founder) whereby they filed a complaint against Petitioner Lumiere in lieu of an indictment in an effort to scare Petitioner Lumiere into cooperation.  At Petitioner Lumiere's arrest, FBI Agent Callahan told him: "It's not too late to work with us."  This is clear evidence that the government had not intended to target Petitioner Lumiere but did so, simply because Petitioner was unwilling to agree to their mistaken "theory".  This far-fetched and biased theory was stated by Jason Thorell, a whistleblower who even the Government and Attorneys acknowledged was motivated not to do the right thing, but by making money off of this complaint.  Thorell would stop at nothing to make money off of Visium and to make them pay for not paying him what he believed he deserved and destroying Visium. He admitted as much in recorded statements where he said he had a "vendetta" against Visium and wanted "jail time for Plaford, Gottlieb". When Petitioner Lumiere stated:  "I just want to make sure investors were treated properly", Thorell said: "What? Investors?  I just want to make money".   It is clear that the Government knows that Thorell's motivations are unpure, but figured if they could not get the Visium Funds founder Jacob Gottlieb, then they could at least get Petitioner Lumiere knowing he could not afford a proper defense which became more apparent to them when Petitioner Lumiere hired a single attorney Eric Creizman as opposed to even a larger firm that could handle a complex case such as this.  When the Government offered Petitioner Lumiere a much reduced charge in return for cooperation against Gottlieb, Defense Counsel Creizman was then conflicted and found the best option for himself was to take this to trial to protect Gottlieb and Visium from being charged so that he could

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

make much more money and make headlines to help his struggling firm which he told Petitioner was on the verge of bankruptcy.


Direct:

Q. Agent Callahan, you said that to summarize, between approximately the day of the search and March 20, you were looking at the electronic evidence?

A. Yes

Q. Have you reviewed this electronic evidence, meaning the electronic evidence seized from the defendant's apartment, since approximately late March 2014

A. No

(Doc 38-1: TR P 9 Ln14-25)


Q. Did you speak to the Assistant United States attorneys then assigned to the case about what you were finding?

A. Yes

(Doc 38-1: TR P 10 Ln19-21)


Q. So what I want to understand is how you and your team, after you review the files and determine that certain things are responsive or not responsive, how do you Track that?

A. We have, our system allows us to mark, or just simply writing down the location, remembering the location, and we can have the forensic examiners go in and pull those files out that we want to have further access to.

Q. But you are saying that there is no--you didn't have any protocol in this review of these computers

A. What do you mean by "protocol"

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Q. Well, either saying, either putting responsive documents in a particular storage device or database or identifying in some way that the files that were reviewed are not responsive.

A. No

Q. There is --other than memory, perhaps, there is no way that--

A. There was no protocol in this case, no

Q. So when did your review of the HP laptop, when was it completed?

A. I spent several hours reviewing all three of the computers.  That would have been done over a one-or two-day period.

Q. Only one or two days to determine what was responsive to the warrant and what wasn't"

(Doc 38-1: TR P 18 Ln2-24)

Q. And what did you do with--what did you do with the materials that were responsive? Did you mark them in some way?  Did you identify them in some way?

A. No

Q. So how did you determine what materials were responsive and what weren't? How did you memorialize that?

A. There was--

Q. No--

A. None

(Doc 38-1 TR P 19  ln19-25 to P 20 ln1-2)

Q. But these computers, or the images of these computers, right, were held for basically two and a half years, right?

A. Yes

(Doc 38-1 TR P 20  ln3-4)

Q. And those USB Flash drives or mirror images of those flash drives, they were kept for two and half years, Correct?

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

A. Yes

Doc 38-1 (P21 Ln9-10)

Q. And did you review these tablets in the same manner that you reviewed the other electronic devices?

A. No

Q. How was it different?

A. There was no review on the IPad or the tablet.

Q. And why was that?

A. We moved to other investigative steps

(Doc 38-1 TR P 22 Ln19-25)

The Court: Just going back a second, so once you got the password for the previous item, why didn't you review it?

The witness: There were other investigative steps that took up the time. We were in cooperative posture with Mr. Lumiere at the time.

(Doc 38-1: TR P 23 Ln22-25 to P 24 ln1)

SL00404 [IVC Pt2] Perjury FBI Bad Faith

The Court addresses FBI Agent Callahan about the period of cooperation to which, Agent Callahan knowingly lies to the Court.

The Court: What was the period that you were in a cooperative posture with Mr. Lumiere?

245

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

The Witness: I would say that it was--well, the third week of March 2014, when he came in for a proffer and then at least through April 15th, when we got consent from him to search the electronic devices that his attorney produced to us with the additional recording that we asked for.

The Court: I'm sorry.  From March of 2014 through April 2014?

The Witness: Correct.

The Court: So I thought--was that the only time period of exploring cooperation, if you will?

The witness: It could have been longer than that.  I mean--

The Court: As far as you know

The witness: As far as I know (Doc 38-1 TR P 24 Ln2-18)

Agent Callahan perjured himself here as the evidence shows that the Government was in a cooperative stance with Petitioner Lumiere with Attorneys Abramson & Morak through at least Oct 15th 2014 when a proffer was scheduled with the government. (See Government emails to Defense Attorney about proffer schedule and Defense Attorney Letter to Petitioner about scheduled proffer meeting with the government: A99.1, A99.2, A99.3, A99.4. A99.5)

Additionally, even after the complaint was filed in June 2016, Agent Callahan stated to Lumiere: "It is not too late to help us". And even after the subsequent Indictment was filed after July 2016, the government approached Defense counsel again to discuss cooperation to have Petitioner Lumiere or perhaps his sister, cooperate to help them build a case to go after Jacob Gottlieb (Visium Funds Founder). (See Memorandum of Secret Discussion between Defense Counsel Creizman and the Government Exhibit: A69)

Q. All I wanted to get to is this question, whether you recall Mr. Udell telling you that there were other recordings that were not seized in the execution of the search warrant.  Do you recall that?

A. Mr. Udell telling is that?

Q. Yes

246

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

A. No

Q. You don't recall that

A. No

Q. Do you recall that he said that there were privileged materials in the items that were seized

A. No

Q. You don't recall that

A. I do not (Add Transcript Reference:


Agent Callahan misled the Court here by saying that Mr. Udell did not tell him that there were other hard drives containing recordings that were missed in the search during Petitioner Lumiere's proffer session.  This is because this information came directly from Lumiere.  Lumiere stated that the Agent missed hard drives during the execution of the search warrant and when asked if they were hidden, Lumiere stated that they were in plain sight, one was next to the printer in the living room and the other was on the desk in the bedroom. (See Defense Counsel Udell Notes from Proffer March 17th, 2014: A80)

Agent Callahan committed perjury when he said the Defense Counsel Udell did not tell him that there were privileged materials that were in the seized during the search. (See Udell Proffer Notes from March 12th, 2014 with Government including Agent Callahan: A 79).  There were attorney recordings, and legal notes made for attorneys meetings just before Lumiere reported his concerns to Park & Jensen Defense Counsel Robert Knuts.

Q. In searching the devices that were seized on February 26, 2014, were there any protocols in place to determine whether files or documents that were found were subject to the attorney/client privilege?

A. Just my review

(Motion to Suppress Hearing Oct 19th, 2016: Tr P 30 Ln5-9)

Q. And did you come across any documents that included Mr. Lumiere having discussions or communications with an attorney?

247

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

A. No

Q. But you didn't know which--who--what might have been an attorney or not, correct?

A. I knew who his attorney was at the time.

Q. Just Jeff Udell?

A. Correct

(Motion to Suppress Hearing Oct 19, 2016: Tr P 30 Ln10-18)


   Agent Callahan committed perjury when he said that he did not know of any of Petitioner Lumiere's attorneys prior to Udell. Agent Callahan was well aware that Lumiere had been represented by Park & Jensen's Attorney, Robert Knuts, who Mr. Lumiere had even put Immunized Witness Thorell in touch with when he warned Mr. Thorell after leaving Visium that he was concerned that Cooperating Witness Plaford (Credit Fund Portfolio Manager and Partner) was misvaluing the portfolio and did not Trust Plaford. (See FBI Agent Callahan "corrected" recorded sessions between Thorell and Lumiere December 19th, 2013: A23), and (Jan 4th 2014 Lumiere #2: A24), and Park & Jensen email describing discussion with Prosecutor(Exhibit), Park & Jensen Retainer Agreement dated March 4th 2013: A 78), (Robert Knuts Email exchange with Agent Callahan when Agent Callahan returned Petitioner Lumiere's cell phone the day after execution of search warrant on Feb 27th 2014: Not available due to Petitioner's current circumstances) and Mr. Udell's email to Government with list of Lumiere's attorneys sent just before or just after his March 12th proffer session: A79).  Additionally, Mr. Callahan told Petitioner Lumiere at the time of the search on Feb 26th, 2014, that he knew that Lumiere was represented by Counsel Robert Knuts and that he should call him after the conclusion of the search. (Evidence from Recordings in Lumiere #1: A23, and Lumiere# 2: A24)


        The Court: Did he provide the name of those attorneys?

        Creizman: He--I don't know if he provided the name of the attorneys, but he did tell the government that Mr. Lumiere went to talk to an attorney when he became concerned about a certain-about certain practices related to valuation at the end of the time that he was at Visium, right before he left Visium.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Creizman was ineffective here as he had spoken to Petitioner Lumiere who told him the evidence he had that he had sent a list of the attorneys and that Petitioner Lumiere referred to Attorney Knuts many times during the recorded government sessions between Thorell and Lumiere.  Mr. Creizman had also spoken to Attorney Udell who should have confirmed the list of lawyers that Udell sent to the government. (Email with list of attorneys' names that Lumiere sent to Attorney Udell: Not available due to Petitioner's current circumstances; Email with list of attorneys' names that Attorney Udell sent to government: Not available due to Petitioner's current circumstances)

> The Court: If he gave the name of the attorney, then the government would be in a position to convey to the agents and, if they heard the conversation with an attorney, they could take steps to minimize it..."

(Motion to Suppress Hearing Oct 19, 2016 Tr P32 Ln14-25)

 The fact is that Agent Callahan and the government were well aware of being on notice of privileged materials in the seized materials from many sources and stating otherwise to enhance their case is simply a lie and committed perjury under oath.

## V.  THERE WAS A PREJUDICIAL CONFLICT OF INTEREST THAT TAINTED AND INFECTED EVERY ASPECT OF CREIZMAN'S REPRESENTATION OF PETITIONER LUMIERE

A conflict of interest claim is really a claim in effective assistance of counsel due to counsel's divided loyalties, Glasser v. United States, 315 U.S. 60, 70 (1942).  While prejudice is presumed where there is an actual conflict of interest, such that the "courts have noted the incentive to characterize what would otherwise be a claim for ineffective assistance as a conflict of interest", United States v. Molee, 220 F.3d65, 69-70 (2d Cir. 2000).

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170

If an actual conflict is discovered at the district court level and "is so egregious that no rational defendant would knowingly and voluntarily desire the attorney's representation, then the Court must disqualify the attorney." United States v. Lussier, 71 F.3d 456, 461 (2d Cir. 1995).

In the instant matter, Petitioner Lumiere would not learn the full extent of the egregious miscarriage of justice until after Trial. At the forefront of Creizman's representation of the Petitioner, Creizman received word from Visium's external counsel that they wished to help and indemnify Petitioner Lumiere and pay for Creizman's counsel. Creizman made it clear that this Common Interest Agreement (Exhibit dated Jan 29, 2017: A62) would be very lucrative for the defense counsel. Petitioner Lumiere voiced his concern in Trusting Jake Gottlieb (Visium Funds Founder) because he believed Gottlieb had an ulterior motive to frame him and had indeed set him up as a fall guy. Petitioner Lumiere commanded Defense Counsel not to communicate with anyone representing Visium, for he adamantly believed they would corrupt the defense counsel. Defense Counsel communicated with them anyway, and informed Petitioner Lumiere again that they wanted to compensate his lawyer fees and wanted him to sign an affidavit exonerating Jake Gottlieb (Visium Funds Founder) of any wrong doing tied to allegations. Incensed by this, Petitioner Lumiere sought to hire a new attorney from a large law firm. When Kobre and Kim reached out to Visium's counsel, they informed Petitioner Lumiere that Visium would only deal with existing counsel Creizman. With no other options, Petitioner Lumiere agreed to indemnification from Visium for he could not afford Krobre and Kim himself. (See Indemnification Letter dated November 1st 2016: A63, A64) He did so under strict instructions not to share any information or discovery or files with Visium. And by no means did the Petitioner agree to allow defense counsel to enter into a joint defense agreement with Visium or a Common Interest Agreement with Jake Gottlieb. Visium, Petitioner's former employer, and by extension, Jake Gottlieb, paid Petitioner Lumiere's counsel, Mr. Creizman, creating an egregious conflict of interest. (A63, A65, A66. A65.1).

Among the risks posed by having the same lawyer or law firm represent multiple individuals or entities are: (1) the lawyer's advice to one represented party will be colored by how that advice will affect the other party; (2) a defense strategy beneficial to one party might be detrimental to the other party; (3) the potential conflict will animate decisions about cross-examination of witnesses; and (4) the confidences of one client will be revealed to another client. See United States v. Schwarz, 283 F.3d 82 (2d Cir. 2002). All of these circumstances explicitly arose throughout the Trial.

Sometimes lawyers from Co-defendants formalize their defense strategy in an oral or written joint defense agreement. A related issue arises when a defendant is represented by lawyers paid for by

an alleged co-conspirator. United States v. Piervinanzi, 23 F.3d 670, 684 (2d Cir. 1994). In this case, Jake Gottlieb (Visium Funds Founder) and Steven Ku (Visium Funds CFO) from Visium were alleged Co-conspirators in the government's misvaluation of assets complaint. (Department of Justice Letter Filed Under Seal Dated September 27, 2016 naming Gottlieb and Ku as alleged Co-Conspirators: A66) The court during pre-Trial motions, demanded that the co-conspirators be revealed during the Petitioner's Trial (A67 p 1-2):

Mr. Naftalis: Then one other issue, to come back to the bill of particulars, the Government would ask to file the coconspirators under seal. The government's investigation's ongoing. We don't think it's appropriate to reveal who the coconspirators are to the world.

The Court: That's fine with two caveats. One is, of course, it's going to come out at Trial.

Mr. Naftalis: Right.

The Court: There's going to be no concealment at the Trial itself. And, number two, of course the--I express no opinion, but often in these situations the press will file an inquiry, and we'll deal with that if and when they file an inquiry." (Tr P18 ln16-25, P 19 ln1-3)

However, neither the Prosecutors nor Creizman mentioned that they were indeed alleged co-conspirators as the court had ordered. The government was looking to solicit Petitioner Lumiere's cooperation against Jacob Gottlieb and Steven Ku even after the indictment of Petitioner Lumiere (See Creizman Memorandum noting meeting on September 8th, 2016 with AUASA Naftalis dated September 12th, 2016: A69 p 1-8)), but during Trial all but ignored the Visium founders and Visium CFO's alleged involvement according to their theory. In this memo, Naftalis solicited Petitioner Lumiere's cooperation in return for a lesser plea of something unrelated to the case such as Misprision of Felony. It is quite obvious why Creizman did not pursue this offer from the government as it would place his funding at risk. And he also did not mention Gottlieb and Ku as alleged co-conspirators due to his arrangement with Visium and Jacob Gottlieb who were in a secret Joint Defense Agreement and Common Interest Agreement with them. Defense Counsel chose to protect Visium and Gottlieb at the expense of his client even though there was significant evidence in discovery that they were deeply imbedded in the procedures and valuations of the allegedly misvalued assets which would alter the government's

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170

presented theory and raise a serious question of doubt into Petitioner Lumiere's knowledge and
culpability.  There is also evidence that Gottlieb when faced with a significant redemption in the Credit
Fund decided to use capital from the Balanced Fund to invest in Credit at coincidently the same time
further involving Gottlieb in the process and valuations. (Document in discovery which Petitioner does
not have access to at the moment due to being incarcerated with the BOP blocking Petitioner access to
His Discovery which is stored on electronic external drives.)  Creizman had a joint defense agreement
(Invoice initially hidden from Lumiere) and common interest agreement (Creizman Letter Dated Jan
29th, 2017: A62) with the Petitioner, Visium founder and CIO Jake Gottlieb.  Jake Gottlieb also
potentially had a joint defense agreement with Chris Plaford and Jason Thorell as well.  In this situation
Creizman may "prevent his client [(Petitioner Lumiere)] from obtaining leniency" by opposing efforts to
have the client cooperate or to properly defend the client in the interest of the alleged co-conspirator
(Wood v. Georgia, 450 U.S. 261, 271 (1981)(remanding for determination of whether attorney
representing employee but paid by employer suffered "actual conflict").  At a minimum, "benefactor
payments" create doubts "as to whether the attorney's loyalties are with the client or the payor." (In re
Grand Jury Subpoena Served upon United States v. Doe, 781 F.2d 238, 248 n.6 (2d Cir. 1986)(en banc);
Amiel v. United States, 209 F.3d 195, 198 (2d Cir. 2000) (remanding for evidentiary hearing where
habeas petitioner sufficiently alleged actual conflict based on benefactor payments by petitioner's
mother, who was her co-defendant); United States v. Bernstein, 533 F.2d 775, 788 (2d Cir. 1976)
(conflict apparent when employer paid for employee's lawyer)).

      At the conclusion of Trial, Petitioner Lumiere fired Creizman due to his astonishingly incompetent
performance and hired another law firm to take over post-Trial motions and proceedings.  Petitioner
Lumiere was asked by new counsel from Foley & Lardner to be cordial and friendly with Creizman as
they would need to be brought up to speed on the case.  Defense Counsel Creizman used the file sharing
cloud storage service from Dropbox to share files and evidence with Petitioner Lumiere.  Petitioner
Lumiere downloaded all of the information contained in this shared cloud storage service to his
computer in anticipation of sharing it with his new lawyers.  In this downloaded information, Petitioner
Lumiere found evidence in his case Dropbox folder that he was granted permission for, that was
apparently not intended for Petitioner Lumiere to be aware of.  This is when Petitioner Lumiere found
the Common Interest Agreement with Visium (exhibit: A62), and the invoices from Creizman to Visium
(exhibit invoices: A65) indicating Creizman was working with Visium in a joint defense agreement and
Jake Gottlieb in the common interest of Jake Gottlieb, tainting and corrupting his defense of Petitioner
Lumiere.

Petitioner Stefan Lumiere v. United States of America                Case No. 18-CV-9170

At this time, when Defense Counsel Creizman knew he was being fired, he sent the contents of a hard drive that had a protection order from the court to Jake Gottlieb's personal criminal attorney at Paul Weiss in a shockingly odious infringement of the Petitioner's right to justice and fairness (A68 p 1-10). Visium and Jake Gottlieb, Chris Plaford, and Jason Thorell now had access to privileged information regarding Petitioner Lumiere's case that they could now use to further frame Petitioner Lumiere and continue to infect future proceedings. This conduct also shows that Defense Counsel Creizman's interests were more aligned with Visium and Jake Gottlieb (Visium Funds Founder) than the Petitioner's interests because it was more lucrative to Creizman to protect Jake Gottlieb and his wealth in an ignominious display of avarice. This parasitic infection so tainted the Trial because it "involved a defense attorney's self-interest that actually conflicted with his client's interests so severely as to permeate every aspect of the representation.", United States v. Perez, 325 F.3d 115, 124 (2d Cir. 2003).

As a result of these conflicts, defense counsel did not put in any effort into Petitioner Lumiere's case, doing no work on discovery, introduced none of the many exculpatory documents on valuation and Valuation Committee likely due to its included involvement of Jake Gottlieb, Steve Ku, and Marc Gottlieb into the procedures and valuations. Additionally, he called none of the many witnesses from Visium and from external advisors that had done the valuation work or had worked on the restructurings for the creditors of many of the investments that were alleged to be overvalued. These are further itemized and discussed in ineffective assistance of counsel: Failure to introduce exculpatory evidence, Failure to Subpoena Witnesses, and Failure to subpoena materials.

SL00501 [V.B Pt2] Co-Conspirators

V.A. BOTH PROSECUTORS AND DEFENSE COUNSEL CREIZMAN DEFIED COURT ORDER THAT THE NAMES OF THE ALLEGED CO-CONSPIRATORS NEEDED TO BE REVEALED AT THE TRIAL. (SEE CO-CONSPIRATOR ALLEGED LIST UNDER SEAL 9/27/16: A66)

However, both the prosecution and defense counsel left out naming the alleged co-conspirators Jacob Gottlieb and Steven Ku. Defense counsel erroneously without court permission placed into the court docket a Bill of Particulars which included alleged co-conspirators in the Visium investigation which

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

included Jacob Gottlieb and Steven Ku.  The prosecutors requested that the names of alleged co-conspirators be sealed as they were still working on their case.  The court stated that the co-conspirators need to be revealed, if not there, then "they need to be revealed at Trial".  Prosecutors however did not do this. They did everything they could to keep Jacob Gottlieb and Steven Ku out of the evidence in defiance of the court order.  In a recording that was submitted into evidence, where Lumiere and Thorell had been discussing whistleblowing on Visium and Lumiere obviously got the impression that Thorell's motivation was not sincere about doing the right thing, so Lumiere asked Thorell: Are you doing this to hurt Visium or for the Money.  Thorell replies: Both.  I want jail time for Plaford... The Transcript and recording are cut off here.  Yet upon review after Trial, Lumiere noticed that the sentence was not complete and therefore listened to the full recording.  Lumiere listened to the full recording which continued showed the end of the sentence to actually be Thorell stating:


CS: (Thorell): "Um, Plaford, yeah.  Like, I...he's gone from the business, if we wanna do [it] like that. That's easy, ok? Personally, I would like jail time. For him. Gottlieb." (Transcript Corrected: A24: Tr P47 ln16)


   The prosecution's specific removal of this part of recording was a Brady violation and ineffective assistance of counsel because it hid who Thorell was accusing of wrongdoing at the time and therefore would have introduced serious and significant doubt of the jury that someone who was paid no bonus during the time of the alleged fraud was knowingly involved in the alleged scheme.  This sentence demonstrated that Gottlieb and Plaford were the obvious accused "masterminds".  Yet the prosecution left it out and defense counsel either never bothered to check and review the recording or Transcript for completeness or purposely left it out do to a conflict ( See Conflict of Counsel).  Additionally Thorell's secret recording of Gottlieb and the Transcript or the discussion of what Gottlieb actually said to Thorell never made its way into the courtroom .  This recording as Thorell described under oath, consisted as Gottlieb being "very concerned" with Thorell's allegations as if he were going to look into it.  Yet it is obvious from the recording is the fact that Thorell had disclosed this to an attorney.


   Gottlieb in this recording is defending the valuations of ATI and CMED.  Gottlieb states that ATI and CMED are not misvalued.  How would you know anyway?  You are not an analyst?  These positions are

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

being valued by outside parties anyway so you are incorrect.  That is pretty interesting evidence that never made its way into the courtroom for the jury to hear and assess. Why was the prosecutor avoiding the content of the recording?  They solely wanted to show Thorell's good faith in the date he reported, but then prosecutor stated that: now not discussing the content of these meetings.  Again, prosecutor is hiding the Truth and the facts which amount to a Brady Violation, abuse of discretion and a defiance of court order.

 The next recording that was pertinent involved Thorell with David Keily (General Counsel at Visium) and Steven Ku (CFO and Partner at Visium). In this recording, again, prosecutor does not want the content of the meeting but only the timeline.  In this recording, Keily and Ku tell Thorell that he has done nothing wrong and laugh that he believed he was doing something wrong.  The GC and CFO then tell Thorell that he should keep on doing what Plaford had been asking him to do because it did not matter anyway.  None of the prices he was providing had anything to do with the calculation of the NAV of the fund. The prices and quotes provided were being used for internal purposes only.  This is very interesting as this is exactly what Plaford had told Lumiere and Vandersnow.  That none of it mattered really because it was for "internal purposes only".  The bottom line, is Thorell, Lumiere were both told that none of this went into the final pricing.  If this does not display that the involvement and misrepresentations came from the top, Gottlieb, Ku, Keily, Plaford and not from Lumiere and Thorell.

But yet, the prosecutor chooses to hide this important piece of information from the court and jury. Why then did defense counsel leave this out?  Was it that he was ineffective?  Did not know the rules of evidence?  Or was it that he was conflicted as it was uncovered that Defense counsel Creizman had entered into a secret Joint Defense Agreement with Visium and into a secret Common Interest Agreement with Jacob Gottlieb.  Perhaps this is why neither counsel introduced this evidence which was so key into describing what happened at Visium.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

## VI. DEFENSE COUNSEL CREIZMAN FAILURE WITH EXPERT WITNESS IN TERMS OF A. CALLING WITNESS AND B. ATTENDING THE DAUBERT HEARING TO ARGUE THE SCOPE OF WHAT THE EXPERT SHOULD BE PERMITTED TO TESTIFY TO.

## VI.A. DEFENSE COUNSEL CREIZMAN FAILED TO CALL EXPERT WITNESS TAWIL WHOM WOULD HAVE PROVIDED INDICATED EXONERATING TESTIMONY, CAUSING A COMPLETE MISCARRIAGE OF JUSTICE.

Mr. Tawil , President and co-founder of Maglan Capital, would have defined confusing terms used throughout this case (A130 pg1).  He would have explained the complex concepts that the government used to manipulate a naive jury into believing the Petitioner may have committed a fraud (A130 pg1, Memorandum of Indicated Tawil Testimony).  He would have contradicted every argument the prosecution had against the Petitioner, and that all of Petitioner Lumiere's actions conformed legitimately to within industry standards (A130 pg2, Memorandum of Indicated Tawil Testimony).  He would have enlightened the jury to the prosecution's misuse and manipulation of industry terms (A130 pg2, Memorandum of Indicated Tawil Testimony). Mr. Tawil would have testified about general practice and many different purposes for hedge funds to request broker quotes (A130 pg2, Memorandum of Indicated Tawil Testimony).  Failing to call Mr. Tawil was so egregiously a fundamental defect of tact that it was far beyond the bounds of reasonable professional conduct and crosses into the realm of deliberate indifference with a culpable state of mind.

We see in United States v. Cronic, 466 U.S. 648, 662 (1984)(presumption of prejudice involving representation by inexperienced lawyer under deadline pressure in complex white collar crime case) "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." Cronic, 466 U.S. at 658.  For example, in the unusual case where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing," then, for Sixth Amendment purposes, that renders "the adversary process itself presumptively unreliable." Cronic, 466 U.S. at 659.

256

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Several instances of deficient performance may be aggregated in order to consTruct an ineffectiveness claim, Henry v. Scully, 78 F.3d 51, 53 (2d Cir. 1996);Rodriguez v. Hoke, 928 F.2d 534, 538 (2d Cir. 1991).

The reason Defense Counsel Creizman gave to Defense Counsel Foley (Petitioner's counsel for post-Trial motions) and Mr. Tawil himself for cancelling Tawil was that the "government's case was too weak", establishing lack of strategicbasis for defense counsel's deficiencies.  The tact of not preparing an adequate defense because of the belief that the government's argument will not be adequate is not in the realm of "strategicchoices made after thorough investigation of law and facts relevant to plausible options" Strickland, 466 U.S. at 690.

Defense Counsel chose not to prepare a defense by calling an identified expert witness, and not to call any witnesses, solely because he believed the government's case would not be adequate.  It is apparent from this explanation that Ceizman's decision as to which witnesses to call was animated primarily by a desire to work in cooperation with Visium and Jake Gottlieb, and to save himself labor - to avoid preparing a defense that might ultimately be detrimental to his cooperation with the indemnity of Co-conspirator Jake Gottlieb and Visium, or to avoid preparing a defense that might ultimately prove unnecessary, Pavel v. Hollins 261 F.3d 210 (2d Cir. 2001).

Failure to call expert witness Tawil because Creizman didn't think government's case was sTrong enough constitutes ineffective assistance of counsel because it "was not based on... a plausible strategiccalculus." Pavel v. Hollins, 261 F.3d 210, 222 (2d Cir. 2001). The decision to not call expert witness Tawil, or any other witness, was not grounded in a strategy serving the interests of the defendant, and that, in the Petitioner's case, there was no strategic reason for counsel's failure to call these witnesses.  The decision to forgo calling these suggested witnesses was because of Trial counsel's other pending cases, commitments, and lack of preparation.  But the most egregious reason for the decision to forgo calling Tawil or any witnesses was due to conflict.  Visium and founder Jake Gottlieb were in an indemnification agreement and paying Defense Counsel Creizman for his defense of Petitioner Lumiere.  If Tawil testified, it would have been devastating to the prosecution's case, and the indictment may have shifted to Jake Gottlieb, Defense Counsel's main source of income.  Without Tawil and other witnesses, the Petitioner could not properly mount a defense to dispel the false version of events presented by the prosecution.

Petitioner Stefan Lumiere v. United States of America                              Case No. 18-CV-9170

SL00601 [VI.B] Daubert Hearing


VI.B. FAILURE OF DEFENSE COUNSEL CREIZMAN TO ATTEND IMPORTANT DAUBERT HEARING
TO ARGUE PERMITTED SCOPE OF EXPERT TESTIMONY AND FAILURE TO ARGUE THAT HE
SHOULD HAVE BEEN ABLE TO ANALYZE AND OFFER HIS VALUATION AND OPINION ON THE VERY
SECURITIES THAT GOVERNMENT ALLEGED WERE MISVALUED.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Defense counsel asked to be excused from the Daubert hearing that went into deciding what the defense expert witness would and would not discuss. The key arguments that defense witness would have testified to included:

However Creizman's failure to attend this most important hearing was incredibly ineffective. Doing so significantly prejudiced the defense at Trial. He had a recent associate who had no security experience and just recently started spending time on Lumiere's case just in the weeks prior to Trial manage the defense side of the hearing. What she ended up doing was a disaster. She simply backed away from every single government ask without any challenge making the judge's ruling too simple as she refused to argue a single position. She may as well have been working for the government promoting the government's position to limit testimony to the securities or to any processes surrounding a hedge fund. There is no reason why the expert should not have been able to discuss how other funds processes work that may bear on the functions and roles. David Keily unfortunately was unable to respond to these as compliance officer since he was not on any committee therefore had no access. There was no one from the Valuation Committee or executive committee that could have described the process. Additionally, there is no reason why Expert should not have been able to analyze, review the securities in question with a more in-depth perspective than that offered by SEC economist Jindra who did not work on the names.

What this witness should have been able to testify to is apparent and would have made the government's arguments fail and would have impeached witnesses Vandersnow and Plaford and Thorell: ( See what the Expert would have testified to)

Vandersnow indicating that Princeridge was small whereas it was quite a large firm by broker dealer standards with over 800 institutional clients and hundreds of employees. Not as large as JP Morgan but still quite large and not a garage bucket shop with 3 employees that the government, Vandersnow and Thorell allude to. As for Janney Montgomery they were also considered a reasonably large firm with a long history of research, investment banking and investment management.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

The fact that the Government, Thorell stated that Reuters was the defacto benchmark would have appeared ridiculous for any bond broker or bond investor.  Bloomberg is the standard platform used and no one would have both a Bloomberg and a Reuters not even at JP Morgan.  As for the pricing service, the expert would have said that these pricing services make more mistakes the less liquid the security.  If there was anyrestructuringor amendments negotiated as in adistressedsituation, it would not reflect any of that so would be worthless.

He could have testified that it is standard that indistressedsituations, members of the creditors committee would get incremental information that the rest of the market would not know and therefore make the perceived market price incorrect if it was asked by a manager to stipulate to the fair value of the security.  Or the investors on a committee may structure unique situations that would give them additional economic benefits that would change the value of their position such as warrants attached or additional equity that would increase the value of their position relative to other investors.

Testified that there is a whole process to setting a price in a fund especially for one's that are disTressed, less liquid or restructured where the Administrator that just relies on a feed from a pricing service would be wrong and not reflect fair value.  So the process would entail, the portfolio manager to discuss the issues with the operations and accounting and valuation committees and investment manager and then communicate this to the Administrator and auditor for their opinions and final review.  This would not possibly be a process where a rogue Trader would inflate the value of a security.  There would be too many checks in place that would need to be argued.

SL00700 [VII.A] Knuts

# VII. ESPECIALLY EGREGIOUS INSTANCES OF DEFENSE COUNSEL'S VIOLATION OF PETITIONER LUMIERE'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

## VII.A. PETITIONER LUMIERE WAS THE FIRST TO REPORT HIS CONCERNS ABOUT VALUATION PRACTICES AT VISIUM

Ineffectiveness of Counsel Robert Knuts- Failure to follow through with Lumiere's report of his concerns as to Visium's valuation issues in the Credit Fund and failure to identify any potential criminal liability to anyone in the fund. Additionally, Knuts repeated failure to follow through with Lumiere's request to report instance to SEC for their review. An effective attorney, especially an attorney that had worked with the SEC such as Robert Knuts, would have instructed Lumiere properly to further the discussions surrounding Visium's valuations, its policies, its representations and worked on reporting such concerns to the SEC under the SEC Whistleblower program. However in this instance, Robert Knuts, repeatedfailure to advise and pay attention to Lumiere's concerns while Lumiere Trusted Knuts due to his previous ties to the SEC. Knuts irresponsibility and lack of action caused irreparable harm to Lumiere as Lumiere would have been the whistleblower in the case instead of a prosecuted target aided by the web of lies told by the subsequent cooperating witnesses Plaford andThorell.


Background: Lumiere met with Park & Jensen, Robert Knuts on May 17th, 2013 (See email of meeting schedule with Park & Jensen on 5-15-13: A70) . He had initially been referred to Tai Park who was referred by attorney from Stroock, Stroock & Lavan but since Attorney Park was not able to make the scheduled meeting offered to have Petitioner Lumiere discuss the situation with Attorney Robert Knuts who was an ex-SEC attorney. Petitioner Lumiere presented his newfound concerns surrounding Visium's valuations and the risk that the procedures implemented by the firm were potentially being corrupted by his superiors, Christopher Plaford, Steven Ku, and Jacob Gottlieb. Petitioner Lumiere presented notes that he had prepared ahead of this meeting for discussion points as well as recordings that he had made of the processes at Visium that his supervisor had told him to follow and was led to believe was proper based on Plaford's telling Lumiere that these procedures were authorized by Jake Gottlieb, the Chief Investment Officer and Steven Ku, the CFO, Accounting, and the SEC who was on sight reviewing Visium's processes. (See Attorney Knuts notes from Petitioner Lumiere's meeting on May 17th 2013: A71, Attorney Udell's Notes of conversation with Attorney Knuts about what Transpired while counseling Lumiere on his concerns of Visium's practices where Knuts told him that he recommended not being a whistleblower: A72)

Petitioner Stefan Lumiere v. United States of America                     Case No. 18-CV-9170

Petitioner Lumiere asked Knuts to review a series of documents and recordings for his opinion on whether these concerns were legitimate and whether he should report them to the SEC. However Knuts stated that this would not be of interest to the SEC as they were primarily interested with insider Trading cases.  He further added that hedge funds had wide latitude into how they valued their positions.  Based on this, Knuts stated to just "Let sleeping dogs lie", without further investigating the matter and responsibly guiding Lumiere. (See Udell notes from discussion with Knuts on March 13, 2014)

Petitioner Lumiere contacted Thorell about his concerns with Plaford and the firm's valuation.  Lumiere advised Thorell to leave Visium which Thorell refused to do but it was obvious that Thorell seeming extremely nervous about his position with Visium and how to handle the situation.  Lumiere advised Thorell to document everything that Plaford had him do and to tape-record everything so that he could protect himself just as Lumiere had.  Thorell admits to Lumiere that Plaford had him doing something that was a red flag of sending pricing files to accounting from. asks Knuts to speak to Thorell and advise him what to do given that Thorell decides to remain at Visium after Lumiere calls Thorell to warn him about his newfound

disTrust with Plaford and the suspicions that he has about Plaford's abuse of valuation processes. Lumiere did not stop there. Lumiere continued to contact Knuts and request that Knuts review the material to see if his recommendation would change. (See emails to Knuts A73, A74, A75, A76, A77 p2-3) Lumiere goes even further, not willing to "let sleeping

dogs lie".

On August 1, 2013, Petitioner Lumiere contacted Knuts again, to ask him if he had any further thoughts on Visium concern based on information he is getting from Thorell in the late July meeting.  It is obvious that Knuts has not paid attention to Lumiere's concerns as he is further asking for "progress and thoughts" as thinking about whistleblowing if there is substance which he is waiting for guidance from Knuts who was a former SEC Attorney.  Knuts did not reply and did not demonstrate any concern while he continued to represent Lumiere in another matter. (see Lumiere email to Knuts August 1 2013: A74)

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Lumiere continues to update Knuts on new information and new confirmation of concerns based on his discussions with Thorell about his description of occurrences at Visium and asks about whistleblowing and if his opinion has changed given the new information provided. {(See emails 12-19-13: A 75) and (1-6-14 (Exhibit A76)}

In February of 2014, when a search warrant was executed on Lumiere's apartment, he contacted Knuts who recommended that he hire Park & Jensen to represent him in proffers with the government. Lumiere who had been in the process of forming his own hedge fund, asked Knuts whether he would have to stop delay the launch of his fund or notify potential investors that Lumiere was being asked to assist with the investigation.  Knuts replied in so many words that Lumiere had done nothing wrong and that they would clear this up and that he should continue his funds launch and if asked by investors to just state that I am working with the government in an investigation and to leave it at that.

When deciding whether to hire Park & Jensen to assist with proffering, Lumiere was upset that Knuts had misguided him.  He canceled his meeting with Doug Jensen from Park & Jensen on March 3, 2014 exhibiting his discontent with Knuts error with respect to handling the situation when presented to Park & Jensen back on May 17th, 2013 and further on and

(See Email to Doug Jensen March 3, 2014: A 77)

It is easy to see where Counsel failed Lumiere, grossly prejudicing him with respect to his case.  Before a case even

existed Lumiere was prepared and offered to do the right thing by investors and report the issue. At this stage nobody else

had yet reached out to the SEC to make a report. It is easy to see how, the first prong of the Strickland test is met, by

Robert Knuts failing to investigate and advise on the matter.  Additionally the 2nd prong of the test is easily met, because

had Lumiere been the first to report suspected wrongdoing at Visium to the SEC, he would not have been prosecuted, he

would have been a witness in the case with granted immunity.  However, Knuts did the opposite.  He told Lumiere that he

did not view anything criminally wrong, failed to investigate further and did not see exposure for anyone at Visium and the

best thing is to "let sleeping dogs lie".  (See Knuts notes and Udell's notes with Knuts dated 5-17-13: A71, A72)

It is clear how Knuts failed Lumiere and proved himself completely ineffective and meeting the 2 prongs of the Strickland

Test.  1) A competent attorney would have assisted Lumiere in reporting the perceived infraction to the SEC and entered the whistleblower program; 2) Lumiere was several damaged as a result as he spent years with the government threatening to prosecute him, he was arrested, and convicted and sent to prison with enormous fines, a felony conviction, and a ban from the securities industry.  Had Knuts been more diligent and followed through with Lumiere's multiple requests to re-examine the situation and material, Lumiere would not have been prosecuted and instead could have worked with the government as a witness under the grant of immunity instead of Thorell piggy-backing off of Lumiere's early diligence and seizing the opportunity to protect himself and make money.

SL00701 [VII.B1-2] Udell

## VII.B. JEFF UDELL, ATTORNEY FROM OLSHAN FROME, FAILED TO MAKE AND INDEPENDENT DETERMINATION OF FACTS, CIRCUMSTANCES, PLEADINGS, AND LAWS TO MAKE INFORMED DECISIONS

VII.B.1. Failure of Attorney Udell to be present at scheduled signing of "Consent to Search" of Hard Drives that Lumiere volunteered to the Government to assist with their investigation of Visium. (see Consent to Search and Separate Rider with no initials)


On April 15th, 2013, not long after Petitioner Lumiere proffered with the Government on March 17th, 2013, Defense Counsel Udell contacted Lumiere to tell him that Agent Callahan was dropping off his

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

belongings and that he should come to pick them up at Udell's office.  Udell also advised that Lumiere
would need to sign a Consent to Search order that Agent Callahan had forgotten to request when hard
drives were delivered to him. Udell was not present in the office or available and did not advise Lumiere
that he was agreeing to waive his constitutional rights by signing said document (See email 4-15-14 from
Attorney Udell stating that he will not be in the office but recommends that Lumiere go to his offices to
meet Agent Callahan and sign the Consent to Search Form: Exhibit: Not available due to Petitioner's
current circumstances).  The document is questionable in that Lumiere was never told by either Agent
Callahan or Attorney Udell of this waiver and the language of the

waiver is on a rider (Separate page from Consent to Search with signature: Rider: Exhibit A82) that
Lumiere never saw or at least was never instructed to read and understand.  Given that there were 2
Hard Drives that FBI Agent Callahan missed in the search of his apartment and that Lumiere volunteered
this information during his proffer on March 17th, 2013 and then subsequently volunteered to produce
them to the Government to aid in their investigation of Visium, Lumiere believed that this turning over
of material would also be under the Proffer he signed.


    Udell in this argument fails the 1st prong of the Strickland Test, as an effective attorney would have at
a bare minimum made sure he was present to review the Consent Order, advise Client on consent order
and its risks.  Preferably, a

competent attorney would have discussed the Consent to Search document in person and confirmed
the document he would

be signing and then presented the document to the FBI after the risks were fully disclosed to client or
would have advised client not to sign the Consent to Search without full immunity.  Udell's action also
caused a failure in the 2nd prong of Strickland since as a result, Lumiere was deeply prejudiced and
resulted in Lumiere converting their case to target Lumiere as opposed to a Witness-Subject of the
investigation and resulting in using the recordings that Lumiere had made and consented to give the
government into an arsenal of accusations and inferences that the government used at Trial to prove
their case.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

VII.B.2. Failure to properly prepare to speak with Government in attorney proffer, making material
mistakes such as telling the government loosely that Lumiere became suspicious of Plaford "over time"
as opposed to the Triggering event which made Lumiere Question Plaford's actions which occurred just
prior to Lumiere's departure from Visium.


   Udell did not prepare sufficiently to communicate the issues and the timing of Lumiere's awareness
of some possible

wrongdoing at Visium.  Udell told prosecutors that Lumiere became suspicious over time which the
Government honed-in on and refused to turn back after that statement even though Udell attempted to
correct himself.  Udell told prosecutors that Lumiere became suspicious within a short period before he
left Visium and then insisted that his client was innocent if they only took time to listen to Lumiere.  The
government honed into Udell's word "short period" and then reinterpreted that by saying that Udell
stated: "Over time" which was incorrect, yet Udell did not correct the government's error properly.
Udell attempted to elaborate by stating that there was a Trigger which was the ATI situation where
Cooperating Witness Plaford (Credit Fund Portfolio Manager) did not want Lumiere to report the new
budgeted numbers to Accounting and that Plaford said that he would take care of it. Furthermore,
where Plaford made the statement that the numbers are backward looking and according to this
investment mandate, the investors do not get that information for several quarters out. However, the
government would not drop Udell's mistaken words which he failed to correct.


   Udell's action in this instance fails the first prong of the Strickland Test as a competent attorney would
have been more formal and exact in his wording as he communicated with prosecutors especially having
been a former prosecutor.  A competent attorney would have understood that first impressions and
presentations count Tremendously and that the prosecution already had a whistleblower witness that
was likely inflating Lumiere's involvement and would not have brought Lumiere in under Proffer at all
unless he had the sense that they may be open to believing what Lumiere was saying.

   According to subsequent counsel, the prosecutors did not let go of Lumiere primarily for "Udell's
actions" which were to fail to properly communicate that Lumiere was proffering to innocence and
wanted to help the government with their investigation whereas the Government had assumed that
Petitioner Lumiere was coming in to proffer to get a cooperation agreement and plead guilty to a crime.

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170

A competent attorney would not have brought Lumiere in at all under the circumstances or would have insisted on immunity or a non-prosecution agreement at the bare minimum. As a result of Udell's ineffectiveness, as disclosed by prosecutors to Lumiere's subsequent counsels, the prosecutors would not have prosecuted Lumiere who was always deemed a low level participant/subject/cooperator and only afterwards became a target when counsel failed to properly pursue cooperation which was offered over the years. (See Notes of Udell Proffer in Appendix: A79, A80, A81 and Creizman Plea offer memorandum of secret meeting with government on 9/8/16: A69), and Abramson & Morak Notes of discussions about government seeking Petitioner's cooperation: A83.) Udell's actions here fail in the 2nd prong of Strickland as his words created the first impression of the government that prejudiced Lumiere. They concentrated on the term used "Short Period" and converted it to "over time" and this was a Tremendous mistake by Udell not to be 100% clear.

SL00702 [VII.C(1-2)] Plea Offers


## VII.C. DEFENSE ATTORNEY'S FAILED TO PURSUE OR EVEN COMMUNICATE COOPERATION AGREEMENT THAT THE GOVERNMENT HAD PRESENTED TO PETITIONER.


VII.C.1. Abramson & Morak was ineffective in failing to communicate cooperation agreement that Government had presented to Lumiere in April to May of 2014.


A competent attorney would have explained the risks to Lumiere of not cooperating and the costs of going to Trial and absolutely taken time to learn about securities and the issues at Visium and understand Lumiere's position and the case.

Additionally, a competent attorney would not only have pursued immunity or non-prosecution or cooperation agreements and properly discussed the benefits of these options with a defendant as soon as offered. However, Abramson & Morak failed to properly educate themselves on the facts of case and the intricacies of why the allegations against Lumiere were incorrect and therefore explain the details and nuances to the government and they failed to communicate an offered cooperation agreement early on in 2014.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Background: AUSA stated to attorneys that they were not interested in another Lumiere proffer if
Lumiere was going to repeat what was stated on Lumiere's first proffer session with Olshan Frome.
Lumiere insisted that he was not able to finish his description of events that led to his understanding
that something may be off at Visium and he was never given the chance since his first Proffer was cut
short by Udell when the Government's stance became heated.  Abramson and Morak after scheduling
the proffer cancelled it, because the government's tone was that they were only interested in a specific

storyline that ended with Lumiere's admitting culpability which Lumiere insisted was not the case.
AUSA's communicated that they believed Lumiere's role to be minor, but yet still insisted on acceptance
of responsibility but were very interested in Lumiere's cooperation with the government.
Communications halted at this point for close to two years.


     Two years later in March of 2016, Lumiere received a voice message from Abramson & Morak that
the prosecutor again was interested in Lumiere cooperating with them and that "The Train was soon
departing".  Lumiere continued to explain his recollection of the events that led to his concern for
valuation practices at Visium, when Alan Abramson, after refusing to understand Lumiere's explanation
for why he believed at the time that Plaford had been telling him the Truth, stated: " I don't want to
know, I don't care".  So Lumiere then felt he could not possibly be represented properly by a law firm
that did not understand the financial concepts that Lumiere described as they could not possibly
communicate these to the government.  Additionally, Abramson stated that he did not care to
understand and refused to investigate them.  As a result Lumiere stated "what next": to which Alan
Abramson stated:  "Well at some point real soon, the FBI is going to kick down your door in the middle
of the night, and haul you off to jail in a cell with some very bad people."  Lumiere stated: "I don't know
what to do what is it that they want me to say."  At that point, Glenn Morak, said that the government
wanted Lumiere to agree to the story that they had put in the cooperation agreement from 2014.
Lumiere stated: What cooperation agreement? (see Abramson & Morak Notes with Discussions with the
Government about wanting Lumiere to be a cooperator A83 p 2,6,8) Lumiere had never been told of any
cooperation agreement, but only that the government was interested in him cooperating.

     Glenn Morak then read aloud from a piece of paper that he said was part of a cooperation
agreement from 2014 that stated that: "Lumiere on a regular basis, met with Plaford and Jacob Gottlieb

in an office to devise a scheme to defraud investors." Lumiere then stated: "But that is not True. I was not in any meetings and was not part of it. To which Alan Abramson interjected: "Can you prove that?" An argument that is virtually impossible to prove since how does one prove a negative. Lumiere then stated yes, all the Government has to do is get the video footage from Visium, which would show that I was not part of any of these alleged meetings.

Abramson then stated: "Does not matter, you could have met at Starbucks." Lumiere stated that he needed to unwind and think, to which he consulted with his sister who advised him to leave Abramson & Morak for new counsel. It eventually led him to Creizman after a hiring Sher Tremonte briefly and Udell, again, for the purpose of a last attempt to convince the government that Lumiere was not a knowing participant in any scheme which the prosecutor refused to accept.

Abramson & Morak's actions failed in the first prong of the Strickland Test as any competent attorneys would have taken the time to learn Lumiere's position, the intricate details of the securities violations allegations and in turn would have been better able to communicate Lumiere's position to the Government and a competent counsel would have disclosed the cooperation agreement that was first proposed and explained that Trial is extremely risky and expensive and the risks of massive fines and incarceration may be unbearable. They fail on the 2nd prong of Strickland since had the discussions with the government been more educated with an understanding of the discrepancies and issues, the government's stance would not have worsened with respect to Lumiere to the point that they decided to make him a target from a subject. Had the cooperation agreement been disclosed with the disclosure of the risks of not cooperating, Lumiere may have been able to entertain this position and worked with the government.

VII.C.2. Creizman failed to pursue offered cooperation agreement on lesser charges of "Misprision of Felony" even up to September 2016 after indictment and before Trial where prosecutors asked for Lumiere's assistance with helping them to prosecute Jacob Gottlieb and Steven Ku. (A69 p5: "You are crazy to think we are not interested in prosecuting Jake Gottlieb, "We are investigating him." Creizman Memorandum of secret meeting with Government on 9-8-16)

A competent attorney would have explained the risks of going to Trial. He would have explained the strength of the evidence and that cooperating witnesses would testify with bias and not be 100%

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

truthful. He would have given an opinion based not only on the facts but the limitations of a defense due to federal rules of criminal procedure, the extremely high costs of defending a financial fraud case all regardless of Lumiere's actual innocence. Had Creizman been competent, he would have explained these risks to Lumiere and that Lumiere risked significant jail time and fines by going to Trial. A competent attorney after the indictment would have approached the government about dropping charges or reducing charges in return for cooperation against "higher ups" at Visium. However, Creizman did the direct opposite of anything a competent attorney would do. He first told Lumiere that the government would not prosecute him now that he has been hired, because the government is afraid of him because he is not afraid to go to Trial. Creizman told Lumiere that he was smarter than the Prosecutors and that the Prosecutors knew that. Creizman told Lumiere, that even if he did go to trial, he would not get any jail time. Creizman when presented with an offer from the Government to cooperate in return for a reduced charge of Misprision of Felony", Creizman told the prosecutors that he was going to Trial and failed to pursue a reduced plea offer as requested by Lumiere. (A69 P 1-8)


Background: Creizman prior to being hired stated that he had financial expertise and that I had come to the right place, as he was a litigator and not afraid to go to Trial and the government knew that and was afraid of him. He posed as a Columbo-type who claimed to be smarter that Naftalis and that he would run circles around him. He even had a name plate on his desk that read "Mr. Wonderful", so Petitioner Lumiere believed he was in good hands. Attorney Creizman then stated that by hiring him, the Government would not prosecute him as they knew he was not afraid to go to Trial. Three months later, Lumiere received a phone call from Creizman stating that he had some bad news, that Lumiere had been indicted and to report at 7am for processing in the Federal Building. Lumiere did as told, but it turned out that he was not indicted, there was a complaint filed. FBI agent Callaghan then met with Lumiere and stated: "It's not too late to cooperate".

On September 8th, 2016, almost 3 months after the complaint was filed against Lumiere and after the first round of discovery had been produced, Creizman called Lumiere to tell him that he had met with Naftalis and that Naftalis knew that Lumiere was not the Portfolio Manager of the Credit Fund, that Lumiere had a portfolio that was taken away and was mistreated at Visium. Naftalis also said that he knew that Lumiere did not make any money at Visium, but they really just needed Lumiere's help in prosecuting Jacob Gottlieb (Visium Funds Founder). Naftalis said what if we have him plea to the lowest possible felony unrelated to the allegations in return for his help. Something like Misprision of Felony.

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170

Lumiere asked Creizman what that was and he said that it meant that someone saw a crime and did not report it. Creizman then said that Lumiere did not know anything as he had no access at Visium, to which Naftalis said he understood and did not doubt that. But then Naftalis proposed a 3rd party cooperation agreement that he would have Lumiere's sister, Alexandra Gottlieb, Jacob Gottlieb's wife (separated at the time and working through divorce proceedings) and Naftalis stated that: "he was sure there must have been some interesting pillow talk". Creizman and Naftalis agreed to continue these discussions. Lumiere told Creizman to see if he could convince Naftalis to agree to a plea of misdemeanor for not reporting it properly, although he did report to attorney Knuts and made various attempts. Creizman agreed to pursue it. Approximately a month later, Lumiere asked Creizman again if there were any further discussions about the prosecutors offer, to which Creizman stated there was plenty of time as we got closer to trial. Weeks away from Trial date, Lumiere asked Creizman again about any further discussions or offers to which Creizman responded that he had not received any other indication, but we would have a chance to present out case to the judge before the Trial to have the indictment dismissed. Creizman's failure to pursue any deal or offers was a direct conflict with Lumiere's constitutional rights to effective assistance of counsel. Knowing that prosecutions result in 97% conviction rates, but still telling the prosecutors to "F_ k off, we are going to Trial" regardless and subjecting client to significant risk. Any reasonable attorney would have pursued this offer as it was a serious deviation from the allegations in the indictment and showed that the government did not actually believe Lumiere's superior role and control over the Visium Credit Fund.

Additionally, Creizman's failure to pursue this offer, was a failure to his client and subjected Lumiere to loss of Liberty and significant monetary damages. Creizman's misrepresentation of himself touting himself as Mr. Wonderful and like Columbo in the court room and claiming financial expertise and that prosecutors feared him sounds like nothing more than an egocentric delusional fool that to an untrained legal mind and Trusting person like Lumiere.

It is clear how Creizman's lack of action with respect to entertaining and continuing to pursue offers from the Prosecution and placing his client at significant risk was an unbelievable breach of duty to his client simply because he advanced his own position by going to Trial and receiving greater funds from Visium going through a Trial. This easily meets the first prong of Strickland, without question as any competent counsel would have advised his client about the risks of trial and jumped on a lesser charge of Misprision of Felony". The 2nd prong of Strickland is clearly met, as a result of this incompetence,

271

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

and likely his greed, Creizman put Lumiere in deep jeopardy of significant jail time and higher charges
the result was Lumiere was incarcerated and received a felony conviction, a ban from the financial
industry which was his Trained career path of over 15 years and significant fines.


## VII.D. INEFFECTIVE ASSISTANCE OF COUNSEL BY CREIZMAN'S FAILURE TO SUBMIT EXCULPATORY EVIDENCE IN TRIAL:

The duty of an attorney is to advocate for his client.  In a criminal case, the duty is overreaching as
the neglect will have dire consequences on the life and liberty of a defendant.  Creizman in failing to
present key evidence to support the valuation basis for pricing the various positions at the center of the
government allegations which were performed by Visium's Valuation Committee (not Lumiere), by
Valuation Research Company (VRC), an independent external valuation firm deeply infected the abuse
of the government and in the actual error in the government assertions.  Had Visium valued these
positions based on what the government contention was the alleged "defacto benchmark" prices of
Reuters, and Markit", that would have been the bad faith misvaluation and worthy of criminality.  The
government basis is was clearly wrong and not researched or worse researched and blocked from
coming in in violation of the duty of the Prosecutor to seek the Truth and not to find a position no
matter how wrong and use it to win at all costs.


VII.D.1. Failure to Submit Exculpatory Evidence Regarding ATI


The valuation reports which were performed by independent valuation company, VRC which
corroborated the Valuation Committees values as well.  The Visium Valuation Committee using a market
based approach valuation assigned values of $29.6 million to Visium's position in ATI versus what the
government alleged was worthless at that time.  Later the value was increased to 30.122 million which
was many months after Petitioner Lumiere left Visium.  Once the restructuring was complete and the
long anticipated new securities were now issued in a new company formed to purchase the best assets
of ATI, called Ancora Holdings, co-owned by Visium and Marblegate.  Visium had extended an offer to
sell its stake in Ancora/ATI to Marblegate however, this was never disclosed by Creizman in Trial or by
the government that was either well aware of it, or avoided researching and knowing about it.  These

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

reports were embedded in some of the discovery material that Lumiere was able to find after the Trial. As it turns out, and uncovered after Trial, by digging through the Allegory platform that contained some uploaded documents from discovery, Creizman also had these reports but claimed to Lumiere that he could not get them from Visium. What the strategic purpose of hiding these from the court and from Lumiere makes no strategic sense unless the inclusion of these reports would then place Visium and Jacob Gottlieb, the firm founder under suspicion as his name is on the Trail of these reports. The exclusion of these reports by counsel is grossly ineffective and incompetent and cannot be explained except for that he was under instructions from Visium not to include any evidence that the government did not already place into evidence. This "error" was an infringement on Lumiere's 6th amendment rights to effective and un-conflicted counsel.

a. Defense Counsel Failed to Submit Exculpatory ATI VRC Reports (A25, A26, A27)

Valuation Research Company (VRC), a reputable and independent external valuation company, was hired by Visium to do an independent valuation of Visium's positions in ATI which later became Ancora Holdings. In its report dated 3/31/13, VRC valued Visium's Ownership in ATI at $28.895 Million. This they noted to compared to Visium Asset Management Committee's valuation of $27.665 Million. VRC in the document describes the method they used to come to the valuation and the inputs and based on the new capital structure (New securities) received by Visium from its prior holdings in pre-restructured ATI. It also denotes that Visium and Marblegate's interests are aligned in the new entity as Ancora (Assets acquired from ATI) is co-owned by Marblegate and Visium. The Government's contention that the investment was worthless, because Apollo Investment's investment was worthless is without merit and contains no substance or logic given the facts. VRC Continues to value Ancora well after Petitioner Lumiere has left Visium at values well above the government's non-analyzed blanket claim of being worthless because Apollo lost most of their money in the investment. Petitioner failed to address the key facts, points of difference and failed to present this key piece of evidence. The failure to educate himself on the issues and understand the concepts caused a Tremendously prejudice to the defendant, where the government abused this lack of insight to allege things that were just clearly erroneous.

b. Defense Counsel Failed to Submit Exculpatory ATI Ernst & Young Reports (A31, A31.1)

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Defense counsel failed to include Ernst & Young Reports on the valuation of Visium's position in ATI.  In the March 12, 2013 Ernst & Young report, they write about their review process and scope of work in determining the valuation method used by Visium Valuation Committee for its valuation of ATI.  In this report which refers to the Visium Pricing Memo 12_31_2012-EY-EY Memo, Management valued its investment in ATI based on a coverage analysis that takes into account the expected holdings resulting from the restructuring.  In aggregate, Management's holdings are valued at $29.6 million.  It discussed the Market Approach utilized specifically the Guideline Public Company (GPCM) where they considered LTM EBITDA multiples of guideline companies, to which they ascertained a total value of ATI at $69.1 Million and Visium's holdings of ATI at $29.6 Million.  Additionally, the report states that they had broker quotes that also valued the ATI position holdings at $29.6 million which Visium did not rely on as considered stale quotes.  This report demonstrates and several very important factors that show Petitioner's innocence.  The firm had instructed the Valuation Committee to use Market Approach to value ATI since there were no providers of any markets in ATI Loans or Mezzanine loans. They assigned the valuation task to Josh Rozenberg on the Valuation Committee who had been valuing ATI way before VRC was hired.  When Petitioner Lumiere questioned Plaford on why bother with getting broker quotes for these as there will be an entirely new capital structure, he stated that Accounting department was fine with it and that the quotes were simply used as plugs for the value as long as the value attained through the broker quotes was the same as the value through the valuation using market approach. Petitioner Lumiere even asked Plaford if the SEC who was on sight evaluating Visium's procedures was okay with the procedure with ATI, and he stated that the SEC said it was fine.  It is not a coincidence that the broker value was the same as the valuation committee valuation.  The brokers were educated on this and told to call the accounting department to discuss the valuations as well to confirm.  Creizman's lack of understanding of the concepts and failure to recall important facts with respect to this document and what happened cause extreme prejudice to Petitioner Lumiere who would have been found innocent at Trial if the jury had been made aware of this.


c. Failure to Include Exculpatory Rozenberg Email Regarding ATI Valuation: Subject Morgan Stanley Follow up-ATI

  Email from Josh Rozenberg to Steve Ku, Robert Stockton, Jacob Gottlieb, Kim Tong (A27.1 p1-3, A27.2, A27.3 p1-3)

Petitioner Stefan Lumiere v. United States of America                         Case No. 18-CV-9170

This email dated June 26th, 2013, references attached worksheets to be sent to MSAIP for responses to questions they had.  It notes that "Due to the restructuring, the value of Credit's holdings has increases since last discussed with MS AIP from $21mm to $25 mm.  All of our current positions are represented by bank debt positions."  It also states: MSAIP is confused regarding the positions and by showing them that our current positions represent a shell (as previously discussed with them).  This email demonstrates that MS AIP has been confused and that the ATI position has been valued as shell representing the value by the old bank debt positions.  It also shows that the entire firm has been aware of the methodology used including Jacob Gottlieb and Steven Ku.  It also identifies a significant value that is increasing and that the situation is complicated.  All of these points should have been addressed by Defense Counsel and communicated to the jury so that they could understand that what the government was portraying was incorrect and that there was a good faith basis by Petitioner Lumiere in the values which were not even derived by him or the credit team but by the Valuation Committee. The Jury would see with this that Petitioner Lumiere was obviously being scapegoated for accounting decisions made by senior management who attempted to assign values for a Truly complex situation.  As a result of all parties ignoring these basic facts and the evidence to support it, Petitioner Lumiere was extremely prejudiced as the government claimed that the ATI Position was worthless when in fact it was not and Visium held positions that the other creditors such as Apollo did not.

d. Failure to Disclose Valuation Committee Memos and Valuation Committee Models Regarding ATI (A33, A34, A35)

 1) ATI Valuation model by Josh Rozenberg on 12/31/12 using the Market Approach values ATI at $29.57 Million

 2) ATI Valuation Committee memo where for December 2012 whereby the valuation committee has agreed to value the company using market comparables, applying an EV/EBITDA multiple to estimated budget to attain a total enterprise value.  However, what this would demonstrate combined with valuation committee model and the Ernst and Young reference to this is that the values had been set by Valuation committee and not by Petitioner Lumiere and it was obvious that the company was using broker quotes to represent the actual value throughout.  The coincidence of the values from valuation committee and those derived from broker quotes show that Visium Management instructed this

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

procedure and validated it.  And now that the procedure was questioned, they leave Petitioner Lumiere
as the fall guy for their accounting decisions.

  3) ATI Valuation Committee memo 7/1/14, where Lee Brown (Credit Analyst) reached out to
Marblegate to see about selling Visium's position in ATI.  Since Marblegate was a government witness,
there is no reason why Defense counsel should have not questioned Marblegate's Milgram on the offer
and if they ended up buying Visium out or assessing how they valued their stake in Ancora/ATI.  Defense
counsel's failure to do this was incompetent.


e. Failure to Comment on Rozenberg 3500 Material Regarding ATI (Not available due to Petitioner's
current circumstances)

  Josh Rozenberg was a member of the Visium Accounting department and Member of the Visium
Valuation Committee.  In his 3500 material, he admits to the government that he was in charge of
valuing ATI for the Valuation Committee.  Josh Rozenberg would have been a material witness to
defense and could have addressed all the ambiguous questions and answers about processes and
procedures posed by the government which answered by Thorell, Keily, Plaford and Jain were based on
pure speculation where they lacked the foundation to know the process.  Additionally, to have been a
member of the valuation committee, he was also responsible for valuing the very securities that the
Government alleged that Petitioner Lumiere misvalued.  Including Rozenberg as a defense witness was
essential to Petitioner's Trial and there was no strategic reason to exclude him.  Without a member of
the valuation committee to cross examine, Petitioner Lumiere could not have had a fair Trial and deeply
prejudiced Lumiere.  With this information, the allegation of the responsibility of Lumiere for everything
would have undoubtedly been questioned by the jury and the court.


f. Failure to Include Exculpatory Review Recording with Transcript from Year-End Review regarding ATI
(Full version Not available due to Petitioner's current circumstances, See Attorney's notes of recordings
A99)


  Year-End review took place in March of 2013 which was an annual review where supervisor Plaford
went through contributions and where the employee is performing and where he needs to improve.  In

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

this Review, Lumiere had already decided to leave Visium and Plaford makes a claim that ATI is Lumiere's responsibility.  Lumiere confront him on this point stating that it was not his recommendation but that it was a new issue that did not perform on was the subject of fraud.  The credit fund only invested in it because Plaford gave the mandate to invest in all new issues.  ATI was assigned to Lumiere's negative PNL after the fraud when its liquidity dried up and Visium was not able to sell.

Petitioner Lumiere was made responsible for this as it was going through bankruptcy and the firm desperately needed Lumiere's expertise in distressed investments to extract as much value as possible for investors in this unpleasant situation.  Lumiere did so and was told to focus his entire efforts for 2012 into helping fix ATI so that investors would get the best possible outcome and recovery.

g. Preliminary Budget by ATI (A52)

This identified the projections from the company for ATI broken down by core campuses and non-core campuses.  This would have shown that at the time, ATI management was telling lenders that the projections were solid still at $45.5 Million EBITDA for core campuses and total Campus Level EBITDA of $39.7 Million.  This would still indicate that there was significant value in ATI and guidance from management was that the issues were not insurmountable and left significant opportunity for investors. If the company could get off of HCM2 and return to operations, it would be able to start enrolling new students and increase profitability and cash flow.  The guidance from advisors and professionals in the education sector showed that the company could be fixed.

h. Informational Memorandum Summer 2012 (A52.1)

 Describes that Investment Banker Stifel Nicolaus Weisel has been retained

That an auction is taking place which are due by Sept 25, 2012

They were projecting 2013 Campus EBITDA of $33.9 Million and Adjusted EBITDA of $13.6M

2014 Campus EBITDA of $42.4 Million and Adjusted EBITDA of $21.7M

i. Information Memorandum Sept 21,2012 (A53)

277

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Stifel Nicolaus Weisel update on sale process and that a foreclosure auction will be held on November 16th, 2012 with a target closing 1st week of December

j. Materials Prepared for Discussion January 6, 2012

Stifel Nicolaus and Miller Buckfire presentation identifying their expertise in the Education space and the large number of Transactions that they have done in Education and the comparable company Transactions values and public value Trading multiples for education companies.

Additionally, this gives valuation ranges for the various campuses of ATI as follows:

ATI Campuses: 3.5 to 4.5x

STVT Campuses: 3.0 to 4.0x

AAI: 4.0 to 5.0x

DNI: 4.0x to 6.0x

A reasonable attorney would have shown that the bankers and advisers were telling a story of recovery and there was no telling how harshly the Department of Education would Treat ATI at that point in time as there was no precedent for an attack on such a large education company. He would have demonstrated these exhibits which would show the rationale good faith petitioner had based on the information he had and why he believed the values that advisors were coming up with and the valuation committee was deriving which they Translated in bank debt prices as shells as acknowledged by Josh Rozenberg from the valuation committee and as explained to investors according to the email.  It is clear from the Visium Credit Opportunities Offering Memorandum that given the complexity of ATI that it should have been considered a "Special Investment" where " a separate Series of Special Investment Shares will be issued to represent each Special Investment and only those Shareholders who are shareholders on the date the particular Special Investment is purchased will participate in that Special Investment pro rata based on the proportion of Class A Shares or Class B Shares held by shareholders".

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

The logical way to have accounted for this investment was to move it into a Special Investment Share class separate from the rest of the fund also known as a side-pocket.  This would have been valued similarly to the value ascribed however new subscribers would not be able to participate and redeeming subscribers would not be able to sell their pro-rata portion of this stake.  This seems to be where the issue was which took a long time for Petitioner Lumiere to figure out but outside the scope of his role as an Analyst in the Credit Fund at Visium.  As for the valuation used according to the offering memorandum

Valuation: Fund investments will generally be valued at their fair value.  Special Investments will be valued at fair value until such investments are sold or deemed sold or Tradeable ( as determined by the Investment Manager , in its sole discretion).

Lack of Liquidity of Fund Investments /Restricted or Non-Marketable Securities.

" The Incentive Allocation will be allocated to the Allocation Class Shares.  To the extent the Incentive Allocation is made at the Master Fund level, no incentive allocation or fee will be charged at the Fund level.

k. Multiple VRC reports (A25, A26, A27)

   Defense counsel failed to introduce VRC report from 6/30/14 which describes the acquisition of ATI which is now called Ancora which is co-owned by Marblegate and Visium.  It discusses the history and details of the acquisition as well as the clear fact that what Visium held is not what Apollo held when the government noted that they lost $55 million in their investment.  The report denotes the value assigned by VRC and the Value assigned by the Visium Valuation Committee.  Although it appears that the values have come down, since 2012, they do not represent the alleged zero value that the government portrayed at Trial.  It also identifies that Visium and its Valuation Committee are backing the procedures that they had put in place and the methodology for valuation.  These valuations and reports are done

279

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170

way after Petitioner Lumiere has left the firm and even after Portfolio Manager Plaford and Trader Thorell have left.  The government's accusations towards Petitioner Lumiere for what was obviously firm wide policy and backed by VRC and Ernst and Young shows the obviousness that Petitioner Lumiere was indeed scapegoated and set up as the fall guy and falsely made responsible for all of the firm's decisions.

I.  The Street News report and PR Newswire reports on Ancora Holdings LLC completion of Acquisition of Certain Assets of ATI.

Defense counsel should have introduced this news report to identifies and separate Visium's position from the rest of bank debt holders such as Apollo.  It identifies that the foreclosure and bankruptcy process ended with the new company Ancora acquiring ATI assets which continued to be profitable and was co-Owned by Visium and Marblegate. (A54.1; A54.2)

VII.D.2. Failure to Submit Exculpatory Evidence Regarding CMED

Similar reports existed and were available based on after Trial research into C-Med , with valuations set by both the Valuation committee and Valuation Research Company (VRC) an independent and well recognized valuation firm.  This report had maintained a value of 33 for CMED Directing class which was Visium's position, as opposed to non-directing class notes which the government used which were quoted under 5.  Defense Counsel's ineffectiveness in presenting this evidence as well as all the legal support for these valuations from law firm Stroock, Stroock and Lavan who helped negotiate the structure, was an utter failure and demonstrated Creizman's incompetence.  Creizman Tried to address the good faith basis of the CMED Directing Class valuation during Trial when he cross-examined Plaford, but failed miserably by not introducing or even mentioning the reports that prove the class distinction into evidence.  He also failed to understand and recall the basic facts and key concepts that Petitioner Lumiere explained to him numerous times verbally and in writing, but he never seemed to grasp or have the attention to understand.  He did not understand that CMED Directing class would receive based on

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

the agreement to fund the litigation in China, a 70 to 85% if the total recovery of assets uncovered and brought back to the estate while the CMED bonds that the government referenced would only have the right to 5% of the total recoveries.  This is mathematically equivalent to 14x to 17x greater value.

The prosecutors failed to mention this which should have been their duty to seek the Truth, but yet, played Tricks with the court and with their cooperating witnesses and presented an unTruth.  When Defense Counsel Creizman cross examined Plaford on this concept and began to mention the disparate rights of the Directing Class versus the bonds in the marketplace, but allowed Plaford to evade stating that he did not believe the prices at the time.  He simply said that he recognized that they were different classes with different rights and should have been valued higher, but a little bit higher.  He would not state what he believed at the time, and Defense Counsel failed to communicate this and if not insTruct the court to make the witness answer the question.  When defense counsel asked the SEC Jindra government witness similar question of the difference between the directing class and the bonds in the marketplace, he was confused not understanding the concept and then the  Prosecutor jumped in quickly to object stating that he was speaking about concepts that were not introduced into evidence. However even though the reports were conveniently not submitted in the evidence, it was clear that Cooperating Witness Plaford that they were different classes therefore the concept was in evidence.

 From this action, it is apparent that the prosecutor was aware of this evidence or should have known, yet choose to avoid presenting the Truth and instead choose to present a lie.  Plaford covered up this knowing that he would likely be impeached for lying by claiming that they were apples and oranges and that they should have been valued lower than they were, but never admitted to not believing the value at the time but only in retrospect.   He also claimed that as a result of the Directing class having a different payout, they could have been valued where Visium valued them, but then they would have to make them level 3.  But since they presented it as level 2 so they would need to value it like the marketed securities.  This is a plain error and flawed statement.  Visium's position was Visium's position. It did not change based on whether Visium or Plaford decide that it should be level 2 or level 3.  Based on Petitioner Lumiere's review of documents after Trial, it is clear that the firm should have placed this position into a special investment vehicle, but this had nothing to do with Lumiere.  This was a decision

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

made by Plaford, the Visium Valuation Committee and Jake Gottlieb (Visium Funds Founder) and Steve Ku, (Visium Funds CFO)

a. Defense Counsel Failed to Submit C-Med VRC Reports

  1) VRC Report 9/30/13: This report assigns a midpoint value to C-Med bonds of 24.2 with a high of 30.7 and low of 19.0.  It also states that Visium Asset Management Valuation Committee assigned a value of 29.4 to the prostitution which they mention is within their range of values.  It also states that Visium Asset Management Valuation Committee had a value of 31.6 for the 2Q of 2013.  The report explains the difference between the Directing Class A investors which they assume will received 70% of the proceeds. (A28)

  2) VRC Report 12/31/13: This report assigns a midpoint value of 21.2 to C-Med directing class bonds. It also states that Visium Valuation Committee has chosen a price of 19.1. (A29)

  3) VRC Report 6/30/14: This report assigns a midpoint value of 21.4 to C-Med directing class bonds while Visium Asset Management Valuation Committee has a midpoint value of 28.07. (A30)

Note that these reports if introduced into evidence at Trial, would further solidify the complexity of the issue and the story behind it but also the good faith into Petitioner's belief in the prices that Plaford told him.  It would also demonstrate that it was not Petitioner Lumiere coming up with values, but both the Valuation Committee and Valuation Research Company which corroborated on these complex valuations as demonstrated in the reports.  The values used by Visium were not the market price of the Non-Directing bonds that were in the marketplace and this continued well after Petitioner Lumiere and Cooperating Witness left Visium.  It is clear that the values were vetted and substantiated by the Visium Funds owner (Jacob Gottlieb) and valued by multiple parties including Valuation Committee and VRC therefore the government's claim of Petitioner Lumiere's mastermind involvement and that these were falsely valued denies the jury access to the Truth that they were complex situations and had different rights.  Defense counsel's failure to communicate and understand these concepts and the government's

Petitioner Stefan Lumiere v. United States of America                              Case No. 18-CV-9170

directive to SEC Jindra to ignore any True analysis of the issues or situation, was a simple exercise in promoting a lie by the government, and not by Petitioner Lumiere.

b. Email from Stroock, Stroock and Lavan dated December 18th, 2012: Subject: CMED Revised Loan Proposal

This email identifies the sharing percentage that the JOLs (Directing Class) holders of bonds would receive to a range of 67.5% to 75% depending on funded amount of litigation by the group. (A30.1)

This should have been presented as evidence and was in the discovery for Defense Counsel to access. But Defense Counsel instead chose not to competently review the discovery or submit any evidence. There is no possible strategic reason not to introduce such exculpatory evidence which proves that the government's allegations are simply wrong.

c. Visium Valuation Committee Memo 7/1/14 (A34)

This memo assigns a value of 19.10 to C-med Directing class bond position well ahead of the values of marketable securities that the government and Jindra referred to. It also mentions that the price falls within VRC's range of 16-28.21 with midpoint 21.39. It also addressed the situation that the liquidators will be presenting in the Hong Kong court. What is also of note in this report is that it is done way after Petitioner Lumiere or Plaford have left the fund. This seriously calls into question the government's allegation that the portfolio was misvalued.

d. Attachment I: CMED Valuation from Valuation Committee 12-31-12 (A33)

This attachment refers to the Directing Class holders as well as the recovery sharing percentage of 67% to 75% that Directing class would receive with an expected funding at that time of $2M to $4M which would make the class eligible for 70% of the recovery. As such the Valuation Committee has calculated a value of $34.56 for the directing class stake in C-Med. This note would clearly clarify several things. First that it is the valuation committee determining the values and that these are corroborated by VRC. And also that the Government and SEC Witness Jindra were wrong in their accusations. They chose to ignore the complexity of the situation and by oversimplifying, yelled fraud where there was none.

Petitioner Stefan Lumiere v. United States of America                 Case No. 18-CV-9170

e. Email from Ernst & Young, Manager of the Visium Funds on 1/17/13 (A31.1)

In this email he discusses CMED and the proper way to value.  He notes the parties and lawyers involved in the Transactions and that VRC has done an analysis of the company and valuation.  It is clear that he addresses all the key points and that Lawyers from Stroock have said that the directing class will get the majority of the proceeds from any recoveries.

Defense counsel should have included this into evidence to substantiate the evidence that these were not the same securities as the government and Jindra SEC porTrayed.  There is no strategic reason why Defense counsel would not have included this document into evidence.

f. Email dated November 26, 2012 from Borelli Walsh on offer to buy back bonds for $105 Million. (A30.4)

Borelli Walsh was hired by the bondholders to assist with communication, negotiations and possible litigation in C-Med.  In this email from Borelli Walsh who has had discussions with Han from C-Med that there is an offer of $105 Million for the bonds where the advisor states that he does not believe it is the most he will pay, but he would not pay much more than that.  There appears to be a real offer on the table which when  communicated by Plaford would have made rational sense to use this offer as a value in light of what Plaford had previously instructed as the investment mandate of the Credit Fund and the obligation to value in all current information.  The inTroduction of this email into evidence would have clarified to the jury further that the situation was not as the government porTrayed and this would show that Petitioner Lumiere would have had  good faith in the prices that Plaford had told him.  As a result it is definite the jury would have found Petitioner not guilty.  As a result of Defense Counsel not reviewing document and including it into evidence, and using the information during cross examination and calling witnesses to  testify to the content, Petitioner Lumiere's Trial was severely prejudiced.

Petitioner Stefan Lumiere v. United States of America                     Case No. 18-CV-9170

g. Defense Counsel Failure to Include Exculpatory Year-End Review Transcript Regarding C-Med. (Full recording not available due to Petitioner's current circumstances; Summary of recording prepared by Abramson & Morak: A99)


Transcript of Year-end Review of Lumiere by his boss Plaford shows that C-Med is not being included in Lumiere's PNL as it is Ameesh Shah's position.  When Plaford states that it is Shah's position, it means he is possibly but not necessarily  responsible for the investment idea, but he is responsible for following earnings and events and updating models.  Lumiere mentions that he has helped out with restructuring advise for C-Med as well as many other positions that were not his, and it is not fair that he is not compensated for dedicating time to these situations that have lost some money, yet Lumiere's help has contributed to minimizing losses for Visium Investors with his advice and work in restructuring.  It is clear from this that C-Med is not Lumiere's position and Lumiere's role in the investment was not large but that he simply helped to minimize losses with his restructuring advice.


h. Defense Counsel Failure to Include Exculpatory C-Med Transcript with Shah and Plaford (Full recording not available due to Petitioner's current circumstances; Summary of recording prepared by Abramson & Morak: A99)


In this recording, Plaford insists that the value is correct for C-Med and mentions surprise that operations is not aware of the situation and says that these are not the same bonds that are Trading, that Visium's holdings are different.  Defense counsel should have introduced this piece of evidence when Plaford stated that Lumiere set prices, that Lumiere was the mastermind, that he just learned about fraud later and continued it after Lumiere left.  This recording would show that none of that is True and in fact it would show that all discussions were believed by at least Petitioner Lumiere and Shah and Plaford insisting on the value showed that he at least portrayed that he "at the time" believed in the values.  A competent attorney would have used such evidence to impeach the witness and bring out the Truth in the case.

Petitioner Stefan Lumiere v. United States of America            Case No. 18-CV-9170

i. Defense Counsel Failed to Include Exculpatory C-Med Transcript with Plaford Explanation of Value (Full recording not available due to Petitioner's current circumstances; Summary of recording prepared by Abramson & Morak: (A99)

Recording of Plaford discussing the value he is assigning based on accounting determination that he had spoken with them that they would use the stock price and apply it on an as converted basis to both bonds. The bonds had a convertible feature therefore they could convert to stock on a specified ratio.

j. Defense Counsel Failed to Include Exculpatory recording where Plaford tells Lumiere to tell brokers about the Directing Class issues and if they can be Trusted not to tell everyone about it as it is private information and Plaford did not want to create an argument with other non-directing class bondholders. (Full recording not available due to petitioner's current circumstances; Summary of recording prepared by Abramson & Morak: A99)

k. Defense Counsel Failed to Include Exculpatory C-Med Transcript with Brook (Full recording not available due to Petitioner's current circumstances; Summary of recordings prepared by Abramson & Morak: A99)

In this recording, Brook (Janney Broker) had bonds for sale from another client and Lumiere asks if they are the same bonds held by the steering committee and it becomes obvious that it is not. Lumiere then says there will not be much value to those bonds as they can no longer join the committee to benefit from higher recovery. This provides evidence that discussions are held with the brokers about what is happening with the various situations and they are not blindly spitting back levels unknowingly and unfamiliar with the situation as the government alleged. This serves as a discussion which proves that the statement that Lumiere did not discuss his research with brokers is false and Non-prosecuted witness Vandersnow (Prince ridge Broker) and Plaford perjured themselves by their statements.

SL00708 [VII.D02(l-s) Pt3] Ineff Exculp C-Med

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

I. Defense Counsel Failed to Submit Exculpatory CMED Bond Trade data on the same day and months later and Quote Data and market data on C-MED Bonds the following 2 days after the Trade of the purported painting the tape Trade. (A

SEC Jindra in Exhibit left out 2 Trades from the same day for the obvious reason of strengthening the government's case by omitting exculpatory evidence and taking information out of context.  The Painting The Tape allegation fits exactly with this abuse by the government leaving out all the information that would explain why the Trade price was not inflated or why Lumiere would not think it was inflated.

   1) The first Trade excluded from Witness Jindra Chart a sale by Broker Hapoalim Securities for an odd lot of $137,000 Notional Amount at 42.5 which occurred on March 23rd, 2012 at 5:31 pm Transacted through Trader Charles Engel from Janney Montgomery. (A88)

   2) The second Trade excluded was a sale by hedge fund Grammercy purchase of 865,000 notional amount for 42.5 on March 23rd, 2012 at 5:31 pm. (A89)

   SEC Jindra and the government hide the fact and Creizman having not done preparation into the quantitative aspects necessary for a complex securities case failed to properly review or even mention the quotes during the next 2 Trading days (A93.5)

        Message # 11662: 03/26/2012  10:05:16  From Albert Fried & Company

                Subject CMED 4% @ 42 1/2 1mm


        Message  #7760  : 03/26/2012   08:59:30 From Jefferies & Co., Inc.

                Subject: WALTHC UNITS 880-2250

                        WALTCH UNITS 880-2250

                        CMED 4.00% 08/13 40-45 vs. 0

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

CMED 6.25% 12/16 144a 40-45 vs. 0

Message # 5621: 03/26/2012  08:33:06  From Merrill Lynch:

Subject: **BAML CONVERT BULL RUN**

CMEDY 12/16 6. vs. 2.51  31-41

CMEDY 8/13 0% vs. 2.51  31-40

Message # 28562: 03-27-2012  08:20:39

Albert Fried & Company

Subject: CMED 4% 500M @ 42.5

   None of these Trades were questioned by FINRA and none of the participants were alleged co-conspirators or accused of painting the tape, yet the government struggled to find a single Trade that was outside of context of stale quotes in order to make a painting the tape allegation which was a reverse engineered allegation.  Secondly "Painting the Tape" is a misnomer and not included in the compliance manual.  It is defined as a single party buying and selling a security to create to illusion of volume Trading and it does not have anything to do with a specific price or inflating a price.  It is considered a term used and it is focused on stock and not illiquiddistressedbonds.

m. Defense Counsel Failed to Submit Exculpatory Article About C-Med written on April 5, 2012 titled: Evidence Suggests China Medical Is Taking Itself Private Via A 3rd Party. (Seeking Alpha: A87 p1-2)

In this article, the analyst writes that AER Advisors has been building a large stake in C-Med stock:

   1/27/12    1.948 Million 6.04% of outstanding

   1/30/12    2.02 Million 6.28% of outstanding

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

2/2/12    3.889 Million or 12.05% of outstanding

2/21/12   4.889 Million or 15.15% of outstanding

3/20/12   6.04 Million shares or 18.72% of the outstanding

4/5/12    6.43 Million Shares or 19.95% of outstanding

This large amount of buying was proof of a positive outlook for C-Med and the large accumulation by a single party such as in a takeover Transaction would have a Tremendously positive impact on the bonds which would have to be redeemed if that were the case.  The actions were unusual, but given that this was a Chinese company it was unclear of what the rules were for them to miss a coupon in order to create panic so that they could buy out the company.  This would have had a significant impact on the bond price as a takeover would force the company to buyback the bonds at 100.  It is fair to say that had this been introduced along with bond pricing data after the Trade along with other Traders having Traded the same day, that there would be no actual evidence of painting the tape.

n.  Defense Counsel Failed to Submit Exculpatory Article About C-Med written within days of Alleged Painting Tape Trade Indicating Belief that C-Med Was Being Bought Out: China Medical is A Mystery that Most Investors Can't Explain: March 28th, 2012. (Seeking Alpha: A86.1)

Seeking Alpha, a reputable online publication where analysts and Traders write investigated articles about stock opportunities wrote an article explaining the thoughts at the time on C-Med.  It explains that the stock dropped from $3.71 to $1.82 on news of a missed coupon payment on the debt.  Then after being halted by Nasdaq it reopened for Trading at $0.62 on Feb 28, 2012 and was up to over $3. The publication indicates some of the investor rumors at the time including convert holders converting to stock which would have a Tremendous gain and debt reduction result.  Other theory was that the company management missed coupon so that they could buy stock at a discount.  Defense Counsel should have introduced this story as it showed the perception at the time in the marketplace.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

o. Defense Counsel Failed to Submit Exculpatory Stock Trade Data Showing Substantial Increases in C-Med Stock from $1.35 to $2.75 leading up to the Trade on March 23, 2012 and then the Stock increase to $12 per share in the months after. (A91)

  1) Bloomberg stock Trading data 12/30/11 to 3/2/12 (A92 P 1-5)

This table shows C-Med stock at 3.10 on 1/3/12 and then dropping after a missed coupon payment and then halted at a    price of 1.82 on 2/6/12.  When the stock reopens on 2/28/12 it closes at $1.70 and then hits a low of $1.35 the        following day.

  2) Bloomberg C-med stock closing price 3/5/12 to 5/4/12 (A92 p 1-5)

This table shows the stock increasing from the low of $1.35 and moving up on significant volume up to $2.51 in 3/23/12 the alleged painting the tape Trade date to $4.12 on 4/9/12.  This shows that the market believes there is something     positive occurring in C-Med which would show why bonds moved higher and why Petitioner Lumiere did not purchase at inflated levels as far as he understood which the government erroneously called "painting the tape".

  3) Bloomberg C-Med stock closing price 5/7/12 to 6/28/12 (A92 p 1-5)

This table shows the stock going from 2.21 on 5/7/12 to a high of $12 on 6/27/12 before closing at $10.78 on 6/28/12 again being halted for Trading.

  4) The Bloomberg C-Med Stock chart from 1/31/12 to October 2012 (A91)

The chart shows the increase in price over the period leading up to the alleged painting the tape Trade and then increases significantly from there to a peak of $12 per share.

  The graphical representation of C-Med stock shows the significant increase in price and the volatility of C-med stock over this period which demonstrates the psychology in the marketplace at the time as

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170

rumors surfaced of a management buyout of the company. Introducing this and the roller coaster ride of the stock and the fact that the convertible bonds held by Vision would be convertible into stock and thereby correlated to stock price movements both due to the stock price conversion factor and to the positive prospects that a takeover of the company would mean for the bonds which would benefit from a 101 change of control put option. Defense counsel's failure to investigate and research the data, the issues surrounding the company, the reports on C-Med was a drastic failure and caused extreme prejudice to Petitioner Lumiere. Had this information been introduced, it would have explained how Petitioner Lumiere did not paint the tape as alleged and as a result, would have been found not guilty.

p. Defense Counsel Failed to Submit Exculpatory Evidence Showing that Lumiere was Not in Office as Plaford Testified Under Oath, but was in Florida Days before up to Days after the Trade Including Airline Ticket, Hotel Invoices and in addition a Concert Ticket for the Day of the Alleged Trade:

  1) Altour Travel Agent booking for flight to Miami from March 21, 2012 at 2:20pm return 11:05 pm on March 26th, 2012. (A84)

  2) Fontainebleau hotel invoice check in 3/21/12 to 3/25/12 (A85)

  3) Concert Ticket for March 23, 2012 at 12pm at the Pool Shelbourne South Beach (A86)

  These prove that Plaford lied under oath when he claimed Petitioner Lumiere was in his office at the time they discussed doing a C-med Trade which the government alleged was painting the tape. However, Plaford does not admit that the Trade intent was to set the price for marking purposes as the government alleged, but that he wanted to buy it ahead of an anticipated tender and thought that by buying it at a 40 would guarantee a higher tender price. Neither of these make sense for several reasons.

  1) Painting the tape is an equity concept and involves buying and selling from the same account to make a stock appear to have more volume. This concept is not applicable to illiquiddistresseddebt.

  2) If Plaford had intended to set a price to mark the portfolio it would not have made sense to do so on March 23rd when month end would be March 31st.

291

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

3) If the government allegations were True that the scheme involved brokers not doing research on the bonds and spitting them back, then why would a Trade need to occur to accomplish that.  Does not make sense.

4) By buying 1 million notional bonds at 43.25 does not guarantee any tender offer at an increased price by a company.  The concept is ridiculous and not supported and any statement of this nature is pure biased speculation.

Further the fact that Plaford lied about Petitioner Lumiere's location or being part of his conversation in his office proves that Lumiere was not a party to this discussion with him and Ameesh Shah.

q. Defense Counsel Failed to Submit Exculpatory Evidence of Lender call scheduled to discuss developments with C-med which Ameesh Shah forwarded invitation on March 21, 2012 for March 26th, 2012 (A94)

Defense Counsel failure to include this evidence which would show that Ameesh Shah was the point person on C-Med at Visium and secondly that given there would be a lender call scheduled for March 26th, 2012 with a "discussion of developments", it is likely that Plaford would have interpreted that as positive and wanted to buy bonds ahead of this call.  This would have explained why Plaford would have insisted on buying bonds before that date.

r. Defense Counsel Failed to Submit Exculpatory Evidence Including Phone Records that Lumiere Did not Have Communications with Brook after 12PM and Brook did not Communicate with Lumiere any Time Around Trade (Not available due to Petitioner's current circumstances)

s. Defense Counsel Failed to Submit Exculpatory Evidence that In Fact It Appears that Thorell Did the Trade with Brook and Brook Was Looking to Get In Touch With Petitioner Lumiere To Argue for A Higher Commission As Brook and Thorell Did Not Appear to Get Along.

3-23-12 15:54:21 CMED Trade ticket sent from Janney to Sudarshan Jain at Visium (A96)

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Then in Bloomberg Chat on 3-23-12, between Brook (Broker from Janney Montgomery and Lee Brown from Visium):

3-23-12 17:22:08: Lee Brown: Says Are you being taken care of (A93 P4)

3-23-12 17:22:08: Jonathan Brook Says Yes but i still can't reach lumi

3-23-12 17:24:22 Jonathan Book Says And it wasn't something that Trades with any frequency

3-23-12 17:24:52 Jonathan Brook Says There was a huge amount of stress getting in shape to buy them

3-23-12 17:25:40 Lee Brown Says      So r u all set

3-23-12 17:25:46 Lee Brown Says      did JT take care of it

3-23-12 17:26:11 Jonathan Brook Says   Yes...I'm 95% set still need to talk to lumi but 95% set as much as i can be.

3-23-12 17:30:24 Jonathan Brook Says   I just want to talk to lumi we bought these things at 42.5 it's illiquid off the run i am assuming we are working for a point but not sure

3-23-12 17:30:44 Lee Brown Says      so the question is economics to you.

3-23-12 17:30:47 Lee Brown Says   got it

3-23-12 17:30:51 Jonathan Brook Says     yes (A93 P 5-6)

t. Email from Ameesh Shah to Josh Rozenberg on July 16, 2012 describing the increase in value of equity and that the bondholders have taken action against the company and would take control of the company (A96)

This email demonstrates again who the primary point person is on C-Med and that is Ameesh Shah working with Cooperating Witness Plaford (Visium Credit Fund Portfolio Manager/Partner).  He is

Petitioner Stefan Lumiere v. United States of America                     Case No. 18-CV-9170

discussing the situation of C-Med with Josh Rozenberg who is also on the Visium Valuation Committee who is responsible for setting the price of C-Med.  Petitioner Lumiere is not on the email and it is not discussed with Lumiere.  Defense counsel Creizman showing this would show the history of C-MEd which he knew nothing about and demonstrated this at Trial.  It would also indicate the volatility around the situation at the time whereby the stock had run up to $12 per share from $1.35 over a short period of time as speculation of a takeover of C-Med was in the mix.

u. Ameesh Shah emailed model to Plaford on July 5, 2011 (A30.6)

 This would show that this was Ameesh Shah and Plaford's position.  The model describes the expected value and upside to an investment in C-Med.  This would show that the government's argument that Lumiere played a major role in C-Med and that it was Lumiere's position is fabricated and false and simply meant to argue motive where there was none and to falsely incriminate Petitioner Lumiere.

SL00710 [VII.D03(a-e)] Exculp Nebraska

VII.D.3. Defense Counsel Failure to Submit Exculpatory Evidence Regarding Nebraska Book. (A36, A37, A39)

Summary

Defense Counsel had access to documents that were provided to him that prove the good faith that Petitioner had in the prices that his boss Cooperating Witness Plaford (Credit Fund Portfolio Manager/Partner) assigned.  However, due to the extreme incompetence of defense counsel and his failure to investigate and his inability to properly communicate the evidence and the concepts to explain the rational for Petitioner Lumiere's good faith, the jury was left in a void with just the government's allegations in support.  Any reasonably competent attorney, wood have submitted the evidence available to the court and thoroughly explained the concepts to show why the government's assertions were plainly erroneous and the fundamental reason why Petitioner Lumiere had a good faith belief in

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Plaford's assigned prices. All of this information, defense counsel failed to address and the government without having the expertise to understand these concepts, choose to plainly ignore to the point where their allegations and explanations were simply wrong. Had Visium chosen to ignore the information that they had in valuing the securities, it would have been to the deTriment of potentially redeeming investors in Visium and unduly benefitting new subscribing investors in direct conTradiction to the compliance manual and fair value mandate of the fund.

a. Alvarez and Marsal Liquidity Model & Credit Memo Assessment FY13 Projection Sensitivity Analysis, May 11, 2012 (A38 identifies the math, P47 identifies Approx $50 Million in Credit Memos)

Alvarez & Marsal is well-known operatingrestructuringadvisor. They were hired by law firm Brown Rudnick on behalf of the creditors of Nebraska Book Company after it filed for Chapter 11 bankruptcy protection in a pre-negotiated agreement among creditors. They had uncovered close to $50 million in credit memos that they alerted the steering committee to, which included Visium. The credit memos in this amount are significant to the valuation as this amount would go to rapidly pay down debt and in turn this would Translate into a significant increase in stock price of $50 million. As a result of not submitting this material and arguing the content in opening, closing and during cross examination of witnesses, the jury had no idea why Lumiere believed in the values that Plaford had determined. Lumiere told Plaford as soon as he heard about the newly uncovered Credit Memos and as a result Plaford told Lumiere that he was required to value in that new information according to the investment mandate of the Visium Credit Fund.

Alvarez & Marsal also in their analysis came up with projections of Adjusted EBITDA (Cash Flow) of $36.438 Million for FY 2013. The projection of valuation off of this number would typically be 5x for a retail business which would Translate into an enterprise value of Approximately $185 million. With an additional $50 Million in credit memos uncovered, this would reasonably convert to a value of $235 Million. This would have been significant to show the jury and use in cross examination when confronted with government attorneys with no financial expertise making fun of a business and claiming that the book industry is essentially worthless right now. Plaford also mistakenly states that this company makes textbooks however they do not. They are a disTributor of textbooks both in store and online as well as disTributor of a wide range of goods on through their Campus stores.

295

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

b. Disclosure Statement: (Evidence not in Discovery, but Petitioner Lumiere had on his computer files at Visium which are public court submitted documents which Lumiere cannot access while being incarcerated due to the fact that he has been prohibited access to all of his electronic files. If given an extension of time to amend his filing, Lumiere would be able to provide such documentation and support for the values used by Visium demonsTrating his good faith.)

Defense Counsel failed to submit this document which included a projection of Pro Forma EBITDA (Cash flow) and an expected value based on the Market Approach of multiple to EBITDA which Petitioner believes was 5x to 7x.   This would have shown based on projected EBITDA of $36.438M which was Alvarez and Marsal's projection for 2013 EBITDA, a value of $185 million.  This would have established a fair value for equity which Lumiere assumes of approximately $10 per share.  However this would need to be established based the disclosure statement document, the exiting capital structure including debt and share count to determine this.

c. Witness from Law Firm Brown Rudnick (Affidavit being prepared: Not available at the moment due to Petitioner's current circumstances)

Steven Pohl, Bankruptcyrestructuringlawyer from Brown Rudnick would have provided testimonial evidence of a meeting that occurred in their offices and that at this meeting, private equity investment firm Cyrus Capital made an offer of 85% for all outstanding 2nd lien bonds of Nebraska Book.   He would have said that the Steering Committee of bondholders including Visium, rejected the offer as they deemed it undervalued the business. This was the basis and rational for Plaford's assigning a higher price that quotes levels for Nebraska Book bonds as he explained to Petitioner Lumiere that the Credit Fund investment mandate required the fund to value in all the new information into their positions which Lumiere believed made sense given Plaford's explanation.  Additionally, he would have stated that Brown Rudnick hiredrestructuringAdvisor Alvarez and Marsal to assess the operations of Nebraska

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Book.  And that in their analysis they uncovered an unaccounted $50 million in credit memos as described in a. above.


 These key points of information would have explained the rational for the value assigned by Plaford at the time.  Defense counsel did not bother to call this advisor to testify or even introduce the evidence and concepts mentioned above.  The government and Cooperating Witnesses chose to ignore these facts during Trial and preferred to make false statements such as stating that the position was overvalued and that the company made textbooks which was jumped on by government lawyers with no business or financial experience to make it sound like textbooks are buggy whips.  These points would have confirmed the prices assigned by Visium and shown the good faith of Lumiere.  It would have shown that the bonds and stock were not overvalued as alleged by the government who did no work in investigation this situation and chose to yell at fraud at anything they saw.

(Exhibits: Affidavit Steve Pohl, Exhibits above)


d.  Nebraska Book Company Summary Update Reports (A36, A37)


 Defense counsel failed to introduce the various reports from Nebraska Book which included the company's strategy for turning the company around and included financial projections and turnaround plan and segmented financial performance.

These reports would have shown Petitioner Lumiere's good faith in the finances and projections and future expected performance of Nebraska Book in which he believed.  It also would give the numerical value of cash flow from which a market based approach would help ascertain a value for the stock in the $9 to $11 range.


e. Textbook buying and renting survey done by Guidepoint Contracted by Visium (Not available but document is in work product that Petitioner had in work drive at Visium that Creizman failed to subpoena as requested)

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Defense counsel failed to mention and produce the results of the survey that Visium had done to help it assess the future of textbook sales and rentals in colleges. This survey which the Visium Credit Fund had contracted out to an external survey company determined that the outlook for textbooks was sTrong and that the majority of students would elect to have paper copies of textbooks than electronic versions. These results have Visium Credit Fund and Petitioner Lumiere the confidence that the risks associated with electronic textbooks were overblown. This would have contributed to Petitioner Lumiere's good faith as well as his indusTriousness and diligence.

SL00711 [VII.D04(a-d)] Exculp Sevan


VII.D.4. Defense Counsel Failed to Submit Exculpatory Evidence Regarding Sevan Marine


Summary


Defense Counsel failed to include documents supporting Sevan Marine Voyageur values used by Visium, set by Plaford and approved and signed off by the Valuation Committee. The Sevan Voyageur was subject to cost overruns on the re-fitting of the unit for a 5-year contract that he entered into with a consortium of oil drilling companies including Eon and Premier Oil valued at over $565 Million. (A57). As the cost overruns caught the company by surprise, they were forced to consider a sale of the business or a bankruptcy, however the Secured bonds that Visium owned were tied to this highly valued asset which gave Petitioner confidence in negotiating to take over the asset with a group of bondholders including DW Investments and Bennett Management. Petitioner and other steering committee bondholders discussed a takeover of the bonds in full at a price above 100 with the CFO of Premier Oil with Attorney from Bingham McCutchin. It was not long after this meeting that Sevan had received a firm offer from Teekay Shipping to purchase all bonds in Sevan for $94 Million in Cash. This offer valued Sevan Voyageur secured bonds at approximately 74 based on the outstanding bonds of NOK 740 Million which Visium owned approximately NOK 60 Million ($10.8 Million notional amount at 5.5 NOK /USD) which is approximately 8% of the outstanding. Since they were to receive $94 million in the agreement they would receive approximately 8% of $94 million which would price the bonds close to 74.

Petitioner Stefan Lumiere v. United States of America                              Case No. 18-CV-9170

Once discussed with other members of the steering committee, the offer was accepted even though it was believed that the offer undervalued the asset, it was an easier situation that taking over the refitting and delivery of the FPSO. AS a result, the bonds were not overvalued as the government alleged. Petitioner believes the bonds were redeemed at the pre-determined price at the end of December 2012 as per the contract.  The Reuters price that the government alleged was the market price was simply incorrect and likely reflected a stale price fed from a broker that conTributes quotes to Reuters that was unaware of the developments in the company and the takeover.  By not accessing the information from Visium that would have showed that they were redeemed in full for cash and not bringing in the evidence that would have been available from testimony from either steering committee members, lawyers from Bingham McCutchin, or advisors from AMA Advisors, all of whom worked on the deal, significantly prejudiced the Petitioner.  Defense counsel Creizman allowed perjured testimony from Plaford and Jindra claiming the price was overvalued based on Reuters.  It cannot be overvalued if Reuters was wrong as it was in this case, and there was a firm contract or offer for all bonds. Alternatively, if Visium had valued the bonds at the incorrect Reuters price, based on Visium's documents which states that it is obligated to value at fair value and not to use a market value if the market value does not represent fair value, this would indeed have been a breach of Trust on the part of Visium.  This would have been a crime, as redeeming investors, would be redeemed at a lesser value than fair value.  The government ignored the concept of fair value choosing pricing services as market values which is simply incorrect especially with less liquid or unique situations.


a. Failure of Defense Counsel to IntroduceEvidence and Comment of the Buyout of Sevan by Teekay Shipping (A42, A43, A44, A45, A49.1)


 Affidavit from AMA Advisors who attended the meeting of bondholders and facilitated the deal with Teekay Shipping during therestructuringof Sevan.  AMA Advisors could have been called as a witness to testify to the Truth of the values and the advanced notice that Visium had to these Transactions as they were members of the steering committee of bondholders.  The affidavit is expected to state the same and that bondholders on the steering committee received advance notice of the Teekay offer to purchase all bonds and the terms of the buyout, which would equate to approximately 74% based on the $94 million offer and the NOK 740 Million outstanding.  He also will state that Petitioner was present

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170

at these discussions and negotiations. He will also state that present at the meeting was Bingham McCutchin attorney Tony Barnes, and bondholders on the steering committee. Some of these Petitioner Lumiere had asked Defense Counsel to call as witnesses for Trial, yet he failed to do so without providing any explanation or strategic reason.

b. Company Filings and Press Releases Indicate Accurate Pricing for Visium's holding in Seven Voyageur based on Actual Transaction: (A40, A41, A43, A44, A45, A46, A47, A48, A49, A49.1)

1) Press release issued 9/30/11 (A42): Teekay agrees to acquire three FPSO units from Sevan Marine ASA and invest in a recapitalized Sevan Marine ASA. This report identifies the agreement and Transaction but does not divulge the terms which they indicate they will do during the week of Oct 3, 2011

2) Interim Financial Report Third Quarter(A41): Discuss the deal and discussed that the terms of the deal were released in stock exchange notice on Oct 18, 2011 and subject to approval by bondholders on Nov 10, 2011.

3) Nov 30th 2011 press release (A43): First Completion of ResTructuring: Company Update:

The second closing is expected to occur on third quarter of 2012. Additionally the bondholders had agreed to release security in exchange for absolute payment guarantee in the amount of USD 94 Million issue by Teekay Corporation in favor of the bondholders in the Sevan Voyageur Bond Loan.

4) Indenture Trustee report show that Voyageur Bondholders were to be paid at the earliest to occur of 1) 12 months from the date of First Completion; ii) 15 December 2012; iii) the date on which Voyageur Completion occurs; iv) such earlier date as Teekay may determine. (A46)

What these reports prove is that the value assigned by Visium was accurate and quantifiable based on an actual offer by Teekay to acquire the bonds for a guaranteed $94 million in cash with a specific deadline for payment. Therefore Petitioner Lumiere simply divided the $94 million divided by the dollar value of outstanding and applied a quantifiable discount rate and included that value into his analysis which he told Plaford. Plaford was however the responsible party to price the security for the fund and

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

he likely used Lumiere's analysis as a basis but still it was Plaford's responsibility and the Valuation
Committee's responsibility to determine if it was accurate and representative of "Fair Value".

c. Letter of Intent Identified that the Voyager was under a fixed 5-year contract valued at $535 Million.
(A47)

This proves that the value of the Sevan Voyageur was at least worth $535 Million and that the minimal
cost overruns for reconfiguring the FPSO for delivery under this contract would have still guaranteed a
full recovery to bondholders as the amount of debt securing the FPSO was only approximately NOK 870
which was approximately USD 145 Million.  Therefore any venture where Visium and Consortium could
have taken over this asset and complied with the contract would have generated a Tremendous
profitability.

d. Expense Report identifying Sevan Meeting in London where Lumiere Travels from 9/14/11 to
9/17/11(A49.1)

This report identifies when Lumiere attends Steering committee meetings with lawyers and advisors to
the committees.

It was at this meeting where the Steering Committee are presented with the offer by Teekay Shipping to
buy out Visium's Voyageur bonds and finance the balance of the build out of the FPSO.  It was also at
while on this Trip that Lumiere and another member of the Voyageur steering committee meet with
CFO from Premier Oil in the presence ofrestructuringlawyer Tony Barnes from Bingham McCutchin.  At
this meeting, the bondholders and the CFO discuss a possible joint venture whereby, Premier Oil would
offer to buy out all bonds at full make whole price over 100, and a joint venture would take control of
the Voyageur FPSO which would be co-owned by a consortium of 3 funds and Premier Oil.

After this meeting, it is announced by AMA Advisors that Sevan has received an all cash off to buyout
the bondholders and take a majority stake in Sevan.  The terms of this offer were not made available to
the public until much later.  However, Visium and the creditor committee knew the offer and what that

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

would payout to the Voyageur Bonds that they held.  This equaled approximately 74% payable in USD.

Reuters prices would not have had knowledge of these offers therefore would not reflect an accurate

price.  The price was hence not overvalued as a firm offer had been made by a large strategicplayer in

the FPSO space.  Lumiere passed this information to Plaford who decided to value in the new offer

keeping to his statement that the Visium Credit Fund's mandate required Visium to value positions

based on all the current information that they had.  If Defense Counsel Creizman had called the expert

witness who was ready, willing and able to testify, all of these concepts would have been clarified to the

jury and to the prosecutors who cannot possibly understand the financial concepts without proper

Training which they do not have.  As a result of a lack of expert, a defense counsel who had no fluency in

financial matters, a prosecution team that had not investigated the facts and unique situations or the

failures of pricing services which are "not valuation services" just as the Administrator is "not a valuation

service".


If Visium had priced the position at the Reuters price, it would have unfairly benefitted new subscribers

to Visium who would be buying into Visium at an unfairly incorrect and low price, and punishing

redeeming investors by selling at an unfairly low price. (See Compliance Manual A, A57)  The pricing of

all current information into the bonds as mandated by Visium investment documents according to

Supervisor Plaford, was a concept that Plaford enforced and it was logical and rational especially if it

were part of the Investor Mandate as he had proclaimed.  Lumiere believed in good faith that it made

sense and was fair and that the prices represented fair value as demonstrated by the evidence.

SL00712 [VII.D05(a-d)] Ineff Exculp USON


VII.D.5. Defense Counsel Failed to Submit Exculpatory Evidence Regarding USON Escrow

Summary


US Oncology (USON) bondholders were in a litigation with McKesson who had acquired US Oncology

and decided to take an erroneous view of the indenture.  According to the terms of the litigation, in

return for releasing the security of the notes, McKesson paid bondholders the initial amount in cash that

was due and held $40 million in an escrow account that was being litigated.  McKesson as part of the

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

agreement also agreed to continue to pay the 9 1/8% coupon interest on any amount that decided in court as well as legal expenses.  As a result of the litigation, McKesson had made several settlement offers beginning with 50% of $20 million and then increasing as time went by and their case looked to favor bondholders.

a. Failure to comment on buyout and settlement of USON Escrow (Recording with discussion with Plaford on settlement math: Not available due to Petitioner's current circumstances; Emails from Stroock describing settlement terms: Not available due to Petitioner's current circumstances; Court Documents on Settlement in Litigation of US Oncology Bondholders vs. McKesson and US Oncology in New York: (Not available due to Petitioner's current circumstances)

  There were public legal documents that Defense Counsel should have brought into evidence to prove the litigation and the amounts settled.  Defense counsel could have downloaded these from Pacer yet chose to ignore it.

b. Stroock, Stroock & Lavan prepared documents and emails outlining settlement agreement with bondholders. (Not available due to Petitioner's current circumstances but may be in discovery or may be able to be subpoenaed from Visium or Stroock.)

  Settlement Documents and emails from Stroock Stroock & Lavan that identified the offers made, and final settlement terms.  These should have been available on Visium Email system which Defense Creizman failed to subpoena.  He could have also subpoenaed Stroock, Stroock and Lavan for all documents and to appear as a witness to testify but failed to do so.

c. Recordings and Transcripts between Plaford and Lumiere where Plaford describes settlement that had been disclosed by Stroock, Stroock & Lavan. (Not available due to Petitioner's current circumstances; Summary of recordings in A99)

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

There are recordings and Transcripts in discovery provided by the government where Plaford goes over his price for USON and his math and Lumiere challenges his math based on the information that he has, but then Plaford makes mention that a superior settlement offer was made that Lumiere was unaware of.  This recording proves that Plaford chose the prices and that they were quantified and also that Lumiere did not follow blindly but challenged Plaford whenever he saw something that was unclear or he did not agree with.  This impeaches Plaford's testimony that Lumiere never pushed back on any prices and that Lumiere was the one who selected prices.  The Recording also proves Plaford's mindset at the time and that he believed the prices he set tied to the settlement offers received which were private and not widely known.

d.  Emails between Lumiere and Brook discussing USON where he has a seller and Visium is contemplating buying them with a Big Boy letter given that Visium is on the committee and knows the information about the settlement offers made whereby the rest of the investment community does not have this knowledge. ( Not available due to Petitioner's current circumstances)

All of these documents and recordings of evidence that Defense counsel ignored and made no mention of during Trial would prove that the values assigned by Plaford and given to Petitioner Lumiere were in good faith and accurate and quantifiable.  Lumiere's good faith belief in the fundamentals was always there and was based on the premise of what his boss Plaford had told him that Visium Credit Fund mandate required him to value all the current information into their position.  According to Plaford, this was a requirement due to fund investor mandate.  With that knowledge Lumiere assumed everything was correct and accurate. It was only when Plaford changed his story with ATI in April 2013 stating that it was backward looking that Lumiere really questioned Plaford's motives and scruples.

SL00713 [VII.D06(a-h)] Ineff Excul Lumiere Analyst

VII.D.6. Defense Counsel Failed to Introduce All of the Evidence that Lumiere was Only An Analyst in the Visium Credit Fund and Not a Portfolio Manager as the Government Claimed

Petitioner Stefan Lumiere v. United States of America                     Case No. 18-CV-9170

a) Visium 2012 Annual Investor Day April 4, 2012: (A1)

 This document is an agenda for Investor Day Presentation to Investors.  In this Document, there are presentations by various members of Visium Funds.  Visium Credit Update lists Chris Plaford, as "Portfolio Manager of the Visium Credit Opportunities Fund".  Petitioner Lumiere is not mentioned anywhere here and is not even invited to attend.

b) Under the Presenting Biographies for this Event: Chris Plaford is listed as "Partner and Portfolio Manager-Visium Credit Opportunities Fund" (A1)

c) Executive Summary where Chris Plaford is mentioned as a Partner of Visium and the Portfolio Manager of Visium Credit Opportunities Fund.  It further states that "Mr. Plaford leads a team of five credit analysts and traders focusing on the Visium Credit Opportunities Fund. (A1)

d) The Numerous Visium Marketing Presentations present Lumiere as either analyst or Cap Structure within Balanced or Credit (due to his role in assisting with special situations and distressed) but never as Portfolio Manager after 2009.  The order is meaningless as Plaford testified, and evidence supports this. For example in the Balanced Fund presentation, Steven Ku is above Marc Gottlieb, yet Marc Gottlieb is a more senior member of the executive committee and a member of the general partnership with signatory authority whereas Steve Ku is a limited partner and does not have signatory authority. Lumiere's placement in the varies throughout the presentations.

 Visium Credit Opportunities: Lists Lumiere #4 on list (A5)

 Visium Balanced Fund- March 2012 (A2)

 Visium Credit Opportunities: Investment Team/Bios: Lists Lumiere last on the list as credit analyst below trader (A7)

 Visium Balanced Fund 2012 Organization Lists Lumiere 4th on list as Analyst (A6)

 Visium Balanced Fund Investment Team Bios (A8): Lists Lumiere as 4th on List.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Only the Visium Global Fund lists Lumiere as a portfolio manager because logically that is the only fund where he had that role. (A3)

e) Email from Lumiere to Thorell telling him that the month-end is in his Bloomberg as he is one of recipients from brokers. (A125)

f) Petitioner Lumiere is a Portfolio Manager of a Book in the Visium Global Fund and Previously in Balanced Fund

   1) Visium Global Fund March 2012 Presentation lists Lumiere as a Portfolio Manager (A3)

   2) Daily PNL Report for CC1 which was the $50 Million portfolio that Lumiere managed in Global in Merger Arbitrage      (Special Situations)  (A8.1)

   3) Employment Agreement Addendum lists gross exposure of $100 Million in 2007 (A15 p1-15) ( This is prior to Credit Fund Existence)

g) Petitioner Lumiere had various signature pages for his multiple roles and the government claimed that Portfolio Manager was tied to the Credit Fund when in fact it was tied to Global Fund. (A16)

h) Visium Credit Opportunities Offering Memorandum: (A13 is partial version.  The full version is not available due to Petitioner's current circumstances)

In this document which is the main document for investors before they subscribe to an investment in the fund there is a section that describes the background of the Investment Manager.  It then follows that the Biography of the Principal is Jacob Gottlieb and then follows with a background of Christopher Plaford who is listed as the Credit and Fixed Income Portfolio Manager of Visium Asset Management LP. No where in this background is Petitioner Lumiere listed or any mention of any sub-portfolios or sub-strategies in Distressed/Special Situations.  Further in the document it does mention that there are

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

unnamed analysts including one that has a CFA and MBA from INCAE.  That is referring to Petitioner
Lumiere as an analyst.


SL00723 [VII.D07] Ineff Subp Wit


VII.D.7. Failure of Defense Counsel Creizman to Call Any of the Myriad of Witnesses that Would have
Presented Exculpatory Testimony. (A98)


According to Strickland v. Washington, defense counsel has a duty to investigate and advocate for his
client at all stages of a Trial.  Failure to do so, deeply prejudices the defendant's rights to a fair Trial in
violation of Petitioner Lumiere's 6th Amendment rights to effective assistance of counsel.  Creizman
failed to reach out to many of the witnesses that Lumiere provided to him for testimony and to appear
as witnesses on behalf of defense (A98).  He also failed to subpoena said witnesses if they demonstrated
reluctance in appearing.  These actions, caused extreme prejudice to Lumiere as no witnesses were
there to testify on his behalf, which allowed cooperating witnesses to supply unchecked prejudicial,
fabricated testimony to the courts, using fabricated statements about Lumiere's character, fabricate
Lumiere's position and role and function in the Credit Fund, fabricate the securities he was responsible
for analyzing (not pricing), fabricate the reasons for his departure and fabricate plain errors of fact, that
as a whole would have painted a completely different picture of Lumiere, his position in the firm, the
securities he was asked to follow for the firm and his good faith.  Had these witnesses been called, the
cooperating witnesses would have been clearly impeached across the board on any allusion to Lumiere
being a Portfolio manager or remotely acting as a portfolio manager of the credit fund, to Lumiere
having any Trading discretion at any time on the Credit Fund, to Lumiere being responsible for setting
prices or checking prices for the credit fund, on Lumiere having received a single penny to enrich himself
for any part of his work in the Credit Fund during this period in question, to Lumiere's motivation for
recording processes at Visium for any purpose other than to protect himself at the guidance of his sister
and her attorney.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

These witnesses some of whom worked at Visium on the Credit team, in accounting, on the valuation committee, partners who were on the executive committee. They would have testified that Lumiere was not a portfolio manager for the Credit Funds, had no portfolio management responsibilities for the credit fund, did not have access to pricing or P&L, and certainly did not have investment or Trading discretion for the Credit Funds. They would have stated that I worked on the Credit Fund part-time in reality assisting with some restructurings and bankruptcies for the fund as well as the larger balanced fund. They would have stated that during the years in question, Lumiere was not authorized to put on any new positions in the years 2011, 2012, 2013. They would have stated that I had a portfolio manager title and function in the Global Fund only and that I previously had a book in the Balanced Fund in 2007 through 2008.  They would have testified that Lumiere was not the analyst on CMED and only helped out initially when the company had defaulted on the obligations and Lumiere was asked to help introducethe firm torestructuringlawyers and advisors and to Kroll for an investigation. They would have stated that the selection of pricing for NAV is a complicated and thorough process with checks and balances and many levels of checks but in the end rested solely with the investment manager, Visium who made the decision based on information supplied by the valuation committee who took arguments from operations and the auditor, Administrator, and external valuation companies, with feedback from Plaford the portfolio manager.  None of this had to do with Lumiere.  The valuation committee witnesses would have been able to discuss the processes and procedures that none of the other witnesses had foundation to and relied solely on Thorell who had no knowledge or access to anything to speculate after the fact.


They would one witness was his sister Alexandra Gottlieb who had agreed to testify but Creizman failed to alert her that by attending the Trial, she would be prohibited from testifying as a witness.  The note that Judge Rakoff questioned came from Lumiere's sister who asked what to do as she wanted to be able to testify, but Creizman simply ignored it.  This ineffectiveness and lack of preparation an lack of knowledge of the rules of criminal procedure and court rules was apparent here and throughout Trial. This is the note she sent up to Creizman on what to do.  She would have had knowledge of Lumiere's role at Visium, lack of access to information and to Plaford's lying and manipulative character and testified to things that Jake Gottlieb had said about Lumiere in groups, dinners, and in deposition for her divorce as well as the information about Thorell's attempted blackmail of Jacob Gottlieb.

308

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

If these witnesses had been summoned and testified Truthfully without fear of reTribution, they would have refuted perjured testimony and ambiguous and purposely misleading testimony and errors of fact by the cooperating witnesses working on behalf of the government in return for leniency on their sentencing, for an agreement by government not to be prosecuted, and a witness who was granted immunity and whereby my conviction would lead to a whistleblower payout to him and the law firm Labaton Suchrow who filed the claim.


Many elements that were ambiguously, erroneously and vaguely presented by Creizman were due to his lack of understanding and lack of researching and lack of preparation for Trial.  Additionally, when Creizman made a lackluster attempt to introduce a factor such as Plaford's good faith in Visium's selected value for C-Med, it was objected to by the government based on reference to facts never submitted into evidence although it was plentiful in the evidence not submitted including the discovery provided by the government.  These elements and facts and the veil of biased ambiguity that infected the Trial, with the aid of key witnesses for defense with actual knowledge, would have been likely changed the government's direct examination of their own witnesses which infected the Trial with prejudicial testimony in violation of Rule 403 rules of criminal procedure.  Additionally, having these witnesses would have voided the government plain error claim that the securities were misvalued in bad faith as these witnesses would have testified that the situations were unique which a competent attorney would have used to build upon the good faith.  Also, the facts such as Lumiere had a minor role in the Credit Fund, did not have any say in the values assigned, did not have access to fund pricing or PNL, was not responsible for most of securities alleged from an analytical perspective and was not responsible for any of the securities or investments alleged from a portfolio management and pricing perspective.  These facts if entered, would have changed the face of the Trial and shown that the cooperating witnesses were not honest, sincere and were flat out lying to save their skins and to make a payday.  As a result, the jury would not have convicted as more than a reasonable doubt would have presented that Lumiere was actually innocent and obviously manipulated and lied to by his supervisor Plaford for his own greedy ambitions.  There is no fathomable strategic reason why Creizman would not have called a single witness in Lumiere's defense that could have changed the entire landscape of the Trial and would have resulted in a not guilty verdict.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Lumiere's minor role as a part-time analyst in the Credit Fund that would have been attested to by calling the multitude of professionals that worked at Visium in the Credit Fund, Visium Global Fund, Valuation Committee, Risk Management, Executive Committee. The list of names were provided to Creizman.  Failing to call any of these witnesses was ineffective assistance of counsel in violation of Lumiere's 6th amendment rights to competent counsel.

Lumiere's good faith in believing Plaford's explanation for the values the firm assigned to its securities would have been apparent by calling as witnesses the bankruptcy professionals and the members of the creditor committees and the attorney's that worked on the company's in question such as CMED, ATI, Nebraska Book, Sevan Marine.  These advisors, investors and attorneys which were given to Creizman to contact included Stroock, Stroock & Lavan, Cosimo Borelli, AMA Advisors, Conway Del Genio, Alvarez & Marsal, Brown Rudnick, Roads Group, Del Mar Asset Management, Cyrus Capital, GLG Partners, DuPont Advisors. By calling these witnesses, the court and jury would have learned that the situations were indeed unique, which Creizman failed miserably to extract from the witnesses who working for the prosecution team demonstrated intense bias in their direct and crosses stating any half-lie, full lie, or misleading and ambiguous statement they could to solidify a win for the prosecution.  The court and jury would have learned that ATI had been in a long restructuring process atypical of any other restructuring due to the fact that they could not accomplish the restructuring under the standard chapter 11 bankruptcy protection because doing so would shut off funding to students for their educations which is primarily provided by the department of education.  They would have learned that Visium and Marblegate were in the unique position and took over ATI assets through a sale.

He proved himself incompetent in this respect as any reasonable attorney faced with a defendant like Lumiere where the allegations in the complaint and indictment were plainly errors of fact would have in addition to documentation support, gathered witnesses to attest to the errors.  Any reasonable attorney would have called witnesses to testify to Lumiere's Portfolio Manager position in the Visium Global Fund, his prior position as a portfolio manager of distressed and Special Situations in the balanced fund which ended in 2009, and shown by any remote definition that he was not a portfolio manager of the Credit Fund, had no Trading or investment discretion in the Visium Credit Funds, had no control or say over pricing in the Credit Fund, had no ability to even directly received historical pricing or PNL

Petitioner Stefan Lumiere v. United States of America                     Case No. 18-CV-9170

conTributions for positions in the Credit Fund. (see Subpoena requests that Lumiere asked Creizman to

call as witness and their expected testimony if testifying Truthfully.)

SL00714 [VII.D07(a-b)] Witness alex-huemer


a. Defense Counsel Caused Petitioner's sister, Visium Founder Jake Gottlieb's Wife, to be Prohibited

from Testifying at Trial.

Alexandra Gottlieb told Creizman that she would testify for defense.  Defense Counsel however invited

her to come to Trial while she was unfamiliar with court rules, was not told that by coming to Trial, she

would be prohibited from appearing as a witness.  She passed a note up to Defense Counsel Creizman

for instructions, when your Honor made the statement that anyone in the court room could not appear

as a witness.  Defense counsel did not respond only stating in court that the note came from Petitioner's

sister.  Defense counsel should have alerted the Court of the error and asked the Court for a brief recess

to have her leave the courtroom and ask the Court's permission to have her appear as a witness.  Yet,

Defense Counsel Creizman, chose to simply ignore the message, which hindered Petitioner's Lumiere's

Trial as a result.


She had foundation having been familiar with the various roles and operations of Visium Funds.  She

also knew about Petitioner's role which she discussed with her husband Jake Gottlieb (Visium Funds

Founder).  She would have testified that Petitioner Lumiere was absolutely not a Portfolio Manager in

the Visium Credit Fund and did not have any portfolio management responsibilities for this fund.  She

would have stated as such, Petitioner would not have had any investment discretion in the Visium Credit

Fund and that he would did not meet with investors, or have anything to do with finalizing or

determining prices.  She would have testified to the contentious divorce that she was going through

with Jake Gottlieb and that Gottlieb had threatened Petitioner Lumiere many times stating such things

as he would desTroy Petitioner's career and make sure he never worked on Wall Street again.  She

would have testified that she had Petitioner Lumiere meet with her and her divorce counsel in the

middle of 2012 after these threats were made and told Petitioner Lumiere that his job was safe for the

time being while they were going through divorce proceedings.  She would have stated that Petitioner

Lumiere's response was that he wished to leave Visium and simply wanted to get out of his contract

with them and get his deferred compensation.  In this meeting, she would have stated that they both

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

told Petitioner Lumiere to take precautions and document everything that Visium had him doing, all work he did, every part of the process, in case Gottlieb would Try to slander him.

She would have testified that the firm handed Petitioner Lumiere existing positions that portfolio managers and other lead analysts were responsible for following when they became problematic for the firm. These situations were assigned to Petitioner Lumiere to assist with analyzing and/or resTructuring, but this had nothing to do with making any investment decision or pricing decision which Petitioner Lumiere would not have any authority over.

She would have testified that Jake wanted to fire Plaford, but that he came back one day and seemed fine with Plaford. She would have stated that Plaford's company Claravant had former FDA officials and hired Brad Hoffman as Director of Business Development and that Brad Hoffman was one of Jake Gottlieb's best friends. She would have testified that when she mentioned Claravant to Gottlieb, he was very evasive and Tried to claim there was nothing worth looking at with Claravant, leading her to believe that in fact there was. She would have stated that Jake Gottlieb had confirmed that Jason Thorell had approached him twice about blackmailing him, and both of these attempts were rejected.

She would have testified that Visium did not ever pay severance or deferred compensation to departing employees and that the fact that Plaford and Thorell were paid severance and deferred compensation was highly irregular and suspicious and that it likely meant that they were working on a common agreed upon story to frame Petitioner Lumiere.

She would have testified to Jake Gottlieb's notes that uncovered that he planned to frame Lumiere and have given instructions about Creizman stating Pretend he's your friend and then fuck him over in the end". She could also have authenticated his handwriting.

She could have testified about Gottlieb, that when she was going through a divorce, he retained all the top law firms so that she would not be able to hire any of them. She would have said that her divorce

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

attorney also ended up in a conflicted relationship with Gottlieb who hired him to attend biotech conferences.

She would have also testified to her discussions with Jacob Gottlieb about Plaford being unscrupulous and unTrustworthy.  She would have also testified that Jacob Gottlieb had it out for Petitioner Lumiere and for the rest of her family and made statements that he would ruin the entire Lumiere family.

Had Alexandra Lumiere testified, she would have testified to Petitioner Lumiere's good character but Trusting and gullible nature and that he was taken advantage of at Visium by Plaford and that he was being obviously framed.

b. Jason Huemer was CEO of Visium Funds.  He would have testified if called for defense witness.  Mr. Huemer would have stated that Petitioner was not in any way a portfolio manager in the Visium Credit Funds and had no Portfolio Management or pricing responsibility for the Visium Credit Fund.  He would have stated that there were no sub-portfolios in the Visium Credit Funds and no Special Situations/Distressed Strategy or "Book" within the Visium Credit Funds.  He would have also stated that Petitioner Lumiere did not have any allocation of capital within the Visium Credit Funds.  He would have stated that Lumiere was a portfolio manager of a Special Situations/Distressed "Book" with an allocation of $100 Million in Gross Exposure but that this was part of Visium Balanced Fund which pre-existed the Visium Credit Funds and had nothing to do with Visium Credit Funds.  He would have stated the residual positions of the Special Situations/Distressed Portfolio were moved to a "DisTressed Book" in the Visium Global Fund.  Additionally he would have stated that Petitioner Lumiere was also a Portfolio Manager of Merger arbitrage (Special Situations) in the Visium Global Fund which also had nothing to do with the Visium Credit Funds and that his allocation in Visium Global Funds was $50 million at its peak.

He would have testified that Petitioner Lumiere was asked to join the Visium Credit Funds at its launch to help out Chris Plaford, but that his role was that of an Analyst for the Visium Credit Fund.  He would have said that when Petitioner Lumiere was given the books to actively manage in Visium Global, he was given the option to depart from Visium Credit Funds entirely, but that Petitioner Lumiere offered to

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

continue to help out Plaford on a limited as needed basis while his focus would be on managing the Visium Global "Books".

He would have testified that Chris Plaford was the sole and only portfolio manager of Visium Credit Funds and that he was the only one with investment and Trading discretion for the Visium Credit Funds. He would have also testified that Plaford was the one responsible for presenting to the valuation committee and to investors and Administrators the pricing and offered valuation parameters for the esoteric illiquid ordistressedpositions and that Petitioner Lumiere had nothing to do with this.

He would have stated that Petitioner Lumiere was not Thorell's boss and did not direct or have anything to do with determining his compensation.

He would have also stated that Petitioner Lumiere was not the No.2 member of the Visium Credit Fund but acted more like an ad hoc analyst, helping out when necessary as Lumiere's focus was on his portfolio in the Visium Global Fund.  He would have also said he was curious why the decision was made to move Petitioner Lumiere to the No.2 position on the org chart which did not denote any hierarchy especially given the knowledge that Gottlieb had the Petitioner Lumiere was preparing to leave Visium.

He would have also testified that Ameesh Shah and Plaford were responsible for the investments in C-Med and that it was Plaford solely that discussed the valuations which he then Translated into pricing to the Valuation Committee.  He would have also stated that Plaford spoke with investors about the key investments in the Portfolio including ATI and C-Med and explained the pricing and valuations.

He would have also been able to assert to the fact that the valuation committee was placed in charge of valuing C-Med and ATI independently but that the investment team simply provided data points to them such as company models, financial statements and any legal updates with contact information of the attorneys involved with the cases.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

He would have also stated that Plaford and not Lumiere was placed on the Board of Directors of ATI
Schools once they took over the company through the new Ancora Holdings which purchased ATI's best
assets in bankruptcy.

He would have testified that Petitioner Lumiere's book in Visium Global was removed on November
27th, 2012 and he was asked to focus his efforts on Visium Credit and to spend time helping to
restructure ATI for Visium Credit Funds.  He would have stated that Petitioner Lumiere was not satisfied
with the limited strategy he had anyway.  He would have testified that Petitioner Lumiere shortly after
this took time off from work to undergo several surgeries tied to injuries he had sustained and that
while out of office recuperating from a surgery, he had called Jacob Gottlieb in mid-April 2013 stating
that he wanted to leave Visium and negotiate a release from his contract asking for his deferred
compensation, and a release from the non-compete clause in his contract.  He would have testified that
Petitioner Lumiere spoke to him a few days afterwards about the departure and to notify Plaford which
he had already done.

This testimony would have shown that Plaford and Thorell committed perjury when they stated that
Petitioner was a portfolio manager in Visium or had any control of investment decisions or Trading
discretion within the Visium Credit Funds.  It would have shown that the Government's theory of
Petitioner's high rank position in the Visium Credit Fund was false and his ability to set pricing or direct
investments was false.  His testimony would have also shown that C-Med was not Petitioner Lumiere's
position but Plaford and Ameesh Shah's position and that he was not aware of Petitioner Lumiere's work
or involvement with C-Med which was likely very limited if any.  He would have said that Petitioner
Lumiere was assigned to dedicate time to work-out ATI for the benefit of the Visium Credit Fund
investors, but as an analyst solely.  Also that an analyst giving his forecasts and expectations for
valuation of an investment is not the same as setting a price for the position.  That role is the
responsibility of the valuation committee with consultation with the portfolio manager of the Visium
Credit Fund which was Plaford solely and not Petitioner Lumiere.  He would also have been able to
testify that the valuation committee had been valuing ATI and C-Med prior to hiring VRC company to do
an independent valuation.  He would have said that they had valued ATI at 25 million after Lumiere left
and increased the value to 29.6 million by June of 2013 based on completion of the resTructuring.  He

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

would have also stated the VRC's valuation was consistent with the Valuation committees and that the values used were thoroughly explained and confirmed and validated by auditors Ernst & Young. He would have testified that C-Med had a Directing Class which had completely different economic interests from the C-Med bonds quoted in the marketplace and that the Directing Class holders would have received 80 to 85% of the proceeds from the bankruptcy versus only 5% for the Tier 3 holders which Translates into approximately lax difference in value.

SL00715 [VII.D07(cd)] Witness Rozenberg-Nataraj


c. Josh Rozenberg, CPA- Visium Accounting Department and Valuation Committee Member.


Mr. Rozenberg would have been able to testify that Plaford was the sole portfolio manager of the Visium Credit Fund.  He would have testified that he assigned responsibility for valuing ATI and C-Med before Valuation Research Company (VRC) was hired to do an independent analysis and continued to value the position for Visium Credit Funds whilst VRC was doing their own independent analysis.  He would have testified that he was assigned to value the position in ATI while the company was undergoing a complexrestructuringout of court and that the firm chose to value the position and use the old bank debt as shell or plug positions to represent the Net Asset Value ("NAVE") of the position until therestructuringwas completed.  This assessment was determined in good faith and signed off by Ernst & Young.


He would have stated that the email that the government used to claim that Lumiere was requesting his own PNL for his positions was not as they had inferred as the email chain to that email would show.  He would have said that Petitioner Lumiere was not the primary analyst for the majority of the bond positions on the email and that he was not the Portfolio manager for any position on the list, nor was he a portfolio manager in the Visium Credit Fund and therefore had no investment, Trading or pricing discretion for the Visium Credit Fund.  He would have stated that he passed the email on to Steven Ku (Visium Funds CFO) who passed on to the Portfolio Manager of Visium Credit Fund Chris Plaford.  He would have stated that Lumiere's request for the PNL conTribution for multiple years was not a request for his own PNL as the Government alleged, but simply for the PNL of the Fund.  He would have stated

Petitioner Stefan Lumiere v. United States of America                                    Case No. 18-CV-9170

that the request was denied by Plaford stating that he was "Not" the portfolio manager or even the primary analyst for most of the positions therefore he would not be given access to the P&L.

He would have also stated that Petitioner Lumiere made a similar request just prior to this for the performance securities of his "Book" of Merger Arbitrage and distressed for the Visium Global Fund.

He also would have uniquely been able to testify to the pricing and valuation processes at Visium which not a single witness at Trial had the foundation to know and simply speculated on during Trial.

What this testimony would have shown is that Petitioner Lumiere was not a control person for Visium Credit Fund and had not authority for the fund and no access to P&L or pricing of securities in the fund. It also would have exonerated Lumiere because it would have shown that it was Rozenberg and the Valuation Committee who valued ATI and then C-Med and then that the firm hired VRC to value these positions as well.  He would have been able to demonstrate that the firm documents authorized the valuation committee to determine prices and that they were done in good faith.

d. Vinny Natarajan-Assistant to Jason Huemer-Business Development for Visium Funds

 Mr. Natarajan would have been able to testify to the following:

-Petitioner Lumiere was not a portfolio manager in the Visium Credit Funds and had no portfolio management responsibility for this Fund.

-Petitioner Lumiere did not have a "book" or sub-portfolio within the Visium Credit Funds which Thorell and Plaford falsely testified to.

-Petitioner Lumiere had no access to the Administrator, Auditor or Investors or decision making over pricing procedures or pricing of securities in the Visium Credit Funds.

-Petitioner Lumiere was solely an analyst in the Visium Credit Fund

Petitioner Stefan Lumiere v. United States of America                     Case No. 18-CV-9170

-Petitioner Lumiere was a portfolio manager with a $50 million allocation in the Visium Global Fund for a
strategy called Merger Arbitrage (Special Situations)

-Petitioner Lumiere had a prior $100 million Allocation within the Visium Balanced Fund for a strategy
called " Special Situations/Distressed" which had nothing to do with the Visium Credit Fund and never
had any accounting issues.

-Petitioner Lumiere did not have Trading or investment discretion for the Visium Credit Fund but would
only be permitted to execute orders given by Plaford the portfolio manager of the Visium Credit Fund.

-Jason Thorell and the rest of the analysts in the Visium Credit Funds including Lee Brown, Ameesh Shah,
Andrew Han, Joe Shoemaker and Stefan Lumiere would have had to clear any investment idea with
Plaford as only he could make investment decisions.

-No analyst or Trader with the Visium Credit Fund would have access or any decision making authority to
price securities as this rested solely with Plaford, the Visium Credit Fund Portfolio Manager, the
Valuation Committee working with the accounting group and Administrator.  However, the
Administrator had no authority to price or value any securities with the approval of the Investment
Manager who had final authority.

-Petitioner Lumiere had a sTrained negative relationship with Jacob Gottlieb (Visium Funds Founder)
due to contentious battles and divorce with Petitioner's sister.  He was not Treated Special as Plaford
described and had less authority at Visium due to his strained relationship.  Even prior to the divorce,
Petitioner was placed on a short leash because Jacob Gottlieb did not want any appearance of nepotism
so Treated Petitioner more harshly than the rest of the investment professionals.  As a result Jacob
Gottlieb continuously belittled Lumiere in meetings, ridiculed him in a slanderous way at executive
meetings.

SL00716 [VII.D07(e-f)] Witness Cahill-Amol

e. Tom Cahill was Head of Marketing for Visium Funds.

Mr. Cahill would have testified that Plaford was the sole portfolio manager of the Visium Credit Funds
and that Petitioner Lumiere was neither a portfolio manager in the Visium Credit Funds, nor did he have

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

an allocation of capital that he was responsible for managing in this fund.  Additionally, he would have

testified that Petitioner Lumiere had no interaction either in person or by any means of communication

with investors. He would have stated that there were no sub-portfolios or sleeves within the Visium

Credit Funds and that it was managed as one portfolio managed solely by Christopher Plaford.  Also

there was no strategy called Special Situations/Distressed in the Visium Credit Funds and that this likely

referred to Petitioner Lumiere's portfolios or "Books" within the Visium Balanced Fund and Visium

Global Fund where he managed an allocation of $100 Million for a period in the Visium Balanced Fund

and an allocation of $50 million in Visium Global Fund.  He would have said there were never any issues

with these portfolios and that neither of these portfolios that Petitioner Lumiere managed had anything

to do with Plaford or the Visium Credit Fund.


He would have testified that Petitioner Lumiere was listed as an analyst in the Visium Credit Fund and

operated as such.


f. Amol Sahasrabudhe- Chief Risk Officer-Visium Funds

Mr. Sahasrabudhe would have testified that Petitioner Lumiere was not a portfolio manager in the

Visium Credit Funds and did not operate any form of portfolio manager for this fund and did not have a

capital allocation within this fund.  He would have also stated that the Visium Credit Fund did not have

any sub-portfolios and that the Distressed/Special Situations "Book" was not part of Visium Credit Funds

and likely referenced Petitioner Lumiere's "book" in the Visium Balanced Fund called "Special Situations

DisTressed" where he had a capital allocation of $100 Million which was moved to Visium Global Funds

and additionally referenced his Merger Arbitrage "Book" (Also known as Special Situations) in Visium

Global Fund which had a capital allocation of $50 Million which he managed until November 27th 2012.

He would have stated that these "Books" had nothing to do with Visium Credit Funds and that there

were no documented issues with the management of these books under Petitioner Lumiere.


He would have stated that Petitioner Lumiere had no interaction with the valuation committee, the risk

committee, Administrators, investors, or the executive committees as it pertained to the Visium Credit

Funds.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

He would have said that Petitioner Lumiere's sole function in the Visium Credit Funds was as an analyst where he shared his time between the Visium Balanced Fund and then Visium Global Funds and Visium Credit Funds.

He would have stated that Christopher Plaford was the sole Portfolio Manager of the Visium Credit Funds and solely responsible for its management and he was the one who discussed pricing the fund with the Administrator and the valuation committee, and accounting departments.

SL00717 [VII.D07(g-h)] Witness Kim-Kelly

g. Robert Kim was director of Research for Visium Global Funds. He was also a member of the risk committee

   As such, he would be able to testify to Petitioner Lumiere's role in Visium Global as a portfolio manager of merger   arbitrage (Special Situations).  He would also be able to testify to Petitioner Lumiere's role in the Visium Credit Fund as solely an analyst with no separate capital allocation

h. Lesley Kelly was head Trader and partner at Visium Asset Management.

   She would be able to testify to Petitioner Lumiere's role as a portfolio manager in Visium Global for Merger arbitrage (Special Situations).  She would also be able to state that Petitioner Lumiere was only an analyst in the Visium Credit Fund and did not have any Trading or investing discretion for this fund. She would also be able to testify that Petitioner Lumiere was not the number 2 person on the credit team as Thorell and the government alleged.

SL00718 [VII.D07(i-j)] Witness Brown-Shah

i. Lee Brown was a credit analyst for the Visium Credit Fund

   He would be able to testify that Petitioner was by no means number 2 in the credit fund.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

He would be able to state that the Credit analysts in the Visium Credit Fund including Lumiere did not have Trading or investment discretion in the fund.  He would also be able to state that Petitioner Lumiere was not a portfolio manager in the credit fund and there was no disTressed/Special situations allocation in the Visium Credit Fund.

He would be able to testify that Plaford had asked Petitioner Lumiere to help out with other analysts work in thedistressedarea.  He would also testify to ATI and the valuation that the Valuation Committee had come up with which they continued to do long after Petitioner Lumiere left Visium.  He would also be able to state that Plaford had told him that he had pricing discretion for the Visium Credit fund that gave them the manager which Plaford identified as himself full authorization to value situations based on the knowledge they had by virtue of serving on creditor and steering committees.  He would also be able to testify to his work as primary analyst on several of the names that Petitioner was asked to get quotes for.  He would be able to testify that Thorell is not Trustworthy and is manipulative and that he only started calling Visium to attempt to slander Lumiere after Feb of 2014 when he started working with the FBI.


j. Ameesh Shah was a credit analyst for Visium Credit Fund.

  He  would be able to testify that Petitioner was not number 2 in the Credit Fund.

He would be able to state that the Credit analysts in the Visium Credit Fund including Lumiere did not have Trading or investment discretion in the fund.  He would be able to state that Petitioner Lumiere was not a portfolio manager in the credit fund and that there was no disTressed/special situations allocation in the Visium Credit Fund.  He would be able to state that Plaford asked Petitioner Lumiere to assist other analysts with work in thedistressedarea.  He would also testify that he was the point person and primary analyst on C-Med.  He would also state that Lumiere had minimal involvement in C-med as the position built pre-existed his being asked for help in therestructuringprocess.  He would be able to state that Lumiere's role in aiding with therestructuringwas very limited as he solely introduced the firm to Kroll and associates who did a diligence review of C-Med and introduced the firm to Stroock, Stroock & Lavan to assist with the resTructuring.  He would be able to state that C-Med was not part of Lumiere's ideas but solely helped on a limited basis.  He would be able to testify that Plaford had told him that he had the obligation to value positions including C-Med based on information that the firm knew privately.  He would also be able to testify that Thorell was not Trustworthy and very manipulative

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

and that he started calling Visium after Feb 2014 after he started working with the FBI to slander Lumiere.

SL00719 [VII.D07(k-l)] Witness Baron-Patel


k. Itai Baron was a credit analyst with Visium Credit Fund.  He worked alongside Petitioner Lumiere as a Credit Analyst.  He would be able to testify that Petitioner Lumiere was not a portfolio manager in the Visium Credit Fund and did not act like a portfolio manager in any form.  He would be able to testify that Chris Plaford was the sole Portfolio manager of the Visium Credit Fund.  He would also be able to testify that he left Visium to go to another fund because he thought Plaford lacked any  ethics and was always looking for inside information which made him feel uncomfortable.


l. Nilesh Patel was a credit analyst with Visium Credit Fund.  He worked alongside Petitioner Lumiere as a Credit Analyst.  He would be able to testify that Petitioner Lumiere was not a portfolio manager in the Visium Credit Fund and did not act like a portfolio manager in any form.  He would be able to testify that Chris Plaford was the sole portfolio manager of the Visium Credit Fund.  He would also testify to Plaford's lack of moral compass.

SL00724 [VII.D07m] Witness VRC Analyst


m. Valuation Research Company (VRC)- John Czapla from External Independent Valuation Research Company hired by Visium to value illiquid and hard to value assets including Visium Credit Funds' investments in ATI and C-Med.


The analyst would have been able to testify that the firm was hired to do the valuations and that he interacted with Josh Rozenberg on the Valuation Committee and Plaford and perhaps Ameesh Shah on C-Med, but never interacted with Petitioner Lumiere.  He would have testified that VRC had been hired to do the analysis and the basis of the analysis and why Markit levels or Reuters levels would not have been accurate representations of value given that there was no liquidity in the exact position that Visium held and that the positions were extremely complex.  He would have testified that they had

Petitioner Stefan Lumiere v. United States of America                          Case No. 18-CV-9170

come up with a value of $23 Million for Visium Credit Funds' ATI position that had eventually turned into Ancora Holdings postrestructuringand asset sale of which only Visium and Marblegate were holders.

He would have testified that the fair value of Visium's holdings in CMED were not the same as the bonds that Traded or were quoted in the marketplace as Visium's holdings represented a Directing Class Tier 1 security which would get 80 to 85% of the proceeds from the liquidation or sale of C-Med assets in bankruptcy.  He would have testified that the public bonds Traded were Tier 3 securities which only would have received 5% of the proceeds.  He would have explained that the issues had been separated into a tiering structure with vastly different economic interests due to the complicated nature of the bankruptcy and ensuing litigation.  He would have explained the value and methodology that he used to come up with a value of 33 for the Directing Class bonds while Tier 3 bonds Traded at 5 or 6 and how economically the Directing Class Bonds were worth significantly more than Tier 3 bonds as they would receive 16x the value of what the Tier 3 bonds received.

His testimony and his analytical work which is included in exhibits were vital to the explanation to the jury of the disparity of the represented value.  Without this testimony and VRC reports, the jury had no basis to understand Petitioner Lumiere's good faith defense.  With this presentation, they would have seen that the Government was simply incorrect in their allegations and that both cooperating witness Plaford and Immunized witness perjured themselves when referencing these positions in order to cut deals and to make money in a whistleblower complaint.

SL00720 [VII.D07(n-o)] Witness Jones-Leand

n. Ben Jones -Restructuring Advisor from Conway del Genio-Interim CFO of ATI

Conway del Genio was hired by the Lenders of ATI to assist with restructuring ATI Schools and salvage the investment.

Ben Jones was placed as interim CFO during this process after the board decided to fire existing CEO and CFOs.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Ben Jones would have testified that Visium and Marblegate had been in the lead position to take ATI private and that the schools that were shut down and liquidated were the ones that Marblegate referred to when he said they were selling their tables and chairs, but that the schools that were being maintained did not go through asset liquidations.  The government's assertion that ATI was in such dire shape that they were selling their tables and chairs for liquidity is preposterous as the secondhand market for these would be insignificant and not contribute to any significant liquidity, but the picture of this was meant to prejudice defense and seem like the situation was dire.  He would have testified that he built the financial and liquidity model for ATI which had forecast EBITDA at the campus level of approximately $13 Million dollars for 2013 and $15 Million for 2014 down from $65 Million previously due to the forced shutdown of numerous programs and campuses mostly in Texas.  He would have testified that originally Cross roads an education specialist had been working with Creditors and that they had believed and modeled a $30 million EBITDA run rate for ATI that got worse due to the amount of time under Heightened Cash Management 2 which caused a liquidity crunch.  He would have stated that Conway del Genio had made an error in their model which they called the creditors about in Mid 2013 where due to delays in returning to HCM1, the EBITDA estimates had dropped to negative 3 million.  This was due to timing, but it was still forecast that 2014 would be approximately $13 million. He would have said that Visium and Marblegate ended up owning the best campuses and assets of ATI which were purchased with their loans and placed into a new company co-owned by Visium and Marblegate called Ancora Holdings.

o. Paul Leand-CEO of AMA Advisors-Advisor on Deep Water Drilling Assets   *(A134)*

Paul Leand, CEO of AMA Advisors was hired by Sevan Marine the steering committee of bondholders. He would have testified that Visium was on steering committee representing Sevan Marine's Voyageur secured bonds and served alongside Bennett Management and DW Investments.  He would have said that as a result of serving on this committee, these funds would have been given access to information about a takeover by Teekay Shipping, a large strategic player in the deep sea drilling market.  They would have been notified and been consulted with about an offer for a fixed dollar amount to be split between the various class of bondholders.  The amount that Sevan Voyageur bonds were to be paid

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

based on the merger agreement would equate to between 71 and 75 which is approximately where Visium had valued the position based on receiving this information from AMA Advisors.


Had Mr. Leand testified, the government's argument that the Sevan Bonds were overvalued would have been without merit.  Additionally, Plaford's testimony would have been perjured because Visium Credit Funds received this exact amount when the FPSO Voyageur was delivered to the designated location in the North Sea as per contract. The fact there was a firm agreement from a major company to buy these bonds under merger agreement at approximately this value clearly shows that the government argument due to a lower Reuters price is without merit.  It has already been established that Reuters is not a market and therefore not an actual price.  The correct price in this situation was the price that was paid by Teekay under agreement for these bonds.  It is likely that Plaford was referring to losses from a currency hedge that Visium had placed on the investment which should have been removed when Plaford learned of an all cash dollar deal as there was no more currency exposure at that point.  Defense counsel failed to introduce the arguments for Sevan and the exculpatory evidence which included filings of the takeover dollar amount by Teekay shipping, and failed to subpoena Mr. Leand as a key witness which caused detrimental prejudice to Petitioner Lumiere.


SL00725 [VII.D07p] Sub Wit Pohl


p. Steven Pohl- Bankruptcy Lawyer for Brown Rudnick   (A135)


Steven Pohl is a bankruptcy attorney from Brown Rudnick that was hired by the bondholders of Nebraska Book Company to organize bondholders and advise on a restructuring of the debt.  He would have testified that Visium was on the steering committee of creditors and that Visium due to serving on this committee had access to information that the general market would not have been made aware of. He would have testified that prior to filing for bankruptcy, private equity Investment firm, Cyrus Capital, presented at an organized meeting of bondholders in the offices of Brown Rudnick, and offer to purchase all bonds outstanding for 85% of par.  A steering committee formed at this first meeting, where Visium was one of 4 original members.  The committee discussed the offer and believed that the

325

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

offer understated the value of the assets and decided to reject the initial offer which creditors
anticipated a full payment offer of approximately 105.   It was then that Plaford stated that he had to
revalue the bond price in the Visium Credit Fund portfolio to reflect a premium to the offer given the
new information which he stated he had to value into the position due to the Visium Investor mandate.

Additionally he would have testified that at the steering committee request, Brown Rudnick hired
Alvarez & Marsal after a site visit determined that the company was in need of an
operationalrestructuringas well due to needed updates in information systems and organization.  Soon
after hiring Alvarez and Marsal, they uncovered a significantly large asset that was not accounted for
and that management had forgotten about.  It was approximately $50 million dollars in credit memos
that would be the equivalent to cash in the next buying cycle.  Since this amount was significant and not
know by the marketplace, Plaford determined that the incremental amount needed to be valued into
the position.

Had Mr. Pohl testified, the good faith of Lumiere would have been apparent to the court, which Plaford
was successful in concealing, the government ignored and defense counsel failed to bring up even
though Petitioner had explained these issues to defense counsel many times in detail.  Defense counsel
did not bother to call Mr. Pohl as a witness and to explain the issues about why Petitioner believed the
prices assigned to Nebraska Book made sense given the information and Plaford's explanation of
Visium's mandate.

SL00721 [VII.D07(q-r)] Subp Wit Gottlieb-Ku

q. Defense counsel should have subpoenaed Jacob Gottlieb (Visium Funds Founder) to testify at
Petitioner Lumiere's trial

His presence at trial and his testimony if given truthfully would show that Thorell perjured himself
incessantly throughout the trial as did Plaford about Lumiere's Position at Visium, and any reference to
any capital allocation or role in pricing for the Visium Credit Funds.  He would have said that he was in a
meeting with Plaford and Steven Ku whereby they told Plaford that they needed additional quotes for
the Visium Credit Funds.  He would have additionally testified if truthful that he told Plaford to tell

Petitioner Stefan Lumiere v. United States of America               Case No. 18-CV-9170

Lumiere that getting these quotes was Lumiere's job and the the quotes were for internal purposes only and had nothing to do with audit.  He also would have testified that he and Steven Ku made the recommendation that Plaford tell brokers where Visium's estimates were for the bond prices if that would help facilitate the brokers task.

He would have also testified that he was in a contentious divorce with Petitioner Lumiere's sister whereby he would sometimes threaten Petitioner Lumiere or disparage Lumiere when he was angry with his wife Alexandra Gottlieb.  He would also testify that Plaford was not truthful and when he read the complaint against Lumiere, he told his wife Alexandra that Plaford is a real liar.

He would have also testified that Thorell had met with him and notified him that he believed there was misvaluation in the credit portfolio to which he asked what in particular to which Thorell replied that he believed that ATI and CMED were egregiously mismarked.  He would have said that he told Thorell: "You are not an analyst so you would not know".  Anyway, those are valued by external valuation companies so you are wrong."  He would have said that he had him discuss these issues with Steven Ku (Visium Funds CFO) and David Keily (Visium Funds Chief Compliance Officer).  He would have said that he fired Thorell in 2013 and after that point, Thorell came back to Visium to attempt to blackmail him for $2 million dollars or he would file a report with the SEC.  He would have said that he asked him to leave the office.  He would have stated that Thorell came back again a second time to blackmail him again for $2 million dollars where he was again asked to leave.  He would have further testified that he entered into a settlement agreement with Thorell to pay him an amount of approximately $300,000 which is something that was previously rarely if never done at Visium.

He would have further testified that he had received a significant redemption request in early 2013 which he met with an investment from the balanced the fund stating to investors that Balanced Fund wanted exposure to credit at that time.

He would have testified that Lumiere called him on his work phone on April 16th of 2013 to tell him that he wanted to leave Visium as he was not happy there and was not doing what he was hired to do.  He

Petitioner Stefan Lumiere v. United States of America                Case No. 18-CV-9170

would have said that he asked Petitioner Lumiere how he wanted to proceed and that Lumiere asked for a release of contract, release of non-compete, mutual non-disparagement agreement and payment of his deferred compensation. He would have said that he advised Petitioner Lumiere that he would have David Keily and Jason Huemer reach out to him to discuss a separation agreement. He would have said that as they were supposed to be in good faith coming up with settlement terms, they decided to simply lock Lumiere out of the office on April 29th 2013 sending him an email that they took his dissatisfaction with Visium as a voluntary resignation and that Lumiere had initiated the departure and not the other way around.

He would have testified that Petitioner Lumiere had his attorney reach out to Visium counsel Seward and Kissel on July 10th 2013, with a cease and desist of any disparagement which Lumiere alleged Jacob Gottlieb had falsely committed stating that Lumiere who he insists resigned, was fired for allegations that were falsely stated in a frivolous suit filed on May 2nd 2013, 3 days after Lumiere left Visium which made no sense. (Frivolous lawsuit was dismissed without prejudice)

SL00721.5 [VII.D7r] Witness Ku

r. Steven Ku- Chief Financial Officer and Partner of Visium Funds

Mr. Ku if testifying Truthfully would have stated that Petitioner Lumiere was not a portfolio manager in the Visium Credit Fund and had no investment responsibility, no investment decision making authority and no pricing authority over the Visium Credit Fund. He would have stated that Petitioner Lumiere was only a credit analyst for the Visium Credit Fund and that his signature block was something that Petitioner created to denote his position in the Visium Balanced Fund that pre-dated the launch of the Visium Credit Fund. He would have stated that Petitioner Lumiere was a portfolio manager in the

Visium Global Fund where he managed a "sleeve" of approximately $ 50 million which ended on November 27, 2013.

Petitioner Stefan Lumiere v. United States of America                     Case No. 18-CV-9170

Mr. Ku would have said that Cooperating Witness Plaford was the only and sole Portfolio Manager of the Visium Credit Fund. He would have stated that Plaford was also a Partner at Visium Asset Management. He would have stated that Plaford was the only one in the Visium Credit Fund that had investment decision making authority and Trading discretion. Additionally he would have stated that it was Plaford that presented arguments as to pricing for the Visium Credit Portfolio and Lumiere did not have any role in these arguments or final decision making authority. He would have stated that the Visium Investment team, meaning Plaford was given a role to provide estimates to operations and to accounting as to unique situations without which it would have been impossible to price the unique situations that Visium Credit were involved with. He would have testified that Visium Credit did not specifically invest in Level 3 securities, but they became level 3 when the companies demanded arestructuringthat became extremely complex from a valuation and accounting perspective. He would have testified that accounting made a decision to use broker quotes to assign estimates and pricing for internally but there was a substantive process for finalizing values assigned which went to valuation committee as part of this determination. He would have stated that the investment team did not in fact price anything in the Visium Credit Fund, but that Plaford did have a role in giving his explanations and logic with support. In the case of ATI, this support came directly from the valuation committee's Josh Rozenberg who was assigned to value Visium's position and to use the old securities as shells until therestructuringwas complete. In the case of C-Med, the documentation from Stroock, Stroock and Lavan and Borelli Walsh served as evidence of the unique situations that required a completely difference valuation to the on the run bonds that were quoted in the marketplace.


He would have also testified that Visium had an audit done after Thorell made a complaint to compliance, and as a result of the audit, there were no issues uncovered in terms of Trading or valuation and the auditor recommended a no action.

SL00722 [VII.D07(s-t)] Sub Wit Knuts


s. Robert Knuts- Former Attorney from Park & Jensen- Former SEC Attorney


Robert Knuts if called to testify and agreed to testify truthfully would have stated the following.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

That Stroock, Stroock and Lavan referred Petitioner Lumiere to Park & Jensen's Tai Park on or about May 15th 2013. That Attorney Tai Park had set a meeting with Lumiere on May 17th, that he was unable to attend and asked if Robert Knuts would meet with Mr. Lumiere. He would have stated that Petitioner Lumiere came to his offices at Park & Jensen on May 17th 2013. That Petitioner Lumiere met with him on this date and told him about his concerns about Plaford and the valuation practices at Visium which he was unclear about but red flags had popped up with a particular situation called ATI. That Lumiere brought with him recordings and documents prepared for the meeting and left all of these with him instructing him that if thought the SEC would be interested in this, to send over to them to investigate the matter.


Further he would testify that Lumiere described that Plaford had told him that he had the ability and obligation based on the firm's documentation to value positions based on all the current information had. And that Plaford professed this mandate was part of the investment documents. As a result, Plaford valued positions based on information acquired from private information attained while serving on Steering committees which were formed when companies were in bankruptcy or when bondholders entered into litigation with a company whose bonds they held. He would have also testified that Lumiere told him that a red flag popped up with Plaford stated that with ATI, it was different, that investors don't get the new information until 1 or 2 quarters later. And that the valuation was based on forecast numbers as of 12/31/12 which was prior to new disclosed numbers. He would have said that Lumiere said he received a phone call from acting CEO at ATI from Conway del Genio in April 2013 whereby the CEO stated that there was an error in the model and the projected numbers would be lower and that Lumiere told Plaford that he should tell Accounting the new information so that they could adjust the models that were used to value ATI. And when Plaford told Lumiere not to call accounting, and that the numbers were backward looking for ATI based on this position and the agreement with investors, Lumiere was confused and it raised a red flag and left Visium after this. He would have said that Lumiere told him that he was asked for get broker quotes on a monthly basis on a handful of companies and that he would explain the situations to brokers, but some of the positions did not trade as they were restricted. He would have said that his recommendation based on Lumiere's statement that he was starting a fund, that he should just "let sleeping dogs lie" as any investigation would be negative publicity. Also he would have stated that he stated that there was no criminal exposure there for anyone including Plaford or Gottlieb as hedge funds have wide latitude in their

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

pricing of securities. Also he would have stated that the SEC would not be interested in this case as they were primarily interested in insider trading investigations. He would have also stated that when Lumiere left his office, he said he would like Knuts to review the material he left with him for further review and to give it to the SEC if he believed there was any wrongdoing. Knuts would have stated that Lumiere contacted him again in May 2013, in August 2013 and in December 2013 and January 2014 to assist with reporting to SEC as Petitioner Lumiere became more knowledgeable of potential wrongdoing based on what he heard from Thorell. He would have also stated that in May 2013, he asked Knuts if he would speak to Thorell as Thorell was concerned with what Lumiere told him about his suspicions and was afraid of losing his job. He would have said that he did speak or meet with Thorell at Lumiere's request. Knuts would also have stated that after the search warrant was executed on February 2014, he communicated with Agent Callahan the same day or the day after to coordinate the return of Petitioner Lumiere's cell phone. And further that he and/or his colleague Doug Jensen were in communication with the Government's office about Lumiere Proffering on February 26th or February 27th of 2014 right after the search. Additionally, he would have stated that he left Park & Jensen the day after the search was executed and moved to Sher Tremonte. He would have stated that as Lumiere was deciding whether to hire Park & Jensen to assist with proffering with the Government, Lumiere and he discussed impact to starting his fund and whether Lumiere should delay the launch or proceed. He would have said that he told Lumiere he should proceed as he had done nothing wrong and that if questioned by investors, he could simply say that Visium is being investigated and that he is assisting the government with this investigation, but that Lumiere has done nothing wrong.

SL00723.5 Goldstein

t. Jaymie Goldstein, Stroock, Stroock and Lavan, Bankruptcy and Restructuring Attorney

Mr. Goldstein would have stated that he was the attorney working on the restructuring and/or litigations of ATI Schools, China Medical and US Oncology. He would have stated that Stroock, Stroock and Lavan represented the steering and creditor committees of bondholders and lenders for these companies. He would have stated the following as to each:

Petitioner Stefan Lumiere v. United States of America                      Case No. 18-CV-9170

ATI Schools- ATI Schools ran into a situation with the Texas Workforce Commission in late 2011. As a result, Stroock was hired as legal counsel by lenders and Conway del Genio as restructuring adviser and X-Roads as education specialist and Stifel Nicholas as investment banker. He would have stated that as the situation was delayed due to schools being placed on HCM2 from HCM1 that the lenders organized to lend money to the company into a priming facility. As a result, this close to $40 million raised would assist ATI with its working capital issues while on HCM2, while it underwent an audit at the request of TWC, and the Department of Education and the DOE worked through the student application validation process.

He would have stated lenders looked to sell the company and hired Stifel Nicholas to explore a strategic sale.

He would have stated that due to the HCM2 status, buyers were reluctant to step in, and as a result, lenders including Marblegate and Visium decided to lend additional monies to ATI in return for control of the company. Additionally, there were several other private discussions between Marblegate, Visium and other strategic partners whereby they would leave the group of lenders and take control of the company in partnership. He would have stated that the issues and structure were complex and that in the end, Marblegate and Visium acquired ATI best assets through a foreclosure process via a new entity called Ancora Holdings which had an entirely new capital structure and whereby none of the other lenders including Apollo participated in the greater part of the value in Ancora. (see ATI/Ancora VRC reports for new value and capital structure that Visium used to value its positions)

He would have stated that Stroock was also the counsel in China Med and he would have stated that the creditors also hired local advisor Borelli Walsh to pursue assets in China based on the CEO's apparent sale of assets and businesses to related parties. He would have said that prior to this, the CEO had extended an offer to buy out bondholders for $105 Million and perhaps slightly more. He would have said that as a result of funding the litigation to go after assets in China, the bondholders were broken out into a tiering structure with 3 separate classes of securities and 3 different economics ranging from 5% for the class (Tier) 3 securities to 75% to 85%(initially) for the class (Tier) 1 securities which was called the Directing Class which Visium helped to formulate and promote and that as a result they would

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

benefit economically significantly more that the bonds that were quoted in the public market by a multiple of 15x to 16x.  He would have also stated that it was expected that as the bankruptcy in the US and Cayman Islands and China unfolded, the creditors would gain the rights to access the China Meds bank accounts, and have the right to petition the courts to force an unwind of any business or asset sales done at low values by the CEO.

He would have stated that Stroock was also hired by creditors in the US Oncology litigation.  He would have said that Visium was on the steering committee and would have knowledge of settlement offers that the rest of the bondholders would not have known about.  He would have said that Visium was told of the various stages of settlement offers throughout the litigation and that a settlement offer was made and finally accepted in the 5-6 context for USON Escrow.

He would have stated that Petitioner Lumiere contacted him shortly after he left Visium.  And that Petitioner Lumiere asked him where other hedge funds had valued C-Med and ATI to which he responded that he did not know and that was up to investment professionals not lawyers.  He would have said that Lumiere told him that he met up with another member of steering committee in China Medical who had valued its position at the Tier 3 level as opposed to Tier 1 and asked what the proper way to do this was.  He would have said that Lumiere told him that he suspected perhaps Plaford had been lying to him and that the situation with ATI and Plaford not wanting to report the new numbers to accounting was a red flag and that the fact that another steering committee holder of China Medical valued it differently was a concern.  He would have said that Lumiere stated that Plaford had also valued USON based on the settlement offers and not where they were quoted.  He would have said that as a result of Lumiere's concern, he referred him to Joel Cohen from Stroock who in turn referred him to speak to Tai Park from Park & Jensen.

SL00726 [VII.D08(a-e)] Trial Prep

VII.D.8. Defense Counsel Creizman Failed to Competently Prepare for Trial with Adequate Documentation and Analysis

333

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

a. Defense Counsel Failed to Hire Forensic Accounting Firm

Creizman claimed that the prosecution realized their mistake and as a result the government would not bring up valuation disparities in Trial, but would switch their focus to level 2 or level 3 representation which Lumiere had nothing to do with.  Since the indictment focused on this, and all the press was made aware of this allegation, he should have been preemptive and done the work by hiring the forensic specialist.  A competent attorney would have not taken a chance that the prosecutor would switch their allegations in Trial an done the proper work and hired experts to manage to data and test the entire list of securities that was made available in the Bill of Particulars and brought up Visium levels and compared to various broker levels, as well as various pricing services to demonstrate the variance between all of them and that there is no one price as levels are just indications and not markets by definition.  The prosecutors' allegation and Vandersnow's perjured testimony stating anything that the prosecutor wanted him to say, got him caught stating a known error in fact as it is well known in the financial industry that a level and indication is not a market, and brokers are not willing to buy on their own behalf since they are agents/middle men.  They have to shop to find the other side to any Trade. This fact was lost in the court unfortunately and a false statement made its way into evidence unchallenged by Creizman.  The 1st prong of the Strickland test is beyond obvious and shows laziness, lack of judgment and lack of responsibility to the client . The 2nd prong of the Strickland is also clearly met as the results would likely show a disparity of levels on the same security between various brokers and various pricing sources.  This would then force a narrowing to the allegations of mispricing's to only the handful of securities that Visium represented as creditor committee and had unique and substantiated valuations by Valuation Committee and Valuation Research Company (VRC). With this, the prosecutors' claims would have been seen as manipulative and incorrect, and the cooperating witnesses would have been deemed liars automatically impeaching their testimony ending in a not guilty verdict for Lumiere.

b. Defense Counsel Failed to Convert Discovery into Searchable Format: Discovery organization firm: Creizman failed in Trial Preparation by failing to hire out a Discovery organization firm.  Creizman had indicated that this was a standard practice when Lumiere retained Creizman, as the amount of discovery

334

is so great that it needed to be organized by I, data, etc. and needed to be converted to a text-searchable format.  Any reasonable attorney who would do the due diligence and review the discovery, would have hired a firm to assist with the discovery organization.  Yet Creizman not only did not do this, but he told Lumiere while Lumiere was in his office that he was sending the discovery out that day to have it organized professionally, after getting off the phone with a vendor that specialized in this area.  Then months later, just before Trial, Lumiere asked about the discovery and the organization firm and how he could review it, and Creizman admitted that he never sent it out to be organized or converted.  There were many millions of documents in discovery, mostly in Tiff format which is non-searchable.  Creizman failure to convert this, meant that he did not actually even review the discovery, or reviewed very little of it.  Current estimates are that there are over 10 million documents in the discovery provided.  Without the benefit of a searchable text function, the ability to go through the material creates a pot luck situation.  It would take an individual working on the discovery full time approximately 15 years to go through these documents.  This is an insurmountable task for anyone and Creizman's failure to convert and organize the material falls well below the acceptable standard.  Additionally as further evidence that Creizman did not bother to go over much of discovery, is that fact that many of the drives and CDs provided were corrupted and could not be opened, yet Creizman never made a mention of it or contacted prosecutor to replace them.

The 1st prong of the Strickland Test is achieved quite easily, while the second prong shows prejudice as any exculpatory material that was in discovery would not be able to be viewed and therefore Creizman fails again here.


c. Defense Counsel Failed to Review Discovery

Creizman failed to properly review exhibits in evidence and stipulated to authenticity and correctness of documents and exhibits without pause and irresponsibly.  Any reasonably competent attorney would review the exhibits, the evidence that the prosecutor provides and have his client examine the content for feedback.  However, Creizman does not bother to review these documents or exhibits in evidence until the evening before being presented in Trial.  As an example, the SEC economist witness that was working for the prosecution team, prepared an exhibit of many pages that was presented at Trial.  He had been asked to simply compare Visium's price used to the price that Reuters used.  If the prices were different, then it would be marked different, and if Visium's price was higher, it was identified as

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

benefiting Visium.  The amount of disparity was not measured at all so for example if Visium used a
price of 79 and Reuters had a price of 78.75 and Bloomberg had a price of 79 and Goldman Sachs had a
live market of 79-80, the SEC mode would show that Visium overvalued the security to its advantage.
This exhibit was prejudicial and lacked foundation yet Creizman blindly stipulated to it.  There was a
chart that identified ATI Markit Price versus Visium Price that was incorrect for several reasons.


        The ATI position held by Visium at that time had been restructured and the original security had been
separated into two classes which the chart ignored.  Secondly it referenced a Markit Price which may
falsely lead the jury and court to believe that it was a market price or marketable price.  Lumiere
brought these points up to Creizman's associate and Creizman, yet both failed to understand by stating
that it was the same Cusip.  This statement alone showed that they did not understand any of the
concepts explained to them making them unable to fairly represent Lumiere in Trial.  Thirdly, this same
chart had assumedly derived the price from another exhibit that the SEC economist had.  There were
over a thousand spreadsheets provided likely by the SEC economist or Labaton Suchrow, yet the exhibit
referenced for the Markit Price for ATI did not have any price for ATI. A review of all the thousand
spreadsheets by Lumiere after Trial revealed that there was no price for ATI on any of these
spreadsheets.  Additionally, it was uncovered that pricing service Markit receives their levels from
pricing service Loanx which in turn had stopped providing levels on ATI. Apollo who had been an early
investor in ATI also had written in their report that they stopped using Loanx as there was no evidence
of actual Trades or marketable levels so they reverted to other methods.  Creizman's failure to review
exhibits in a timely fashion or review them for errors, showed extreme prejudice to Lumiere in Trial thus
failing in the 2nd prong of the Strickland test where Creizman's incompetence caused gross prejudice
during the Trial.  A reasonable attorney would have reviewed these, found the flaws and refused to
stipulate to these exhibits which were extremely prejudicial and incorrect.


        d. Another exhibit that Creizman failed to review was the alleged C-Med Trade of March 23, 2012.  A
reasonably competent attorney would have looked into the Trade, reviewed various broker levels
around that date and after, looked at the news for that week, looked at the stock price movement,
interviewed the Trader from Janney Montgomery, Interviewed the other parties that Transacted in C-
Med that day and looked at any published reports on C-Med leading up to Trade.  Creizman however did

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

none of this and never even mentioned this specific Trade to Lumiere.  A reasonable attorney would have mentioned it to Lumiere and asked Lumiere to research where he was on that Trade date and any other information Lumiere could remember about that time period or the alleged Trade and who executed the Trade and why.  What Creizman would have uncovered was that Lumiere was not even in NYC at the time and was in fact Traveling in Florida, automatically impeaching Plafond's testimony that Plafond claimed Lumiere was in his office at the time of the Trade while they discussed paying a higher price for it to solidify a higher tender price.  Creizman would have been able to present airline tickets, hotel room invoices and a concert stub for that date for a concert that began at noon that day to present to the court and jury. Additionally Creizman would have been able to show that even if Lumiere did mention to Janney Montgomery Plafond's order to execute, it may have been a simple order from Plafond to buy 1 Million face.  And a thorough investigation of the circumstances around this date would have revealed that there was no True published C-Med offered at any price, there were rumors that a management buyout of the company facilitated by the Deutsch Brothers and the stock was up 273% over the past 2 weeks.


A competent attorney would have been able to state that even if Lumiere did place an order for C-Med that day, Lumiere may have simply said, "Plafond wants to buy 1 million, I am on vacation so call Thorell or Plafond to discuss price when you locate a potential seller".  That price may have simply come back at 42.5 or 43 and either Plafond, or Sudarshan Jain, or Thorell may have accepted the price since there were no phone calls picked up by Lumiere after 2pm while the Trade occurred after 5pm. Unfortunately, the counterparty is deceased so could not testify to this and question whether he would remember it specifically. It is unclear who executed the Trade or what the representation of the broker was or the language used to place the order but given the facts of the week around that Trade, it is within the realm of likelihood that 40s was the right context.  Additionally, had Creizman done a reasonable level of due diligence as any competent attorney would have done, he would have been able to bring in evidence that levels from many major broker/dealers had C-Med bonds quoted in the 40 to 45 context the very next Trading day.


The exhibit placed into evidence included a chart which identified only Visium's Trade but footnote identified that 2 other Trades at around same price in the 40's are conveniently excluded to create more

337

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

prejudice to Lumiere.  One came from a broker called Hapoalim the 2nd from a hedge fund.  When Lumiere noticed these at Trial, he mentioned the error to Creizman's team but was ignored.  Creizman's failure to examine discovery, evidence and exhibits in a timely manner and blindly stipulating to exhibits and evidence prior to Trial and during Trial without properly reviewing or showing to Lumiere for review is well below any acceptable standard of an attorney and this greatly influenced the Trial of Lumiere. Had these been examined, corrected reviewed and not stipulated to in its current form, and had Creizman been prepared to counter the arguments presented by prosecutors and SEC witness and cooperating witnesses, he would have been able to impeach them all and at the very least corrected the mischaracterization and clarified.  As a result, Lumiere good faith would have been shown and he would have been found not guilty.  Therefore, Creizman easily fails on both prongs of the Strickland Test quite easily.

### e. Defense Counsel Creizman Failed to Ensure All Discovery was Received and Viewable

 Creizman failed to review the discovery to make sure that he had received it and failed to load entire the discovery onto Dropbox give Lumiere access.  Creizman had in his possession corrupted CDs and Hard Drives provided by the government with no request made to replace such drives and discovery.  He additionally never even noticed that a material amount of discovery stated as delivered on August 8th 2016 was incomplete and had material information related to emails of alleged co-conspirators Jacob Gottlieb and Steven Ku and emails from Mark Gottlieb.

SL00727 [VII.D08(f-g)] Materials

### f. Failure to subpoena material necessary for defense of allegations of misvaluations such as:

 Creizman did not file many of the subpoenas that Lumiere considered important to his defense whereas Creizman should have understood the importance of getting data and values in preparation to defend Lumiere given the allegations in the complaint and indictment.  Any reasonable attorney would have requested subpoenas of all of Lumiere's emails from Visium as well as those of the alleged co-

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

conspirators, in addition to files pertinent to defense including Lumiere's entire network work drive, Co-
conspirators and the Credit Analysts work drives, and all Bloomberg messages and chats for the period
in question from all alleged co-conspirators which would include bond runs to compare all other dealer
quotes, indications, markets at the periods in question to compare to Reuters, Bloomberg, IDC, Markit,
Loanx pricing services for inaccuracies.


Creizman did issue some subpoenas very late in the process and too close to Trial for many of the
subpoena's to be acting upon reasonably by recipients. He also did so without reviewing them in
advance with Lumiere so many mistakes were made and incomplete information was requested, and
incomplete information or no information was received. Several requests that Creizman followed up
with ended with Creizman simply letting them out of complying with subpoena in return for a
conversation or information which provided zero benefit to Lumiere


Some of the essential subpoena's that failed due to incompleteness, tardiness, or not being sent or
let out included:


1) Funds' that were members of the creditor's committees valuation, source and descriptive rational
information for positions such as ATI, CMED, Nebraska Book, USON Escrow, Sevan Marine ( Did not
receive many of these and asked for incomplete information)


2) Pricing, source and liquidity representations for all securities in the Bill of Particulars from: Reuters,
Markit, IDC, Bloomberg.  (Did not receive)


3) Bloomberg Bond Runs from Janney Montgomery and Princeridge to show what bonds they
marketed and Traded and what sectors they were involved with

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

4) Bloomberg Bond Runs from other mid-sized brokers such as Imperial Capital, CRT Group, and then from larger dealers such as Barclays, Goldman Sachs, JP Morgan, Banc of America to show comparisons from level of involvement in various sectors, names, large market versus mid-market. Would also indicate a clear difference from an level, quote and an actual market which is only a market and active when there is a size displayed per bid side or offer side.

5) Several responded that given that request was coming during holidays, they would not be able to comply at such a last minute.  He received few of the responses from the subpoena requests.

6) Requested subpoena of all of Lumiere's: Network work files, Emails, Bloomberg chats and Bloomberg Messages and all phone records for Visium Direct lines and conference lines. ( Requested the same for Plaford, Thorell, Ameesh Shah, Andrew Han, Sudarshan Jain, Lee Brown, Jacob Gottlieb, Steven Ku, Josh Rozenberg)

7) VRC Reports from Visium and Valuation Committee Memos and Memos from the Executive Committee, Transcripts from Credit Fund investor calls led by Plaford and all evaluation reports by Plaford on the credit team members.

8) Reports from Conway del Genio, Stroock, Stroock and Lavan, Brown Rudnick, AMA Advisors, Paul Leland that would have documentation on the following names: ATI, USON Escrow, Nebraska Book, Sevan Marine, CMED

9) Claravant failed to subpoena directly to Plaford through the government and his attorney which the Court admonished Creizman for resulting in a very limited review.  This would have revealed additional information such as the employees of Claravant with included one of Jacob Gottlieb's best friends, Brad Hoffman who simultaneously worked as an investment banker in the Healthcare Group, an investment banker in the same healthcare group where Brad Hoffman worked who was on the board of Claravant, the list of Ex-FDA officials that were on the board of Claravant and a likelihood that Jacob Gottlieb was

Petitioner Stefan Lumiere v. United States of America                              Case No. 18-CV-9170

involved somehow with Claravant professionally with Plaford in what may have been a sophisticated insider Trading information pool.  The list of clients of Claravant was never revealed either and any payments made to Claravant.  All of these would have been key to cross examine Plaford to show that he was still continuing to lie to the government, lie in court, and likely protecting himself and Gottlieb which would explain why the firm and Plaford decided to point fingers at Lumiere as a scapegoat/fall guy.

g. Defense Counsel Failure to Review and Correct Material Plain Errors in Government Exhibits.

1) Failure to review Transcripts of recordings and correct errors and manipulations by Government

   Creizman did not review the Transcripts of recordings submitted into evidence and never asked Petitioner Lumiere to review the Transcripts for accuracy which supposedly arrived weeks before Trial and stated that he would stipulate them because he did not have time to review them. (Exhibit email to Government from Creizman).  He did not bother to correct material and significant miswording, even the snippets provided by the government which were important misstatements changing the meanings of statements and allegations.

SL00729 [VII.D08g1(a-d)] Transcripts Review (New)

a) Government Version of Manipulated and Materially Significant Erroneous Transcript

For example:

Government version of erroneous Transcript:

   "First we must extort him.  I would love to go to them and say: Plaford, Jake give us $100 Million between the both of you."

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Corrected version:


"Well of course we can't extort him.  I would love to be able to go to them and say: Plaford, Jake, give us $100 Million between the both of you." (A24 Tr P Ln)


The tone if listened to, is obviously in jest and excitement and meant to spur Thorell to show Petitioner Lumiere what information he has as he has refused to show Petitioner Lumiere the actual evidence he had gathered while supposedly working with Petitioner Lumiere to whistleblow.  The thought of even joking about it was in response to Thorell's prior statement from July 2013 which was a recorded conversation where Thorell stated that he wanted to buy Petitioner Lumiere's recordings telling Petitioner that he could pay him and asking "don't you want to make money".  Petitioner Lumiere's responded to this offer with: "What are you talking about?  Do you mean you want to blackmail Jake.  You can't do that.  That's an offense."


This statement which from the tone and corrected wording, is obviously banter, yet due to Creizman's ineffectiveness in preparation and his lazy stipulations to evidence without any competent review, the Government uses this material error during Trial and in rebuttal summation to allege that Petitioner Lumiere's motive in participating in the scheme was to blackmail Jake which is sinister and lacks rational thought.  This argument which is completely made up as well as would be refuted by testimony from Petitioner's sister who in the presence of her attorney, advised that Petitioner Lumiere document everything Visium had him doing for protection against possible slander by Gottlieb.  The government's argument is not only incorrect, false, and prejudicial but it lacks any rational thought.  The government alleged that Lumiere was the Mastermind of this scheme and hid it from everyone, but then tape-recorded it all so that he could blackmail Gottlieb and Plaford.  It makes no logical sense.  None of it does.  Petitioner Lumiere was the first to report the instances that he felt were suspicious to attorneys that knew the securities just after he left Visium.  He then reported his suspicions to Immunized Witness Thorell to warn him for the purpose of protecting him from being set up as the "Fall Guy" by Cooperating Witness Plaford.  He then reported it to Former SEC Attorney Robert Knuts from Park & Jensen at a meeting on May 17, 2013. And throughout the recordings Petitioner Lumiere discusses leaking it or reporting to the FBI (which he was advised not to do by Attorney Robert Knuts).  Petitioner

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Lumiere also warns Thorell that he cannot use the information to blackmail Visium as it would be an offense. He does the same to a former colleague when he indicates he would use it as leverage in his negotiations to get Visium to drop him from lawsuit. Lumiere also is in discussions to Whistle blow or report the instance further in all the recordings that Thorell had when surreptitiously recording Lumiere. The Government's allegations are not in the character of Lumiere and that is exhibited throughout the preponderance of the evidence. A theory should be rational, but the Government's theory was so ridiculous that not only was it improbable, but it was impossible. The theory should make sense yet it makes no sense. The government's simple manipulation of the Transcript to prejudice and defame Petitioner Defense counsel's incompetence in sTressing these points, sunk to a level of incompetence that no defendant should have to confront on a single point, yet Defense counsel Creizman repeats these same incompetencies throughout the Trial deeply prejudicing defendant.


b) Recording from Thorell Bar in July 2013 after Thorell brags about his confrontation with Jake Gottlieb and Steven Ku and that Ku had told him they don't do overrides and that they don't exist and what Lumiere understood from Thorell that Ku stated that they don't use NAV for valuation, the government Transcript was erroneous and said:


"Even though Plaford has been manipulating the values." (this is incorrect)


This is in error in a corrected version would indicate as Thorell had testified about Lumiere's responses that it appeared Lumiere was shocked. ( See Transcript where Thorell discusses this recording)


Actual version consistent with statement is more of shock and question and a newfound realization:


"So Plaford has been manipulating the values!?"

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

The tone and the words are very different and have different meanings of time and realization. The corrected version proves that his suspicions had not been confirmed and are recently developed and become further developed because of this new information from Thorell in July 2013.

b) Secret recorded conversation with Thorell never introduced as evidence in May 2013 right after Petitioner's departure from Visium.

A week after Petitioner Lumiere's departure from Visium on or about May 6th 2013, the recording clearly shows that Petitioner Lumiere is warning Thorell that Plaford is not Trustworthy and further telling him to leave the firm or at the very least advise to get a recording device so he could protect himself from being blamed and set up as fall guy for Plaford. Petitioner Lumiere tells Thorell that he recorded conversations of Plaford to protect himself as well. In this same recording Thorell states that he is concerned about his job and wants to speak to anyone who may potentially report the issue so that he could dissuade them from doing so. It is here that Lumiere tells Thorell to call brokers not from his desk phone but from his cell phone so as to not alert Visium to what he is doing as he is concerned about his job and it is not isolated to Plaford but it is an issue that obviously involves Gottlieb (Visium Funds' Founder) and Ku (Visium Funds' CFO) as well. Thorell flips this one instance where he tells him to use his cell phone to fabricate a story that Lumiere told him to use his cell phones to call brokers when asking for quotes. Lumiere never did so, and Thorell's statement falls into a pattern of deception that pervaded his testimony. It is quite clear that Thorell studied this recordings and Transcripts in order to fabricate his web of fabricated statements made to falsely incriminate Lumiere. It is also on this recording where Lumiere tells Thorell that he is contacting an attorney and advises him to do the same. Also on this recording Thorell admits that he has done something that Lumiere was not aware of that indicates that Thorell may have unknowingly been involved in something he was also unaware of where he states that Plaford had him copy bond prices onto his own email that Plaford had emailed him to send to operations to pass off as coming from him, the Trader. The recording shows that Lumiere is shocked about this and says speaking about what Thorell has told him about what Plaford had him doing: "that is "another level" of egregiousness that I have not seen before." Thorell then during Trial, uses Lumiere's own words in this instance to pass off as his own when he states that the sending of the USB to brokers was "another level of egregiousness, he had not seen". Thorell again uses Lumiere's

Petitioner Stefan Lumiere v. United States of America                Case No. 18-CV-9170

words to fabricate a story that pervaded the Trial.  Thorell was on his work desk phone line on speakerphone when Lumiere for the first and only time asked if Odeon would assist Visium with quotes which was at the direction of Plaford.  On this same call, Lumiere tells Odeon: "We will send you a usb that includes all the quotes requested with Visium's estimates, just go through it and check whatever you agree with and send back".  Lumiere never stated any surreptitious or nefarious requests in this, but the government chose this incident to twist it into an example of Mal-intent which never existed.


c) Government Version of Manipulated and Erroneous Transcript

Additional snippet that government cut short of complete sentence in presentation to jury was the part where I say do not tell anyone about the way Visium is marking its book, I don't know, maybe the SEC will just hear about it. was conversation with Phil Broenniman where I state:  Clearly stating that I will be the one leaking this to the SEC as I am disturbed by what I thought I uncovered, yet the Government hides this last part about the SEC and says the I am simply asking Phil not to mention it anyone and to keep it quiet.


d) Government partial Transcript that is cut short of a complete sentence is recording where Thorell states that he wants jail time for Plaford, Gottlieb.


SL: But, like, to be quite honest, like, I don't think...and this is just from a Karma perspective.  These guys don't deserve to be where they are. Like..

CS: But...

SL: He does not deserve to be in business.

CS: No, I know. Um...

SL: He, he falsified infor...he falsified marks, levels, performance.

CS:(Thorell): Yeah, I know this. I...

SL: It was...

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

CS: I have all this stuff.

SL: Yeah.

CS: Um, Plaford, yeah.  Like I...he's gone from the business, if we wanna do [it] like that.  That's easy, ok?
Personally, I would like jail time.  For him. Gottlieb" (Transcript from Jan 6, 2014: Lumiere#2 Corrected:
A24:P47 ln7-16)

   Government cuts out "Gottlieb" which was at the end of the sentence and inTroduces incomplete
sentence to avoid making allegations towards Jake Gottlieb (Visium Funds' Founder) who was one of the
alleged co-conspirators and Defense Counsel does not bother to check the full recording to see that the
snippet has been altered to cut this sentence short.  Since the Government could not get Lumiere to tell
their version of a storyline, they are switching storylines to make it look like Petitioner Lumiere was the
mastermind of a plot and that Petitioner Lumiere did this secretly without the knowledge of the Jake
Gottlieb (Visium Funds' Founder), Plaford (Visium Credit Funds' Portfolio Manager/Partner) allegedly
until after Petitioner Lumiere leaves, Accounting department, Ernst & Young Auditors, Administrators
Morgan Stanley and Prime brokers at JP Morgan, Goldman Sachs, and Morgan Stanley as well as the SEC
who were on site as Visium was registering as investment advisor during the period.  The theory is
simply incredulous and only in a Trial with a jury with no understanding of how a financial firm operates,
no ability to detect perjury, and without the patience and willingness to connect all the obvious dots to
the Truth combined without the use of an expert witness to make sense of it all, and a defense counsel
with no understanding of the subject matter who also lacked the ability to communicate basic financial
concepts and recall facts would Petitioner Lumiere possibly be found guilty.  Petitioner Lumiere was
confronted with the "perfect storm" of incompetence without which he would have been found Not
Guilty.

Additionally, literally beginning the next line, Lumiere demonstrateshis good faith is apparent and
conveniently excluded from Trial:

SL: I don't know.  I, I just think at this point, I don't know, but my lawyer says they...Because,
performance misrepresentation is not a necessarily a jailable offense as insider [Trading].

Petitioner Stefan Lumiere v. United States of America                Case No. 18-CV-9170

CS:(Thorell): Mm-hm.

SL: But, they said that the FBI would definitely be in there...

CS: Yeah, you...

SL: The F-,the FBI is, is, is the group that, like you want in there.  The SEC [u/i]

(A24 P47 ln17-A24 ln1-5)


The Government has taken Lumiere's statements out of context, which defense counsel is supposed to aggressively argue for inclusion.  Not only did the government include an incomplete sentence which was doctored obviously purposefully, but they removed and ignored evidence of good faith which they are well aware of.  Additionally they get Thorell to perjure himself by where Thorell acknowledges Lumiere's statements referencing that "He"(A24 P47 ln11) meant only Plaford and not Lumiere and Plaford as he testified to at Trial.  He says:


CS: "Yeah, I know this.  I ...

SL: It was...

CS: I have all this stuff.

SL: Yeah.

CS: Um, Plaford..." (A24 P47 ln12-16)


It is clear he blames Plaford and Gottlieb and not Lumiere.

SL00728 [VII.D08g(2-3)] Phones & Emails


2) Defense Counsel Creizman Failed to Analyze Phone Records and Emails To and From Brokers


347

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Defense Counsel insisted that the government was not going to focus on cell phone use since both cell phone and desk phones were used throughout.

A competent attorney would have looked at allegations in the complaint and indictment and seen that allegations around intent were based on cell phone use. A thorough analysis of the phone records would have to include phone records from Visium's desk lines, conference lines and office lines as well as cell phone lines. However the only information provided by the government included only calls where at least one cell phone was used, but excluded landline to landline calls. The FBI Agent admitted to this during Trial when asked if these were all of Lumiere's phone records, to which Agent Callahan replied "cell phone". It left out Visium desk phone, conference room lines to the various brokers. A competent attorney would have seen this as one of the factors that he needed to introduceto conTradict the prosecution's claim. Creizman did nothing with this and as proof had not a single question when the FBI agent presented the narrow view of data. Additionally Creizman should have dated each call with days that Lumiere was out on vacation, Traveling, out of office, out recovering from surgeries at home which was most of the year of 2013 before he left Visium. The cell phone records had location areas that showed that Lumiere was out of office for most of these calls. None of these were presented to the court or the jury. This non-chalant approach, and lack of due diligence and failure to recognize what was apparent from complaint, shows a complete failure of Creizman to any acceptable reasonable standard failing on the first prong of the Strickland test with ease. The incompetence fails the second test as the FBI agent presentation had a material negative impact on the Trial. Had Creizman paid attention and organized the calls to emails, or addressed them to Lumiere prior to Trial, he would have noticed significant errors that were material. One of the main presentations had bond quotes coming back which the prosecution claimed was at the same time as the phone call. However, the phone call prior to this is when Lumiere had made the request for quotes that was more than 3 hours earlier. Had Creizman prepared and analyzed the exhibit, he could have timed the time it would take to read off a list of security identifiers and approximate levels and shown that the call was actually made 3 hours earlier. The following was simply a call where Princeridge called to say he was done checking levels and sent back what he had done. Having inspected these, he would have been able to bring this up when cross examining Vandersnow to preempt the false presentation made by Agent Callahan.

348

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

3) Defense Counsel Creizman Failed to Explain USB


Plaford Instructed Petitioner Lumiere to send a USB with the large amounts of Bond Identifiers along with Visium's estimates for the last month of 2011.  The list was much larger than the typical 10 to 15 quotes that Plaford had requested.  Plaford had built it all in a spreadsheet and Lumiere mentioned that the list was long and brokers were going to be leaving for vacation shortly.  Lumiere mentioned the idea of the USB because other brokers had given out USBs with bond prices, research at conferences therefore Lumiere thought it would be easy for the broker to use it and take it home with them if they needed to take time to review the numbers over the weekend or vacation.  Plaford said that the idea was fine and that Visium messenger could send it that afternoon.  Plaford did not have any spare USBs so Plaford asked Petitioner Lumiere to go out and buy several which he did and submitted for expense to the Credit Team.  There was no nefarious intent as described by the government.  The evidence of this is that Lumiere submitted the receipt for reimbursement, Plaford chose to use the standard Visium Messenger service and they were sent in the afternoon directly to the brokers' offices.  There was no thought to hide the USB or tell the brokers to desTroy it.  It was a simple way to port the many bond identifiers and estimates so that the brokers could properly review without being rushed.  Creizman was aware of this, but instead in Trial said he had no explanation for the USB. ("I can't explain it")

SL00730 [VII.D08g4)] Privileged Docs


4) Defense Counsel Creizman allowed privileged material into Trial.


Government introduced acknowledged attorney privileged content into Trial (Exhibit 1010) after agreeing not to include.  The document included notations prepared for counsel as discussion points for a meeting.  The content was extremely prejudicial and presented in court as evidence and discussed as a main point of evidence in Trial and brought back up in Summation which was also misconduct on the part of the government who recognized that this document was one of numerous documents where Petitioner asserted privilege and they agreed.  Petitioner Lumiere mentioned this plain error to the Defense Counsel associate when it was first introduced who ignored what Petitioner Lumiere was saying.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Defense Counsel marked his incompetence by stipulating to the exhibit just like he followed his
regiment of stipulated to every document at Trial without bothering to review.  This proves that Defense
Counsel's incompetence and lack of attention infected every point of the Trial prep and Trial.
Furthermore, not objecting to its inTroduction or to the government discussion of it numerous times,
again demonstrated his lack of attention and failure at Trial further prejudicing defense.  As a result, this
exhibit was presented to the jury which had notations for Lumiere's meeting with Park & Jensen in May
of 2013 which stated " Dictated by Plaford".  This was the crux of the government's argument where the
government twisted the wording into falsely claiming that it represented proof that Petitioner Lumiere
was dictating levels that he wanted brokers to spit back, which was not the intention of the notation nor
did it represent the intent of discussing Visium's estimates with brokers.  The notation had nothing to do
with brokers, but simply was a note to show that Plaford called Petitioner Lumiere on the phone
monthly to "tell or dictate" the levels that Visium had come up with for estimates.  This was the formal
procedure that Petitioner Lumiere had been instructed to follow by his boss, Cooperating Witness
Plaford ( Credit Fund Portfolio Manager/Partner) and recommended and approved by Jacob Gottlieb
(Visium Funds' Founder/Chief Investment Officer of Visium Credit Funds') and Steven Ku (Visium Funds'
CFO).  Petitioner Lumiere was instructed to give the brokers Visium's estimates only after he
communicated to them that brokers would find it a waste of their time to spend any time gathering
quotes for Visium.  Plaford met with Ku and Gottlieb to discuss this and they came up with the proposal
to give the brokers Visium's estimates in order to facilitate the broker's job so that they could use this to
help identify the most reasonable levels.  Plaford described to Petitioner Lumiere the required
procedure was approved by Gottlieb and Ku and telling Lumiere that this request for a price check was
for internal purposes and that "Jake just wanted them".  When Lumiere asked why Operations was not
taking care of this as it seemed more of a back office job, Plaford said: "Jake said this is your job. I'm not
going to Trust operations to know where some of these bonds are."


   Placing this privileged content into the Trial was deeply prejudicial, inaccurate and contributed to an
unfair Trial and erroneous conviction.  Defense Counsel should have taken steps to review content
before blindly stipulating to everything, and then should have alerted the court to the error
immediately.  It is not possible that the government simply committed an error by its inTroduction, but
identified Defense Counsel's lack of attention and took the opportunity to abuse their privilege to
guarantee themselves a win while sacrificing Petitioner's Lumiere right to a fair Trial which was a

Petitioner Stefan Lumiere v. United States of America              Case No. 18-CV-9170

violation of Petitioner Lumiere's 5th amendment right to a fair Trial. All the incompetence of Defense

Counsel, also created a severe violation Petitioner Lumiere's 6th Amendment right to competent

counsel. Even if Defense Counsel had missed the stipulation, he should have objected, called for a

misTrial. ( See Recorded Transcript, and see email)

SL00731 [VII.D09a-b] Ineff Trial Performance

VII.D.9. Defense Counsel Creizman's Trial Performance was so Deficient the Identified Acts or Omissions

were Outside the Range of Professionally Competent Assistance which Prejudiced the Defense.

a. Failure to Cross Examine Witnesses with Relevant Questions.

There are many instances when the court admonishes Creizman for not asking relevant questions and

where Creizman fails to object to materially prejudicial questions and does not stop witnesses from

describing the state of the world in their responses outside of the scope of the question with the

obvious and sole purpose to defame and implicate Lumiere. Examples of such are in the Transcript

record such as when CFA witness alleges that defendant's conduct was extremely prejudicial, yet the

Court stops the witness criticizing both Creizman and the Prosecutor for allowing this testimony and that

Creizman sat there " as sedentary as a potted plant" raising no objections" to this highly prejudicial form

of testimony. The Court also states that Creizman allows hearsay and double hearsay into the record

which should never have been allowed into evidence. The Court also notes that Creizman's objections

are untimely and late (in the rare instances they occur) and as a result he has "waived" the prejudicial

questions.

b. Defense Counsel Creizman Failed to Recall Material Facts and State Arguments During Motion to

Suppress Hearing.

Defense Counsel Creizman was ineffective in Motion to Suppress hearings because he was disorganized,

unprepared and could not remember key facts that I communicated to him that were extremely

351

Petitioner Stefan Lumiere v. United States of America                Case No. 18-CV-9170

important in the hearing.  Additionally his lack of attention to responses and connecting the issues to FBI Agent Callahan's testimony, caused the Court to make a decision based on faulty factual information.

-Creizman forgot that it was actually Lumiere and not his attorney that told FBI Agent Callahan and the rest of the panel of government officials during his proffer on March 17th, 2014 that the agent had forgotten 2 hard drives during the search.  (See FBI Perjured testimony section A)

Had Creizman recognized this, he could have corrected the agent or called for impeachment which would have alerted the court to dishonesty on the part of the government.

Additionally Creizman failed to introducethe known facts that the government including the AUSA Zach Feingold and FBI Agent Callahan knew about Knuts as my attorney and not just Udell as Agent Callahan stated under oath. Another lie. ( See FBI Perjured testimony Section A)

Creizman also failed to respond properly to the court that an entire list of attorneys that Lumiere would assert privilege to and that there were privileged communications in the material was sent to the AUSA Zach Feingold and Agent Callahan on or about March 11th, 2014, prior to the proffer session on March 17th and before the imaging of the computers and drives would have been completed which took one to two weeks according to Agent Callahan.  Therefore, Agent Callahan did not act in good faith, because he had the list of attorneys and was notified to privileged content in the material searched, but completely disregarded it. ( See email from Udell to AUSA with list of Lumiere's attorneys).

Q: "Agent Callahan, did there come a time when you began to review the electronic evidence?" (Doc 38-1: TR P 6 Ln21-22)

Q: "For shorthand, I am going to refer to electronic evidence as the evidence that we just discussed that was taken from the defendant's apartment" (Doc 38-1: TR P 6 Ln24-25 to P 7  Ln1). This would enable him to make statements of the length of search beginning on the eve of the search of Feb 26th 2014 where he admitted that he only reviewed Lumiere's personal cell phone.  But then later admitted that he searched all three computers and hard drives for "several hours over a couple of days" which would not have been at least until after the proffer session on March 17th , 2014 since the imaging had not been complete until after that.  Now the first search of the iphone, would not have had any folders to review so would have resulted in only personal phone calls, and texts which is why he did not continue a

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

review.  The second search of several hours over a couple of days could literally mean 1 hour a day for 2 days.  Hardly enough time to do any type of review on 3 computers each with 500 gigabyte hard drives with Thousands of folders, sub folders, and millions of files.  When the government insisted that "He looked", he may have just looked at the device, looked at the massive amount of folders and then walked away without bothering to examine any of the material and files within the folders.  Secondly, the fact that he did not follow any protocols whatsoever or separate a single item that he thought might be responsive to the search, shows that he really did not do a review because a review would not be possible in a couple of hours given the numbers of files, folders, subfolders which would have appeared overwhelming.  Thirdly, the Ganias (Get full case) case which the government insisted on, the agent had clear protocols that were filed and had a separate team parse out responsive from non-responsive which was not done here.  Fourth, he had the list of attorneys and ignored the attorney privilege in this review which would Trigger a "Fruit of the Poisonous Tree DocTrine" and bad faith of the government which Creizman failed to bring up.

Had these been presented to the court for the court to assess, the court would have agreed that this was more like the Metter case which ended with complete suppression of all the evidence.  However due to Creizman's lack of focus, attention, disregard for the facts, he failed in this motion to suppress and allowed the government to mislead the court.

SL00732 [VII.D09c] Ineff Threatened Defendant


c. Defense Counsel Creizman Unprofessionally and Illegally Threatened Petitioner.


1) When Lumiere had insufficient liquid funds to pay him a up front $250,000 retainer.  Lumiere had discussed his limited liquid resources with Creizman before Creizman agreed to take the case.  He indicated he was comfortable with Lumiere and that he believed he would be paid.  Lumiere had already given Creizman a $15,000 retainer prior to the complaint being filed most of which was unused.  Creizman having received a solicitation from Visium counsel at Seward & Kissel that Visium "really wanted to help Stefan and Indemnify him", Creizman appeared to be excited about such an offer.  However Lumiere was not comfortable with Visium being involved in his Trial as he was convinced that Gottlieb and Plaford had lied to Lumiere and set him up to be the Fall Guy.  Lumiere believed that Gottlieb would attempt to influence the defense to make sure that Gottlieb was left out of everything.

353

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

So when Creizman excitedly thought it was great for him to have the indemnification as he would be able to make a lot of money, Lumiere's defense was only secondary.  So when Lumiere refused the aid of Visium and gave him instructions not to speak with Visium or their counsel under any circumstances, Creizman got more aggressive with Lumiere, pushing Lumiere to come up with the cash immediately or else.  The threat came in the form of telling Judge Rakoff that Lumiere was not honoring his commitment and was being irrational in his demands.  Creizman gave Lumiere an ultimatum of payment of the funds and signing of new contract by 5pm that day or he would call Judge's chambers.  He continued by insisting that the money go into his operating account as opposed to an escrow account because Creizman had indicated his firm was not doing well financially and would have to go bankrupt if he was not paid.  This ended up placing Lumiere at a disadvantage in Trial prep, as Creizman had refused to do any work on discovery or on the case until he was paid in full in advance. (Evidence emails)


2) When Lumiere Tried to meet with Creizman in the weeks before Trial, Creizman had not made himself available stating that he was working around the clock and if he took time to meet with Lumiere he would likely lose the Trial.  Creizman did not offer his planned defense theory or prep on delivery of his opening and closing as he had said he would.  Then during Trial, Lumiere again wanted to speak to Creizman to aid with cross questions Lumiere had prepared, but Creizman ignored them stating that he received them, but he was going to use his own cross.  When Lumiere saw Creizman's performance on cross was ineffective, he asked Creizman to call back witnesses Thorell and Vandersnow, which Creizman refused to do.  Then Lumiere asked Creizman if before he let a witness go, if it would be possible for Lumiere to finish cross examining the witness.  Creizman blew up at Lumiere, stating: "If you ever F--ing say that again, I will leave you to defend yourself".  Creizman was not prepared with the material, with understanding of the issues in the case, and as such was completely ineffective in crossing witnesses that he should have been able to impeach easily with the evidence that was available including recorded statements, the Truth, and documentation. (Evidence in emails)

SL00733 [VII.D09d.] Testify Lumiere


d.  Defense Counsel Creizman Failed to Prepare Defendant to Testify.

Petitioner Stefan Lumiere v. United States of America                     Case No. 18-CV-9170

Creizman did not prepare defendant to testify. Creizman continuously stated that there was plenty of time to prepare questions and to testify up through Trial. Lumiere again asked Creizman, when are you going to prepare him to testify to which Creizman responded again that there was plenty of time. Lumiere offered to come to Creizman's hotel room where he stayed during Trial so that they could prepare, but Creizman said that would not be possible as he was working on cross examination questions and Summation, but still Creizman stated there was plenty of time. However time had run out and Creizman did not at any period prepare defendant to testify so when prosecutor asked the Court if Lumiere was planning to testify, Creizman offered no interjection, no response. Lumiere looked over to Creizman who was 2 seats away from him and Creizman had his head buried into the desk in front of him offering no guidance. The Court asked Lumiere whether he planned to testify, to which Lumiere had no choice but to state that no although he did not believe that he had a choice at this point. Lumiere then contacted Creizman that evening to let him know that he really wanted to testify, and that if he could contact the Court to let them know that Lumiere would actually like to testify. But, Creizman stated that it was too late and offered no other resolution. Petitioner Lumiere had the right to competent counsel that would advocate for him. He had the right to be prepared to testify and the right to testify. Yet, Creizman ignoring Lumiere requests to prepare him and to tell him there was plenty of time and then to stay silent without requesting a recess to discuss Lumiere's wishes to testify leaving Lumiere caught off guard when the Court asked him directly if he wished to testify was unfair. (Evidence: Emails and record where Prosecutor says that they spoke to Creizman and Lumiere may want to testify)

SL00734 [VII.D09e] Defense Presentation New


e. Failure to Present Actual Defense During Opening or Closing Statements.


Creizman failed to put in any sort of legitimate defense which would have been the simple Truth. Instead he made simple arguments that Lumiere was not the portfolio manager of credit, that Plaford set the prices and that Lumiere believed the prices that Plaford was giving him. This was simple but incomplete and was not enough to overcome a conscious avoidance charge. There was a large amount of evidence in Discovery and in records that are at Visium but not supplied to Petitioner as part of discovery that prove exactly why Lumiere believed the prices that Plaford told him to check. There are

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

many, many models and documents some of which are referenced in the current brief and attached as
appendix which prove that the values that Lumiere believed were correct and why he would in good
faith believe them.  It is apparent that Lumiere was set up by Plaford and Gottlieb as the Fall guy and fed
a bunch of lies and asked to do a simple task that they vouched for and Lumiere believed.  Then Lumiere
decides to leave Visium due to him being overlooked at Visium due to the poor relationship of Gottlieb
and his sister.  While he prepares to leave, Lumiere has checked out, he scheduled 3 consecutive
surgeries after his portfolio in Global funds was taken away, and is seldom in the office when he hears
from ATI CEO that the forecasts are going to be lower than the company modeled.  Lumiere tells Plaford
and says that we need to tell accounting so they can relay the information to the valuation committee
and the external valuation group. A red flag pops into Lumiere's mind when Plaford says not to call josh (
see recording).  He says that he will speak to him and explain.  This is fine but Plaford got aggravated and
acted oddly stating that it was backward looking and not forward looking meaning that the valuations
were based on last year's forecast for this coming year as opposed to real time projections.  This
countered everything Plaford had previously told Lumiere that he was required to value things based on
the real-time information that Visium had which first started with the US Oncology position where the
steering committee learned of a settlement offer from McKesson.  This is perhaps what Plaford was
relying on when he stated that "it started with Lumiere".  Creizman should have questioned Plaford with
relevant questions but failed. Not including all the evidence of values that would demonstrate Lumiere's
"good faith" and show that the government's arguments were simply wrong and in error falls below any
level of competency that a lawyer should have which prejudiced defendant.  Creizman simply provided
no defense, included no evidence to support Lumiere's "good faith" and utterly failed at the most basic
tasks which was in violation of the Code of Conduct of the New York Bar Association and as a result
caused Petitioner Lumiere's conviction at Trial whereas had included such evidence, Lumiere would
have been found "not guilty". (Evidence that Creizman should have included are available throughout
Discovery and in Visium documents, models, work product that were not produced in Discovery, and in
witness testimony that he did not elicit and in witnesses that he did not bother to call)

SL00735 [VII.D10 Pt1] Trial Errors


VII.D.10. Defense Counsel Creizman Failure to Object to Questions that Were Prejudicial, Leading,
Lacked Foundation, Plain Error, and Long-Winded Prejudicial Answers Outside the Scope of Question.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Defense Counsel when he did object, did so consistently late resulting in a completely ineffective representation of defendant with inTroduction of prejudicial, irrelevant, lack of foundation, opinion, questions and statements that should never have allowed to be introduced into evidence.  This is a sample set of the constant flaws of defense counsel during Trial, which caused extreme prejudice to client and a total lack of due process and lack of effective assistance of counsel:

No Objections obvious to the Court that Admonished him several times:

Tr P 107 ln5-Page 108 ln3: The Court:" I am concerned that a great many that would appear to be objectionable questions are being asked within any objection being raised.... If it gets totally out of hand in terms of delaying the progress of the case, the court will intervene sua ponte....there were numerous questions asked of the witness about his reaction to something or other.  I do not see how that was admissible testimony, but no objection was raised, so now it is part of the evidence in this case.  He was also frequently asked for hearsay, sometimes double hearsay. No objection was raised, so that's part of the evidence in this case... totally inadmissible evidence is being put before the jury and that's your decision, not mine..."

Tr P 323-327: Tawil hearing, Creizman does not show up to this essential hearing and leaves Madrigal to give up on every single point. See below

P 324 ln9-25 -325 Ln1-7 Madrigal ln1 "I don't think that this is going to be part of his testimony" (referring to classification as Level 1, 2, 3)

Tr P 325 ln15-21: Ms. Madrigal: ...The second issue that the government raised was their objection to Mr. Tawil testifying about whether certain securities were, in fact, valued properly, and I can also say that Mr. Tawil will not be rendering any opinion about whether or not any security in the credit fund was properly valued." ( Gives away this point simply because it hurts the government's case simply because the government does not want it included makes no sense)

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Tr P 327: Ms. Madrigal: " In2-8:...this testimony goes more to just explaining to the jury-I understand the issue with the characterization of a large hedge fund, but again, to explain to the jury how a hedge fund is structured and how it's not just one person making all of the decisions.  There's an executive committee, there's compliance, there's auditors, there's an Administrator and I mean, the jury--

Tr P 327 In15-22 [Ms. Madrigal: Well, your honor, I will say this much.  When we drafted this expert disclosure on December 15th, we weren't sure how the testimony was going to develop..."

The Court: "I'm not being critical at all.  I'm just saying I just need to know whether you're still offering that testimony or not."

Ms. Madrigal: " We would be happy to exclude that from the testimony."] ( Does not even make an argument why he should be able to discuss the issues of how funds operate and the roles of Administrators, executive committee, valuation committee, all the groups that provide checks and balances that would have had other

Tr P 328 In4-8- Ms. Madrigal: "Well, there has been no expert report prepared.  I had a telephone conversation with Mr. Tawil.  I may have notes from that, which I'm happy to provide to the government, and I will do so this evening..."

Tr P 348  In1-13- The Court: " I don't know whether to be more Troubled by the government's conduct or the defense conduct.  Here we have a witness who, in effect is suggesting that the entire financial crisis of 2008 is a function of the breakdown in Trust atTributable to the kinds of violations that are alleged against the defendant in this case, a grossly prejudicial form of testimony... But defense counsel who apparently thinks he should be more sedentary than a potted plant, allowed this entire testimony to come in, and it was finally the Court, on its own, cut it off..." (The Government and Defense counsel

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

are admonished in side bar about the grossly prejudicial testimony which was irrelevant and defense
counsel said nothing throughout to object)


Tr P 367 ln.1-P3ln1 - P370 ln1-8he Court: "So the court notes again there was no objection to any of the
last testimony; but once again, the Court is concerned both about the timing of these proceedings and
about the inTroduction of irrelevancies...Your Honor, if I may, just on the last sidebar we had, first I want
to apologize to Mr. Creizman. The witness had never, in our preparations, said what he said on the
stand.  It was shocking to the government as well, so that moment was not preplanned.  We obviously
would never have done something like that, and so we will all...

Mr. Creizman: If I may?;

The Court: Excuse me. I appreciate knowing that, and that's good to know, but Mr. Creizman and his
colleagues were silent throughout.;

Mr. Creizman: Yes, your Honor.;

Ms. Shoffel: It's my fault, your Honor;

Mr. Creizman: No, no, no.  I thought that----

The Court: If you made a strategicdecision, fine.

Mr. Creizman: Absolutely. And I didn't take any offense by it.

The Court: Nevertheless, there comes a point where the court needs to intervene, which is what I finally
did, but I am interested to know that defense counsel feels that this was to his benefit.

Mr. Creizman: But there is one thing, though, that I am concerned about, though.  The witness
continually finds it appropriate, without prompting--;

The Court: Now we are talking about the witness.

Mr. Creizman: This particular witness, this does bother me, though, very much, and I don't know if I
should object to- The The Court: Excuse me.  I have already instructed him once on this and I will
insTruct him again, but only upon counsel taking steps....You can cut him off midsTream, you can ask the
court to sTrike portions or the entirety of the previous statement so that they cannot be considered; or
you can ask the court to insTruct the witness once again not to volunteer.  Those options have been

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

available to you and, instead, you seem to want to think that is something you should kevetch about at sidebar....

Mr. Creizman: But I just didn't want to stand up and tell the witness to be quiet.  Do you know what i mean?"

(Court admonishes Creizman because he allows significantly prejudicial testimony and says nothing which appears throughout the court record.)


Tr P 301 ln1-22 -

Mr. Creizman: I'm not sure what this is being introduced for, and it seems like it would be hearsay.  I don't know what Stefan Lumiere to Josh Rozenberg, I don't think he's on the email.


Mr. Naftalis: It is the defendant's own statement.  And it is being introduced to show the P&L means these are all the positions, and it is the all the positions that are mismarked are his.


Creizman: Okay. That's fine.  The other point is that the witness keeps offering about the de facto benchmark being Bloomberg, I don't know what to do about that.  I'm not going to object to the statements of the witness, but I mean, I just don't think it is appropriate.


The court: I'm sorry what is not appropriate?


Creizman: The witness keeps offering this commentary about the de facto benchmark.


The Court: I do agree with that.  I think that the witness needs to be instructed he should just answer the question and not give the state of the universe or whatever pops into his head, and sometimes he has erred in that direction."

Petitioner Stefan Lumiere v. United States of America                Case No. 18-CV-9170

(Thorell keep talking state of the universe and stating about Reuters being the de facto benchmark
which is plain error.  Additionally this email they are introducing has nothing to do with Thorell, the
email is cut off to exclude the chain that follows that shows that these are not Lumiere's' securities but
that Lumiere did some work on them at one point over the 2009 to 2012 period.  Additionally, he is not
given access to the P&L from these and government falsely states that they were all mismarked.  See
Brady Violation Email Chain)

Irrelevant Cross Examination Questions:

Tr p 449 ln1-20: Court: "...And the reason i say that is now many of the questions you have asked have
been repetitive.  Many of the questions have been largely irrelevant, and you need tom for your benefit-
-but all I am concerned about is the jury's benefit--you need to focus more."

Tr P 461 ln1-20: "The Court: You know, I wanted to insTruct both the counsels, ask the questions...You
may be under the illusion that you are having a conversation in a bar, in a home, and if you want to
terminate this case and go to a bar, I will allow you to do that, but assuming you're not interested in
wasting the time of the jurors, I do not want colloquy... I've about had it with the imposition on this fine
jury from two people who can't follow the rules, both of you." ( Cannot follow the rules)

Tr P 463 ln20- 464 ln1-10: Creizman: The next question was simply... Did  you understand that the values
that you were providing to the Administrator were false?

A. Eventually, along that time frame, what I came--the closest I came to ultimate validation, which was
pretty--

The Court: No, no, no.  At the time that he's asking you about, did you understand that they were false,
yes or no?

The Witness: I'm sorry, can you--the exact time was which month?

By Mr. Creizman:

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170

Q. August 2013.

A. Yes, I did.

(Creizman messes this question up, because the question was when did he realize that Plaford was misvaluing the credit fund, and Creizman picks a date after which Lumiere has already left the firm and warns Thorell that something is off with Plaford and thought that Plaford was not being honest. Creizman should have picked a date earlier such as mid 2012, not a date after which Thorell had already been warned by Lumiere and after he had already reported the issue to an attorney and Compliance. Creizman's lack of attention and detail, misled the Court and the jury.)

Tr P 471 ln16- to P 472 ln8: The Court: "...But the record should reflect that I had admonished very quietly both the witness and counsel previously to , on the one hand, just ask the questions and , on the other hand, just give direct answers.  Indeed in the latter regard, I was doing so not only on my own instance, but at the instance of defense counsel.  And when, despite those repeated admonitions, both counsel and the witness continued to make statements in the case of defense counsel, and give irrelevant or over-volunteered answers in the case of the witness, I felt that I had no alternative but to make my message clear.

No Objection to plain error:

Tr P 90 ln3-9  "so painting the tape is where market players in order to artificially manipulate the price of a security, will engage in a series of buy and sell Transactions just amongst themselves to give the appearance that there is a lot more Trading in the security than is actually the case." (This an erroneous definition. Painting the tape is an equity term where a party would Trade a security back and forth to enhance the appearance of activity making it appear like it Trades with volume.  It has nothing to do with artificially manipulating the price.)

Jan 6th Trans P6 Motions in Limine- Thorell tapes just received this past Friday.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Tr P 129- "I think it would be fair to state that I had no idea that what is alleged in the indictment in this matter was allegedly happening." (This is plain error and indictment information and allegations were prejudicial and never should have been allowed in.  He should have stopped or sTricken the response.)

SL00736 [VII.D10 Pt2] Trial Errors


No Objections to Plain Error:


Tr P 213- ln4-25- P 214 ln3- Naftalis: They included the fact that Mr. Lumiere was disciplined or told that he should not be Trading with his brother; so he's giving preferential Trades to his brother.  He was disciplined for expenses--..

He did not report his external Trading accounts to the firm.  He didn't comply with the expense policy. He stopped showing up for work.  (Naftalis makes all these factual assertions to the court, but yet none of these are facts.  Lumiere never received a disciplinary notice while at Visium.  Visium had a coverage with a brokerage firm that provided research coverage which Lumiere's brother worked for.  He was never disciplined but he as well as the entire firm were asked to place all the equity Trades through the Visium Trading desk at some point. This policy was not exclusive to Lumiere.  Lumiere was never told not to Trade with his brother and the firm knew Lumiere's brother who provided research coverage to other groups within Visium.  Lumiere was never discipline for expenses. There was one instance where Gottlieb asked why he had 2 hotel rooms for a conference in Miami overlap on a single night, which Lumiere explained that there was consTruction at the hotel so he moved to another hotel and there were no issues.  As for not showing up to work, Lumiere had planned 3 surgeries and was out of the office for much of 2013 and then resigned.  Lumiere was out on sick leave for these periods and was never in breach of any policy.)  Creizman does not object to any of the false assertions however infecting the Court's view of Lumiere. The only time they came out as compliance issues was after Lumiere left and was asking for settlement offer then filed a cease and desist order on Gottlieb for slandering him to a large family office advisor.


Tr P 246 Ln8-12 Are you familiar with the terms "covering a name" or "covering a position.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

A: Yes

Q: When you use that term, when a portfolio manager covers a name or covers a position, can you explain what that means?...

As a portfolio manager in the credit fund, did the defendant cover certain names?

A: Yes

( Creizman did not object to the use of combining Portfolio manager with covering a name which is not what a portfolio manager does.  An analyst follows or covers a name.  He also did not object to use of Portfolio manager in credit fund which is leading and false)


Tr- Q: what was his role at Visium between 2011 and 2013?

A. It was my understanding that he was a portfolio manager in charge of a section or subsection of the credit fund with a certain strategy specific to him, which included special situations anddistressedinvesting. ( Lack of foundation and no evidence to support this.  Creizman should have objected to this answer and moved to sTrike.  The government keeps pointing to a signature page referencing a title for Lumiere's portfolio in Global fund and claiming falsely that this referenced the Credit Fund. ( See Thorell Perjury)


Tr P 546 Ln1-4

Q. 5210 is the broader rule?

A Correct it's this rule, the broader rule.

Q Was Mr. Lumiere subject to these rules?

A. Yes.

( this was FINRA witness, however Lumiere was not registered was FINRA, he was not a broker, and the rules did not apply to him. This is plain error and Creizman did not investigate or understand the facts. Creizman should have blocked this statement and blocked the witness since it was irrelevant.)

364

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Tr P 518 Ln11-16 to 519 Ln1-12: "..During the course of that search, the FBI recovered Government exhibits 1000-1027.  It is further stipulated and agreed that this stipulation be received in evidence at the Trial.  We offer Exhibit 1405 and 1000 thru 1027.

---Naftalis: Ms. Meister, can you please bring up Government exhibit 1010 in evidence....

Q What does it say there?

A It says: March 2013, month-end, dictated by Plaford, Chris."

( Creizman has not reviewed the exhibits before stipulating to them.  He has allowed a privileged document into the Trial and does not stop, or object or call for a misTrial)


Tr P 49 Ln8-25  (

No objection to exhibits 133 and 1407.  Stipulated to these without reviewing them and failed to notice that the ASC 820 version that was submitted was incomplete and not the full version of the accounting standards and leaves out the section that applies to Visium's accounting for ATI and CMED which is discussed in Ernst & Young audit reports.)


Lack of Focus:

Tr P 455 Ln18-25 to 456

Creizman: Okay. and at that point, you had turned over a substantial number of documents that you had from Visium, correct, to the U.S Attorney's office and the Securities and exchange commission?

A. At the point that I was in communication with the government.

Q. Okay. Visium was aware of this or not, aware that you had documents?

A. I'm sorry, I'm not sure I answered your question.

Q. I'm sorry. Go ahead.

Petitioner Stefan Lumiere v. United States of America                Case No. 18-CV-9170

Tr P 451 LN1-19 The Court: So first, why have you not waived these objections by not objecting to the previous questions?

MR. Creizman: Well, the previous question, it kind of woke me up, and this one, actually. I also find it, by the way, 403, prejudicial. (Creizman is asleep at the wheel and is not paying attention and allows prejudicial questioning go with no objections)

Tr P 452 Ln9-13: The Court: We've already been through that with another witness, in effect, and there was no objection to that and that might have been another waiver of this witness, but I'm going to exclude this witness. At a minimum, I think it presents 403 problems. (Creizman shows again previously that he waived objection with another witness that was prejudicial but he offered no objection)

Tr P 265 Ln14-25 Creizman: May I personally be excused from the Daubert hearing this evening? My colleagues will handle it...." (Creizman is going to miss this important hearing with the expert witness, the only witness for defense? Absolutely ludicrous and irresponsible)

Tr P 266 Ln1-5

Naftalis: Is that because defense has provided these objections so late, the flow of using these recordings is getting massively interrupted, and the effect of playing them is really slowing down the case; So I don't know what to do. We're going to play more. ( Creizman has not provided objections to recordings and Transcripts and what he would like to add. He was unprepared and disorganized. This was a specific area that Lumiere had early on asked Creizman to listen to recordings in office and document the minutes and seconds and notes, after Creizman stated that he was listening to them in the car and while asleep which Lumiere found completely irresponsible and ineffective. See email to Creizman)

Tr P 610 Ln20-25 to 615 Ln: So you've been Trying to service him with a subpoena, and subpoenas for what?

366

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Creizman: The subpoena is for materials relating to a company that Mr. Plaford started after Visium called Claravant and Claravant is sort of a consulting company that advises investment firms about

The Court: Okay. So you were unsuccessful in serving him?

Creizman Very Much so.

The Court: You knew that the government had him on a witness list, yes?

I did not that, yes.

Did you ask the government whether they could help facilitate your service.

The answer is only, did I ask them? Only yesterday I asked them and

The Court: "... But this is clearly a very substantial and onerous subpoena, which you made insufficient efforts to serve.  You could have asked the government, you could have asked the Court, you did none of the above... So why isn't this, on its face, untimely, overbroad, burdensome and quashable?" (Creizman does not serve this subpoena like the others he sent out way too late to comply with.  Here he does not contact the government to serve it until the day before well into Trial.  Additionally key facts that Lumiere asked him to subpoena were ignore by Creizman who chose to point to his capital raising efforts, instead of the likely illicit activities of Claravant and its customers and former FDA advisors. Creizman fails to describe the relevance to this as to why Plaford might have plead guilty to a small insider Trading scheme and misvaluation scheme Trying to cover up the activity at Claravant.)

SL00737 [VII.D10 Pt3] Trial Errors


Defense Counsel Lack of knowledge about rules of evidence causes inability to argue for exculpatory evidence inclusion in recordings that were explanatory to statements made that would fall under rule of completeness:

Tr P 269 Ln8:  "Court: You misunderstand the rule of completeness"


Tr P 270 Ln1-9..19-25: (Cannot argue for completeness argument as he fails to communicate and cogent thought)

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Tr P 271 1-11: (Creizman cannot explain)

Tr P 428-429: Creizman: Who determines if lying?" ( Does not know how to impeach witness)

Tr P 569 Ln16-18: (Creizman does not know the rules)

Defense Counsel lack of Preparation and understanding of Subject matter:

Tr P 110 Ln4- P 111 Ln1-8: [The Court:] ' Defense counsel does not have specific items he wants included.  I can't deal with this... I can't deal with this in the abstract. But it is going to be a little awkward there, because I won't be able to hear it because we are not going to play it at the sidebar..." ( Creizman lack of preparation caused prejudice to defendant because he did not organize the seconds, minutes of the recordings so that the court could hear it and make an appropriate decision.  As a result, the court had to stall every time and look to Transcript instead of recording which Creizman had also failed to correct the many mis-worded plain errors which were done with intent to prejudice Lumiere.)

Tr P 400 Ln1-18: [Creizman]: "...I prepared an extensive outline of my cross last night, actually until early this morning, and it appears that the wrong version is here..(Creizman is unprepared, sleep deprived, disorganized, and is doing things at the last minute.  As a result of his lack of preparation, he allowed an entire episode before this statement of objectionable prejudicial testimony without a single objection from defense counsel)

Tr 531-Creizman did not cross examine Agent Callaghan who testified with highly prejudicial and incomplete and false information about cell phone records and emails, where he completely ignored the desk phone calls that were primarily used except when Lumiere was out of office or Travelling.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Creizman failed to investigate any of the calls and match up timing which is why he had nothing to argue. (See Cell Phone and email records Flaws)

Tr P 162 Ln2-9; Creizman: "Excuses too early in the morning"

Tr P 192 Ln16-22: Creizman: "I'm not sure I understand securities all that well" (Shows that defense counsel does not understand the subject matter of the case and did not learn it or hire people with this expertise which makes the case impossible to communicate and defend)

Tr P 554 Ln24-25- P 555  Ln1-3: Creizman: Individual brokers, right, are subject to FINRA rules as well, correct?

A: Yes

Q: Series 7 would be an example?

A. Well, that's an exam, not a rule.

(Creizman fails on this questioning demonsTrating several material things. 1) that he is completely unfamiliar with the subject matter, and 2) he states that individual brokers are subject to FINRA as well, implying that Lumiere was also subject to FINRA which he was not.  FINRA members that are subject to FINRA rules which are designed for brokers.  Lumiere was not a broker, so not subject to these rules, even though he had been a FINRA member a long time before he was at Visium. He has not prepared for this case and does not know the rules or the content of this case)

Tr P 571  Creizman: " These securities are not generally sold on an exchange" ( Does not know subject matter.  They are over the counter therefore never sold on an exchange, there is not an option)

Oct 19th-PreTrial Hearing Motion to Suppress: Creizman Fails to interpolate the timeline to use this to show how FBI Agent Callaghan is lying, and misleading the court.

Petitioner Stefan Lumiere v. United States of America                Case No. 18-CV-9170

Feb 26th, 2014 FBI Executed Search Warrant

Feb 27th, 2014 FBI Returned Iphone to Lumiere ( Attorney Robert Knuts communicated with Government including Agent.

March 11th, 2014 FBI requested imaging of 3 computers and thumb drives seized in the search (Took 1 to 2 weeks to complete and he did not review these until imaged so March 18th or March 26th at earliest) Therefore could not have known if any recordings were missing at the time of the proffer since they were still not even imaged yet, therefore did not review 1 single file by this point.)

March 12, 2014 Attorney Udell Proffer with the government including Agent Callaghan (No mention of hard drives as FBI Agent Callaghan had not been made aware by Lumiere yet. (

March 17th 2014 Lumiere Proffer with the Government including Agent Callaghan ( After which the government asks for additional hard drives only after Lumiere mentions that 2 hard drives were missed in the execution of search)


Tr P 14 Creizman: "Did you review before they were imaged"

   FBI Agent Callaghan: "Yes"

   FBI Agent Callaghan: "No protocol"

   FBI Agent Callaghan: "Several hours over a one or 2 day period to review all 3 computers."

   FBI Agent Callaghan: "Cooperation posture with defendant through April 15th, 2014" ( Creizman knows this is false as government sought Lumiere's cooperation when he hired Law Firm Abramson & Morak after Attorney Udell who had set up a proffer session but then Abramson cancelled, and prosecutor sought cooperation in 2016 when they contacted Abramson & Morak again stating: "the Train was leaving and it was not too late to get on".  Prosecutor also reached out to Creizman to seek cooperation at least through September 8th, 2016 where they contemplated a lesser charge of Misprision of Felony and simply wanted Lumiere's cooperation in going after Jacob Gottlieb and Steven Ku.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Tr P 28:  FBI Agent Callaghan: "Mr. Udell telling that there were other recordings? No."  ( Creizman could not properly word or recollect the basic facts because he did not prepare so could not possibly ask the right questions. First of all, Lumiere was the one, not his attorney Udell, that told the government that they had missed additional "hard drives" not "recordings" during the execution of the search warrant. He did so during the proffer on March 17th, 2014 which is why the government asked for these drives after this proffer.  They did not know about it before in complete conTradiction to Agent Callaghan statements and misinformation. (See FBI Agent Callaghan Perjury)


Tr 29: Privileged Material ( Creizman failure to recollect the facts)


Tr P 30: Creizman: "Just Jeff Udell?" (Creizman knew that there were many other attorneys such as Knuts that FBI Agent and the Prosecutor communicated with the day of the search and the day after, yet did not bring this up.   He also knew that the FBI tapes and Thorell tapes contained discussions about Knuts as attorney reviewing the Visium matter for Lumiere.  However, Creizman fails to bring any of this up.  Creizman was also aware that a list of attorneys was provided by Udell who notified the government of potential privileged materials in the seized files, but he failed to remember the facts and could not correctly answer the court when asked leading the Court to deem that if FBI did not know about other attorneys what else could he reasonably do.


Tr P 952 ln18-25 - 953 Ln1-13:

Shoffel: At some point, did you come to learn that there were some recordings that were missed in the raid?

a: Yes

Q: Subsequently, were they voluntarily provided to you by Mr. Lumiere, through his counsel?

A: I don't know if I'd say voluntarily. They were requested and he complied with the request.

Q: So he complied with that request?  He turned over those recordings?

A: Yes.

371

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170

Shoffel: No further questions

The Court: Did you know about those other recordings before he or his counsel brought them to your attention?

The witness: Yes.

(Defense Counsel fails here, because she was also unfamiliar with the facts of the case yet somehow she is the one selected to do key cross examination of FBI Agent. She should have asked if he had come to learn that other "hard drives" not "Recordings" were missed in the raid. She should have followed up how did you come to learn this? Did Lumiere bring it up in his proffer session on March 17th, 2014 that you agent Callahan had missed 2 hard drives that were left in his apartment during the search? However she fails to the point, where the Court understanding that the question was not asked properly, asked Agent Callahan after Shoffel dismissed the witness, if he had known about those recordings before he or his counsel brought them to your attention.  It is here that FBI agent Callahan perjured himself fully.  Agent Callahan could not have been aware of the missing hard drives, because he missed them during the search.  He could not have known by the time of the proffer on March 17th 2013 that Agent Callahan had missed 2 hard drives because Lumiere brought up this fact during this proffer session.  And Agent Callahan by the time of the Proffer session where he finally acknowledges that "Either Lumiere or his attorney" brought it to his attention which he misled the court about at the Oct 19th Motion to suppress hearing, fails to account for the time it took to image the computers and storage drives which he did not send in for imaging until March 11th, 2014. He testified that he did not review these until they were imaged.  And he testified that they imaging took 1 or 2 weeks which would have ended March 18th or March 25th.  This was after the proffer session so what he states is clearly a lie and shows his "Bad Faith".

SL00738 [VII.D10 Pt4] Trial errors

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Tr P 21 ln23-25: Creizman:"...He was a portfolio manager of a small number of securities that basically was, ultimately taken away from him years before, but he worked for the credit fund....had a lot less to gain from inflating the prices of these securities" ( This confuses the court as the securities that Lumiere managed were in another fund first Balanced then in Global and it was not a small number of securities. He fails to mention this important distinction and that Lumiere was just an analyst for the credit fund more of an ad hoc analyst that helped out with resTructurings and giving Plaford ideas early on in the fund in 2009 and 2010 when the fund made large returns and then focused on his own portfolio in the Global fund that had nothing to do with the credit funds. But he agreed to continue to help Plaford with resTructurings and situations that came up. He fails to state the case and instead leaves open ambiguity)

Tr P 25 ln18-19: Creizman: "These investments aren't generally Traded on a cenTral exchange" (They are never Traded on an exchange. They are Trading through brokers on phone calls.)

Tr P 26 ln3-8: Creizman:" That's an area of investing in debt that your lending money to companies that are in serious financial Trouble, and there's a pretty good chance that that company is never going to pay the investor back on their insTruments. Eventually the company has a good chance of going out of business ( Creizman does not understand subject. This is not whatdistressedis about. It is aboutrestructuringand recapitalization, fixing problem areas and very rarely about liquidations. He makes it sound like a Ponzi Scheme)

Tr P 27 ln13-19: No understanding of the subject matter of C-Med. The directing class paid for the litigation and the bankruptcy proceedings in China to recover the assets there and with that they were to receive 85% of the proceeds of anything they were able to extractincluding any cash, property, equipment, businesses that were sold to associates illegally. This was 13x more than what other bondholders were to receive.)

Tr 27 ln23-25- P 28 ln1-2: Creizman: In those situations... Visium, who paid money into it, to pay for lawyers and pay for investigators to find out whether this was a real company or not actually, they were

Petitioner Stefan Lumiere v. United States of America                Case No. 18-CV-9170

able to --they get first dibs on a percentage of whatever comes out of bankruptcy. So they get to make money before anyone else. (See below CMED 13x not first dibs and he makes it sound like a boiler room operation)

Tr P 197 ln4-11: Creizman:".....there are circumstances where a portfolio manager believes that fair value would not produce an accurate or fair valuation for a given insTrument, it may produce alternative means to value an insTrument? Is that fair?"

Government: Objection

A: No--.

(This is a mistakenly worded question. He states fair value would not produce a fair valuation which makes no sense. This question misses the premise by which the investment manager is responsible to value based on good faith and not based on market value if market value does not reflect the fair value. This error by Creizman and Keily's failure to correct Creizman gives Keily the opportunity to say "No" even though if worded properly the actual answer is "Yes" as per the  fund's documentation and also due to its obligation to value in good faith "if the market price does not reflect the fair value")

Tr 469 ln19-24 [Creizman: " Okay. And as part of assisting the government, do you recall discussing whether Mr. Lumiere was shady or not?

A: "I'm Trying to remember. It's a good possibility. I think I may have."

Creizman: "No further questions."]

( Creizman is attempting to bring up that Thorell in a conversation with Odeon broker Callahan where Thorell had testified that Callahan had brought up that Lumiere was shady, when in fact it was Thorell who brought it up in order to lead Callahan, and Creizman instead of saying was it you who said this to Callahan and not Callahan saying this to you, he just states if he recalls discussing whether Mr. Lumiere was shady, which does not offer the Truth of the matter. Lumiere only spoke briefly to Callahan 1x for a couple of minutes and Callahan was Thorell's relationship not Lumiere's.)

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Tr P 576 Ln2-3 Creizman: "Large funds don't deal in illiquids"

(He meant to say large banks not funds. However this is also an error, because they can deal with illiquid situations, but smaller brokers tend to carve out a niche of focusing more middle market and less liquid situations whereas large banks prefer to focus on more active one. Creizman is unable to communicate these concepts because he has not educated himself on the subject matter.)

Tr P 581 "We believe that obviously a little bit of a 403 issue (Defense counsel shows complete lack of confidence and opens for rejection.)

SL00739 [VII.D11 Pt1] Rule 29 motion New

VII.D.11. Defense Counsel Creizman Lackluster and Obviously Unprepared Rule 29 Motion Failed to Conform to An Objective Standard of Reasonableness Under Professional Prevailing Norms.

Defense Counsel failed at laying out a cogent and specific outline for the court and the jury in summation, explained what the facts of the case were and what was simply government inference and conjecture. Creizman should have been more forceful, organized in laying out all the inconsistencies in the Rule 29 motion to dismiss the case due to insufficiency of evidence. However Creizman was unprepared and the court recognized this in its denial.

An effective counsel would have maintained notes of all of the inconsistencies that went into evidence, knocking them all out one by one. The evidence was nothing but misleading arguments and biased remarks by cooperating witnesses looking to avoid jail and an immunized witness who was out to make some money.

A competent attorney would have laid out the following:

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170

1) Lumiere was not a portfolio manager of the credit fund.  He was an analyst.  You cannot go by his signature page because it has nothing to do with his duties at Visium especially in this case where he was a Portfolio Manager of 2 books in global funds:

Book 1: Distressed in wind down since end of 2008

Book 2: Merger Arbitrage

while at the same time he helped as an analyst in the Credit Portfolio for which Plaford was the portfolio manager. You cannot combine all into one like the government is attempting to do and even in the face if inconsistent testimony from witnesses Plaford, Thorell and Keily, continue to state the original allegation.

2) Lumiere had no control of pricing in the Credit Portfolio:  Plaford admitted to be the one that was selecting pricing and Tried to fool the court by saying that the weekly meetings discussing the fundamentals of the company and Lumiere's projections and Lumiere's valuation of fair value from a risk perspective and investment perspective have nothing to do with the pricing of the securities.  This concept had been confused throughout the Trial by Plaford's biased testimony and Thorell's biased testimony.  If an analyst is asked to state his opinion on a company based on the fundamentals that he sees, it is not his authority or discretion to pick the value.  This is the responsibility of the Investment manager, valuation committee and portfolio manager, not the analyst.  As an example, if someone asks a Goldman Sachs analyst what his price target is on Google and his research states $400 per share.  That does not mean he is pricing it at $400.  That is the responsibility of the portfolio manager.  He may take into consideration the analyst's perspective and valuation, but the decision on where to value it is his own.

3) Lumiere did not dictate prices that he wanted to brokers to spit back. It is clear from the evidence that all Lumiere did was follow orders of Plaford and Gottlieb and Ku, that he had been told was part of the new procedure that was authorized.  Lumiere did call the brokers as asked and told them what securities they needed quotes for, and gave the brokers the estimates that Plaford had told him and told him to tell brokers to help them.  What is one to do if one is told by supervisors, the owner of a fund and the CFO that this process is legitimate.  It did not sound wrong on its face based on what was described

376

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

to Lumiere by Plaford as it being authorized.  Not a single broker said that it did not sound right and did
not do it.

4) Lumiere did give the reasoning for the values that Visium estimated to the brokers even though
Vandersnow stated that he did not recall that.  The 3500 material from Brook and Vandersnow
demonstrate this as well as recordings from Plaford where Plaford insTructs Lumiere to tell the brokers
about the C-Med situation and the Directing Class.

5) Lumiere did not consciously avoid anything.  He did everything that a reasonable analyst would.  He
asked his boss, Plaford the right questions: How can you value USON Escrow about the market even
though we know of a settlement offer?  Plaford responded because that is my obligation and the
Investment mandate of the credit fund.  We are required to value things real time, based on the
information that we have, and not based on what some brokers who don't know what is happening
currently.  Lumiere then asked, but if we ask them for a quote, how would they know the information
that we know.  Plaford then told Lumiere to tell them.

6) Lumiere did not pick brokers to corrupt.  Plaford told Lumiere to call Princeridge the first time.  When
Plaford requested another broker, Lumiere did call Brook from Janney Montgomery and explained to
him the same thing Plaford had told Lumiere and Vandersnow that it was for internal purposes only and
the levels that Visium had estimated were meant as aids to assist the brokers and not meant for them to
spit them back.  They were simply supposed to check them for Visium.

7) Plaford Tried to get around the C-Med Directing class acknowledgment but admitted that Ameesh
was the primary analyst but Lumiere worked on it too.  This is True Lumiere did work on it, but primarily
in the beginning of the C-Med situation to help organize the resTructuring.  It was not Lumiere's position
and Lumiere had nothing to gain from it.  Plaford's testimony about the Directing Class worth a bit more,
it should have been valued a bit higher. This is all in hindsight.  He did not recognize that at the time.
See the recording where Plaford insists on the value and that it is not the same security.  See the VRC
report and Valuation Committee analysis on C-Med Directing Class.  As for ATI and C-Med, his discussion

of apples and oranges does not hold water.  Visium could not have valued the price of C-Med based on the market price of the Tier 3 bonds.  This was not the position they held. This would have been a fraud to exiting investors of Visium.  The position does not change based on whether Visium decides it is level 2 or level 3.  This argument is absolutely ridiculous.  The answer is that it should have been valued based on the alternate methodology, but it should have been side-pocketed as the investment offering memorandum states into a Special Investment Vehicle.  But this had nothing to do with Lumiere.  This was the Investment Managers decision meaning Gottlieb not Lumiere.  Lumiere was not part of these discussions.

8) Thorell was not the first to make a report.  Lumiere was.  Lumiere figured something seemed wrong which was not the wrong that the government said. Lumiere thought perhaps Plaford had lied to him about valuing things based on current information.  Lumiere spoke to Thorell right after leaving Visium and warned him and told him to leave Visium.  Lumiere then spoke to an attorney from Stroock who referred him to Park & Jensen shortly after leaving Visium on May 15th of 2013, and not just before the search warrant was executed.  Lumiere showed good faith throughout and then Tried to do something about it when he figured something might be wrong. Thorell then jumps in to take advantage of the situation in order to Try to get a higher position at Visium and then when that fails, he attempts to make some money from this revelation, by whistleblowing and Trying to blackmail Gottlieb for $3 million. Thorell's story changes from when he whistleblows to when he comes to Trial.  First he is pointing fingers at Gottlieb and Plaford, then switches to Lumiere for the benefit of the Trial.

9) Lumiere's email to Josh Rozenberg request for PNL conTribution for 2009, 2010, 2011, 2012 was not any indication that he wanted to get paid from these, or claiming that he was the primary analyst for all these securities.  Lumiere had worked on these securities at some point over the years either as a primary analyst and others he helped other analysts with some of the work at Plaford's request. Lumiere was simply Trying to figure out what the conTribution of these securities was so that he could back out and figure out how much money he had made for Visium over the years so that he could figure out an approximate Track record that he wanted to mention for a fund he was proposing to launch. Lumiere did not expect a single dollar of bonus given the circumstances with Jake Gottlieb and his sister

Petitioner Stefan Lumiere v. United States of America                 Case No. 18-CV-9170

and was preparing to leave Visium having scheduled surgeries, out of office and planning a new fund
with some ex-colleagues.  This evidence is available to present but was not included in the Trial.


10) Valuation Company Reports and Valuation Committee reports had valued ATI at $23 Million in
March 2013, and then increased it to $27 million in June 2013 after Lumiere left.  This was based on the
expected and correct valuation methodology of ASC 820. Ernst & Young describes it here. It says it is
complicated.  C-Med is valued at 33 by VRC.  So the government's assertion is flawed. Now the fact that
they have not been able to sell the position is solely because it is not Transferable and the litigation is
ongoing.  Additionally, even if it turns out to be worth less than 33 or worth 100, it was based on the
assumptions at the time and none of this is Lumiere's responsibility.  As for ATI, what was conveniently
left out was that Visium and Marblegate were the primary holders and controllers of the company.

SL00740 [VII.D11 Pt2] Rule 29


Visium and Marblegate set up a new company called Ancora Holdings to purchase the best assets of ATI
that would include the schools with programs that were being permitted to continue and get funding
and had acceptable placement rates.  Visium and Marblegate had set up a new capital structure which
they shared which included New Debt, New Preferred Shares, and New Equity.  It was these that Visium
was valuing but through the old securities as shells until the new capital structure was finalized.  The
NAV that was used represented the value of the new securities but used the old securities as a shell or
plug. So Visium did not represent each security value to investors, but the entire NAV which was
consistent with VRC's and Ernst & Young's opinion.  The issue was extremely confusing, and what the
government did was ignore the VRC valuation reports, the Valuation committee valuations, the emails
between the valuation committee and the investors including MSAIP who was a witness at Trial and
oversimplified to the point of it being incorrect and the NAV representation of the government's would
have been a fraud to investor's that were redeeming.  According to the Offering Memorandum, this
position should have been side-pocketed earlier on into a Special Investment Vehicle, which the firm
only did later, but failed to do when they should have.  This has nothing to do with Lumiere, but was the
decision of valuation committee, accounting, Steve Ku (CFO), and Jacob Gottlieb (Chief Investment
Officer).

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

As for CMED, we see in the VRC reports which is documented with letters and filings from Stroock,
Stroock and Lavan that confirm that the Tier I securities or Directing Class would receive 85% of the
proceeds from anything they get from the CMED liquidation in China and assets in the US the creditors
were pursuing. Defense counsel misspoke and was confused when he said the Tier I would get "first
dibs".  They were to receive a multiple of what the Tier 3 were getting.  Remember the Tier 3 were the
securities that were available for sale in the marketplace.  The SEC witness, Jindra, did not look into this
issue because he was not told to.  So his presentation of CMED, ATI were plain incorrect.  He measured
the wrong securities.  He admitted this when he said he did not look into it and that he did not
havedistressedexperience..(See Jindra Cross)


11) As for Jindra report, he admits the quotes were double counted.  Additionally he admitted that he
did not spend a lot of time understanding the methodology in the compliance manual.  He also admitted
that he used as comparison points in an order of first Reuters, then Bloomberg.  This is not correct and is
not what the manual states.  It uses Reuters and Bloomberg as several of many methods that Visium
would use to the extent that it represented fair value.  Defense counsel misstated the question to Keily
when Counsel stated: does Visium have the right to value things at fair value when fair value does not
represent the fair value."  To which Keily stated No before an objection was raised and the issue stopped
there.  The question was not corrected which was an error of defense counsel but also should have been
corrected by the witness or the government.  it should have read: to which the answer would have been
a clear yes.  We also learned that Reuters is just a pricing service, not an exchange, that Jindra did not
know how they were calculated as the algorithms were private.  Markit Price is not the Market price.
Markit is the name of a company. Jindra did not know if the price used by Markit was accurate. But we
already learned that it did not matter, as Visium had chosen to value their securities through the shell
securities and that this represented the NAV that they were using for the newly restructured business.
Also the 357 quotes over the 1.5 year period which were monthly, would have been reduced and were
likely the same group of securities.  It was not the bulk of securities that were overridden.  And the
variances. Jindra admitted to not measuring that.  There should have been a statistical level of
significance to this.  None of the pricing services will be accurate when the situations are disTressed,
illiquid, or restructured so the results would be meaningless.  The obligation of the fund manager is to
adjust this to fair value when necessary not when convenient.  When it is convenient as in liquid
securities, then it should use the pricing services that should be as accurate within a certain variance to

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

broker quotes.  Visium may have valued a security at 93 whereas Jindra stated that it was overvalued relative to Reuters which was 92.346.  But Bloomberg may have been 93 and several brokers may have also indicated 93.  His analysis did not measure these because that is not what he was asked to do.  He also misunderstood the order used as the priority which is not correct.

SL00741 [VII.D12(a-c)] Time for Disc


VII.D.12. Defense Counsel Creizman Failed to Prepare, Understand the Complex Securities and Failed to Thus Argue for More Time for Trial Preparation, More Time for Trial and to Insist on Discovery and Government Exhibits in a Timely Manner and Waited until it Was Too Late to Subpoena Witnesses.


   a.  Trial Counsel ineffective during civil arraignment where complied with government's request to stay SEC civil Case:

This event was a clear element of incompetence and a violation of Lumiere's 6th amendment rights to competent assistance of counsel.   The failure meets the 2 prongs of the Strickland test because his decision to stay the SEC civil case was incompetent and below the basic standards of professional conduct.  It also meets the 2nd prong, because Lumiere's defense was prejudiced by not having the benefit of further subpoena rights as well as access to statements, witnesses, and investigative feedback from the SEC case which would have uncovered more information and more about the prosecution's case that would have helped to direct the defense.


   During SEC arraignment under Judge Failla, Creizman recommends that the Trial be stayed pending the outcome of the

criminal investigation.  Lumiere Creizman that I did not understand but if the government was pushing for this, there is likely something they are hiding from defense.  Judge Failla noted concern that why would we want this stayed as we would have more access to discovery and subpoena.  Creizman stated that we did not have a choice because of the enormous amount of discovery and the limited time that Judge Rakoff had given defense for Trial preparation.

Petitioner Stefan Lumiere v. United States of America                 Case No. 18-CV-9170

   Creizman additionally did not explain that defense would not be able to litigate the SEC actions
afterwards because of Collateral Estoppel in the 2nd Circuit.  A competent attorney would not have
stayed the SEC Trial as more information would have been made available to assist in the criminal Trial
which perhaps may have led to a dismissal of the indictment.  This was ineffective assistance of counsel
in violation of the 6th Amendment due to his making a decision due to "not enough time to handle both
Trials due to the limited timeline to prepare for Trial ordered in the criminal Trial.  However the
allegations in the cases were the same, therefore there would likely be significant duplication which
would have made the work more reasonable and more fruitful.  This hurt discovery of new information
and subpoena power that would have been more expansive than offered for the criminal Trial and given
defense access to statements made by parties, documentation, audits, security violations alleged or not
alleged.

b. Trial Counsel Ineffective during Criminal arraignment with respect to time allocation for Trial Prep and
Trial as well as receiving and accepting enormous amount of discovery in the multiple millions of
documents much of it late just prior to Trial in TIF Format (Non-Text Searchable):

Creizman was ineffective, incompetent and unprepared during the criminal arraignment, allowing
prosecution to set the Trial schedule without much effective argument.  A competent attorney would
have investigated the norms in Federal Court for Trial preparation for cases like Lumiere's and for Trial
days.  Had he spent more time in preparation for this, he should have expected, investigated and
understood to be an enormous amount of data to go through to refute government allegations of
misvaluations of securities.  The 2nd prong of the Strickland Test is met here by the forcing of a rushed
Trial schedule with limited Trial prep, which led Creizman to not do any discovery work or analysis on
the allegations of misvalued securities, the single Trade of painting the tape, an analysis of phone
records and not simply cell phone records.  All of this left the defense prejudiced beyond repair as
defense had no questions for any of the allegations which could have been rebutted with more
investigation and more time.

Creizman failed to communicate to the courts the shear complexity and required preparation for
financial cases, and his only pushback was that he had another case that he was preparing for so could

382

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

not have the Trial in August as Judge Rakoff initially recommended.  He then settled based on Court setting a date of December knowing he had another Trial in November Trial stating: "that it was ok, but I don't know what the evidence is what is in the discovery so fine".   A competent attorney would have investigated ahead of time, gathered case precedents as well as from other cases and should have had more understanding of financial fraud allegations and cases of that nature that on a federal level, courts allow significant time for Trial prep and extensive Trials of 4 to 6 weeks and Trial prep of over a year.

When Petitioner Lumiere asked Creizman to request more time to prepare, Creizman made only one attempt to contact the Court to request an extension of time to prepare for Trial but did not prepare a substantive argument describing the reason for the necessary time to prepare beyond that he had another case he was Trying in the month prior to Trial.  Additionally, when Creizman was granted an extension of only 2 weeks versus an ask of 3 months, only under the condition that defense waived any ability to extend for any reason whatsoever no matter how exTraordinary the circumstances was an infringement on my due process rights in direct violation of the 5th amendment as well as a violation of Lumiere's 6th amendment rights of competent counsel. Creizman then threatened Lumiere that he would quit the case unless Lumiere signed the agreement as he was not able to work under the original December timeline given his other case Trial schedule.  He additionally threatened Lumiere that Lumiere should deposit $250,000 into Creizman's operating account by 5 pm, or he would contact the Judge to tell him that he wanted to drop the case and that Lumiere was not paying him the agreed retainer amount.  Lumiere refused acknowledging that the signing off would prejudice him for yet circumstances not yet known.  Finally under duress and threats of Creizman leaving and making derogatory comments about Lumiere to Judge Rakoff, Lumiere then agreed only to allow Creizman to sign off on the waiver of right if the court amended the section stating for any reason whatsoever and replace with "unless there are exTraordinary circumstances" and that he accept a lesser amount into his operating account now and a later amount into an escrow account shortly thereafter.  Lumiere later discovered that Creizman had signed the original version waiving Lumiere's requested rights.  This was an ethical violation according to the New York Bar Association as well as a 6th amendment violation of right to competent counsel that convince the Judge of the need for an extensive delay as well as a 5th amendment violation of due process given the large amount of discovery produced, much of it extremely late and just before Trial, giving limited time to prepare.

Petitioner Stefan Lumiere v. United States of America                        Case No. 18-CV-9170

A competent attorney would have investigated and requested from the government what type of discovery would be provided, what the format of the discovery was and whether it was text-searchable and the quantity in terms of number of pages of document in discovery.  The investigation would have uncovered that there were many millions of documents to review, that the format was being provided in TIF non-searchable format, that investigators, forensic accounting specialists would need to be retained to pile through the data and quantifying to the judge the length of time that it would take to go through the discovery being insurmountable.  With the current estimate given by computer specialists, there are over 18 million documents and over 10 Terabytes of data which would take an individual over 28.5 years to go through, if this were his/her full-time job.  A competent attorney would have requested disclosure from the government about discovery, but also understood that based on the nature of the allegations, there would be significant amount of data to sift through and analyze and compare. Additionally, Creizman would have insisted that the government present a version of discovery in Text-Searchable format so that the review would be feasible versus in the actual format received, TIF which was non-text searchable and not possible to review.  Also Creizman did not notice or mention and replace, the several drives and CDs in discovery that the government produced that were corrupted files and were not able to be viewed.  This is a violation of the 6th amendment right to effective assistance of counsel as well as a violation of the 5th amendment right to Due Process making the examination and review of discovery impossible setting up "a Trial by ambush."


Additionally Creizman agreed to Prosecutors proposal of a 2 week Trial instead of what should have been a 4 week Trial by Federal standards as mentioned by the Court which subsequently was cut short to 5 days plus summation and deliberation on the 6th day, due to a Holiday and to Judge's newly announced Travel commitment schedule where he would be out at a lecture for several days.  These caused the Trial to be cut down to 6 days due to holidays and Judge Travel commitments during scheduled Trial.  Creizman was ineffective in requesting an extension of time based on the rushed court schedule which was a violation of the 6th amendment right to effective assistance of counsel and a 5th amendment violation of the right to due process.


c. Did not send any subpoenas until 2 weeks before Trial, and did not subpoena what Petitioner Lumiere had been insisting on for many months prior.

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170

[Evidence of this is the subpoena sent out and Court Transcript on Claravant Subpoena]

SL00742 [VII.E] Rule 106 Inclusion of Excul New

## VII.E. DEFENSE COUNSEL CREIZMAN FAILED TO COMPETENTLY ARGUE FOR NECESSARY EXPLANATORY/EXCULPATORY EVIDENCE IN RECORDINGS AND TRANSCRIPTS

   Fed R. Evid. 106 rule of completeness is violated "where admission of the statement in redacted form distorts its meaning or excludes information substantially exculpatory of the declarant."  United States v. Yousef, 327 F.3d 56, 154 (2d. Cir 2003).  In these instances of redaction (A132 pg1 Lee Brown 3500; A65 Creizman invoices; A24 pg47 Thorell correct Transcript) the redacted portions contain potentially exculpatory statements that should have been included in discovery pursuant to the rule of completeness embodied by Federal Rule of Evidence 106.2.  Under this principle, an "omitted portion of the statement must be placed in evidence if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion." United States v. CasTro, 813 F.2d 571, 575-76 (2d Cir. 1987).


There are statements that Petitioner made that were explanatory to the out of context snippets that the government introduced, that defense counsel Creizman should have argued competently for inTroduction under Rule 106 Rule of Completeness and the more broad Rule 6F (Check this) which grants the authority to the Court to determine if the inclusion of recorded statements should be included in the case that they are explanatory of the statement included and without which the context of the statement introduced causes an utter failure of due process and inTroduces prejudice on the defendant.


Background: the recording is taken on January 6th, 2014, more than eight months after Petitioner has left Visium and after several conversations with Thorell including one in July 2013 where he states that Ku told him that there are no overrides and that they don' t go into NAV and the firm does not use NAV

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

to value it's positions which is a shock to Lumiere.  This is also after Thorell has told him of meetings he has had with Gottlieb where he states that Gottlieb Tried to have him sell bonds in a company that the credit team was invested in that Visium was restricted in.  This is also after the Visium Credit Fund has been shut down and Lumiere has reported the issues to a former SEC attorney from Law Firm Park & Jensen.  This conversation is also in the context of pursuing a whistle blowing complaint against Visium.  Lumiere also acknowledges that he does not think that the misrepresentation that "he now" thinks that Plaford did was criminal.  To take a single date conversation and assume all the information is included is erroneous from any sense of rationality.  It is obvious from the documentation and recordings that Petitioner Lumiere's suspicions about Plaford and Visium valuation, went through a cycle with cumulative knowledge gained throughout the process.  Lumiere questioned Plaford about ATI valuation which was the Trigger for him.  Lumiere left the firm.  Asked Attorney from Stroock about it to check with propriety.  Was referred to Park & Jensen to discuss, which he did in May 2013.  It is after this that Petitioner Lumiere gets more confirmation of suspicions based on what Thorell is telling him and this culminates to recordings in 2014.  To say that statements made in 2014 represent thoughts of petitioner from 2011 in light of all the new information acquired by Petitioner, does not make any sense.  And then to extract from Thorell that He" which at the time only meant Plaford as he states, then to turn that "he" always means Lumiere and Plaford is illogical and which only purpose being to prejudice defendant with unTruth.

In the corrected Transcripts:

 After Lumiere states referencing Plaford:

SL: He falsified infor...he falsified marks, levels, performance....

SL: I don' know.  I, I just think at this point, I don't know, but my lawyer says that they...Because, performance misrepresentation is not a necessarily a jailable offense as insider [Trading.]

CS: Yeah, you,.

SL: The F-the FBI is, is, is the group that, like, you want in there.  The SEC[u/i] (A24: Corrected Transcript from Lumiere#2 P47 ln11-17 to P48 ln1-5)

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Further in the Transcript, Lumiere states his Trigger point and when he thought there could be red flags.

SL: As soon as I told him about ATI...

CS: (Clears throat) Mm-hm.

SL:...[the way] we missed their numbers big time.

CS: Mn-hm

SL: Uh, I gotta see if I recorded that, and I was like, I'm gone, man.  That's when I fucking ...Lool, the next week I went in and [u/i]... (A24 P80 Ln4-8)

And Lumiere very close to that states his good faith about reporting to SEC and FBI.

CS: Whistleblower attorneys.

SL: Well, mine is supposed to be the best.

CS: Alright.  Well, we could use yours, too. But...

SL: Because he's got all the SEC contacts. (A24 P 80 ln11-14)

Government took out a snippet to present to the court about the valuation committee alleging that it was only Josh Rozenberg on it, yet a couple of lines later in the same topic of discussion Lumiere says he does not know who else is on it.

It is also clear from Lumiere's use of the word "Yeah" throughout the recordings, that he uses it not as testimonial and that it clearly does not mean yes or any sense of affirmation.  Petitioner Lumiere simply uses the term "Yeah" to acknowledge that he is listening.  Government continually insisted that Lumiere's use of Yeah meant Yes, but it is clear from the pattern of speech that it was not the case.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

CS: First of all, what's the deal with the valuation committee? Is it, is that even...

SL: It's Josh.

CS: It's just him?

SL: Yeah.

CS: Ok.

SL: That's it.

CS: That's problematic.

SL: Yeah.

CS: Um, so [what,] Ku's not on it? No one is?

SL: Oh, I don't know who else is on it. [u/i]

CS: So, it's not just Josh, [U/i]

SL: Yeah, I don't know. [u/i]

(A24 P82 ln18-20 to P83 Ln1-9)


CS: And you wouldn't have a problem?

SL: With what?

CS: I dunno. Anything?

SL: Would I have a problem?

CS: Yeah.

SL: He says, "No". Because he, it's his, it was his physical portfolio.  He was in charge of that.

CS: It was Chri...He was directing it, yeah.

SL:" He was directing his positions.  You were not involved [ui] direc[ing/ly][ui]

CS: Yeah. Ok. Um, we can do that. (A24: P114 Ln9-17)

388

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

A23(December 19th, 2013)

SL: Everything else I can get.  He kept, Chris kept explaining, "Oh well it based on, uh, our, our, our, our documents, our subscription documents enable us to mark what we submit if things are not.  So, if we have inside information..."

CS:(Laughs)

SL: (Overlapping) "because [u/i] occurred to me or something..."

CS: (Overlapping) Right, well that was the whole explanation. Right.

SL: (overlapping)"...to which [u/i] Nebraska, it made sense completely.  We had [u/i]...

CS: Like, we're restricted with [u/i]

SL: So, I guess when we knew...

CS: Yeah.

SL: ...that the final thing was like, A China Med, when I find out that Chin...that, uh, the guy, even though we were in negotiations, the guy headed out to the hills, he was, he went incommunicado.  That [u/i]

CS: Yeah.

SL: ...[u/i] immediately.

CS: Yeah.

SL: There's no negotia[tion]...he's gone.

CS: Yeah.

SL: He disappeared.

CS: Wait, but...

SL: And he found out that a lot of money disapp[eared]...Like, he stole money, they didn't invest it...

CS: Of cour[se]...he wanted to, like, [u/i]

Petitioner Stefan Lumiere v. United States of America                Case No. 18-CV-9170

SL: And then ATI, when they [u/i] us, as a matter of fact...I was like, "I can't be here for another fucking second. [u/i] told you, don't fucking [u/i]."

CS: Yeah, no, and I, I purposely didn't.

SL: (overlapping) That's when I was gone.  That's when I was gone

CS: Yeah.

SL: Listen, I was not going to be there for that." (A23: Corrected Transcript from Lumiere#1 Dec 19, 2013 P 70 ln1-16, to P71 Ln1-8)


It is clear from the following that Petitioner Lumiere is showing his good faith by wanting to tell everyone about what is going on at Visium.  Lumiere is talking about telling people so that the investors are protected which is in-line with his statements from the prior recording with Thorell, where Lumiere was interested solely in protecting investors and was not interested in the whistleblower fee that Thorell fantasized about.


SL: I know, it's a, it's a, it's complex. I mean, I think it's something to deal with, but I think...Here, here's where I'm looking is, if like [u/i] protecting their investments.

CS: What's that?

SL: [You're] protecting their investments.

CS: Who is?

SL: If you, if you fucking tell everybody the shenanigans that were going on, you're kinda protecting their investments, from being involved with the [u/i]

CS: Right.

SL: It's probably the right thing to do... (A23 P77 ln8-14)


A couple of sentences further in the same conversation Lumiere shows his good faith again by telling Thorell that the right approach is to report it to the SEC:

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

SL: I think the right way to approach it is, um like dealing with the SEC>

CS: Mm-hm

SL: [Necessary to u/i]

CS: Yeah.

SL: Like, he's not gonna, the...dealing with him directly is a non-starter.  Like, he can't...

CS: Who, directly?

SL: Jake. (A23 P79 Ln9-15)

SL00800 [VIII.(A-G)] Good Faith Defense new


## VIII. DEFENSE COUNSEL CREIZMAN FAILED TO ACT AS PETITIONER'S ADVOCATE WHEN HE DID NOT ESTABLISH THE GOOD FAITH AND INTEGRITY BEHIND ALL OF PETITIONER LUMIERE'S ANALYSIS.


 Petitioner Lumiere had explained to Defense Counsel each of the positions and timeline in depth multiple times during Trial preparation.  Just prior to Trial Creizman asked Lumiere to go over all these again with his associate as he was busy on other matters.  Lumiere asked why don't you simply give her the notes that you took from our last discussions.  Creizman admitted to not having taken notes and did not remember any of the situations.  2 weeks before Trial Lumiere spent time going through each of these in detail with Defense Associate Madrigal who said she was taking notes, but then again, Defense asked Lumiere to write up the situations again indicating that they again did not take notes or understand the complex situations.  These notes and associated documents that supported the valuations and Petitioner's Good Faith belief were not discussed in Trial during arguments, and were not used during cross examination failing to identify the key pieces of evidence to show why Lumiere believed in the values based on analysis and what his supervisor, Plaford had told him about Visium's mandate and obligation to investors to value positions based on all the current information that Visium had.  This last concept Creizman failed to approach during Trial on cross examination of Plaford where

391

Petitioner Stefan Lumiere v. United States of America                                 Case No. 18-CV-9170

Creizman simply said what will I do if he lies.  Without this key concept, the issues and valuations don't
make sense.  This prompted the Court in light of the lack of logic attached to add a conscious avoidance
charge which is doubtful he would have done had Defense counsel shown the necessary evidence and
analysis to support Lumiere's good faith belief and integrity.

## VIII.A. DEFENSE COUNSEL CREIZMAN FAILED TO ESTABLISH PROOF OF PETITIONER'S INTEGRITY USING YEAR-END-REVIEW RECORDINGS

   Year-End review discuss several of the issues with Plaford, including ATI.  In this review, not only does
Lumiere state that ATI is not his position and that it was a new issue that Plaford had assigned to him to
work out, Plaford identifies that the loss on ATI is not that significant.  Plaford shows his belief and
confidence in the valuation which is done by VRC and the Valuation Committee.  Plaford does not say
these are misvalued or anything that indicates illegal behavior.  When Plaford references C-Med, he
admits this is Ameesh's position and Lumiere is not being assigned the negative P&L from this position
as he just helped out.  Nowhere here, does Plaford say this is misvalued which is at that point being
valued in addition to the valuation Committee but by VRC as well.  Not mentioning any of these points
prejudiced Petitioner by removing the real time discussions about positions which showed what Plaford
believed at the time as opposed to what he claims now in court Trying to save himself from prison time
for insider Trading.

## VIII.B. DEFENSE COUNSEL CREIZMAN FAILED TO ESTABLISH EVIDENCE IN SUPPORT OF VISIUM VALUATION COMPANY ANALYSIS ON ATI POSITION

   Visium had decided to value ATI position based on an assumption of severalrestructuringproposals that
were presented first by BC Partners and then by several other private equity investors that had worked
on ATI and had specialization in the education space.  Based on projections from BC Partners and ATI
management on Lender's call, which had disclosed an immaterial impact to cash flow from the TWC
probation, it was deemed insignificant to the debt.  Later, BC when the situation worsened, BC Partner
had approached Visium about arestructuringproposal that would equitize part of the mezzanine debt
and reinstate the Term loan B.  Based on their projections, which was passed on to Plaford and then to
the accounting team, the valuation committee made determinations as to discount the value of the debt

Petitioner Stefan Lumiere v. United States of America                Case No. 18-CV-9170

for unknown risks to the proposals.  Transcripts and notes from such call and a pitchbook was presented outlining these events and values.  The valuation committee worked on a market approach valuation methodology to value Visium's position in ATI and continued to ask for quotes for internal purposes which Petitioner Lumiere questioned, but was told that accounting was fine with getting quotes as long as the NAV of the positions were the same as what the valuation committee used for their Market Based Approach.  Petitioner Lumiere even asked Cooperating Witness Plaford, his boss, since the SEC was on site doing a review of Visium, if they were in accord with the procedure and process of valuing ATI. Plaford told Lumiere that they were fine with it.  These documents were available via the materials that Lumiere requested that Defense Counsel subpoena from Visium when he asked for all of his work files, but Defense Counsel refused to subpoena any of the relevant information. Had these been made available in defense, Petitioner Lumiere's Good faith would have been obvious and the government's assertion that there were no models, no research to support the values would have been shown to be false.  During Rule 29 motion, if the judge had seen the models and values and reports that substantiated the values that Lumiere believed when Plaford assigned them, he would have seen that there was good faith and that the government's arguments against Lumiere was overreaching and erroneous and false. (Document exists but Lumiere has not been able to access due the Government refusal to allow access to the discovery while incarcerated)


VIII.B.1. Conway del Genio Projection Model

   Conway del Genio was hired asrestructuringadvisor by the Lenders of ATI.  They were positioned as interim CEO and CFO of ATI Schools.  It was they who maintained a proprietary model of students, revenues, cash flows and EBITDA.  Visium Valuation Committee member, Josh Rozenberg, used this model to value ATI using the Market Based Approach which is identified in ASC 820-10-55-3A; 820-10-55-3B; 820-10-55-3C (3A-3F) (A57.1 describes Market Approach, Cost Approach, Income Approach)

This model was the basis for the cash flows and used for the market based approach which is in ASC 820 GAAP which is further explained in Ernst & Young report (In discovery).  The basis is the use of EBITDA as base to apply a market or peer multiple to assess the value of the business and from there to back into a value for securities or for the position held.  Not including this model from the independent advisor that was put in place by lenders and built these inTricate and expansive models deeply prejudiced the Petitioner during Trial. (Part of model is in some of the exhibits attached and the actual models were in

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Visium Work files which were either in discovery or not produced to Petitioner in discovery and
Creizman failed to subpoena at Lumiere's request/)


VIII.B.2. Crossroads Projection Model

The model identified a run rate of approximately $30 Million in EBITDA for ATI schools once they came
off of HCM2 and stabilized.  (A53.1)  This was the basis that lenders were conTributing additional loans
to ATI via a new priming facility, because there was a sincere belief that the company would be
stabilized and retain significant value which went into the values the Visium used.  There was no
liquidity to the loans and no visibility from Petitioner's perspective.  It was not his portfolio, he did not
have access to Markit, and


VIII.C. DEFENSE COUNSEL CREIZMAN FAILED TO ESTABLISH PROOF OF PETITIONER'S GOOD
FAITH BELIEF IN THE PRICES AND VALUES USING BC PARTNERS LENDER'S CALL TRANSCRIPTS
AND PITCHBOOK PROPOSAL TO CREDITORS.


VIII.C.1. During the lender call in 2011, right after the TWC placed ATI on probation, ATI and BC partners
hosted a Lender call identifying the issues as surmountable and that the impact to values and EBITDA
was anticipated to be minimal.  (Evidence in discovery or in notes in Files at Visium or available from
conference call notes which may or may not have been provided in discovery)


VIII.C.2. BC Partners had put together a pitchbook which he sent to select Lenders in ATI making a pitch
to agree to resolve the temporary issues with TWC and ACCSB and DOE by agreeing to cut some of the
debt in the mezzanine Tranche in return for equity in the business.  It identified scenarios which were
reasonable in terms of recoveries for the various Tranches which showed very high recoveries for all of
them. As a result of not placing this pitchbook into evidence, Petitioner Lumiere's Good faith defense
was quashed.  This would have shown his good faith and as a result the jury would have seen that the
issues are complex and not simple as the government relied on to win their case.  The values were there

Petitioner Stefan Lumiere v. United States of America                Case No. 18-CV-9170

and substantiated in this pitchbook. (Evidence either in discovery or in Visium Work files that were never produced to Petitioner in discovery and Creizman never subpoenaed)

## VIII.D. DEFENSE COUNSEL CREIZMAN FAILED TO ESTABLISH PROOF THAT CREDIT FUND PORTFOLIO MANAGER PLAFORD AGREED WITH CREDIT ANALYST AMEESH SHAH'S ANALYSIS OF C-MED POSITION THROUGH RECORDINGS.

In a recording in discovery which was not introduced into evidence by either Creizman or the Government, Plaford is insistent on the value of C-Med when discussing with Lumiere and Ameesh Shah. He clearly states that is the correct value as these are not the same securities.  This recording would have gone to impeach Plaford which Creizman incompetently failed to do. (recording in discovery)

## VIII.E. DEFENSE COUNSEL CREIZMAN FAILED TO ESTABLISH GOOD FAITH IN BROOK BROKER CALL

Evidence of discussions with brokers about the differences between CMED Directing class holders, and discussions about new issue (Which implies par or 100 value at issue price) are available in discovery, yet Creizman never mentioned them to challenge the government's assertions that Lumiere did not educate or share his research with the brokers.  Additionally Vandersnow does not state that Lumiere did not discuss his research with him, but simply states that he did not recall.  Yet the government states that Vandersnow said that he did not discuss the research which was a misstatement.  There are very few recorded conversations with brokers, and the fact that in these calls there is a discussion or identification of differences in securities shows that the brokers were educated in these and were not simply and blindly spitting back quotes with no knowledge of the issues.  Creizman's failure in presenting these, deeply prejudiced the Petitioner.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

## VIII.F. DEFENSE COUNSEL CREIZMAN FAILED TO ESTABLISH EVIDENCE IN SUPPORT OF PETITIONER'S ANALYSIS ON NEBRASKA BOOK POSITION

### VIII.F.1. Disclosure Statement

This disclosure statement had an analytical section as all Disclosure statements have that give an investment bank or advisors independent expectation for value and recoveries.  In this the numbers, the analysis showed a value that Petitioner Lumiere discussed with Plaford demonsTrating the good faith. Without showing this evidence, the court was not presented with all the analytical basis and information that were data points that Plaford used in setting the prices. (Evidence is either in discovery or in Visium Work files that the government did not send to Petitioner which Petitioner Lumiere asked Creizman to subpoena but he failed to do so.)

### VIII.F.2. Nebraska Book Pitchbook

Investment bank had put together a pitchbook for the refinancing of Nebraska book and vouching for its value.  (This evidence is either in discovery or was in work files at Visium which was not produced by the government or Visium but which Petitioner asked his attorney to subpoena)

SL00801 [VIII.F Pt2] Good Faith Defense

## VIII.G. DEFENSE COUNSEL CREIZMAN FAILED TO SHOW GOOD FAITH BY ARGUING THAT THE PHIL BROENNIMAN RECORDING WAS PROOF THAT LUMIERE WAS LOOKING TO LEAK HIS CONCERNS ABOUT PLAFORD'S VALUATION TO THE SEC

Government stated that Lumiere told Broenniman that he wanted him to keep the issue about the way Visium valued its portfolio quiet.  This was taken purposely and literally taken out of context and had the opposite meaning to what the government stated which is evident in the fact that the government cut out the following portion: "I think the SEC is just going to hear about it" (Evidence in Discovery which Petitioner does not have access to due to current circumstances) indicating that Lumiere was planning on telling the SEC about the issue so that they could investigate. The follow-on discussion shows the good faith and integrity of Petitioner Lumiere and that he was angry at what he had learned and would

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

not let it go unpunished.  The rest of the discussion is where Phil and Lumiere say that Visium is going to

get what's coming to them.


The context of the conversation on April 14th, 2013 is in the context of Lumiere resigning from Visium

and asking his former colleague how he went about resigning and what the process was like.  Lumiere

notifies Jake Gottlieb 2 days later of his intention to leave Visium and wanting to be given severance and

any type of settlement that would be available to him. ( See email David Keily on Resigning A107, A108,

A109, A110, A111, A112, A113, A114, A115, A116)


Yet the government introduced this recording with no witness to cross on this which was another

problem.  Additionally, on direct examination of Plaford, the government inTroduces this and the date

of April 14th and asked Plaford if I was still at Visium at the time.  Creizman on cross does not even

mention the context of the conversation or that Lumiere had hired an attorney the following day and

announced to Gottlieb his intention to leave just 2 days later or that Lumiere had been out of the office

for most of 2013 recovering from surgeries.  The government's manipulation in the use of this tape and

cutting it short without being able to confront witness Broenniman was plain error and violated

Lumiere's 5th amendment right to due process.  A competent attorney would have forced the

inTroduction of the continuation of the statement and the context and mentioned that on this date

Lumiere was at home recovering from surgeries and it was just prior to his announcing his desire to

leave Visium.  Defense Counsel failed to mention any of this or present any argument of the facts which

was a Tremendous deTriment to Petitioner Lumiere's defense.

Petitioner Stefan Lumiere v. United States of America            Case No. 18-CV-9170

SL00900 [IX.(1-32)] Framed

## IX. THE PREPONDERANCE OF THE EVIDENCE SHOWS THAT THE PETITIONER WAS FRAMED BY VISIUM WITH THE AID OF DEFENSE COUNSEL CREIZMAN.

1. Creizman entered into a secret Common Interest Agreement, without Lumiere's permission, with Paul Weiss's Roberto Finzi who was Jake Gottlieb's personal Criminal attorney and sent him a hard drive just when Lumiere was firing him, then denied doing so. (A62, A68)

2. Creizman entered into a secret Joint Defense Agreement with Visium's Counsel Seward and Kissel, Rita Glavin without defendant's permission. (A65)

3. Jake Gottlieb was involved with witness tampering by hired law firm Mozillo to represent all of its employees who according to Defense Counsel stated that if Defense called subpoenaed any witnesses from Visium, they would plead the 5th amendment.  There were many witnesses that defense counsel

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

could have called to testify to Lumiere's Good Faith by introducing supported valuations by the valuation committee and testified that Lumiere was not a control person or portfolio manager in the Visium Credit Fund and was listed as an analyst, but really only helped out when needed in the years 2011 until he left.  Creizman never attempted to call any of these witnesses directly to request their help in defending Lumiere.  Creizman could have sought immunity for witnesses in return for providing testimony.  This blatant witness tampering was a violation of Petitioner Lumiere's 5th amendment rights. (Emails: A65.1)


4. Visium had originally only agreed to advance Petitioner Lumiere with only $25,000 as part of indemnification agreement before Lumiere was arrested in a complaint.  This would only be advanced if Lumiere agreed to a $100,000 cap with Lumiere matching dollar for dollar.  This amount is grossly inadequate in light of the complexity of the case and the legal fees charged by law firms for a proper defense.  Lumiere had met several law firms but they all indicated that a defense would cost greater than $3 million dollars.  After this Lumiere refused to sign this and the inadequate amount offered was a clear indication that he was being scapegoated.  Lumiere interviewed several firms and came to a capped contract with Creizman who claimed that he understood complex securities which turned out to be false.  After Lumiere was arrested, Visium Counsel from Seward & Kissel approached Creizman to tell him that "they really wanted to help Lumiere and indemnify him".  They claimed that they did not know if Lumiere was cooperating with the government, but that now that it was clear that he was not, they were very interested in providing indemnification to Lumiere.  When Creizman reported this to Lumiere, he was excited and stated: "this is very good for me as I am going to make a lot more money, oh, it's good for you too, but it's really good for me".  Lumiere was suspicious of this and rejected this offer and instructed Creizman not to speak with any representatives of Visium.  Creizman however ignored Lumiere's insTruction and did speak to Seward & Kissel again about indemnification.  Lumiere then decided that it was obvious Creizman was more interested in making money from Visium than in defending him, so he interviewed several other law firms that all wanted $3 million retainer which was beyond Lumiere's means.  Lumiere after meeting with Kobre and Kim, heard an argument from them that they would not be twisted in their defense and they would do serious work on the case, analyzing all the data which was necessary for this complex case.  Lumiere told Kobre & Kim to call Visium who had offered indemnification, but more confident that his defense would not be sacrificed with Kobre & Kim as it was likely to be with Creizman as apparent by Creizman's interaction with Visium and refusal to

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

follow instructions from Lumiere. (A63, Emails from Law firm that Lumiere hired to go after Visium Insurance for defense: Not available due to Petitioner's current circumstances)

5. Gottlieb move Lumiere to No 2 position on Credit Fund org chart from historically being at the bottom of the Org Chart as they know Lumiere is preparing to leave in 2012 as per discussions with sister Alexandra and her Attorney Beslow that tell Lumiere that Gottlieb is going to frame Lumiere and make sure he never works again.  As this is happening, Lumiere is gathering proof of his work at Visium to counter any slander attacks by Gottlieb. (A5 P5 compared to A6 P4, A7 P1, A5 p3, A8 P1, A2 P3, A4 p3)

6. Deposition with Alexandra Gottlieb and Jake Gottlieb where Alexandra states that Jake had threatened Lumiere that he would make sure that Lumiere never worked on Wall Street again. (Appendix in Court filings: Not available due to Petitioner's current circumstances)

7. Attorney Beslow ends up in conflict with client Alex Gottlieb whereby Jake hires Beslow to attend Biotech conferences for payments.( Information from Petitioner's sister which she uncovered: Not available due to Petitioner's current circumstances)

8. After Trial, Lumiere contacted Creizman to discuss Rule 33 which Creizman stated he was unavailable to discuss until Wednesday of the following week. The day after Trial, a reporter came to Alexandra Gottlieb's apartment to meet with Lumiere.  Right after the reporter left, Creizman frantically calls Alexandra Gottlieb multiple times and then Petitioner Lumiere and states that Lumiere better not speak with any reporters as that would be very unwise. (Not available due to Petitioner's current circumstances)

9. Jake Gottlieb handwritten notes that indicate his strategy for framing Petitioner Lumiere, including:

   -Creizman will just go through the motions

   -Don't indemnify Lumiere with law firm Kobre and Kim because they will not be "friendly to the firm"

Petitioner Stefan Lumiere v. United States of America                          Case No. 18-CV-9170

-Benefits to Framing Stefan

-Notes for Creizman: "Pretend your his friend and then fuck him over in the end"

-Benefits to ring-fencing incident to Credit Team Lumiere and Plaford: can claim failure to supervise

-Is Stefan a friend or foe?

-Find someone in politics to help Jake

-Donation to Democratic Party

-Stefan believed in the values, he is in Trouble just because he is Jake's brother in law. (Not available due to Petitioner's current circumstances)

10. Jake Gottlieb's refusal to indemnify Lumiere and advance legal payments to Lumiere for a defense unless Lumiere agreed to an interview with Visium counsels and when Lumiere refused at the insTruction of Counsel, they offered Lumiere indemnification advancement only if Lumiere signed an affidavit that Jacob Gottlieb was not involved in any of the allegations. (Not available due to Petitioner's current circumstances)

11.   After Lumiere agreed to be indemnified, Gottlieb still held up finalizing indemnification and payments until just prior to Trial so that Lumiere had no choice in switching or adding counsel and unable to prepare for Trial. (Final Indemnification letter dated Nov 1, 2016: A64)

12. Creizman not pursuing cooperation agreement for reduced charge at insTruction of Lumiere even though Prosecutor offered Lumiere a plea of Misprision of Felony for helping to cooperate against Gottlieb and Ku. (A69 P1-9)

13. Creizman telling Petitioner Lumiere's Sister to come to Trial after she said she wanted to testify as a witness for her brother having knowledge of Visium operations and Lumiere's role at Visium. Creizman did not prepare her to testify and did not warn her that by coming to Trial, she would be prohibited

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

from being a witness.  She passed a note to Creizman when Judge Rakoff alerted the court to this rule, which was noticed by the court, yet Creizman did nothing to request a moment to notify the court that Alexandra Gottlieb was a witness making it appear that it was too late for her to be a witness at that point. (Note that was passed to Creizman at beginning of Trial: Tr)

14. Creizman not preparing Petitioner Lumiere to testify after Lumiere pleaded with him to prepare him to prepare him for "all options". (A102)

15. Creizman not calling any witnesses from Visium or from the variousrestructuringadvisors and various funds that served on the Creditor committees alongside Visium (A98)

16. Creizman not subpoena materials, emails, work product, files from Visium. (Emails exist with request from Lumiere to Creizman, but not available due to Petitioner's current circumstances.)

17. Creizman did not work on the prices or numbers that the government used.  Creizman claimed that he learned from Seward and Kissel that Visium did an audit and all the numbers used for valuations were in line with fair value and that the Government recognized that they made an error and that the case would not be about values and valuation of positions therefore there was no need to hire an accounting firm to analyze the data.

18. Creizman waiting until the last minute to serve Plaford with subpoena for Claravant which Lumiere believed would contain information of Jake Gottlieb's and Friends of Gottlieb's involvement.  He then did not follow through with requesting service until after Trial had begun guaranteeing that it would not be fulfilled adequately. (This is in the Transcript where Judge Admonishes Creizman for not serving subpoena to government and as a result does not get the information that Lumiere requested with list of investors and clients of Claravant to show that Gottlieb was involved)

Petitioner Stefan Lumiere v. United States of America                          Case No. 18-CV-9170

19. Creizman refusal to put into evidence any of the documents that substantiated the valuations that Visium Credit Funds' used that Lumiere persistently asked him to including Valuation Research Company (VRC) reports, Valuation Committee notes on the securities that the government alleged were misvalued such as ATI and CMED, restructuring advisor documents on Nebraska Book Company and documents on Sevan Marine and other models in support of the valuations.  Email about investment in ATI from Valuation Committee and Accounting to investor MSAIP that explained and substantiated the valuation used by Visium Credit Funds' at $25 million and increased it from after Petitioner Lumiere left the firm noting that the old securities were used as shell securities to value their holdings while they awaited the new securities to be issued (A26.1, a26.2, Jake Gottlieb emails on ATI and CMED: A26.1, A26.2, A27.3, A27.4, A27.6, A27.7, A27.8; VRC Reports: A25, A26, A27, A28, A29, A30; Valuation Committee Notes: A33, A34; ATIrestructuringdocuments Nebraska Book   A was on this email)


SL00901 [IX] Framed-Continued

20. Creizman cancelled expert witness without notifying defendant and just before he was scheduled to testify claiming that the Government's case was too weak therefore he would not be needed. ( Affidavit from Tawil expected but not available at the moment due to Petioner's current circumstances)


21. There is clear evidence that Plaford placed the trade order by his own admission of his in office discussion with Ameesh Shah, which Lumiere was not present for.  There is supporting evidence that the trade was not out of context of market given the information coming out at the time, and the stock price movement, but if it was outside of context, and Creizman cancelling expert witness without notifying defendant and before he was scheduled to testify.


22. Creizman called no witnesses from Visium claiming that Visium hired Mozillo to represent anyone we would potentially call as a witness and they would be instructed to plead the fifth.  Creizman did not make any attempt to call them separately or to seek immunity for other witnesses in return for testimony.  He additionally did not call any of the restructuring advisors and other steering committee members that Lumiere asked him to call as witnesses. (Email to creizman requesting that he call witnesses and creizman notes with list of witnesses.)

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

23. If Petitioner Lumiere was the person that placed the order, why would Plaford ask Lumiere to do something that he was fully capable of doing himself while Lumiere was on vacation, unless he was taking advantage of the fact that Lumiere was on vacation and therefore not following the trades and quotes.

24. Plaford says it is going to be a problem if Lumiere is unavailable to get quotes while he is on vacation unless he is using Lumiere to do something and lying to him about purpose. (Email in Discovery and not available due to Petitioner's current circumstances)

25. Lumiere filed cease and desist order against Gottlieb (A105 P1-2)

26. Government Clawed-Back Documents Claiming that Visium Was Asserting Privilege:

Prosecutor's contacted Creizman to tell him that Visium was asserting privilege on 4 documents that they had sent over in discovery.  Creizman received a note from prosecutors that the contents of the documents could bear on the innocence or guilt of Lumiere.  Creizman stated that he would review the documents to see what they were, but he never let Lumiere know what it was.  After trial, Lumiere came across the files that he was reviewing when he received the some of the discovery back, and saw the documents. 2 of the documents referred to independent audits that were done at Visium around the time of the Thorell complaint to compliance.  One document was an opinion by an auditor that reviewed the valuations and recommended "no action".  The second document was also an opinion by an independent auditor that reviewed the trades in the Credit Opportunities Funds and also saw nothing out of the ordinary and recommended a "no action".  Neither one of these documents were privileged as they were written by auditors not lawyers.  Secondly the fact that a formal audit was done and found that Thorell's allegations were unfounded as to trades and valuations would have demonstrated to the court and the jury that the accusations were wrong and would have solidified a not guilty verdict for Lumiere.  The hiding of these documents, and the full reports constitute a Brady violation by the government.

Petitioner Stefan Lumiere v. United States of America                Case No. 18-CV-9170

SL00902 [IX] Framed Conclusion In Transcript

There is further evidence of a conspiracy forming not in mispricing securities, but in framing Mr. Lumiere.  The conspiracy begins with Jacob Gottlieb and consists of Steven Ku, Keily and then Plaford and Thorell who all had motives to make it appear that Lumiere was the ringleader, which is so far-fetched in light of the preponderance of the evidence on and off the record that it sounds completely ridiculous when taking the time to put it together.

Gottlieb Involvement: First, Plaford on direct admits that Gottlieb pressured him to keep assets at Level 2 on cross:

Q. And we'll talk about that time frame in a minute.  Did you feel any pressure to classify assets as Level 2?

A. I did.

Q. What was the source of the pressure?

A. Jake Gottlieb

Q. What did he say to you?

A. Try to price everything at Level 2, if you can.

Q. Did you have an understanding of why?

A. Because, as I said, it was important for investors not to have Level 3 assets, if possible.

Q. Did you and the defendant discuss the need to keep assets at Level 2?

A. We did. ( TR P 704 Ln5-17)

Q. What was Mr. Gottlieb's reaction when you said you consulted with a lawyer?

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

A. He, from the body language that I read, seemed very sTressed and concerned once I mentioned that I had an          attorney.  And I don't know that he verbalized much to convey those concerns, but it was very Transparent in terms          of his physical body nature. (Tr P 375 Ln21-25 to P 376 Ln1-11)

Steven Ku Involvement: Plaford on direct admits that Ku told him to get Thorell to send the prices that Plaford came up with instead of sending them directly from himself as he had been doing:

Q. At some point, did you, yourself, stop sending prices to operations?

A. Yes.

Q. And why was that?

A. Steve Ku asked me to have Jason Thorell send them instead.

Q. Do you remember what he said to you?

A. He said it just looks better if the prices aren't coming directly from the portfolio manager.

Q. What did you understand Mr. Ku to mean by that?

A. That if a third party was looking at the process, the portfolio manager should not have that much influence over the pricing process in general.

Q. Did you then insTruct Jason Thorell, the Trader, to send the prices to operations?

A. I did.

Q. Did he follow your instructions?

A. He did. (Tr P 677 ln16-25 to P 678 ln1-7)

Steven Ku Involvement: Based on Thorell's statements to Lumiere, Ku states that firm does not override and does not use NAV to calculate prices which runs contrary to what Plaford had told Lumiere and what Lumiere understood to be Visium's policies for certain investments.

Q. In the first line you say: He said the valuation committee determines the prices?

A. Yes.

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170

Q. And who is "he" here?

A. I was referring to Steve Ku

Q. And you go on to say: Every--We've never had any overrides--he said this to my face.  What did you understand that to mean, when you said that Ku said we've never had any overrides?

A. He's refuting that overrides exist.

Q. Was that what you believed?

A. No.

Q. And then the defendant says: What do you mean no pricing overrides? With a question mark. Do you see that?

A. Yes.

Q. What did you understand the defendant to mean there?

A. He seemed to be as confused as I was.  In other words, in disbelief that Steve Ku was making the assertion that there were no pricing overrides.

Q. And then you say: What do you think he's sending me that spreadsheet for?  Who is the "he" there, he's sending me the spreadsheet for?

A. That's Chris Plaford.

Q. And that's the overriding spreadsheet you're talking about?

A. Yes.

Q. And then you say: So he goes it's never going to NAV.  Who is the "he" there.

A. The "he" is Steve Ku. (Tr P 394 Ln15-25 to P 395 Ln1-18)

Plaford & Thorell Involvement: Thorell on direct states:

Q. In the middle of 2011, did there come a time when you spoke to Mr. Plaford in his office?

A. Yes...

407

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170

Q. Was anyone else present for this meeting?

A. No...

Q. What did Mr. Plaford say to you during this meeting?

A. ...he had just come out of some meeting that had to do with the pricing process and making some changes to it...        And he concluded the meeting with "Do not tell anyone else in the firm about this conversation."


Lumiere's is not knowingly involved:

On Cross, Thorell admits that he did not tell Lumiere about it:

Q. And June 2011, you leave his office.  Do you tell anyone about it?

A. No.

Q. Do you tell Mr. Lumiere about it?

A. No. (Tr P. 417 Ln24-25 to P 418 Ln1-3)

SL01000 [X] Penalties Argument new


**X) THE COURT PLACED ON LUMIERE $1 MILLION IN PENALTIES WHICH LUMIERE BELIEVES TO BE WRONG BECAUSE LUMIERE IS INSISTENT ON HIS INNOCENCE, BUT ALSO EXCESSIVE GIVEN THAT LUMIERE DID NOT MAKE OR INTEND TO MAKE A SINGLE PENNY FROM ANY PROCEEDS DERIVED FROM ANY ALLEGED FRAUD.  AS A RESULT OF HONEYCUTT WHICH SENTENCING COUNSEL BROUGHT TO THE ATTENTION OF THE COURT, A PERSON CANNOT BE SUBJECT TO FORFEITURE FOR FUNDS HE DID NOT CONTROL OR HAVE IN HIS POSSESSION AND DID NOT RECEIVE.  THIS IS THE CASE WITH LUMIERE AS HE RECEIVED ZERO BONUS FOR ANY OF THE YEARS IN WHICH THE ALLEGED FRAUD OCCURRED.**

Petitioner Stefan Lumiere v. United States of America                   Case No. 18-CV-9170

Additionally the court was extremely clear that it would assume a zero loss when sentencing Lumiere because Judge Rakoff's belief that in a financial crime at a bank or fund, the amount of money can distort the True actions of the defendant.  The same concept may apply to restitution as Lumiere was not a control person in the Credit Funds, did not receive compensation from the Credit Funds' during the years in question and no actual losses were able to be proved by the government, therefore it was decided that Lumiere would not be held liable to this.  Additionally there were no losses proved or likely as a result of any of Visium's accounting decisions.  As per the government's own admission, their initial numbers were flawed as they did not include monies paid back to credit investors.  The alleged losses also did not include existing positions which remained on the books at Visium which continued to be valued using third party valuation models in complete conTradiction to the Government's claims.  Recall that Visium's positions had different economics from the securities that were quoted from pricing sources that the government falsely and erroneously claimed were dependable.  These were not the same securities and therefore the impression left by Jindra's exhibits did not represent the value of Visium's positions which used ASC 820 Market based approach in valuing and continued to do well after Lumiere left Visium.  this approach was also substantiated by the evidence and models included in the appendix and referenced in this brief. These values were valued by outside parties and by the Visium Valuation Committee as seen in the exhibits included.  Visium continued to use these approaches even now.  As a result it is obvious that the Government inflated the values of losses in presenting its analysis to the jury and to the Court.


  The Government's was unable to prove any losses to investors and as a result of their analytical errors no restitution was due.  Also as result of Petitioner Lumiere not being paid a single penny from any of the alleged conduct during the alleged years the forfeiture was also invalidated as per Honeycutt.  which the government claims that Visium inflated their values which then without the forfeiture or restitution provision sought to find another way to penalize Lumiere besides 18 months in prison.  The court asked the government what the maximum penalty was for a securities fraud violation, to which the government responded up to $5 million.  With that, the Court set a court penalty of $1 million on Lumiere which Lumiere believes is excessive given Lumiere's position in the credit fund (analyst not portfolio manager) and the fact that he had no control over any of the pricing of the fund.  Lumiere has been penalized for following a basic function of requesting quotes which was done at the behest of his

Petitioner Stefan Lumiere v. United States of America                Case No. 18-CV-9170

Supervisor Plaford and which process and procedure was approved by Visium Funds' Founder, Jake Gottlieb and Steven Ku.


   Lumiere recognizes the power of the court to set penalties and punishment and that even though he insists on his innocence and his Trial was flawed for the many reasons stated in this appeal, the amount of $1 million for a court penalty appears extreme and will severely handicap Lumiere for the foreseeable future as he fights to overturn his conviction.  Petitioner Lumiere recognizes that he faces an uphill battle in this respect as the court has viewed inferences in the light most favorable to the government, but Lumiere believes in his innocence and that he was prejudiced by an overzealous prosecutor on a witch hunt who would not stop at the Truth in order to convict Lumiere for not cooperating and ruining their chances at getting their prize: Jacob Gottlieb. (See Creizman Memorandum of Government meeting with Creizman on September 8, 2016)


Lumiere requests that given the punishment already endured by him and his family, the pain, the suffering, the loss of income and opportunity, the loss of life savings to pay for defending himself, and his imprisonment away from family and friends, that the court would see fit to nullify the penalty of $1 million and to make any financial penalties deemed paid by the $300 assessment which Lumiere believes is the standard court penalty amount which he has already paid.  Additionally Lumiere request that the 3 years of supervised release be reduced to 1 year given his 18 month sentence, and the obvious misstatements of losses that he believes took some part in the Court's decision in penalizing Lumiere to the term of imprisonment, the supervised release and the fine imposed.

Petitioner Stefan Lumiere v. United States of America                    Case No. 18-CV-9170