UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

  - v. -                                                  :          16 Cr. 483 (JSR) (BCM)

STEFAN LUMIERE,                              :

         Defendant.                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

STEFAN LUMIERE,                              :

         Petitioner,                      :
  - v. -                                                                 18 Civ. 9170 (JSR) (BCM)
                                          :

UNITED STATES OF AMERICA,                    :

         Respondent.                      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**GOVERNMENT'S OPPOSITION TO DEFENDANT STEFAN LUMIERE'S
MOTION FOR RELIEF UNDER 28 U.S.C. § 2255**


GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007


Ian McGinley
Joshua A. Naftalis
Assistant United States Attorneys
- Of Counsel -

# TABLE OF CONTENTS

BACKGROUND .................................................................................................... 1

    A.    The Indictment ..................................................................................... 1

    B.    The Trial............................................................................................... 2

           1.    Visium and the Defendant ....................................................... 2

           2.    The Scheme to Defraud ........................................................... 3

           3.    Fraudulent Broker Quotes ....................................................... 4

           4.    Painting the Tape ..................................................................... 6

           5.    Valuation Standards and the Collapse of the Credit Fund ......... 7

           6.    Audio Recordings of the Defendant ......................................... 7

            7.    The Verdict .............................................................................. 8

    C.    Post-Trial Motions .............................................................................. 8

    D.    Sentencing........................................................................................... 8

APPLICABLE LAW ............................................................................................. 9

    A.    Section 2255 Petitions......................................................................... 9

    B.    Procedural Bar .................................................................................. 10

    C.    Ineffective Assistance of Counsel...................................................... 11

    D.    Conflicts of Interest........................................................................... 14

THE INEFFECTIVE ASSISTANCE OF  COUNSEL CLAIMS ARE WITHOUT MERIT .. 16

    A.    Trial Counsel Was Not Conflicted..................................................... 17

    B.    Trial Counsel Adequately Developed Viable Defenses...................... 20

    C.    Trial Counsel Reasonably Decided Not to Call Expert Witnesses ...... 22

    D.    Trial Counsel Adequately Objected to the Government's Evidence and Arguments...…………………………………………………….......…..23

    E.    Trial Counsel Was Not Ineffective "At All Stages" ........................... 26

CONCLUSION ................................................................................................... 27

# TABLE OF AUTHORITIES

*Armienti* v. *United States*, 313 F.3d 807 (2d Cir. 2002) ................................................................. 16

*Blake* v. *United States*, 2012 WL 3154989 (S.D.N.Y. Aug 3, 2012) ........................................... 23

*Bousley* v. *United States*, 523 U.S. 614 (1998) ............................................................................. 11

*Brown* v. *Artuz*, 124 F.3d 73 (2d Cir. 1997) ................................................................................. 13

*Cabrera* v. *United States*, 972 F.2d 23 (2d Cir. 1992) ................................................................. 10

*Chang* v. *United States*, 250 F.3d 79 (2d Cir. 2001) .................................................................... 10

*Cuoco* v. *United States*, 208 F.3d 27 (2d Cir. 2000) ....................................................................... 9

*Gupta* v. *United States*, 913 F.3d 81 (2d Cir. 2019) ..................................................................... 11

*Gutierrez* v. *Smith*, 702 F.3d 103 (2d Cir. 2012) .......................................................................... 11

*Henry* v. *Poole*, 409 F.3d 48 (2d Cir. 2005) ................................................................................. 23

*Hopkins* v. *Schillinger*, 866 F.2d 1185 (10th Cir. 1989) .............................................................. 10

*Lumiere* v. *United States*, 18 Cv. 9170 (JSR) .............................................................................. 23

*Mayo* v. *Henderson*, 13 F.3d 528 (2d Cir. 1994) .................................................................... 11, 13

*Mickens* v. *Taylor*, 535 U.S. 166 (2002) ...................................................................................... 13

*Mui* v. *United States*, 614 F.3d 50 (2d Cir. 2010) .................................................................. *passim*

*Murray* v. *Carrier*, 477 U.S. 478 (1986) ...................................................................................... 11

*Newfield* v. *United States*, 565 F.2d 203 (2d Cir. 1977) ................................................................ 9

*Padilla* v. *Kentucky*, 130 S. Ct. 1473 (2010) ............................................................................... 13

*Pham* v. *United States*, 317 F.3d 178 (2d Cir. 2003) .................................................................... 10

*Puglisi* v. *United States*, 586 F.3d 209 (2d Cir. 2009) ................................................................. 10

*Rodriguez* v. *United States*, 2013 WL 6171618 (S.D.N.Y. Nov. 25, 2013) ................................. 9

*Sanders* v. *United States*, 1 F. App'x 57 (2d Cir. 2001) ................................................................ 9

*Strickland* v. *Washington*, 466 U.S. 668 (1984) .................................................................. *passim*

*Strouse* v. *Leonardo*, 928 F.2d 548 (2d Cir. 1991) ................................................................ 14

*Triana* v. *United States*, 205 F.3d 36 (2d Cir. 2000) ............................................................. 15

*United States* v. *Aguirre*, 912 F.2d 555 (2d Cir. 1990).......................................................... 12

*United States* v. *Bayless*, 201 F.3d 116 (2d Cir. 2000)..................................................... 21, 23

*United States* v. *Best*, 219 F.3d 192 (2d Cir. 2000) ......................................................... 13, 20

*United States* v. *Bokun*, 73 F.3d 8 (2d Cir. 1995)................................................................... 9

*United States* v. *Caracappa*, 614 F.3d 30 (2d Cir. 2010) ...................................................... 14

*United States* v. *Fulton*, 5 F.3d 605 (2d Cir. 1993)............................................................... 16

*United States* v. *Gaskin*, 364 F.3d 438 (2d Cir. 2004) .......................................................... 13

*United States* v. *Luciano*, 158 F.3d 655 (2d Cir. 1998) ......................................................... 12

*United States* v. *Lumiere*, 249 F. Supp. 3d 748 (S.D.N.Y. 2017).............................. 8, 20, 24, 25

*United States* v. *Munoz*, 143 F.3d 632 (2d Cir. 1998) ........................................................... 10

*United States* v. *Plitman,* 194 F.3d 59 (2d Cir. 1999) ........................................................... 20

*United States* v. *Sanchez*, 790 F.2d 245 (2d Cir. 1986) ......................................................... 20

*United States* v. *Sanin*, 252 F.3d 79 (2d Cir. 2001) .............................................................. 10

*United States* v. *Schmidt*, 105 F.3d 82 (2d Cir. 1997) ........................................................... 20

*United States* v. *Schwarz*, 283 F.3d 76 (2d Cir. 2002)............................................ 14, 15, 16, 18

*United States* v. *Simmons*, 923 F.2d 934 (2d Cir. 1991).......................................................... 14

*United States* v. *Stantini*, 85 F.3d 9 (2d Cir. 1996).............................................................. 10

*United States* v. *Thorn*, 659 F.3d 227 (2d Cir. 2011) ................................................... 11, 17, 23

*United States* v. *Venturella*, 391 F.3d 120 (2d Cir. 2004) ..................................................... 12

*United States* v. *Walters*, 910 F.3d 11 (2d Cir. 2018)........................................................... 25

*United States* v. *Williams*, 372 F.3d 96 (2d Cir. 2004)........................................................... 14, 15

*United States* v. *Zichettello*, 208 F.3d 72 (2d Cir. 2000) ............................................................ 25

*Winkler* v. *Keane*, 7 F.3d 304 (2d Cir. 1993)............................................................................ 15

*Yarborough* v. *Gentry*, 540 U.S. 1 (2003) ................................................................................. 12

*Zhang* v. *United States*, 506 F.3d 162 (2d Cir. 2007)....................................................... 11, 17, 23

The Government respectfully submits this memorandum in opposition to Stefan Lumiere's *pro se* petition, filed pursuant to 28 U.S.C. § 2255 (the "Petition" or "Pet."). (Dkt. 23). In support of this opposition, the Government also respectfully attaches the Declaration of Eric M. Creizman, Esq., Lumiere's trial counsel. ("Creizman Decl.").

Lumiere was convicted after a six-day trial of wire fraud, securities fraud, and conspiracy to commit those offenses, based on his participation in a long-term scheme to mismark the value of numerous securities. The Court sentenced Lumiere to a total of 18 months' imprisonment.

Lumiere now argues that he received ineffective assistance of counsel because his attorney at trial, Eric M. Creizman, Esq., purportedly: (i) operated under a conflict of interest; (ii) failed to adequately develop viable defenses; (iii) failed to call an expert witness at trial; (iv) failed to object to the Government's arguments and evidence; and (v) generally failed to provide competent representation at trial. The Petition should be denied in its entirety because Lumiere's claims are meritless, and because he has failed to affirmatively prove that, but for counsel's alleged errors, the result of the proceeding would have been different, given the overwhelming evidence of his guilt.

## BACKGROUND

### A.    The Indictment

On June 15, 2016, Lumiere was arrested on a three-count Complaint charging him with conspiracy to commit securities and wire fraud, securities fraud, and wire fraud, in violation of 15 U.S.C. §§ 78j(b), 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. §§ 371, 1343, and 2. On July 14, 2016, an Indictment was returned charging Lumiere with these same offenses.

###### B.       The Trial

On January 11, 2017, trial commenced against Lumiere.  The evidence at trial established that from June 2011 until April 2013, Lumiere, a former employee at the hedge fund Visium Asset Management L.P. ("Visium"), participated in a scheme to defraud investors in Visium's Credit Fund (the "Credit Fund") by deceiving them about how the Credit Fund's monthly net asset value ("NAV") would be calculated, and by exploiting that deception to report fraudulently inflated performance results to investors.  The purpose of the fraud was to dupe investors into believing that the Credit Fund was performing far better than it actually was.

The Government's proof at trial included (1) the testimony of three co-conspirators who mismarked the Credit Fund with the defendant; (2) audio recordings of the defendant and his co-conspirators obtaining fraudulent quotes to mismark the value of securities held by the Credit Fund; (3) audio recordings of the defendant discussing the scheme; (4) numerous incriminating emails and other documentary evidence showing that the defendant obtained fraudulent price quotes; (5) the testimony of investors at other firms that had properly valued the securities that the defendant mismarked; and (6) testimony from Visium's General Counsel about how the valuation process was supposed to work.

###### 1.    Visium and the Defendant

Visium was a hedge fund manager and an investment advisor registered with the Securities and Exchange Commission ("SEC") that, at its peak, had $8 billon of investor money under management.  (Tr. 40, 42; PSR ¶ 11).[1]  Visium managed a number of funds, including the

---

[1]        "Tr." refers to the trial transcript; "PSR" refers to the Probation Office's Presentence Investigation Report prepared in connection with sentencing; and "GX" refers to Government exhibits admitted at trial.

Credit Fund, which invested principally in bonds, bank debt, and other credit instruments, and which managed up to $500 million.  (Tr. 42-43, 630-31; PSR ¶ 11).

In 2011, Christopher Plaford was the senior portfolio manager for the Credit Fund. (Tr. 45, 630-31; PSR ¶ 12; GX 106).  Lumiere was a senior analyst and also a portfolio manager, responsible for between $50 and $100 million of the Credit Fund's portfolio.  (Tr. 146-47, 244-46, 664-65; PSR ¶ 13).  Before joining Visium, Lumiere worked in the securities industry for a number of years.  (GX 809).  Lumiere had also obtained numerous professional certifications, including becoming a Chartered Financial Analyst ("CFA") and obtaining his Series 7, 16, and 55 licenses. (Tr. 345, 547-48).  In obtaining these credentials, he studied and had to demonstrate his understanding that "inaccurate market quotations" and "painting the tape" were prohibited practices.  (Tr. 546-54; GX 809, 812).  Jason Thorell was the main trader for the Credit Fund and executed trades for Plaford and Lumiere.  (Tr. 241-42, 652-53).

Plaford pled guilty to participating in the fraud and testified at trial pursuant to a cooperation agreement.  Thorell was not charged and testified under a grant of immunity.  (Tr. 222-23, 640-41).

### 2.   The Scheme to Defraud

In 2011, the Credit Fund's performance began to suffer, in part because Lumiere's investments were losing money.  (Tr. 248-49; PSR ¶ 26; GX 117).  For that reason, Lumiere initially suggested to Plaford that they mismark certain securities in Lumiere's portfolio.  (Tr. 674-75; PSR ¶ 26).  Over time, Lumiere, Plaford, and Thorell mismarked securities throughout the Credit Fund.  (PSR ¶ 26).

Visium's NAV was the key metric by which Visium reported its performance to investors.  The NAV represented the aggregate fair market value of all investments and cash held

by the hedge fund.  (Tr. 60, 662-63).  Liquidity was also important to investors, who strongly preferred that the Credit Fund not hold illiquid assets designated as "Level 3" under Accounting Standard Codification 820.  (Tr. 663, 703-04).[2]

Plaford and Lumiere were incentivized to increase the Credit Fund's NAV because the higher the NAV, the higher their compensation could be.  (Tr. 248, 664).  Lumiere received three to five percent of the profits he made on his positions in the Credit Fund.  (PSR ¶ 38).  In contrast, poor performance would have resulted (and ultimately did result) in Lumiere's termination.  (Tr. 248, 658, 664, 769-70, 780).

Visium reported the Credit Fund's NAV and liquidity to investors on a monthly basis.  (Tr. 661).  To achieve their goal of duping investors into believing that the struggling Credit Fund was performing well and held no illiquid investments, Lumiere, Plaford, and Thorell systematically manipulated the NAV and the liquidity calculations each month from 2011 to 2013.

### 3.  Fraudulent Broker Quotes

Plaford and Lumiere did not directly control the level at which the NAV was reported, because it was calculated by Visium's back-office Operations group.  However, to make the calculation, Operations relied to a significant degree on securities prices reported by the investment team — *i.e.*, by Plaford and Lumiere.  At the end of each month, the investment team would send Operations a list of prices for each security held by the Credit Fund.  (Tr. 560-61). The next business day, Operations would obtain market prices for each security from a third-party pricing source such as Markit, and then send to the investment team a spreadsheet that compared Visium's in-house prices with the third-party prices.  (Tr. 561-63).  In order to cause Operations to use an in-house price instead of a third-party price in calculating the NAV, the investment team

---

[2]     Level 3 assets are generally illiquid and not traded in active markets.

was required to provide independent verification that its in-house price was fair and accurate. This was known as "overriding" the third-party price. (Tr. 563-65, 667-68). A quote from an outside broker indicating that it would transact in a security at the investment team's in-house price was sufficient to override a third-party price. (Tr. 564-65).

To implement this scheme, Lumiere and Plaford obtained inflated price quotes from hand-picked, corrupt brokers. It was Lumiere's primary responsibility to dictate the prices that he wanted the corrupt brokers to send back to him. (Tr. 633-34; PSR ¶ 30). Lumiere personally selected and corrupted the two main brokers used for this purpose: Scott Vandersnow[3] of Princeridge and Jonathan Brook of Janney Montgomery Scott. (Tr. 285, 293-94, 305, 483, 680-81). Both brokers were personal friends with Lumiere and worked at firms that did not typically trade the type of securities the Credit Fund held, and thus could not realistically be counted on for objective price quotes. (Tr. 314-15, 351; GX 1224; PSR ¶¶ 30-31). Later, at Lumiere's suggestion, Thorell located a third corrupt broker, Matthew O'Callaghan of Odeon Capital Management, who was selected because he worked at another "bucket shop." (Tr. 306-09; PSR ¶ 35). These brokers allowed Lumiere and his co-conspirators to dictate the prices the brokers attested they were willing to pay. (*E.g.*, Tr. 489-91; GX 1209, 1227). For example, Vandersnow testified that he "would just provide the price that [Lumiere] gave" him, and that he did not do "any due diligence or research on the prices" provided by Lumiere. (Tr. 490-91, 494, 501-20). In return for the brokers' providing the sham prices, Lumiere directed Thorell to steer more business their way. (*E.g.*, Tr. 285-86, 294; PSR ¶ 36).

Mindful of the wrongful nature of his conduct, Lumiere often used surreptitious means to get these favorable quotes from the corrupt brokers. To avoid detection, Lumiere

---

[3]     Vandersnow testified at trial pursuant to a non-prosecution agreement.

frequently used his personal cell phone to call Vandersnow and Brook on their personal cell phones, because Lumiere did not want the calls to occur on phone lines that might be recorded by the brokers' employers.  (Tr. 360-62, 526; PSR ¶¶ 30, 34).  On at least two occasions, Lumiere also couriered a thumb drive containing suggested bogus price quotes for hundreds of securities, once to Vandersnow and once to O'Callaghan.  (Tr. 365-66, 506-07; PSR ¶ 32).

After the brokers supplied the dictated quotes, their emails would be sent to Operations as the necessary back-up documentation for Plaford's and Lumiere's hand-picked securities prices.  (Tr. 276, 289).  As a result, the defendant grossly inflated the NAV of the Credit Fund.  In addition, using broker quotes as back-up also prevented these securities, which were often thinly traded, from being classified as illiquid Level 3 assets.  (Tr. 693).

The senior debt ATI, a security in Lumiere's portfolio, was one particularly egregious example of a security that Lumiere mismarked during this scheme.  For example, in September 2011, Markit valued ATI Senior Debt at $32.50.  (GX 18).  Apollo Global Management LLC ("Apollo"), an experienced investment firm, valued the same debt at $33 for September 2011.  (Tr. 824).  In contrast, Lumiere obtained quotes that fraudulently valued ATI senior debt almost *three times higher* than both Markit and Apollo.  (GX 658).

### 4.   Painting the Tape

In a slight variation on the scheme, Lumiere and Plaford also mismarked the value of securities held by the Credit Fund by "painting the tape" — that is, they intentionally paid more than necessary for certain bonds so that they could use that elevated price to mark the value of those bonds.  (Tr. 638-39; 708-15; PSR ¶¶ 56-60).  Specifically, Plaford and Lumiere purchased certain China Med bonds over their prevailing market price.  (Tr. 708-15; PSR ¶ 57).  These bonds

were in Lumiere's portfolio, and he found the broker to execute these above-market trades.  (Tr. 655, 707, 710).

### 5.    Valuation Standards and the Collapse of the Credit Fund

This, of course, was not how the valuation process was supposed to work.  Visium represented to investors that it would use independent prices from external sources.  (GX 906). Visium also represented to investors that the pricing function would be carried out independent of the trading function — meaning that the defendant and Plaford would not mark their own performance.  (GX 906).  As a portfolio manager, Lumiere was well aware of these representations to investors, and Lumiere himself certified repeatedly that he was in compliance with Visium's policies on the proper valuation of securities.  (GX 112).

In April 2013, the Defendant was fired for poor performance.  (Tr. 658, 679).  The remaining investment team was subsequently removed from the pricing process, and the scheme collapsed.  (Tr. 758-60).  In the middle of 2013, the Credit Fund received a string of redemption requests from investors, and Visium began to liquidate the Credit Fund's assets.  (Tr. 43-44).  By September 2013, the Credit Fund was almost entirely liquidated, with the exception of certain illiquid securities that Visium "side-pocketed."  (Tr. 694, 698).  As a result of its inability to liquidate those positions, Visium was unable to fully redeem certain investors.  (Tr. 899-90).  By the time the Credit Fund collapsed in around June 2013, investors had overpaid approximately $3,156,409 in fees as a result of the mismarking scheme.  (Tr. 912; GX 18).

### 6.    Audio Recordings of the Defendant

In recorded conversations both before and after Lumiere was fired from Visium, he brazenly discussed his mismarking scheme.  In one of these conversations, he told a friend not to tell anyone about "the way Visium portrays its P&L," and about the "fucking mismarking of the

book." (GX 1231).   In another conversation, the defendant stated that, based on their knowledge of the mismarking fraud at Visium, he could extort Plaford and Visium's CEO Jacob Gottlieb for $100 million.  (GX 1222).  In another recorded conversation, the defendant stated that Plaford has been "mismarking shit egregiously" in the Credit Fund since its inception in 2011.  (GX 1238). The Government also introduced numerous recordings in which Plaford instructed Lumiere to obtain predetermined price quotes from brokers, and Lumiere, in turn, then contacted brokers and obtained price quotes from brokers at the predetermined levels Plaford had previously provided to Lumiere.  (GX 1212, 1229, 1228, 1224).

### 7.   The Verdict

On January 19, 2017, the trial concluded when the jury found Lumiere guilty on all counts of the Indictment after less than two hours of deliberations.

### C.      Post-Trial Motions

After his conviction, the defendant replaced his trial counsel, Eric Creizman, with new counsel.  During various conferences and filings, Lumiere's new counsel indicated that he intended to argue that trial counsel was ineffective and that he was researching such claims, including the admission of the extortion call and trial counsel's development of a good faith defense.  (*E.g.*, Dkt. 87).  Lumiere's new counsel did not ultimately assert ineffective assistance of counsel claims his post-trial motions. On April 18, 2017, the Court denied the defendant's Rule 33 motion for a new trial in its entirety, finding the evidence of Lumiere's guilty was "overwhelming." *United States* v. *Lumiere*, 249 F. Supp. 3d 748, 749, 764-65 (S.D.N.Y. 2017).

### D.     Sentencing

On June 14, 2017, the Court sentenced Lumiere principally to 18 months' imprisonment.  Lumiere filed a notice of appeal and against replaced his counsel for appeal.  Before

filing a brief on appeal, Lumiere dismissed his appeal with prejudice and did not pursue a direct appeal.

## APPLICABLE LAW

### A.    Section 2255 Petitions

A prisoner in federal custody may move to vacate, set aside, or correct his sentence only "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such a sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  28 U.S.C. § 2255(a).  "Because collateral challenges are in tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack."  *Mui* v. *United States*, 614 F.3d 50, 53 (2d Cir. 2010) (internal quotation marks and citations omitted).  To succeed on a collateral attack on a final judgment under Section 2255, a petitioner must demonstrate either the existence of a "constitutional error . . . or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *United States* v. *Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (internal quotation marks and citations omitted); *see also Sanders* v. *United States*, 1 F. App'x 57, 58 (2d Cir. 2001) (summary order); *Cuoco* v. *United States*, 208 F.3d 27, 30 (2d Cir. 2000); *Rodriguez* v. *United States*, 2013 WL 6171618, at *1 (S.D.N.Y. Nov. 25, 2013).

The filing of a Section 2255 petition does not, by itself, obligate the district court to conduct an evidentiary proceeding.  *Newfield* v. *United States*, 565 F.2d 203, 207 (2d Cir. 1977) (filing of motion "does not entitle petitioner automatically to a hearing").  Rather, a district court may summarily dismiss a Section 2255 petition where the defendant submits no supporting

affidavit or fails to raise "detailed and controverted issues of fact." *Id.* Similarly, where the existing record "conclusively show[s] that the petitioner is entitled to no relief," summary dismissal may be appropriate. *Id.; see also* 28 U.S.C. § 2255; *United States* v. *Stantini*, 85 F.3d 9, 17 (2d Cir. 1996) (no need for further factual development because defendant failed to raise plausible ineffectiveness claim regarding attorney's performance in plea negotiations or at trial); *Hopkins* v. *Schillinger*, 866 F.2d 1185, 1211 (10th Cir. 1989) ("Conclusory allegations unsupported by specifics are insufficient to require a court to grant an evidentiary hearing, as are contentions that in the face of the record are wholly incredible."). Finally, "a district court need not assume the credibility of factual assertions, as it would in civil cases, where the assertions are contradicted by the record in the underlying proceeding." *Puglisi* v. *United States*, 586 F.3d 209, 214 (2d Cir. 2009) (collecting cases).

Even where a defendant's petition survives this initial hurdle, a district court is still not required to hold an evidentiary hearing, with live testimony and cross examination, in order to resolve disputed factual issues. Instead, the district court has the discretion to choose a "middle road" and resolve the petition based on written material, such as affidavits from relevant witnesses. *Pham* v. *United States*, 317 F.3d 178, 184 (2d Cir. 2003) ("Our precedent . . . permits a 'middle road' of deciding disputed facts on the basis of written submissions"); *Chang* v. *United States*, 250 F.3d 79, 86 (2d Cir. 2001) (finding it "within the district court's discretion" to choose the "middle road" of deciding the case based on written submissions, including affidavits).

## B.    Procedural Bar

"A motion under § 2255 is not a substitute for an appeal." *United States* v. *Munoz*, 143 F.3d 632, 637 (2d Cir. 1998). The "mandate rule . . . bars re-litigation of issues already decided on direct appeal." *Mui*, 614 F.3d at 53; *see also United States* v. *Sanin*, 252 F.3d 79, 83 (2d Cir.

2001) (per curiam) ("It is well-established that a § 2255 petition cannot be used to 'relitigate [issues] which were raised and considered on direct appeal.'" (quoting *Cabrera* v. *United States*, 972 F.2d 23, 25 (2d Cir. 1992))).

Similarly, a defendant is generally "barred from collaterally challenging a conviction under § 2255 on a ground that he failed to raise on direct appeal." *United States* v. *Thorn*, 659 F.3d 227, 231 (2d Cir. 2011); *see also Mui*, 614 F.3d at 53-54; *Zhang* v. *United States*, 506 F.3d 162, 166 (2d Cir. 2007). "An exception applies, however, if the defendant establishes (1) cause for the procedural default and ensuing prejudice or (2) actual innocence." *Thorn*, 659 F.3d at 231; *see also Bousley* v. *United States*, 523 U.S. 614, 622 (1998); *Gupta* v. *United States*, 913 F.3d 81, 84 (2d Cir. 2019); *Zhang*, 506 F.3d at 166. Establishing cause requires a showing that "some objective factor external to the defense impeded counsel's efforts to comply" with applicable procedural rules. *Murray* v. *Carrier*, 477 U.S. 478, 488 (1986). Prejudice means the claimed error "resulted in substantial disadvantage, infecting the entire trial with error of constitutional dimensions." *Gutierrez* v. *Smith*, 702 F.3d 103, 112 (2d Cir. 2012) (citation omitted). To demonstrate actual innocence, a petitioner must show "factual innocence, not mere legal insufficiency, and demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Thorn*, 659 F.3d at 233-34 (internal citation omitted).

### C.    Ineffective Assistance of Counsel

To prevail on a claim of ineffective assistance of counsel, a defendant must (1) overcome the strong presumption that counsel's conduct was reasonable by showing that his counsel's performance fell below "an objective standard of reasonableness" under "prevailing professional norms"; and (2) "affirmatively prove prejudice" by showing that "but for counsel's

unprofessional errors, the result of the proceeding would have been different." *Strickland* v. *Washington*, 466 U.S. 668, 687-89, 693-94 (1984); *accord Mayo* v. *Henderson*, 13 F.3d 528, 533 (2d Cir. 1994).  Only if both of these elements are satisfied can a petitioner demonstrate that his "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.

Under the first prong of the *Strickland* analysis, the reviewing court "'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' bearing in mind that '[t]here are countless ways to provide effective assistance in any given case' and that '[e]ven the best criminal defense attorneys would not defend a particular client in the same way.'" *United States* v. *Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990) (quoting *Strickland*, 466 U.S. at 689); *see also United States* v. *Venturella*, 391 F.3d 120, 135 (2d Cir. 2004) ("a reviewing court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" (internal quotations omitted)).

"The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Yarborough* v. *Gentry*, 540 U.S. 1, 8 (2003).  As the Supreme Court cautioned in *Strickland*:

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

*Strickland*, 466 U.S. at 689 (internal quotation omitted).

Such deference is particularly warranted when considering matters of trial strategy, which reviewing courts are "ill-suited to second-guess." *United States* v. *Luciano*, 158 F.3d 655, 660 (2d Cir. 1998). "As a rule, counsel's decision to stipulate to certain evidence, like his decisions to offer or object to evidence, involves a strategic choice, which is 'virtually unchallengeable' if made after thorough investigation." *United States* v. *Gaskin*, 364 F.3d 438, 468 (2d Cir. 2004); *see also Brown* v. *Artuz*, 124 F.3d 73, 77 (2d Cir. 1997) (identifying "what evidence should be introduced, what stipulations should be made, what objections should be raised, and what pre-trial motions should be filed" as matters that "primarily involve trial strategy and tactics" (internal quotations omitted)). "Actions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance." *United States* v. *Best*, 219 F.3d 192, 201 (2d Cir. 2000) (internal quotations omitted).

Under the second prong of the *Strickland* test, a defendant must meet the "heavy burden" of showing "actual prejudice." *Strickland*, 466 U.S. at 692. To satisfy the prejudice prong of *Strickland*, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see also Padilla* v. *Kentucky*, 130 S. Ct. 1473, 1482 (2010). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Mayo*, 13 F.3d at 534 (quoting *Strickland*, 466 U.S. at 694). A defendant cannot establish prejudice by showing merely that counsel's errors had "some conceivable effect" on the result, for "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Strickland*, 466 U.S. at 693. "[D]efects in assistance that have no probable effect upon the trial's outcome do not establish a constitutional violation." *Mickens* v. *Taylor*, 535 U.S. 162, 166 (2002).

Moreover, the Supreme Court has noted that the "object of an ineffectiveness claim is not to grade counsel's performance," and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697. Applying that teaching, the Second Circuit has often rejected ineffectiveness claims by determining that, in view of the strength of the prosecution's case, the defendant is unable to establish prejudice. *See, e.g., United States* v. *Caracappa*, 614 F.3d 30, 48-49 (2d Cir. 2010) (affirming district court's denial of ineffectiveness claim based on failure to show prejudice); *Strouse* v. *Leonardo*, 928 F.2d 548, 556 (2d Cir. 1991) (declining to address alleged deficiencies of counsel given the overwhelming evidence of guilt); *United States* v. *Simmons*, 923 F.2d 934, 956 (2d Cir. 1991) ("[G]iven the plethora of evidence against [the appellant], there is little reason to believe that alternative counsel would have fared any better.").

### D.      Conflicts of Interest

The Sixth Amendment provides a criminal defendant with the right to the effective assistance of counsel. *See Strickland*, 466 U.S. 668 (1984). This "right to effective assistance of counsel includes the right to representation by conflict-free counsel." *United States* v. *Schwarz*, 283 F.3d 76, 90 (2d Cir. 2002) (internal quotation marks omitted).

The Second Circuit "group[s] attorney conflicts of interest into three general categories." *United States* v. *Williams*, 372 F.3d 96, 102 (2d Cir. 2004). "The first category describes those conflicts that are so severe that they are deemed *per se* violations of the Sixth Amendment," such as where "trial counsel is not authorized to practice law and where trial counsel is implicated in the same or closely related criminal conduct for which the defendant is on trial." *Id.* at 102-03 (internal quotation marks omitted). The second category consists of "actual conflict[s] of interest." *Id*. at 102 (emphasis omitted). "An attorney has an actual, as opposed to a

14

potential, conflict of interest when, during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action." *Schwarz*, 283 F.3d at 91 (internal quotation marks omitted).  Finally, the third category consists of "potential conflict[s] of interest."  *Williams*, 372 F.3d at 102 (emphasis omitted).  An attorney has a potential conflict of interest if "the interests of the defendant may place the attorney under inconsistent duties at some time in the future."  *Id.* (internal quotation marks omitted).

In order to prevail on a claim of an actual conflict of interest, a defendant must show more than just that counsel's interests diverged from the defendant's on some material legal or factual issue; that is, he must show more than just the mere existence of an actual conflict. *Schwarz*, 283 F.3d at 92 ("The finding of an actual conflict, however, is only the first step in determining whether [a defendant] has established his claim of ineffective assistance of counsel."). In addition, a defendant "must also show that the actual conflict adversely affected [counsel's] performance by demonstrating that a lapse in representation resulted from the conflict." *Id.*; *see also, e.g., Triana* v. *United States*, 205 F.3d 36, 40-41 (2d Cir. 2000) (defendant must "show[] that counsel's interests diverged from the defendant's on some material legal or factual issue and resulted in an actual lapse in representation.") (internal quotation marks omitted).

To prove a lapse in representation is, in turn, a two-step process that requires "a defendant [to] demonstrate that some plausible alternative defense strategy or tactic might have been pursued, and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests."  *Schwarz*, 283 F.3d at 92 (internal quotation marks omitted); *see also Triana*, 205 F.3d at 41 ("Such a lapse of representation occurs when counsel, acting under a divided loyalty, forgoes some plausible alternative strategy of defense.").

15

In other words, a defendant may not simply show that an alternative strategy was forgone, but must show that the alternative strategy was forgone because of the conflict. *See Williams*, 372 F.3d at 106 (defendant must show that "lapse in representation resulted from the conflict"); *Winkler* v. *Keane*, 7 F.3d 304, 309 (2d Cir. 1993) (same). However, once a defendant has shown that an alternative strategy was forgone as a result of counsel's actual conflict, he need not "show that the lapse in representation affected the outcome of the trial." *Schwarz*, 283 F.3d at 92. Rather, in such circumstances, "prejudice is presumed." *Id.* at 91.

If the defendant can show only a potential conflict of interest, to obtain relief he has the heavier burden of establishing that the conflict resulted in prejudice, rather than simply establishing that it had an adverse effect upon counsel's representation. *See Armienti* v. *United States*, 313 F.3d 807, 810 (2d Cir. 2002). Thus, "[i]f the defendant establishes the mere possibility of a conflict of interest," the ordinary test for ineffective assistance of counsel applies, requiring the defendant to show "that counsel's performance fell below an objective standard of reasonableness and the reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *United States* v. *Fulton*, 5 F.3d 605, 609 (2d Cir. 1993) (internal citations and quotation marks omitted) (citing *Strickland*)).

## THE INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS ARE WITHOUT MERIT

Lumiere's ineffectiveness arguments amount to nothing more than an attempt to "Monday-morning quarterback" trial counsel's reasoned trial strategy. The Court should reject them out of hand because the defendant is generally barred from raising the claims, having not pursued a direct appeal, and because he does not come close to meeting the requirements of *Strickland*. There is no basis to grant the relief, including because, as Judge Rakoff found in

denying Lumiere's post-trial motions, the evidence of Lumiere's guilty was "overwhelming." *Lumiere*, 249 F. Supp. 3d at 749, 764-65.

### A.  Trial Counsel Was Not Conflicted

The gravamen of Lumiere's conflict claim appears to be that his trial attorney, Eric Creizman, placed Visium's interests above Lumiere's at trial because Visium paid Creizman's fees and there was a joint defense agreement between Lumiere and Visium.  (Pet. 3-4).  Lumiere claims this purported conflict manifested itself at trial because Creizman set Lumiere up as the "fall guy" for the mismarking and because Creizman failed to advance the defense that Lumiere had a good faith belief that the broker quotes he obtained were accurate.  (Pet. 3, 15).  These claims can be swiftly rejected.

As a threshold matter, Lumiere procedurally defaulted this claim by failing to raise it on direct appeal.  *See Thorn*, 659 F.3d at 231; *Mui*, 614 F.3d at 53-54; *Zhang*, 506 F.3d at 166.

What is more, Lumiere's claims fail because the lapses in representation that he alleges that stem from the conflict — setting him up as the fall guy and not pursuing a good faith defense — simply did not exist.  Both the trial record and the detailed declaration of Creizman demonstrate that Creizman, in his jury addresses and in his vigorous cross examination, argued that others — besides Lumiere — were responsible for the mismarking and that Lumiere had a good faith belief in the accuracy of the broker quotes.

For example, in his opening statement, Creizman stated, "[l]et me be clear, and the evidence will show this, Mr. Lumiere believed, in good faith, that those prices that he went to the brokers to confirm were accurate, reasonable, and justifiable."  (Tr. 20-21).  Creizman also pinned the blame for the mismarking on Plaford and Thorell, and portrayed Visium's CEO Jacob Gottlieb as vindictive for firing Lumiere because of Gottlieb's divorce from Lumiere's sister.  (Tr. 22-24).

17

Trial counsel continued to press these themes and defenses during trial.  For example, he emphasized deficiencies in Visium's compliance function, the inference being that others were to blame for the mismarking.  (Tr. 142-44).  Counsel also emphasized that Plaford (and not Lumiere) had final say on buying and selling decision, had more input on valuations, and generally had final say on matters relating to the management of the Credit Fund.  (Tr. 148-49).  Creizman also suggested that Lumiere was following Visium's policy (and therefore acted in good faith) in seeking broker quotes, rather than consulting with established pricing sources like Bloomberg and Reuters.  (Tr. 195-96).  During the cross examination of Vandersnow, one of the corrupt brokers, Creizman highlighted Vandersnow's experience in the industry to demonstrate Lumiere's good faith reliance on the quotes provided by him.  (Tr. 511-12).  During the cross examination of Sudarshan Jain, a member of Visium's Operations group, Creizman elicited that numerous individuals at Visium were aware of the quotes being provided by the brokers whom Lumiere used. (Tr. 577-78).  This testimony served to underscore Creizman's argument that Lumiere had a good faith belief in their accuracy; otherwise Lumiere would not have shared the quotes so widely.  During the cross examination of Plaford, Creizman suggested that Plaford stood to gain most from the mismarking, not Lumiere.  (Tr. 737).

These themes also featured prominently in the defense summation.  Trial counsel explicitly pinned the blame on others at Visium:  "What it really boils down to, though, is that the Government wants to hold Stefan Lumiere responsible for the conduct of other people."  (Tr. 1013).  Creizman also explicitly argued that Lumiere believed in the price quotes:  "You heard no evidence whatsoever from anyone — not a single witness — that Stefan Lumiere did not believe, in good faith, in the prices that Chris Plaford marked the securities in the Credit Fund — not while Stefan Lumiere was getting those broker quotes."  (Tr. 1016-17).

18

Thus, even assuming *arguendo* that Creizman suffered from an actual conflict of interest, Lumiere has not demonstrated that the conflict caused a "lapse in representation." *Schwarz*, 283 F.3d at 92.[4]   Creizman did not permit Lumiere to be the "fall guy."  In fact, he strenuously argued that others at Visium perpetrated the fraud and that Lumiere had a good faith belief in the quotes he received.

In any event, Creizman did not operate under any actual conflict of interest.  To the extent there were common interest communications between Lumiere and Visium, those communications do not, by themselves, create a conflict.  (Creizman Decl. ¶ 11).  Lumiere must show that his interests diverged from Creizman's on a material issue at trial.  As noted in Creizman's Declaration, there was never such a divergence because Lumiere sanctioned Creizman's fee arrangement with Visium, was aware of Creizman's communications with Visium, and Creizman did not forgo any viable defenses as a result of this arrangement.

Lumiere (not his trial counsel) first had the idea of seeking indemnification and the advancement of legal fees from Visium.  (Creizman Decl. ¶ 6).  Tellingly, in his Petition, Lumiere admits that he agreed to this indemnification.  (Pet. 5).  Trial counsel also made it clear to Lumiere that if he did not want to be indemnified by Visium, Creizman would represent Lumiere without such a fee advancement.  (Creizman Decl. ¶ 7).  After Lumiere entered into the indemnification agreement with Visium, Creizman kept Lumiere informed about all of his communications with Visium and did not share any materials with Visium without Lumiere's permission.  (Creizman Decl. ¶ 8).

---

[4]      Nor is there any merit to Lumiere's suggestion that this purported conflict resulted in Creizman advising Lumiere not to cooperate with the Government.  (Pet. 6-7).  Lumiere went to trial because he believed he was innocent.  (Creizman Decl. ¶ 12).  Given his profession of innocence, it was impossible for him to cooperate with the Government, which did not credit Lumiere during pre-trial proffers.  (*Id.*).

In addition, as Creizman explains, the common interest communications with Visium were in Lumiere's interests, including because Creizman learned about the valuation process, met with counsel for several Visium executives, and was able to subpoena and obtain documents for use during the cross-examination of Plaford.  (Creizman Decl. ¶ 9).  Nor did the existence of these common interest communications prevent trial counsel from presenting evidence at trial that was contrary to the interests of Visium and Gottlieb.  (Creizman Decl. ¶ 12). As noted above, Creizman repeatedly criticized Visium's compliance function and suggested that Gottlieb had an animus toward Lumiere.

At most, Creizman had a potential conflict of interest due to his joint defense arrangement with Visium.  This potential conflict of interest did not prejudice Lumiere.  As the Court noted in denying the Defendant's Rule 33 motion, the evidence of the defendant's guilt was "overwhelming."  *Lumiere*, 249 F. Supp. 3d at 749, 765.   In sum, it consisted of numerous recordings where the defendant essentially acknowledged his guilt, the testimony of three co-conspirators who identified the defendant as leading the scheme, and documentary evidence of the fraudulent price quotes that the defendant obtained.

Accordingly, the defendant's conflict of interest claims should be rejected.

**B.    Trial Counsel Adequately Developed Viable Defenses**

Next, Lumiere contends that trial counsel was ineffective for failing to call a number of witnesses who purportedly could have helped establish his good faith defense.  (Pet. 19-22).  These claims can also be swiftly denied.

A defendant cannot prevail on a claim of ineffective assistance merely because he believes that his counsel's strategy was inadequate.  *United States* v. *Sanchez*, 790 F.2d 245, 253 (2d Cir. 1986).  Counsel's reasonably prudent decisions concerning the "selective introduction of

evidence, stipulations, objections, and pre-trial motions" are generally upheld as matters of trial strategy. *See United States* v. *Plitman,* 194 F.3d 59, 63–64 (2d Cir. 1999). Likewise, tactical decisions concerning which witnesses to introduce, if any, are "ordinarily not viewed as a lapse in professional representation." *Best,* 219 F.3d at 201 (quoting *United States* v. *Schmidt,* 105 F.3d 82, 90 (2d Cir. 1997)). "Actions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance." *United States* v. *Bayless,* 201 F.3d 116, 130-31 (2d Cir. 2000) (citation omitted).

Lumiere first complains that Creizman did not call witnesses to establish that Visium's Valuation Committee was responsible for the mismarking. This claim ignores Lumiere's recorded comments that the Valuation Committee was incompetent: "The valuation committee is Josh Rozenberg, who has never taken a fucking finance classes." (GX 1219). In light of these comments, it was not a plausible defense to suggest that the Valuation Committee was at fault for perpetuating a long term and sophisticated fraud. Creizman's decision not to call Rozenberg was certainly a reasonable strategic choice.

Lumiere next complains that trial counsel erred in failing to call purported third-party witnesses who would have testified about their valuations of ATI and other securities. Trial counsel conducted an extensive investigation concerning these third parties and served many of them with Rule 17 defense subpoenas. (Creizman Decl. ¶ 14 & Exs. A, B). Trial counsel's decision not to call these witnesses was a reasonable, tactical determination that they would not have been favorable to the defense. (Creizman Decl. ¶ 18). Indeed, the two third parties who testified at trial about the valuations Lumiere obtained provided devastating evidence of his guilt, because these two firms valued securities in Lumiere's portfolio at considerably lower prices.

Finally, as noted above, trial counsel vigorously cross examined the trial witnesses on the two topics Lumiere now claims he ignored — Lumiere's good faith and the complicity of others at Visium.

Accordingly, Creizman's performance did not fall below an objective standard of reasonableness.

### C.     Trial Counsel Reasonably Decided Not to Call Expert Witnesses

Lumiere claims that his trial counsel was ineffective for (a) failing to call an expert witness, David Tawil, "to define[] confusing terms used through this case," to "contradict[] every argument the Prosecutor had against the Petitioner," and to show that "Lumiere's actions conformed legitimately to within [sic] industry standards" (Pet. 24); and (b) allowing his law partner to handle the mid-trial *Daubert* hearing. (Pet. 26-29). Both claims should be rejected.[5]

After Lumiere noticed Tawil as an expert, the Government moved to preclude certain portions of his testimony (Dkt. 44), and the Court held a *Daubert* hearing on January 12, 2017. Trial counsel explained in his declaration that the decision not to call Tawil was a strategic one, made in consultation with a consulting expert: "The decisions not to call any witnesses were based on tactical determinations. As discussed above, the determination not to call the expert witness was based on a considered evaluation of the risks and benefits of the expert witness's likely direct testimony and his likely answers on cross-examination, which we were able to predict based on our preparation of the expert witness, and based on the analysis of our consulting expert witness." (Creizman Decl. ¶ 18). "In considering . . . whether counsel's performance fell below

---

[5]      As noted, Lumiere replaced his trial counsel for post-trial motions and sentencings. Replacement counsel indicated that he intended to investigate Creizman's failure to call Tawil as a witness. (Dkt. 87, at 15). Replacement counsel did not make any such arguments in the post-trial motions that were filed.

an objective standard of reasonableness, a court must bear in mind both that counsel has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process, and that counsel must have wide latitude in making tactical decisions."  *Henry* v. *Poole*, 409 F.3d 48, 63 (2d Cir. 2005) (citation omitted).  "Actions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance."  *Bayless*, 201 F.3d at 130-31. Accordingly, Lumiere's claim fails.

There is similarly no basis to argue that trial counsel acted inadequately in allowing his partner to handle the *Daubert* hearing.  Trial counsel's partner, Ms. Madrigal, was fully familiar with the case and complex securities transactions. *See* https://piercebainbridge.com/melissa-madrigal.

## D.    Trial Counsel Adequately Objected to the Government's Evidence and Arguments

Lumiere next claims that his trial counsel was ineffective for failing to object to (a) the Government's alleged material misstatements at trial that Lumiere was a portfolio manager and generally during summations, and the Government's use of an allegedly incorrect transcription of a recorded call where Lumiere discussed extorting his boss, Jacob Gottlieb; and (b) the Government's alleged use of perjured testimony from Thorell, Plaford, Vandersnow, David Keily, and Jan Jindra.  (Pet. 29-49).

As a threshold matter, Lumiere procedurally defaulted these claims, having failed to file a direct appeal.  *See Thorn*, 659 F.3d at 231 (defendant is generally "barred from collaterally challenging a conviction under § 2255 on a ground that he failed to raise on direct appeal"); *Mui*, 614 F.3d at 53-54; *Zhang*, 506 F.3d at 166; *see also* Oct. 26, 2018 Mem. & Order 6, *Lumiere* v. *United States*, 18 Cv. 9170 (JSR) (BCM) (Dkt. 12) ("'In this Circuit, a claim of perjury or prosecutorial misconduct is subject to the procedural default rule.'" (quoting *Blake* v. *United*

*States*, 2012 WL 3154989, at *5 (S.D.N.Y. Aug 3, 2012))). Lumiere can also not meet the requirements of *Strickland.*

The Government addresses each category of claims in turn:

*First*, the evidence established that Lumiere was a portfolio manager at Visium. (GX 106, 658, 1160).  Trial counsel conceded as much in his closing statement, but argued that Lumiere was a portfolio manager for a different portfolio of securities that "had nothing to do with the overvaluing that's involved in this case."  (Tr. 1036).  Thus, this tangential argument was put before the jury by trial counsel, and, in any event, Lumiere failed to raise it on appeal.

*Second*, Lumiere argues that the Government made misstatements in arguments to the jury:  "The Prosecutor made numerous and repetitive obvious misstatements of facts choosing to ignore obvious facts.  This led Prosecutors to argue irrational and non-sensical theories while failing to investigate and understand the issues and in several cases preferring to simply ignore the truth turning the trial into a persecution of the defendant."  (Pet. 29). The Government did not make misstatements during its summations or otherwise engage in the conduct Lumiere alleges in a conclusory fashion.  The evidence at trial established, as Judge Rakoff found in denying Lumiere's post-trial motions, that Lumiere's guilt was "overwhelming."  *Lumiere*, 249 F. Supp. 3d at 749, 765.  In any event, Lumiere's claim is barred because he is simply seeking to relitigate his claim, which he unsuccessfully advanced in his post-trial motion but failed to raise on direct appeal, that the Government made misstatements during its summations, including by arguing that there was no evidence that Lumiere acted in good faith.  As Judge Rakoff found, this argument was "frivolous" and "perfectly proper rebuttal."  *Id.* at 763.

*Third*, the Government did not offer an incorrect transcription of the extortion call or improperly use this evidence at trial.  (GX 1222 & 1222-A).  Lumiere plainly said on the

recording, "Well, first we can extort him."  *(Id.)*  Lumiere's effort to insert a "not" into the

transcription — "Well, first we ca*n't* extort him" — is fiction.  Judge Rakoff moreover instructed

the jury:  "[P]lease remember that the transcripts are just an aid, and it is the recordings themselves

that are in evidence."  (Tr. 1098).  And the defendant made a post-trial motion arguing that the

extortion conversation should have been excluded as improper propensity evidence.  Judge Rakoff

properly rejected this argument:

> [T]he Government, both to rebut Lumiere's innocent explanation for
> his recordings, and to reinforce its own more sinister explanation,
> introduced the extortion recording, which narrowly and precisely
> showed just how Lumiere viewed recordings of the mismarking
> scheme: as fodder for blackmail.  That is strong evidence that
> Lumiere's own recordings were made for the same purpose, thereby
> demonstrating his lack of good faith.

*Lumiere*, 349 F. Supp. 3d at 762.  This claim is procedurally barred as well, having not been

raised on direct appeal.

> *Fourth*, Lumiere variously claims that many of the Government's witnesses

committed perjury.  Lumiere focuses on Thorell, a Visium trader; Plaford, a Visium portfolio

manager; Vandersnow, a corrupt broker; David Keily, Visium's former General Counsel; and Jan

Jindra, an SEC economist.  Having failed to raise these claims on direct appeal, the defendant has

defaulted them.  Moreover, the defendant has not shown that any of the witnesses (i) "actually

committed perjury," (ii) "the alleged perjury was material," (iii) "the Government knew or should

have known of the alleged perjury at time of trial," or  (iv) "the perjured testimony remained

undisclosed during trial." *United States* v. *Zichettello*, 208 F.3d 72, 102 (2d Cir. 2000); *see also*

*United States* v. *Walters*, 910 F.3d 11 (2d Cir. 2018).  Furthermore, trial counsel engaged in

extensive cross-examination of these witnesses and sought to impeach and undermine their

credibility before the jury.  (*See* Creizman ¶ 17 ("The transcripts of trial demonstrate what I believe is skillful and effective cross examination")).

*        *        *        *        *

Accordingly, Lumiere's claims that the Government variously made misstatements and suborned perjury, and that trial counsel failed to objected to such misconduct, are barred and plainly do not meet the *Strickland* standard.

### E.    Trial Counsel Was Not Ineffective "At All Stages"

Finally, Lumiere alleges, in a conclusory fashion, that his trial counsel was ineffective "at all stages" of the trial, because he (a) "[d]id not call review [sic] and correct transcripts that had clear highly prejudicial errors"; (b) "[f]ailed to effectively review discovery"; (c) "did not go through phone records and subpoena returns to show that most of the calls from Petitioner's cell phone were when he was traveling or at home and that many calls were placed on landline's [sic] from Visium when on site and similarly called  Broker's landlines"; (d) "did not add a securities lawyer . . . nor did he have any members on his team with securities experience"; and (e) "fail[ed] to follow through on Rule 16 violation[s]."  (Pet. 50).

These complaints largely mirror or repeat his prior claims.  Not only are they refuted by trial counsel's detailed declaration, but they do not establish that trial counsel's performance fell below "an objective standard of reasonableness" under "prevailing professional norms," or show prejudice.  *Strickland*, 466 U.S. at 687-89, 693-94.  They also ignore Lumiere's consulting expert's conclusions, including that the "[o]nly defense here is that Stefan believed in marks.  Can't get into whether they were valued correctly because pretty obvious that most were marked wrong."  (Creizman Decl. ¶ 18).

26

## CONCLUSION

For the reasons set forth above, the Government respectfully submits that the Court should deny the petitioner's motion for relief pursuant to 28 U.S.C. § 2255.

Dated:     New York, New York
           August 6, 2019

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By:   /s/
      Ian McGinley
      Joshua A. Naftalis
      Assistant United States Attorneys
      (212) 637-2257 / 2310

27