#42   November 14, 2019

**BY Hand Delivery to *Pro Se* Intake Unit**
The Honorable Barbara Moses
United States District Court
Daniel Patrick Moynihan United States Courthouse
Southern District of New York
500 Pearl Street
New York, NY 10007

Re: *Stefan Lumiere, Petitioner, against, United States of America, Respondent*:
    18 CV. 9170 (JSR) (BCM) / 16 cr. 483

Dear Justice Moses:

I am the petitioner, *pro se,* in the above captioned habeas proceedings, referred to Your Honor by Order of Justice Jed S. Rakoff filed October 10, 2018.

I respectfully request, pursuant to Federal Rules of Civil Procedure 5.2(e), that a protective be issued with respect to the enclosed affidavit (also attached to my reply papers). Upon request of the Affiant, I am submitting a redacted version of the affidavit in further support of my 28 U.S.C.§ 2255. Should the Court require and unredacted affidavit, I respectfully request that a protective order be issued so that I can provide the Court with same.

Thank you for your consideration.

Respectfully submitted,

STEFAN LUMIERE
Petitioner, *Pro Se*
(212) 397-8059

Enclosure
cc:   AUSA Ian McGinley (via email only) without enclosure
      AUSA Joshua A. Naftalis (via email only) without enclosure



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ x
                          :

STEFAN LUMIERE                 :
Petitioner                     :    Docket No.:
                           :    18-CV-1970 (JSR/BCM)
    -v-                    :    16-CR-483 (JSR)
                           :

UNITED STATES OF AMERICA   :    AFFIDAVIT
Respondent                 :

                           OF ██████████

------------------------------------ x

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████

████████████, being duly sworn, hereby declares under penalties of perjury pursuant to 28 U.S.C. §1746:

1. My name is ████████████, I am over 18 years old and not party to this action. I submit this Affidavit in support of Stefan Lumiere's motion to vacate his conviction in United States v. Lumiere, 16 CR 483 (JSR), pursuant to 28 U.S.C. § 2255.

2. I am a relative of Petitioner in the instant action, Stefan Lumiere (hereinafter referred to as "Stefan").

3. In or about the period between January 17, 2016 and June 16, 2017, upon reason and belief, I was party to discussions both directly and jointly with Stefan's post-trial counsel herein referred to as Foley at the law firm Foley & Lardner ("Foley"). I in substance assisted

Foley with explanations of key financial concepts and to help procure and review historical financial data on securities.

4. During this period and on multiple occasions, upon information and belief, Foley stated that in substance that they believed it would not be strategically wise to attack Creizman's performance or credibility at that stage in post-trial litigation or to address his ineffectiveness in the reply papers.  Upon information and belief, Foley explained in substance that the decision was a result of the limited time that they as new counsel would have to prepare for Stefan's filings, hence they would in substance need Creizman's assistance with gathering information, impressions from trial, and discovery.  Upon information and belief, Foley advised both Stefan and me to remain cordial with Creizman in case they would need information from him.

5. Beginning in or about September 2017 until at least after Stefan decided to go Pro Se, during the period after Stefan engaged the Law Offices of Jeffrey Lichtman ("Lichtman") as appellate counsel, I assisted in substance with matters such as communications between Stefan and Einhorn for appeal and habeas questions.  Upon reason and belief, I also in substance assisted with similar explanations of financial concepts and collection of data to support their arguments for Stefan's 2255 Petition.

6. On or about September 16, 2017, I reached out to Jeffrey Einhorn ("Einhorn") an attorney of the Law Offices of Jeffrey Lichtman and was in substance attempting to coordinate with alternate counsel on the direct appeal.

7. On or about September 19, 2017, upon reason and belief, Stefan told me in substance that he had not yet heard from Einhorn but wanted me to discuss his appeal situation with alternate counsel.  Upon reason and belief, he also asked me to ask Einhorn to mail him court transcripts.  Upon reason and belief, Stefan also asked in substance that I send him

law books and to seek an alternate counsel's opinion on direct appeal and habeas filings, and in substance timing and procedures for each.

8. On or about September 22, 2017, Stefan asked me in substance to ask Einhorn if he could file for a motion to delay direct appeal and to check other counsel's responses as well and upon reason and belief communicated that Einhorn had not yet accepted his invitation which upon reason and belief may have been due to an incorrect email address.

9. On or about September 28, 2017, Stefan again asked in substance I seek alternate counsel's advice on an Appeal and the possibility of filing for a delay and in substance to ask Einhorn about appellate issues.

10. On or about October 2, 2017, I communicated with Stefan and he asked me to in substance speak to Einhorn about filing for an extension to his appeal and he had in substance told me that Einhorn had not yet set up a privileged call with him yet or sent any emails yet to discuss the issue since Stefan surrendered to Otisville on or about September 12, 2017. On or about the same day, I asked Einhorn in substance about filing for an extension to Stefan's direct appeal. In response, Einhorn told me in substance during several telephone conversations that there was no way to file for an extension of a direct appeal and that he would not do it, and that Stefan should forget about it.

11. In or about the same period, Stefan expressed to me that he was concerned that Einhorn was not being truthful with him about the matters of the appeal, and that he was concerned that Einhorn's statement to me about filing for an extension was not forthcoming. Stefan further communicated that he did not have confidence in Einhorn's representation and concerned that he was not advocating for him. In or about the same period, I reached out to attorney Nat Dershowitz ("Dershowitz) on behalf of Stefan.

12. On or about October 9, 2017, I contacted Dershowitz who I had asked to in substance review Stefan's case and to provide counsel. Dershowitz asked in substance that I have Einhorn send me a draft of the direct appeal he had prepared, which I did. I contacted Einhorn and asked in substance that he send me a draft of the direct appeal in any format so that another attorney could review and offer his opinion.

13. On or around October 9, 2017, Einhorn told me in a phone call that in substance that he did all the work for the direct appeal but had not prepared anything in writing.

14. On or about October 10, 2017, Dershowitz emailed me asking me in substance for the draft of Stefan's opening appeal brief that Einhorn should have prepared for the filing deadline.

15. On or about that same day, I replied to Dershowitz and relayed in substance what Einhorn had told me over the phone, which was that he had not prepared a draft of the direct appeal, but that he had done all the work.

16. On or about October 11, 2017, I spoke to Dershowitz by telephone, during which conversation he stated to me in substance that he was concerned with the fact that Einhorn had not prepared a draft of the direct appeal and had no notes or work product drafted that he could send over.

17. On or about that same day, Einhorn sent me an email stating in substance that he had scheduled a privileged call with Stefan for the next day, October 12, 2017 at 10:30 AM. Later in a telephone conversation, I asked Einhorn in substance to contact Dershowitz to discuss the preparation of Stefan's appeal. Upon information and belief, Einhorn did not mention to me that he had filed a waiver of appeal during this immediate time period. On or about the same day, I also sent an email to Einhorn which in substance included Dershowitz' contact information.

18. On or about October 20, 2017, Dershowitz sent me an email stating in substance that he had not yet received a phone call from Einhorn.

19. On or about that same day, I sent an email to Einhorn in substance reminding him to contact Dershowitz to which he responded in substance that he would do so on or about Monday October 23, 2017.

20. On or about October 23, 2017, Dershowitz sent me an email stating in substance that he had a conversation with Einhorn and from their discussion, it seemed to Dershowitz that Einhorn had a good handle on the matter. On or about that day, Einhorn emailed me stating in substance that he had a very long call with Dershowitz and that their views were aligned.

21. In or about 2018, Stefan and I began in substance discussing legal options on our own, such as turning to a 2255 petition, as Stefan had in substance communicated to me that Einhorn would not take action on Stefan's direct appeal request.

22. While gathering notes and Affidavits in support of Stefan, I spoke to Einhorn about in substance his reviewing discovery for Stefan because Stefan had in substance communicated to me that the Bureau of Prisons refused to allow Stefan access to his discovery due to the volume of the files that needed to be reviewed. Einhorn stated that in substance that he was a small firm and that he had given Stefan a discount rate for his appeal and therefore he was going to provide a discounted appeal which would not include a review of the discovery. Further to this, Einhorn in substance assigned to me the task of reaching out to witnesses in order to seek affidavits, and to pull up files and transcripts.

23. During this same period, Einhorn had told me in substance that he would file a 2255 petition, but then he was done. When I reviewed the contract he had with Stefan, it stated in substance that replies and oral arguments were included for both direct appeal and habeas, to which Einhorn replied in substance that he defined oral arguments as conference

calls and not an evidentiary hearing. Einhorn then confirmed in substance what he had told
me on the phone, that an evidentiary hearing would cost an additional $65,0000 per week.

24. On or about August 2nd 2018, while Stefan discussed with me in substance that he was
wary due to the responses he had received from Einhorn and concerned that he was not
advocating for him.  He communicated to me both by telephone and email that in substance
he wanted me to help him investigate the ability to file for an extension of time to file his
habeas.  Einhorn on or about the same date communicated that he had done the research
and could not file for an extension under these circumstances.

25. In or about October of 2018, I communicated with Einhorn asking in substance for a
progress report on when he would have a draft the 2255 petition for Stefan and myself to
review, and he stated in substance that he would not have a draft until approximately a
week before it was due.

26. On or about October 1, 2018, Stefan sent me by email, which appeared in substance to be a
compilation of emails which I understood to be his writing of arguments that he had put
together on the prison email system.  He asked me in substance to help him sort and assist
with ordering them into a word document for his submission in the event Einhorn did not
have anything produced.  On or about October 4, 2018, which I understood to be
approximately one week from the deadline for Stefan to file the 2555 petition, I
communicated with Einhorn in substance asking about receiving a draft of the 2255, and
his response was that in substance he would likely not have one prepared until on or about
the day it was due and that he would likely file it electronically.  Upon information and
belief, I in substance communicated this information to Stefan

27. On or about the next day, I communicated with Stefan who said in substance that he had
filed the emails with arguments as his 2255 and instructed me to notify Einhorn that in

substance he was not authorized to submit anything on Stefan's behalf, and to send him any work product to date. I communicated this in substance to Einhorn as Stefan had in substance requested.

28. Upon information and belief, while doing some legwork for Einhorn on Stefan's appeal (which Einhorn never, in fact, filed) and subsequently aiding a corporate counsel to in substance request affidavits, I did reach out by email, text and/or telephone to a several of the individuals listed on the appendix appended hereto. Upon reason and belief, I had discussions with a few of the people listed, some whom worked at Visium and some upon information and belief who worked at various advisory firms and law firms. I was able to get some affidavits, one from a restructuring attorney and one from a restructuring advisor neither of whom had been contacted by Creizman. There were some listed in the Appendix that did agree in substance with some of the facts requested, while others who in substance claimed to have no knowledge and others who in substance did not respond. One person that I was able to communicate with indicated in substance that Stefan was not responsible for the Credit Fund and that Jason Thorell ("Thorell") acted out of greed and lied and did not care about whose lives he impacted. However, upon information and belief, all of the people on the list that I did communicate with in some form, for diverse reasons stated in substance that they would not be willing or not able to provide an affidavit. Upon information and belief, one party stated in substance that it was due to a ongoing litigation in ChinaMed ("CMED"). Upon information and belief, one stated in substance that he recognized the tiering structure of CMED and that those who funded the litigation would get more. One stated in substance that he feared impact to his career. One stated in substance that their firms would not allow it. (Appendix appended of those I did communicate or attempt to communicate with)

29. Upon information and belief, at no point did Creizman or his staff contact me about details

of my employment or ask me to testify as to those points. Had I been notified by Creizman

that certain information would be alleged, upon information and belief, I would have been

willing to testify in order to offer the Court clarity to the following points:

30. In or around the period from October 2007 through May 2013, I had changed employment

several times.   Upon information and belief, during the times when I changed firms, there

were several periods when I was not employed and therefore my understanding was that I

would not have been affiliated with any securities firm and upon information and belief

therefore not covering any accounts of Visium Asset Management ("Visium") as an

institutional salesperson during those intermittent periods.   Upon information and belief

and to my recollection, one of those periods was a confusing one occurred in or about 2009

where FINRA registered me as working at Summit beginning on or about October 21,

2009. However, upon information and belief while I did officially leave ICAP on or about

October 7, 2009, upon information and belief due to lengthy delays with Summit Securities

setting up the infrastructure for equity trading, it is my recollection that I did not actually

begin trading securities with any firm until on or about March 25, 2010 and therefore

during this period, upon information and belief, I would not have been covering Visium or

any accounts.   As for GFI, upon information and belief, FINRA erroneously has me

registered from September 8, 2010 to August 1, 2012, yet my official resignation date was

July 2, 2012.

31. While I was employed as an institutional salesperson or research salesperson, upon

information and belief, I did have accounts open with Visium Asset Management. During

my employment with GFI securities, upon information and belief, I had an ongoing GFI

compliance monitored daily chat room open with Visium traders including to my

recollection Paul Lee, Justin Lee and Head Trader Lesley Kelly. To the best of my
knowledge, I also had similar chat rooms open with Visium traders while working at other
firms including MKM Partners and Maxim Group. Upon my recollection, the Visium
traders would give me direct trading orders to execute for Visium directly in the chat room.
Upon information and belief, at no point did anybody claim or allege that my trading
relationship was concealed at Visium.

32. During the periods when I covered Visium as an institutional salesperson, it is my
recollection that I had come into Visium offices numerous times accompanied by either
other salespeople and/or analysts to meet with other members of Visium Credit, Visium
Global and Visium Balanced which included traders, analysts and portfolio managers.  It is
my recollection that on one occasion, I came to Visium offices while working at MKM
Partners accompanied by MKM strategist Michael Darda to give a presentation.  It is my
recollection and belief that at this meeting, several Visium employees attended including
Jacob Gottlieb.  Upon information and belief and to my recollection, I did confer with Bob
Kim who I understood to be the Director of Research at Visium to schedule the meeting.

33. During the period October 2007 through May 2013, upon information and belief, I had at
least one direct telephone conversation with Mark Gottlieb and met with him and another
salesperson at his office at least once and one direct face to face conversation with Jacob
Gottlieb regarding in substance compensation from Visium as an institutional salesperson
covering the Visium Asset Management account. Upon information and belief, the
substance of the conversation with Mark Gottlieb was regarding another salesperson at
ICAP having a relationship with a new Visium employee and to my recollection the
discussion involved asking if we could split the commissions generated from that
relationship. Upon information and belief, my conversation with Jacob Gottlieb was in

substance about how I could increase the level of business I was doing with Visium Asset

Management.  His response was in substance that I should to speak with Stefan and the

traders as they would be in charge of directing commissions to me.

34. While I worked at GFI which is a large inter-broker dealer, I did meet with Thorell after he

started working at Visium Credit Fund.  I did speak to Thorell at least several times, and he

did give me orders to work on.

**APPENDIX**

[redacted]

11-9-2019
Dated

State of Florida
County of Palm Beach
On this 9 day of November 2019
before [redacted] the
foregoing instrument, and acknowledged that he
executed the same as his free act and deed.
SEAL (signed)
NOTARY PUBLIC

JEAN HUGUES POLYCART
Notary Public - State of Florida
Commission # GG 285338
My Comm. Expires Dec 18, 2022
Bonded through National Notary Assn.

(Signature page to Affidavit of [redacted] in support of Stefan Lumiere's Motion to Vacate his conviction pursuant to 28 U.S.C. §2255 in United States v. Stefan Lumiere 16 CR 483 (JSR) and Stefan Lumiere v. United States of America 18-cv-9170 (JSR/BCM))

Pro Se Intake Unit
500 Pearl Street
16 CV 9170 (JSR/BCM)


RECEIVED
NOV 18 2019
PRO SE OFFICE