UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW
YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA          :

   - v. -          :          16 Cr. 483 (JSR)

STEFAN LUMIERE,          :

       Defendant.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

STEFAN LUMIERE,          :

       Petitioner,          :
   - v. -          18 Civ. 9170 (JSR) (BCM)
          :
UNITED STATES OF AMERICA,          :

       Respondent.          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# APPENDIX TO PETITIONER'S SURREPLY

TO BE FILED UNDER SEAL PURSUANT TO COURT PROTECTIVE ORDER
DATED
OCTOBER 8, 2016



**STEFAN LUMIERE**
**Pro-Se Petitioner**
**(212) 397-8059**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW
YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA                    :

   - v. -                                            :      16 Cr. 483 (JSR)

STEFAN LUMIERE,                             :

        Defendant.                          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

STEFAN LUMIERE,                             :

        Petitioner,                        :
   - v. -                                                   18 Civ. 9170 (JSR) (BCM)
                                            :
UNITED STATES OF AMERICA,                   :

        Respondent.                        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# APPENDIX  TO PETITIONER'S SURREPLY


TO BE FILED UNDER SEAL PURSUANT TO COURT PROTECTIVE ORDER
DATED
OCTOBER 8, 2016


**STEFAN LUMIERE**
**Pro-Se Petitioner**
**(212) 397-8059**

| | |
|---|---|
| Affidavit | David Tawil- Trial Expert Witness |
| Affidavit | Alexandra Gottlieb |
| Affidavit | Lawrence Moy-Outten & Golden |
| Affidavit | Steven Pohl-Attorney Brown Rudnick |
| Affidavit | VA (Formerly Visium Asset Management) |
| Affidavit | Dr Robert Leonard Ph.D.-Forensic Linguist |
| Affidavit | Dennis Wurst-Expert Securities |
| Affidavit | Affiant (Redacted) |

APPENDIX TABLE OF CONTENTS

| | | |
|---|---|---|
| A 163 | VI | Plaford-Visium Settlement Agreement- 3-9-15 |
| A 164 | VI | Jacob Gottlieb Affidavit-Supreme Court of the State of New York County-in Reply 7-18-13 |
| A 165 | VI | Ku Email Plaford-Spoke to auditor-No need to mark down on a "fire sale" if no material change-5-22-13 |
| A 166 | VI | Plaford and Ku-Valuation Process Update 8-2-13 GX 164 |
| A 167 | VI | CP explaining USON -Transcript |
| A 168 1-2 | VI | Thorell describing markets to Plaford all just estimates-Not making them up |
| A 169 P 1-7 | VI | Thorell Email complaint about pricing not good with pricing source appears to reflect Reuters- 6-1-2011 GX 715 |
| A 170 | VI | Thorell meeting with Friend after J Gottlieb Meeting-Transcript 6-24-13 |
| A 171 1-8 | VI | Thorell-Visium-Severance Agreement 6-13-14 |
| A 172 p 1-18 | VI | Lumiere recorded thorell 5-12-13 Transcript |
| A 173 1-35 | VI | Plaford YE Review Transcript |
| A 174 P 1-4 | VI | Lumiere-Notifies Plaford-told him that asked Visium to release from Contract |
| A 175 | VI | Lumiere asks Jake Gottlieb to release from contract 4-16-13 |
| A 176 p 1-3 | VI | Lumiere contact with Huemer and Ku to determine requested release from contract and Non-compete 4-18-13 |
| A 177 p 1-4 | VI | Jacob Gottlieb has been slandering me-report to attorney to file cease and desist |
| A 178 p 1-5 | VI | Visium release from Non Compete |
| A 179 | VI | Letter from Visium Counsel denying Jacob Gottlieb slander accusation 7-10-13 |
| A 180 | VI | Compel visium to pay- they want to pay |
| A 181 p 1-6 | VI | Creizman Email No Discovery, Want money Visium |
| A 182 p1-4 | VI | Creizman-Do not sign Affidavit |
| A 183 | VI | Creizman Will Withdraw due insufficient time |
| A 184 | VI | Creizman initially agrees not to sign Affidavit |
| A 185 | VI | Creizman agrees to contract terms 8-8-16 |
| A 186 | VI | Creizman does not want to be told what to do 9-1-16 |
| A 187 | VI | Creizman refuses to build arguments for an extension of time to prepare-Does not want to anger the Judge |
| A 188 | VI | Creizman Withdraw- I need to be paid today |
| A 189 | VI | Creizman withdraw threat-unless agree to Visium indemnification |
| A 190 | VI | Creizman affidavit specifically unauthorized-Barring unforseen circumstances |
| A 191 | VI | Creizman Notification Udell on Privileged Attorney List from Udell to AUSA 10-24-16 from email 4-3-14 |
| A 192 | VI | |
| A 193 | VI | Creizman with Packles and Alex -Not Proficient in Securities and Distressed |
| A 194 | VI | Ordered Creizman to Cancel Visium Meeting |
| A 195 P 1-2 | VI | Creizman No Cap on Fees with Visium-Cancel Meeting with Visium |
| A 196 | VI | Not comfortable with you talking to Visium |
| A 197 | VI | Creizman -Does not think I trust him because he lied to me and went against orders. |
| A 198 | VI | Creizman-Spoke to Visium Counsel 6-21-16 |
| A 199 p1-2 | VI | Creizman Wants to be Co-Counsel - Gets in the way of my decision |
| A 200 p 1-2 | VI | Creizman Side Letter 9-13-16 |
| A 201 p1-4 | VI | Creizman Engagement Letter 9-13-16 |
| A 202 p1-9 | VI | Creizman Disparages me to Foley after he was fired and caught him in a lie |
| A 203 P 1-3 | VI | Melissa Madrigal Creizman Profile 2016 |
| A 204 p1-3 | VI | Melissa Madrigal Pierce Bainbridge Profile 2019 |
| A 205 p1-4 | VI | Creizman Pierce Bainbridge Profile 2019 |
| A 206 p1-4 | VI | Allegory- Creizman did not load discovery until 11-15-16 and only put in a limited number of documents |
| A 207 p1-2 | VI | Lumiere Notice of Appeal Filed 8-1-17 |
| A 210 | VI | |
| A 211 | VI | DDQ Morgan Stanley-Plaford only PM in Credit |
| A 212 | VI | March 12 2014 Meeting- Olshan with AUSA |
| A 214 | VI | Discuss holding off on ATI and CMED till guidance from management |
| A 215 p1-3 | VI | MSAP Redemption Discussion 5-29-13 ( do we trust the PM of the Credit Fund) |
| A 216 | VI | Ku to Rozenberg Can you have VRC team rerun valuation using 2014 earnings and 5x Multiple |
| A 217 | VI | Rozenberg valuing ATI and CMED |
| A 218 p1-20 | VI | DDQ Visium 8-17-12 GX 469 |
| A 219 p 1-5 | VI | DDQ Visium 5-14-10   GX 767 |
| A 220 p1-2 | VI | Plaford and Investor Relations on questions on ATI 7-7-13 |
| A 221 p1-2 | VI | Plaford Credit Investor Call 9-19-13 |
| A 222 P 1-6 | VI | Demand Letter to Creizman dated 8-23-19 |
| A 223 | VI | Foley email- Creizman lied but we need him for now |
| A 224 | VI | Foley Asks if Creizman was ambushed |
| A 225 | VI | Witnesses sent Creizman to contact |
| A 226 | VI | Sent Creizman Top priority list with witnesses- thinks Tawil For testimony; packles to help for cross |
| A 227 | VI | Creizman Issue Compromised |
| A 228 | VI | Creizman does not know basics of securities-markets, quotes, stale, indications |

**Moustakis, Philip**

| | |
|---|---|
| **From:** | Conway, William T. |
| **Sent:** | Thursday, July 16, 2015 10:10 AM |
| **To:** | Szczepanik, Valerie; Riely, Charles |
| **Cc:** | Moustakis, Philip; Sunshine, Jason; Fitzpatrick, Brian |
| **Subject:** | Rozenberg interview recap |

███ ████████ ███ ████████ ████ ████████ Visium did not, and still does not, have any concerns with the Credit Fund's valuation practices or the valuations of its securities such as ATI and CMED, which we cited as having been marked widely different from where the market was.  Rozenberg also said that he was not aware of any pressure from management to keep securities at Level 2.

We also spent some time walking through their valuation process and ████████████ Rozenberg to concede that broker quotes, regardless of how different they are from the administrator's pricing feeds, were never really questioned.  Rozenberg pointed to two securities (ONCJ and SVNT) where they noted a disparity between John Brooks' quote and the Reuters price and decided to average them out, but he did not have an explanation for why the same treatment was not applied to other apparent mismarkings such as ATI.

████████████████ ████ ████████ ████

-Bill

William T. Conway III | Senior Counsel | U.S. Securities and Exchange Commission | New York Regional Office | Brookfield Place, 200 Vesey Street, Suite 400, New York, NY 10281 | direct: 212 336 0956 | conwayw@sec.gov

PRIVILEGED & CONFIDENTIAL: This email message (including any attachments) from the United States Securities and Exchange Commission is for the exclusive use of the intended recipient(s) and may contain confidential, non-public, and privileged information. If you are not the intended recipient, please do not read, distribute, or take action in reliance upon this message. If you have received this email in error, please notify the sender immediately by return email and promptly delete this message and its attachments from your computer system. The sender of this email does not intend to waive any privileges that may apply to the contents of this email or any attachments to it.

3509-3
Rozenberg

A 151

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ x
                                          :

UNITED STATES OF AMERICA          :

                                :     Docket No.: 16-CR-483 (JSR)

        -v-                   :

                                :     **DECLARATION OF**

STEFAN LUMIERE,               :     **ROBERT KNUTS**

                                :

            Defendant.         :

------------------------------------ x

     I, ROBERT KNUTS, hereby declare under penalties of perjury pursuant to 28 U.S.C.

§1746:

     1.  I am an attorney duly admitted to practice law in the courts of the State of New York

and before this Court.  I am a partner of the firm Sher Tremonte LLP, with offices located at 80

Broad Street, Suite 1301, New York, New York 10004

     2.  In approximately May 2013, the defendant in this case, Stefan Lumiere, sought my

legal advice concerning issues that related to securities law compliance questions arising at

Visium.  At approximately the same time he first consulted with me, Mr. Lumiere provided me

with a collection of documents and audio recordings concerning these securities law compliance

questions arising at Visium.  I reviewed the hard copy documents and audio recordings that Mr.

Lumiere provided to me and thereafter, provided legal advice to Mr. Lumiere based on the

information that he provided to me.

     3.  On or about July 23, 2013, at my request, a paralegal at my law firm (Park & Jensen

LLP) made an electronic copy of the documents and audio recordings provided to me by Mr.

Lumiere.  My recollection is that during July 2013, Mr. Lumiere asked me to re-review the

materials that he had provided to me in order to again provide legal advice to him concerning

those materials.

4.  In order to facilitate my ability to review the documents received from Stefan Lumiere away from my office, an electronic version of the documents and audio recordings that I received from Stefan Lumiere was copied to a USB "flash" drive.

5.  Attached as Exhibit A is a copy of the folder from that USB flash drive containing the documents and audio recordings that Mr. Lumiere provided to me.  All of the handwritten annotations that appear on the documents were Mr. Lumiere's.

6.  At some point after July 2013, Mr. Lumiere asked me if I would consider representing both him and a former Visium colleague named Jason Thorell in connection with legal advice regarding securities law compliance issues relating to Visium.

I hereby declare that the foregoing is true and correct to the best of my knowledge under penalty of perjury under the laws of the United States of America.

_____

Robert Knuts

New York, New York
December 28, 2016

Gmail - Fwd: Lumiere                                                                      1/29/17, 10:27 PM

 Gmail                                    Stefan Lumiere <stefanlumiere@gmail.com>

## Fwd: Lumiere
1 message

**Eric Creizman** <ecreiz@creizmanllc.com>                    Mon, Dec 26, 2016 at 11:14 PM
To: Stefan Lumiere <Stefanlumiere@gmail.com>

### Bobby is coming through!!!!!!!!
---------- Forwarded message ----------
From: **Robert Knuts** <RKnuts@shertremonte.com>
Date: Mon, Dec 26, 2016 at 10:19 PM
Subject: Re: Lumiere
To: Eric Creizman <ecreiz@creizmanllc.com>


I have calls in the morning but we can talk either in between calls or in the afternoon.


You can count on me for an affidavit that says: (a) SL sought my legal advice concerning certain issues that
related to securities law compliance questions arising at Visium; (b) in connection with seeking that advice from
me, SL provided me with a collection of documents and audio recordings; (c) I arranged for an assistant at my
firm to make an electronic copy of the documents and audio recordings; (d) I reviewed the documents provided
by SL in connection with rendering legal advice to SL; (e) in order to facilitate my ability to review the
documents received from SL away from my office, I copied the electronic version of the documents and audio
recordings received from SL to a USB "flash" drive; and (f) attached as [insert how you want to present the
contents of the flash drive to the Court].


Bob




**From:** Eric Creizman <ecreiz@creizmanllc.com>
**Date:** Monday, December 26, 2016 at 7:27 PM
**To:** Robert Knuts <RKnuts@shertremonte.com>
**Subject:** Re: Lumiere


# Hi Bob,

A 160

Gmail - Fwd: Lumiere

1/29/17, 10:27 PM

I almost forgot because things have been so crazy in preparing for trial, but if you are still available today or tomorrow to discuss, please let me know. I need to put in a motion in limine to prevent the government's introduction of privileged materials by Wednesday.


Eric


On Fri, Dec 23, 2016 at 8:18 PM, Robert Knuts <RKnuts@shertremonte.com> wrote:

While I don't have an independent memory of the specific documents that Stefan gave to me to review, I think I found an electronic file that will identify those documents more persuasively than my memory. Let's talk on Monday morning and you can tell me how you want to handle the forensics relating to the file. I'll be in my office by late morning.

Robert Knuts
Sher Tremonte LLP
(212) 202-2638 (o)
(917) 828-2235 (m)
Sent from my wireless device

---

**From:** Eric Creizman <ecreiz@creizmanllc.com>
**Sent:** Friday, December 23, 2016 6:04:04 PM
**To:** Robert Knuts
**Subject:** Re: Lumiere


Hi Bob, it's 6 p.m. and I see you called me back. As you can imagine, it's been a very hectic day. I'm still in the office, but it's 6 pm on a holiday and I don't want to bother you. Let me know if you're up for a call about those documents, and if so, great, and if not, when it would be convenient for you to talk.


On Fri, Dec 23, 2016 at 11:24 AM, Robert Knuts <RKnuts@shertremonte.com> wrote:

Yes.

Bob Knuts
Sher Tremonte LLP
(212) 202-2638 (o)
(917) 828-2235 (m)
Sent from my wireless device

---

**From:** Eric Creizman <ecreiz@creizmanllc.com>
**Sent:** Friday, December 23, 2016 11:12:03 AM
**To:** Robert Knuts
**Subject:** Re: Lumiere

Yes. Sorry.  Still behind schedule.  I appreciate your patience.  Can I call you within the next half hour?  Sorry about this

Sent from my iPhone

Eric M. Creizman

Attorney at Law

Creizman LLC

565 Fifth Avenue, Fl. 7

New York, New York 10017

T: (212) 972-0200

F: (646) 200-5022

www.creizmanllc.com

On Dec 23, 2016, at 11:02 AM, Robert Knuts <RKnuts@shertremonte.com> wrote:

I'm available now if this still works for you.

Bob Knuts
Sher Tremonte LLP
(212) 202-2638 (o)
(917) 828-2235 (m)
Sent from my wireless device

---

**From:** Eric Creizman <ecreiz@creizmanllc.com>
**Sent:** Friday, December 23, 2016 9:53:21 AM
**To:** Robert Knuts
**Subject:** Re: Lumiere

Bob, I apologize but are you available to have our call at 11 am instead?  Something has come up

Sent from my iPhone

Eric M. Creizman

Attorney at Law

Creizman LLC

565 Fifth Avenue, Fl. 7

New York, New York 10017

T: (212) 972-0200

F: (646) 200-5022


www.creizmanllc.com


On Dec 22, 2016, at 8:19 PM, Robert Knuts <RKnuts@shertremonte.com> wrote:

> Yes.  What time?
>
> Bob Knuts
> Sher Tremonte LLP
> (212) 202-2638 (o)
> (917) 828-2235 (m)
> Sent from my wireless device

---

**From:** Eric Creizman <ecreiz@creizmanllc.com>
**Sent:** Thursday, December 22, 2016 7:45:32 PM
**To:** Robert Knuts
**Subject:** Lumiere


# Hi Bob,


# Do you have any time to speak tomorrow about documents that Lumiere marked up which I think he did to give to you?  I want to preclude them from being used at trial and I

think these are the documents he sent you.

Here is a dropbox link to those documents:

https://www.dropbox.com/sh/m0d
8oxwbrsrn0ce/AADxsUvrfLFM9BhG6LH5912Na?dl=0

Best regards,

Eric

--

Eric M. Creizman, Esq.

CREIZMAN LLC
Attorneys at Law
565 Fifth Avenue, New York, New York 10017
T: (212) 972-0200; F: (646) 200-5022
Direct Dial:  (646) 513-4842

www.creizmanllc.com

--

Eric M. Creizman, Esq.

CREIZMAN LLC
Attorneys at Law
565 Fifth Avenue, New York, New York 10017
T: (212) 972-0200; F: (646) 200-5022
Direct Dial:  (646) 513-4842

www.creizmanllc.com

--

Eric M. Creizman, Esq.

CREIZMAN LLC
Attorneys at Law
565 Fifth Avenue, New York, New York 10017
T: (212) 972-0200; F: (646) 200-5022
Direct Dial:  (646) 513-4842

www.creizmanllc.com

--

Eric M. Creizman, Esq.
CREIZMAN LLC
Attorneys at Law
565 Fifth Avenue, New York, New York 10017
T: (212) 972-0200; F: (646) 200-5022
Direct Dial:  (646) 513-4842

www.creizmanllc.com

EXECUTION VERSION

## CONFIDENTIAL SETTLEMENT AGREEMENT

This Confidential Settlement Agreement ("Agreement") is by and between Chris Plaford ("Plaford"), an individual residing at 2 Lakeview Lane, Bedford, NY 10506, and Visium Asset Management, LP, a Delaware limited partnership ("Visium" or the "Company").

WHEREAS, Plaford was employed by Visium commencing as of December 29, 2006;

WHEREAS, subsequent to the closing of the Visium Credit Opportunities Fund on September 30, 2013, Employee's employment with the Company was terminated without cause effective December 30, 2013 (the "Termination Date");

WHEREAS, Plaford and the Company have disputed the amount of severance benefits and deferred compensation that the Company is obligated to pay to Plaford subsequent to the termination of his employment with the Company; and

WHEREAS, the parties have agreed to settle, compromise and resolve Plaford's claims against the Company and its affiliates and related entities for the purpose of avoiding the costs, uncertainties and burdens of litigation.

NOW, THEREFORE, in exchange for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.     This Agreement shall become effective upon the execution by all parties and the expiration of the revocation period set forth in paragraph 9 below (the "Effective Date").

2.     Subject to the terms set forth herein, within two (2) business days of the Effective Date, the Company shall pay to Plaford the sum of Six Hundred Twenty-Five Thousand Dollars ($625,000.00), less applicable deductions and withholdings, in full and final settlement of Plaford's claims for severance and deferred compensation by hand delivering a

check made payable to Plaford to his attorneys Himmel & Bernstein, LLP at 928 Broadway,

Suite 1000, New York, New York 10010.  In exchange for the foregoing payment, Plaford

agrees to permanently forfeit any and all rights he may have in any remainder of any deferred

compensation amounts that were designated in his name.  If Visium fails to make the above

settlement payment in accordance with this paragraph this Agreement will be null and void.

        3.      Plaford acknowledges and agrees that the payment set forth in paragraph 2

includes, without limitation, any and all amounts due or arguably due to him on account of

wages, bonuses, salary, separation pay, incentive compensation, deferred compensation, profits

interests, partners unit plan, vacation pay, paid time off, benefits or any other form of

compensation from the Company or any of its affiliates or related entities under the Visium

Deferred Compensation Plan or otherwise.

        4.      Plaford and Visium each shall bear their own costs, attorneys' fees and

expenses incurred in connection with the settlement negotiations and the preparation and

negotiation of this Agreement.

        5.      (a) In exchange for the payment set forth above and other good and

valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Plaford, on

behalf of himself and his heirs, executors, administrators, representatives and assigns (the

"Plaford Releasors"), hereby forever unconditionally and irrevocably releases and discharges the

Company and each of its affiliates, predecessors, successors, assigns and related investment

vehicles, any employee benefit plans established or maintained by any of the foregoing entities

and each and all of their respective current and former officers, directors, members, employees,

trustees, agents, attorneys, representatives, partners, advisors and shareholders, (collectively and

individually, the "Released Parties"), from any and all claims, causes of action, complaints,

2

VAM 000228997

agreements, promises (express or implied), contracts, undertakings, covenants, guarantees, grievances, liabilities, damages, rights, obligations, expenses, debts and demands whatsoever, in law or equity, known or unknown, whether present or future, and of whatsoever kind or nature, which Plaford, his heirs, executors, administrators, representatives and assigns ever had, now have or hereafter can, shall or may have, for, upon, or by reason of any alleged or actual matter, cause or thing from the beginning of time until the Effective Date of this Agreement, including, but not limited to, those arising out of, in connection with or relating in any way to the terms and conditions of Plaford's employment, Plaford's deferred compensation under the Visium Deferred Compensation Plan or the cessation of his employment.

Plaford understands and acknowledges that by signing this Agreement he is waiving and releasing any and all claims he may have concerning the terms and conditions of his employment and the termination of his employment under any federal, state, city or local law, including those prohibiting discrimination on the basis of sex, age, race, color, disability, religion, creed, national origin, ancestry, sexual orientation, pregnancy, handicap, marital status, citizenship or any other protected factor or characteristic, prohibiting discrimination for requesting or taking a family or medical leave, prohibiting discrimination with regard to benefits or any other terms and conditions of employment, or prohibiting retaliation in connection with any complaint or claim of alleged discrimination or harassment and that he intends to do so. As such, this release includes, but is not limited to, any claims arising under the Age Discrimination in Employment Act of 1967 ("ADEA"), the Older Workers' Benefit Protection Act of 1990, Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Civil Rights Act of 1866, the Employee Retirement Income Security Act, the Equal Pay Act, the Americans with Disabilities Act, the Family and Medical Leave Act of 1993, the Worker Adjustment and

3

VAM 000228998

Retraining Notification Act, the Uniformed Services Employment and Reemployment Rights Act, the U.S. Sarbanes Oxley Act of 2002, §§ 748(h)(1), 922(h)(1) and 1057 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, the New York State Labor Law, the New York State and New York City Human Rights Laws, each as amended, and any other federal, state or local statute or the common law.

Plaford hereby intends to expressly waive and relinquish, to the fullest extent permitted by law, all claims he may have whether or not known or suspected to exist in his favor at the time of executing this Agreement. Plaford further acknowledges that he is aware that he may hereafter discover facts in addition to or different from those which he now knows or believes to be true with respect to the subject matter of this Agreement, but it is his intention to, and he does fully, finally and forever settle and release any and all claims against the Released Parties in any forum whatsoever, whether known or unknown, suspected or unsuspected, which now exist, may hereafter exist, or heretofore have existed, and without regard to the subsequent discovery or existence of such different additional facts.

(b) In exchange for the promises and obligations made by Plaford herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Released Parties hereby forever unconditionally and irrevocably release and discharge the Plaford Releasors from any and all claims, causes of action, complaints, agreements, promises (express or implied), contracts, undertakings, covenants, guarantees, grievances, liabilities, damages, rights, obligations, expenses, debts and demands whatsoever, in law or equity, known or unknown, whether present or future, and of whatsoever kind or nature, which the Released Parties ever had, now have or hereafter can, shall or may have, for, upon, or by reason of any alleged or actual matter, cause or thing from the beginning of time until the

4

Confidential FOIA Treatment Requested by Visium Asset Management

VAM 000228999

Effective Date of this Agreement, including, but not limited to, those arising out of, in connection with or relating in any way to the terms and conditions of Plaford's employment or the cessation of his employment or any actions taken on behalf of the Released Parties during his employment ("Claims"); provided, however, that the release and discharge given to the Plaford Releasors by the Released Parties pursuant to this paragraph 5(b) shall not be effective (i) with respect to any Claims arising out of, in connection with or relating in any way to investments made by Visium's advisory clients in the equity and debt of ATI Acquisition Company and Ability Intermediate Holdings, Inc. (including each of their affiliates, and each of their respective successors and assigns) until the date that all of the investments made by Visium's advisory clients in the instruments identified on Schedule A ("Schedule A Instruments"), including all instruments which are later exchanged (in whole or in part) for Schedule A Instruments and all instruments into which Schedule A Instruments (in whole or in part) are later converted, will have been liquidated; (ii) with respect to any Claims arising out of, in connection with or relating in any way to investments made by Visium's advisory clients in the equity and debt of China Medical Technologies, Inc. and DEMC, Ltd. (including each of their affiliates, and each of their respective successors and assigns) until the date that all of the investments made by Visium's advisory clients in the instruments identified on Schedule B ("Schedule B Instruments"), including all instruments which are later exchanged (in whole or in part) for Schedule B Instruments and all instruments into which Schedule B Instruments (in whole or in part) are later converted, will have been liquidated; and (iii) with respect to any Claims arising out of, in connection with or relating in any way to investments made by Visium's advisory clients in the equity and debt of WP Rocket Holdings Inc. and Rural/Metro Corporation (including each of their affiliates, and each of their respective successors and assigns) until the date that all of the

5

VAM 000229000

investments made by Visium's advisory clients in the instruments identified on Schedule C

("Schedule C Instruments"), including all instruments which are later exchanged (in whole or in

part) for Schedule C Instruments and all instruments into which Schedule C Instruments (in

whole or in part) are later converted, will have been liquidated; provided further, however, that

nothing in the preceding proviso shall be deemed to toll any statute of limitations applicable to,

or constitute an admission on the part of Plaford that he engaged in any wrongdoing with regard

to, any Claims that are subsumed in clauses (i), (ii) and (iii) above.

6.      Plaford and Visium represent and warrant that they have not filed any

claim, action, lawsuit, charge, complaint, arbitration or proceeding of any kind ("Lawsuit")

against the other or any of the Released Parties.  Plaford and Visium further covenant and agree

that they will not bring any Lawsuit, at law or in equity, against the other or the Released Parties

arising out of, in connection with or relating in any way to Plaford's employment or the

termination of his employment or any of the claims released in paragraphs 5(a) and (b), above;

provided, however, that (i) until released pursuant to clause (i) of paragraph 5(b) above, Visium

has the right to bring a Lawsuit against the Plaford Releasors for Claims arising out of, in

connection with or relating in any way to investments made by Visium's advisory clients in the

equity and debt of ATI Acquisition Company, Ability Intermediate Holdings, Inc., each of their

affiliates, and each of their respective successors and assigns; (ii) until released pursuant to

clause (ii) of paragraph 5(b) above, Visium has the right to bring a Lawsuit against the Plaford

Releasors for Claims arising out of, in connection with or relating in any way to investments

made by Visium's advisory clients in the equity and debt of China Medical Technologies, Inc.,

DEMC, Ltd., each of their affiliates, and each of their successors and assigns; and (iii) until

released pursuant to clause (iii) of paragraph 5(b) above, Visium has the right to bring a Lawsuit

Confidential FOIA Treatment Requested by Visium Asset Management

VAM 000229001

against the Plaford Releasors for Claims arising out of, in connection with or relating in any way to investments made by Visium's advisory clients in the equity and debt of WP Rocket Holdings Inc., Rural/Metro Corporation, each of their affiliates, and each of their respective successors and assigns; provided further, however, that nothing in the preceding proviso shall be deemed to toll any statute of limitations applicable to, or constitute an admission on the part of Plaford that he engaged in any wrongdoing with regard to, any Claims that are subsumed in clauses (i), (ii) and (iii) above.  In the event Plaford or Visium violates this paragraph 6, the violator agrees to pay all costs and expenses of defending against any such Lawsuit incurred by Plaford, the Company or any of the Released Parties, as the case may be, including reasonable attorneys' fees.  Nothing herein, however, shall prevent Plaford or Visium from enforcing the terms of this Agreement. Further, nothing herein shall limit Plaford's right, where applicable, to file or participate in an investigative proceeding of any federal, state or local governmental agency.  To the extent permitted by law, Plaford agrees that if such administrative claim is made, Plaford shall not be entitled to recovery of individual monetary relief or other individual remedies.

7.      Notwithstanding anything in the foregoing paragraphs or otherwise in this Agreement to the contrary, no penalty, condition precedent (including any requirement that Plaford tender back the consideration being paid under this Agreement) or other limitation shall be imposed if Plaford challenges the waiver of his rights in paragraph 5 or the covenant not to sue in paragraph 6 on the grounds that the waiver or covenant not to sue was not made knowingly and voluntarily under the ADEA.  However, nothing herein shall affect Visium's rights to seek restitution, recoupment or setoff or any other remedy in connection with any such challenge.

8.      Plaford hereby acknowledges that:

7

Confidential FOIA Treatment Requested by Visium Asset Management

VAM 000229002

(a)     the payments and benefits he will receive under this Agreement are more than he would have been entitled to had he not signed this Agreement;

(b)     he is hereby advised by Visium to consult with an attorney concerning the terms of this Agreement and its effect on him before signing it;

(c)     he has in fact read this Agreement, has had an adequate opportunity to review its terms, understands its terms and consequences and is executing it freely and voluntarily; and

(d)     he is hereby advised that he has a period of twenty-one (21) calendar days from the date of receipt of this Agreement in which to decide whether to sign it.

9.     Plaford understands that for a period of seven (7) calendar days following the execution and delivery of a signed copy of this Agreement to Visium, this Agreement may be revoked by him by delivering written notice revoking same within that time period to David L. Keily, General Counsel, Visium Asset Management, LP, 888 Seventh Avenue, 22nd Floor, New York, New York 10019. If the Agreement is not revoked during that seven (7) day period, it shall become final. Should Plaford revoke this Agreement, Plaford understands that Visium has no obligation to provide the consideration set forth above, that Plaford shall have the same rights with respect to Visium that he had prior to signing this Agreement and that he shall have no entitlement to any amounts under this Agreement. The payments and benefits described in paragraph 2, if otherwise due, shall be held by Visium until the expiration of the seven (7) day revocation period and then paid in accordance with the requirements of paragraph 2.

10.     Plaford represents that during his employment he had access to and possession of confidential and proprietary information about the Released Parties, their business,

8

their clients and prospective clients, investors and prospective investors, service providers, vendors and information concerning other parties which the Released Parties agreed to hold in confidence ("Confidential Information"). Such Confidential Information includes but is not limited to any securities trading strategies, concepts, ideas, or plans; trade secrets, trading studies and analyses, and computer trading program systems relating to the Released Parties; inventions, marketing plans, product plans, business strategies, financial information (including but not limited to any written information regarding the investment or trading performance or results of the Released Parties or any other employee, manager, or affiliate of the Released Parties), forecasts, personnel information and customer information. Confidential Information also includes, but is not limited to: knowledge of the Released Parties' operations; technical and scientific information; information relating to software architecture, design or code; research and development information; plans or projections; current and prospective customer and/or investor lists, advertiser lists, supplier lists, customer sales analyses, and price lists; and any other non-public information concerning the Released Parties' business. Plaford acknowledges the trade secret status of the Confidential Information, and that the Confidential Information constitutes a legitimate protectable interest of the Company. Plaford acknowledges that this Confidential Information is among the Company's most important business assets, that the value of this Confidential Information would be diminished or extinguished by disclosure and that by reason of such disclosure, the Company will suffer immediate and irreparable injury.

Plaford represents and warrants that during his employment he did not at any time disclose to any person or use for his benefit or the benefit of others (except in the performance of his obligations as an employee of the Company), any such Confidential Information obtained by him. Plaford further acknowledges and agrees that at all times following the cessation of his

9

Confidential FOIA Treatment Requested by Visium Asset Management

VAM 000229004

employment he will keep and hold all such Confidential Information in strict confidence and trust, and will not use, publish or disclose or permit others to use, publish or disclose in any manner, whether in written or oral form or otherwise (including but not limited to disclosure by means of speeches, papers or interviews), any Confidential Information without the prior written consent of the Company, except as may be required by law subject to the provisions of paragraph 15 below.

11.    Plaford understands that all documents (including computer records, facsimiles and e-mail) and materials created, received or transmitted in connection with his work or using the Company's facilities are the Company's property. Plaford hereby represents that he has delivered to the Company all documents and materials of any nature pertaining to his work with the Company. Under no circumstances will Plaford retain any property of the Company, or any documents or materials or copies thereof containing any Confidential Information. Further, Plaford represents that he has returned to the Company all Company property and equipment of any kind in his possession or under his control. This includes computer equipment (hardware and software), BlackBerry, iPhone, smartphone or similar device, iPad, tablet, credit cards, office keys, security access cards, badges, identification cards and all files, documents, copies (including drafts) of any documentation or information (however stored), relating to the business of the Released Parties, their clients or prospective clients and investors or prospective investors. Plaford further represents that he has downloaded onto a disk or flash drive and returned to the Company's Chief Compliance Officer any Company property stored or saved on any computer, storage device or cloud storage system (excluding those at the Company's offices) he has used or has access to, and has taken and will take all steps necessary to purge any and all Company

10

Confidential FOIA Treatment Requested by Visium Asset Management

VAM 000229005

property permanently from any such computer, storage device or cloud storage system he has used or has access to (excluding those at the Company's offices).

12.  (a)  Plaford agrees that he will not at any time disparage, criticize or ridicule any of the Released Parties, or make any negative public comments, whether by way of news interviews, posting comments on, or publishing internet blogs or webpages (whether or not done anonymously or pseudonymously), publishing and/or circulating any other form of media, or the expression of his personal views, opinions or judgments to the media, internet blogs and webpages, or otherwise (whether or not done anonymously or pseudonymously), or to current or former officers, directors or employees of the Company or its affiliates, or to any third party within the financial services or investment management communities.

(b)  Visium agrees that it shall instruct those individuals holding the title of Chief Investment Officer, Chief Administrative Officer, Chief Financial Officer, Chief Operating Officer, Chief Compliance Officer and General Counsel as of the Effective Date not to at any time disparage, criticize or ridicule Plaford, or make any negative public comments, whether by way of news interviews, posting comments on, or publishing internet blogs or webpages (whether or not done anonymously or pseudonymously), publishing and/or circulating any other form of media, or the expression of their personal views, opinions or judgments to the media, internet blogs and webpages, or otherwise (whether or not done anonymously or pseudonymously), or to current or former officers, directors or employees of the Company or its affiliates, or to any third party within the financial services or investment management communities.

13.  Plaford acknowledges and agrees that that the terms and conditions of this Agreement, the settlement negotiations that led up to this Agreement, the amount and form of

11

Confidential FOIA Treatment Requested by Visium Asset Management

VAM 000229006

consideration, and the existence of this Agreement (together, "Settlement Information") are confidential and sensitive information and represents and agrees that he has not and will not disclose any Settlement Information to any third party other than (i) to his immediate family, attorneys or, with respect to the amount and form of consideration hereunder only, his accountant or tax preparer, and then only after securing the agreement of such individual to maintain the confidentiality of the Agreement and its terms and of its existence, and (ii) in response to a subpoena, regulator's request or other legal process, subject to the provisions of paragraph 15 below.

14.    (a)    Plaford agrees to reasonably cooperate in all respects with the Released Parties in connection with any and all existing or future claims, investigations, arbitrations, proceedings, litigations or examinations involving any of the Released Parties which relate to his service.  This cooperation shall include, without limitation, making himself available on reasonable notice for interviews and other communications with in-house and outside counsel acting on behalf of the Company in connection with any such matter and appearing without a subpoena for a deposition or to give testimony in any hearing, trial or arbitration at the request of the Company.  The Company will reimburse Plaford for all reasonable expenses he incurs as a result of any such requested cooperation.

(b)    For the avoidance of doubt, nothing in this paragraph 14 or elsewhere in the Agreement is intended in any way to prevent Plaford from testifying fully and truthfully in any action or proceeding or in connection with any regulatory matter.

15.    In the event Plaford receives a subpoena or other legal process (including a request by regulators) related to his employment with the Company, or requesting disclosure of Confidential Information or Settlement Information, he shall promptly notify the Company's

12

Confidential FOIA Treatment Requested by Visium Asset Management

VAM 000229007

General Counsel in writing so that the Company will have adequate time to consider and take any appropriate action to object to such disclosure or preserve the confidentiality of any information sought.  Nothing in this paragraph 15 or elsewhere in this Agreement shall prohibit Plaford from complying with any lawful subpoena or court order or taking any other actions affirmatively required by law.

16.    This Agreement amicably resolves any issues between the parties and they agree that this Agreement shall neither be interpreted nor construed as an admission of any wrongdoing or liability on the part of Plaford, Visium or any of the Released Parties.

17.    This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of law.  The parties agree that any and all actions and proceedings arising out of or relating to this Agreement shall be heard and determined exclusively in, and the parties hereto agree to submit to the exclusive jurisdiction of, any New York state or federal court, in each case sitting in the Borough of Manhattan.

18.    Subject to paragraph 7 of this Agreement, in the event any provision or term of this Agreement is held to be invalid, void or unenforceable for any reason, the remaining provisions and terms of this Agreement will remain in full force and effect and will in no way be affected, impaired or invalidated.

19.    Subject to paragraph 7 of this Agreement, in the event Plaford is found to have materially breached this Agreement (which breach, if capable of being cured, is not cured within thirty (30) days' written notice thereof to Plaford), the Company shall be entitled to recover from Plaford $325,000 as liquidated damages in addition to any other remedies at law or

Confidential FOIA Treatment Requested by Visium Asset Management

VAM 000229008

in equity it may have; provided, however, that this paragraph 19 shall not apply to any Claims brought by Visium under paragraphs 5(b)(i), (ii) and/or (iii).

20.     This Agreement shall be binding on and shall inure to the benefit of Plaford's heirs, executors, administrators, representatives and assigns and the Company's successors in interest and assigns.  Plaford may not assign any of his rights or duties hereunder, except with the written consent of the Company.  Plaford represents and warrants that he has not assigned or attempted to assign any rights or claims he may have against any of the Released Parties at any time prior to signing this Agreement.

21.     This Agreement contains the entire agreement between Plaford and the Company and supersedes and cancels any prior agreement or understanding between the parties on the subjects covered herein.  No agreements, representations or statements of either party not contained in this Agreement shall bind that party.  Plaford and Visium acknowledge that neither party has relied on any statements, representations or promised not specifically contained in this Agreement.  This Agreement can be modified, or any of its provisions waived, only in writing signed by both parties.

22.     This Agreement may be signed in separate counterparts, each of which taken together shall constitute a single instrument.  The parties agree to accept a fax or pdf signature as a fully binding original, provided that each party also exchanges an ink-signed original.

*[SIGNATURE PAGE FOLLOWS]*

14

Confidential FOIA Treatment Requested by Visium Asset Management                    VAM 000229009

IN WITNESS WHEREOF, the parties have executed this Agreement.

VISIUM ASSET MANAGEMENT, LP

By: _____

NAME: Mark Gottlieb

TITLE: Chief Administrative Officer

MARCH 9, 2015

Date: ~~March 4, 2015~~

CHRIS PLAFORD

_____

Date: _____

15

Confidential FOIA Treatment Requested by Visium Asset Management

VAM 000229010

ACKNOWLEDGMENT

STATE OF NEW YORK          )
                          )  ss.:
COUNTY OF NEW YORK        )

On the __4__ day of _____ in the year 2015, before me, the

undersigned, a notary public in and for said state, personally appeared Chris Plaford, personally

known to me or proved to me on the basis of satisfactory evidence to be the individual whose

name is subscribed to the within instrument and acknowledged to me that such individual

executed the same in his individual capacity, and that by his signature on the instrument, he

executed the instrument, and that he made such appearance before me.

Debra Brazee
Notary Public, State of New York
No. 01BR6059749
Qualified in Westchester County
Commission Expires June 04, 20 __

_____
Notary Public

ACKNOWLEDGMENT

STATE OF NEW YORK          )
                          )  ss.:
COUNTY OF NEW YORK        )

On the __9th__ day of __March__ in the year 2015, before me, the

undersigned, a notary public in and for said state, personally appeared Mark Gottlieb, personally

known to me or proved to me on the basis of satisfactory evidence to be the individual whose

name is subscribed to the within instrument and acknowledged to me that such individual

executed the same in his individual capacity, and that by his signature on the instrument, he

executed the instrument, and that he made such appearance before me.

ROCHEL L. KRACOFF
Notary Public, State of New York
No. 01KR6259866
Qualified in Kings County
Commission Expires April 16, 2016

_____
Notary Public

SCHEDULE A

Ancora Holdings LLC Preferred Units

Ancora Holdings LLC Common Units

Ancora Education LLC Preferred Units

Ancora Acquisitions LLC Preferred Units

Ancora Acquisitions LLC Warrants

Ancora Intermediate Holdings LLC – Series AA Preferred Units

ATI LC Claim

Funded – Debt Service Priority Tranche T

17

Confidential FOIA Treatment Requested by Visium Asset Management

VAM 000229012

SCHEDULE B

China Medical Technologies, Inc. 6.25% convertible bond due 12/15/16

China Medical Technologies, Inc. 4% convertible bond due 8/15/13

China Medical Technologies Sponsored ADRs

DEMC, Ltd. Class A Shares

DEMC, Ltd. Class B Shares

18

Confidential FOIA Treatment Requested by Visium Asset Management                    VAM 000229013

SCHEDULE C

Rural/Metro Corporation Tranche B Secured Loan T/L effective 12/01/14

Rural/Metro Corporation Tranche B Unsecured Loan T/L effective 12/01/14

Rural/Metro Corporation Delayed Draw Term Loan Facility effective 11/04/14

Rural/Metro Corporation Common Stock

19

Confidential FOIA Treatment Requested by Visium Asset Management

VAM 000229014

## 1258

Defendant claims.  I know Defendant would like this Court to
believe that I torture small children and animals, but it is
simply untrue.[23]

52.    I did not fire Defendant's brother, Stefan.  He
quit.  Stefan resigned and was not fired from Visium.  He
initiated the topic of his leaving Visium, not the other way
around.  It is interesting to note that Stefan and Defendant's
other brother, Justin are both currently being by sued by Sachin
Shah for defamation and other claims.[24]  Defendant's insinuation
that I fired Stefan because of this lawsuit shows how egocentric
Defendant is.

### MONEY ISSUES AND OUR LIFESTYLE

53.    While I may earn a significant income, I am
very sensitive to raising children with a sense of values and a
work ethic.  I was not raised with wealth and I have worked
really hard to accumulate the assets that I have.  Defendant was
raised in a wealthy family and was given the majority of the
assets she now has, whether by her parents or by me.  Part of
the reason for our divorce is that we do see the world very
differently and have different values.  In that connection, I

---

[23] Last summer, Defendant also accused me of killing her frog and her fish  I
did not even know she had a frog and a fish and I certainly did not kill
either of them.

[24] Sachin Shah v. Justin S. Lumiere, Stefan Lorca De St. Pierre Lumiere, Lester
Levy and Jon Doe(s).

A 164

From: Steven Ku <sku@visiumfunds.com>
Date: Wed, 22 May 2013 16:47:45 -0400 (EDT)
To: Chris Plaford <cplaford@visiumfunds.com>
Subject: Valuation

Per my discussion with our auditors, any discounted price obtained via
a "fire sale" or forced sale will not impact the valuation of
remaining positions in the same names (i.e. if Fund A is forced to
sell at a discount, Fund B doesn't have to write down the value of its
holding in the same name).  This of course assumes that there is no
material change to the underlying fundamentals of CMED/ATI.
Let me know if you have any other questions.

...................................................
Steven Ku, CPA, CTP
Partner, Chief Financial Officer
Visium Asset Management LP
888 Seventh Avenue, 22nd Floor
New York, NY 10019
(212)484-2727
sku@visiumfunds.com

A 165



**From:** Chris Plaford
**Sent:** Friday, August 02, 2013 8:29 AM
**To:** Steven Ku
**Cc:** Jason Thorell; Josh Rozenberg; Alan Greenbaum; David Keily; Sudarshan Jain
**Subject:** RE: Valuation process update

Yes – per our discussion can we have ops generate a file with prices as soon as the weekly/monthly updates are made and send it to Jason and I for review – thanks


Chris Plaford, CFA
Visium Asset Management, LP
888 Seventh Ave - 22nd Floor
New York, NY 10019
Direct: 212-474-6899
Fax: 212-474-8808
cplaford@visiumfunds.com
 V I S I U M


**From:** Steven Ku
**Sent:** Thursday, August 01, 2013 6:49 PM
**To:** Chris Plaford
**Cc:** Jason Thorell; Josh Rozenberg; Alan Greenbaum; David Keily; Sudarshan Jain
**Subject:** Valuation process update

Hi Chris.
As discussed, the valuation committee has decided to simplify the month-end and weekly valuation process. The desk (you/Jason) will no longer provide a pricing file to Sudarshan for estimates. All initial pricing will be performed by ops/accounting using our usual sources (brokers, Reuters, Markit, etc) then you/Jason can review them if you wish before estimates are cut on T+2.
Let me know if you have any questions, thanks.

Steven Ku, CPA, CTP
Partner, Chief Financial Officer
Visium Asset Management LP
888 Seventh Avenue, 22nd Floor
New York, NY 10019
(212)484-2727
sku@visiumfunds.com

GOVERNMENT
EXHIBIT
164
16 Cr. 483 (JSR)

1

A166 1-2

**From:** Jason Thorell
**Sent:** Thursday, August 01, 2013 4:08 PM
**To:** Steven Ku
**Cc:** David Keily
**Subject:** RE:

sure

**From:** Steven Ku
**Sent:** Thursday, August 01, 2013 4:08 PM
**To:** Jason Thorell
**Cc:** David Keily
**Subject:** RE:

Hi Jason, can you come downstairs in a few minutes?

**From:** Jason Thorell
**Sent:** Thursday, August 01, 2013 4:07 PM
**To:** Steven Ku
**Cc:** David Keily
**Subject:** FW:

**From:** Chris Plaford
**Sent:** Thursday, August 01, 2013 4:03 PM
**To:** Jason Thorell
**Subject:**

Chris Plaford, CFA
Visium Asset Management, LP
888 Seventh Ave - 22nd Floor
New York, NY 10019
Direct: 212-474-6899
Fax: 212-474-8808
cplaford@visiumfunds.com

V I S I U M

1

| | |
|---|---|
| *C. Plaford:* | No, I don't think they do. |
| *S. Lumiere:* | I thought they had one that was like five, and then we had one that was like two. |
| *C. Plaford:* | Um, we -- I -- I don't remember. We might have. But they -- they definitely didn't average them. Uh. |
| *S. Lumiere:* | That's odd. All right. |
| *C. Plaford:* | So, you know, and -- and I think part of that might've been because we -- we don't historically average, so they didn't want to just change our policy to average some stuff because they, you know -- |
| *S. Lumiere:* | I thought -- I thought we always averaged. |
| *C. Plaford:* | No, we actually don't. |
| *S. Lumiere:* | We just -- we just -- they just -- |
| *C. Plaford:* | I thought we might have, too, but we actually don't. We -- we don't average, which is I think why they didn't want to just change it to start averaging. But, at any rate, um, look, at the end of the day, I'm not really that worried about this. I mean, you know, the company's already offered full, you know, um, for these and they're -- they're -- they're in the process of increasing their offer again and -- |
| *S. Lumiere:* | I thought -- I thought they offered like 67 cents, or was it 70 cents? |
| *C. Plaford:* | No, but they -- they -- they basically offered -- their last offer was, basically, like -- was basically like all -- eight -- was it -- I think it was over 80 cents but it was on the non-accrued, which brought it -- if -- if the total accrued is like, you know, let's say 5 ½ right now or whatever it's at, um, their -- their offer equated to probably like 75 cents or 80 cents of that, because they were doing it without the accrued. And then after -- |
| *S. Lumiere:* | So, if -- if -- let's just use a number here. So, if we had $40 million that was in the original escrow, and that's all they're incorporating, they're saying 80% of that? That's 32 on 770 which is the original amount. Right? That's 4.1. |
| *C. Plaford:* | So, then they came back and said -- I -- I don't remember -- I -- I did -- it's been awhile. I did the math, uh, a few weeks ago. It was -- I think it was like around five or something like that. But anyway. |

A 1671-3

| | |
|---|---|
| S. Lumiere: | Okay. |
| C. Plaford: | They came back and said, um, after we won the summary judgment and they called Jamie again and said, "Yeah." Because we have offered them, basically, you know, 82 or 85 cents of the full accrued amount. |
| S. Lumiere: | Mm hmm. |
| C. Plaford: | And they came back and they tried to lift us after we won the summary judgment and we said, "No." So, that -- that was the last iteration, so, um. |
| S. Lumiere: | So that's, uh, that's 4.96 approximately. |
| C. Plaford: | Yeah. That -- that sounds pretty close. Um, and then, you know, and right now, people aren't really that worried about it because they think they know what the discovery's going to say. |
| S. Lumiere: | Yeah. |
| C. Plaford: | And, uh, and we're still getting, uh, you know, the 9% coupon on this, so. Um, my guess is they'll -- they come back again and -- or that's what Jamie thinks. |
| S. Lumiere: | Yeah. |
| C. Plaford: | But anyway. If -- if there's any broker that we could just -- I mean we -- we obviously need to be careful in telling them the latest iteration of this. But if there's any broker that -- I think the older iteration was known, right? That they had offered like 50 cents or something. |
| S. Lumiere: | No, I don't think it was. That was also, uh, uh, private. They -- they said there was an offer. They never disclosed what it was. |
| C. Plaford: | Okay. Well, look, these -- these obviously don't -- it's not like these trade a lot, anyway. So, even if -- it's actually fine if there's -- there's -- if there's a -- if there's a disclaim-- |

*[End of Audio]*



I certify that the foregoing documents were transcribed by Verbal Ink based on the audio files submitted by *(Client Name)* which were provided on *(Date of File Submission)*. The provided files were:

| Run-Time | Billable Minutes | File Title |
|---|---|---|
| 0:03:27 | 4 | CP Mark on USON |

\* These transcripts were completed to the best of our ability.

\*No words from the speaker in the recording have been changed or paraphrased.

\* All employees of Verbal Ink are bound by a non-disclosure agreement.

_____                    *2/20/19*

Armando Reif                                          Date

Account Executive

Verbal Ink



I certify that the foregoing documents were transcribed by Verbal Ink based on the audio files submitted by *Stefan Lumiere* which were provided on *(2/11/19)*. The provided files were:

| Run-Time | Billable Minutes | File Title |
|---|---|---|
| | | 1201-A-Lumiere Recording #2 1.3.2014 10-17-19 |

\* These transcripts were completed to the best of our ability.
\*No words from the speaker in the recording have been changed or paraphrased.
\* All employees of Verbal Ink are bound by a non-disclosure agreement.

Armando Reif

Account Executive

Verbal Ink

Date        7/17/19

11835 W. Olympic Blvd.,  uite 1020E Los Angeles, CA 90064 877-267-0990 www.verbalink.com

168 p 1-2

so that he could somehow market how he wanted to.

| S. Lumiere: | Exactly. |
|---|---|
| J. Thorell: | He's not very bright. |
| S. Lumiere: | You've got a lot of fucking shit to put him – put him out of the business. |
| J. Thorell: | I think. |
| S. Lumiere: | Well of course, we can't extort 'em. I'd love to be able to go to them and say:  listen, Jake, Chris, give us $100 million between the both of you. |
| J. Thorell: | Personally, I'm just interested in prison time. I mean -- |
| S. Lumiere: | Yeah- |
| J. Thorell: | I – I – |
| S. Lumiere: | I,  I'm very confident that like any of this stuff gets out, They'll be shut down. They will be shut down. |
| J. Thorell: | Yeah, I think that's very possible. |
| S. Lumiere: | Now what my lawyer says is based on this information, Chris will definitely be out of the business if they find a way to tie that Jake had some way to know about this, but – but likely the fund would shut down because people are like: you have oversight. You're supposed to know all the – |
| J. Thorell: | Yeah, because of what happened with Cohen, failure to supervise. |
| S. Lumiere: | Yeah. He's the Portfolio Manager, but you're still marketed as a – as a Chief Investment Officer, so how do you not know what's in your portfolio? |
| J. Thorell: | Right, and I – I have a couple of tapes, too, okay? I have a tape that, um, when Gottlieb called me in, he had an agenda, one of many times, and he was asking me how the selling was going. This was before Credit was – |
| S. Lumiere: | You have to understand, I was planning to leave since 2011. |
| J. Thorell: | I was planning to leave since Day 1, anyway, so – |
| S. Lumiere: | Well, I – I waited it out because I figured, hey, Visium will build a |

| From: | Chris Plaford <cplaford@visiumfunds.com> |
|---|---|
| Sent: | Thu, 24 Oct 2013 12:11:09 -0400 (EDT) |
| To: | Jason Thorell <jthorell@visiumfunds.com> |
| Subject: | RE: Outstanding Orders |

This is very simple - Just add a column in daily email or another way to designate which bids/offers are most likely real and which are level only/looking – I understand will always be subject to change

Chris Plaford, CFA
Visium Asset Management, LP
888 Seventh Ave - 22nd Floor
New York, NY 10019
Direct: 212-474-6899
Fax: 212-474-8808
cplaford@visiumfunds.com
W VISIUM

**From: Jason Thorell**
**Sent:** Thursday, October 24, 2013 10:08 AM
**To:** Chris Plaford
**Subject:** RE: Outstanding Orders

I am not making up a price. I am giving you quotes and I am also communicating to you repeatedly what was firm and what most likely can be firm. In trading nothing is technically real until you execute. I am giving you the best possible guidance I have prior to any potential trades we do. I can get you firm prices to you but that entails 1) asking for a market 2) putting the dealer on hold 3) calling you and then giving you that "real" price then 4) executing or not depending on your feedback. If you want "real" prices on an overnight e-mail that is not possible but if you disagree let me know how to do that. Also, the proper term is "quotes", not "making up a price".

**From: Chris Plaford**
**Sent:** Thursday, October 24, 2013 9:37 AM
**To:** Jason Thorell
**Subject:** RE: Outstanding Orders

Going forward lets distinguish which levels are real and which are not on the daily email   no need to make up a price just say no real offer

Chris Plaford, CFA
Visium Asset Management, LP
888 Seventh Ave - 22nd Floor
New York, NY 10019
Direct: 212-474-6899
Fax: 212-474-8808
cplaford@visiumfunds.com
W VISIUM

**From: Jason Thorell**
**Sent:** Thursday, October 24, 2013 9:32 AM
**To:** Chris Plaford
**Subject:** RE: Outstanding Orders

PTSAC 7.875s - there are only buyers and no offerings. I have checked both DB and MS repeatedly. We've had this same discussion over and over again. You can't buy bonds that aren't offered. There are no offerings therefore there is no price unless you want to bid a ridiculous price and see if you get hit. A ridiculous price means a major yield to worst. I would advise against doing that. Please let me know otherwise.

CONVAT 8.25s, small size trading this week in the 103/103.25 context per Goldman. If you want to pay up higher, we should be able to buy the bonds at or close to that context. Last we talked we cared lower (at or around 102.75), if that has changed and we care higher please let me know.

**From: Chris Plaford**
**Sent:** Wednesday, October 23, 2013 4:32 PM
**To:** Jason Thorell
**Subject:** RE: Outstanding Orders

Have room on the ptsac -- is there any room on the 102.875 offer? How the ptsac 9.75s – where do you think we could buy back some of those? We sold those through Val so check with him if msco doesn't have any inventory left

Has convat traded any more volume in the 103s this week?

Chris Plaford, CFA
Visium Asset Management, LP
888 Seventh Ave - 22nd Floor
New York, NY 10019

Confidential FOIA Treatment Requested by Visium Asset Management

VAM 000171050

A 168

Direct: 212-474-6899
Fax: 212-474-8808
cplaford@visiumfunds.com

**VISIUM**

**From:** Jason Thorell
**Sent:** Wednesday, October 23, 2013 4:02 PM
**To:** credit
**Subject:** Outstanding Orders

| Identifier | Credit | Rank | Buy / Sell | Amount (mm's) | Level | Bid | Ask | Order Notes |
|---|---|---|---|---|---|---|---|---|
| | **Bonds/Bank Debt** | | | | | | | |
| 21244vaa1 | CONVAT 8 1/4 01/15/19 | Sr Unsecured | Buy | 3 | 102.75 | 102.875 | 103.25 | Bot 2mm at 102 from GS, working 3mm there (or lower), 10/8. |
| 750492ad2 | RDNT 10 3/8 04/01/18 | Sr Unsecured | Buy | 2.4 | 106.375 | 106 | 107 | I paid 106.375 for 600k to work 2.4mm at RBC, 10/10. |
| 14879eab4 | PTSAC 7 7/8 10/15/18 | Sr Unsecured | Buy | 2.25 | 102.25 | 101.875 | 102.875 | I bot 2.75mm from Stifel at 102, 10/15. |
| 871507ab5 | SMBI 11 08/23/15 | Sr Unsecured | Buy | 5 | 100.25ish | 100.000 | 101.000 | Barclays flat the name, will keep us up on any sellers they may see, 10/8. |
| | **Watch List** | | | | | | | |
| 090613aj9 | BMET 6 1/2 08/01/20 | Sr Unsecured | Buy | 5 | 104 area | 106.000 | 106.375 | bot 2mm at 106.375 from Jefferies and bot 3mm at 106.5 from MS, 10/16 |

Confidential FOIA Treatment Requested by Visium Asset Management

VAM 000171051

```
From: "Jason Thorell" <jthorell@visiumfunds.com>
Date: Wed, 01 Jun 2011 16:23:07 -0400 (EDT)
To: "ops" <ops@visiumfunds.com>
Cc: "Chris Plaford" <cplaford@visiumfunds.com>
Subject: Month-End Pricing
Attachments: Copy of Pricing Comparison 5 31 11.xls;
```

Yellow highlights are the broker quotes.  I have all the printouts here if you
need them.

Fyi some of these marks are VERY far from where things are currently trading.
GAPT for example is 11.25 points from where we traded it this week. Not sure if
there isn't a better pricing source to use going forward. If you like I can look
into it.


Thanks,

```
Jason Thorell
Visium Asset Management
950 3rd Avenue - 29th Floor
New York, NY 10022
W: 646-840-3605
C: 646-770-5911
jthorell@visiumfunds.com
```

**GOVERNMENT
EXHIBIT
716**

16 Cr. 483 (JSR)

A 169

## Positions

| CUSIP | Description | Quantity | Our Price | Reuters Price | Reuters Market Value | NAV Impact | Comments |
|---|---|---|---|---|---|---|---|
| 99988AYV0 | ACTEL CB 0 22NOV2011 REGS | 2,988,000.00 | 101.7390 | 101.7390 | (4,185,372.50) | (21,085.00) | Reuters Price not Available |
| 99988AYV0 | ACTEL CB 0 22NOV2011 REGS | 12,284,000.00 | 101.7390 | 101.7390 | (2,836,565.00) | (14,290.00) | Reuters Price not Available |
| 99988AYV0 | ACTEL CB 0 22NOV2011 REGS | 3,148,000.00 | 101.7390 | 101.7390 | (858,512.50) | (4,325.00) | Reuters Price not Available |
| 01860BAL7 | AIQ 8 01DEC2016 | (4,217,000.00) | 98.7500 | 99.25 | 1,925,254.50 | 1,024.80 | |
| 01860BAL7 | AIQ 8 01DEC2016 | (2,868,000.00) | 98.7500 | 99.25 | 9,439,983.18 | 5,020.06 | |
| 01860BAL7 | AIQ 8 01DEC2016 | (865,000.00) | 98.7500 | 99.25 | 2,395,567.04 | 1,275.14 | |
| 03234GAF5 | AMLN CB 3 15JUN2014 | 2,100,000.00 | 91.6788 | 91.6788 | (590,480.00) | | |
| 03234GAF5 | AMLN CB 3 15JUN2014 | 10,287,000.00 | 91.6788 | 91.6788 | (534,920.00) | | |
| 03234GAF5 | AMLN CB 3 15JUN2014 | 2,613,000.00 | 91.6788 | 91.6788 | (477,950.00) | | |
| 03491BAC6 | ANPCN 7.75 01APR2014 | (976,000.00) | 53.0000 | 60.5 | 3,710,475.00 | (73,200.00) | |
| 03491BAC6 | ANPCN 7.75 01APR2014 | (894,000.00) | 53.0000 | 60.5 | 13,263,175.00 | (66,300.00) | |
| 03491BAC6 | ANPCN 7.75 01APR2014 | (790,000.00) | 53.0000 | 60.5 | 2,587,500.00 | (59,250.00) | |
| 05162DAA0 | ARDX 10.75 15JAN2018 144A | 3,585,000.00 | 105.5000 | 103.5 | 35,050,709.32 | | |
| 05162DAA0 | ARDX 10.75 15JAN2018 144A | 12,850,000.00 | 105.5000 | 103.5 | 98,741,171.70 | | |
| 05162DAA0 | ARDX 10.75 15JAN2018 144A | 2,500,000.00 | 105.5000 | 103.5 | 39,920,157.13 | | |
| 64125KAA9 | BLUCN CB 6 19NOV2026 144A | 6,999,550.00 | 30.0000 | | 35,965,628.07 | | Reuters Price not Available auto quote |
| 156709AP4 | CEPH CB 2 01JUN2015 | 20,244,260.00 | 173.2500 | 173.139 | 800,702,850.00 | 123.50 | |
| 156709AP4 | CEPH CB 2 01JUN2015 | 57,010,000.00 | 173.2500 | 173.139 | 1,816,978.75 | 280.25 | |
| 156709AP4 | CEPH CB 2 01JUN2015 | 23,056,710.00 | 173.2500 | 173.139 | 461,943.75 | 71.25 | |
| 156709AP4 | CEPH CB 2 01JUN2015 | 20,767,030.00 | 173.2500 | 173.139 | 625,275.00 | (787.50) | |
| 156709AR0 | CEPH CB 2.5 01MAY2014 | 702,650,000.00 | 123.1680 | 123.185 | 1,875,925.00 | (2,392.50) | |
| 156709AR0 | CEPH CB 2.5 01MAY2014 | 1,475,000.00 | 123.1680 | 123.185 | 476,400.00 | (600.00) | |
| 156709AR0 | CEPH CB 2.5 01MAY2014 | 375,000.00 | 123.1680 | 123.185 | 179,284.49 | (475.51) | |
| 15135BAC5 | CNC 5.75 01JUN2017 144A | 630,000.00 | 99.3750 | 99.25 | 537,653.48 | (1,428.52) | |
| 15135BAC5 | CNC 5.75 01JUN2017 144A | 1,880,000.00 | 99.3750 | 99.25 | 136,597.71 | (362.29) | |
| 15135BAC5 | CNC 5.75 01JUN2017 144A | (894,000.00) | 99.3750 | 99.25 | 5,757,987.50 | | |
| 222862AG9 | CVH 5.95 15MAR2017 | 480,000.00 | 107.0000 | 106.718961 | 46,039,090.00 | | |
| 222862AG9 | CVH 5.95 15MAR2017 | 188,000.00 | 107.0000 | 106.718961 | 11,701,016.25 | | |
| 222862AG9 | CVH 5.95 15MAR2017 | 504,000.00 | 107.0000 | 106.718961 | 29,192,326.03 | | |
| 12543DAF7 | CYH 8.875 15JUL2015 | 128,000.00 | 103.6300 | 103.375 | 7,202,013.97 | 13,445.00 | |
| 12543DAF7 | CYH 8.875 15JUL2015 | 5,570,000.00 | 103.6300 | 103.375 | 851,550.00 | 34,835.71 | |
| 12543DAF7 | CYH 8.875 15JUL2015 | 4,536,000.00 | 103.6300 | 103.375 | 2,534,550.00 | 8,594.29 | |
| 284139AG9 | ELN 8.875 01DEC2013 | 11,319,000.00 | 104.6250 | 104.75 | 648,800.00 | (1,050.00) | |
| 284139AG9 | ELN 8.875 01DEC2013 | 10,756,000.00 | 104.6250 | 104.75 | | (3,150.00) | |
| 284139AG9 | ELN 8.875 01DEC2013 | 27,888,589.00 | 104.6250 | 104.75 | | (800.00) | |
| 12513PAA7 | EMS 8.125 01JUN2019 144A | 6,875,431.00 | 101.5000 | 101.375 | | | |
| 12513PAA7 | EMS 8.125 01JUN2019 144A | 940,000.00 | 101.5000 | 101.375 | | | |
| 12513PAA7 | EMS 8.125 01JUN2019 144A | 2,520,000.00 | 101.5000 | 101.375 | | | |
| 45841AAC9 | FFN 11.5 30APR2014 144A | 940,000.00 | 88.5000 | 86.5000 | | | Reuters Price not Available |
| 45841AAC9 | FFN 11.5 30APR2014 144A | 1,904,000.00 | 88.5000 | 86.5000 | | | Reuters Price not Available |
| 45841AAC9 | FFN 11.5 30APR2014 144A | 3,098,000.00 | 88.5000 | 86.5000 | | | Reuters Price not Available |
| 45841AAA3 | FFN 14 30SEP2015 144A | 5,508,000.00 | 107.5000 | 107.000 | | | Reuters Price not Available |
| 39006AAL7 | GAPT 11.375 01AUG2015 144A | 16,221,033.00 | 110.0000 | 98.75 | 3,752,500.00 | (6,000.00) | Reuters Price not Available |
| 39006AAL7 | GAPT 11.375 01AUG2015 144A | 3,800,000.00 | 110.0000 | 98.75 | 3,937,162.50 | (9,937.50) | |
| 39006AAL7 | GAPT 11.375 01AUG2015 144A | 3,867,000.00 | 110.0000 | 98.75 | 1,000,337.50 | (2,812.50) | |
| 77927BAA8 | GGP 8.75 09NOV2015 | 1,013,000.00 | 104.1250 | 103.75 | 1,880,002.50 | | |
| 77927BAA8 | GGP 8.75 09NOV2015 | 1,800,000.00 | 104.1250 | 103.75 | 2,749,375.00 | | |
| 77927BAA8 | GGP 8.75 09NOV2015 | 2,850,000.00 | 104.1250 | 103.75 | 778,125.00 | | |
| 779273AF8 | GGP 2 15SEP2012 | 750,000.00 | 105.0000 | 104.75 | 13,835,147.23 | | |
| 779273AF8 | GGP 2 15SEP2012 | 13,016,847.00 | 105.0000 | 104.75 | 17,160,426.77 | | |
| 37565BAL7 | GILD CB 1 01MAY2014 144A | 10,401,553.00 | 112.5460 | 112.221 | 6,272,011.00 | (7,507.50) | |
| 37565BAL7 | GILD CB 1 01MAY2014 144A | 5,987,600.00 | 112.5460 | 112.221 | 2,592,305.10 | (20,470.00) | |
| 37565BAL7 | GILD CB 1 01MAY2014 144A | 2,310,000.00 | 112.5460 | 112.221 | 7,089,523.00 | (2,047.50) | |
| 37248YAB4 | GSE 11 15MAY2012 | 6,300,000.00 | 100.0000 | 100.125 | 706,392.30 | | |
| 37248YAB4 | GSE 11 15MAY2012 | 1,760,000.00 | 100.0000 | 100.125 | 1,975,089.60 | | |
| 413217AA0 | HARMNY 10 01MAY2016 144A | 6,300,000.00 | 103.2500 | 106.25 | 6,307,875.00 | (5,720.00) | Reuters Price not Available |
| 413217AA0 | HARMNY 10 01MAY2016 144A | 6,300,000.00 | 103.2500 | 106.25 | 23,331,419.87 | 7,875.00 | Reuters Price not Available |
| 413217AA0 | HARMNY 10 01MAY2016 144A | 4,800,000.00 | 103.2500 | 106.25 | 4,806,000.00 | 29,127.87 | Reuters Price not Available |
| 404119AH2 | HCA 6.75 15JUL2013 | 1,512,000.00 | 106.0000 | 106.25 | 2,117,562.50 | 6,000.00 | |
| 404119AH2 | HCA 6.75 15JUL2013 | 4,536,000.00 | 106.0000 | 106.25 | 538,687.50 | 4,982.50 | |
| 404119AU7 | HCA 7.875 15FEB2020 | 1,152,000.00 | 110.2500 | 110.25 | 3,472,875.00 | 1,267.50 | |
| 404118BU7 | HCA 7.875 15FEB2020 | 1,993,000.00 | 110.2500 | 110.25 | 23,605,627.50 | . | |
| 404119BJ7 | HCA 8.5 15APR2019 | 507,000.00 | 112.2500 | 112.25 | 5,996,497.50 | . | |
| 404119BJ7 | HCA 8.5 15APR2019 | 3,150,000.00 | 112.2500 | 112.25 | 1,885,800.00 | . | |
| 404119BF5 | HCA 8.5 15APR2019 | 21,411,000.00 | 112.2500 | 112.25 | 24,903,785.00 | . | |
| 404119BF5 | HCA 8.5 15APR2019 | 5,439,000.00 | 112.2500 | 112.25 | 6,324,165.00 | | |

## Positions

| CUSIP | Description | Quantity | Our Price | Reuters Price | Reuters Market Value | NAV Impact | Comments |
|---|---|---|---|---|---|---|---|
| 444993AK4 | HGSI CB 2.25 15OCT2011 | 2,400,000.00 | 176.8070 | 176.418 | 4,234,032.00 | (9,336.00) | |
| 444993AK4 | HGSI CB 2.25 15OCT2011 | 3,976,000.00 | 176.8070 | 176.418 | 7,012,615.50 | (15,462.75) | |
| 444993AK4 | HGSI CB 2.25 15OCT2011 | 1,125,000.00 | 176.8070 | 176.418 | 1,984,702.50 | (4,376.25) | |
| 422248AA2 | HNT 6.375 01JUN2017 | 7,711,500.00 | 105.0000 | 105.281239 | 8,118,762.75 | 21,687.75 | |
| 422248AA2 | HNT 6.375 01JUN2017 | 17,515,500.00 | 105.0000 | 105.281239 | 18,440,534.42 | 49,260.42 | |
| 422248AA2 | HNT 6.375 01JUN2017 | 6,377,000.00 | 105.0000 | 105.281239 | 6,713,784.61 | 17,934.61 | |
| 43844DAA9 | HOLX VRN CB 15DEC2037 | 650,000.00 | 97.7900 | 99.264 | 645,216.00 | 9,581.00 | |
| 43844DAA9 | HOLX VRN CB 15DEC2037 | 5,462,000.00 | 97.7900 | 99.264 | 5,427,789.68 | 80,509.88 | |
| 43844DAA9 | HOLX VRN CB 15DEC2037 | 1,388,000.00 | 97.7900 | 99.264 | 1,377,784.32 | 20,459.12 | |
| 466112AC3 | JBSSBZ 11.625 01MAY2014 | 4,925,000.00 | 117.1250 | 116.75 | 5,749,937.50 | (18,468.75) | |
| 466112AC3 | JBSSBZ 11.625 01MAY2014 | 2,000,000.00 | 117.1250 | 116.75 | 2,335,000.00 | (7,500.00) | |
| 466112AC3 | JBSSBZ 11.625 01MAY2014 | 2,293,000.00 | 117.1250 | 116.75 | 2,677,077.50 | (8,598.75) | |
| 494578AA5 | KND 8.25 01JUN2019 144A | 1,050,000.00 | 101.3750 | 101.25 | 1,063,125.00 | (1,312.50) | |
| 494578AA5 | KND 8.25 01JUN2019 144A | 3,100,000.00 | 101.3750 | 101.25 | 3,138,375.00 | (3,875.00) | |
| 494578AA5 | KND 8.25 01JUN2019 144A | 800,000.00 | 101.3750 | 101.25 | 810,000.00 | (1,000.00) | |
| 48886LAA5 | KNDL CB 3.375 15JUL2012 | 5,063,000.00 | 100.0000 | 100.485 | 5,087,555.55 | 24,555.55 | |
| 48886LAA5 | KNDL CB 3.375 15JUL2012 | 9,894,000.00 | 100.0000 | 100.485 | 9,941,985.90 | 47,985.90 | |
| 48886LAA5 | KNDL CB 3.375 15JUL2012 | 2,740,000.00 | 100.0000 | 100.485 | 2,753,289.00 | 13,289.00 | |
| 48274DAD9 | KVA 12 15MAR2015 144A | 2,181,000.00 | 91.0000 | 86.5 | 1,886,565.00 | | |
| 48274DAD9 | KVA 12 15MAR2015 144A | 10,700,000.00 | 91.0000 | 86.5 | 9,255,500.00 | | |
| 48274DAD9 | KVA 12 15MAR2015 144A | 3,984,000.00 | 91.0000 | 86.5 | 3,446,160.00 | | |
| 53217VAC3 | LIFE 6 01MAR2020 | 1,050,000.00 | 109.6695 | 109.539504 | 1,150,164.79 | (1,364.96) | |
| 53217VAC3 | LIFE 6 01MAR2020 | 3,150,000.00 | 109.6695 | 109.539504 | 3,450,494.38 | (4,094.87) | |
| 53217VAC3 | LIFE 6 01MAR2020 | 800,000.00 | 109.6695 | 109.539504 | 876,316.00 | (1,039.97) | |
| 46185RAM2 | LIFE CB 3.25 15JUN2025 | 12,381,000.00 | 106.1250 | 106.321 | 13,142,338.81 | 24,227.56 | |
| 51654SAC4 | LIFE CB 3.25 15JUN2025 | 3,139,000.00 | 106.1250 | 106.321 | 3,337,416.19 | 6,152.44 | |
| 51654SAC4 | LMDIMG 9.75 15MAY2017 | 1,905,000.00 | 103.0000 | 103.5 | 1,971,675.00 | 9,525.00 | |
| 53688RAD9 | LMDIMG 9.75 15MAY2017 | 3,095,000.00 | 103.0000 | 103.5 | 3,203,325.00 | 15,475.00 | |
| 53688RAD9 | MENTOR 12.5 15FEB2018 144A | 8,809,000.00 | 111.7500 | 111.25 | 9,800,012.50 | (10,800.00) | |
| 53688RAD9 | MENTOR 12.5 15FEB2018 144A | 5,643,000.00 | 111.7500 | 111.25 | 6,277,837.50 | (15,300.00) | |
| 62853DAL1 | MENTOR 12.5 15FEB2018 144A | 3,759,000.00 | 111.7500 | 111.25 | 4,181,887.50 | (3,900.00) | |
| 62853DAL1 | MYL 7.875 15JUL2020 144A | 16,100,000.00 | | | 17,492,837.50 | 1,036.00 | |
| 62853DAL1 | MYL 7.875 15JUL2020 144A | 4,089,000.00 | | | 4,181,887.50 | 10,204.08 | |
| 65733TAF8 | MYL 7.875 15JUL2020 144A | 1,196,000.00 | | | 1,530,200.00 | 2,571.52 | |
| 65733TAF8 | NATRC 10 01MAR2012 144A | 304,000.00 | | 95.5 | 288,800.00 | (3,515.00) | |
| 65733TAE1 | NATRC 10 01MAR2012 144A | 540,000.00 | | 95.5 | 542,700.00 | (2,500.00) | |
| 63957MAE1 | NATRC 9.25 01MAR2012 | 765,000.00 | | 95 | 768,825.55 | (4,485.00) | |
| 63957MAJ0 | NBERX 10 01DEC2011 | 195,000.00 | 100.5000 | 100.5 | 195,975.00 | (2,154.25) | |
| 64026BAH1 | NBERX 10 01DEC2011 | 925,000.00 | 100.5710 | 100.683 | 931,317.75 | (23,210.25) | |
| 64026BAH1 | NKTR CB 3.25 28SEP2012 | 9,134,000.00 | 100.5710 | 100.683 | 9,166,385.12 | (6,000.25) | |
| 64026BAH1 | NKTR CB 3.25 28SEP2012 | 2,296,000.00 | 100.5710 | 100.683 | 2,311,681.68 | (13,857.50) | |
| 66986WAA6 | NKTR CB 3.25 28SEP2012 | 2,812,000.00 | 99.7500 | 99.625 | 2,801,455.00 | (33,100.00) | |
| 66986WAA6 | NOVA CB 1 15JUN2012 | 1,880,000.00 | 99.7500 | 99.625 | 1,793,250.00 | (8,592.50) | |
| 66986WAA6 | NOVA CB 1 15JUN2012 | 3,588,000.00 | 99.7500 | 99.625 | 3,574,545.00 | 1,610.82 | |
| 68190AAL2 | NOVA CB 1 15JUN2012 | 1,231,000.00 | 96.0000 | 95.825 | 1,179,805.75 | 7,140.96 | |
| 68190AAL2 | OCR CB 3.25 15DEC2035 | 13,263,000.00 | 96.0000 | 95.825 | 12,709,269.75 | 1,816.02 | |
| 68190AAL2 | OCR CB 3.25 15DEC2035 | 3,429,000.00 | 96.0000 | 95.825 | 3,285,439.25 | 18,303.28 | |
| 68234KAC4 | OCR CB 3.25 15DEC2035 | 5,543,000.00 | 105.2500 | 105 | 5,820,150.00 | 27,175.88 | |
| 68234KAC4 | ONUC 11.75 15MAY2017 | 13,240,000.00 | 105.2500 | 105 | 13,902,000.00 | 2,559.32 | |
| 68234KAC4 | ONUC 11.75 15MAY2017 | 3,437,000.00 | 105.2500 | 105 | 3,698,850.00 | 1,945.90 | |
| 74369LAF0 | ONUC 11.75 15MAY2017 | 3,000,000.00 | 102.0000 | 102 | 475,851.30 | 494.10 | |
| 74369LAF0 | POLI CB 2 15FEB2012 | 471,000.00 | 100.6880 | 100.688 | 2,109,096.40 | | Reuters Price not Available |
| 74369LAF0 | POLI CB 2 15FEB2012 | 2,088,000.00 | 100.6880 | 100.688 | 536,469.30 | | |
| 69329YAA2 | POLI CB 2 15FEB2012 | 831,000.00 | 100.6880 | 100.688 | 9,143,747.76 | | |
| 69329YAA2 | POLI CB 2.875 15FEB2015 | 8,396,000.00 | 108.8880 | 108.906 | 13,515,221.96 | | |
| 69329YCB8 | POLI CB 2.875 15FEB2015 | 12,466,000.00 | 108.8880 | 108.906 | 1,278,094.44 | | |
| 69329YAQ2 | POLI CB 2.875 15FEB2015 | 1,174,000.00 | 108.8880 | 108.906 | 3,302,830.30 | | |
| 69329YAQ2 | POLI CB 3.75 01MAY2015 | 3,190,000.00 | 103.4760 | 103.537 | 838,849.70 | | |
| 69329YAQ2 | POLI CB 3.75 01MAY2015 | 810,000.00 | 103.4760 | 103.537 | 9,508,710.00 | | |
| 75049ZAD2 | POLI CB 3.75 01MAY2015 | 8,236,000.00 | 103.4760 | 103.537 | 9,148,452.50 | | |
| 75049ZAD2 | RDNT 10.375 01APR2018 | 8,754,500.00 | 105.2500 | 104.5 | 1,380,987.50 | | |
| 75049ZAD2 | RDNT 10.375 01APR2018 | 1,321,500.00 | 105.2500 | 104.5 | 2,806,870.00 | | |
| 77869XAF8 | RDNT 10.375 01APR2018 | 2,686,870.00 | 105.2500 | 104.5 | 8,974,650.00 | | |
| 77869XAF8 | ROHI 10.5 15MAR2018 144A | 8,930,000.00 | 101.0000 | 100.5 | 14,642,850.00 | | |
| 77869XAF8 | ROHI 10.5 15MAR2018 144A | 14,570,000.00 | 101.0000 | 100.5 | 1,507,500.00 | | |
| 77869XAF8 | ROHI 10.5 15MAR2018 144A | 1,500,000.00 | 101.0000 | 100.5 | | | |

## Positions

| CUSIP | Description | Quantity | Our Price | Reuters Price | Reuters Market Value | NAV Impact | Comments |
|---|---|---|---|---|---|---|---|
| 77866BAE1 | ROH 10.75 15OCT2015 | 8,045,000.00 | 110.5000 | 111 | 8,929,950.00 | 40,225.00 | |
| 77866BAE1 | ROH 10.75 15OCT2015 | 15,132,000.00 | 110.5000 | 111 | 16,796,520.00 | 75,660.00 | |
| 77866BAE1 | ROH 10.75 15OCT2015 | 3,323,000.00 | 110.5000 | 111 | 3,688,530.00 | 16,615.00 | |
| 44993A4A6 | RX 12.5 01MAR2018 144A | 416,000.00 | 120.0000 | 119.75 | 498,160.00 | (1,040.00) | |
| 44993A4A6 | RX 12.5 01MAR2018 144A | 944,000.00 | 120.0000 | 119.75 | 1,130,440.00 | (2,360.00) | |
| 44993A4A6 | RX 12.5 01MAR2018 144A | 240,000.00 | 120.0000 | 119.75 | 287,400.00 | (600.00) | |
| 83388SAE1 | SATMEX FRN 30NOV2011 | 528,000.00 | 100.5000 | 99.512 | 525,423.36 | (5,216.64) | |
| 83388SAE1 | SATMEX FRN 30NOV2011 | 857,880.00 | 100.5000 | 99.512 | 853,494.32 | (8,473.88) | |
| 83388SAE1 | SATMEX FRN 30NOV2011 | 247,000.00 | 100.5000 | 99.512 | 245,794.64 | (2,440.36) | |
| 81619BAJ8 | SEM 7.625 01FEB2015 | 17,886,000.00 | 102.5000 | 101.3125 | 18,100,491.25 | | |
| 81619BAJ8 | SEM 7.625 01FEB2015 | 26,282,000.00 | 102.5000 | 101.3125 | 26,626,951.25 | | |
| 81619BAJ8 | SEM 7.625 01FEB2015 | 2,868,000.00 | 102.5000 | 101.3125 | 2,905,642.50 | | |
| 81619QAF2 | SEM FRN 15SEP2015 | 670,296.00 | 98.2500 | 97 | 650,187.12 | (8,378.70) | |
| 81619QAF2 | SEM FRN 15SEP2015 | 1,142,000.00 | 98.2500 | 97 | 1,107,740.00 | (14,275.00) | |
| 81619QAF2 | SEM FRN 15SEP2015 | 1,350,286.00 | 98.2500 | 97 | 1,309,777.42 | (16,878.58) | |
| 81619QAF2 | SEM FRN 15SEP2015 | 486,418.00 | 98.2500 | 97 | 452,425.46 | (5,830.23) | |
| 81619QAF2 | SEM FRN 15SEP2015 | | | | | | Reuters Price not Available |
| 99BWV4BF1 | SEVAN 14 22DEC2014 | 17,000,000.00 | 70.0000 | 98.5 | 2,048,800.00 | | |
| 83014RAA4 | SIZPL 12.25 15APR2016 144A | 2,080,000.00 | 100.6250 | 98.5 | 5,434,245.00 | | |
| 83014RAA4 | SIZPL 12.25 15APR2016 144A | 5,517,000.00 | 100.6250 | 98.5 | 1,381,955.00 | | |
| 83014RAA4 | SIZPL 12.25 15APR2016 144A | 1,403,000.00 | 100.6250 | 98.5 | 9,129,137.50 | | |
| 83066RAC1 | SKH 11 15JAN2014 | 8,885,000.00 | 103.5000 | 102.75 | 10,916,160.00 | | |
| 83066RAC1 | SKH 11 15JAN2014 | 10,624,000.00 | 103.5000 | 102.75 | 4,937,137.50 | | |
| 83066RAC1 | SKH 11 15JAN2014 | 4,805,000.00 | 103.5000 | 102.76 | 1,818,917.50 | | |
| 803111AR4 | SLE 2.75 15SEP2015 | 1,800,000.00 | 99.5000 | 101.009722 | 2,575,524.79 | 27,017.50 | |
| 803111AR4 | SLE 2.75 15SEP2015 | 2,550,000.00 | 99.5000 | 101.009722 | 656,506.32 | 38,274.79 | |
| 803111AS2 | SLE 2.75 15SEP2015 | 650,000.00 | 99.5000 | 101.009722 | 2,178,006.67 | 9,758.32 | |
| 803111AS2 | SLE 4.1 15SEP2020 | 2,205,000.00 | 97.5000 | 98.778534 | 3,007,806.36 | 28,191.67 | |
| 803111AS2 | SLE 4.1 15SEP2020 | 2,421,840.00 | 97.5000 | 98.778534 | 2,963,356.02 | 38,931.36 | |
| 871507AB5 | SMB 11 23AUG2015 | 3,000,000.00 | 104.0000 | 98.778534 | 2,177,802.06 | 38,356.02 | |
| 803111AS2 | SMB 11 23AUG2015 | 1,340,286.00 | 104.0000 | 96.5 | 1,279,954.04 | | |
| 803111AS2 | SMB 11 23AUG2015 | 3,045,000.00 | 104.0000 | 96.5 | 2,312,852.70 | | |
| 871507AB5 | SMB 11 23AUG2015 | 2,280,421.00 | 104.0000 | 96.5 | 604,515.00 | | |
| 871507AB5 | SMB 11 23AUG2015 | 633,000.00 | 104.0000 | 96.5 | 1,017,900.00 | | |
| 88033GAT7 | THC 8.5 01DEC2019 | 1,000,000.00 | 102.5000 | 101.75 | 1,780,625.00 | (7,500.00) | |
| 88033GAT7 | THC 8.5 01DEC2019 | 1,750,000.00 | 102.5000 | 101.75 | 251,250.00 | (13,125.00) | |
| 88033CAWO | THC 6.5 01JUN2012 | 250,000.00 | 103.0000 | 100.5 | (4,187,671.03) | (6,250.00) | |
| 88033SSAV0 | TMO 4.5 01MAR2021 | (3,987,000.00) | 104.536652 | 104.2745 | (1,058,854.95) | 103,448.74 | |
| 90ESBC8K9 | TMO 4.5 01MAR2021 | (1,013,000.00) | 104.536652 | 104.2745 | 21,835,800.00 | (2,654.26) | |
| 90270AC4 | UHS 7 01OCT2018 | 20,786,000.00 | 105.3750 | 105 | 17,577,000.00 | | |
| 90270AC4 | UHS 7 01OCT2018 | 16,740,000.00 | 105.3750 | 105 | 21,749,700.00 | | |
| 90ESBC8K9 | UHS 7 01OCT2018 | 20,714,000.00 | 105.3750 | 105 | | | |
| 90ESBC8K9 | USON 9.125 15AUG2017 | 27,994,782.00 | 1.9000 | 1.9000 | | | Reuters Price not Available |
| 90ESBC8K9 | USON 9.125 15AUG2017 | 34,857,218.00 | 1.9000 | 1.9000 | | | Reuters Price not Available |
| 09067JAC3 | VRXCN CB 5.375 01AUG2014 144A | 6,000,000.00 | 1.9000 | 1.9000 | | | Reuters Price not Available |
| 09067JAC3 | VRXCN CB 5.375 01AUG2014 144A | 6,723,000.00 | 370.5000 | 369.63 | 46,943,010.00 | | auto quote |
| 09067JAC3 | VRXCN CB 5.375 01AUG2014 144A | 12,700,000.00 | 370.5000 | 369.63 | 112,419,226.20 | (22,035.00) | |
| 93451AJ44 | WCRX 7.75 15SEP2018 144A | 30,414,000.00 | 370.5000 | 369.63 | 22,059,318.40 | (31,340.00) | |
| 93451AJ44 | WCRX 7.75 15SEP2018 144A | 4,407,000.00 | 105.7500 | 105.25 | 4,638,367.50 | (22,360.00) | |
| 93932AAL7 | WM 4 15JAN2009 | 6,268,000.00 | 105.7500 | 105.25 | 6,597,070.00 | (31,340.00) | |
| 93932AAL7 | WM 4 15JAN2009 | 8,896,000.00 | 105.1250 | 109.875 | 9,443,786.25 | (1,012.50) | |
| 93932APB | WM 4 15JAN2010 | 405,000.00 | 109.1250 | 109.875 | 444,993.75 | (3,230.00) | |
| 93932APB | WM 4.2 15JAN2010 | 323,000.00 | 109.5000 | 109.5 | 356,915.00 | 30,256.00 | |
| 93932ZATD | WM 5 22MAR2012 | 3,025,000.00 | 108.5000 | 110.5 | 3,342,625.00 | 1,520.00 | |
| 93932ZATD | WM 5 22MAR2012 | 162,000.00 | 108.5000 | 110.5 | 167,960.00 | (4,167.50) | |
| 93932AJC3 | WM 5.25 15SEP2017 | 1,667,000.00 | 112.2500 | 112.25 | 1,871,207.50 | (5,000.00) | |
| 93932ZAV5 | WM 5.25 15SEP2017 | 2,000,000.00 | 112.2500 | 112.25 | 2,245,000.00 | 14,812.50 | |
| 93932ZAX1 | WM 5 24AUG2011 | 3,950,000.00 | 113.1250 | 113.125 | 4,468,437.50 | 3,937.50 | |
| 93932ZAX1 | WM 5 24AUG2011 | 1,050,000.00 | 112.7500 | 113.375 | 1,187,812.50 | (33,937.50) | |
| 93932ZAX1 | WM 5 24AUG2011 | 4,525,000.00 | 114.5000 | 113.75 | 5,147,187.50 | (87,345.00) | |
| 93932ZAX1 | WM 5 24AUG2011 | 646,000.00 | 114.5000 | 113.75 | 8,697,725.00 | (8,152.50) | |
| 93932ZAX1 | WM 5.5 24AUG2011 | 1,087,000.00 | 114.5000 | 113.75 | 1,236,482.50 | (18,540.00) | |
| 93454MAE8 | WMG 7.375 15APR2014 | 2,472,000.00 | 114.5000 | 113.75 | 2,811,900.00 | 807.50 | |
| 93454AEB | WMG 7.375 15APR2014 | 846,000.00 | 101.6250 | 101.625 | 867,305.50 | 7,021.25 | |
| 93454AEB | WMG 7.375 15APR2014 | 5,617,000.00 | 101.6250 | 101.75 | 5,715,297.50 | 1,827.50 | |
| 92933BAB0 | WMG 9.5 15JUN2016 | 1,462,000.00 | 101.6250 | 101.75 | 1,487,585.00 | | |
| 92933BAB0 | WMG 9.5 15JUN2016 | 10,976,000.00 | 107.6875 | 106.75 | 11,716,880.00 | | |
| 92933BAB0 | WMG 9.5 15JUN2016 | 2,791,000.00 | 107.6875 | 106.75 | 2,979,392.50 | | |
| 92933MAF0 | WMG VRN 15DEC2014 | 753,000.00 | 104.2500 | 103.0625 | 776,060.63 | (8,941.88) | |

## Positions

| CUSIP | Description | Quantity | Our Price | Reuters Price | Reuters Market Value | NAV Impact | Comments |
|---|---|---|---|---|---|---|---|
| 92930MAAF0 | WMG VRN 15DEC2014 | 3,617,000.00 | | 104.2500 | 103.0625 | 3,727,770.63 | (42,951.88) |
| 92930MAAF0 | WMG VRN 15DEC2014 | 961,000.00 | | 104.2500 | 103.0625 | 990,436.63 | (11,411.88) |
| | | | | | | | 39,469.11 |

| SecurityDesc | Underlying | Symbol | Long | Short | Our Price | Mark It Price | Our MV | Markit MV | |
|---|---|---|---|---|---|---|---|---|---|
| ASPEN DENTAL TL 1L USD | ASPDEN | 9A999GI63 | 14,290,237 | 0 | 100.5 | 100 | 14,361,688 | 14,290,237 | |
| ABILITY ACQUISITION (ATI) (12/09) SENIOR | ATIENT | 9A999F508 | 17,030,048 | 0 | 93 | 90.75 | 15,837,945 | 15,454,769 | |
| ABILITY ACQUISITION (ATI) (12/09) SUB | ATIENT | 9A999F509 | 3,000,000 | 0 | 93.5 | 91.5 | 2,805,000 | 2,745,000 | |
| BIOMET ALTERNATE CURRENCY REVOLVER 09/2013 (09/07 | BMET | 9A999F41 | 0 | -4,750,000 | 4 | 9 | (190,000) | (427,500) | |
| BIOMET DOLLAR REVOLVER 09/2013 (09/07) | BMET | 9A999F42 | 0 | -4,750,000 | 4 | 4 | (190,000) | (190,000) | |
| COMMUNITY HEALTH TL B-NQNEXT 1L USD | CYH | 9A999GJ13 | 13,315,907 | 0 | 97 | 96.824 | 12,916,430 | 12,892,994 | |
| COMMUNITY HEALTH TL DD 1L USD | CYH | 9A999GJ14 | 684,094 | 0 | 97 | 96.824 | 663,571 | 662,367 | |
| GAP DIP TL | GAPT | 9A999GF01 | 20,750,000 | 0 | 101.5 | 101.479 | 21,061,250 | 21,056,893 | |
| GREEN VALLEY RANCH 1ST LIEN TL | GRNVLR | 9A999GL78 | 7,000,000 | 0 | 100 | #N/A | 7,000,000 | #N/A | Price not available via Markit |
| GREEN VALLEY RANCH 2ND LIEN TL | GRNVLR | 9A999GL80 | 2,000,000 | 0 | 99.25 | #N/A | 1,985,000 | #N/A | Price not available via Markit |
| GRACEWAY PHARMACEUTICALS 1ST LIEN TL | GRWAY | 9A999GA71 | 0 | -17,745,661 | 54.5 | 59.3 | (9,671,385) | (10,523,177) | |
| GUNDLE/SLT ENVIRONMENTAL INC 1ST LIEN TL | GSE | 9A999GL85 | 7,000,000 | 0 | 100 | #N/A | 7,000,000 | #N/A | Price not available via Markit |
| GUNDLE/SLT ENVIRONMENTAL INC 2ND LIEN TL | GSE | 9A999GL84 | 5,000,000 | 0 | 99.5 | #N/A | 4,975,000 | #N/A | Price not available via Markit |
| CAESARS OCTAVIUS/LINQ, LLC TL 1L | HET | 9A999GJ76 | 3,000,000 | 0 | 99 | 101.175 | 2,970,000 | 3,035,250 | |
| IASIS HEALTHCARE TL B 1L USD (4/11) | IAS | 9A999GJ99 | 3,000,000 | 0 | 100.563 | 100.062 | 3,016,875 | 3,001,860 | |
| LIFECARE TLB (NEW) | LCARE | 9A999GG16 | 11,677,778 | 0 | 102 | 101.5 | 11,911,334 | 11,852,945 | |
| LIFECARE INCREMENTAL TLB | LCARE | 9A999GK96 | 0 | -2,100,000 | 4 | #N/A | - | #N/A | Price not available via Markit |
| LEE ENTERPRISES TL A 1L USD | LEE | 9A999GK03 | 2,000,000 | 0 | 89.5 | 87.75 | 1,790,000 | 1,755,000 | |
| NATIONAL SURGICAL HOSPITALS TL | NASHOS | 9A999GQ20 | 14,475,248 | 0 | 100.375 | 100.375 | 14,529,530 | 14,529,530 | |
| NATIONAL SURGICAL HOSPITALS DD | NASHOS | 9A999GG21 | 0 | -2,524,753 | -0.375 | -0.375 | 9,468 | 9,468 | |
| NYCO HOLDINGS 3 APS 12/29/2013 | NYCO | 9A999FB68 | 16,000,000 | 0 | 100 | 99.6875 | 16,000,000 | 15,950,000 | |
| PHYSICIAN ONCOLOGY TL B 1L (VANTAGE) | PHYONC | 9A999GH75 | 6,270,000 | 0 | 100 | 99.875 | 6,270,000 | 6,262,163 | |
| PHYSICIAN ONCOLOGY DD UNFUNDED (VANTAGE) | PHYONC | 9A999GH76 | 0 | -714,285 | 0 | 0.125 | - | (893) | |
| QUINTILES TRANSNATIONAL CORP  TL B 1L USD | QTRN | 9A999GL69 | 10,000,000 | 0 | 99.5 | 99.469 | 9,950,000 | 9,946,900 | |
| SELECT MEDICAL TL B 1L USD | SEM | 9A999GL15 | 25,000,000 | 0 | 99.25 | 99.2345 | 24,812,500 | 24,808,625 | |
| GREEN VALLEY RANCH GAMING LLC  TL 1L USD | STN | 9A999GJ18 | 20,447,978 | 0 | 88 | 87.764 | 17,994,221 | 17,945,953 | |
| STRATEGIC PARTNERS INC. 1ST LIEN TL | STRPAR | 9A999GA84 | 3,980,000 | 0 | 101 | 100.375 | 4,019,800 | 3,994,925 | |
| VALITAS HEALTH SERVICES TL B 1L USD | VALHEA | 9A999GL30 | 1,000,000 | 0 | 99.5 | 100.5 | 995,000 | 1,005,000 | |

*[0:00:00]*

Hello. Testing, testing, one, two, three. Testing, one, two, three. Testing, testing, one, two, three. *[Pornography playing in background]*

*[Transcription ends at 0:00:36]*

*[Transcription begins at 0:46:30]*

*[Phone ringing]*

*[Inaudible]*

*[Turns TV down]*

Not much. Just watchin' the game.

Uh, uh, both. I – so I talked to Joe beforehand. He said it sounded like – I can't remember where we left off when I talked to you, but he said –

*[0:47:00]*

it sounded like – kind of like, uh, in-between e-mail to Jake just send: "I'd like to meet you – with you, it's urgent, about company pricing rather than like the bold email, which made sense. The only problem was I saw Jake in the bathroom like 20 minutes before I sent that e-mail, so he's probably pissed, like why didn't you just tell me in the bathroom instead of sending me an e-mail, but whatever. He figured out pretty quick. So it was one of the more nerve-wracking meetings I've ever had in my life, and I just went in there and, um, Joe told me like created some like talking points and I had it pretty well scripted, so I brought it in with me and actually had my spy pen on me, so I _____ recorded. But, uh –

Did I tell Jake that?

*[0:48:00]*

Oh, I told him I might and he didn't say that's not right to do, so I actually sent him my recording on e-mail. Uh, I'll bring it home for you. It's nothing _____. Um, so I went in there, probably shitting my pants on the way into his office. Um, and talked to Jake for like a half an hour and just – he said I wanna know – I want you to know what's going on. You know, it's a delicate situation, um, and I'm tryin' to look out for my own interest but protect the firm, blah, blah, blah. Um, I – you know, that Chris brought me into his office a year and a half ago and did all that shady shit and I think I told you all about that. Um, and so Jake was like kinda taking notes the whole time and seemed interested and, um –

*[0:49:00]*

A 170

one thing he did bring up which was a little disappointing, but fair enough on his part, was he had said that, um – oh, I'm tryin' to watch the game at the same time. Um, he had said, well, it's been a year and a half, coulda brought this up sooner, like kinda nicer than that, like – I'm like, yeah, fair point. I – I did say that, um, when I was brought into Chris' office, there was no one there and, you know, I could not deny it 'cause then he knew that he could definitely fire me right away, so I did build up a little bit of a track record but, uh, I see your point about a year and a half. Um, so I think like the turning point in the whole conversation was when I told him I had a lawyer. Because I asked Joe beforehand should I tell him I have a lawyer? He said yeah, you probably should.

*[0:50:00]*

Because when I sent the – that e-mail I'll be – I have a serious concern with our, uh, pricing, and he's probably already pissed. Jake. And then I walk in there with like a notebook and like printed out piece of paper _____ can see, and then I'm like doing all this like strategic stuff in the meeting, um, once I told him I had a lawyer, I think he kinda put everything together and was like: "oh fuck". And he started asking all these questions about – he didn't ask who I was represented by, but he said what type of lawyer? Is he a securities lawyer, an employment lawyer? I'm like, well kinda both, and when talkin' to Joe, he had said just don't ever say anything about SEC, don't say anything about whistleblowing. So I knew he's a whistleblower lawyer, um, but I didn't bring that up. I'm like just employment law, securities law among other things.

*[0:51:00]*

And I – Jake seemed like really nervous and almost like pissed, so I kind of tapered it off a little bit and said, you know, Joe – or I didn't say his name, but I'm like we spent very little time together, I haven't met him in person, it's all in discretion, um, it's more advisement, I haven't really hired him. And then I – I coupled that with – I didn't tell him who Joe represented because I didn't wanna feel like I'm threatening him, but I said that he's like pretty prominent, the only reason he's dealing with me is 'cause I had a referral and I don't even know if I'm paying for him, basically referring I can't pay for him. So it was kind of like a dual approach to be like I'm not spending much time with him to you're dealing with a –

*[0:52:00]*

big-time fuckin' lawyer here. Um, and I – I – I think that if I hadn't have said that, that I had lawyered up, and led with that same exact approach, I think I probably would be sitting on the beach right now and not going back to work. But – not quite that drastic, but –

No, not right at that meeting, but I think it would have been a downhill slope real fast. Um, but once I said I had a lawyer, he just got really weird– like perked up big time, which ideally I don't wanna like have it happen to the head of the company, meaning

have it – like causing much concern, but at the same time, fuck it. My boss put me in ridiculously illegal, unethical position.

*[0:53:00]*

So fuck it. And I made that like abundantly, uh, uh, apparent. Like I said, like in-depth exactly how it went down, that there was no phone calls made, nothing on e-mail, no meetings. Chris told me to tell nobody about this, represent that I'm sending out the prices, and the whole time Jake's like taking notes about this, not really commenting. Um, so I think the key thing is that he knew I was lawyered up, which who knows – which now he knows why I'm doing what I'm doing, which is playing kinda hardball. And – and he's probably very concerned about it, which probably should be. Um, and he left it at that like, um, he's like I gotta talk to compliance, and –

*[0:54:00]*

he's like you'll get a call – you'll probably get a call from compliance, so we'll see what happens. I'll probably get a call tomorrow.

Um, I don't know. I'm not too worried about compliance. Like I am but I'm not nearly – much less stressful than this meeting 'cause compliance is like the police force, but they're like idiots, so I'm gonna be straightforward, but like I'm not dealing with anyone with like a lotta brain power, so I'm not likely intimidated. Whatever, I'll –

Jake? Yeah, I met with the head of the company.

Guy makes $22 million a year, $4 billion hedge fund and I'm – I'm walking in there with a stealth pen recording,(Laughs) tryin' to take him down.

I heard he pulls down $22 million a year.

*[0:55:00]*

And I'm basically inferring implicit way I'm lawyered up with one of the big-time lawyers in New York City and I have like your PM being like ridiculously illegal and breaking like all kinds of laws. And he –

He might. He might. He acted like he didn't. I didn't ask. Um, he might. I don't know.

No, you don't wanna ask that question.

*[0:56:00]*

Like my – my whole thing, the first thing I said when I walked in was, well, thanks for like taking the time to meet with me. But he's like ten minutes _____ said it was urgent, so no wonder, but after that, I was like, you know, this is a very, um, like informed

meeting. Um, it's very sensitive subject, and I just want you to know that it – there's a lotta deliberation in my mind about who to meet, and I'm tryin' to protect myself as much as respecting the firm. And then I went on to explain. And I said that like numerous times. And then it got a little uncomfortable because I just wanted him to like kinda read between the lines and figure it out, and when I said like –

*[0:57:00]*

I'm tryin' to like balance it between like respecting – you know, lookin' out for my safety and respecting the firm, he was kind of – at one point was like, well what does that mean? Like what's the alternative to respecting the firm or something like that? He – he was throwing the bait out to see if I would throw like SEC lawsuit or – or whistleblowing. That's what he wanted me to say. But I was well coached by Joe to say don't mention those words at all. And he tried to bait me a couple of times to say 'em, and I just dodged it, so it's good. Because if you say it, it's just like taking it to like another level beyond belief. So what's the point, you know? He probably figures that. And – and the whole thing is once – once he – once I told him I was lawyered up, I had like –

*[0:58:00]*

a big time lawyer, but can't really pay him 'cause you don't pay me, in a way, I think he got everything – now I think he understands everything I'm doing because it might have pissed him off with the whole thing, but he's like, Jason's concerned and got a lawyer, guy knows what he's doing, and, um, he's – he's being very methodical about what he does, so he's probably pretty concerned. So-

No, not quite. He touched on that. Like he – he – like the whole time he –

*[0:59:00]*

he was tryin' to bait me into like – like saying too much 'cause he would throw out like, "So how's it going with you and Chris?" Um, and he must know I hate him 'cause I do. Um, but I'm not gonna go for that, so I was like, you know, you can't – you can't say, oh, I love the guy, he's great because he – he'd know I'm full of shit, so it's just about playing the right midground, and I'm like, well, you know, it's – our day-to-day dialog is very civil. Um, he travels a lot so I don't see him in person and I – I talk to him on the phone, he's very responsive, but at the same time, the reason I'm here is because, like I felt like, Chris would fire me immediately, you know, after

*[1:00:00]*

putting me in that uncomfortable situation. So everything I said was kinda like with balance.

Yeah, it was very, very tight. Um, I don't know. Jake was kinda like, um, said something about like he could go to compliance versus me, and I was like, Jake, believe me, I

thought about that beyond belief, and I just felt like it was more respectful to go to you because, whether or not I went to compliance, HR, to Chris, it's all gonna go to you, so here I am, like, you know, ballsy move. Like I wanted him to know that, and I think he acknowledged that and he's like, yeah, I hear ya, I see what you mean.

*[1:01:00]*

But I don't know, I don't really trust the guy, I don't – I don't trust him. I don't distrust him, but I definitely don't trust him. So –

Yeah, well he – if he doesn't – if he didn't know what Chris is doing, he did a damn good job of acting like he didn't knew. He didn't – like he knew – did not know what he was doing. Because I think he – he knows like Chris is mismarking the book. I didn't think he – I don't think he knows that I was the one like just forwarding e-mails___, but he may have. I don't know. I don't give a shit. If he didn't, he should have.

Well, I – I didn't let him ask that because –

*[1:02:00]*

I wanted to let him know in – in no uncertain terms that I probably – I – I – as soon as I got home, I listened to the recording again, which by the way, the pen is fuckin' badass. Um, and I said probably three or four times, which is good 'cause I knew it was key, is to say, "Jake, my only intention is just to fix this. I don't wanna be involved in this pricing process the way it is. I just wanna fix it and move on and – and be, you know, valuable to the firm as a credit trader going forward." And I probably said that three times just to make sure because I was instructed not to say like SEC or blow the whistle, so I kept pressing on that – that's my only goal. And it is, so I hopefully put his concern that he is _____ 'cause he looked fuckin' completely distraught –

*[1:03:00]*

when he knew I was lawyered up.

No, I haven't. I – I've talked to him only over the phone. So I talked to him like two times before this, and then tonight when I got home, I called him at like 6:15, 6:30, called me back a little bit later. Um, and I walked him through what happened and then he – he didn't ask for it, but I was like I recorded the whole thing so I'll send that to you. He's like a really chill lawyer. I like him. Like a lotta lawyers, they're like traders in a way where like everything they say is so staged. It's like they have very deliberate and careful words and they're like always on the witness stand. It's hard to even – like they talk in circles.

*[1:04:00]*

Um, but Joe's cool, he's laid back and just like I feel like I can shoot the shit with him and not worry about being – like talking with a lawyer like on a witness stand. Uh, so

anyway, so I talked to him, and then I sent him the – actually downloaded the audio file, um, the whole recording and sent that to him and, uh, I'm like if you wanna listen to it, go ahead.

I think he's probably gonna charge me, but it's not a big deal, um, 'cause he's done like a lot for me, uh, and that he knows like – I don't think the reason he asked me my salary was to figure out how much they pay me, but he could infer off that. Like, he hasn't spent a lotta time, like I think what he's done for me so far has definitely worth a few grand, you know, so no big deal.

*[1:05:00]*

No. He said – like I brought it up the first one phone call___ and then he said the next time we talk, we'll figure that out. And he never brought it up, but he said, um, I plan on sending you an engagement letter, which I didn't really know what he's talking about, but _____ they'd send me – they're gonna send me a bill like____. So whatever____.

Um, like he's been – compared to the other lawyers I went to the first time, those guys like didn't do anything for me, and maybe it's because I got – it probably is because I got referred 'cause Joe's not gonna make much off this no matter what he charges me, but yeah, so that's probably totally what it is. But the other guys were like hire me over like they didn't give me shit. So Joe is –

*[1:06:00]*

Joe's like playing at a very good midground where he charged me a few grand, fine, but like that's been invaluable.

Yeah. All right, brother.

Well, uh, probably not, but tomorrow I think I'm gonna be getting a call from compliance, aka the Po-Po. So I'll have to deal with that first. Um, I don't – what's that?

Yeah. Yeah, they do. Joe said there's a slight chance that they could hire an external –

*[1:07:00]*

lawyer to come and sit with me, in which case he's like definitely call me and then I'm gonna come in. I'm like definitely will do that, but I don't think they're gonna do that at all.

Yeah, I asked him that and he's like, yeah, they probably would tell you. And he's like you could have me come in and sit with compliance even if they don't have their external lawyers, but I like Joe 'cause he's a straight shooter and he's like you probably don't wanna do that though 'cause that would be looked upon as very aggressive. I'm like yeah.

Like these – these guys like could totally fuck me, these lawyers, because I know nothing about law. I know about finance, and he could totally manipulate the situation and escalate it, just –

*[1:08:00]*

blow it up so I'm like blowing the whistle, I'm gettin' my life in disarray, but he's like – he seems like a really cool straight shooter, so very glad to have him, yeah.

I will.

All right, dog. Bye.

*[Transcription ends at 1:08:23]*



I certify that the foregoing documents were transcribed by Verbal Ink based on the audio files submitted by *(Client Name)* which were provided on *(Date of File Submission)*. The provided files were:

| Run-Time | Billable Minutes | File Title |
|---|---|---|
| | | Thorell-Friend-(Describe Meeting with Gottlieb) R-00007 |

* These transcripts were completed to the best of our ability.

*No words from the speaker in the recording have been changed or paraphrased.

* All employees of Verbal Ink are bound by a non-disclosure agreement.

Armando Reif

Account Executive

Verbal Ink

11/8/19

Date

## CONFIDENTIAL SETTLEMENT AGREEMENT

This Confidential Settlement Agreement ("Agreement") is by and between Jason Thorell ("Thorell" or "Employee") and Visium Asset Management, LP ("Visium" or the "Company").

WHEREAS, Thorell was employed by Visium commencing as of January 20, 2011;

WHEREAS, Employee's employment with the Company was terminated effective November 12, 2013 (the "Termination Date");

WHEREAS, Thorell has asserted that he was terminated unlawfully and the Company has denied such allegations; and

WHEREAS, the parties have agreed to settle, compromise and resolve Thorell's claims against the Company and its affiliates and related entities for the purpose of avoiding the costs, uncertainties and burdens of litigation; and

NOW, THEREFORE, in exchange for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.     This Agreement shall become effective upon the execution by all parties (the "Effective Date").

2.     Subject to the terms set forth herein, within five (5) business days of the Effective Date, the Company shall pay to Thorell the sum of One Hundred Seventy Five Thousand Dollars ($175,000.00), less applicable deductions and withholdings, in full and final settlement of Thorell's claims.

3.     Thorell acknowledges and agrees that the payments set forth in paragraph 2 include, without limitation, any and all amounts due or arguably due to him on account of wages, bonuses, salary, separation pay, incentive compensation, deferred compensation, profits

3507-15
Thorell

A\17)

interests, partners unit plan, vacation pay, paid time off, benefits or any other form of compensation from the Company or any of its affiliates or related entities.

4.    Thorell and Visium each shall bear their own costs, attorneys' fees and expenses incurred in connection with the settlement negotiations and the preparation and negotiation of this Agreement.

5.    In exchange for the payments and benefits set forth above and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Thorell, on behalf of himself and his heirs, executors, administrators, representatives and assigns, hereby forever unconditionally and irrevocably releases and discharges the Company and each of its affiliates, predecessors, successors, assigns and related investment vehicles, any employee benefit plans established or maintained by any of the foregoing entities and each and all of their respective current and former officers, directors, members, employees, trustees, agents, attorneys, representatives, partners, advisors and shareholders, (collectively and individually, the "Released Parties"), from any and all claims, causes of action, complaints, agreements, promises (express or implied), contracts, undertakings, covenants, guarantees, grievances, liabilities, damages, rights, obligations, expenses, debts and demands whatsoever, in law or equity, known or unknown, whether present or future, and of whatsoever kind or nature, which Thorell, his heirs, executors, administrators, representatives and assigns ever had, now have or hereafter can, shall or may have, for, upon, or by reason of any alleged or actual matter, cause or thing from the beginning of time until the date Thorell signs this Agreement, including, but not limited to, those arising out of, in connection with or relating in any way to the terms and conditions of Thorell's employment or the cessation of his employment.

Thorell understands and acknowledges that by signing this Agreement he is waiving and releasing any and all claims he may have concerning the terms and *conditions* of his employment and the termination of his employment under any federal, state, city or local law, including those prohibiting discrimination on the basis of sex, age, race, color, disability, religion, creed, national origin, ancestry, sexual orientation, pregnancy, handicap, marital status, citizenship or any other protected factor or characteristic, prohibiting discrimination for requesting or taking a family or medical leave, prohibiting discrimination with regard to benefits or any other terms and conditions of employment, or prohibiting retaliation in connection with any complaint or claim of alleged discrimination or harassment and that he intends to do so. As such, this release includes, but is not limited to, any claims arising under Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Civil Rights Act of 1866, the Employee Retirement Income Security Act ("ERISA"), the Equal Pay Act, the Americans with Disabilities Act, the Family and Medical Leave Act of 1993, the Worker Adjustment and Retraining Notification Act ("WARN"), the Uniformed Services Employment and Reemployment Rights Act, the U.S. Sarbanes Oxley Act of 2002, §§ 748(h)(1), 922(h)(1) and 1057 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, the New York State Labor Law, the New York State and New York City Human Rights Laws, each as amended, and any other federal, state or local statute or the common law.

Thorell hereby intends to expressly waive and relinquish, to the fullest extent permitted by law, all claims he may have against the Released Parties whether or not known or suspected to exist in his favor at the time of executing this Agreement. Thorell further acknowledges that he is aware that he may hereafter discover facts in addition to or different from those which he now knows or believes to be true with respect to the subject matter of this

Agreement, but it is his intention to, and he does fully, finally and forever settle and release any and all claims against the Released Parties in any forum whatsoever, whether known or unknown, suspected or unsuspected, which now exist, may hereafter exist, or heretofore have existed, and without regard to the subsequent discovery or existence of such different additional facts.

6.  Thorell represents and warrants that he has not filed any claim, action, lawsuit, charge, complaint, arbitration or proceeding of any kind against the Company or any of the Released Parties. Thorell further covenants and agrees that he will not bring any claim, action, lawsuit, charge, complaint, arbitration or proceeding of any kind, at law or in equity, against the Company or any of the Released Parties arising out of, in connection with or relating in any way to his employment or the termination of his employment or any of the claims released in paragraph 5 above. In the event Thorell violates this paragraph, Thorell agrees to pay all costs and expenses of defending against any such claim, action, lawsuit, charge, complaint, arbitration or proceeding incurred by the Company or any of the Released Parties, including reasonable attorneys' fees. Nothing herein, however shall prevent Thorell from enforcing the terms of this Agreement.

7.  Thorell represents that during his employment he had access to and possession of confidential and proprietary information about the Released Parties, their business, their clients and prospective clients, investors and prospective investors, service providers, vendors and information concerning other parties which the Released Parties agreed to hold in confidence ("Confidential Information"). Such Confidential Information includes but is not limited to any securities trading strategies, concepts, ideas, or plans; trade secrets, trading studies and analyses, and computer trading program systems relating to the Released Parties; inventions,

4

marketing plans, product plans, business strategies, financial information (including but not limited to any written information regarding the investment or trading performance or results of the Released Parties or any other employee, manager, or affiliate of the Released Parties), forecasts, personnel information and customer information. Confidential Information also includes, but is not limited to: knowledge of the Released Parties' operations; technical and scientific information; information relating to software architecture, design or code; research and development information; plans or projections; current and prospective customer and/or investor lists, advertiser lists, supplier lists, customer sales analyses, and price lists; and any other non-public information concerning the Released Parties' business. Thorell acknowledges the trade secret status of the Confidential Information, and that the Confidential Information constitutes a legitimate protectable interest of the Company. Thorell acknowledges that this Confidential Information is among the Company's most important business assets, that the value of this Confidential Information would be diminished or extinguished by disclosure and that by reason of such disclosure, the Company will suffer immediate and irreparable injury.

Thorell represents and warrants that during his employment he did not at any time disclose to any person or use for his benefit or the benefit of others (except in the performance of his obligations as an employee of the Company), any such Confidential Information obtained by him. Thorell further acknowledges and agrees that at all times following the cessation of his employment he will keep and hold all such Confidential Information in strict confidence and trust, and will not use, publish or disclose or permit others to use, publish or disclose in any manner, whether in written or oral form or otherwise (including but not limited to disclosure by means of speeches, papers or interviews), any Confidential Information without the prior written

consent of the Company, except as may be required by law subject to the provisions of paragraph

12 below.

8.    Thorell understands that all documents (including computer records, facsimiles and e-mail) and materials created, received or transmitted in connection with his work or using the Company's facilities are the Company's property.  Thorell hereby represents that, within two (2) business days after the Effective Date, he will destroy or deliver to the Company all documents and materials of any nature pertaining to his work with the Company.  Under no circumstances will Thorell retain any property of the Company, or any documents or materials or copies thereof containing any Confidential Information.  Further, Thorell represents that within five (5) business days after the Effective Date, he will return to the Company all Company property and equipment of any kind in his possession or under his control.  This includes computer equipment (hardware and software), BlackBerry, iPhone, smartphone or similar device, iPad, tablet, credit cards, office keys, security access cards, badges, identification cards and all files, documents, copies (including drafts) of any documentation or information (however stored), relating to the business of the Released Parties, their clients or prospective clients and investors or prospective investors.  Thorell further represents that he has downloaded onto a disk or flash drive and returned to the Company's Chief Compliance Officer any Company property stored or saved on any computer, storage device or cloud storage system (excluding those at the Company's offices) he has used or has access to, and has taken and will take all steps necessary to purge any and all Company property permanently from any such computer, storage device or cloud storage system he has used or has access to (excluding those at the Company's offices).

9.    (a)    Thorell agrees that he will not at any time disparage, criticize or ridicule any of the Released Parties, or make any negative public comments, whether by way of

6

news interviews, posting comments on, or publishing internet blogs or webpages (whether or not done anonymously or pseudonymously), publishing and/or circulating any other form of media, or the expression of his personal views, opinions or judgments to the media, internet blogs and webpages, or otherwise (whether or not done anonymously or pseudonymously), or to current or former officers, directors or employees of the Company or its affiliates, or to any third party within the financial services or investment management communities.

(b)      Visium shall instruct those individuals holding the title of Chief Investment Officer, Chief Administrative Officer, Chief Financial Officer, Chief Compliance Officer and General Counsel as of the Effective Date not to at any time disparage, criticize or ridicule Thorell, or make any negative public comments, whether by way of news interviews, posting comments on, or publishing internet blogs or webpages (whether or not done anonymously or pseudonymously), publishing and/or circulating any other form of media, or the expression of their personal views, opinions or judgments to the media, internet blogs and webpages, or otherwise (whether or not done anonymously or pseudonymously), or to current or former officers, directors or employees of the Company or its affiliates, or to any third party within the financial services or investment management communities.

(c)      Thorell shall direct prospective employers requesting a reference to Visium's Human Resources Department.  In response to any inquiry or request for a reference from a prospective employer of Thorell, Visium's Human Resources Department will provide a neutral reference consisting only of confirmation of Thorell's dates of employment and his last position held and a statement that providing any additional information is prohibited by Visium's personnel policies.

7

10.     (a)     Thorell acknowledges and agrees that that the terms and conditions of this Agreement, the settlement negotiations that led up to this Agreement, the amount and form of consideration, and the existence of this Agreement (together, "Settlement Information") are confidential and sensitive information and represents and agrees that he has not and will not disclose any Settlement Information to any third party other than (i) to his immediate family, attorneys or, with respect to the amount and form of consideration hereunder only, his accountant or tax preparer, and then only after securing the agreement of such individual to maintain the confidentiality of the Agreement and its terms and of its existence, (ii) in response to a subpoena, regulator's request or other legal process, subject to the provisions of paragraph 12 below.

(b)     Visium acknowledges and agree that the Settlement Information is confidential and sensitive information and represents and agrees that it will not disclose any Settlement Information to any third party other than to its employees with a business need to know, its attorneys, accountants, or tax advisors, or as otherwise required by law, regulation or business necessity, or in response to a subpoena, regulator's request, or other legal process.

(c)     Notwithstanding the foregoing, it shall not be deemed a breach of this paragraph 10 for either party to reference, use or submit this Agreement in any bona fide dispute seeking to enforce the terms of this Agreement, except that the parties agree that they will use their best efforts to seek to file any documents that reference this Agreement or any of its terms under seal, subject to and in accordance with any applicable rules of court or the assigned judge's individual practices.

11.     (a)     Thorell agrees to cooperate fully in all respects with the Released Parties in connection with any and all existing or future claims, investigations, arbitrations, proceedings, litigations or examinations involving any of the Released Parties which relate to his

8

service. This cooperation shall include, without limitation, making himself available on reasonable notice for interviews and other communications with in-house and outside counsel acting on behalf of the Company in connection with any such matter and appearing without a subpoena for a deposition or to give testimony in any hearing, trial or arbitration at the request of the Company. Nothing herein shall limit Thorell's right to representation by an attorney of his choosing (and at his expense) in connection with any such cooperation, including interviews or other communications with Visium's in-house or outside counsel.

(b)     For the avoidance of doubt, nothing in this paragraph 11 or elsewhere in the Agreement is intended in any way to prevent Thorell from testifying fully and truthfully in any action or proceeding or in connection with any regulatory matter.

12.     In the event Thorell receives a subpoena or other legal process (including, to the extent permitted by applicable law, rule or regulation, a request by regulators) related to his employment with the Company, or requesting disclosure of Confidential Information or Settlement Information, he shall promptly notify the Company's General Counsel in writing so that the Company will have adequate time to consider and take any appropriate action to object to such disclosure or preserve the confidentiality of any information sought. Nothing in this subsection shall prohibit Thorell from complying with any lawful subpoena, legal process or court order or taking any other actions affirmatively required by law.

13.     Notwithstanding any provisions in this Agreement to the contrary, no promise, representation, warranty, covenant or restriction in this Agreement shall limit, restrict, or apply in any way, to Thorell's right to file or his participation in any investigative proceeding of any federal, state, or local government agency or to Thorell's provision of truthful information in connection with any such proceeding. Thorell agrees that in connection with any such

9

proceeding, he shall not be entitled to recovery of individual monetary relief or other individual remedies that he could have obtained through asserting a claim against any of the Released Parties.

14.   This Agreement amicably resolves any issues between the parties and they agree that this Agreement shall neither be interpreted nor construed as an admission of any wrongdoing or liability on the part of Visium or any of the Released Parties.

15.   This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of law. The parties agree that any and all actions and proceedings arising out of or relating to this Agreement shall be heard and determined exclusively in, and the parties hereto agree to submit to the exclusive jurisdiction of, any New York state or federal court, in each case sitting in the Borough of Manhattan.

16.   Thorell has read this Agreement, has had an adequate opportunity to review its terms and consult with counsel of his choice and at his own expense in connection with the decision to enter into this Agreement, understands its terms and consequences and is executing it freely and voluntarily.

17.   In the event Employee breaches this Agreement, the Company's obligations shall cease and it shall be entitled to recover all amounts paid under this Agreement in addition to any other remedies at law or in equity it may have.

18.   If any provision of this Agreement shall be held invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired, and the parties undertake to implement all efforts which are necessary, desirable and sufficient to amend,

10

supplement or substitute all and any such invalid, illegal or unenforceable provisions with
enforceable and valid provisions which would produce as nearly as may be possible to the fullest
extent afforded under the law the result previously intended by the parties without renegotiation
of any material terms and conditions stipulated herein.

19.     This Agreement shall be binding on and shall inure to the benefit of
Employee's heirs, executors, administrators, representatives and assigns and the Company's
successors in interest and assigns.  Employee may not assign any of his rights or duties
hereunder, except with the written consent of the Company.  Employee represents and warrants
that he has not assigned or attempted to assign any rights or claims he may have against any of
the Released Parties at any time prior to signing this Agreement.

20.     Except as expressly provided herein, this Agreement contains the entire
agreement between Employee and the Company and supersedes and cancels any prior agreement
or understanding between the parties on the subjects covered herein.  No agreements,
representations or statements of either party not contained in this Agreement shall bind that
party.  Employee acknowledges that he has not relied on any statements, representations or
promised not specifically contained in this Agreement.  This Agreement can be modified, or any
of its provisions waived, only in writing signed by both parties.

21.     This Agreement may be signed in separate counterparts, each of which
taken together shall constitute a single instrument.  The parties agree to accept a fax or pdf
signature as a fully binding original, provided that each party also exchanges an ink-signed
original.

11

IN WITNESS WHEREOF, the parties have executed this Agreement.

VISIUM ASSET MANAGEMENT, LP

By: _____

NAME
TITLE

Date: _____June 13, 2014_____

JASON THORELL

_____

Date: _____June, 13, 2014_____

12

[0:00:00]

| | |
|---|---|
| *Thorell:* | Right. Yeah, I suppose I should do that. I guess it would get back to Chris but my job would then be safe, you know. |
| *Stefan:* | No, I don't think it would be. I mean they would probably still end up – like once you report to compliance, like, I don't know. They might try to bury it. Likely, they'll try to bury it. They might get rid of you and threaten to sue you if you disclose it or disparage anything. You know, who knows? Like there's like – it's kinda like they -- |
| *Thorell:* | Well no, it could be the other way around. It could be they don't want to – they know they're in the wrong. They don't want to deal with someone who has, could have evidence to -- I mean that's like serious shit, mismarking a book. |
| *Stefan:* | I know. I mean the problem is it's so prevalent that it's like – like, Chris has been doing this since that book started, under Jake's -- |
| *Thorell:* | Yes. |
| *Stefan:* | Jake has told him effectively to do that. |

[0:01:00]

| | |
|---|---|
| *Thorell:* | Yes. |
| *Stefan:* | You know, and his arguments were, well, you know, the – you know, well, it's a – we have one investor and it doesn't really make a difference. They just want to see volatility, uh, or they'll make some excuse like on valuation of, uh, ATI. |
| | He'll set a valuation based on an above the line EBITDA as opposed to, like, bottom line EBITDA, or like the one that really kinda got me and it was like this is just beyond wrong. |
| | And that's, like, when I decided to have that, like, to expedite my exit from there and have that conversation, and I did not want to be around for that marking of that situation, was when they finally said – when, when I found out, when, when I found out that the – and I disclosed this to Jake and to Chris, that the proforma estimates have come down significantly from positive, like, $12 million EBITDA, to negative EBITDA for the next two years. |
| *Thorell:* | Mmm-hmm. |

A172  P1-18

| | |
|---|---|
| *Stefan:*<br><br>*[0:02:00]* | Like, Chris has said "we don't have to disclose that. This is backward-looking, this is on trailing, so we only have to use estimates, uh, when we're marking this thing based on where those estimates were back in December, which seems like ridiculous to me. |
| *Thorell:* | It seems completely ridiculous. |
| *Stefan:* | It sounds ridiculous but he's saying that that's the – he's already spoken to Ku and it's only based on a trailing number. No [interference] I mean, like if it were anything else, a public company, the stock would be down like 60 percent. |
| *Thorell:* | I hear you. |
| *Stefan:* | So I mean he's concealing this and, I mean I told you about China Med. Like I spoke to a couple of guys at DuPont and stuff like that. They all this thing marked at a penny. Like, Chris is the only one that has this marked where he has it. |
| *Thorell:* | Yeah, it traces at a penny several times. |
| *Stefan:* | I know, but, like, he's the only one who has it marked there and his argument is that we're part of a directing class that's gonna get all of the proceeds. It's like, it's like ridiculous. |
| *Thorell:* | It's bullshit. |
| *Stefan:* | It's completely bullshit. |
| *Thorell:* | It's bullshit. |
| *[0:03:00]* | |
| *Stefan:* | But I'm just concerned for you that, like, I'll find out more from Rahul but, like, uh, uh –. |
| *Thorell:* | I'm gonna – so yeah, if you could find out more. I would even meet with, with Bart and Rahul. I know most of those guys and I don't know what to. I can see why they're pissed and I guess, like, that's the angle that it would take but I mean -- |
| *Stefan:* | This is – I don't, I don't know if they're doing – if they're taking this personally. Like, they're, like – it's, like, it's because Visium is suing them or Visium is suing Rahul and, and, and really fucking |

|  |  |
|---|---|
|  | with them that they want to use this as their advantage to their edge and, like, there's a lot of disdain going on. Like, I don't know. |
| Thorell: | Yeah. |
| Stefan: | I mean, like, the conversations from their lawyers were almost like you need to -- you need to, uh, report to the SEC. |
| Thorell: | Yeah. |
| Stefan: | So, I mean something could happen there, like, I – and that whole place could blow up if that if this gets out. |
| Thorell: | Um, yeah. I, I would actually – before they pull the trigger on this I wouldn't mind like talking to those guys. |
| [0:04:00] |  |
| Stefan: | Yeah. |
| Thorell: | Um, and either like, aligning myself and getting ready to resign and joining, because either way if they go that route I'm gonna be involved and I'm gonna be -- I'm gonna be taken down or one of them is gonna be taken down. |
| Stefan: | I mean you might be; you might be scapegoated and they might –. |
| Thorell: | Yeah. |
| Stefan: | -- like call the SEC and have you –. |
| Thorell: | No, I think I should preempt it and either align with these guys or try and talk 'em out of it or – but they – they can do it, if they could do it but it just sucks that -- |
| Stefan: | Yeah, what I – what I think you should do is you need to find yourself, uh, an attorney and, and disclose this to them what's going on at Visium. Um, I mean, hopefully, this whole thing kind of like does not come out right now, for many reasons. |
| Thorell: | Yeah. |
| Stefan: | Like, one of the reasons is also my sister is in settlement negotiations. |
| Thorell: | Mm-hmm. |

| | |
|---|---|
| *Stefan:* | And she doesn't want this whole thing to blow up, obviously. |
| *[0:05:00]* | |
| *Thorell:* | Yeah. |
| *Stefan:* | So, I don't, you know, uh, hopefully this, this could get done. But, like, I would start making my exit, 'cause you don't, you don't want to be there when that happens because they're definitely gonna scapegoat you. There's no fucking question in my mind that they're gonna turn, point the fingers at you and say that it's been you doing it and –. |
| *Thorell:* | Yeah. |
| *Stefan:* | They might have the cops come in and take you out in cuffs. |
| *Thorell:* | Yeah. I just don't know what I could have done differently. Like as soon as Chris told me that, I was just like speechless. I couldn't believe he was asking me, but what do you do? Do you say no? He is gonna want to fire you, and you could try and sue but it's just like a path I didn't want to take. |
| *Stefan:* | Yeah, no, I understand. |
| *Thorell:* | So you know -- |
| *Stefan:* | I understand. |
| *Thorell:* | Yeah. |
| *Stefan:* | Yeah. But, like, somehow you need to document this to protect your ass is my point, like, and I've done that for myself. |
| *Thorell:* | Yeah. |
| *Stefan:* | Like, I have recorded every conversation I've had with Chris when he's asked me to mark shit, where to mark it. |
| *Thorell:* | Like, verbally? |
| *Stefan:* | Yeah, I've tape recorded every conversation with Chris. |
| *Thorell:* | Oh, so you have like a pen or something? |

| | |
|---|---|
| *Stefan:* | What's that? |
| *[0:06:00]* | |
| *Thorell:* | Is it like a voice recorder or phone recorder? |
| *Stefan:* | I have a -- I have a small voice recorder that I carry with me on the phone or around the office and I documented everything. So –. |
| *Thorell:* | Yeah, I thought about doing that but technically I was told if you hook up a voice recorder to a phone internally, you'd have to let the other party know. |
| *Stefan:* | Actually, that's not true. Legally, you – as long as you're part of a conversation in the state of New York, you're allowed to record it. What you can't do –. |
| *Thorell:* | Okay. |
| *Stefan:* | What you need to disclose is if you're not a party to the conversation you need to disclose that you are recording the conversation. If you are the person –. |
| *Thorell:* | Okay. |
| *Stefan:* | In the discussion, you're allowed to tape record it without disclosing it. |
| *Thorell:* | Okay. Um, what about if, if you're not on the phone, like, in someone's office, can you tape it? |
| *Stefan:* | Yeah. Any conversation can be tape recorded that you're a part of. |
| *Thorell:* | All right. |
| *Stefan:* | What you can't do is like be part of – like not be part of a conversation and tape record something. |
| *[0:07:00]* | |
| *Thorell:* | Yeah, yeah, I understand. Wish I had that initial request tape recorded. |
| *Stefan:* | Yeah. Yeah, so, I mean you should probably document at least one incident of that, where he asked you to do that, like, month end to just cover your ass. |

| | |
|---|---|
| *Thorell:* | Well, yeah, but the thing is he doesn't ask me to do it, he'll forward me the e-mail, um and -- of what he wants marked and then I just, uh -- I re-paste it to like a separate e-mail, reattach it and I send it out as if it was my own. |
| | But that's all, like -- that's all on e-mail, like people can see – they could go in there and see Chris sending me the thing and then me just sending the exact same thing out to ops with my name on it. |
| *Stefan:* | Yeah, but you should print that out, but what about the – oh, he is sending you e-mail with the levels? |
| *Thorell:* | Yeah, and then, like, I'll take his e-mail and take it then if they -- |
| *Stefan:* | Wait a second, wait a second, he is e-mailing you levels? |
| *Thorell:*  [0:08:00] | Yeah. So that's all the proof I need, right? Because it goes to me, directly just to me, I take the e-mail, instead of forwarding it, I copy it and save the file, and then I resend with, with me sending it out with his file attached. |
| *Stefan:* | Ahh, but back up a second, back up a second. Look, 'cause this is like something different than the way he's operated in the past. |
| | So Chris is sending you an e-mail with, like, China Med, he's like – and it will say these are the levels I think they are 50 cents and all that, and he sends you that e-mail to your Visium address from his Visium address. |
| *Thorell:* | Yeah. |
| *Stefan:* | All right. He is a fucking idiot, by the way. |
| *Thorell:* | Yeah. |
| *Stefan:* | He is so fucking stupid. That is the dumbest thing. |
| *Thorell:* | Yeah. |
| *Stefan:* | He is not even smart enough to cover his tracks. |
| *Thorell:* | Right. I mean I'd basically just get that and then I would get backup from, from him, you, whoever, and then I have officially – |

| | |
|---|---|
| *Stefan:* | What you need to do, what you need to do is, uh, print that e-mail out. |
| *Thorell:* | Yeah. |
| *Stefan:* [0:09:00] | So, every time he sends you that e-mail or, like, like that's all the proof you really need, really. |
| *Thorell:* | Right. So I almost want to be aligned with these guys, but, uh, when you meet with them see what they say and just – I don't mind if you just say, like, in fact, I kinda wouldn't – I would prefer if you don't mind just saying, like, I don't know if you want to tell them all this. |
| | But just – if they're gonna go try and take Credit down, I don't think they really give a shit about me at this point. Um, but I'm directly implicated, so I'm gonna have to try and figure out how to protect myself but that's -- |
| *Stefan:* | Yeah. I mean you, you get that, you get that e-mail. I mean, uh, if this is gonna go down, like before this goes down also I'm gonna get myself a criminal attorney. |
| *Thorell:* | Mmm-hmm. |
| *Stefan:* | Uh, right now I just have, uh, an employment attorney advising me but, yeah, I'll have to get a criminal attorney and, like, watch -- wait for them to fucking try to throw me under the bus and then, you know, and, and do it preemptively. |
| [0:10:00] | And, you know, like, if they're gonna go public with this, that whole -- like, that whole thing is going down. |
| *Thorell:* | So they – |
| *Stefan:* | And they're gonna – there is no question that they will point fingers at other parties and Chris will be, like, whoa, I didn't know, like, I -- |
| *Thorell:* | He'll blame it on me. |
| *Stefan:* | It was a trader's job to get the levels, you know, and like that was it. |
| *Thorell:* | Yeah. |

| | |
|---|---|
| *Stefan:* | And he did it because he wanted to get a higher bonus, you know. He'll play dumb. And Jake does the same thing. |
| *Thorell:* | Sure, yeah. I mean I absolutely know I'll be thrown under the bus. To get an employment attorney is probably the right way to start. Do you have to pay them upfront? |
| *Stefan:* | Uh, I have an employment attorney but, like, he's only gonna advise you as to, like, get out of your contract and negotiate settlements for exit and stuff like that. |
| | He's not a, he's not gonna tell you — I mean you know some stuff. I don't know how much you need at this point until you're ready to leave. |
| *Thorell:* | Yeah. |
| *Stefan: [0:11:00]* | Right. You usually have to pay him a retainer for consultation, and like consultation can run -- I mean my guy charged me $780 an hour. |
| *Thorell:* | Uh-oh. |
| *Stefan:* | Um, and, uh, Rahul has a guy also that charges him, like, uh, that is charging him like a flat rate. So, throughout this whole thing he is charging him like $60,000. |
| *Thorell:* | Jesus. |
| *Stefan:* | So that's a -- it's a reasonable expense, uh. My attorney is also charging me — is gonna cap me at $5,000. I've already paid him $4,000. He'll cap me at $5,000, plus I gotta give him, uh, like 20 percent of, or 10 percent of everything that I'm able to extract out of Visium, like, from deferred compensation. |
| *Thorell:* | Mmm-hmm. |
| *Stefan:* | Stuff like that. |
| *Thorell:* | All right. |
| *Stefan:* | So, it's something like that. So, it's like – it doesn't have to be 60,000. He is, like, in a – he's in a much more litigious battle, like, he's protecting himself from Visium suing him for $3 million. Like, I don't think Visium —. |

| Thorell: | Right. |
|---|---|
| Stefan: | Is gonna sue you for $3 million unless you go out and start soliciting to start a fund. |

[0:12:00]

| Thorell: | Yeah, yeah, yeah. |
|---|---|
| Stefan: | Right, and I think my case is much better. Even if I did decide to do something along those lines, I'm not saying I am, but like the fact that like the history between, uh, Jake and my sister, uh, the way they manipulated my portfolio, the way they pulled the portfolio away from me for no legitimate reasons, I don't think they have a case to kind of bind me to prevent me from starting a fund or doing anything. |
| Thorell: | Yeah. |
| Stefan: | Right. |
| Thorell: | It doesn't sound like it. |
| Stefan: | No, it's ridiculous. Um, but yeah. So the reason I asked for your employment contract, I – do me a favor, look, see if you have one, um, I'm just kinda curious. |
| | I can make the argument that as of – effectively as of November when they took my portfolio away, that, uh, that would have started my noncompete effectively because I was, uh, constructively terminated as a portfolio manager as of that point. So, then I would be bound by not that contract but by a contract that would be more similar to yours. |

[0:13:00]

| Thorell: | Yeah. Um, I, you know, I don't recall, like, getting a noncompete or anything but I guess I could call Lee. I don't know it's the right move. I could verify it through her but then I don't want it to get to Ku. It'd look suspicious if I'm checking like my employment contract. You know what I mean? |
|---|---|
| Stefan: | No, it, it will and don't, don't you – just check your -- check if your e-mails. They would have sent you one to your personal e-mail before you came onboard. |

| | |
|---|---|
| Thorell: | Yeah, I just did and I didn't see anything. Um, I'll look around a couple folders but I thought that she -- |
| Stefan: | From, from Steve. |
| Thorell: | All right. |
| Stefan: | So Steve -- see it's from Steve Ku. Check your folders, Steve Ku or Mark Gottlieb. |
| Thorell: | Yeah. |
| Stefan: | Or -- right. |
| Thorell: | Um, I mean I definitely don't have it in my Visium folder. So, I don't know why –. |
| Stefan: | Or what about Suzy Redd? Suzy Redd was there, right? |
| Thorell: | Who? |
| Stefan: | Was Suzy Redd there when you were, uh, hired? |
| Thorell: | No, no. |
| Stefan: | Who was, who was –? |
| Thorell: | I was talking, I was talking to Vinny, Mark Gottlieb. |
| Stefan: | Yeah. |
| Thorell: | Um, that's pretty much it. |
| [0:14:00] | |
| Stefan: | All right. Well, check. It would be somebody maybe in the HR at that point would have sent you something for you to sign. Um –. |
| Thorell: | Yeah, nothing. |
| Stefan: | Yeah. |
| Thorell: | I think we – who did we have for HR then, nobody? |
| Stefan: | Uh, I mean Vinny was kind of acting as HR a little bit and, uh, and– |

| | |
|---|---|
| Thorell: | Yeah. |
| Stefan: | And, uh, who else? I thought it was Suzy Redd or, uh –. What was the name of the Asian woman? |
| Thorell: | I don't know. |
| Stefan: | Uh, fuck, I don't know. I don't know. Just do a search maybe for contract, employment contract or something like that in your e-mail. |
| Thorell: | Yeah, I'll, I'll look a little more, but offhand I, I didn't see anything I don't recall it, which seems strange. |
| Stefan:<br><br>[0:15:00] | Yeah. I, I mean I could call Lee. I'm just a little bit nervous that, uh – I mean I like Lee a lot and I trust him but I'm just a – I know he loves Visium and he's really gunning to stay there and to get his own portfolio there, right. I'm just a little bit nervous that something I tell Lee might go back to Chris or Jake or something. |
| Thorell: | Yeah, I don't know if I would use the word loves Visium by any means. |
| Stefan: | What's that? |
| Thorell: | Um – I don't know if I would say he loves Visium. I think he's trying to – like, I don't want to get into his shit but, like, he is trying that route and other routes, you know. |
| Stefan: | You think he's trying to leave Visium? |
| Thorell: | I'm not -- I don't want to get into his business. Like, I think we're all looking, you know. |
| Stefan: | Got it. I mean I, I get that. I mean he's really been pitching himself to the street as, uh, as his own – as a portfolio manager at Visium. |
| Thorell: | Yeah, I think he has [laughter.] |
| Stefan: | Yeah, so. Yeah. |
| Thorell:<br><br>[0:16:00] | Um, so I, I don't know what his deal is. But like he – Lee sometimes runs his mouth a little bit much but I'd like to think that if you talked to him he wouldn't be stupid enough to say something to either of those guys. |

| | |
|---|---|
| *Stefan:* | Yeah. Well, I definitely don't want to mention any of this just 'cause I think he likes Chris even though he doesn't feel like he's – he thinks he's underpaid, right, so he does complain a lot. |
| *Thorell:* | Yeah. |
| *Stefan:* | But like, I know that he's been kissing, like, Chris' ass and it's probably just to his benefit to, like, make sure everything's kosher and to get paid and all that stuff, as much as he can. So, you know, he's, he's a little bit more political than I am about that. |
| *Thorell:* | Yeah. |
| *Stefan:* | But, uh, but I, you know, I don't know – |
| *Thorell:* | A little bit. |
| *Stefan:* | How much he's playing that game or he really, like, will like, he really likes Chris and all that. I don't know. |
| *Thorell:* | No, he doesn't like Chris at all. He hates him. |
| *Stefan:* | Really? All right. |
| *Thorell:* | Yeah. Nobody does, nobody likes him. |
| *Stefan:* | I didn't realize that. |
| *Thorell:* | Yeah – no. Everyone hates Chris. |
| *Stefan:* | I don't know, he never told me that. I mean he said he was upset with the way he was compensated but I just know that he likes –. |
| *Thorell:* | Well –. |
| *Stefan:*<br>*[0:17:00]* | He loves the fact that Visium is a healthcare specific company and he thinks he's got edge there and I think he wants – he's been gunning to run his own portfolio there for a while. |
| *Thorell:* | Yeah, but he's been saying that since I started practically, I feel like. Uh, uh, and I don't know, like, the context and the conversation.<br><br>But I think he was just trying – like, he's trying to get something done internally, um. Maybe he didn't go to the extreme and say, |

|  |  |
|---|---|
|  | hey, Chris – I shouldn't put words in his mouth but he knows he is a thief just like everyone else. Um, so he's trying to do things internally to better his position and that's, that's probably all he's saying. |
| *Stefan:* | Yeah. So, meaning he's trying to convince Jake to give him money to run his own portfolio. Like, I know he's been trying to –. |
| *Thorell:* | Yeah, I mean it's just not gonna happen. |
| *Stefan:* | -- trying to get a CLO or something like that. |
| *Thorell:* | Yeah. I don't know if he's gone to Jake directly. He has his own way of doing it, but I don't think that's gonna happen. |
| *Stefan:* | I mean it would happen if Chris got fired, I guarantee you. |
| *Thorell:* | Oh yeah. Yeah, he would – it probably would. |
| *Stefan:* [0:18:00] | I mean they'd have no choice. Like they would have to find somebody there and try to pitch it as he was the guy who kind of uh, doing all the work and, you know, effectively running a portfolio. I mean they would spin it, right, they would try to spin it. |
| *Thorell:* | Right. Yeah. |
| *Stefan:* | I mean here's the thing. It's like Rahul is raising money from – you know the parties, right, from Steven Schonfeld and from, uh, Lighthouse. |
| *Thorell:* | Yeah, yeah. |
| *Stefan:* | Steven Schonfeld was considering and had been considering putting money into credit. |
| *Thorell:* | Mmm-hmm. |
| *Stefan:* | And Rahul is – hasn't said anything but wants to tell them, for their own protection why they should not but he's -- |
| *Thorell:* | Mmm-hmm. |
| *Stefan:* | He's kind of conflicted because by doing that, he puts himself further under the bus that he's been disparaging Visium. |
| *Thorell:* | Right. |

| | |
|---|---|
| *Stefan:* | Right. And, and, uh, and strengthening their case that there is a disparagement, that he's stealing customers. |
| *Thorell:* | Right. |
| *Stefan: [0:19:00]* | So, like the only way to do to that might be to actually physically report them to the SEC that it is fraudulent. |
| *Thorell:* | Okay. |
| *Stefan:* | So -- |
| *Thorell:* | Um -- |
| *Stefan:* | Uh, you know, I don't know when this goes down. |
| *Thorell:* | When is Lee gonna meet with him? |
| *Stefan:* | What's that? |
| *Thorell:* | When is he gonna meet with him? When is gonna -- |
| *Stefan:* | I'm gonna meet with him on – like, Tuesday or Wednesday, this week. |
| *Thorell:* | All right, well –. |
| *Stefan:* | I'll tell. I'll tell them. I'll tell them – don't talk to them. Don't tell them I told you anything. |
| *Thorell:* | Yeah. |
| *Stefan:* | Just wait for me, for my meeting to finish. I'll see, I'll get a better sense for timing of what's gonna happen but, you know, for your own benefit, dude, you should be looking elsewhere aggressively. |
| *Thorell:* | Yeah, okay. Um, definitely try to keep me in the loop after you meet with these guys, 'cause I'm – I mean I'll have to think about this quite a bit. I'm glad you gave me a heads up, so protect myself and start taking some preemptive moves but -- |
| *Stefan: [0:20:00]* | Yeah, don't -- what you can't do, and, and maybe I made this mistake because they'll come – they'll try to come after me for stealing, uh, Visium information or something like that. If they do, but I basically e-mailed myself to my personal account a lot of this |

|  |  |
|---|---|
|  | evidence, and that's what I've been doing basically since June. Like, I've been spending a lot of time just collecting e-mails and sending them to myself so like just protect my own ass. |
| *Thorell:* | Mmm-hmm. |
| *Stefan:* | Right. Um -- |
| *Thorell:* | Yeah. |
| *Stefan:* | So, like, that's – so I've done that but like, they -- they track all that. Uh, you know, even if you use blind copies, I think they know everything that I've been doing. |
| *Thorell:* | Yeah. |
| *Stefan:* | So my lawyers says that they can track anything you do on their computers. |
| *Thorell:* | Right. |
| *Stefan:* | So, what you need to do is like what they can't really track is you printing shit out. |
| *Thorell:* | Right. |
| *Stefan:* | So he just says paper copies, just print them out. |
| *Thorell:* | Yeah, yeah, yeah. |
| *Stefan:* | And voice recorders, that's really all you can do. |
| *Thorell:* | Yeah, that's the safest way to do it. Well, that's good to know. Um, I'll look around a little more to make sure I didn't sign anything like that, I don't recall it. And then, um just any – |
| *[0:21:00]* |  |
| *Stefan:* | You think -- you think it'd be pretty safe just asking – I guess I don't have to tell 'em anything, I can just ask Lee what his employment contract is. You don't think he'll throw me under the bus and tell Chris or something? |
| *Thorell:* | No, no, I don't. |
| *Stefan:* | Yeah. |

| | |
|---|---|
| *Thorell:* | Uh, uh –. |
| *Stefan:* | I just don't want to give them any – I don't want them to think that I'm worried about getting sued. |
| *Thorell:* | Um, no, I think – I think you'd be safe. I, I don't think Lee would burn you like that at all. Just make sure that he knows not to say anything. Um, he's opened his mouth but not – like, he talks a lot but about shit that's like to extreme but not like shit as serious aa this, you know. |
| *Stefan:* | Yeah, yeah, yeah. I mean I -- I'm just wondering if I should tell, you know – I want to kinda keep this quiet. Like, I don't want to tell Lee –. I, I want to tell you because you're – you could be thrown under the bus. I don't think there is any shot that Lee is gonna be -- could be implicated in this, because, A, they're not even in his positions, B, he's just an analyst there. |
| *[0:22:00]* | |
| *Thorell:* | Right. |
| *Stefan:* | Right. It's really the people that are kind of marking the books, that's why I'm telling you to protect your own ass. |
| *Thorell:* | Right. |
| *Stefan:* | So – |
| *Thorell:* | Yeah. |
| *Stefan:* | I mean I'll definitely tell Lee and Ameesh like before anything happens so they can kind of, like, structure their escapes but, like, I don't want to –. |
| *Thorell:* | Mmm-hmm. |
| *Stefan:* | Tip them off to this shit yet. |
| *Thorell:* | Yeah, okay. |
| *Stefan:* | Once that happens it snowballs and then –. |
| *Thorell:* | Well, I'll –. |
| *Stefan:* | -- this whole thing kinda gets, uh, unwound pretty quickly. |

| | |
|---|---|
| *Thorell:* | Yeah. I'll keep it quiet. Uh, I would go on the aggressive right now if I had something to fall back to but I don't. But I've been trying to be a little more proactive on looking. Um, I just, I've got a couple of referrals out there but, uh, I haven't heard back yet. So I did start being proactive in things like that. |
| *Stefan:* | Got it. I'm gonna -- I'll shoot your resume over to, uh, uh, Wingspan. You know, I did play poker with Dersh the other day. |
| *Thorell:* [0:23:00] | Yeah. |
| *Stefan:* | So I could your resume over there. And, uh, I'll send it over to Venor, maybe Venor could be interested. They're looking to expand. |
| *Thorell:* | Yeah, just um -- that would be great. Just make sure they know that I'm still there and to keep it quiet, you know. |
| *Stefan:* | Yeah, yeah, of course, of course. |
| *Thorell:* | Okay, I appreciate that. |
| *Stefan:* | All right, man. |
| *Thorell:* | Yeah. All right, man, I'll, I'll, uh -- I'll talk to you soon. |
| *Stefan:* | Okay, talk to you later, bye. |
| *Thorell:* | All right, bye. |
| [0:23:32] | |
| [End of Audio] | |



I certify that the foregoing documents were transcribed by Verbal Ink based on the audio files submitted by *Stefan Lumiere* which were provided on *(2/11/19)*. The provided files were:

| Run-Time | Billable Minutes | File Title |
|---|---|---|
|  |  | Conv Jason (Tell Jason Something wrong) 5.12.13 |

\* These transcripts were completed to the best of our ability.
\*No words from the speaker in the recording have been changed or paraphrased.
\* All employees of Verbal Ink are bound by a non-disclosure agreement.

Armando Reif

Account Executive

Verbal Ink

Date     7/17/19

| | |
|---|---|
| *S Lumiere:* | Uh, it's getting kinda, like, tight, so all the cartilage and the scar tissue, you know, obviously, just wanted out a week early. How's it look? |
| *C Plaford:* | I don't know. Hold your arm over your head. |
| *S Lumiere:* | Yeah. *[Laughs]* |
| *C Plaford:* | Yeah, yeah. |
| *S Lumiere:* | Huh? |
| *C Plaford:* | Yeah. |
| *S Lumiere:* | Yeah. It's tough when you're a righty |
| *C Plaford:* | What's that? |
| *S Lumiere:* | It's tough when you're a righty, you know? |
| *C Plaford:* | What, you don't have an electric razor? |
| *S Lumiere:* | No. |
| *C Plaford:* | All right, so, can you – can you, like, move it a little bit, though? |
| *S Lumiere:* | I mean, I could move the hand, uh, though I don't have a lot of motion up and down – |
| *C Plaford:* | That's – that's not very good. |
| *S Lumiere:* | – right now. I've got to do finger movements, so. I mean, that takes – that's just going to take a couple weeks. |
| *C Plaford:* | Yeah. |
| *S Lumiere:* | So, it's just like, uh, all the scar tissue and stuff like that, healing. Gotta force it, you know. I've gotta, like, the exercises are, like, I can passively move it, like up to here. |
| *C Plaford:* | Sweet. Yeah. I like that. You're walking okay, right? |
| *S Lumiere:* | Yeah, no, the foot's healing up. |
| *C Plaford:* | What's that? |

A 173 P 1-35

| | |
|---|---|
| *S Lumiere:* | The foot is healing up. |

*[Background noise/static]*

| | |
|---|---|
| | Well, yeah, you know, the tendon's there, right? |
| *C Plaford:* | No. |
| *S Lumiere:* | Yeah, only tendon. |
| *C Plaford:* | Where – where? |
| *S Lumiere:* | In my ankle. |
| *C Plaford:* | Okay. They didn't wanna knock that out at the same time? |
| *S Lumiere:* | They couldn't. Because of that, I can't – I can't bear weight. They would have, but if I can't bear weight on my shoulders, and then I won't be able to bear weight on my feet. Without crutches, I can't use crutches, you know. Wanna wait with this to deal with this. |
| *C Plaford:* | Awesome. |
| *S Lumiere:* | Otherwise, I would've had it done all at the same time. I guess he couldn't just transport me out of the bed. |
| *C Plaford:* | All right. So you would've had to (static) but you never did your – your review, just FYI? |
| *S Lumiere:* | Mm-hmm. |
| *C Plaford:* | Um, the, uh, the – I saw, um – I saw your request to accounting for one of the versions, which had, um, multiple years – |
| *S Lumiere:* | Yeah. |
| *C Plaford:* | – of stuff on there. |
| *S Lumiere:* | Yeah. |
| *C Plaford:* | Um, that can become very problematic – |
| *S Lumiere:* | Why? |
| *C Plaford:* | – with names because you had names, like, Elan and InSight and stuff like that that you worked on several years ago. |

| | |
|---|---|
| *S Lumiere:* | Mm-hmm. |
| *C Plaford:* | But accounting doesn't know how to segregate out – like Ameesh has been really active in Insight, you know, like last year, you know. |
| *S Lumiere:* | No, No I know. That's why – that's why I specifically said for a given year. Right? |
| *C Plaford:* | The – the one that I saw said, you know, it was, like, several years and just a bunch of – just a bunch of stuff. |
| *S Lumiere:* | *No, No, No,* like – I sent them something that said for this – specific for these years for this event or whatever it was. |
| *C Plaford:* | Well, I mean, you've gotten your P&L every year for the names for that year, right? What do you want to go back – what do you – |
| *S Lumiere:* what the – | I just want to see what the Cumulative *(Time: 11.33)* looks like, |
| *C Plaford:* | But don't you have that saved? Didn't you save these each year? |
| *S Lumiere:* | No. I – I didn't physically get – I don't remember physically getting anything. |
| *C Plaford:* | You've gotten one of those every single year for the names that you've had on- |
| *S Lumiere:* | No, no. You – I – I think, uh, last year or the year before that, was a, uh – I didn't get one last year – uh, I didn't get one last year, and the year before that, I didn't get one, but you showed it to me in your book. That was it. Never got one. |
| *C Plaford:* | Um, yeah, I mean – |
| *S Lumiere:* | I know I never physically got something with a breakdown. No. |
| *C Plaford:* | What did I show you. I mean, are you sure? I know it was down, but I don't – |
| *S Lumiere:* | Hundred percent. |
| *C Plaford:* | – I – it's done – it's done every year. I mean, it's – you know, it's calculated every year so – |

| | |
|---|---|
| *S Lumiere:* | No, I know it must be calculated every year, but I didn't think I would get one. I remember, like, last year we didn't get one, but I don't know if everybody else did. |
| *C Plaford:* | What do you mean I – what do you mean I showed it to you? What – what does that mean? |
| *S Lumiere:* | Last year, we weren't shown anything 'cause it was a flat year, so we didn't get – literally, we didn't get shown anything, or I didn't, at least, and we were – and we were talking about, and Jake said there was no money to go around, and then we made – we – we had that conversation on, "Well, why wouldn't we get anything for the assets raised?" We were kind of building up the portfolio, to get up, and the year before that, you just kinda gave me a number, but I didn't think we'd get anything. |
| *C Plaford:* | So, yeah. That's, uh, that's not usually – that sheet is – I – I know that, you know, last year, your names were down. So, you know, that sheet is calculated, um, and it might've been done in December – |
| *S Lumiere:* | Mm. |
| *C Plaford:* | – so it might've been without a couple weeks left – |
| *S Lumiere:* | Mm. |
| *C Plaford:* | – and obviously, you know, through the end of the year, it was still down. So, you know, maybe there – maybe there wasn't an official – I'll – I'll try to go back and – I'll try to go back and check. |
| *S Lumiere:* | Mm-hmm. |
| *C Plaford:* | But the thing is this, you know, just understand with accounting, for something that's complex, they don't know, you know, they're – they're given instructions not to give, you know, other people's P&L out, right? I mean, think about it. You wouldn't want – you know, you wouldn't want the other guys, you know, to other guys, you know, to get your sheet just the same way as they probably don't want you to have their sheet, right? So – |
| *S Lumiere:* | Yeah. I don't – I don't know why, but – |
| *C Plaford:* | Well, think about it. It's people's – it's people's comp – |

| | |
|---|---|
| *S Lumiere:* | Yeah. |
| *C Plaford:* | – you know? So, you know, they're sensitive to that – |
| *S Lumiere:* | Mm-hmm. |
| *C Plaford:* | – so when they have – when they have, uh, you know, significant, you know, when there's a lot of complexity, like they don't know, especially when you go in and ask for multiple time periods. |
| *S Lumiere:* | Mm-hmm. |
| *C Plaford:* | They don't know. But, you know, they're like, what, you know. You could give any names you want, and – and they have no, you know – |
| *S Lumiere:* | Yeah. |
| *C Plaford:* | – they have no way of knowing what name you worked on what anyone worked on. Um, I'll check, uh, uh, I'll check on – I'm sure – I'm sure that I have that. Um, I – you were given one, the, you know, I – what would you get paid, like $600,000.00 or $700,000.00 or something like that, not last year but the year before. |
| *S Lumiere:* | $400,000.00 |
| *C Plaford:* | You were given a P&L in that year. |
| *S Lumiere:* | I was given – |
| *C Plaford:* | I – 100 percent I know you were because I – |
| *S Lumiere:* | I know you showed – you showed me something. You didn't give it to me. You showed me something. You said, "Look," and you had it in – in a piece of paper, but you didn't give me anything. How would this happen, or else I woulda had it. I'd remember it. |
| *C Plaford:* | So I – I gave you a piece of paper, and I took the piece of paper back? Why would I do that? |
| *S Lumiere:* | You showed it to me, and what you – look, I didn't – I didn't keep it. You said that – you said – you showed it to me. |
| *C Plaford:* | Well, look, I mean – |
| *S Lumiere:* | Yep. |

| | |
|---|---|
| *C Plaford:* | – I – I can tell you – uh, I can't tell you the exact number – |
| *S Lumiere:* | Hmm. |
| *C Plaford:* | – but, you know, we've had this conversation, *[phone ringing]* uh, you know, the – it's – it's – it stunk – it's – *[answers phone]* |
| | *[Side conversation]* |
| | So, um, you look – you know, look, I mean, barring any, uh – the goal is around 5 percent payout, which we've talked about, barring anything, you know, crazy and any, like, really severe netting risk or something like that, right? But that's the goal, individual payments. Uh, you were paid significantly more than that, um, in 2010- |
| *S Lumiere:* | Mm. |
| *C Plaford:* | – than 5 percent because the assets were small, right? So it was, you know, I mean, we – it – it's a lot of – I'll go back and check what we have. I'm not trying to recreate the wheel here. |
| *S Lumiere:* | I mean, another point they're trying to make is, you know, stuff that was out of my control, but uh, like, *ATI ( time 18.22-18.35)* could've blown up. We could've had a zero, and I have spent a lot of time on that and getting us a reasonable recovery, and we would – it would've been a doughnut, had I not done what I did, intervened. |
| *C Plaford:* | Right, but that's your name – |
| *S Lumiere:* | And – |
| *C Plaford:* | – right? What – what would happen if I had said – |
| *S Lumiere:* | I mean it was a new issue that blew up.   I mean, it had a fraud – |
| *C Plaford:* | You can't. But – but – |
| *S Lumiere:* | – or – like, that's just an example. |
| *C Plaford:* | Let me ask you something. |
| *S Lumiere:* | That's just an example, and then names that – names that – |
| *C Plaford:* | We gotta to get paid on – |

| | |
|---|---|
| *S Lumiere:* | – yeah. But if I – I spend time on it, though, right? |
| *C Plaford:* | Yeah, but if you're – |
| *S Lumiere:* | If I'm getting – if I'm spending six months – if I'm spending six months on something I'm told to dedicate my time entirely to that, and that's all I'm doing in order to – your words, not mine, "If this blows up, we're gonna lose the fund," and – and then go back to the same rules, like, you're changing the rules. You're telling me – |
| *C Plaford:* | How is that changing the rules? |
| *S Lumiere:* | Because you're tell – you're telling me to – to not focus on anything else. |
| *C Plaford:* | Was ATI your name? |
| *S Lumiere:* | It was a name that we invested in as a fund and in a new issue that was – that was – that had no liquidity and that had a fraud attached to it, and I did what we could to save it. |
| *C Plaford:* | What – it's – are you the primary on ATI? |
| *S Lumiere:* | I am the primary on ATI. |
| *C Plaford:* | If we would've made, you know, $20 million on ATI – |
| *S Lumiere:* | Yep. |
| *C Plaford:* | Would you've said, "Well, you told me to spend all my time on this, and –" |
| *S Lumiere:* | If – if we had made $20 million, and it was part of a new issue that we just flipped or we held on for a little bit, then it should've gone into the new issue bucket and split with everybody like everything else, or I assume that's where everything else is. |
| *C Plaford:* | Look, the – you know the rules Stefan. The rules are – |
| *S Lumiere:* | Okay, but you – but you – |
| *C Plaford:* | – names that you work on – |
| *S Lumiere:* | – but my – that's – |

| | |
|---|---|
| *C Plaford:* | – you get paid on. |
| *S Lumiere:* | Those are the rules, but then – but if you change the rules by saying, "You need to focus 100 percent of your time on this for a long period of time, and you can't look at anything else," that kind of – that straps me. |
| *C Plaford:* | What do you mean? How many names are there on your – on – on that sheet? |
| *S Lumiere:* | Oh, most of these, we've been selling off. I mean, most of these had been sold off midyear. |
| *C Plaford:* | Stefan, Let's be real. |
| *S Lumiere:* | Yeah. |
| *C Plaford:* | Do you think your performance has been good – |
| *S Lumiere:* | I think – |
| *C Plaford:* | – the last couple years? |
| *S Lumiere:* | – I think it has been good, yeah. It's not 100 percent reflected in – in this right now because it's been – |
| *C Plaford:* | Market – how much is the – how much is the market up in the last couple years? |
| *S Lumiere:* | The credit markets? Fifteen percent. |
| *C Plaford:* | Last year, the high-yield market was up 16 percent. I don't know with Distressed – |
| *S Lumiere:* | Mm-hmm. |
| *C Plaford:* | – it was probably – |
| *S Lumiere:* | Mm. |
| *C Plaford:* | – similar the year before that. It was up significantly as well, right? |
| *S Lumiere:* | And the year before, it was at 11 percent. |
| *C Plaford:* | You had two years – you had two years of down P&L. You've been not just flat, down. |

*S Lumiere:*      Yeah. But look – but I was – I was told I had – like, there was nothing to – like, I had no investment. Everything was in wind down for the entire year –

*C Plaford:*      But think – think about –

*S Lumiere:*      – right?

*C Plaford:*      – why that is because – let me ask you a question. If you had a –

*S Lumiere:*      Why that is.

*C Plaford:*      – if you had a –

*S Lumiere:*      Why that is, is because I assume, I assume we'd been told to not invest in non-healthcare, and a lot of these were non-healthcare.

*C Plaford:*      And your performance. We've been losing it's not just ATI –

*S Lumiere:*      Wait, yep.

*C Plaford:*      – you know. How many names on there, Sevan, Nebraska, what – what else names on there? They're all down. You know, all of those positions, you know –

*S Lumiere:*      Yeah, but something that – but the problem with –

*C Plaford:*      – all the names that we were investing in, we've lost money in them.

*S Lumiere:*      Yeah, well, first of all, Nebraska, they're all unique situations, right? So it's about timing, like, whether it's down now, it's back up to – like, the bonds are back up to par. The loans are above par. It's like we're being forced to sell this –

*C Plaford:*      Would – would you advocate that – that we – that we – I mean, would you invest in that if we – if woulda said, "Look, the game plan on this investment is to lose 20 percent –"

*S Lumiere:*      No, but, like –

*C Plaford:*      – and then – then we'll make 40 percent."

*S Lumiere:*      – if your strategy is to allocate money to a group of assets that have higher than the average return, one or two of them are not going to work. That's the bet you're making. Why are you even in this line

|  |  |
|---|---|
|  | of work if you have to manage it? Obviously, it sold off much more than we expected. I know there were technical issues. |
| *C Plaford:* | You didn't have – you didn't – it wasn't just one or two. You don't have P&L that's making up for it in the other names. That's – that's the thing that your show has been very poor. |
| *S Lumiere:* | Yeah, the problem is, like, but I think I've been restricted from investing. Like, I've been – like, as – as a fund, I think we've been limited to what we could look at, so that's been a big problem. I mean, you ask me why I didn't come up with a lot of ideas. |
| *C Plaford:* | Stefan– |
| *S Lumiere:* | – this year. |
| *C Plaford:* | – do you realize – |
| *S Lumiere:* | Yeah. |
| *C Plaford:* | – you realize that had we done well on those names over the last several years, we could be doing out the – if we were building a track record, that could've become a separate strategy where we're expanding outside of healthcare. I would've loved to do that. I would've loved to be able to build out, you know, and – and – and carve out a track record, which then we could go to people and say, "And look. Look at our non-healthcare stuff. Look at how well we've done."

Not only would we not be having the, you know, reduce them, the reason we're reducing them, it's because it becomes really hard to explain to people why we're losing money in non-healthcare stuff. That's why we have to punt it out, and that's, you know, we're – we've lost Lumix, $100 million-plus account for us. This is a big reason why, you know. They're looking at the non-healthcare stuff and looking at the performance and going, "You know, why am I giving you money. You're supposed to be doing healthcare, and then you're losing all this money in these other names?"

That's why money hasn't been allocated. It's – it's not, you know – |
| *S Lumiere:* | Yeah. |
| *C Plaford:* | – I would've loved for it to be up, but it didn't work out like that. |

| | |
|---|---|
| *S Lumiere:* | I mean, the problem is that there are – there are circumstances, and, like, when you have a fraud situation, you have to take that into account and work your way out. There's – there's, like, very little way to protect against that, right, and Sevan was a fraud, ATI was a big fraud – |
| *C Plaford:* | Why don't we just – |
| *S Lumiere:* | – and we managed through those. |
| *C Plaford:* | – why don't we, you know, why don't we simplify this? Let's think about this. |
| *S Lumiere:* | And CMED. CMED was a fraud, right? That was a big fraud – |
| *C Plaford:* | And – and – |
| *S Lumiere:* | – and we're working through it. |
| *C Plaford:* | – and Ameesh it's just, you know, and me, have taken that P&L hit |
| *S Lumiere:* | Mm. |
| *C Plaford:* | – right, and what – what – what we don't do, though, is – and, you know, you wouldn't want this, I don't think, either if the tables were reversed. You know I – I didn't say Ameesh didn't say, "Look, you know, um, this is a fraud, therefore, you know, we're gonna add part of a, you know, CMED loss to – to your P&L as well," and you know, say you – say you were up, you know, $15 million bucks this year. |
| *S Lumiere:* | Mm-hmm. |
| *C Plaford:* | Oh, by the way, you've gotta take, you know, you gotta take a $5 million hit in CMED because, you know, Ameesh invested in a fraud, and there's nothing you can do about it. What would you say to that, you know? It's – it's – look, if – if ATI's a fraud, then ATI's a fraud, but it's still your name. We can't – and the fund doesn't get paid on, you know, it's not like the fund gets paid on every other name except fraud. |
| *S Lumiere:* | Yeah. |
| *C Plaford:* | It's your name. It's your P&L, you know. Look – |

| | |
|---|---|
| *S Lumiere:* | No, I understand – I understand your point, Chris – |
| *C Plaford:* | – this is – this is the bottom line, you know. |
| *S Lumiere:* | – but it's like – but – but the point is that if you're telling me that you told Ameesh, "Don't work on anything else. Just work on CMED, and that's all you're focusing on," like you told me for six months, that limits my ability to do anything. So it limits my ability to make anything outside of it. See, that's why whereas the outperformers here, it's like I'm limited here, like, you – like, we're selling things that should – that necessarily shouldn't be sold because we're – |
| *C Plaford:* | You're – you're being limited because your book was being cut down even before that. Your book was being cut down because of performance. The way to increase your book, right, is to have good performance, just like any other pad here, right? What happens when you have a PM that's having a drawdown? Do they get a capital increase? No. You get a decrease, right? That's Investing 101. It's not just for, and it's not just for a specific portfolio manager. |
| *S Lumiere:* | Mm-hmm. |
| *C Plaford:* | What – what does any fund do when there's, you know, there's periods of volatility? You cut back. You get smaller, right? You cut out the low-conviction ideas, right? That's how things work, and then what do you – you know, and then when you're making money, you get additional capital. It's not just specific to ATI. |
| | But look, at the end of the day, if you had the performance and all the rest of the stuff, and the ATI ended up being a fraud, you know, as of right now, we haven't lost all that much money in ATI. We're down, what, a few million bucks? That's not an insurmountable, you know, delta to overcome. But, you know, we're not – we *[laughs]* – we're also losing money in the Sevan and the Nebraska and, you know, the rest of the names. It's not – |
| *S Lumiere:* | I mean, like, Sevan and ATI were two of the frauds. I mean, there was those three, two frauds. |
| *C Plaford:* | What -- what do you want me to tell you? It's – it's a business. The fund doesn't get paid when we lose money. |
| *S Lumiere:* | No, I – I understand that. I understand that, and I – I never said that, you know, that I shouldn't have taken that ding. We miscalculated, like, the company and the bankers all lied to us. Our |

|   |   |
|---|---|
|   | own advisors lied to us, like, we could've – listen, we could've hit – hit the ball out of the court on that one, and that we bring in the capital needed to – to buy it.  It's done very well. |
| *C Plaford:* | Well. |
| *S Lumiere:* | Actually, it's – it's – it's up – it's up over 100 percent now. But we weren't in a position to do that, so. |
| *C Plaford:* | Look – |
| *S Lumiere:* | Like I'd be like, why am I getting dinged for BELLUS when I'm like, I had nothing. |
| *C Plaford:* | I actually didn't have BELLUS on that sheet. |
| *S Lumiere:* | Yeah. |
| *C Plaford:* | You sent that to Josh. |
| *S Lumiere:* | I did. I asked – I asked him for BELLUS because I've been – I've been spending a lot of time, and if this – this would've been – if you compare it to what we would've gotten, had I not dug for our stake, we would've – |
| *C Plaford:* | Like I said – |
| *S Lumiere:* | – lost a lot more. |
| *C Plaford:* | – I actually – I actually didn't put BELLUS on there. |
| *S Lumiere:* | Yep. |
| *C Plaford:* | I only added it – I only added it subsequently. |
| *S Lumiere:* | No, my point is the way to look at BELLUS or something to that effect that – that was not my name but, I've been instrumental, and I just look at the delta, between what we would've gotten otherwise. I know you're not getting paid on it, the difference, but listen, I'm spending hours upon hours, days upon days, weeks upon weeks negotiating, dealing with this thing, and I go – I take – I take 'em going from, uh, uh, $8 million hit down to a $3 or $4 million hit. Like, there should be some level of compensation for that. I mean, it's time.<br>It's time dedicated to that that's – that's not dedicated elsewhere, or if you have me work on something – |

| | |
|---|---|
| *C Plaford:* | I – |
| *S Lumiere:* | – like CMED, like CMED or Lorillard, and I'm spending countless hours on those names, at some point, then there should be some compensation for that. |
| *C Plaford:* | I'm fine taking – I'm fine taking BELLUS off and, you know, and even, you know, in addition to that, trying to think about a way – I – agree that that wasn't a name that, you know, you were the primary on originally, and – and that's fair. But it's still not going to be a big enough delta – |
| *S Lumiere:* | My point is – |
| *C Plaford:* | – to catch up on these. |
| *S Lumiere:* | – my point is to just keep in mind and consider, like, most of the funds if you have somebody come in as a workout guy, and they help turn something around, they're paid off of the performance of what they would get otherwise. |
| *C Plaford:* | Yeah, and – and that's fair. |
| *S Lumiere:* | Right. |
| *C Plaford:* | That's fair. That's a very reasonable point. Well, think about this, though, too. Do you think you're working that hard right now? |
| *S Lumiere:* | Right now? |
| *C Plaford:* | Or just last year, just – |
| *S Lumiere:* | Last year, I was working my tail off. What are you talking about? |
| *C Plaford:* | For – for – for this portfolio? |
| *S Lumiere:* | For Credit yeah. Like, I don't know why there was a miscommunication. |
| *C Plaford:* | Yes, it was. |
| *S Lumiere:* | Like, you – I wasn't spending almost any time on M&A. I had no interest in the M&A. |
| *C Plaford:* | This is what I see. You come in at 9:00, sometimes 9:30. You leave, you know, 5:00, sometimes earlier. You don't respond to |

| | |
|---|---|
| | half, probably over half of my emails. People call you, can't get a hold of you for half a day, right? If you're – if you're you know, and – and we've had this conversation before, and – and in addition to that, it sets a bad example for everyone else, right? It doesn't look good. Everyone else on the desk has to be in their seat at least by 8:30. |
| *S Lumiere:* | Mm. |
| *C Plaford:* | If you're going to be on this team – |
| *S Lumiere:* | Well, first of all – first of all, I came in at 9:00 today, for other reasons, but I usually will come in at 9:00, Chris. |
| *C Plaford:* | When's the last time you came – I haven't seen you come in before 9:00 – |
| *S Lumiere:* | I usually – |
| *C Plaford:* | – so don't lie. |
| *S Lumiere:* | I'm usually here by 8:15, 8:30. |
| *C Plaford:* | No, you're not. |
| *S Lumiere:* | I am. |
| *C Plaford:* | No. *[Laughs]* |
| *S Lumiere:* | I don't walk in at 9:00. |
| *C Plaford:* | You're – you're not – I – I sat here. I – I sit here. I have a direct line of sight onto your desk – |
| *S Lumiere:* | I know you do. |
| *C Plaford:* | – and I – I – I see what time you come in, and – and you were not coming in. Look, this is the point. It – it – it looks from our perspective like you're not working all that hard. You're getting paid, you know, $200,000.00 a year for basically a 9:00 to 5:00 job, and if you're doing work outside, you don't respond to anybody's emails or answer their calls most of the time, and – and – I'm not – I'm not exaggerating that, you know. |
| *S Lumiere:* | Yeah. |

| | |
|---|---|
| *C Plaford:* | The emails that I sent you last week, you still haven't responded. Sometimes, you respond to an email two weeks later, like it was yesterday. I'm just saying, look – |
| *S Lumiere:* | You're – you're – you're using as an example a time that I've been partially out due to needing surgeries and something like that. |
| *C Plaford:* | No, I'm not. I'm not counting any of that – |
| *S Lumiere:* | Yeah. |
| *C Plaford:* | – any medical issues – |
| *S Lumiere:* | I – like, there – |
| *C Plaford:* | – before that. |
| *S Lumiere:* | – there are – there are multiple ways to communicate with me all the time, so, like, I've always gotten back. Like, there was one situation with ATI that was a miscommunication. Like, nobody would try to even reach me all day. I had already talked to several of them, too. |
| *C Plaford:* | I'm – I'm – I'm giving you honest feedback here – |
| *S Lumiere:* | Mm-hmm. |
| *C Plaford:* | – and this is – what – |
| *S Lumiere:* | But – but it's – I – I think – I think it's somewhat exaggerated, alright? That's all. |
| *C Plaford:* | Okay, let me – let me – let me help to put this in perspective for you. I think that for your career, you don't write that off. People who you– people who we both know, who you've worked with outside of this firm have said the same thing to me. I'm not – I'm not exaggerating that. Your communication skills could be improved on. I think you would be doing yourself a benefit not to blow that off and say that I'm – look, we've had this conversation multiple times. We've had this – how many times have I asked you to be in your seat by 8:30, you know, and then – |
| *S Lumiere:* | Three. |
| *C Plaford:* | What? |

| | |
|---|---|
| *S Lumiere:* | Three. |
| *C Plaford:* | Over – over a multiyear period. |
| *S Lumiere:* | Yeah. |
| *C Plaford:* | I – I stopped asking you because, you know, you're – you're in your own world half the time. |
| *S Lumiere:* | I – I think I'm in the office by 8:30. |
| *C Plaford:* | You're not. |
| *S Lumiere:* | I think I am. |
| *C Plaford:* | *[Laughs]* I'm telling you you're not. Listen, there's times you – have you – have you noticed sometimes there – like when Lee will– jokingly say, "Stefan, would you read this email next week? You know, think about this," and we make a joke out of it. There's a reason for that. |
| *S Lumiere:* | Well, we started joking about that from a long time ago. Plus, there was – there was a period, maybe in '09, where my emails are just getting overwhelmed by too many emails coming in. |
| *C Plaford:* | Listen – |
| *S Lumiere:* | That's it. |
| *C Plaford:* | – you didn't. I've – I've written you emails – |
| *S Lumiere:* | And what email did I not respond to? |
| *C Plaford:* | – last week. Nebraska book, two days ago. Did you respond to that email? No. |
| *S Lumiere:* | I didn't see that email. |
| *C Plaford:* | Well – just – |
| *S Lumiere:* | But what – what was – what was the context of the email? |
| *C Plaford:* | You sent me the thing about the paydown, and I said, "Okay, what does that mean?" |
| *S Lumiere:* | I didn't see it yet. |

| | |
|---|---|
| *C Plaford:* | Right, okay, well, but the – |
| *S Lumiere:* | Yeah. |
| *C Plaford:* | – like, there's all sorts of emails like that, like, and let me – |
| *S Lumiere:* | When was that? That was yesterday. |
| *C Plaford:* | – let me – let me take a step back as well, you know. So look, I would – you get paid, right, as a risktaker, right? You get paid for, you know, performance, you know, first and foremost, right? Now look, you know, you've been down the last couple years, right? I want you to be, you know, if you're I interested in committing and contributing, I want you to, you know, to be, I would say back on the team 'cause frankly, it feels like you really haven't been for – for quite a while, and I assume that was because you were spending a lot of time doing the other stuff, which, you know, frankly, is preferable to, you know, just not, you know, if you're telling me you're not – |
| *S Lumiere:* | You mean M&A? What I'm telling you – M&A was no more than 20 percent of my time. It's like, I don't know what – |
| *C Plaford:* | It's like if you worked primarily for me, I would've been all over you. I would've been all over you. It's not – look – let me – let me – so, like, Rotech – |
| *S Lumiere:* | Mm. |
| *C Plaford:* | – it was literally the summer of last year where I started asking you about, you know, Rotech, like, building out a model, and doing that. |
| *S Lumiere:* | Mm-hmm. |
| *C Plaford:* | And over the last eight months, right, we finally got there. That is so much slower, so much slower than I would put up with from anybody else on the team. Now, look, there – there's – you know, you're not a stupid guy, so what does that tell me? That you're not spending your, you know, are you – are you spending 12 hours a day working on that? No, I – I – I think the answer has to be no. I – – you're not – you're not spending the same amount of time and effort that the other people are. |
| *S Lumiere:* | No, I haven't spent eight months on it. I recognize that I didn't eight months on it. |

| | |
|---|---|
| *C Plaford:* | And the thing is this, dude. It's, you know, look, it comes down to – it comes down to performance. |
| *S Lumiere:* | But you have to – you have to consider also if you're gonna talk about Rotech, that there was a lot of issues and situations that we don't know. It's still highly complex, a lot of that time just digging and digging and digging and trying to find out catalysts and trying to find out data points to kind of, like, use as an input for the model, otherwise how do you model it? We don't know. The model is useless unless you get an understanding. |
| *C Plaford:* | Of course. |
| *S Lumiere:* | I had – I had a rough model before, but it's somewhat useless. |
| *C Plaford:* | But what you're telling me that your – your – your whole capacity is only to cover one name. |
| *S Lumiere:* | Well, you know, we know that's not true. |
| *C Plaford:* | Then you should – hopefully you made a lot of money on that one name. |
| *S Lumiere:* | Yeah, yeah, hopefully, that's not true. |
| *C Plaford:* | I think you can do more. I think you can do it quicker. I think you can commit more. I think that, you know, I think if you really were in your seat at 8:00 and you know, leave at 6:00, I mean, that's not – that's, you know, like a solid ten hours a day? I think you'd be doing a lot better. I mean, you know, I don't know what you do when you're out of the office. I, you know, I tried multiple times to – to conform you to what everyone else does, you know, that hasn't seemed to work – |
| *S Lumiere:* | Right. Well – |
| *C Plaford:* | – and at the end of the day, if you want to get paid. But – so – so – so – okay, so if you not gonna do that – |
| *S Lumiere:* | So what I like to – |
| *C Plaford:* | – if you're not gonna do that – |
| *S Lumiere:* | What? |

| | |
|---|---|
| *C Plaford:* | – and you're only gonna respond to half the emails and – |
| *S Lumiere:* | Oh, that's – that's – I'm not responding to half the emails. I might miss – I might miss – |
| *C Plaford:* | Literally, literally – |
| *S Lumiere:* | One or two. It can't be – |
| *C Plaford:* | I'm trying. I'm not – |
| *S Lumiere:* | Yeah. Look, it's not half the emails, right? |
| *C Plaford:* | The emails – I'm giving you honest feedback – |
| *S Lumiere:* | Yeah. |
| *C Plaford:* | – right, and like I said, it's not just from me. There – I think you'd be doing yourself a big favor to, you know, to systemically work on your, you know, your communication stuff. You know, I've had other people, um, not just one person, multiple other people that we both interact with that have told me, "Look, you know, Stefan's disappeared for a few days. He hasn't responded to this. What do I do? You know, I'm not hearing anything back from Stefan, you know? Stefan is not always –" |
| *S Lumiere:* | Well, I mean, I can't respond to that because I don't know what's – what are the circumstances. |
| *C Plaford:* | I know, and I'm trying not to blow up – |
| *S Lumiere:* | Yeah. |
| *C Plaford:* | – you know, the people as well. |
| *S Lumiere:* | Well, keep – keep in mind where it's coming from and the – maybe potential bias there. |
| *C Plaford:* | They're not the people that you would think of. They're not the people that you're thinking of that would have a bias. These people don't have a bias towards you. |
| *S Lumiere:* | I'm thinking of Strook, and that seems like it'd be an easy bias to give them an excuse for-it's not Strook? It's not? You sure? |
| *C Plaford:* | Well, actually, now that I think about it – |

| | |
|---|---|
| *S Lumiere:* | Yep. |
| *C Plaford:* | Does Jamie have a bias against you? |
| *S Lumiere:* | It's not against me. It makes him look to his firm like they're doing a good job and they're trying to get stuff done, so they obviously want to throw somebody up there. I don't think he's got bias against me, but it's a very easy – |
| *C Plaford:* | Not on ATI. |
| *S Lumiere:* | On what? |
| *C Plaford:* | Not on ATI, on other stuff. Stefan, I – I – I – I'm giving you honest feedback. |
| *S Lumiere:* | I'm listening to it. I'm listening to it. |
| *C Plaford:* | Okay. I think you'd be doing yourself a big favor. That's my point. Look, at the end of the day, right, you know, look, if you were up a lot of money, you know, in the last even – even in, you know, one of these years, in the last couple years – |
| *S Lumiere:* | Mm. |
| *C Plaford:* | – you're gonna wanna get paid, you're gonna want to get paid |
| *S Lumiere:* | I – I just feel like it's gonna be tough to do that if I, A. don't know the rules, and I'm being strapped. Like, I don't know what the rules are. Like, what we were – what you had been telling me was that what our biggest investors, does not want non-healthcare. Mark had been telling me, he's like, "We shouldn't be investing in non-healthcare, period," so that's my assumption. So forget about offering any ideas outside of healthcare because it's not gonna do anything. It's a waste of time. |
| | And the healthcare names, like, okay, what are the names I can focus on, right, that aren't already taken care of. The space is covered – Can I count on Rotech or on – |
| *C Plaford:* | Honestly, dude, there's a lot. There's many names that we are under capacity to look at right now. You're not being given those because you're not working that hard, and you're not – you're – you're – you're – it – there's so much more of a delay. Look, if – if – if I need a name in a timely basis, I – I don't have eight months, you know? |

You – you could've – you could've gone through, you know, a couple dozen names in that time. You'd have a lot more positions in the portfolio.

There's plenty of stuff within healthcare for you to do. You're not committed. You're not committed to this. You're – you're not, you know. That's the thing. So, you know, at a point, you – you could've been all over – when we started talking about, like in Apria Eventually, I had to give that to Andrew. You're – you're – it's – it's not –

S Lumiere:      That's fine. I spent a lot of time on Apria, like, whatever –

C Plaford:      Stefan, there's – there's not – one of two things.

S Lumiere:      Hmm.

C Plaford:      You have to work on your communication so that –

S Lumiere:      But you knew I was working on Apria.

C Plaford:      But there's nothing that comes back. There's nothing. It's been eight months, Stefan. It's been eight months. Nothing comes back. What would you do in my situation?

S Lumiere:      All you have to do is ask me, right?

C Plaford:      I have.

S Lumiere:      I've developed a full model on it –

C Plaford:      Are you still working on it?

S Lumiere:      – and I've broken up.

C Plaford:      But, like, look –

S Lumiere:      Well, if you want – you want the – you want the – an intermediary, or do you want to a fait accompli?

C Plaford:      It comes back to communication, right? If it's the case where you're, you know, you're diligently working on it ten hours a day, first of all, it doesn't take eight months to do that, okay, right? I mean –

S Lumiere:      It didn't take me eight months, no.

| | |
|---|---|
| *C Plaford:* | Okay. Give me a status update. Communicate. There's – there's multiple emails that I sent you, you know, that just – it – you don't respond to the email. If I, you know, look, if somebody asks you something multiple times, and you just don't respond, how am I to know what you've done? You didn't send me anything. You don't respond when I ask you about it. |
| *S Lumiere:* | Mm. |
| *C Plaford:* | What am I – |
| *S Lumiere:* | For – |
| *C Plaford:* | – supposed to know if – |
| *S Lumiere:* | I just don't know the examples that we're talking about in terms of timeline between emails. Like, you're saying that – but, like, I understand I – I didn't see the response back from Nebraska if they sent me something. But you didn't send something back immediately, so I don't know what that timeline is. When did you send that out?  And before that – I don't know. I haven't looked at my Blackberry this morning yet. |
| *C Plaford:* | There's not – it – it – it comes down to this. I would like to have you on the team and committed, right? But like anything else, you're – you're in a senior position. You're not going to get paid as a. as a junior analyst, and I couldn't do that anyway because you're not, you know – I don't have the same degree of ability to – to just have a normal communication with you such that, you know, we're working things out systematically, like – like an Andrew, for instance. |
| | You know, there's multiple names that we'll bang out every week, you know, updating the model on this, doing the model on this.  It takes communication to do that. If I were to give you a name like that, and if nothing comes back, and you don't respond when I ask you about it, and you don't send me anything proactively, I'm not gonna wait – I'm not gonna wait a while. I mean, how – how would I  have any way even to know if you're not responding when I ask about it, right? How am I supposed to know what you've done or what you haven't done? |
| *S Lumiere:* | Hmm. |
| *C Plaford:* | So, you know, that only leaves – |

| | |
|---|---|
| *S Lumiere:* | You know, we – we haven't had a meeting like this in a while, first of all. We used to go over this, and we used to give status updates. That stopped, like, over six, seven months ago. |
| *C Plaford:* | And do you know why? |
| *S Lumiere:* | No, I don't know why. |
| *C Plaford:* | Because there – there wasn't any – as the names in your book started coming down, which is solely based on performance, and then I would try to give you new things to work on. I remember very distinctly, it was, like, late spring when I started it last year, when I started asking you about Rotech model. |
| *S Lumiere:* | Mm. |
| *C Plaford:* | And you know, nothing is coming back on a timely basis. |
| *S Lumiere:* | Let me ask you a question. Let's just go on Nebraska, for example, all right? So my understanding is, like, we're selling stuff. It doesn't matter if it's right or wrong. Like, we had very good intel on what was happening, and I've called it pretty well since the bankruptcy. |
| *C Plaford:* | We lost a ton of money. |
| *S Lumiere:* | Hold on, I've called it pretty well since the bankruptcy. Term loans, we're going to get paid out of 105. Top of the structure, we'll get a huge vendor credit memo. |
| *C Plaford:* | There is – |
| *S Lumiere:* | That's coming – that's coming from somewhere else. Jake is saying, "Sell it." You told me this every week, "Jake said to sell it." |
| *C Plaford:* | Which – which, let me try again, the reason that is, is because we lost too much money in the non-healthcare stuff. It's become a significant focus for investors, and we passed the point of anything I can do to change that. |
| *S Lumiere:* | So why the focus on that one name? |
| *C Plaford:* | It's not. All of your non-healthcare things had to come out. Systematically, we're past the point where we're – we're able to have – |

| | |
|---|---|
| *S Lumiere:* | Yep. I mean, the problem is – the problem is there's a ton of, apart from the frauds, and we're kinda recovering from those, most all of the names worked out – Most all the names worked out. Lee Enterprise is way up above where it was. Uh, Washington – |
| *C Plaford:* | Mm-hmm. |
| *S Lumiere:* | – Washington, everything, Great Atlantic Pacific, everything. Nebraska Book is still not there, but I'm pretty confident we'll get there. It takes time sometimes. That's all. |
| *C Plaford:* | There's been – there's been a two-year period where you're down money, and the market's ripped, two years in a row where you've lost money. |
| *S Lumiere:* | Yeah, and sometimes there are uncontrollable circumstances. |
| *C Plaford:* | We haven't lost that much money in ATI, just so you're clear. |
| *S Lumiere:* | Well, like, I didn't see the last year's data, so. In the last – |
| *C Plaford:* | There's a sheet. |
| *S Lumiere:* | Year before. |
| *C Plaford:* | It wasn't – it wasn't a big loser the year before. |
| *S Lumiere:* | No, Well what was then, besides Sevan. Where did I lose money? |
| *C Plaford:* | You were down more in 2011 than you were down in 2012. Um, you know what? No. |
| *S Lumiere:* | I mean, outside Nebraska, I don't even know what the losses were. |
| *C Plaford:* | I sent you an email. I – I remember this very clearly. I sent you an email with your P&L on it. You do have a copy of your P&Ls, absolutely you do. |
| *S Lumiere:* | You sent me an email? |
| *C Plaford:* | I sent you. I sent you your P&L, 100 percent. I'll go back through my file and dig it up again. You have those. There's no – there's no way that I wouldn't give you your P&L, and I remember because I did send it on email, and you probably did have the final one. You probably had it through mid-December, which was through the time of your review, and it probably wasn't done – like |

|   |   |
|---|---|
| | the official one was never even done because you were down. But you – you – you do have your names, absolutely. |
| S Lumiere: | Man, I just can't even think of names that have lost money apart from ATI, Sevan, and, uh, Nebraska. |
| C Plaford: | All right. Well, I mean, I'll go – I'll try to go back through again – |
| S Lumiere: | I mean – |
| C Plaford: | – and dig through, you know, dig through, but look, the – the facts are the facts. I mean, *[laughs]* there wasn't, like, you – |
| S Lumiere: | I gotcha. I just don't know the names of lost money. |
| C Plaford: | Okay, well – |
| S Lumiere: | Like, maybe that's a bigger problem, like everything – |
| C Plaford: | Maybe that is a bigger problem. |
| S Lumiere: | – I mean, unless we're forced out of something for a temporary move and whatever, but. |
| C Plaford: | I'll have to – I'll – I'll try to get you those again, but look, at the end of the day – |
| S Lumiere: | So – |
| C Plaford: | – you're not gonna win the argument that – |
| S Lumiere: | – so let me ask you a quick – |
| C Plaford: | – we were out money in 2011 'cause you won't – I'm just – I'm – I'm – |
| S Lumiere: | I was up in 2011? |
| C Plaford: | No, you weren't. You were down in 2011. You've been down the last two years. That's a fact. I'll go back and try to get you the documentation again, but you're not gonna win the argument by saying, "I just don't know what the names would've been." |
| S Lumiere: | I mean like, look who knows – I don't know but maybe Ameesh would've showed it down*[background noise]* |

| C Plaford: | You were down 2011. You were down in 2012, and – and you know, and that's a pretty big – that's a pretty big delta versus the market in the – you know. |
|---|---|
| S Lumiere: | 2011 was down – the market was down 11 percent |
| C Plaford: | What market was down 11 percent? |
| S Lumiere | Distressed credit. Most funds were down 11 percent in '11, and we were flat. |
| C Plaford: | Most funds were not down 11 percent in 2011 |
| S Lumiere: | I'm pretty sure they were. What do you – what do you think that the – the market would be up or down? |
| C Plaford: | Well, I can actually play it out right now. |
| S Lumiere: | What is that based on? What – what benchmark? |
| C Plaford: | Well, I'll tell you. Hold on a second. |
| S Lumiere: | I thought we were up like 50 bps in 2011, right? |
| C Plaford: | Our fund was basically – |
| S Lumiere: | Flat, and I knew that was very good compared to our peers. I don't know. I mean, I'm – I'm going by most of the credit funds that I know were down, like, significantly, 7 to 11 percent. Oh, update, so Friendfinder, uh, they're going to be doing a restructuring, and I think it's coming pretty soon. |
|  | *[Sighs]* I was supposed to talk to one guy, uh, today, but they, um, are gonna equitize that's done. They're gonna equitize the second Liens. I think they're doing it outside of bankruptcy with renegotiation. I don't know. There was some mention of something about 50 percent. Like, the bottom was not wanting 50 percent of the equity because they don't want to have it on their books for – for review, for pension reasons or whatnot, or maybe just one fund who was just saying that it was one of the larger holders. |
|  | So, I mean, they're trying to dilute that down, so there's probably, I think it's broken up between that and the new money plan. I mean, right now, it's, like, it's volatile, so that just means that recovery depends on what kind of – performance has been pretty good at the company. I think they're doing about $85 million right now. They want to reinvest some money into the business. They should be able to do, uh, $20, uh, $15 million in earnings next year, once they do – you know, once they, uh, equitize this. |

| | |
|---|---|
| *C Plaford:* | So what you're saying is – |
| *S Lumiere:* | In the end, the bonds could be worth, you know, 55, 50, 55 context. I don't know – I don't know what happens if they come back, and if they do this on a, you know, pre-pack, you know consent-type thing like they did with Lee Enterprise, yeah, we're gonna do this, but if they're going to do prepack anyway, we have to agree. I'll get more details about it today. |
| *C Plaford:* | So the J.P. Morgan – I'm sorry, the, uh, High Yield corporate bond fund index was up 2.6 percent in 2011. |
| *S Lumiere:* | Yeah, but was distress down? |
| *C Plaford:* | I don't know but– I have Event, which was up 1.5 percent or something. I don't know. I think they have a good – loans were up. |
| *S Lumiere:* | I think – I think more high-yield, distressed-angle funds are down. |
| *C Plaford:* | And that's fine.  But if you look at that sheet, most of your P&Ls are coming from, you know, coming from more high-yield-type stuff. And I'm not saying that, you know, change the strategy, but – |
| *S Lumiere:* | You're not? |
| *C Plaford:* | – what? |
| *S Lumiere:* | You're not? |
| *C Plaford:* | Look, it – the – you know, again, the bottom line is – |
| *S Lumiere:* | I don't understand why Great Atlantic is down $238,000.00. We got taken out at *make-whole*  Why is it down $238,000.00. It doesn't make any sense. |
| *C Plaford:* | What was the P&L last year? |
| *S Lumiere:* | I don't know. All I know is we bought bonds at 85, and we got taken out at 105, plus coupon. |
| *C Plaford:* | When was that? |
| *S Lumiere:* | In 2012, beginning of 2012. |

| | |
|---|---|
| *C Plaford:* | Yeah, but that was the beginning of 2012, and maybe all the money was made in 2011, and then if it would cut to the beginning, we would already realize the gain in 2012. |
| *S Lumiere:* | But they still shouldn't be down. |
| *C Plaford:* | I'll try to send you your P&L for 2012 again. I'm gonna have to try to find it. |
| *S Lumiere:* | For what? |
| *C Plaford:* | For – for 2011. |
| *S Lumiere:* | Mm. Well, I mean if it's 2011, end of 2011, we should have that in email, right, or most of it, whatever that new system is. Let me go finish up filing this really quick. Let me know what names you think *[background noise]* look good that are not covered by anyone. |

*[Background noise]*

| | |
|---|---|
| *C Plaford:* | This is the bottom line.  There are other names, right, which I would – I would – we're not covering all the names, like M-Modal. |
| *S Lumiere:* | I'm working MModal. I've been working on it for a week. |
| *C Plaford:* | Okay, well, you know, nobody's doing any work on M-Modal. They're, like, another name. I'll go back and – |
| *S Lumiere:* | So that's two, two names. |
| *C Plaford:* | There's CRC. There's – let's put it this away. |
| *S Lumiere:* | No, I've worked on CRC. I've spent a lot of time on CRC. I've done probably seven calls it. I've built up models over the past year. |
| *C Plaford:* | Is it – is it up to date? |
| *S Lumiere:* | Yeah. |
| *C Plaford:* | Do we have an updated model? |
| *S Lumiere:* | Yeah. The problem with that one is, like, we – I looked at it, and I thought, like, every time we invest in something, I know it's illiquid. It's gonna be – it's – it's a small issue, very illiquid. We |

got counterinformation about a sale of one of the businesses, and that was false. We checked on that, for the fat camp, so I'm looking for a catalyst. I

know everything we're doing needs a hard catalyst, so you know, 85, yeah, it looks interesting, like it already bounced to par.

| | |
|---|---|
| *C Plaford:* | What? |
| *S Lumiere:* | Bonds. |
| *C Plaford:* | Look. |
| *S Lumiere:* | So bonds at par, you find a way to make a point, you know? |
| *C Plaford:* | In a market like this, you could get, you know, a low, even a low double-digit yield that's reasonably safe, that could be interesting. |
| *S Lumiere:* | I didn't think you were interested in that stuff. Not that you weren't interested in insurance, I didn't think you were interested in illiquid names. It sounds like every time we get involved in a liquid name, like, it's too small, or we can't invest enough in it. You can't allocate enough capital to it to make sense 'cause it can't be more than 10 percent. I know it's illiquid because I know firms have been trying to sell it. It takes a month to make a single sale. It's really off the run and off the radar. You buy it. You own it. And it's levered. I'm not saying it's not levered. Almost 6x. |
| *C Plaford:* | I mean, we've got – we've got positions that are, you know, $250 million, $300 million size of the bonds, and look, if it's something that we – |
| *S Lumiere:* | This is smaller, though. This is not $250 Million. This is, like, a $160 million issue. |
| *C Plaford:* | That's fine. I'm just saying, you know, we do have positions that are not, well, if it's $150 million, then that would be small. |
| *S Lumiere:* | Literally, like, I doubt whether we could buy more than $3 million if we wanted to at this point. |
| *C Plaford:* | Okay, well – |
| *S Lumiere:* | So it's like, are we going to spend time? I guess why even bring it up, like, what are we going to do? Are we gonna put $3 million on it, and it gets taken out in, like, three months? |

| | |
|---|---|
| *C Plaford:* | For $3 million, no, but there's a disconnect somewhere because hasn't Jason talked to you about this name? |
| *S Lumiere:* | I did talk about it. I talked about it many times. |
| *C Plaford:* | He's been pressing, and I asked him several times to check on the liquidity, and he seems to think that it is transactable. |
| *S Lumiere:* | It was. There was a period at, you know, throughout the years where there's been $8 million for sale, one seller. They'd been trying to sell it, and it's not able or sell it. And that's been it. It's been Libertas trying to sell it. So it was transactable on $8 million, and it took that long to place it. It's not there now. |
| | I know they – they've traded most of it. I think there might be two, three more left, and now it's at a level where it's like, okay, now everybody's betting on their refi. Likely, it will get done. There's value there. It's covered. But, like, there's – I mean, I say it's an impossibility that there's somewhat of a restructuring? No, I don't think it's likely. |
| *C Plaford:* | Look, if the name – if the – if the name that has, you know – |
| *S Lumiere:* | Sorenson is the name I've spent countless weeks and hours on. |
| *C Plaford:* | Sorenson is getting harder 'cause I don't know if you can argue with that healthcare. I – I think like I said before, there's not – there's a lot of shit that we – that we're – it takes us a long time. I mean, there's enough names in healthcare that it takes us, you know, longer than, you know, there's always things that we'd like to be doing that we're not. I would be very happy to plug you in to having more responsibility on this stuff. We have to have a better communication. I mean, that's the bottom line. |
| *S Lumiere:* | Well, it sounds like it. |
| *C Plaford:* | I can't – I can't – look, you know, when Jason asked me, "Hey, has anybody looked at CRC?" And I said, "Oh, I don't know. I think Stefan may have looked at it a while back. I have no idea." |
| *S Lumiere:* | Jason knows about CRC. We've talked about it many times. He knows that I've done the calls up until, you know, August of last year. |
| *C Plaford:* | But that's still – August of last year, that's six months ago. |
| *S Lumiere:* | Yeah, and the way I looked at it was, like, I didn't think you would |

want to. I didn't think you'd want it. It's some very illiquid. I knew there was $8 million for sale, no buyers, down at 88, you know, no buyers. So it's like if there's no buyers, there's nobody to transact. We buy, like, like if you decide you wanna take some off, like, we're screwed.

C Plaford:     That – that's fine. But – and – and maybe CRC is too, too small. But look, I – I – I look at the workload, um, for all the guys for any – in any given week, right? I'm struggling to get – and there's stuff to do in equity, too. There's there's a lot of moving pieces in healthcare right now. There's ACA Implementations going on right now. The exchanges are all brand new. That's going on right now.

There's all kinds of potential changes to reimbursement. You know, labs are a new area for us we've been spending a lot of time with, right, in addition to all the other stuff, you know.

I don't have enough people to work on even all of the ideas that I have, right? There's – there's plenty of stuff to do, but, you know, in a given week, right, we'll bang out, you know, probably three or four of those types of things, so it has to go on a – look, it can go one of two ways.

You're gonna get paid on the ideas that you work on, regardless. If you – if you wanna have, you know, more autonomy, right, then we're gonna need more communication either way, but it'd be a lot easier, right, to have the communication beforehand as opposed to you trying to guess, you know, what we're understanding, what we're not understanding, who's been doing work on this or that, right?

Then we should sit down and – and – and talk about them. I mean, it has to be a quicker turnaround time than eight months.

S Lumiere:     I – I – I – I know, we've discussed this, like the size of the fund, does not make sense to invest unless we get at least $15 million on the pad on something, and I didn't think CRC was one that we could put $15 million on.

C Plaford:     And CRC may be not, but M-Modal's a lot bigger.

S Lumiere:     Yeah.

C Plaford:     Nobody's looking at that at all. I didn't even know –

S Lumiere:     I thought you knew. I told you I was working on it.

| | |
|---|---|
| *C Plaford:* | Yeah, you did, and then I said, and I told Jason 'cause Jason asked about it. Jason and you had a conversation, and what was that like? |
| *S Lumiere:* | I told him everything about the business, explained to him how it worked, explained to him how the valuations worked, and, uh, I think he – I think he liked the loans better, but. |
| *C Plaford:* | Jason's not equipped to – |
| *S Lumiere:* | I'm looking for the catalyst, like, right now, so I think it's, uh, I think it's interesting. It's traded down significantly. They've had an operation mishap, probably something that we probably need to, uh, get comfortable with management. Is it possible that it's a, uh, a Nebraska book situation, like, are they fucking up that bad internally? It's possible. They've done a very poor job of – of, uh, getting their sales network up – up to speed and reselling this new platform, really done a bad job. |
| | So there's a – and it's not a function of the – the business. It's a function of what – what they're trying to sell. They're changing a little bit and moving away from many use, and they're trying to sell on a per monthly minimum usage. So that's a change in structure, and people are unable to explain how that might benefit the customer base. So they're having trouble explaining that and getting people to convert over. |
| *C Plaford:* | Okay. So – |
| *S Lumiere:* | They haven't lost any contracts, but there – there's definitely an issue there. |
| *C Plaford:* | Okay, so when can we sit down and do a thorough review? |
| *S Lumiere:* | Modal? Uh, Monday, Tuesday? |
| *C Plaford:* | Why don't you let me know when you're ready. That would be a great name for you to – for us to – |
| *S Lumiere:* | I'm just building the model now. It's really – we've got very limited financial information. |
| *C Plaford:* | Okay. |
| *S Lumiere:* | So – |
| *C Plaford:* | But again, I want – I wanna be very clear here. I would love to have you take on more responsibility, but, I mean, the |

communication is – is so key, right? I – I would – I would love – and – and – and, you know – and not just that, even on, you know, regular stuff. There's plenty of, you know, like I said, you know, even equity ideas, that we're – we're doing a lot more of those – plenty of stuff with catalysts, plenty of stuff that needs to be vetted out.

Look, you know, – I – I would love – I would love to see you, you know, uh, you know, with – with a dozen names back on the – back on the pad. I mean, you know, we're completely aligned in that respect, and there's plenty of stuff to do. But, you know, for now, at least, it has to be in healthcare, as we talked about, and, you know, we obviously have to be – we have to be making money, right?

I mean, that's – you know, granted, I think there – there – there is a lot of stuff, you know, that – that's harder – that's harder for you, um, you know, that – that it's harder to, you know, think about what – what is an appropriate compensation, on, you know, you know, a name, like where – a BELLUS, right? I got it. I got it. But at the same time, you know, we're – we're still, at least in the last couple years, we've still been losing money. It's not like BELLUS is, you know, making the delta between –

*S Lumiere:*   I'm not saying it's just BELLUS.

*C Plaford:*   It's not like BELLUS is worth $5 million –

*[End of Audio]*



I certify that the foregoing documents were transcribed by Verbal Ink based on the audio files submitted by *Stefan Lumiere* which were provided on *(2/11/19)*. The provided files were:

| Run-Time | Billable Minutes | File Title |
|---|---|---|
|  | 62 | CP YEReview 2012 march 2013 |

\* These transcripts were completed to the best of our ability.
\*No words from the speaker in the recording have been changed or paraphrased.
\* All employees of Verbal Ink are bound by a non-disclosure agreement.

Armando Reif

Account Executive

Verbal Ink

Date        7/17/19

| | |
|---|---|
| *S Lumiere:* | Hello? |
| *C Plaford:* | Stefan? |
| *S Lumiere:* | Yeah, what's up, Chris. |
| *C Plaford:* | Hey, how's it going, man. |
| *S Lumiere:* | Okay. |
| *C Plaford:* | So J.T. gave me a heads-up that you're uh -- you're uh wanting to move on, it sounds like? |
| *S Lumiere:* | Yeah, it's uh – I've asked uh them to release me from my contract. |
| *C Plaford:* | Right, okay. Well I mean I'm sorry to hear that obviously but uh you know, I wish you uh the best of luck and all that. |
| *S Lumiere:* | Yeah. |
| *C Plaford:* | And you know it's been what, several years now? |
| *S Lumiere:* | Several years what? |
| *C Plaford:* | Several years that we've worked together. |
| *S Lumiere:* | Yeah, no. I know. Uh -- |
| *C Plaford:* | But -- |
| *S Lumiere:* | But you know I've been there for over five and a half and uh it's just uh – you know although I did uh enjoy the stuff I was doing, it just wasn't enough. |
| | Like I just need to – I need to get involved with things that are uh you know just not locked into healthcare. |
| *C Plaford:* | Yeah – no. I understand that. I knew that you were unhappy just looking at healthcare stuff. So, I get it. I understand completely. Do you uh – do you have uh something that uh you know is imminent or --? |
| *S Lumiere:* | No, you know, I've thought about it. I've had a couple of offers over the past year um to go work at uh other funds or private equity and um I just – you know I'm just gonna – you know |

A 174 p1-4

|  |  |
|---|---|
|  | obviously I'm injured still. So I'm still gonna kinda take a little time and think about it. |
| *C Plaford:* | Right. |
| *S Lumiere:* | Which direction I wanna take. You know, obviously if I move to private equity it's a big, big step in a different direction. |
| *C Plaford:* | Right. |
| *S Lumiere:* | Uh, but I definitely wanna be somewhere where I can invest more distress type stuff. |
| *C Plaford:* | Yeah – no. That makes sense. That's your skillset. |
| *S Lumiere:* | Yeah. |
| *C Plaford:* | It makes complete sense. |
| *S Lumiere:* | So but listen, I'm still available, if you need help on the – you know I'm not doing anything right now, so – I mean  you know Modal still does interest me. So I could still like send you that model, after I finish. |
| *C Plaford:* | Well, yeah. I mean if you wanna send me the model, then that's -- |
| *S Lumiere:* | Yeah. |
| *C Plaford:* | Then that's great, or what you have so far, that's great. |
| *S Lumiere:* | Yeah. |
| *C Plaford:* | And uh look, you'll do well. You're a smart guy. You know, you're – you know, I wish you the best of luck and uh you know, just keep in touch. Uh, you know regardless, just let us know, uh or let me know, at least if you want when you land and -- |
| *S Lumiere:* | Yeah, definitely. |
| *C Plaford:* | -- I'm sure we'll run into each other on -- |
| *S Lumiere:* | I'm sure, I'm sure. |
| *C Plaford:* | -- I mean down the road, et cetera. So -- |
| *S Lumiere:* | I'm sure we will. |

| | |
|---|---|
| *C Plaford:* | All right. |
| *S Lumiere:* | All right, thanks, Chris. |
| *C Plaford:* | Thanks, bud. |
| *S Lumiere:* | Appreciate it. |
| *C Plaford:* | Bye, take care. |
| *S Lumiere:* | Thanks, bye. |

*[End of Audio.]*



I certify that the foregoing documents were transcribed by Verbal Ink based on the audio files submitted by *(Client Name)* which were provided on *(Date of File Submission)*. The provided files were:

| Run-Time | Billable Minutes | File Title |
|---|---|---|
| 0:02:31 | 3 | CP-Wanted to move on-Release from contract |

* These transcripts were completed to the best of our ability.

*No words from the speaker in the recording have been changed or paraphrased.

* All employees of Verbal Ink are bound by a non-disclosure agreement.

Armando Reif

Account Executive

Verbal Ink

Date  2/20/19

 **Gmail**

Stefan L <stefanlumiere@gmail.com>

---

## FW: Stefan
2 messages

---

**Moy, Laurence S.** <lsm@outtengolden.com>
To: Stefan Lumiere <stefanlumiere@gmail.com>

Fri, May 19, 2017 at 3:44 PM



**Laurence S. Moy | Partner**
685 Third Ave 25th Floor | New York, NY 10017
T 212-245-1000 | F 646-509-2074
LSM@outtengolden.com | Bio



This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.

*Please consider the environment before printing this e-mail.*

**From:** Stefan Lumiere [mailto:stefanlumiere@gmail.com]
**Sent:** Thursday, April 18, 2013 8:17 AM
**To:** Moy, Larry
**Subject:** Fwd: Stefan

Begin forwarded message:

> **From:** Stefan Lumiere <stefanlumiere@gmail.com>
> **Date:** April 16, 2013, 6:11:29 PM EDT
> **To:** jgottlieb@visiumfunds.com
> **Subject: Stefan**

A175 pt-2

Gmail - FW: Stefan                                                                                                                    11/10/19, 4:36 PM

Jake,

Thanks again for speaking with me today.   I'm not resigning, but wanted to talk to you about the
possibility of trying to get to an agreement on some type of arrangement where we can agree to go
our separate ways (as it pertains to our business relationship)

I know you're busy so I appreciate you spending the time to talk to me and advise me.   Please let
me know what you think when you get the chance.   As you suggested, I will call you tomorrow
before speaking to David and Chris.

Stefan

Stefan Lorca Lumiere, CFA

C 917-696-9099

StefanLumiere@gmail.com

---

**Stefan L** <stefanlumiere@gmail.com>                                   Fri, Nov 8, 2019 at 7:09 PM
To: Stefan Lumiere <stefanlumiere@gmail.com>

[Quoted text hidden]

**Subject:**  Fwd: Catching up

**From:**  Stefan Lumiere (stefanlumiere@gmail.com)

**To:**  alumiere@yahoo.com;

**Date:**  Tuesday, April 30, 2013 2:06 PM


Okay.  Was hoping to be first to let him know that i was thinking about moving on, but just had a conversation

On Apr 18, 2013, at 9:05 AM, Jason Huemer <jhuemer@visiumfunds.com> wrote:

Hi Stefan. I gave him a heads up when Jake told me,  so he knows.


**From:** Stefan Lumiere [mailto:stefanlumiere@gmail.com]
**Sent:** Thursday, April 18, 2013 8:32 AM
**To:** Jason Huemer
**Subject:** Re: Catching up


Sure either way.  Was planning on coming back to work today and have not mentioned anything to chris about this.  But since my surgery i have been working from home which chris does knows about.  Have you or jake mentioned anything to chris yet? I can call him today or wait until our conversation, but prefer not to leave him in dark as i have been working on an interesting project for him.

On Apr 18, 2013, at 8:20 AM, Jason Huemer <jhuemer@visiumfunds.com> wrote:

Let's do a call today or tomorrow; really don't need you to kill yourself to do this in person. I think a call tomorrow is probably going to work a little better for my schedule. I'm not sure what David's availability is, so I'll ask Donna to sort it out for us.


**From:** Stefan Lumiere [mailto:stefanlumiere@gmail.com]
**Sent:** Thursday, April 18, 2013 8:11 AM
**To:** Jason Huemer
**Subject:** Re: Catching up


Hi jason,

A176 p1-3

Thanks for reaching out. I am available to get on a call with you and david today, or if you prefer i can try to make it to office tomorrow or monday. Been working from home for the past weeks as i have been recuperating from an ankle surgery. Bit difficult to move around because i had ankle surgery following my shoulder surgery and have not been mobile because i have not been able to bear weight and use a crutch. Still tender now. What do you recommend? Call today or tomorrow? Or i can try to make it into office tomorrow or monday?

Best,

Stefan

On Apr 18, 2013, at 7:56 AM, Jason Huemer <jhuemer@visiumfunds.com> wrote:

> Hi Stefan. Jake passed your message on to me and suggested that you and David and I try to catch up today or tomorrow. Is there a good time to get you? I've cc'ed Donna, who has my calendar, so maybe we can schedule a time to speak.
>
> All the best,
>
> Jason
>
> **Jason Huemer**
>
> **President**
>
> **Visium Asset Management**
>
> 888 Seventh Avenue, 22nd Floor
>
> New York, NY 10019
>
> w. 212-474-8811, m. 917-576-4065
>
> jhuemer@visiumfunds.com

&lt;image001.gif&gt;

This information is confidential and intended only for recipients named above. It is for informational purposes only and does not constitute a solicitation to transact securities, nor legal or tax advice. Any unauthorized dissemination or use of the contents is strictly prohibited. If you received this message in error, please delete it and notify the sender immediately. This message is being retained. Past performance is not necessarily indicative of future results.

This information is confidential and intended only for recipients named above. It is for informational purposes only and does not constitute a solicitation to transact securities, nor legal or tax advice. Any unauthorized dissemination or use of the contents is strictly prohibited. If you received this message in error, please delete it and notify the sender immediately. This message is being retained. Past performance is not necessarily indicative of future results.

This information is confidential and intended only for recipients named above. It is for informational purposes only and does not constitute a solicitation to transact securities, nor legal or tax advice. Any unauthorized dissemination or use of the contents is strictly prohibited. If you received this message in error, please delete it and notify the sender immediately. This message is being retained. Past performance is not necessarily indicative of future results.

Fwd: FW: Visium Asset Management, LP, Jacob Gottlieb

Page 1 of 3

## Fwd: FW: Visium Asset Management, LP, Jacob Gottlieb

| From: | Stefan Lumiere <stefanlumiere@gmail.com> |
|---|---|
| To: | "Stefan Lumiere, CFA (GBG)" <slumiere@greatbarriergroup.com> |
| Priority: | Normal |
| Date | 02-06-2014 09:58 PM |

Stefan Lumiere, CFA

--------- Forwarded message ---------
From: Moy, Larry <LSM@outtengolden.com>
Date: Wed, Jul 10, 2013 at 4:35 PM
Subject: FW: Visium Asset Management, LP, Jacob Gottlieb
To: "Stefan Lumiere (stefanlumiere@gmail.com)" <stefanlumiere@gmail.com>

Stefan,

Just received this letter from Seward & Kissel in response to our letter.
As expected, Gottlieb is denying that he has disparaged you. It's the rare
situation where anyone ever admits that he has been engaging in this kind
of conduct, and the important thing of course is that he stops what he's
been doing. This letter will also be helpful if we bring a claim for
defamation and/or disparagement.

If you'd like to pursue starting an arbitration case against Visium and
Gottlieb, as you indicated last week, then I'll raise this matter with our
firm's litigation committee. As we discussed, I'd expect the committee to
require a retainer payment. Also, I can consult with the committee about
seeking to make a public filing since an arbitration case before the AAA
(indicated in your employment contract) is a private proceeding.

Regards,

Larry

Laurence S. Moy

Outten & Golden LLP          Tel:    (212) 245-1000, ext.
9821

*Advocates for Workplace Fairness* <http://www.outtengolden.com/>
Fax:    (646) 509-2074

3 Park Avenue, 29th Floor          www.outtengolden.com
New York, NY 10016

*From:* Patin, Anne [mailto:patin@sewkis.com] <patin@sewkis.com>]
*Sent:* Wednesday, July 10, 2013 4:06 PM
*To:* Mendez-Comas, Diana
*Subject:* RE: Visium Asset Management, LP, Jacob Gottlieb

Dear Ms. Mendez-Comas,

A 177 P 1-4

Fwd: FW: Visium Asset Management, LP, Jacob Gottlieb

Attached please find a letter for Mr. Moy.  Thank you.

Anne Patin

--------------------------

*Anne C. Patin*
*Partner*

Tel: (212) 574-1516
Email: patin@sewkis.com

*S**EWARD & **K**ISSEL LLP*
One Battery Park Plaza
New York, NY 10004
Fax: (212) 901-2110
Web: www.sewkis.com
*..........................*

*Confidentiality Notice*: This e-mail is intended only for the person or
entity to which it is addressed and may contain information that is
privileged, confidential or otherwise protected from disclosure. If you
have received this e-mail in error, please notify Seward & Kissel LLP by
return e-mail and destroy the original message and all copies thereof.

*Circular 230 Notice*: To ensure compliance with Treasury regulations
regarding practice before the IRS, we inform you that, unless expressly
stated otherwise, any federal tax advice contained in this communication
was not intended or written to be used, and cannot be used, by any taxpayer
for the purpose of (i) avoiding penalties that may be imposed on the
taxpayer under United States federal tax law, or (ii) promoting, marketing
or recommending to another party any tax-related matters addressed herein.

--------------------------

*From:* Mendez-Comas, Diana [mailto:dmc@outtengolden.com<dmc@outtengolden.com>]
*Sent:* Wednesday, July 03, 2013 2:02 PM
*To:* Patin, Anne
*Subject:* Visium Asset Management, LP, Jacob Gottlieb

Hi, this email is being sent to you on behalf of Attorney Laurence S. Moy.

Thanks,

*Diana Mendez-Comas*

*Legal Assistant*

*Outten & Golden LLP*

*Advocates for Workplace Fairness <http://www.outtengolden.com/>
  3 Park Avenue, 29th Floor       New York, NY 10016
Tel: (212) 245-1000 <%28212%29%20245-1000> *

*Email: dmc@outtengolden.com <mmcgoy@outtengolden.com>www.outtengolden.com
<http://www.outtengolden.com/> *

| Part_1.2.html | Content-Type: text/html<br>Size: 14.34 KB |
| Letter to Laurence S. Moy, Esq..pdf | Content-Type: application/pdf; name="Letter to Laurence S. Moy, Esq..pdf"<br>Size: 65.84 KB |

Fwd: Need to speak with you.                                        Page 1 of 1

---

**Fwd: Need to speak with you.**

| | |
|---|---|
| From: | Stefan Lumiere <stefanlumiere@gmail.com> |
| To: | "Stefan Lumiere, CFA (GBG)" <slumiere@greatbarriergroup.com> |
| Priority: | Normal |
| Date | 02-06-2014 09:58 PM |

Stefan Lumiere, CFA

---------- Forwarded message ----------
From: Stefan Lumiere <stefanlumiere@gmail.com>
Date: Tue, Jul 2, 2013 at 11:45 AM
Subject: Need to speak with you
To: "Moy, Larry" <lvn@outtengolden.com>

I have just discovered that Jacob Gottlieb has been meeting with
Consultants and allocators that when asked about my departure, he is saying
that they dismissed me due to insider trading investigations.

Stefan Lorca de St Pierre Lumiere, CFA
Special Situations Investments
C 917-696-9099
Stefanl.umiere@gmail.com

| Part_2.html | Content-Type: text/html<br>Size: 1.11 KB |
|---|---|

Gmail - FW: Visium / Stefan Lumiere                                                                11/8/19, 7:05 PM

 Gmail                                              Stefan L <stefanlumiere@gmail.com>

## FW: Visium / Stefan Lumiere
1 message

**Moy, Larry** <LSM@outtengolden.com>                              Tue, Oct 13, 2015 at 10:48 AM
To: Stefan <stefanlumiere@gmail.com>

Stefan,

Please scroll all the way down to see Anne Patin's contact information.

Rgds,

Larry

Laurence S. Moy

Outten & Golden LLP

Advocates for Workplace Fairness

3 Park Avenue, 29th

New York, NY 10016

Tel:     (212) 245-1000, ext. 9821

Fax:     (646) 509-2074

www.outtengolden.com

**From:** Moy, Larry
**Sent:** Thursday, September 19, 2013 11:53 AM
**To:** 'Stefan Lumiere'
**Subject:** FW: Visium / Stefan Lumiere

Stefan,

A178 P1.5

She pushed back, and so I'm clarifying what she actually said during our call.  I also have her voicemail saved, but that goes mainly to the point that Visium is unwilling to confirm in writing.

Larry


OUTTEN & GOLDEN ..


Laurence S. Moy

Outten & Golden LLP             Tel:     (212) 245-1000, ext. 9821

*Advocates for Workplace Fairness*      Fax:     (212) 977-4005

3 Park Avenue, 29th Floor        www.outtengolden.com

New York, NY 10016


**From:** Moy, Larry
**Sent:** Thursday, September 19, 2013 11:51 AM
**To:** 'Patin, Anne'
**Subject:** RE: Visium / Stefan Lumiere


Anne,


Already tried to call you and left word with your assistant.  If you're free now, I'll try again.


Regarding my prior email, let me know how my message was inaccurate.  It seemed quite clear that your client is waiving the non-compete and "capacity rights."  You had advised that this was being done "as a gesture" on the part of your client because there is "a family component to this," although you also added that your client was not prepared at this time to make any type of proposal on the economics.  I had also clarified with you that the waiver was without any conditions.


Regards,

Larry


OUTTEN & GOLDEN ..

Laurence S. Moy

Outten & Golden LLP          Tel:     (212) 245-1000, ext. 9821

*Advocates for Workplace Fairness*          Fax:     (212) 977-4005

3 Park Avenue, 29th Floor          www.outtengolden.com

New York, NY 10016

**From:** Patin, Anne [mailto:patin@sewkis.com]
**Sent:** Thursday, September 19, 2013 11:38 AM
**To:** Moy, Larry
**Subject:** RE: Visium / Stefan Lumiere

Hi Larry,

I don't agree with your self-serving characterization below, but I'm happy to discuss.

        Anne

---

**Anne C. Patin**
*Partner*

Tel: (212) 574-1516
Email: patin@sewkis.com

**Seward & Kissel llp**
One Battery Park Plaza
New York, NY 10004
Fax: (212) 901-2110
Web: www.sewkis.com

---

**Confidentiality Notice**: This e-mail is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. If you have received this e-mail in error, please notify Seward & Kissel LLP by return e-mail and destroy the original message and all copies thereof.

**Circular 230 Notice**: To ensure compliance with Treasury regulations regarding practice before the IRS, we inform you that, unless expressly stated otherwise, any federal tax advice contained in this communication was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (i) avoiding penalties that may be imposed on the taxpayer under United States federal tax law, or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.

---

**From:** Moy, Larry [mailto:LSM@outtengolden.com]
**Sent:** Thursday, September 19, 2013 10:19 AM
**To:** Patin, Anne

**Subject:** RE: Visium / Stefan Lumiere

Anne,

I'll try to call you today, but if there's certain times that work better than others, please let me know.   Received your message that your client is fine with Mr. Lumiere competing and that your client is also waiving the "capacity"/participation rights, but would like to discuss.

Regards,

Larry

Outten & Golden

Laurence S. Moy

Outten & Golden LLP              Tel:    (212) 245-1000, ext. 9821

*Advocates for Workplace Fairness*          Fax:    (212) 977-4005

3 Park Avenue, 29th Floor            www.outtengolden.com

New York, NY 10016

**From:** Moy, Larry
**Sent:** Wednesday, September 11, 2013 10:48 AM
**To:** 'patin@sewkis.com'
**Subject:** Visium / Stefan Lumiere

Anne,

Just called and left you a detailed voicemail.  When you have the chance, please let me know your thoughts concerning same.  I'm not in the office, but available at 646-824-0784 if you'd like to discuss.

Thanks,

Larry Moy

OUTTEN & GOLDEN

Laurence S. Moy

Outten & Golden LLP               Tel:     (212) 245-1000, ext. 9821

*Advocates for Workplace Fairness*          Fax:     (212) 977-4005

3 Park Avenue, 29th Floor          www.outtengolden.com

New York, NY 10016

# SEWARD & KISSEL LLP

ONE BATTERY PARK PLAZA

NEW YORK, NEW YORK 10004

ANNE C. PATIN
PARTNER
(212) 574-1516
patin@sewkis.com

TELEPHONE: (212) 574-1200
FACSIMILE: (212) 480-8421
WWW.SEWKIS.COM

901 K STREET, NW
WASHINGTON, DC 20001
TELEPHONE: (202) 737-8833
FACSIMILE: (202) 737-5184

July 10, 2013

**BY EMAIL AND REGULAR U.S. MAIL**

Laurence S. Moy, Esq.
Outten & Golden LLP
3 Park Avenue
29th Floor
New York, New York 10019

### Stefan Lumiere/Visium Asset Management, LP

Dear Mr. Moy:

I received your letter dated July 3, 2013 regarding defamatory statements allegedly made by Jacob Gottlieb, Chief Investment Officer of Visium Asset Management, LP ("Visium"), about Stefan Lumiere.

For the record, Jacob Gottlieb categorically denies that he made any of the defamatory statements alleged in your letter. Mr. Gottlieb did not make any such statements and would not do so, as he is a highly successful and sophisticated hedge fund manager and he obviously would not be claiming that a former employee of his firm who is also his brother-in-law had been fired because he engaged in insider trading or even was purportedly investigated for doing so.

These allegations appear to be completely fabricated. In your letter, Mr. Lumiere does not identify his sources, does not specify the times or places where the defamatory statements were allegedly made and he does not quote what was allegedly said.

Mr. Lumiere resigned his employment. Mr. Lumiere's suggestion that he did not resign is not supportable, and these fabrications and threats are not in any way changing Visium's position on the matter.

This letter is without prejudice to Visium's and Mr. Gottlieb's rights and remedies, all of which are respectfully preserved.

Very truly yours,

*Anne Patin /MBR*

Anne C. Patin

SK 27980 0001 1396739

A 179



Gmail Stefan L <stefanlumiere@gmail.com>

# Time/docs/defense strategy/ appearance

**Eric Creizman** <ecreiz@creizmanllc.com> Thu, Aug 11, 2016 at 10:22 AM
To: Alexandra Gottlieb <alexgottlieb212@gmail.com>
Cc: Fafa Lumiere Stefan fafa personal <stefanlumiere@gmail.com>

Hi both of you make very valid points. I spoke with the head of the federal defenders last night as well as a number of other prominent lawyers. The fact is that Judge Rakoff is not good about giving lawyers a lot of time for a trial. The issue here is not a matter of him being pro-prosecution or otherwise accommodating to prosecutors. He's equally unfair in this respect. He expects that lawyers should work 24/7. Luckily I do. He does too. So I will try my best but I don't know how far I will get in this effort. If I don't get much more time, and you're concerned about the fact I have a trial in between, I will withdraw as counsel. But I do think I could get ready for trial in the time allotted.

Motions to dismiss aren't of the table but in a federal criminal case, a motion to dismiss is only even potentially viable if there's a defect in the way the allegations are pled: i.e. taking the facts in the indictment as true, there's no crime. That's not the case here and you can't get rid of a case based on the facts until the close of the government's case. There are a lot of good motions to be made here but that's not one of them. Anyone may have an opinion that it's not a crime but the issue is whether on the facts as alleged by the government, whether it is a crime. And my professional opinion is that the indictment alleges a fraud under the criminal laws. The issue is whether the government can prove beyond a reasonable doubt that Stefan knowingly and intentionally committed a crime.

As for Visium, we don't need to make a motion to compel them to pay. They are ready and willing. But they want to do it on condition we share information with them (and they say they will share information with us). If you don't trust them to, I respect and understand that. litigation is an option, but it's costly and uncertain and will divert the time we need to prepare for trial.

Sent from my iPhone
Eric M. Creizman
Attorney at Law
Creizman LLC
565 Fifth Avenue, Fl. 7
New York, New York 10017
T: (212) 972-0200
F: (646) 200-5022

www.creizmanllc.com
[Quoted text hidden]

**From:** **Eric Creizman** ecreiz@creizmanllc.com
**Subject:** Re: Time/docs/defense strategy/ appearance
**Date:** August 11, 2016 at 4:23 PM
**To:** Alexandra Gottlieb alexgottlieb212@gmail.com
**Cc:** Fafa Lumiere Stefan fafa personal stefanlumiere@gmail.com, Alexandra Gottlieb gottlieb212@gmail.com

Ok, I talked to Vic Rocco, my mentor, and an attorney who has had a great number of cases before Judge Rakoff. He said that Judge Rakoff is very tough in terms of pushing parties to trial, but he was a defense lawyer, and he's equally tough on the government. The government will have to work very hard, just as we will. Vic also made the very salient point that although there's a ton of discovery, most of it is totally irrelevant. That's the way it always is. The real meat of the case -- the witness statements -- we don't get until two weeks before trial. And that's always the case.

If we have until January 9, we are going to have 5 months to prepare for trial. We just need to up our game, and we will. I will master the discovery very quickly and very thoroughly. We will subpoena who we need to and we will educate the judge about the case through our motions and through our ex parte requests for subpoenas.

Vic is of the view that with Judge Rakoff, we should take the extra 3 weeks and sign the affidavit. And the reason is that if we wait to make a motion to Judge Rakoff about needing the extra time because of all of the discovery, he's going to think that's pure bullshit. And it really is. Number one, we know generally what our defense is going to be and we know generally what their case is going to be. We're going to put in a tremendous amount of time to master the facts and the law. We just have to spend a lot of time doing it. That's what we have to do. And we'll use the trial date and the amount of discovery to force the government to identify precisely what they deem is relevant to proving their case. It makes our bill of particulars motion that much stronger.

Vic says, and I agree, and this was my concern, that what do we do if we discover through our own investigation that there is evidence we need to pursue that is exculpatory, we may need more time. In that case, though, we can make an application to Judge Rakoff to release me from my promise for very good reasons. What is Judge Rakoff going to do if I make a record demonstrating why we need the extra time? Let's do it if we really need it and at the time we really need it. Not now. Not in a vacuum. So I'm in favor of an affidavit. It gets us 3 additional weeks, which is valuable.

You guys know that I care so much about my cases and my trial preparation that I will be ready. More than ready. And we will kick ass. So my advice is let's put in the affidavit. Otherwise, we'll be stuck with December 19. And I guarantee you we will because Judge Rakoff is stubborn like that. And what are we really giving up? Again, if we have a truly legitimate basis for an adjournment, we'll ask for one and put it all on the record. Judge Rakoff was a defense lawyer. He'll either understand or we can appeal and the decision will be overturned.

As for Visium, my view is this: When I spoke to Rita on those two occasions, the conditions for advancement of fees were not that onerous: no caps were discussed and I guarantee that if they paid for my fees, I can really staff this case so that we can efficiently and effectively defend it. Plus they are offering to pay for transcripts and giving us information about potential witnesses. She even said that she would provide me with cross examination outlines and witness background information for Plaford and everyone else.

They are ready to pay me because they know me and they know I will take this case to trial. And by paying my fees, they cannot and will not interfere with my independent judgment and they cannot and will not affect our strategy for the case. All they claim they want is to share information about what is going on in the case and to see the discovery on the basis that we

A 181 P 1-6

information about what is going on in the case and to see the discovery on the basis that we have a shared common interest in demonstrating that Stefan is not guilty of the crimes with which he is charged, because that benefits Visium in connection with the government's investigation of it. We don't have to deal with Jacob's lawyers if we don't want to.

And let's consider this: even if Jacob made Stefan the fall guy, well, Stefan is now in this case. What can they do to hurt us at this point? If they claim to be acting under a common interest privilege, they can't then hurt us and use information against us. That would violate legal ethics and they would not be able to do so. We would prevent them from making use of that information because of their violation of the common interest privilege. They wouldn't be able to use it and their reputations will be ruined.

In any event, it's your call as to whether to go with January 9 or gamble on December 19 and getting more time in a vacuum at this point. It's also your call as to whether to pay me yourselves or whether you want me to get advancement from Visium. I'll do whatever you guys decide on this, but we need to decide soon--no later than tomorrow morning -- at least with respect to the trial date. Again, I recommend January 9.

And at this point, it's very real. I need to ramp up immediately so that I can start preparing pretrial motions that are due August 31 and diving into the discovery. I will master it. But I need to get paid as soon as possible so that I can spend the time necessary to adequately defend this case and to pay for the help we will need. I want a $250,000 retainer to be paid now. I can't wait much longer for it. The trial retainer can wait until one month before trial. But I need the retainer--from either you or Visium. I can't afford to go any further in this case because Judge Rakoff won't let me out if it goes on much longer. So I need an answer on this and action. Or I can withdraw and I must withdraw now, before Judge Rakoff won't let me.

I'm here all night tonight. You can call me or meet me. I'm available all morning tomorrow, because we either need to file the affidavit by close of business for sure or say we're not going to do it. And I need to know whether you want me to represent you or not. And I need to be funded because I can't do this for free and I can't do it without being funded. I've got to pay my attorneys and I can't staff them on a case where we are not paid. That's why my retainer is what it is. That's what we need to do to move forward. So please let me know what you want to do.

I won't take it personally if you want me to withdraw. I like you guys alot and I want you to be comfortable with your representation and to get acquitted. You know that. If you drop me, I'd like to be paid for the work I've done to date. If you want me to go forward, we need to decide before the end of the business day tomorrow.

Eric

On Thu, Aug 11, 2016 at 3:42 PM, Alexandra Gottlieb <alexgottlieb212@gmail.com> wrote:

Eric,

I agree with your decision NOT TO SIGN AFFADAVIT. For the law clerk trying to suggest on Stefan's waiving future rights to extensions of time to prepare for trial (especially at this early stage) sounds shady.

Futhermore if you have yet to be able to even download their discovery materials then the prosecution has already failed in terms of delivering discovery by previously agreed to date__ If the formating they presented discovery in is not readily accessible__that too presents clear argument for further delay since__in effect you have yet to be able to access/make use of the information.

While the government has the NSA and Feds and hefty capital and human resources and while Visium has enourmous servers in various backup locations, the human and capital resources to maintain that__that Stefan's limited resources __who Visium will

essentially not indemnify (i say will not because they said they would not advance without stipulations that could and likely would harm Stefan's ability to defend himself therefore would not) __required more time and prudence to analyze.

And the fact that the quantity of info is so large that download takes time is itself a reason for a much longer time frame to review and respond.

Recall the email indicating and the date of the email indicating when the prosecution had said they had already reviewed millions of documents. For the judge not to take that into account is highly problematic.

Also my understanding is that the full intent of the right to a speedy trial is there to protect defendant. In this case, the defendant requires more time to be fairly represented. Therefore, with the correct clauses in place to protect Stefan from later being put in jail awaiting trial, i suggest we may consider waiving his rights to speedy trial since the guided time frames are only serving to prevent Stefan from uncovering the facts to support his innocence.

I am also wondering what the written or federal case law may say about a defendant's rights to more funds/support (ie for u to possibly get more staff) when faced with charges explanable via framing by large and flush organizations whose motivations for being forthcoming and truthful are slim? Somewhere there must be something that addresses this.

And what laws or cases exist that provides better guidance/defence and possibly funds for scapegoats or lack of prosecutorial integrity or for those whose miranda rights waived by own attorneys who did not explain situation to Stefan.

Also might you be able to present Motion to the judge requesting that the Judge orders Visium to advance funds for Stefan's defence given Stefan's position having stemmed from his employment by Visium (and vengeance of brother in law owner), from the existance of an insurance policy and from the firms own open offer to advance (indicating that advancement would not present hardship to Visium)...

Re: Visium motive there ___if Visium were innocent in not framing and scapegoating Stefan, Visium should want to advance fees AND provide useful support to Stefan (without additional caps or clauses or visibility)...If Stefan is deemed innocent it would then (depending on evidence presenting) be a very wise investment for Visium...but for which Stefan cannot agree to given a number lf factors including but not limited to ___argument of framing/scapegoating__And would only make sense for Visium if Govt entirely on their own came to ridiculous conclusions and were only misled by Chris and prosecution fabricated charges without Visium's support....

I still think we need to make motion to dismiss and want to discuss with you. And
I want to propose items to subpoena that i think would be useful to Stefan.


Alexandra


Alexandra Gottlieb

On Aug 11, 2016, at 2:48 PM, Eric Creizman <ecreiz@creizmanllc.com> wrote:

> Guys, can you call me or can you give me Stefan's new number again?  I'm not going to sign
> that affidavit.  I'm waiting to talk to Vic Rocco to get his opinion, but my plan is to call the
> Judge's clerk with the prosecutors and tell the judge that I just got an enormous amount of
> discovery, etc..., and I can't agree not to ask for time.  I haven't even been able to download
> all the discovery.  So I am going to say I want to leave it at December 19 and make it one of
> my pretrial motions that we need more time.  And then, like Stefan suggested, we can use
> precedent from other similar cases, like Gupta.
>
> Are you with me?  I think this will work.  If Vic Rocco agrees with this strategy, I'm going to
> pursue it.  He has a lot of experience with Rakoff.
>
> On Thu, Aug 11, 2016 at 10:45 AM, Eric Creizman <ecreiz@creizmanllc.com> wrote:
>> Ok we got on the phone and the judge's law clerk said that the judge wanted to convey to us that 6 months is sufficient time
>> and that he already took trial schedules into account and that "there is no rational basis to move the trial date."  That said, the
>> clerk says that the judge will agree to move the trial date to January 9 if and only if the prosecution and the defense agree to
>> submit by tomorrow afternoon affidavits that neither side will ask for a further extension.
>>
>> So I need you guys to make a final decision today whether you are with me or not.
>>
>> Eric
>>
>> Sent from my iPhone
>> Eric M. Creizman

Attorney at Law
Creizman LLC
565 Fifth Avenue, Fl. 7
New York, New York 10017
T: (212) 972-0200
F: (646) 200-5022

www.creizmanllc.com

> On Aug 11, 2016, at 9:43 AM, Alexandra Gottlieb <alexgottlieb212@gmail.com> wrote:
>
> Hi Eric,
>
> Please ask Judge for more than double the time you think appropriate here since the judge and prosecution will slash any request you make. Consider also mentioning to court how my parents, myself and my kids rely on Stefan as well lest they imagine him to be just some single guy without responsibilities
>
>
> I knew they would intentionally inundate with unnecessary docs and we have yet to put together a list for subpoena which will be even more useful.
>
> Given the volume of data and my firm belief that you will have to prove Stefan was framed if any crime at all is even proved to have even been committed (since i still maintain there was none__i think Chris confessed to a crime that was not a crime in order to draw attention away from elsewhere where his actions could be grave and just because Chris claims he committed a crime does not make it so....
> I want to explain how it was not a crime and how/why all the people my brother went to for their take/opinion as to appropriateness had also said not a crime.
>
> I very much think Stefan should file a motion to dismiss and want to review several details/facts with you and discuss some ideas with you.
>
> Please also consider how to bring up that SEC had their own personnel inside Visium doing their reviews and assessments of all this at the same time as all this occured. Strange that at the time, SEC  themselves approved of process, yet are now charging my brother for what they themselves reviewed and approved .... Yet not Jake who is required to bear responsibility and culpability as owner by regulatory mandate (even if
> Prosecution chooses not to pursue that)
> A friend of mine who worked for Central Banks of Thailand and Also for Central Bank equivalent in Hong Kong told me that all everyone in investment community there are talking about is shock that Jake avoiding prosecution and blame. Apparently the Visium case is being discussed much more heavily and intensely abroad than in NYC.
>
> Alexandra Gottlieb
>
>> On Aug 11, 2016, at 8:49 AM, Stefan Lumiere <stefanlumiere@gmail.com> wrote:
>>
>> Eric,
>>
>> Can we point to other with similar volumes of discovery for an argument to timeline.  Other securities trials i have seen have been over a year and they were much simpler based on a couple of phone calls or texts.  This one is dealing with valuations and processes that I have never seen as a case before let alone being argued as a crime, with the company not being implicated to defend and offer insight and backup.  I would look at that basis for an argument for much more time and not just a couple of months.  Also, does it make sense to look through things first and create arguments before going to Rakoff.  Also do not want to remove the option to file for motion to dismiss or suppress as discussed before.  I maybe we can make an argument to Judge why this case has no basis if we can bring in an expert in the area and point to a couple of facts about the processes at the firm and my role there and the estranged situation with brother in law who had threatened me.  Also if motion to dismiss is denied, can we make an argument to Judge to compel Visium to cover legal costs so that you can go over the volumes of information.
>>
>>


--

Eric M. Creizman, Esq.
CREIZMAN LLC
Attorneys at Law
565 Fifth Avenue, New York, New York 10017
T: (212) 972-0200; F: (646) 200-5022

www.creizmanllc.com

Eric M. Creizman, Esq.
CREIZMAN LLC
Attorneys at Law
565 Fifth Avenue, New York, New York 10017
T: (212) 972-0200; F: (646) 200-5022

www.creizmanllc.com

 Gmail

Stefan L <stefanlumiere@gmail.com>

## Attorney Client Privileged-Confidential
10 messages

**Stefan Lumiere** <stefanlumiere@gmail.com>                           Fri, Aug 12, 2016 at 9:50 AM
To: Eric Creizman Lawyer Friend Vic Rocco <ecreiz@creizmanllc.com>
Cc: Stefan Lumiere <stefanlumiere@gmail.com>
Bcc: Alexandra Gottlieb <alexgottlieb212@gmail.com>

Eric,

I am of the opinion that any rush job and ultimatum especially on the part of someone who is supposed to be impartial,
is a bad choice and does not sound right and is an infringement on my civil rights. Given the circumstances of the
case and what seem to be conflicts of interests as well as a history of past misrepresentations and gross
negligence/misconduct on the part of past attorneys and that I am being obviously framed here,  I would have any
issues filed in public motions so that there is scrutiny in the public eye.  So I would not sign any affidavit to the effect
with Judge Rakoff that limits my civil rights.  I understand that under normal circumstances that Vic's argument would
make sense, but given the conflicts and the fact that I am being framed, and the history of prosecutors winning on
purely circumstantial evidence and interpretation, I believe that I am in the position that I need to prove that I am
innocent of all charges in this District Court which runs contrary to the law but seems to be the way it works
nowadays.  I understand he is well respected, but given some seemingly obvious conflicts, and the fabrications in this
case by the government.  we need to investigate this further.  Also, I am thinking about the SEC case and the stay on
that part.  What are the limitations of discovery in Federal case versus Civil case.  I will spend some time today and
over the weekend to do some research on prior cases to see if we can formally come up with an argument for an
greater extension that several weeks.


Stefan


**Eric Creizman** <ecreiz@creizmanllc.com>                           Fri, Aug 12, 2016 at 10:06 AM
To: Stefan Lumiere <stefanlumiere@gmail.com>

I'm not going to argue for an extension now.  I've thought about this.  Either we take what we have now and make it
closer to trial or we  sign the affidavit.  I'm not going to start this case off by pissing this judge off and not getting
anywhere.

Sent from my iPhone
Eric M. Creizman
Attorney at Law
Creizman LLC
565 Fifth Avenue, Fl. 7
New York, New York 10017
T: (212) 972-0200
F: (646) 200-5022

www.creizmanllc.com
[Quoted text hidden]


**Eric Creizman** <ecreiz@creizmanllc.com>                           Fri, Aug 12, 2016 at 10:12 AM
To: Stefan Lumiere <stefanlumiere@gmail.com>

I've listened a bunch of the conversations.  We don't have to worry about fabrications but about dealing with the
evidence.  And yo need to decide today on me.  Please.  I need to protect myself.  I've never let a client go this long

A 182 P 1 - 4

without paying my retainer. Needs to be today

Sent from my iPhone
Eric M. Creizman
Attorney at Law
Creizman LLC
565 Fifth Avenue, Fl. 7
New York, New York 10017
T: (212) 972-0200
F: (646) 200-5022

www.creizmanllc.com

> On Aug 12, 2016, at 9:50 AM, Stefan Lumiere <stefanlumiere@gmail.com> wrote:
>
[Quoted text hidden]

---

**Eric Creizman** <ecreiz@creizmanllc.com>                                     Fri, Aug 12, 2016 at 10:49 AM
To: Stefan Lumiere <stefanlumiere@gmail.com>

Stefan,

It's been two months since the Complaint and I really need a retainer paid today. You've known about this since you hired me. You haven't even paid my bills since the complaint. I cannot go forward now beyond today if I'm not paid. The judge will keep me in this case if I don't get out today and say you're not comfortable with the deadline and my schedule. And I'm not going to keep going anymore. It's not fair to me. I went out on a limb already going this far. My reputation is going to be damaged with this judge because I'm getting out now and fucking up his schedule. Shame on me. But I can't let this go on after today.

Sent from my iPhone
Eric M. Creizman
Attorney at Law
Creizman LLC
565 Fifth Avenue, Fl. 7
New York, New York 10017
T: (212) 972-0200
F: (646) 200-5022

www.creizmanllc.com

> On Aug 12, 2016, at 9:50 AM, Stefan Lumiere <stefanlumiere@gmail.com> wrote:
>
[Quoted text hidden]

---

**Stefan Lumiere** <stefanlumiere@gmail.com>                                   Fri, Aug 12, 2016 at 11:55 AM
To: Eric Creizman <ecreiz@creizmanllc.com>
Cc: Stefan Lumiere <stefanlumiere@gmail.com>
Bcc: Alexandra Gottlieb <alexgottlieb212@gmail.com>

Hi Eric,

We discussed this yesterday. My sister is in court today and helping me with this as I mentioned. You will be paid. Since today will not be possible given her court appearance, can I suggest this Saturday or Sunday to go over retainer and payments.

Stefan Lumiere, CFA

[Quoted text hidden]

**Stefan Lumiere** <stefanlumiere@gmail.com>                Fri, Aug 12, 2016 at 12:15 PM
To: Alexandra Gottlieb <alexgottlieb212@gmail.com>


Stefan Lumiere, CFA


[Quoted text hidden]

---

**Eric Creizman** <ecreiz@creizmanllc.com>                Fri, Aug 12, 2016 at 12:29 PM
To: Stefan Lumiere <stefanlumiere@gmail.com>

I love you Stefan, really.  But it's not possible.  You can get me paid today and everything else can wait. But unless I know I'm getting paid, I'm not going forward.  If you don't submit an affidavit today, I might be stuck in a trial for December 19.  That I can't risk.  I'm sorry.  I'm not springing this on you.  I've never waited this long but I trust you.  But even if I trust you, I still can't agree to stay on.

If you do submit an affidavit, I might be stuck in a trial for January 9.  At the very least, you will have to agree to have me submit an affidavit (you don't have to sign it) so I have until January 9, and then I would agree to meet on Sunday to get absolute assurance and guarantees and specifics on payment.  If not, I have to withdraw and it will have to be today.

[Quoted text hidden]
--

Eric M. Creizman, Esq.
CREIZMAN LLC
Attorneys at Law
565 Fifth Avenue, New York, New York 10017
T: (212) 972-0200; F: (646) 200-5022

www.creizmanllc.com

---

**Stefan Lumiere** <stefanlumiere@gmail.com>                Fri, Aug 12, 2016 at 12:31 PM
To: Alexandra Gottlieb <alexgottlieb212@gmail.com>


Stefan Lumiere


---------- Forwarded message ----------
From: **Eric Creizman** <ecreiz@creizmanllc.com>
Date: Fri, Aug 12, 2016 at 9:29 AM
Subject: Re: Attorney Client Privileged-Confidential
To: Stefan Lumiere <stefanlumiere@gmail.com>

[Quoted text hidden]

---

**Eric Creizman** <ecreiz@creizmanllc.com>                                    Fri, Aug 12, 2016 at 12:55 PM
To: Stefan Lumiere <stefanlumiere@gmail.com>

### If I put in the affidavit, I can say, "Barring unforeseen extraordinary circumstances, I will not seek a further adjournment of the trial date."

[Quoted text hidden]

---

**Eric Creizman** <ecreiz@creizmanllc.com>                                    Fri, Aug 12, 2016 at 1:05 PM
To: Stefan Lumiere <stefanlumiere@gmail.com>

I don't want to withdraw.  As an alternative If you want me to pursue Visium today and get paid by the company, I can reach out to Rita.
But I need to get paid today.  Otherwise I know I will be stuck in this case.  I will give you 150%.  You need to do this for me today.  If you say you're ok with Visium paying my fees and me sharing discovery with them under a joint defense agreement, that's fine too.  But the stakes are high right now.  And I'm going to be affected.

Alternatively  I can ask for January 9, and say that I won't ask for a further extension barring an unforeseen extraordinary circumstance if that makes you feel better.  And then we can iron everything out on Sunday because I trust youZ. But I need one or the other.  Believe me I don't want to lose this case but I have no choice.


Sent from my iPhone
Eric M. Creizman
Attorney at Law
Creizman LLC
565 Fifth Avenue, Fl. 7
New York, New York 10017
T: (212) 972-0200
F: (646) 200-5022

www.creizmanllc.com
[Quoted text hidden]

 Gmail

Stefan L <stefanlumiere@gmail.com>

## Time/docs/defense strategy/ appearance

**Eric Creizman** <ecreiz@creizmanllc.com>                                   Thu, Aug 11, 2016 at 5:27 PM
To: Alexandra Gottlieb <alexgottlieb212@gmail.com>
Cc: Fafa Lumiere Stefan fafa personal <stefanlumiere@gmail.com>, Alexandra Gottlieb <gottlieb212@gmail.com>

No problem.  I understand.  Good luck tomorrow.  Fafa, I would like you to read and consider, though.  We don't have a lot of time here.  If I move to withdraw tomorrow, I can say that because my client believes the time allotted is insufficient given my trial schedule, he will seek to retain new counsel.  That will likely work.  Otherwise, it will be hard for me to get out of the case, so I need a real commitment from you and financing so I can move forward.  I can call Visium if you want to as well.

[Quoted text hidden]

A183

11/13/19, 8:12 AM

Gmail - Time/docs/defense strategy/ appearance

 Gmail

Stefan L <stefanlumiere@gmail.com>

## Time/docs/defense strategy/ appearance

**Eric Creizman** <ecreiz@creizmanllc.com>                                    Thu, Aug 11, 2016 at 2:48 PM
To: Alexandra Gottlieb <alexgottlieb212@gmail.com>
Cc: Fafa Lumiere Stefan fafa personal <stefanlumiere@gmail.com>

Guys, can you call me or can you give me Stefan's new number again?  I'm not going to sign that affidavit.  I'm waiting to talk to Vic Rocco to get his opinion, but my plan is to call the Judge's clerk with the prosecutors and tell the judge that I just got an enormous amount of discovery, etc..., and I can't agree not to ask for time.  I haven't even been able to download all the discovery.  So I am going to say I want to leave it at December 19 and make it one of my pretrial motions that we need more time.  And then, like Stefan suggested, we can use precedent from other similar cases, like Gupta.

Are you with me?  I think this will work.  If Vic Rocco agrees with this strategy, I'm going to pursue it.  He has a lot of experience with Rakoff.

[Quoted text hidden]
--

Eric M. Creizman, Esq.
CREIZMAN LLC
Attorneys at Law
565 Fifth Avenue, New York, New York 10017
T: (212) 972-0200; F: (646) 200-5022

www.creizmanllc.com

A 184

 Gmail

Stefan L <stefanlumiere@gmail.com>

## Attorney Client Privileged-Confidential

**Eric Creizman** <ecreiz@creizmanllc.com>                    Fri, Aug 12, 2016 at 10:06 AM
To: Stefan Lumiere <stefanlumiere@gmail.com>

I'm not going to argue for an extension now.  I've thought about this.  Either we take what we have now and make it closer to trial or we  sign the affidavit.  I'm not going to start this case off by pissing this judge off and not getting anywhere.

Sent from my iPhone
Eric M. Creizman
Attorney at Law
Creizman LLC
565 Fifth Avenue, Fl. 7
New York, New York 10017
T: (212) 972-0200
F: (646) 200-5022

www.creizmanllc.com
[Quoted text hidden]

A 187

 Gmail

Stefan L <stefanlumiere@gmail.com>

---

## Attorney Client Privileged-Confidential

**Eric Creizman** <ecreiz@creizmanllc.com>                          Fri, Aug 12, 2016 at 12:29 PM
To: Stefan Lumiere <stefanlumiere@gmail.com>

I love you Stefan, really.  But it's not possible.  You can get me paid today and everything else can wait. But unless I know I'm getting paid, I'm not going forward.  If you don't submit an affidavit today, I might be stuck in a trial for December 19.  That I can't risk.  I'm sorry.  I'm not springing this on you.  I've never waited this long but I trust you.  But even if I trust you, I still can't agree to stay on.

If you do submit an affidavit, I might be stuck in a trial for January 9.  At the very least, you will have to agree to have me submit an affidavit (you don't have to sign it) so I have until January 9, and then I would agree to meet on Sunday to get absolute assurance and guarantees and specifics on payment.  If not, I have to withdraw and it will have to be today.

[Quoted text hidden]
--

Eric M. Creizman, Esq.
CREIZMAN LLC
Attorneys at Law
565 Fifth Avenue, New York, New York 10017
T: (212) 972-0200; F: (646) 200-5022

www.creizmanllc.com

A 188

Gmail - Attorney Client Privileged-Confidential                                    11/13/19, 8:05 AM

 Gmail                                **Stefan L** <stefanlumiere@gmail.com>

## Attorney Client Privileged-Confidential

**Eric Creizman** <ecreiz@creizmanllc.com>                     Fri, Aug 12, 2016 at 1:05 PM
To: Stefan Lumiere <stefanlumiere@gmail.com>

I don't want to withdraw.  As an alternative If you want me to pursue Visium today and get paid by the company, I can
reach out to Rita.
But I need to get paid today.  Otherwise I know I will be stuck in this case.  I will give you 150%.  You need to do this
for me today.  If you say you're ok with Visium paying my fees and me sharing discovery with them under a joint
defense agreement, that's fine too.  But the stakes are high right now.  And I'm going to be affected.

Alternatively  I can ask for January 9, and say that I won't ask for a further extension barring an unforeseen
 extraordinary circumstance if that makes you feel better.  And then we can iron everything out on Sunday because I
trust youZ. But I need one or the other.  Believe me I don't want to lose this case but I have no choice.


Sent from my iPhone
Eric M. Creizman
Attorney at Law
Creizman LLC
565 Fifth Avenue, Fl. 7
New York, New York 10017
T: (212) 972-0200
F: (646) 200-5022

www.creizmanllc.com
[Quoted text hidden]

A 18 9

 Gmail

**Stefan L <stefanlumiere@gmail.com>**

## Attorney Client Privileged-Confidential

**Eric Creizman** <ecreiz@creizmanllc.com>
To: Stefan Lumiere <stefanlumiere@gmail.com>

Fri, Aug 12, 2016 at 12:55 PM

If I put in the affidavit, I can say, "Barring unforeseen extraordinary circumstances, I will not seek a further adjournment of the trial date."

[Quoted text hidden]

A 190

From: **Eric Creizman** ecreiz@creizmanllc.com
Subject: Fwd: FW: Attorneys
Date: October 26, 2016 at 12:58 PM
To: Stefan Lumiere Stefanlumiere@gmail.com, mmadrigal@creizmanllc.com



See below.
---------- Forwarded message ----------
From: **Jeffrey Udell** <judell@wmhlaw.com>
Date: Mon, Oct 24, 2016 at 3:45 PM
Subject: FW: Attorneys
To: Eric Creizman <ecreiz@creizmanllc.com>


Eric – See below confirmation that my first email was received.


Jeffrey A. Udell

# WALDEN MACHT & HARAN LLP

One Broadway, 6th Floor

New York, New York  10004

(212) 335-2045

judell@wmhlaw.com

http://www.wmhlaw.com


From: Feingold, Zachary (USANYS) [mailto:Zachary.Feingold@usdoj.gov]
Sent: Friday, April 11, 2014 1:28 PM
To: Jeffrey Udell <judell@olshanlaw.com>
Subject: Re: Attorneys


Jeff,
Can you please give me a call at 212-637-2436?
Thanks,
Zac


**From**: Udell, Jeffrey A. [mailto:JUdell@olshanlaw.com]
**Sent**: Thursday, April 03, 2014 04:50 PM
**To**: Feingold, Zachary (USANYS)
**Subject**: Attorneys


Zak -


Three things.


First, do you have any ETA on when Mr. Lumiere can receive his computer back, post imaging?  I thought that the agent had said a week or two ago that it was almost ready.


Second, as discussed, I look forward to hearing from you shortly about another meeting.


A191 P1-5

Third, for your review of seized documents, below is a list of the attorneys with whom Mr. Lumiere has had privileged communications. Note that the list is divided into two groups: (i) those with whom he had privileged communications related to personal legal advice about a myriad of things (some related to issues we've discussed and some not at all), including advice received AFTER the execution of the search warrant on his apartment; and (ii) those with whom he had privileged communications in his capacity as a Visium employee.

**Legal Advice Personal:**

Jayme Goldstein-Stroock & Stroock & Lavan

Dennis Hirsch-Stroock & Stroock & Lavan

Dan Ginsberg-Stroock & Stroock & Lavan

Dan Ross-Stroock & Stroock & Lavan

Joel Cohen -Stroock & Stroock & Lavan

Laurence Moy -- Outten & Golden

Tai Park, Doug Jensen, Robert Knuts -- Park and Jensen

Mark Greenwald and others -- Quinn Emanuel

Eric Belfi - Labaton Sucharow

Timothy Barrett- Labaton Sucharow

Alan Abramson, Abramson & Morak

Martin Whitmer- Whitmer & Worall

Guy Petrillo- Petrillo Klein & Boxer

Nelson Boxer - Petrillo Klein & Boxer

Joshua Klein- Petrillo Klein & Boxer

Jay Musoff- Loeb

Jeff Liddle- Liddle & Robinson

Karen Roos- Lawyer

Charles Schaffran-Lawyer

William S. Beslow- Law Offices of William S. Beslow

Jeff Uffner-Stroock & Stroock & Lavan

James Nygard-Stroock & Stroock & Lavan

Ken Pasquale-Stroock & Stroock & Lavan

Bryan Berson- Private Law Practice

Julie Feder Hough- Hough Law Group

Ed LNU- Fiabane Law

Louis Fiabane- Fiabane Law

Josh Bardavid- Bardavid law

Justin Dellecave- Peterson Dellecave

Christine Koo- Sadis & Goldberg

Ron Geffner- Sadis & Goldberg

Jonathan Minikes-Cutler Minikes & Adelman

Jeff Hammapour- Cutler Minikes & Adelman

Timothy Horn- Villani & DeLuca

Stephen Peskin- Tolmage, Peskin, Harris

Bob Viner-Securities Lawyer

Richard Nasca- Skene Law

Kurt Roth- Lawyer

Mike Ballas- Louis Fiabane & Co

Ward Hendon- Axiom Legal

Steve Hutter- Securities Lawyer

Chris Lombardy- Sadis & Goldberg

Josh Bressler- Bressler Law


**Legal Advice to Visium**

Jeff Silverstein- Seward & Kissel

Jack Hogoboom- Lowenstein Sandler

David Banker- Lowenstein Sandler

Lawrence Gelber- Schulte Roth

Steven Pohl- Brown Rudnick

Jeb Singer- Brown Rudnick

Robert Stark- Brown Rudnick

Andrew Strehle- Brown Rudnick

Andreas Andromalos- Brown Rudnick

Nicole Runyan- Stroock, Stroock & Lavan

Neil D'Amato- Brown Rudnick

H. Bennett- Stroock, Stroock

Alice Curry- Milberg Weiss

Tony Barnes- Bingham McCutchen

Sayan Bhattacha- Stroock, Stroock & Lavan

Kellie Cairns- Paul Weiss

Jonathan Canfield- Stroock, Stroock & Lavan

Rebecca Cohen- Paul Weiss

Alex Cotta- Stroock, Stroock and Lavan

Hannah Wright- Bingham McCutchen

James Terry- Bingham McCutchen

Rebecca Zubaty- Paul Weiss

Helena Huang- King & Wood

Cosimo Borelli- Borelli Walsh

Neil McDonald- Hogan Lovells

James Pardo- King & Spalding

Michelle Carter- King & Spalding

Margaret Phillips- Paul Weiss Phillips

Margaret Phillips-Paul Weiss Phillips

Charlotte Rowley- Bingham McCutchen

Claudia Saffar- Brown Rudnick

Dan Saval- Brown Rudnick

Liz Osborne- Bingham McCutchen

Andrew Rosenberg- Paul Weiss

Bruce H. Schneider-Stroock & Stroock & Lavan

Curtis Mehling-Stroock & Stroock & Lavan

Chris Lombardy-Stroock & Stroock & Lavan

Lewis Kruger-Stroock & Stroock & Lavan

Kris Hansen-Stroock & Stroock & Lavan

Howard Lavin-Stroock & Stroock & Lavan

Denise Wilds-Stroock & Stroock & Lavan

Lindsay Wolf-Stroock & Stroock & Lavan

Brett Lawrence-Stroock & Stroock & Lavan

Daniel Epstein Day- Stroock & Stroock & Lavan

Bruce Sneider- Stroock, Stroock & Lavan

**Jeffrey A. Udell**

# O L S H A N

**OLSHAN FROME WOLOSKY LLP**

**Park Avenue Tower**
65 East 55th Street
New York, NY 10022
Direct: 212.451.2238
Facsimile: 212.451.2222
Email: JUdell@olshanlaw.com
Web: www.olshanlaw.com

_____

To ensure compliance with requirements imposed by the IRS, we inform you that unless specifically indicated otherwise, any tax advice contained in this communication (including any attachment to this communication, other than an attachment which is a formal tax opinion) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code, or (ii) promoting, marketing, or recommending to another party any tax-related matter addressed herein.


Electronic transmissions by the law firm of Olshan Frome Wolosky LLP may contain information that is confidential or proprietary, or protected by the attorney-client privilege or work product doctrine. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents hereof is strictly prohibited. If you have received this transmission in error, please notify Olshan Frome Wolosky LLP at once at 212.451.2300.


--

Eric M. Creizman, Esq.
CREIZMAN LLC
Attorneys at Law
565 Fifth Avenue, New York, New York 10017
T: (212) 972-0200; F: (646) 200-5022

www.creizmanllc.com

Gmail - Steering Committee Advisor_Testimony- Preclusion without Full & Complete Economic Disclosures                                         11/13/19, 9:23 AM

 Gmail                                                          Stefan L <stefanlumiere@gmail.com>

## Steering Committee Advisor_Testimony- Preclusion without Full & Complete Economic Disclosures

2 messages

**Alexandra Gottlieb** <alexgottlieb212@gmail.com>                                    Mon, Jan 16, 2017 at 3:43 PM
To: Eric Creizman <ecreiz@creizmanllc.com>, mmadrigal@creizmanllc.com
Cc: Alexandra Lumiere <alexgottlieb212@gmail.com>
Bcc: stefanlumiere@gmail.com

In order to help reduce **Potential Conflicts of Economic Interest,** where another Investor in one of these Securities Stands to make a huge profit by slamming Visium's valuation (to then scoop it up at depressed value)____BEFORE they are allowed to comment on Visium's Valuations for the same

And <u>Before</u> any of these Advisor from Steering Committee are allowed to take the stand as a witness, they should be REQUIRED to <u>**First Fully Disclose Their Economic Interests in the position or should be precluded from commenting on the valuation**</u>

*Current positions in any securities that they share in common with Visium
*their own (investment AND accounting) valuations (These would be distinct) and backup for those securities in question when they bought in, during the interim of Restructuring, and again Post Restructuring

(The investment valuations should reflect their confidence in an investment...you buy because you think it is already or will soon be worth more.  The accounting valuations follow different rules...So different)

Why the 3 time frames?
Because these would each uniquely and significantly affect the values of the same securities

During the restructuring, price is going through a transformation

I've been advised that Accounting should have not presented the data to investors together with their other invesments, but that these should have been sequestered from an accounting point of view....But this is really something for Forensic Accountants...which is why ridiculous to assume Stefan could have had any knowledge when the company's own dedicated Accounting, Operations and Compliance Department were uneducated with these kinds of "Pseudo"-Private Placement Securities are concerned....

And that for Accounting purposes, the firm was not supposed to reflect the terms that are being negotiated Until the deals are finalized...(From investment purposes, the terms would have to be reflected in their valuations)

During restructuring, there are specials agreements and covenants being made or else being drummed up.  Cusips are often NOT changed After Initial Issuance even as the Security itself is undergoing change and restructuring and then after the deals are complete, the Cusip is sometimes changed and sometimes not.... And that will depend on the details of the deal e.g. Exchange and Tender.  So the Government would need to make an affirmation that they are in fact dealing with the same security and same rights, covenants and restrictions if they seek to draw any comparisons in price

**Eric Creizman** <ecreiz@creizmanllc.com>                                           Mon, Jan 16, 2017 at 5:32 PM
To: stefanlumiere@gmail.com

A193 P-1-5

If Milgrom wanted to be difficult, how would he answer these questions and what would we say to counter

Sent from my iPhone
Eric M. Creizman
Attorney at Law
Creizman LLC
565 Fifth Avenue, Fl. 7
New York, New York 10017
T: (212) 972-0200
F: (646) 200-5022

www.creizmanllc.com

Begin forwarded message:

> **From:** Marc Packles <MPackles@breansa.com>
> **Date:** January 16, 2017 at 5:22:08 PM EST
> **To:** Eric Creizman <ecreiz@creizmanllc.com>
> **Cc:** Melissa Madrigal <mmadrigal@creizmanllc.com>
> **Subject: Re: Steering Committee Advisor_Testimony- Preclusion without Full & Complete
> Economic Disclosures**


1) ask for:
What was their position in ATI securities?
how many bonds did they own,?
when did they initiate and over what time frame did they purchase and/or sell those bids?
Confirm they are the same securities as Visium i.e. The same cusip with the same associated economic
rights
after learning about the alleged allegations against Visium, was there any communication internally or
with others on the benefit of removing Visium from their interest in ATI, if so with whom and what were
those discussions.

Ask directly, if Visium were to be removed, in your opinion, would that help or hurt Marblegate.

I might also want to ask him a general question : since he is involved in the distressed / restructuring
world, does he consider marking bonds a difficult task at times, that is often subject to wide price
discrepancies...

I would think that he would say yes, does this give you more credibility in the case... if he says no it's
easy, then you can possibly hammer back with:
Well then why are these bonds generally quoted with very wide bid /offer spreads by brokers, why is the
size of the trades generally smaller than comparable Investment grace bonds, and if it was so easy, why
are you paid so much money for doing your job....

Food for thought.


On: 16 January 2017 17:44, "Eric Creizman" <ecreiz@creizmanllc.com> wrote:
1) Yes, I can ask about it.  Just need to know what information I'm asking for.

2) The email is from Stefan's crazy sister.  I can't tell if she's ever making any valid points or not.

On Mon, Jan 16, 2017 at 4:13 PM, Marc Packles <MPackles@breansa.com<mailto:
MPackles@breansa.com>> wrote:
i break down this email to the following points:

1) Legal question - does Marblegate have to disclose their investments in ATI or other securities where, by their testimony, they are possibly acting in their own self interest and at the detriment of Visium.  I would want to know but not sure if you can compel it. Certainly can ask and if so paint a conflict of interest picture possibly as discussed before ("Old School Wall Street...")

2) Investment vs Accounting methodology - don't appreciate this point.  If you purchase an asset because you believe that it is worth more if in the future is one thing but there is still a market today.  What the price will be in the future if X, Y or Z happens, yes will cause the price of the asset to move, hopefully for the buyer it will go up but at the same time the seller thinks it is going lower and thats why they sold it. Just because the buyer makes a purchase at $50 because they believe it is worth $70 does not mean they can value it immediately at $70...

I think the stronger arguement (if it indeed exists) is the A + B = C arguement from my prior email. Is the market not entitled to certain rights that Visium has and thus the market is not including part "B"... is the sentence in yellow, is this the "B" and if so pick ATI or CMED and have Stephan articulate what is not being accounted for in the quotes from the brokers which is just the "A" piece...

From the email below:

"During restructuring, there are specials agreements and covenants being made or else being drummed up.  Cusips are often NOT changed After Initial Issuance even as the Security itself is undergoing change and restructuring and then after the deals are complete, the Cusip is sometimes changed and sometimes not.... And that will depend on the details of the deal e.g. Exchange and Tender.  So the Government would need to make an affirmation that they are in fact dealing with the same security and same rights, covenants and restrictions if they seek to draw any comparisons in price"

 3) regarding Accounting rules, is this referring to internal accounting of how the Fund needs to mark the investments, or how the investments got valued in the first place? A bit confusing

Dont appreciate how, depending on what "accounting method" you use, it will vary your "fair market value"...

Marc Packles
Managing Director
Brean Strategic Advisors

Brean Strategic Advisors
3 Times Square - 14th Floor
New York City, NY   10036
Tel: (212) 655-1116<tel:%28212%29%20655-1116> | Cell: (917) 747-6200<tel:%28917%29%20747-6200>
Email: MPackles@breansa.com<mailto:MPackles@breansa.com>

From: Eric Creizman <ecreiz@creizmanllc.com<mailto:ecreiz@creizmanllc.com>>
Sent: Monday, January 16, 2017 3:51 PM
To: Marc Packles
Subject: Fwd: Steering Committee Advisor_Testimony- Preclusion without Full & Complete Economic Disclosures

---------- Forwarded message ----------
From: Eric Creizman <ecreiz@creizmanllc.com><mailto:ecreiz@creizmanllc.com><mailt
o:ecreiz@creizmanllc.com<mailto:ecreiz@creizmanllc.com>>>
Date: Mon, Jan 16, 2017 at 3:48 PM
Subject: Fwd: Steering Committee Advisor_Testimony- Preclusion without Full & Complete Economic
Disclosures
To: Marc Packles <marcpackles@gmail.com<mailto:marcpackles@gmail.com><mailto:
marcpackles@gmail.com<mailto:marcpackles@gmail.com>>>, "mmadrigal@creizmanllc.com<mai
lto:mmadrigal@creizmanllc.com><mailto:mmadrigal@creizmanllc.com<mailto:mmadrigal@
creizmanllc.com>>" <mmadrigal@creizmanllc.com<mailto:mmadrigal@creizmanllc.com>
<mailto:mmadrigal@creizmanllc.com<mailto:mmadrigal@creizmanllc.com>>>

Does this make any sense whatsoever?
[Quoted text hidden]
--

   Eric M. Creizman, Esq.
   CREIZMAN LLC
   Attorneys at Law
   565 Fifth Avenue, New York, New York 10017
   T: (212) 972-0200<tel:%28212%29%20972-0200><tel:(212)%20972-0200>; F: (646) 200-
5022<tel:%28646%29%20200-5022><tel:(646)%20200-5022>
   Direct Dial:  (646) 513-4842<tel:(646)%20513-4842>


   www.creizmanllc.com<http://www.creizmanllc.com><http://www.creizmanllc.com>




--

   Eric M. Creizman, Esq.
   CREIZMAN LLC
   Attorneys at Law
   565 Fifth Avenue, New York, New York 10017
   T: (212) 972-0200<tel:%28212%29%20972-0200>; F: (646) 200-5022<tel:%28646%29%20200-5022>
   Direct Dial:  (646) 513-4842<tel:%28646%29%20513-4842>

   www.creizmanllc.com<http://www.creizmanllc.com><http://www.creizmanllc.com>

The information contained in this communication is confidential, intended only for the use of the recipient
named above, and may be legally privileged. If the reader of this message is not the intended recipient
or person responsible to deliver it to the intended recipient, you are hereby notified that any use,
dissemination, distribution or duplication of the contents of this communication is unauthorized and
strictly prohibited. If you have received this e-mail in error, please notify the sender by replying to this
message and permanently delete this e-mail, its attachments, and any copies of it immediately. The
information set forth, other than Brean Capital, LLC. Research Reports, was obtained from sources
believed to be reliable, but we cannot guarantee its accuracy. E-mail transmission cannot be guaranteed
to be secure or error free. Therefore, we do not represent that this information is complete or accurate,
and it should not be relied upon as such. Neither the information nor any opinion expressed should be
regarded as an offer to sell or as a solicitation of an offer to buy any financial product, an official
confirmation of any transaction, or as an official statement of Brean Capital, LLC. All information is
subject to change without notice. For more information about Brean Capital, LLC, please visit our
website at http://www.breancapital.com.

--

Eric M. Creizman, Esq.
CREIZMAN LLC
Attorneys at Law
565 Fifth Avenue, New York, New York 10017
T: (212) 972-0200; F: (646) 200-5022
Direct Dial:  (646) 513-4842

www.creizmanllc.com<http://www.creizmanllc.com>

The information contained in this communication is confidential, intended only for the use of the recipient named above, and may be legally privileged. If the reader of this message is not the intended recipient or person responsible to deliver it to the intended recipient, you are hereby notified that any use, dissemination, distribution or duplication of the contents of this communication is unauthorized and strictly prohibited. If you have received this e-mail in error, please notify the sender by replying to this message and permanently delete this e-mail, its attachments, and any copies of it immediately. The information set forth, other than Brean Capital, LLC. Research Reports, was obtained from sources believed to be reliable, but we cannot guarantee its accuracy. E-mail transmission cannot be guaranteed to be secure or error free. Therefore, we do not represent that this information is complete or accurate, and it should not be relied upon as such. Neither the information nor any opinion expressed should be regarded as an offer to sell or as a solicitation of an offer to buy any financial product, an official confirmation of any transaction, or as an official statement of Brean Capital, LLC. All information is subject to change without notice. For more information about Brean Capital, LLC, please visit our website at http://www.breancapital.com.

 Gmail

**Stefan L <stefanlumiere@gmail.com>**

## Hey eric

**Stefan Lumiere** <stefanlumiere@gmail.com>                    Mon, Jun 27, 2016 at 5:45 PM
To: Eric Creizman <ecreiz@creizmanllc.com>

I think we need to revisit this meeting with Visium counsel for this week.  I want to discuss options.  So let's cancel meeting with Visium on wednesday and halt communications with them for now. I want to put some ideas together and discuss with you early next week.  Think we need to think about conflicts as well as think about how discussions with them put me at risk.

Stefan

A 194

 Gmail

Stefan L <stefanlumiere@gmail.com>

## Hey eric

Eric Creizman <ecreiz@creizmanllc.com>
To: Stefan Lumiere <stefanlumiere@gmail.com>

Mon, Jun 27, 2016 at 6:21 PM

Hi Stefan,

First of all, I have a lot of experience doing this, and I believe I have very sound judgment, and would never put you at risk in any discussions I have with them. Second, I would never be conflicted in representing you.  You are my client and my sole loyalty is to you and I am determined and driven to get you acquitted or the case against you dropped.

The question is advancement of fees.  It seems to me that if you want to get advancement of fees, we're going to need to deal with these people in sit-down meetings. We can sue them, but that doesn't mean you're entitled to blanket payment of attorneys' fees for everything that's been done or that will be done.  Furthermore, I don't know that you're entitled to advancement based on the excerpts I read.  It could very well be discretionary in terms of advancement.  I can guarantee you that if we sue them and we get the full by-laws and it's discretionary, then they're going to exercise their discretion not to advance fees (because we sued them instead of sitting down with them at their request).  Remember, indemnification comes at the end of the case, provided you're acquitted, while advancement means pay as you go or otherwise before the end of the case.

The fact of the matter is that we're about to embark on a very significant journey here in terms of defending this case.  It's going to require a lot of attention and it's going to be expensive.  I know that there's no one better to represent you in this case than us.  No one will give it more time, effort, fight, and creativity than we will.  The question is whether you are going to pay for it (in which case we don't need to be indemnified) or they're going to pay for it (and if they do, it's going to be at a higher amount than we agreed to do because there won't be caps or flat fees).  If they pay, I won't be conflicted, I will only serve to represent you as zealously as possible.  If you pay, same thing.  I don't really care if you pay or if they pay. But if you want them to pay, we're going to have to have this meeting, which is why we should spend tomorrow discussing strategy for the meeting as well as the defense strategy for the case.  If you want to discuss, call me at 212-972-0200.  I'm here for another 4 hours

A 195 p 1. 2

at least.

Eric

[Quoted text hidden]
--

Eric M. Creizman, Esq.
CREIZMAN LLC
Attorneys at Law
565 Fifth Avenue, New York, New York 10017
T: (212) 972-0200; F: (646) 200-5022

www.creizmanllc.com

 Gmail

Stefan L <stefanlumiere@gmail.com>

## Hey eric

**Stefan Lumiere** <stefanlumiere@gmail.com>
To: Eric Creizman <ecreiz@creizmanllc.com>

Tue, Jun 28, 2016 at 1:26 PM

Hi Eric,

Given all that is going on, i am just way too uncomfortable with your meeting with Jake's Attorney or Visium's Attorneys or any of the attorneys defending Visium's other employees.

I hear your enthusiasm, i read your email and do understand some of the points you make. And i have concerns of my own beyond your points. And i am not convinced that this would be in my best interest.

From my point of view, your meeting with them only opens the door to added risk. This is why i do not feel comfortable and at this stage, i do not want you to meet with any of them.

I am open to discussing this in person with you for you to try to convince me otherwise. But should i then change my mind, i would then let you know in writing that i am okay with your meeting them.

Again If i am convinced this would best serve me, then you could at that later point in time reschedule to meet with them. But not now.

We should meet to talk about this first and other issues as well...Only I have a lot on my plate this week and am heading to CT with my family early this week for a very much needed mini vacation/extended long 4th of July weekend.

So, let's plan to meet after this holiday weekend to discuss this further.

In the meantime, i do expect you to either cancel your planned meeting or else let them know you will need to reschedule at a later yet undetermined point in time. In addition, I know you wanted to discuss strategy etc, but at this point, until we meet and I make a decision on next steps. I do not want you doing any work on my case until I notify you in writing what I decide to do.

Thanks,

Stefan Lumiere

[Quoted text hidden]

A 196

Gmail - Hey eric

 Gmail

Stefan L <stefanlumiere@gmail.com>

### Hey eric

Eric Creizman <ecreiz@creizmanllc.com>                                        Tue, Jun 28, 2016 at 1:56 PM
To: Stefan Lumiere <stefanlumiere@gmail.com>

Hi Stefan,

I appreciate your position and I hear you loud and clear.  I will cancel the meeting
asap.  I won't even try to convince you about any meeting with them until you ask me
to. No pressure on that score.

Your email, however, coupled with the one yesterday, has me concerned and
uncomfortable about issues deeper and more important than this indemnification or
advancement issue and I would appreciate a call or even a brief in-person meeting
today or this evening, if possible.  To begin, I'm concerned that you don't trust me
fully based on your statements that you will let me know in writing about me meeting
with them, the reference "to other issues," and the statement that you don't want me
working on the case until you notify me in writing as to what you decide to do.

I've put a lot of attention and enthusiasm in this case and I have acted with genuine
concern for you and your family during this time.  I've met with you and your sister for
large blocks of time, including late at night, and left open my entire day today so that
we could meet.  I also have performed work that has exceeded the initial retainer and
have not even raised the question of payment.  I've been dealing with you candidly
on the basis of trust.  Given all that, I would appreciate the courtesy of at least a call
to discuss what's going on with your thought process here because it's kind of
disheartening to get this email, which suggests a lack of trust or confidence as to
whether I'm acting in your best interests.  It also leaves me in the dark as to my
status in the case going forward and whether you plan on keeping me as your
attorney.

Eric

[Quoted text hidden]

A 197

 Gmail

Stefan L <stefanlumiere@gmail.com>

## For tomorrow
1 message

**Eric Creizman** <ecreiz@creizmanllc.com>                                       Tue, Jun 21, 2016 at 7:07 PM
To: Stefan Lumiere <Stefanlumiere@gmail.com>

I had a good conversation with Rita Glavin's partner.  Let's make sure to add that to
our agenda for tomorrow.

Eric

--

Eric M. Creizman, Esq.
CREIZMAN LLC
Attorneys at Law
565 Fifth Avenue, New York, New York 10017
T: (212) 972-0200; F: (646) 200-5022

www.creizmanllc.com

A198

 Gmail

Stefan L <stefanlumiere@gmail.com>

## Co-Counsel
3 messages

**Eric Creizman** <ecreiz@creizmanllc.com>                          Wed, Aug 31, 2016 at 9:35 PM
To: Lumiere Stefan <stefanlumiere@gmail.com>, Gottlieb Alexandra <alexgottlieb212@gmail.com>

Privileged and Confidential
Attorney-Client Communication

Stefan,

If you want a big firm to represent you and you still want me to be on the case, why not check out the following firm
and guy, Moe Fodeman.  He's a former prosecutor but a terrific trial lawyer and we get along really well.  And he
knows Rita Glavin and he can do the trial on January 9.

Sean Casey called me today and told me that he plans on trying to get in and then told me that he wants me to ask to
be relieved and then they'll come in and replace me, and they'll figure out a way to get me back in the case (which will
never happen--I guarantee Naftalis will make a motion to disqualify me on the basis that we tricked the court into
getting more time).  Why don't you call Moe and set up a meeting with him tomorrow afternoon or Friday.  You will like
him and we can work really well together and he can Marshall the resources and get the work done while I'm on trial in
November.

https://www.wsgr.com/WSGR/DBIndex.aspx?SectionName=attorneys/BIOS/11708.htm

Call him and meet with him.  Please.  Otherwise Kobre and Kim are going to want me out of the case so they can
move the trial date.

Eric


Sent from my iPhone
Eric M. Creizman
Attorney at Law
Creizman LLC
565 Fifth Avenue, Fl. 7
New York, New York 10017
T: (212) 972-0200
F: (646) 200-5022

www.creizmanllc.com


**Eric Creizman** <ecreiz@creizmanllc.com>                          Wed, Aug 31, 2016 at 9:37 PM
To: Lumiere Stefan <stefanlumiere@gmail.com>, Gottlieb Alexandra <alexgottlieb212@gmail.com>

FYI,

You know you said there has only been mismarking prosecutions where the defendants pled guilty.  Well guess who
was the defense lawyer in one of them:  Sean Casey.  They are going to try to replace me.  I'm telling you.

Sent from my iPhone

A 199

Eric M. Creizman
Attorney at Law
Creizman LLC
565 Fifth Avenue, Fl. 7
New York, New York 10017
T: (212) 972-0200
F: (646) 200-5022

www.creizmanllc.com
[Quoted text hidden]

---

**Eric Creizman** <ecreiz@creizmanllc.com>                              Wed, Aug 31, 2016 at 9:58 PM
To: Lumiere Stefan <stefanlumiere@gmail.com>, Gottlieb Alexandra <alexgottlieb212@gmail.com>

Here are a couple of others I'd recommend but I haven't called them to find out if they can do January 9.  I'm telling
you this:  Kobre and Kim won't come in if the judge won't move the trial date.  And as long as I'm in the case he won't
move the trial date.  If it's a larger firm you want or just another firm as co-counsel, here are others I'd recommend. Let
me know if you want to meet any of them.  I want to defend you in this case and you know how hard I will work for
you.  I've already listened to half of the tapes.  So I already told you Mo, who's ready to do the trial.  But also:

Vic Rocco

Peter Skinner of Boies Schiller:
http://www.bsfllp.com/lawyers/data/2194

Craig Warkol of Schulte Roth
https://www.srz.com/lawyers/craig-s-warkol.html

Henry Mazurek of Clayman & Rosenberg
http://www.clayro.com/professional/henry-mazurek/

Sarita Kedia (solo)
http://www.kedialaw.com/


Sent from my iPhone
Eric M. Creizman
Attorney at Law
Creizman LLC
565 Fifth Avenue, Fl. 7
New York, New York 10017
T: (212) 972-0200
F: (646) 200-5022

www.creizmanllc.com
[Quoted text hidden]

# CREIZMAN LLC

565 Fifth Avenue  7th Floor
New York, New York 10017
tel: (212) 972-0200
fax: (645) 200-5022
ecreiz@creizmanllc.com
www.creizmanllc.com

*By Email*

September 13, 2016

Stefan Lumiere
17 E. 96th Street, Apt. #2A
New York, New York 10128

**Re:**  *Confidential Side Letter Agreement*

Dear Stefan:

Unless and until Visium Asset Management, Inc. and/or any of its related or affiliated entities ("Visium") or other applicable insurance carrier provides advancement of fees, or indemnifies legal fees, the following amendments to the Engagement Letter Agreement, dated September 13, 2016 (the "Engagement Letter") apply and supersede the terms of the Engagement Letter:

- The cap on legal fees (excluding disbursements) will be $300,000.  $50,000 in addition to the retainer of $250,000 (the "Retainer") paid will become due, however, only after legal billings have equaled $350,000.

- In the event that Eric Creizman is hired by another firm, or Creizman PLLC ceases to the exist or is restructured or acquired, the same arrangement set forth in the Engagement Letter and this Side Letter shall apply to this representation with Eric Creizman still serving as attorney.

- Upon receipt of the Retainer, Creizman PLLC shall be permitted to move $50,000 of those funds into Creizman LLC's operating account to cover any outstanding fees.  Going forward, only those amounts sufficient to cover monthly legal fees as set forth in its monthly invoice, which Stefan Lumiere must approve within 3 business days.  Stefan Lumiere's approval shall not be unreasonably withheld.

- Melissa Madrigal's hourly fee shall be $350 during the entirety of the engagement.

NEW YORK          WHITE PLAINS

Stefan Lumiere
September 13, 2016
Page | 2
**Confidential – Side Letter Agreement**

- $25,195 has been paid by Stefan Lumiere towards the retainer so the amount currently due is $224,805.

- Should Stefan Lumiere wish to continue this representation on appeal, the cap on any appellate legal fees (excluding disbursements) is $100,000. If the appellate fees equal or exceed $150,000, an additional $25,000 will be due.

Even if indemnification or advancement is provided as described above, Stefan Lumiere will not be personally liable for any amounts above $300,000.

Very truly yours,

Eric M. Creizman

ACCEPTED AND AGREED TO:

By: _____     9/13/16
      Stefan Lumiere          Date

# CREIZMAN LLC

565 Fifth Avenue  7th Floor
New York, New York 10017
tel: (212) 972-0200
fax: (646) 200-5022
ecreiz@creizmanllc.com
www.creizmanllc.com

*By Hand*

September 13, 2016

Stefan Lumiere
17 East 96th Street, Apt. 2A
New York, New York 10128

**Re: *Representation of Stefan Lumiere***

Dear Stefan:

We are pleased to welcome you ("you" or the "Client") as a client of Creizman PLLC ("Creizman LLC" or the "Firm"). This letter sets forth the terms of our engagement. Although we would prefer to confirm our engagement in a less formal manner, we have found that the attorney-client relationship is enhanced by a mutual understanding of our services and fee arrangements.

You are retaining us for the purposes of representing you in a criminal case pending in the United States District Court for the Southern District of New York before the Honorable Jed S. Rakoff, captioned, *United States v. Stefan Lumiere*, 16-CR-483 (JSR) and a parallel SEC civil action pending in the United States District Court for the Southern District of New York before the Honorable Katherine Polk Failla. This engagement includes representation through trial, and, if necessary, sentencing. We are not aware of any representation that would preclude the Firm from undertaking this engagement or that would adversely affect the Firm's ability to complete it.

We will endeavor to keep you informed of the progress of your matter and respond to your inquiries. We will coordinate with you on all motions and communications with other counsel and share our internal memoranda to file. You acknowledge the need to provide us with accurate and complete information and the need to cooperate and keep us informed of any developments related to our representation of you. Unless otherwise agreed in writing, the terms of this letter will also apply to any additional matters that we handle on your behalf.

**Fees and Billing**

The Firm bills for its services on a monthly basis for the value of our professional services based on our hourly rates in effect from time to time. Our currently hourly rates are based on years of practice, training, specialization, and professional accomplishment, as well as the time likely to be expended; the complexity of the matter; time limitations imposed; the novelty and difficulty

NEW YORK          WHITE PLAINS

A 2 0 1

Stefan Lumiere
September 13, 2016
Page | 2

of the issues posed; the amount in controversy, and the potential results to be obtained.

I will be the attorney responsible for this matter and the hourly rate applicable to this matter will be $600. Current hourly rates for our other professional staff for this matter are set forth below:

| | |
|---|---|
| Daniela Raz | $500 |
| Zachary Taylor | $500 |
| Melissa Madrigal | $400 |
| Caroline Polisi | $350 |
| Law Student Analyst | $125 |
| Paralegal | $100 |

Time will be accounted for in increments of one-tenth of an hour and invoices will reflect the time spent and a brief description of the services performed.

Disbursements

Monthly invoices will also reflect certain disbursements incurred in connection with the engagement. The Firm's policies with respect to billing disbursements are set forth below:

The Firm will not charge you for routine daily office expenses that we incur in the course of representing you such as postage, long-distance telephone charges, secretarial work, meals, in-house photocopying, or taxi fares. In addition, the Firm will not charge you for the use of computerized legal research, except where the Firm incurs out-of-pocket costs for specialized research outside the Firm's monthly subscription agreement with its research provider.

The Firm will charge you for reasonable costs and expenses incurred by the Firm directly on your behalf in the course of the representation such as fees for court filings, process servers, court reporters, and transcripts. In addition, you will be responsible for reimbursing the Firm out-of-state travel costs, which includes airline fare (economy class for domestic travel; business class for international travel), hotel accommodations (up to $300 per room per night), and car rental charges (not to exceed $30 per day). Any out-of-state travel time taken between the hours of 9:30 a.m. and 6:30 p.m. will be billed to you at ½ of our hourly rates for legal services. In addition, subject to your consent and approval in advance, you agree to pay reasonable costs and expenses incurred by the Firm on your behalf for private investigators, experts, and other third parties.

Retainer

Our representation of you will commence with the return of an executed engagement letter and a payment of $250,000 (the "Retainer") into our attorney escrow account. We will place these funds on account and upon our presentation to you of a statement for services rendered and disbursements incurred, we will apply the Advance Payment against our fees and disbursements,

Stefan Lumiere
September 13, 2016
Page | 3

which will be deemed to have been earned immediately upon our presentation to you of such statement. At the conclusion of the engagement, you will be entitled to the credit balance, if any, on your account. If during the engagement, the Advance Payment is depleted, you agree to pay monthly invoices promptly after receipt.

**Termination**

You have the right to terminate the Firm's representation of you at any time. In other words, if you are dissatisfied with the Firm's services for any reason, you are not obligated to continue to keep the Firm as your lawyers. In the event the Firm is terminated as counsel, the Firm is entitled to be compensated for the reasonable value of completed services that have been rendered at its standard hourly rates less the amounts billed on this case through the date of termination.

**Arbitration**

We appreciate the opportunity to serve as your attorneys and look forward to continuing productive and mutually rewarding relationship. If you become dissatisfied with our charges or services, we encourage you to bring that to our attention immediately. We believe that most problems of this nature can be resolved through good faith discussion. In the event that we cannot resolve a dispute through discussion, we believe that binding arbitration offers a more expeditious and less expensive alternative than court action.

By signing this engagement letter agreement, you agree to binding arbitration before JAMS Arbitration and Mediation Services in New York City of any dispute, claim or controversy regarding our services, including any dispute as to the fees for our services, which you might otherwise have the right to arbitrate under Part 137 of the Rules of the Chief Administrator of the Courts. You are also agreeing to waive your right to a jury or court trial, and to waive any right you might have to collect punitive damages. This waiver of punitive damages applies only to the maximum extent permitted by law. If you do not wish to agree to arbitration, you should advise us before signing this letter. If you have any questions or concerns regarding the advisability of arbitration, we encourage you to discuss them with us, independent counsel, or your other advisors.

**Confirmation of Agreement**

You should review and familiarize yourself with the terms of this agreement regarding our professional services. If this letter accurately reflects your understanding of our agreement, please acknowledge your approval and acceptance of these terms by signing and returning to me the enclosed copy of this letter, along with the requested Advance Payment. This letter may be executed in counterparts, each of which shall be deemed to be an original, but all of which, taken together, shall constitute one and the same agreement.

Stefan Lumiere
September 13, 2016
Page | 4

I look forward to working with you.  We will strive to represent your interests vigorously and efficiently.  Please do not hesitate to discuss with me at any time any aspect of the Firm's representation or the terms of this letter agreement.

Very truly yours,

Eric M. Creizman

ACCEPTED AND AGREED TO:

By: _____   _____9 / 13 / 16_____
      Stefan Lumiere                              Date

 Gmail

Stefan L <stefanlumiere@gmail.com>

**Follow-Up**

Eric Creizman <ecreiz@creizmanllc.com>                          Wed, Feb 1, 2017 at 10:15 PM
To: "JHalpern@foley.com" <JHalpern@foley.com>
Cc: "mmadrigal@creizmanllc.com" <mmadrigal@creizmanllc.com>, Stefan Lumiere <Stefanlumiere@gmail.com>

It's really nothing personal towards you, Jonathan--you know I love you--but the
manner in which Stefan decided to dispose of my services, including purposely
waiting until the last minute and allowing me to work all hours of the night after the
trial researching and writing a brief and constantly asking for a draft (knowing he was
already switching counsel and would simply transfer the draft to new counsel even
though I haven't been compensated for the vast bulk of my work -- a fact that he
clearly doesn't care about), the way he sneaked into our system on Sunday and
stole/downloaded work product without our authorization, the way I sense now based
on his emails to me after trial that he's been trying to build some kind of "record"
against me (ludicrous, but reflective of his character, after I put my heart and soul into
the case).

Unless you can provide me with authority that shows I need to do more than I've
already done (which includes a lengthy conversation with you last week detailing my
arguments and views about the case, spending hours putting together this file for
you, handing over transcripts, transcriptions, recordings, that I paid for out of pocket -
- so that Foley & Lardner and Stefan apparently can reap the benefits), I am not
inclined to assist you any further in preparing his post-trial motions.  I effectively lost
two months' worth of revenue because of him and I'm out very substantial
disbursements, which he does not care about repaying.

I've provided Stefan zealous representation and used most of the resources of my
firm for almost two months, fronted costs for transcripts, experts, transcriptions,
copying, investigators, contract paralegal e-discovery, and transcripts--I'm out literally
about $100k in expenses alone, expenses you don't need to worry about since you're
getting the transcripts and other materials--while Stefan is worried about his
"indemnification."  I've done my duty and gone well beyond what is required by the
rules of professional responsibility.  You have a large firm, he hired you and left me in
substantial debt, so you can use your resources to help him or do whatever you think
is appropriate.  I've done my job.

You're getting not only close to $100k worth of materials that this small law firm paid

A202 P 1-9

for out of pocket, and likely will never be reimbursed for (certainly if it's up to Stefan, I never will be) but also countless hours of work product.  You're a terrific attorney, and I'm sure you can figure it out.

I am done with Stefan.  He could have kept me on to do the post-trial motions under your supervision and he didn't.  Yet he wanted to steal my work product, lull me into drafting a brief for him, and then hand it over to you to use.  He hired you, so unless you're going to reimburse me for my time and expenses or he is going to reimburse me, it's on you to handle this.

Best regards,

Eric

On Wed, Feb 1, 2017 at 9:34 PM, JHalpern@foley.com <JHalpern@foley.com> wrote:

Eric,

Ouch. Thank you very much. I'm sorry you had to go to such lengths stretching to this hour – especially after a long day in court. Much appreciated, especially given the time crunch we're in. I'll arrange for a messenger pick-up in the morning.

Would be very pleased to continue to hear your views on a motion for a new trial and how we can optimize Stefan's chances at a new trial. Would time tomorrow afternoon and/or Friday be possible?

Thanks again.

Jonathan

Jonathan N. Halpern | Partner | Foley & Lardner LLP
90 Park Avenue | New York, New York | 10016-1314
T: 212.338.3650 | F: 212.687.2329

jhalpern@foley.com

**My Foley Bio**
**Foley.com**

11/13/19, 11:40 AM



**From:** Eric Creizman [mailto:ecreiz@creizmanllc.com]
**Sent:** Wednesday, February 01, 2017 9:08 PM
**To:** Halpern, Jonathan N.
**Cc:** mmadrigal@creizmanllc.com
**Subject:** Re: FW: Follow-Up

Hi Jonathan,

I apologize but I just spent the last 4 hours loading the hard drive and including all the original discovery discs and hard drives.  The package is ready, but I'm not going to make it to FedEx in time for the 9 pm deadline.  The contents of the package includes a hard drive, original subpoenas, hard copies of discovery transmittal letters (with passwords in printed out emails), discovery discs and hard drives, and a hard drive specifically containing the case file with the following folders (which are mostly self-explanatory):

0-Bail

0a-Motion to adjourn

1-Charging Instruments

1a-Complaint-SEC

2-Pretrial Motions

3-Bill of Particulars

4-Subpoenas

5-Orders

6-Conferences and Hearings-Transcripts

7-Motions in limine

8-3500 material

9-Trial Transcripts

10-Government Trial Exhibits

11-Defense Exhibits

12-Jury Instructions and Voir Dire

13-Discovery (includes folders for each document production; the transmittal letters, passwords, in many cases, also the load files; where possible, there are native files included; I also converted many of the recorded conversations to listenable files; we also have the government's transcripts, our edited transcripts)

14-Trial Prep (documents that we used, among others, to prep for trial and prepare cross-examinations based on witness or subject matter)

15-Client Documents (files from Stefan's previous lawyers and Stefan's own files)

16-Materials provided by client's family

17-CFA Matter (their inquiry into Stefan's license)

If you have any questions, please let me know.  I will have the package ready and waiting for you to pick up with 7th floor

reception at 565 Fifth Avenue, Fl. 7, New York, NY 10017

Eric

On Wed, Feb 1, 2017 at 6:45 PM, JHalpern@foley.com <JHalpern@foley.com> wrote:

Eric,

Are you free to chat?

Jonathan

Jonathan N. Halpern | Partner | Foley & Lardner LLP
90 Park Avenue | New York, New York | 10016-1314
T: 212.338.3650 | F: 212.687.2329

jhalpern@foley.com

My Foley Bio
Foley.com



**From:** Halpern, Jonathan N.
**Sent:** Wednesday, February 01, 2017 12:52 PM
**To:** 'Eric Creizman'
**Subject:** RE: Follow-Up

We're just looking into all issues, and we look forward to discussing them with you. Let me know what times are convenient for you.

Thanks.

Jonathan N. Halpern | Partner | Foley & Lardner LLP
90 Park Avenue | New York, New York | 10016-1314
T: 212.338.3650 | F: 212.687.2329

jhalpern@foley.com

My Foley Bio
Foley.com



**From:** Eric Creizman [mailto:ecreiz@creizmanllc.com]
**Sent:** Wednesday, February 01, 2017 12:24 PM
**To:** Halpern, Jonathan N.
**Subject:** Re: Follow-Up

Are you willing to discuss what you have in mind regarding your ineffective assistance claim?

Sent from my iPhone

Eric M. Creizman

Attorney at Law

Creizman LLC

565 Fifth Avenue, Fl. 7

New York, New York 10017

T: (212) 972-0200

F: (646) 200-5022

Gmail - Follow-Up                                                                                11/13/19, 11:40 AM

www.creizmanllc.com

On Feb 1, 2017, at 12:13 PM, "JHalpern@foley.com" <JHalpern@foley.com> wrote:

> Eric,
>
> I understand that you're in court now. Would there be some time later today, tomorrow or Friday to carve out to speak?
>
> Much appreciated.
>
> Jonathan
>
> Jonathan N. Halpern | Partner | Foley & Lardner LLP
> 90 Park Avenue | New York, New York | 10016-1314
> T: 212.338.3650 | F: 212.687.2329
>
> jhalpern@foley.com
>
> **My Foley Bio**
> **Foley.com**
> <image001.jpg>

The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of the Foley & Lardner LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of the Foley & Lardner LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

--

Eric M. Creizman, Esq.

CREIZMAN LLC
Attorneys at Law
565 Fifth Avenue, New York, New York 10017
T: (212) 972-0200; F: (646) 200-5022
Direct Dial:  (646) 513-4842


www.creizmanllc.com

[Quoted text hidden]


--

Eric M. Creizman, Esq.
CREIZMAN LLC
Attorneys at Law
565 Fifth Avenue, New York, New York 10017
T: (212) 972-0200; F: (646) 200-5022
Direct Dial:  (646) 513-4842

www.creizmanllc.com

# CREIZMAN LLC

| Our HOME | Who WE ARE | What WE DO | Why US | News & UPDATES |
|---|---|---|---|---|

| Contact OUR TEAM | Client LOGIN |
|---|---|

## Melissa Madrigal, Attorney



Attorney
mmadrigal@creizmanllc.com
New York
T: +1 212.972.0200
F: +1 646.200.5022

Melissa Madrigal is an attorney at Creizman LLC, and concentrates her practice in the areas of white collar and federal criminal defense. She is admitted to practice law in the states of New York and Florida.

Ms. Madrigal has substantial experience in representing defendants in complex federal and state criminal cases. After graduating from law school, she practiced at a prominent boutique criminal defense firm in Miami, Florida, where she participated in all aspects of criminal cases, including trials, pretrial motions, discovery, plea negotiations, and sentencing. During law school, Ms. Madrigal clerked for the narcotics section of the United States Attorney's Office for the Southern District of Florida. She also

A 203 P 1-3

Recognized by SuperLawyers in 2016 as a "rising star" in the field of White Collar Criminal Defense

PRACTICE AREAS

– White Collar Criminal Defense and Investigations
– Federal and State Criminal Defense
– Federal Sentencing Advocacy

EDUCATION

– Florida International University College of Law, 2011
Juris Doctor, cum laude
– Florida International University, 2007
Bachelor of Arts, cum laude

ADMISSIONS

– New York
– United States District Court, Southern District of New York
– United States District Court, Eastern District of New York
– Florida
– United States District Court, Southern District of Florida

PROFESSIONAL MEMBERSHIPS

– National Association of Criminal Defense Lawyers
– Cuban American Bar Association

clerked for a law firm specializing in the defense of individuals prosecuted for capital offenses.  In addition, Ms. Madrigal served as a judicial intern for the Honorable Adalberto Jordan, United States District Judge for the United States District Court for the Southern District of Florida.

Ms. Madrigal graduated *cum laude* from Florida International University College of Law, where she ranked in the top ten percent of her class for grade point average and achieved Dean's List honors every semester.

Ms. Madrigal is fluent in Spanish.

« Back to Attorneys Page

Melissa Madrigal, Attorney | NYC Attorneys | Creizman LLC                                      8/22/16, 2:11 PM

# (212) 972-0200

565 Fifth Avenue 7th Floor    
New York, NY 10017
info@creizmanllc.com

Powered by

© 2016 Creizman LLC. All Rights Reserved.

Home   About Our Firm   Why Creizman LLC?   Our Professionals   Practice Areas   Services
News & Updates   Office Location   Work For Us   Contact   Legal Notices



**Melissa Madrigal**
Partner
O: (212) 972-0201
mmadrigal@piercebainbridge.com

**Melissa Madrigal**

Melissa Madrigal concentrates her practice in the areas of white collar and federal criminal defense and regulatory investigations. She is licensed in New York and Florida.

Melissa has represented individuals in criminal investigations and prosecutions brought under a broad array of federal criminal statutes including RICO, health care fraud, securities fraud, mail and wire fraud schemes, conspiracy offenses, tax offenses, government contract fraud, money laundering, access device fraud, identity theft, fish and wildlife offenses, terrorism charges, Bank Secrecy Act violations, obstruction of justice charges, and narcotics trafficking. Melissa has also represented individuals before the Second Circuit Court of Appeals on various complex criminal matters. In addition to her white-collar defense practice, Melissa routinely represents individuals in regulatory investigations and proceedings, particularly by the Securities & Exchange Commission and FINRA.

Melissa has been named a "Rising Star" by Super Lawyers in the field of white collar criminal defense in New York City for four consecutive years. She is fluent in Spanish.

# PRACTICE AREAS

White Collar Defense

Federal Criminal Defense

Criminal Appeals

Securities and Financial Regulatory Enforcement

Internal Corporate Investigations

A204 p 1-3

Melissa Madrigal | Pierce Bainbridge                                          11/13/19, 8:31 AM



**NOTABLE REPRESENTATIONS**

Represented a lead defendant at sentencing and on appeal in largest Ponzi scheme on Long Island.

Represented clients in largest ever prosecution in SDNY for importation of illegally caught seafood and wildlife (Lacey Act).

Represented executive of public company for sentencing and appeal in scheme to defraud HUD on a real estate development contract.



Represented Chinese citizen charged in the District of Columbia with violating Iranian export sanctions.

Represented medical doctor charged in the EDNY with unlawful distribution of oxycodone and fentanyl.

**EDUCATION**
J.D., Florida International University
B.A., Florida International University

**ADMISSIONS**
United States Court of Appeals, 2nd Circuit

United States District Court, District of Columbia

United States District Court, Southern District of Florida

**PREVIOUS ASSOCIATIONS**
Partner
*Creizman LLC*
Associate
*Samuel J. Rabin Jr, P.A.*
Law Clerk
*United States Attorney's Office, SDFL (Narcotics Section)*
Judicial Intern
*Hon. Adalberto Jordan, United*

Melissa Madrigal | Pierce Bainbridge



United States District Court,
Eastern District of New York

United States District Court,
Southern District of New York

State Bar of Florida

State Bar of New York

States District Court, SDFL

Eric Creizman
Partner
O: (212) 972-0200
ecreizman@piercebainbridge.com

## Eric Creizman

Eric Creizman represents individuals and corporations in white collar criminal defense matters, government and regulatory investigations, and complex commercial litigation. He has represented clients in several high-profile prosecutions and has defended many clients in federal criminal jury trials in the Southern and Eastern District of New York. Eric has extensive experience in pre-indictment advocacy, indicted cases, bail proceedings, criminal discovery, jury trials, post-trial motions, sentencing hearings, and appeals in the federal criminal courts. He has successfully represented clients and obtained favorable results in a wide variety of investigations and prosecutions, including for securities and investment fraud, health care fraud, environmental offenses, Bitcoin and cybercurrency related matters, and money laundering. Eric has also represented individuals and companies in corporate internal investigations.

Mr. Creizman has been rated by Super Lawyers every year since 2012 as one of the preeminent white collar criminal defense practitioners in New York. He is rated AV Preeminent by Martindale Hubbell's attorney ratings system, the highest rating available for competency and ethics. Mr. Creizman is also a member of the New York Council of Defense Lawyers, one of the leading criminal defense bar organizations in the country. In addition to his white collar criminal defense practice, Mr. Creizman routinely represents individuals in regulatory investigations and proceedings, primarily involving the Securities & Exchange Commission, FINRA, and OFAC. He is knowledgeable about Bank Secrecy Act and Money Laundering laws and has counseled banks, payment processing companies and others in connection with issues relating to these areas. Mr. Creizman also represents corporations and others in complex commercial litigation.

Mr. Creizman has published articles in numerous legal publications, co-authored a chapter on federal criminal discovery in a treatise published by Law Journal Press, Defending Federal Criminal Cases: Attacking the Government's Proof, and has lectured for continuing legal education programs.

## PRACTICE AREAS

White Collar Criminal
Defense

Government and
Regulatory
Investigations

Securities Enforcement

A 20501-4



Appeals

Complex Commercial
Litigation



U.S. v. Eliyahu Weinstein: Represent principal defendant for sentencing and appeal in allegedly the largest Ponzi Scheme ever prosecuted in New Jersey Federal Court.

U.S. v. Lebedev: Represented IT expert in bitcoin-exchange fraud and bank bribery trial in the SDNY.

U.S. v. Bengis: Represent father and son in largest ever prosecution in the SDNY for the importation of illegally caught seafood and wildlife (Lacey Act). Successfully negotiated resolution of the $22.5 million criminal restitution action against son (David Bengis) for $1.25 million after obtaining reversal of restitution order against him on appeal.

EDUCATION
Columbia University School of
Law
B.A., Columbia University,
Columbia College

ADMISSIONS
State Bar of New York
United States District Court,
Southern District of New York
United States District Court,
Eastern District of New York
United States Court of Appeals,
2nd Circuit
United States Supreme Court
United States Tax Court

PREVIOUS ASSOCIATIONS
Associate
*Gibson Dunn & Crutcher LLP*
Associate
*Heller Ehrman LLP*
Associate
*Sullivan & Cromwell LLP*
Principal Attorney and
Founding Member
*Creizman LLC*

 Gmail

Stefan L <stefanlumiere@gmail.com>

---

## RE: Attorney Privileged- Private and Confidential

12 messages

---

**Stefan Lumiere** <stefanlumiere@gmail.com>                            Sun, Apr 23, 2017 at 9:33 PM
To: Alma Asay <alma@allegorylaw.com>, Benjamin Llinas <ben@allegorylaw.com>

Hi Ben and Alma,

Can you please confirm whether or not Creizman either uploaded or asked you to upload into Allegory a hard drive
that was supplied by the Government based on a cover letter dated 12/27/16 that might have been received on
12/31/16 which had in it the following Bates numbers and content listed below.

Also can you confirm if anything was deleted from Allegory regarding my case at anytime?  We have been looking for
these files for over 3.5 months now and Creizman had told Camila from Foley that it was on Allegory.  When I did the
review with webcast review with Ben recently, I did not see any uploads that would have matched the time frame of
the supposed receipt of this hard drive or of its contents.  After this, I asked Foley to check with Creizman again.
Creizman now states that everything he received from the government, he either sent to Foley or does not have. So
we are wondering what happened to it or if it was ever received?

Also can you confirm if Allegory has the ability to track if anything was deleted from a file at anytime.  I understand this
would not make sense, but just would like to understand all functions on the Allegory system?

  VAM 000005142-000005144 (Credit Fund Trading Data for 2011-2013)
• VAM 000257802-000270136 (John Shoemaker emails)
• VAM 000257802-000270136 (Josh Rozenberg emails)
• VAM 000270137-000278034 (Lee Brown emails)
• VAM 000278035-000282433 (Mark Gottleib emails)
• VAM 000288422-000294123 (Steven Ku emails)
• VAM 000294124-000303238 (Sudarshan Jain emails)
• VAM 000642022-000642687 (Visium Credit Fund offering documents)
• VAM 000642698-000645282 (Visium's monthly investor newsletters)
• VAM 000650074-000652021 (Personnel files)
• VAM 000652022-000652090 (Visium's authorized trader lists)
• VAM 000806664-00080665 (Investor lists)
• VAM 001175617-001582861 (Jacob Gottleib's emails)
• VAM 006355989-006357275 (Hard copy documents)

---

**Benjamin Llinas** <ben@allegorylaw.com>                              Sun, Apr 23, 2017 at 10:16 PM
To: Stefan Lumiere <stefanlumiere@gmail.com>
Cc: Alma Asay <alma@allegorylaw.com>

Hi Stefan,

I was able to find all of those ranges but the last three; the last VAM document we have is "VAM0652818".  Attached is
a spreadsheet with entries matching the ranges you mentioned along with links to their production binders and when
they were loaded.  All of the ranges that I located were loaded between 11/15/2016 and 11/16/2016.

A 207 P 1-4

Gmail - RE: Attorney Privileged- Private and Confidential                                    11/9/19, 1:53 PM

All of these ranges were on the production log we sent to Foley earlier, please let me know if you need that sent to you again.

Thank you,

Benjamin Llinas

[Quoted text hidden]
--
Benjamin Llinas
Director of Technical Solutions | Allegory Law, Inc.
Allegorylaw.com



 **Productions.xlsx**
33K

---

**Alma Asay** <alma@allegorylaw.com>                                    Sun, Apr 23, 2017 at 10:23 PM
To: Benjamin Llinas <ben@allegorylaw.com>
Cc: Stefan Lumiere <stefanlumiere@gmail.com>

Stefan,

Ben went ahead and added you back as a user to Allegory, so you should now be able to access the links/files.  Since we have to do custom logins for this matter, Ben will send you the login information, if he hasn't already.

Allegory does not track if or what documents have been deleted from the system since they were originally added.

Best,
Alma
[Quoted text hidden]

---

**Benjamin Llinas** <ben@allegorylaw.com>                                    Sun, Apr 23, 2017 at 10:34 PM
To: Stefan Lumiere <stefanlumiere@gmail.com>

Stefan,

Your username and password are below:

username: slumiere@creizmanllc.com
password: DVHjHyg4CFckmnUspLFURdTR

On Sun, Apr 23, 2017 at 9:33 PM, Stefan Lumiere <stefanlumiere@gmail.com> wrote:
[Quoted text hidden]


[Quoted text hidden]

**Stefan Lumiere** <stefanlumiere@gmail.com>    Mon, Apr 24, 2017 at 1:29 AM
To: Alma Asay <alma@allegorylaw.com>
Cc: Benjamin Llinas <ben@allegorylaw.com>

I understand.  Thank you.  Will look into this.  So just so I understand, if one of the licensees were to erroneously delete a file, there would be no way to know this or retrieve?
[Quoted text hidden]

**Stefan Lumiere** <stefanlumiere@gmail.com>    Mon, Apr 24, 2017 at 9:38 AM
To: Alma Asay <alma@allegorylaw.com>, Benjamin Llinas <ben@allegorylaw.com>

It seems like the government made an error here.  The Bates numbers for John Shoemaker and Josh Rozenberg are in this batch are the same.  Can we schedule a call this morning to get me up to speed on the usage.  Also, is there any way to freeze content so that nothing can be mistakenly deleted by a licensee.  I know that Eric ran into this problem with dropbox before where one of his associates had deleted hundred's of thousands of files, but was able to recover.  Does Allegory have something similar?

On Sun, Apr 23, 2017 at 9:33 PM, Stefan Lumiere <stefanlumiere@gmail.com> wrote:
[Quoted text hidden]

**Stefan Lumiere** <stefanlumiere@gmail.com>    Mon, Apr 24, 2017 at 9:41 AM
To: Benjamin Llinas <ben@allegorylaw.com>
Cc: Alma Asay <alma@allegorylaw.com>

That is odd, because I did not find these ranges in the dropbox that Creizman had.  There were whole batches that were left out including most of these and they were not supplied until after 12/27/16.  So curious if they match content.  When can we schedule the call today?

On Sun, Apr 23, 2017 at 10:16 PM, Benjamin Llinas <ben@allegorylaw.com> wrote:
[Quoted text hidden]

**Benjamin Llinas** <ben@allegorylaw.com>    Mon, Apr 24, 2017 at 9:42 AM
To: Stefan Lumiere <stefanlumiere@gmail.com>
Cc: Alma Asay <alma@allegorylaw.com>

Hi Stefan,

Unless a user is an admin on the case documents cannot be deleted from Allegory.

I am free after 11am, I will send you an conference invite shortly.

Thank you,

Benjamin Llinas
[Quoted text hidden]

**Stefan Lumiere** <stefanlumiere@gmail.com>    Mon, Apr 24, 2017 at 9:44 AM
To: Benjamin Llinas <ben@allegorylaw.com>
Cc: Alma Asay <alma@allegorylaw.com>

ok.  Great.  I will be on my cell or home line might be better.

Gmail - RE: Attorney Privileged- Private and Confidential                                      11/9/19, 1:53 PM

212-333-6084 home
212-397-8059 cell
[Quoted text hidden]

**Benjamin Llinas** <ben@allegorylaw.com>                    Mon, Apr 24, 2017 at 11:00 AM
To: Stefan Lumiere <stefanlumiere@gmail.com>

Hi Stefan,

I sent a conference link, do you want to join that so if you are by a computer we can view your workspace together, or
would you like for me to give you a call?

Thanks
[Quoted text hidden]

**Stefan Lumiere** <stefanlumiere@gmail.com>                 Mon, Apr 24, 2017 at 11:02 AM
To: Benjamin Llinas <ben@allegorylaw.com>

prefer to do both.  Don't see the link yet
[Quoted text hidden]

**Benjamin Llinas** <ben@allegorylaw.com>                    Mon, Apr 24, 2017 at 11:03 AM
To: Stefan Lumiere <stefanlumiere@gmail.com>

Join the call: https://www.uberconference.com/allegorylawben
Optional dial in number: 646-854-1399
No PIN needed
[Quoted text hidden]
[Quoted text hidden]



From: **Jeffrey Einhorn** einhorn@jeffreylichtman.com
Subject: RE: 17-2010 United States of America v. Lumiere "Order FILED"
Date: August 1, 2017 at 12:32 PM
To: Stefan Lumiere stefanlumiere@gmail.com

No, the clerk added it free of charge, so to speak.

**From:** Stefan Lumiere [mailto:stefanlumiere@gmail.com]
**Sent:** Tuesday, August 1, 2017 12:20 PM
**To:** Jeffrey Einhorn <einhorn@jeffreylichtman.com>
**Subject:** Re: 17-2010 United States of America v. Lumiere "Order FILED"

Did we request extension?

On Aug 1, 2017, at 11:15 AM, Jeffrey Einhorn <einhorn@jeffreylichtman.com> wrote:

The Second Circuit gave us an additional day.

**From:** cmecf@ca2.uscourts.gov [mailto:cmecf@ca2.uscourts.gov]
**Sent:** Tuesday, August 1, 2017 11:13 AM
**To:** Jeffrey Einhorn <einhorn@jeffreylichtman.com>
**Subject:** 17-2010 United States of America v. Lumiere "Order FILED"

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing.

### Court of Appeals, 2nd Circuit

**Notice of Docket Activity**

The following transaction was filed on 08/01/2017

**Case Name:**     United States of America v. Lumiere
**Case Number:**   17-2010
**Document(s):**   Document(s)

**Docket Text:**
ORDER, dated 08/01/2017, stating that the Appellant's brief and appendix must be filed on or before 10/10/2017, FILED.[2090886] [17-2010]

**Notice will be electronically mailed to:**

Mr. Jeffrey Einhorn, -: einhorn@jeffreylichtman.com
Ms. Margaret M. Garnett, -: margaret.garnett@usdoj.gov
Jeffrey H. Lichtman, -: jl@jeffreylichtman.com
Joshua A. Naftalis, Assistant United States Attorney: joshua.naftalis@usdoj.gov
CAMP Screen, -: ca02_campscreen@ca2.uscourts.gov

**Notice will be stored in the notice cart for:**

Quality Control 1

The following document(s) are associated with this transaction:

A 207  p 1-2

**Document Description:** Order FILED
**Original Filename:** 17-2010 Order.pdf
**Electronic Document Stamp:**
[STAMP acecfStamp_ID=1161632333 [Date=08/01/2017] [FileNumber=2090886-0]
[01d5a9c61428a6a6125ce30e163157c7de8bd89c815ae317c010ed3c78b5b257dd65e5e42d8abba67809cc8e83a2
98cc1219bf7c06ffc1f85eb175e39b2eefa1]]

# O L S H A N

PARK AVENUE TOWER • 65 EAST 55TH STREET • NEW YORK, NEW YORK 10022
TELEPHONE: 212.451.2300 • FACSIMILE: 212.451.2222

## memorandum

**date:**     March 14, 2014

**to:**       Jeffrey A. Udell

**from:**     Amy F. Mauro

**re:**       Meeting with the U.S. Attorney's Office  regarding Stefan Lumiere Investigation

---

On March 12, 2014, Jeffrey Udell ("Jeff") and I attended a meeting at the U.S. Attorney's Office, One St. Andrew's Plaza, on behalf of client Stefan Lumiere ("Stefan").  The meeting began around 2:00 P.M. and lasted until approximately 3:00 P.M.  Present at the meeting were, Zachary Feingold ("Zac"), Assistant United States Attorney, Charles Riely, ARD, U.S. Securities and Exchange Commission, Matthew Callahan, Special Agent, U.S. Department of Justice FBI, Brian Fitzpatrick, Asset Management Specialist, U.S. Securities and Exchange Commission, Bempsey G. Co, Special Agent, U.S. Department of Justice FBI, William Conway, Senior Counsel, U.S. Securities and Exchange Commission, and John Henderson, Staff Attorney, U.S. Securities and Exchange Commission.

The meeting began with a discussion about the purpose of the meeting; Jeff then suggested beginning the meeting with a discussion of the principles of the case to see if he was off base, or if there was any contradiction.  The big picture from the U.S. Attorney's Office is that they say he (Stefan) was a major player at the fund but he says he is not in a position to provide information – but they say he was at the top in the credit department.

Jeff then begins to discuss the background regarding Stefan's work at the fund.  He says Stefan was a credit fund analyst, who did not direct purchases and reported to someone else.  He explains how Stefan knew the head of the fund (Jacob Gottlieb) prior (he was his sister's boyfriend then husband).  Stefan was not a partner, but rather a W-2 person who got a base salary and bonus for the performance of assets that were under his control.  Jeff continues to describe Stefan's role explaining how he did not do fund raising and had no interaction with investors.  He was not charged with the responsibility to assess what investments were worth.  He did not set the price and valuation of products and did not have a say in the process of marking.  He was asked to get levels from brokers and he did provide information that he got from brokers that apparently lead to the setting of the price/valuation; but he was not making the final decision and was not privy to any of the results (ie, valuations).

Jeff continues to explain how overtime Stefan began to have concerns and suspicion that things were not being conducted properly.  He was not sure if was a crime or unethical and furthermore he was not sure if he should report it to the SEC.  It is later communicated to Stefan that Gottlieb is out for him after Gottlieb and Stefan's sister part ways.  He hears that he wants to "can" him, so he decides to take documents to gather some evidence such as records and

1

A212  p 1-4

conversations. He then separates from Visium; although it is disputed if he quit or if he was fired.

Stefan then proceeds to go to a lawyer to see if the stuff that was going on is okay and to see if he should put together a whistleblower complaint. He speaks to Jason Thrall about the same thing and shows him some evidence. Jeff explains the big thing he sees is that Stefan was not in a position to control or direct anything they see as problematic conduct. Stefan did not have knowledge of what was done and he was not a participant in this conduct that might be unlawful; Jeff's not sure it was.

Zac then follows up with a question, wanting to know more about the marking tasks that Stefan performed. Jeff explains Stefan would call brokers to get level/quotes of the bid/ask. He would get them from the broker, the broker would e-mail them back to him, and Stefan would forward that e-mail along to someone else. He did not take the information and do anything with it. Zac further inquires about when he (Stefan) became concerned; whether it was when he was performing the marking tasks or after. Jeff continues to describe how Stefan may have made his own models and report up the chain; he is not saying that that was all he did. The long and short of it all was that he would do this and then pass that information along. Jeff proceeds to give an analogy to someone working at a public company where the CFO might say to an employee to run the numbers for that quarter's earnings. The employee says they were $20M but the report comes out that they are $40M. The person who got the $20M knows that's what it was, but all he does is turn that number in. The difference in this case is the end result is not published or announced, so Stefan doesn't know what number is being used or the obligations for how they are being valued. To Jeff's understanding it is similar with assets. It is not made clear Stefan has knowledge of how reporting is done, what it is used for, or what discretion the fund has to determine value. Stefan is not an accountant, he is not doing financial reporting, and Jeff's not aware of the visibility he has to how the numbers are derived and/or used.

Zac asks about whether Stefan would ask for a bid/ask at particular prices. Jeff says he thinks Stefan would say Chris Playford would give him particular prices that Chris thought they were valued at and the instruction was to run the prices by brokers and see if brokers are coming out in the same place.

**A break was then taken in the meeting and Jeff and I stepped out of the room to give the other members of the meeting time to talk things over**

After the break, Jeff asks to add one thing before they start the meeting again. He says he is most concerned about this. Jeff explains he was told Stefan was given numbers from Chris for the level/mark, Chris would dictate to Stefan his view, and then Chris wanted Stefan to get quotes from the broker. Basically tell them, we're at this level, and then get the quote. It was his understanding, he had not seen any chart, that Stefan was told that Visium had the ability to value things based on what we (fund) have in our discretion; so I think we're here to see what the street is saying. Zac inquires further about this, asking where there was a point when Stefan stopped participating. Jeff says yes, right before he left.

**A couple of side notes are then pointed out:**

- Jeff explains how he has only been in the case a couple of days and needs to provide Zac with a list of the privileged documents in those seized from Stephan in the search warrant

- Jeff also clarifies that he is not speaking for Stefan regarding every possible scenario. If he is leaving something out that doesn't mean it didn't happen or Stefan might not have even told Jeff about it yet

The meeting returns to the question at hand, and Jeff explains that Stefan did this practice for some time, and then there was a trigger at the end where he was more uncomfortable with the signals he was getting from Chris regarding the valuation and where it was coming from. Stefan then left a short time after that.

Zac asks about the recordings that Jeff mentioned and asks where they are. After a pause, Jeff says he is going to reserve on that for the moment because he wants to think about it.

Zac then asks if there is anything else about interacting on valuations he can provide information on. Jeff responds by saying he is not here to waste time with information he doesn't have. He is definitely not saying, "No nothing else," because Jeff does not have a full handle on everything. Jeff explains at this point he is not aware of evidence of criminality. Jeff goes into a broader picture example Stefan can talk about; how guys would talk about "edge." Stefan heard guys say "got to have an edge." One recollection, a post hoc account, given to him by guy at fund with an example of what was meant by edge; at an investor conference you give a ride to analyst in a cab and look over their shoulder to see a report regarding information and that would be edge – trading on that information. Jeff says this kind of example would be useful from a witness perspective but he does not think that it can make or break a case. Jeff reiterates that he is not telling everything he heard, he is not even sure he knows everything else; this is the big picture.

Zac, after inquiring if there was anything else to add, explains that there is not a huge disagreement on the facts. He says no, Stefan did not organize a scheme, but he was participating. He further explains he cannot put down any knowledge or judgment hearing it from Jeff. They have their view, guaranteed toward one assumption from their experience and evidence and unless there is something to move them off from that, that is where they are. There was no issue in realizing he did not come up with the scheme but the fact that he was not a top person regarding the execution of it, is not how they (US Attorney's Office) necessarily see it. Jeff agrees to a certain extent, but also says this not the end of the equation.

The gentleman to the left of Zac then explains that the SEC is in the middle of an investigation and it is hard to agree on the facts without hearing from the witness, which he hopes can be voluntary, so he tells Jeff that they need to hear from Stefan.

Jeff responds to them by noting that this is helpful, in that the government is not saying that they totally have something else. He explains that he has been doing this for a long time, and understands that they want to see Stefan in person. Jeff met with Stefan and looked at him and saw a consciousness of innocence – he does not understand the gravity of the situation. He explains how Stefan went to an attorney right after he left the fund and if he had committed a

3

crime or fraud, he would not run to an attorney. From Jeff's perspective there was no way, at the end of the day, that Stefan had knowledge that something wrong was going on. At the end of the day, Jeff explains, each side has seen things the other hasn't, for instance Jeff has met Stefan, but Jeff wanted to take the temperature of the situation.

Zac explains that they will work towards charging Stefan. Although there is not a huge disagreement over what he did at the fund, he explains, that doesn't preclude him from coming in to provide information, which could have a favorable result for Stefan. If Stefan doesn't come in, they will work towards charging him. He says Stefan has a choice to make and he has to review and pursue options. Zac thinks Stefan does not grasp the situation because it had been two weeks since the FBI came to his apartment and dug through his stuff and the US Attorney's Office doesn't have time to waste; they are either going to build a case against Stefan or work with Stefan to build a case against others.

Jeff agrees with Zac on where things are at, and explains the delay for the past two weeks has been logistical. There were issues with lawyers being away, etc. but Stefan is dealing with the situation entirely and Jeff has to get a handle on the case himself.

There is a question (from man to the left) about Jeff's representation of Stefan regarding the SEC investigation. Jeff explains he is authorized to represent Stefan in the SEC investigation. Jeff says he is representing Stefan so they should all deal with Jeff (i.e. no one talk to Stefan regarding both investigations). If there ends up being charges and a litigation that would be another stage, so Jeff cannot say right now he will be representing Stefan for that. He further explains, if there are going to be charges, to call Jeff, no need to surprise Stefan again.

A piece of paper is then passed to Zac from one of the men to his right. The question is raised when Stefan first became suspicious of what was going on at the fund. Jeff said that he cannot definitively answer that for Stefan. Zac explains that Jeff had already said that overtime Stefan became concerned.

Zac concludes the meeting by explaining how he cannot stress enough how advantageous it would be for Stefan to come in now and give meat to the bones about what he thinks and knows because that information cannot come from Jeff. They have an active investigation going on and the window to help them is shrinking. He explains Stefan is in a good position to help them and himself and they need to get going; so he needs to make a decision.

From: Steven Ku <sku@visiumfunds.com>
Date: Mon, 24 Jun 2013 18:56:34 -0400 (EDT)
To: Josh Rozenberg <jrozenberg@visiumfunds.com>
Cc: Kim Tong <ktong@visiumfunds.com>, Robert Stockton
<rstockton@visiumfunds.com>
Bcc: sku@visiumfunds.com
Subject: Re: ATI/CMED

I think we just provide them with the data as requested.

Bob – have you heard otherwise from Jake on this?

.....................................
Steve Ku

On Jun 24, 2013, at 9:52 AM, "Josh Rozenberg"
<jrozenberg@visiumfunds.com> wrote:


Steve,

Sorry to be bothering you on vacation but I wanted to follow up on the
conversation you had with Jake regarding ATI and CMED and our
response. IR/Marketing are pushing for responses relating to Benchmark
and I told them we are holding off till we receive guidance from
management.

Regards,
Josh Rozenberg, CPA
Visium Asset Management
888 Seventh Avenue, 22nd Floor
New York, New York 10019
Tel: 212-484-2726
JRozenberg@visiumfunds.com

A 214

| | |
|---|---|
| **From:** | Berner, Lawrence (IM) <Lawrence.Berner@morganstanley.com> |
| **Sent:** | Wednesday, May 29, 2013 10:41 AM |
| **To:** | Vasiliadis, Peter (IM) |
| **Subject:** | Visium note |

**Summary**

Visium Credit received big redemptions for Q1 and Q2.  Two illiquid positions got revealed that we were unaware of.  They will trigger a 9% SLV.

1) Visium has done a poor job of volunteering information.

   a. They did not warn us of redemptions until after the fact, so we missed the redemption date.  "the redemptions came in at the buzzer"

   b. They avoided telling us about the ATI situation until recently.  They blamed the fact that it wasn't a top 10 position (beta CS01, not market or notional), nor a major detractor and that they were restricted.  Did not tell us they were restricted or it was a problem.

   c. AIP was not made aware of any issues on positions or redemptions during our March 2013 onsite visit.

2) Visium has been slow to respond to our information requests.  It took them 10 days to get us answers on our initial questions

3) Visium Balanced allocated to the fund to mask the redemptions in Q1

4) They were very lenient on the timing of the level 3 declarations.  They probably should declared the assets level 3 earlier.

5) The ATI position is not a healthcare name.  It's a college that teaches healthcare classes.

6) Why did we not know about this position?  Position sizes don't sync up to our notes.  They say it was not a top 10 name.  "Not a top 10 name on a CS01 basis."

   a. Reason: disclosing names market value vs. beta CS01

   b. Visium would disclose positions on a beta CS01 basis.

   c. Since it was a distressed name, it had a small beta CS01.  A zero beta was assigned to the cash portion of the position.

   d. The market value was much bigger.

Question: Do our concerns go beyond the Visium Credit fund?  How involved has Jake been?

Question: Do we trust the PM of the Credit fund?

**Notes**

1

FOIA Confidential Treatment Requested by Morgan Stanley
Confidential Treatment is requested by Morgan Stanley pursuant to 17 C.F.R. 200.83          MS-NY-09015AIP-00002743

A 215 p 1-3

- Assets
  - Redemptions: $210 M of requests that came in for March and June
    - Q1: $70 M
    - Q2: $140 M
  - The largest investor, $90 M, submitted a redemption in Q1. Money came out 50/50 over two quarters.
- AUM
  - As of Dec 31st: Fund: $341 M, strategy: $400 M
  - As of Feb 28: Fund: $385 M, strategy: $444 M
    - *Assets ticked up from a $40 M inflow from Visium Balanced*
  - As of Feb 28: Fund: $319 M, strategy: $378 M
- Asset flows
  - Dec 31st outflows: $50 million
  - Feb 1st inflows: $40 million from the Balanced Fund
  - March 31 outflows: $70 million
  - June 30 outflows: $144 million
  - YTD net outflows as of June 30: $24 million
- 9% of the redemption proceeds for March and June will be held to reflect illiquid positions.
- Visium is restricted in two positions: ATI (6%, $22 M) and China Medical Technologies (3%)
- ATI
  - aggregate cost: $24 M (added to position over time; add on investments)
  - Market price: $21 M
  - Net P&L: $700,000 since inception
  - They own 4 securities in the new capital structure (not finalized)
  - Cap structure is being re-tiered
  - Initial purchase in 2009 at $1.9 M
  - They have not sold any of the position
  - Best guess exit?
    - Letter of credit: 25%, to be paid over next couple of quarters

2

FOIA Confidential Treatment Requested by Morgan Stanley
Confidential Treatment is requested by Morgan Stanley pursuant to 17 C.F.R. 200.83

MS-NY-09015AIP-00002744

- Remaining 75%, via a liquidity event in the 2nd half of 2013

Lawrence Berner, Executive Director
**Morgan Stanley Alternative Investment Partners | AIP**
25 Cabot Square | Canary Wharf | Floor 07
London, E14 4QA
Phone: +44 20 7425-8215
Fax: +44 20 7056-5082
Lawrence.Berner@morganstanley.com
www.morganstanleyaip.com

Be carbon conscious. Please consider our environment before printing this email.

3

FOIA Confidential Treatment Requested by Morgan Stanley
Confidential Treatment is requested by Morgan Stanley pursuant to 17 C.F.R. 200.83                    MS-NY-09015AIP-00002745

| From: | Steven Ku <sku@visiumfunds.com> |
| --- | --- |
| Sent: | Thu, 11 Apr 2013 08:11:57 -0400 (EDT) |
| To: | Josh Rozenberg <jrozenberg@visiumfunds.com> |
| Cc: | Kim Tong <ktong@visiumfunds.com> |
| Subject: | ATI |

Can you please have VRC rerun valuation using 2014 projected earnings and a 5x multiple?   Thanks

Confidential FOIA Treatment Requested by Visium Asset Management

VAM 000293494

A 216

Thanks,
Sudarshan

**From:** Josh Rozenberg
**Sent:** Monday, January 07, 2013 2:09 PM
**To:** 'Chu, Stephen'
**Cc:** msfs-visium; Sudarshan Jain; Sam Kim
**Subject:** RE: Visium Credit December 2012 Month End pricing

Steve,

CMED - $0.05

And ATI -- I will provide support.

For CMED and Ability we are probably moving these to level 3 and will provide our support on Wednesday after our final valuation meeting.

Si -- can you provide support for VTV?

Regards,
Josh Rozenberg, CPA
Visium Asset Management
888 Seventh Avenue, 22nd Floor

2
59

Confidential FOIA Treatment Requested by Visium Asset Management

A 217

VAM 000005123

# VISIUM CREDIT OPPORTUNITIES FUND:
# DUE DILIGENCE QUESTIONNAIRE

For further information – please contact:

Robert Stockton
Director of Investor Relations
(212) 474-8801
rstockton@visiumfunds.com

Sarah Klein
Investor Relations Associate
(212) 474-8802
sklein@visiumfunds.com

Tom Cahill
Director of Marketing - Europe
(212) 474-8816
tcahill@visiumfunds.com

Josh Hamilton
Director of Marketing – North America and Canada
(212) 474-8817
jhamilton@visiumfunds.com

Ryan Holland
Marketing Associate – Asia
(212) 474-8818
rholland@visiumfunds.com

Stevenson Jacobs
Director of Marketing – North America and Latin America
(212) 474-8812
sjacobs@visiumfunds.com

Marina Tatarskaya
Marketing Analyst
(212) 474-8803
mtatarskaya@visiumfunds.com

Updated as of: **August 17, 2012**

Furnished to: **Morgan Stanley**          Document Number:      **259**

GOVERNMENT
EXHIBIT
469
16 Cr. 483 (JSR)

VISIUM CREDIT OPPORTUNITIES FUND
STRICTLY CONFIDENTIAL – PLEASE SEE IMPORTANT DISCLOSURES

A 218   P 1-20

THIS DUE DILIGENCE QUESTIONNAIRE IS BEING DELIVERED TO YOU AT YOUR SPECIFIC REQUEST AND IS INTENDED ONLY FOR YOUR USE. THIS IS NOT AN OFFER OR SOLICITATION WITH RESPECT TO THE PURCHASE OR SALE OF ANY SECURITY. THIS BROCHURE IS STRICTLY CONFIDENTIAL AND MAY NOT BE REPRODUCED OR REDISTRIBUTED IN WHOLE OR IN PART NOR MAY ITS CONTENTS BE DISCLOSED TO ANY OTHER PERSON OR ENTITY.

THIS IS NOT AN OFFERING OR THE SOLICITATION OF AN OFFER TO PURCHASE AN INTEREST. ANY SUCH OFFER OR SOLICITATION WILL BE MADE TO QUALIFIED INVESTORS ONLY BY MEANS OF A FINAL OFFERING MEMORANDUM AND ONLY IN THOSE JURISDICTIONS WHERE PERMITTED BY LAW.

AN INVESTMENT IN THE VISIUM FUNDS IS SPECULATIVE AND INVOLVES A HIGH DEGREE OF RISK. OPPORTUNITIES FOR WITHDRAWAL/REDEMPTION AND TRANSFERABILITY OF INTERESTS ARE RESTRICTED, SO INVESTORS MAY NOT HAVE ACCESS TO CAPITAL WHEN IT IS NEEDED. THERE IS NO SECONDARY MARKET FOR THE INTERESTS AND NONE IS EXPECTED TO DEVELOP. THE PORTFOLIO, WHICH IS UNDER THE SOLE TRADING AUTHORITY OF THE GENERAL PARTNER/INVESTMENT MANAGER, IS PRIMARILY CONCENTRATED IN THE HEALTHCARE INDUSTRY, AND THIS LACK OF DIVERSIFICATION MAY RESULT IN HIGHER RISK. A SUBSTANTIAL PORTION OF THE TRADES EXECUTED MAY TAKE PLACE ON NON-U.S. EXCHANGES. LEVERAGE WILL BE EMPLOYED IN THE PORTFOLIO, WHICH CAN MAKE INVESTMENT PERFORMANCE VOLATILE. AN INVESTOR SHOULD NOT MAKE AN INVESTMENT, UNLESS IT IS PREPARED TO LOSE ALL OR A SUBSTANTIAL PORTION OF ITS INVESTMENT. THE FEES AND EXPENSES CHARGED IN CONNECTION WITH THIS INVESTMENT MAY BE HIGHER THAN THE FEES AND EXPENSES OF OTHER INVESTMENT ALTERNATIVES AND MAY OFFSET PROFITS.

THERE IS NO GUARANTEE THAT THE INVESTMENT OBJECTIVE WILL BE ACHIEVED. MOREOVER, THE PAST PERFORMANCE OF THE INVESTMENT TEAM SHOULD NOT BE CONSTRUED AS AN INDICATOR OF FUTURE PERFORMANCE.

## FUND INFORMATION

### FUND DETAILS

| | |
|---|---|
| Contact Information | Visium Credit Opportunities Fund, LP<br>c/o Morgan Stanley Fund Services USA LLC<br>2000 Westchester Avenue<br>Purchase, New York 10577<br>Telephone: (914) 225-8885<br>Fax: (914) 750-0203<br><br>Visium Credit Opportunities Offshore Fund, Ltd.<br>c/o Morgan Stanley Fund Services (Bermuda) Ltd.<br>7-11 Sir John Rogerson Quay<br>Dublin 2, Ireland<br>Telephone: +353-1-799-8778<br>Fax: +353-1-655-8787 |
| Fund structure | Visium Credit Master Fund, Ltd., is a master-feeder fund |
| Date of inception | May 1, 2009 launch. |

### TERMS

| | |
|---|---|
| Management fee | 2% |
| Incentive fee | 20% |
| Hurdle Rate | N/A. |
| High Watermark | Full High Watermark. |
| Sales fee | None. |
| Redemption terms | One (1) year soft-lock, 5% early withdrawal/redemption penalty. |
| Any other fees | None, though some costs are paid by the fund, as described below. |
| Minimum initial investment | $2,000,000 |
| Minimum subsequent investment | $1,000,000 |
| Subscription frequency (when) | Monthly. |
| Redemption frequency (when) | Quarterly on or after the end of the appropriate lockup period. |
| Redemption notice period | 90 Days. |
| Redemption cash proceeds time period | Generally, 90% of the withdrawal proceeds are distributed within 45 days of the relevant withdrawal date, with the remaining 10% payable after the final determination of the value of all capital accounts or net asset value, which may be after the completion of the annual audit. |

| | |
|---|---|
| Do you have any lock-up period or any other liquidity constraints? | Gate:<br>No more than twenty percent (20%) of net capital may be withdrawn or redeemed on any withdrawal date, with clean-up provision in documents.<br><br>Special Investments (sidepockets):<br>Limited to 10% of fund net assets (measured at the time of investment). Investments will be allocated to sidepockets based on expected holding period and transaction restrictions. Generally, the fund expects to hold these investments between one and three years, and in general does not expect investment holding periods to exceed five years. Shareholders/partners will be restricted in their ability to redeem their direct interests in Special Investments. |
| Do you allow for transfer of shares between nominees? | Morgan Stanley Fund Services has the ability to allow nominee transfers. In each case, investors are subject to AML procedures. Transfer of the US fund interests may only be permitted with the consent of the General Partner.  Transfer of the Offshore fund shares may only be permitted with the written consent of Visium Asset Management. Transfers representing change in beneficial ownership are subject to crystallization. |
| What costs are charged to the fund? | Costs include, but are not limited to:<br>- Investment Management Fee<br>- Incentive Fee/Allocation<br>- Administration Fees<br>- Audit Expense<br>- Legal Fees<br>- Organizational Expenses<br>- Trading Costs<br>- Research Fees and Expenses<br>- Enhanced Research and Consulting Fees<br>- Interest on Margin Accounts and Other Indebtedness<br>- IT Infrastructure<br>- Borrowing Charges on Securities Sold Short<br>- Market Data Services<br>- Director's fees<br>- Insurance |
| Fees calculated and charged: | Offshore: Series Method of accounting<br><br>Domestic: US Partnership with investor capital accounts and fees calculated and charged to each account, Tax Aggregation Method. |
| Have any investors been granted rebates? | No. |
| Disclose any soft dollar agreement | We do not use soft dollars. |

| FUND PROMOTERS | |
|---|---|
| What external promoters have been appointed? | None. |
| Duration of your professional relationship | N/A. |

**DATA OVERVIEW**

| FUND ASSETS | |
|---|---|
| Assets by investment vehicle | As of February 1, 2012:<br>Visium Credit Opportunities Fund, LP $213M<br>Visium Credit Opportunities Offshore Fund, Ltd. $260M<br>Visium Credit Master Fund, Ltd. $472M |

| CAPACITY | |
|---|---|
| Maximum capacity of the fund | The maximum capacity of the fund depends on many considerations, including market conditions, infrastructure of the management company, staff levels and experience, trading issues, constraints of ownership policies, the ability to source new ideas and research, etc. The strategy is scalable but finite, and we will dynamically determine this level throughout the life of the fund as conditions merit. We will judiciously raise capital with performance in mind.<br><br>We estimate that we can manage approximately $750M in the Visium Credit Opportunities Fund. |
| Projected time frame to reach capacity | Unknown. |
| Will new money be accepted after capacity is reached? | On a limited basis, generally only for strategic investors upon reassessing the maximum capacity of the fund. |
| How will front / back-office operations be affected in the event of significant increase in assets under management, and what measures will be taken? | At the current time, Visium has sufficient resources to accept additional capital. Our strategies scale very effectively. The impact of new capital is limited, thus, new staff is not required to handle large inflows. If the volume and complexity of products grow, Visium has sufficient resources to add new staff in line with needs. |

| FUND PERFORMANCE | |
|---|---|
| Historical performance since inception | Performance can be found in our investor presentation and monthly letters. |
| Is the fund performance audited? | All capital account returns are audited by Ernst & Young. |
| Targeted Returns | We do not define targeted returns. The goal is to generate the maximum possible returns without taking on undue risk. |

**ADMINISTRATOR**

*Domestic*

| | |
|---|---|
| Contact Information | Morgan Stanley Fund Service USA LLC<br>2000 Westchester Ave<br>Purchase, NY 10577<br>Telephone 914-225-8885<br>Fax 914-750-0122<br>fs-investor-services@morganstanley.com<br><br>For more information, please contact:<br>Erik Forssman<br>(914) 225-4906<br>fs-investor-services@msfundservices.com |
| Duration of professional relationship | Since Visium's launch in November 2005. |

*Offshore*

| | |
|---|---|
| Contact Information | Morgan Stanley Fund Services (Bermuda) Ltd.<br>Clarendon House<br>2 Church Street<br>Hamilton HM DX, Bermuda<br><br>please address any written communications to:<br>c/o Morgan Stanley Fund Services (Bermuda) Ltd.<br>7-11 Sir John Rogerson Quay,<br>Dublin 2, Ireland<br><br>For more information, please contact:<br>Erik Forssman<br>(914) 225-4906<br>fs-investor-services@msfundservices.com |
| Duration of professional relationship | Since Visium's launch in November 2005. |

## AUDITOR

*Domestic*

| | |
|---|---|
| Contact Information | Ernst & Young LLP<br>5 Times Square<br>New York, New York 10036<br><br>Brian Byrne<br>Phone: (212) 773-8857<br>brian.byrne@ey.com |
| Duration of professional relationship | Since Visium Credit Opportunities Fund launch in May 2009. |

*Offshore*

| | |
|---|---|
| Contact Information | Ernst & Young<br>62 Forum Lane<br>Camana Bay<br>PO Box 510<br>Grand Cayman, KY1-1106<br>Cayman Islands<br>Phone: (345) 949-8444<br>Fax: (345) 949-8529<br><br>Brian Byrne<br>Phone: (212) 773-8857<br>brian.byrne@ey.com |
| Duration of professional relationship | Since Visium Credit Opportunities Fund launch in May 2009. |

## LEGAL ADVISOR

*Domestic*

| | |
|---|---|
| Contact Information | Seward & Kissel LLP<br>One Battery Park Plaza<br>New York, NY 10004<br>Steven B. Nadel<br>(212) 574-1231<br>nadel@sewkis.com |
| Duration of professional relationship | Since Visium's launch in November 2005. |

*Offshore*

| | |
|---|---|
| Contact Information | Maples and Calder<br>PO Box 309, Ugland House<br>South Church Street, George Town<br>Grand Cayman KY1-1104<br>Cayman Islands<br>Jarrod Farley<br>(345) 814-5182<br>jarrod.farley@maplesandcalder.com |
| Duration of professional relationship | Since Visium's launch in November 2005. |

## PRIME BROKERS

| | |
|---|---|
| *Domestic and Offshore* | J.P. Morgan Clearing Corp.<br>383 Madison Avenue<br>New York, NY 10179 |
| Contact Information | Relationship Manager:<br>Phillip Brill-Edwards<br>(212) 272-3650<br>prime.orangeteam@jpmorgan.com |
| Duration of professional relationship | Since September 2008. |
| *Domestic and Offshore* | Credit Suisse Securities (USA) LLC<br>11 Madison Avenue<br>New York, NY 10010 |
| Contact Information | Relationship Manager:<br>Jennifer Esposto<br>(212) 325-8413<br>list.pb-tea-vis@credit-suisse.com |
| Duration of professional relationship | Since October 2010. |

## CUSTODIAN

| | |
|---|---|
| *Domestic and Offshore* | The Bank of New York Mellon<br>1 Wall Street<br>14th Floor<br>New York, NY 10286 |
| Contact Information | Relationship Manager:<br>Jason Steinberg<br>(212) 635-7184<br>jason.steinberg@bnymellon.com |
| Duration of professional relationship | Since February 2012. |

## ISDA Counterparties

|  |
|---|
| Bank of America / Merrill Lynch<br>Barclays<br>Citigroup<br>Credit Suisse<br>Goldman Sachs<br>JP Morgan<br>Morgan Stanley<br>UBS |

| | |
|---|---|
| **DIRECTORS OF FUND** | |
| Directors: | **Linburgh Martin** is the Managing Director of Intertrust (Cayman) Limited and its affiliate, Intertrust Bank (Cayman) Limited, firms licensed and regulated by the Cayman Islands Monetary Authority. He is a member of the Institute of Chartered Accountants in England & Wales, a member of the Society of Trust and Estate Practitioners and Deputy Chairman of the Board of Directors for the Cayman Islands Monetary Authority. He is a former trustee of the Public Service Pension Board and a former council member of the Cayman Islands Society of Professional Accountants. He is a Notary Public and holds a Bachelors degree from the University of Kent at Canterbury.<br><br>Upon graduating from university, Mr. Martin joined Ernst & Young in London and later joined Ernst & Young, Cayman.  During his time at Ernst & Young his clients included insurance companies, banks, hedge funds and large manufacturing concerns.  In 1994 he moved to Chartered Trust, an affiliate of Ernst & Young where he became managing director and a shareholder in 1998. Chartered Trust was acquired by Close Brothers Group plc ("Close Brothers") in April 2001 and changed its name to Close Brothers (Cayman) Limited.  The company was acquired by a subsidiary of Intertrust Group Holding S.A. on 1st June 2011 and changed its name to Intertrust (Cayman) Limited on 1st August 2011.<br><br>**John Sutlic** is a Director of Intertrust (Cayman) Limited and is Deputy Managing Director of Intertrust (Cayman) Limited and its affiliate Intertrust Bank (Cayman) Limited, firms licensed and regulated by the Cayman Islands Monetary Authority. He is a member of the Canadian Institute of Chartered Accountants, a former Council member of the Cayman Islands Fund Administrators Association and currently serves as Treasurer of the Cayman Islands Bankers Association.<br><br>Mr. Sutlic studied at the University of Toronto, where he received his Bachelor of Commerce degree, concentration in Accounting and Finance in June 1990.  He started his working career in Toronto with Ernst & Young in 1990 and received his Chartered Accountant's designation in 1993. He then joined Citco Canada Inc. as an account manager in October 1993, overseeing the valuations and administration of international hedge funds with net assets exceeding $2 billion. He then accepted an international transfer in 1996 to Citco Fund Services in the Cayman Islands and served as a Senior Account Manager responsible for a portfolio of approximately 20 fund administration clients.<br><br>Mr. Sutlic spent three years with a Cayman based private banking & trust and asset management firm, serving as Financial Controller before joining Close Brothers (Cayman) Limited in April 2003 as Chief Financial Officer with a mandate to focus on administration, operational finance, strategic planning and risk management.  The company was acquired by a subsidiary of Intertrust Group Holding S.A. on 1st June 2011 and changed its name to Intertrust (Cayman) Limited on 1st August 2011.<br><br>**Warren Keens** is a Director of Intertrust (Cayman) Limited and Managing Director of IntertrustFund Services. He is a member of the Institute of Chartered Accountants in England and Wales (I.C.A.E.W), a member of the Cayman Islands Society of Professional Accountants and a Council member of the Cayman Islands Fund Administrators Association.<br><br>Upon graduating from the University of Birmingham with a Bachelor of Science degree in Mathematics and Statistics he joined Baker Tilly Chartered Accountants and was admitted as a member of the Institute of Chartered Accountants in England and Wales (I.C.A.E.W) in 1995.<br><br>Warren moved to the Cayman Islands in 1995 and spent his first two years auditing Mutual Funds and Captive Insurance companies with Coopers & Lybrand before joining CIBC Bank and Trust Company (Cayman) Limited's Mutual Fund Department as an account manager in 1997.<br><br>In 2001 Warren joined HSBC Financial Services (Cayman) Limited to head up their Mutual Fund Department, having full responsibility for all aspects of its Cayman Fund operation. Warren joined Close Brothers (Cayman) Limited in August 2005 with the mandate to focus on new business development aimed at the Mutual Fund and Fiduciary Services Department.  The company was acquired by a subsidiary of Intertrust Group Holding S.A. on 1st June 2011 and changed its name to Intertrust (Cayman) Limited on 1st August 2011.<br><br>**Steven Ku, CPA, CTP**, is the Chief Financial Officer of the Investment Manager.  Steven is also involved in risk management, business strategy and operations.  Prior to joining the Investment Manager, he was Controller of Balyasny Asset Management.  Steven previously served in similar roles at Caxton Associates as a registered Financial and Operations Principal and at Moore Capital Management as Assistant Controller.  Both firms manage global-macro hedge funds.  Steven joined Moore Capital Management after several years in Ernst & Young's audit and consulting practice where he also obtained his certification as a Certified Public Accountant in the State of New York. Steven is also a Certified Treasury Professional registered with the Association for Financial Professionals. |

| | |
|---|---|
| | Steven graduated in 1990 from Pace University in New York City with a B.S. in public accounting. |
| | **Jacob Gottlieb, M.D., C.F.A., P.R.M.** is the founder, Chief Executive Officer and Chief Investment Officer of Visium Asset Management, LP. Mr. Gottlieb founded the Investment Manager in 2005. |
| | Prior to launching the Investment Manager, Mr. Gottlieb was a Portfolio Manager at Balyasny Asset Management ("BAM"). During his six years at BAM, he built a team of more than 20 investment professionals to cover all sectors within the healthcare industry including biotech, pharmaceuticals, services and med-tech devices. Mr. Gottlieb was previously a Portfolio Manager at Merlin Biomed focused on the pharmaceuticals, med-tech devices and biotech sectors. He began his career as a buyside analyst at Sanford C. Bernstein covering companies in the pharmaceuticals, med-tech devices and biotech sectors. |
| | Mr. Gottlieb graduated from NYU Medical School. He graduated magna cum laude from Brown University with a BA in Economics. Mr. Gottlieb obtained his C.F.A. charter from the Association for Investment Management and Research (now the CFA Institute) in 2001, and his P.R.M. designation from the Professional Risk Managers' International Association in 2010. |
| Duration of relationship | Since Visium's launch in November 2005. |

| MANAGER TRACK RECORD | |
|---|---|
| Has the fund's track record been audited? | Yes. |
| What is your level of portfolio turnover? | Approximately 700%. |
| Brokerage to equity ratio | Less than 1%. |
| Administrator fee to equity ratio | Below 25 bps. |
| Custodian fee to equity ratio | We are not charged custodial fees. |
| Auditors' fee to equity ratio | Below 40 bps. |

## STRATEGY

| | |
|---|---|
| Describe your strategy (in as much detail as possible): | The funds will generally engage in credit strategies in the healthcare sector. Fundamentals-driven investments will dominate the portfolio, and will include deep analysis of scientific, clinical, and financial data, use of consultants and a proprietary network of clinicians, scientists, analysts, etc. The portfolio will generally be oriented toward the best ideas whose concentrations may be significant, depending on market conditions, liquidity, conviction level and ability to effectively manage and monitor the investment. Long and short trades are expected to generate positive returns, and we may trade around positions and engage in derivatives trading to hedge risk and enhance returns. We may also engage in futures and index investing as a method to hedge the portfolio and maintain proper balance and exposure. |
| | We will generally look for long and short trade ideas based on valuation, momentum, clinical/scientific catalysts, regulatory actions, corporate actions, capital structure changes and other qualities where we can gain an investment edge. We are comfortable being short individual securities. |
| Market exposure | Majority of assets are invested in publicly traded securities in the healthcare sector, with gross exposure levels between 150-300% We may also engage in investing in private transactions including PIPEs, Registered Directs and Private Placements. |
| Portfolio concentration in terms of amount of instruments and exposure bias | Generally positions will not exceed 10% allocation on longs and 10% on shorts. The fund has historically held 20-40 long positions and 10-30 short positions. |
| Geographic market focus | Primarily US, with foreign investments selected on a case-by-case basis. Generally over 80% in US markets. |
| List the instrument types | The fund invests primarily in credit products, including high-yield bonds, bank loans, convertible bonds, common and preferred stocks, credit default swaps and other derivatives. |
| What is your trading philosophy? | We seek to preserve capital while delivering outstanding annual performance. We rely on the effectiveness of analysts, the expertise of traders and the communication between our investment professionals to manage positions on an individual and portfolio level. Analysts are responsible for tracking major catalysts and relevant information regarding their companies, and are assisted by traders who actively monitor the portfolios throughout the day. Traders are in a position to act quickly and maintain communications flow with the investment community, and are relied upon for the ability to assess market dynamics and optimize entry and exit points, assist in determining appropriate position sizing and to take advantage of market mispricings as they occur. |
| | Our trading strategy has been constructed to help us control portfolio risk. We rely on our trading skills and agility to adjust positions as circumstances dictate. We believe that our traders, analysts and portfolio managers, as a result of their specializations, are quicker to see problems and opportunities developing in companies of interest and are able to provide valuable information flow about the portfolio. By managing position size actively, we should be able to achieve the best entry and exit points. We also seek to enhance portfolio returns by trading around core positions, taking advantage of shorter-term price fluctuations, based upon our depth of understanding of these positions. |

| | |
|---|---|
| Do you believe that there are persistent structural inefficiencies in the area you invest in? | Yes. We believe there are persistent inefficiencies in healthcare. These inefficiencies arise from the regulatory/political uncertainty, volume and breadth of clinical data, proliferation of companies and investors in the healthcare sector, press/media attention and resulting sentiment, involvement of public-sector institutions and financing sources, and the inherent difficulties in predicting scientific/technological development.

Our research processes are designed to take advantage of these inefficiencies. The team maintains databases tracking developments in healthcare, and is in frequent contact with leaders in the various fields of healthcare and the community that supports them. We read through clinical trials data, and compare against related developments in order to assess probabilities of success in individual stories. It is through our process that we uncover truths in the underlying information that allows us to make better risk-reward investments and capitalize on the inherent difficulties of investing in Healthcare.

We believe there are few if any competitors seeking to capitalize on inefficiencies in the healthcare credit markets. This lack of specialist attention has historically translated into less efficiency and more opportunities vs. markets with a larger number of dedicated participants. |
| What makes your strategy unique? What makes your strategy different from your peers? | Our focus on the healthcare sector and the depth and quality of our fundamental research are differentiating characteristics. Our proprietary data sources and analytical tools, network of scientific/clinical/regulatory contacts, vendors, distributors, third-party consultants and relationships with management teams are combined to create trading ideas with high conviction levels. Each investment is rigorously evaluated, with a view to determining accurate risk-reward profiles and high conviction levels. When we have confidence in the trade, we will scale into positions and maximize returns. We rigorously track catalysts, presentations, meetings, conferences, corporate actions, earnings calendars and clinical/scientific development schedules to enhance the investing process. Analysts also attend clinical/scientific trade shows, Wall Street investor conferences and frequently meet management teams individually or in small groups to maintain relationships and gain deeper insight into individual companies and markets at large.

Over time we have developed confidence in investing in binary events, controversies and special situations, taking advantage of our information network and our grass roots research capabilities. We believe that the ability to originate and execute these transactions is an important differentiating skill that we have employed to our advantage. In addition, each analyst tracks their individual conviction levels against the subsequent market action relating to the investment thesis. This allows for better fine-tuning of risk-reward (and expected-value) calculations, and to purge biases from the mind/process of each analyst.

Finally, the team shares attributes that we think sets us apart. We are comfortable on the short side. We are patient enough to wait for the stories to play out, and we are willing to add to core positions as short term fluctuations occur. We are also comfortable waiting for the proper entry points to emerge before deploying capital to each idea. We are intellectually honest - seeking out opposing views is core to our analytical process, and we do not allow ourselves to become emotionally attached to positions. We focus on digging deeper and finding misconceptions regarding healthcare companies, and designing trading strategies to best take advantage of these situations. |

| | |
|---|---|
| What are the strengths / weaknesses of your investment strategy? | Our investment strategy has been designed to play to our strengths. By focusing on Healthcare, we believe that we have been able to achieve an information advantage based on the quality of the proprietary network of relationships we have established over time. Our trading skills and agility permit us to manage risk effectively and we strive to drive performance through rigorous analysis and application of risk-reward profiles. We believe that we can all do things better. We strive to eliminate weaknesses by maintaining detailed records of trade ideas, and evaluating those decisions with a view to fine-tuning the process at the individual analyst and group-wide levels. This rigorous process of self-examination and the constant desire to improve our processes and our judgments help define the firm and drive performance into the future.<br><br>We believe that our approach (that is, a strategy for achieving returns and creating hedges through multiple sources—longs, shorts, derivatives, special situations) fosters low correlation and provides the highest likelihood of achieving absolute returns under all market conditions. By engaging in trading throughout the Healthcare sector - pharmaceuticals, biotech, devices, services, diagnostics, distributors, etc - we are able to maintain low correlations between positions and minimize negative periods while remaining positioned to take advantage of new ideas and misunderstood stories. Our constant focus of digging deep into each story allows us to not only benefit from the performance of high conviction trades, but also to optimally structure trades based on scenarios we understand very well. |
| What are the biggest risks of the strategy? | The most significant risks to our strategy relate to leverage and liquidity. The fund employs leverage and may have certain concentrated positions. In addition, our ability to secure and maintain borrow for our shorts is a function of the markets and our prime brokers, and is relied upon for a significant portion of the strategy. Short squeezes may occur, and position/market liquidity may change to the detriment of the strategy. Diversification is also a consideration in the context of a single-sector fund; healthcare is known to be a volatile sector.<br><br>These are not uncontrolled risks - we will add additional prime brokers as needs dictate, and we will use a combination of our expertise and general investment prudence to attempt to limit these risks. |
| In which markets do you believe your strategy performs best/worst? (Give examples of time periods): | Our performance comes from issuer-specific, bottom-up analysis. In general, the strategy performs best in markets that are trendless/directionless with volatility. For example, the market conditions that prevailed in 2004 suited us well as the S&P moved within a relatively narrow band. In markets that rise strongly throughout the course of a year, our strategy may underperform relative to indexes with greater market exposure. A dramatically declining market will also have a negative impact on our portfolio. |
| Average holding period for all investments | The primary focus is near-term and medium-term holding periods. Investments are reviewed dynamically for valuation, upcoming catalysts, portfolio concentration, etc. We do not restrict ourselves to fixed holding periods, as the realities of the markets may dictate that we dynamically change the composition and nature of the portfolio. |
| Does the strategy have a long or short bias? | We are agnostic to investing long or short. The fund does not have a predefined net exposure threshold. We prefer to create returns based on generating alpha at the company level as opposed to a market level. Consequently we often maintain fairly low net exposures. |
| What are the instruments traded? | The majority of the strategy focuses on US securities. High-yield and investment grade bonds, bank loans, convertible bonds, common and preferred stocks, credit default swaps and other derivatives are used to express directional and volatility exposures, or as hedges. Foreign positions represent a small portion of the strategy. Futures and indexes are expected to be used only for balancing/adjusting market exposure. Currencies may be used as hedges for foreign investments. Commodities are not traded in the funds. |

| | |
|---|---|
| Do you trade fixed income? Private Equity, PIPEs, etc? | The majority of the portfolio will be invested in fixed income securities. The fund invests in debt instruments, convertible debt products, and PIPE's. Other securities types may also be used as we uncover enhanced risk-reward characteristics in these securities, as extensions to the fundamental research which drives the investment process. |
| How do you deal with redemptions? | We monitor liquidity profiles and are mindful of redemption concerns when trading the portfolio. The redemption and gating provisions set forth in the offering document limit capital withdrawals to 20% of total capital in any fund on any withdrawal date, and combined with the redemption notification period, we believe we have sufficient time to manage the sizes of underlying positions appropriately. |
| Have the strategy or trading processes changed over time due to capital flows? | Trade processing has become more efficient as we implement new business processes and integrate updated technologies. |
| Describe the cash management policy | We will seek to maximize the profit potential of our cash balances within appropriate risk parameters. We may selectively decide to invest in indexes, appropriate securities or hold cash in interest-bearing accounts. We do not expect to hold significant cash balances at any time. |
| Do you outsource this function? If so, please give name of provider and method used. | No. |

## RISK AND LEVERAGE

### LEVERAGE

| | |
|---|---|
| How do you define leverage? | Leverage is defined as gross positions (longs + shorts) divided by investment capital. For example, if an investor contributes $100 to the fund and we put on $75 long and $75 short, the fund is at 150% (1.5x) leverage. Typical leverage is in the 150%-350% range. |
| What determines the leverage used? | Leverage for the fund is determined by Mr. Plaford, and is a function of the effectiveness of the staff in generating new ideas, conviction level, liquidity, and performance. |
| Discuss your leverage limits and exposure policy and its management over different market cycles | As a general rule we look to reduce our exposures when we are uncertain about the environment or our performance, and increase exposure when our conviction is strong. |
| How is leverage financed? How much do you pay for leverage? How many financing lines? To what extent is financing guaranteed? | Leverage is financed through our prime broker relationships via margin financing and securities lending. Additionally, a portion of the portfolio is levered via counterparties with whom we have relationships governed by ISDA agreements. We generally pay a spread on the Federal Funds Rate or LIBOR. |
| Discuss sensitivity (cost) to LIBOR/Fed Funds levels | Borrowing costs in recent years have generally been favorable. As borrowing costs change in the future, we will consider them in deploying leverage in the portfolio (although we do not expect to use excessive leverage). |

### HEDGING

| | |
|---|---|
| How is the portfolio hedged? | It is our preference to establish core short positions. We use a mix of securities to hedge risk while maintaining high reward characteristics. We may selectively use ETFs or indexes as hedges and to maintain desired market exposure. |
| How do you determine size and limits for each position/basket? | Position size is based on a variety of variables, but conviction levels, liquidity, catalysts and information edge are all taken into consideration. |
| How often do you re-hedge? | Dynamic. |
| Are short positions profit centers? | Yes. |

## DIVERSIFICATION

| | |
|---|---|
| Discuss the depth of diversification: | We will generally have 20-40 long positions and 10-30 short positions in the fund, though these ranges will vary in accordance with our ability to develop investment edge and new ideas. We invest across all areas of healthcare, and constantly monitor and adjust our sector/sub-sector weighting. |
| How do you calculate the correlation between each investment in the portfolio? | There is some correlation among positions, reflecting the fact that the funds investments are concentrated in the healthcare sector. We use tools such as Bloomberg to quantify correlations. |
| What are the main sources of marginal risk in your strategy? | Poor security selection, unforeseen correlations and highly adverse liquidity conditions. |
| How do you determine size and limits for each position/basket? | Position size is based on a variety of variables – conviction level, liquidity, catalysts and information edge are all taken into consideration. A typical position would be between 2-3% of the portfolio. A high conviction position can be as large as 10% of assets. |
| How large a percentage of a company would you own? Historically? | It is not our goal to own more than 4.9% of a company, though in isolated cases we may acquires stakes up to, or greater than, 9.9% of a company. In these cases, we have a high conviction level in a small company, often acquiring large blocks of shares purchased in private transactions negotiated directly with the issuer. We do not seek control or board seats in these cases - the high proportion of ownership in these cases are generally driven by the idea that we ought to deploy a meaningful amount of capital to high conviction ideas. |

## RISK MANAGEMENT

| | |
|---|---|
| Discuss position and stop-loss limits and their management: | We do not generally use fixed stop-loss levels in trading. We employ a mix of quantitative measures and judgment as experience has shown us that a combination of quantitative measures and qualitative judgment yields the best performance over time. All individual securities are triggered for immediate examination if prices change more than 10%, at which point the relevant team members caucus with Mr. Gottlieb to discuss the price action and optimal strategies for managing the position and portfolio. |
| How do you adjust your risk capital allocation when there is a significant increase in equity due to trading profits? | The strategy remains the same. We do not make any significant changes to the book due to historical successes. We are always focused on developing high conviction, positive expected value trades. |
| Do you use an external risk monitor? If so, who, and why that particular one? | Amol Sahasrabudhe is our in house Chief Risk Officer. We also use Risk Metrics, Novus, and other analytical products in house for calculation and reporting of risk attributes of securities and the portfolio. |
| How do you measure minimum liquidity of positions: | We establish individual position sizes in a manner that takes into account the trading depth and breadth of each security added to and held in the portfolio. We do not have fixed liquidity metrics limiting investment decisions. In healthcare stocks, liquidity often increases rapidly as controversies, catalysts and binary events become clearer. Historical measures of volatility and liquidity are often inappropriate, so we rely on the expertise of our analysts, traders and PM to assess liquidity. |

| | |
|---|---|
| Do you have a designated Risk Management Team? | We have a Risk Committee that meets weekly. Voting members include Amol Sahasrabudhe, Jacob Gottlieb, Jason Huemer and Steven Ku. |

# EXHIBIT I

## VISIUM CREDIT TEAM

Chris Plaford – Portfolio Manager – Partner – Credit
Balyasny Asset Management - Trader
WHW Capital - Trader
Goldman, Sachs & Co., former Spear, Leeds & Kellogg - Trader
BS, Finance - Indiana University

Stefan Lumiere, CFA – Analyst – Credit
Brencourt Advisors – Head Trader/Senior Analyst, Distressed/HY
Oscar Gruss & Son – Senior Analyst, Special Situations
Carlin Financial Group – Senior Analyst, Cap Structure Arbitrage
Goldman, Sachs – Analyst, Distressed/Special Situations
MBA – INCAE Business School, Costa Rica; BA, Sociology & Pre-Med – Tulane University

Ameesh Shah – Analyst – Credit
Tennenbaum Capital Partners – Principal/Sector Head, Healthcare
Ziff Brothers Investments – Equities Analyst, Healthcare
Lazard – Analyst, Healthcare Investment Banking
BS, Economics – University of Pennsylvania

Lee Brown – Analyst – Credit
Highland Capital Management – Senior Portfolio Analyst
Merrill Lynch – Vice President, Global Economics & Research
MBA – Harvard Business School; BS – United States Naval Academy

John Shoemaker – Analyst – Credit
HAP Capital Advisors – Analyst
GFI Group – Healthcare Derivative Manager
Sequitur Investment Management – Senior Analyst
Argenis Capital Advisors – Analyst
National Institute for Medical Research
Schering-Plough BioPharma – Assistant Scientist II
Ph.D. – National Institute for Medical Research
M.S., Chemical Engineering – San Jose State University
B.S., Chemical Engineering – Univeristy of California at Davis

Andrew Han – Analyst – Credit
Credit Suisse – Investment Banking, Analyst
Bank of America Merrill Lynch – Alternative Investments, Analyst
AB, Economics – University of Chicago

Jason Thorell – Trader – Credit
Black Diamond Capital Management - Distressed Credit Trader
Mizuho Securities – Leveraged Loan & LCDS Trader
Fidelity Investments – High Income Group, Assistant Trader
Fidelity Investments – Bank Loan Specialist
Fidelity Investments – Accounting Analyst
Providence College, Bachelor of Science in Finance

## VISIUM HEALTHCARE TEAM

Dr. Jacob Gottlieb, MD, CFA – Chief Investment Officer -Portfolio Manager
Balyasny Asset Management – Portfolio Manager
Merlin Biomed – Pharmaceuticals, Biotech and Devices
Sanford C. Bernstein – Pharmaceuticals, Biotech and Devices
MD – NYU Medical School; BA, Economics – Brown University

Dr. Jerry Wu, MD – Portfolio Manager - Partner - Biotech
Balyasny Asset Management – Senior Analyst - Biotech
Lazard - Equity Research - Biotech
Forstmann Asset Management - Healthcare
MD, Yale Medical School; BS, Chemistry - Harvard

Ryan Ogg, MS – Portfolio Manager - Partner - Biotech
Balyasny Asset Management – Senior Analyst - Biotech
Dresdner Kleinwort Wasserstein - Equity Research - Biotech
Prudential Securities - Equity Research - Biotech
MS, Biochemistry and Molecular Biology - Colorado State University; BA, Biochemistry - University of Colorado

Sanjay Valvani, MBA – Portfolio Manager - Partner – Specialty Pharmaceuticals
Balyasny Asset Management – Senior Analyst – Pharmaceuticals
Smith Barney-Citigroup - Equity Research - Pharmaceuticals
Kaiser Permanente - Senior Healthcare Business Analyst
MBA, Duke University; BS, Public Health, Health Policy and Administration - University of North Carolina, Chapel Hill

Doug Nigen – Portfolio Manager - International Healthcare
Fidelity - Global Analyst / Portfolio Manager – Healthcare
Fidelity - Equity Research Analyst
SEI Investments - Investment Consultant
MBA, University of Chicago; BIM, Bachelor Industrial Management - Carnegie Mellon University

Shalabh Gupta – Portfolio Manager – International Healthcare
Federated Global Investments – Senior Analyst – Healthcare
Credit Suisse – Senior Analyst – Healthcare
Deutsche Bank – Associate
Merck & Company – Research Engineer/Senior Engineer
MBA – The Wharton School
MSc – University of Maryland
BSc – Indian Institute of Technology

Anthony Sterling, CFA, CPA – Portfolio Manager - Healthcare Services
Amaranth Advisors - Sector Head / Analyst – Healthcare Services
Merrill Lynch - Investment Banking Associate – Global Healthcare
Banc of America Securities - Equity Research Associate – Medical Devices
MBA, Columbia Business School; BS, Accounting - Lehigh University

Joshua Brown – Senior Analyst - Specialty Pharmaceuticals
UBS – Associate Director, Healthcare Group
Chase H & Q—Analyst, Healthcare Group
MBA – MIT Sloan School of Management; BS, Finance and Accounting - Indiana University

Rutwik Ghodadra – Senior Analyst – Med-Tech Services
Oracle Partners – Senior Analyst - Medical Devices and Diagnostics
Lehman Brothers – Principal Trading - Medtech, Biotech, HMO's and Hospitals
Lehman Brothers – Equity Research - Large Cap Medtech
CSFB – Equity Research - Small cap Medtech/Diagnostics
MBA, Indiana University; MSE, Biomedical Engineering - Johns Hopkins University

Hartaj Singh – Analyst - EU Biotech
Lehman Brothers - Equity Research – Biotech
Navigant Consulting - Life Sciences Practice
ClinTrials Research - Oncology/Central Nervous System
MBA, Duke University; BA, Case Western Reserve University

Anne Daub – Analyst - Biotech
Bear Stearns & Co - Biotech Equity Research
Integrated Finance Ltd - Investment Banking
JPMorgan Securities - Investment Banking
Ecole des Hautes Etudes Commerciales (HEC) Graduate School of Management

Whit Penski, CFA –Analyst - Quant
Bear Stearns Asset Management , Associate Director / Senior Analyst
FactSet Research Systems, Senior Consultant and Account Executive
AB, History - Princeton University

Mark McInerney – Analyst – Biotech
Balyasny Asset Management – Research Associate
Deerfield Management – Healthcare
BA, Economics – Hunter College
BA, Music – SUNY Buffalo

Jarod Seah – Analyst – Healthcare Services
UBS – Investment Banking – Financial Institutions Group – Leveraged Finance, 2005 – 2008
MS, Financial Engineering – Columbia University; 2005
BS, Mechanical Engineering – Cornell University; 2004

Ron Belldegrun – Analyst - Specialty Pharmaceuticals
BA, Biological Basis of Behavior, Healthcare Management - University of Pennsylvania/Wharton

Kevin Han – Analyst – Med-Tech Services
Goldman Sachs - Global Invesment Research - Medical Technology
Morgan Stanley - Equity Research - Medical Technology
BS, Business Administration - University of North Carolina at Chapel Hill

Neetu Dhliwal – Analyst – Specialty Pharmaceuticals
J.P. Morgan – Healthcare Investment Banking Analyst
BS, Economics, Concentration in Finance, The Wharton School, University of Pennsylvania

Kyle Gibson – Analyst - Services
UBS – Leveraged Finance – Associate
Miller Buckfire – Restructuring Analyst
Alvarez & Marsal – Restructuring Associate
BBA – The University of Texas at Arlington

Lesley Kelly– Trader
Citigroup – Trader
U.S. Army – Intelligence Officer
MBA, Finance/Accounting - Vanderbilt University; BA, Biological Anthropology - University of Michigan

Justin Lee – Trader
Knight Capital Group, Trader
Salomon Smith Barney, Trader
BA, Economics – St. Lawrence University

Paul Lee – Trader
Mission Global Advisors LLC - Trader
BNY Mellon - Trader
BSM, Finance & Accounting - The Tulane University

Jason Thorell – Trader
Black Diamond Capital Management - Distressed Credit Trader
Mizuho Securities – Leveraged Loan & LCDS Trader
Fidelity Investments – High Income Group, Assistant Trader
Fidelity Investments – Bank Loan Specialist
Fidelity Investments – Accounting Analyst
Providence College, Bachelor of Science in Finance

Pierre-Antoine Papillon – Trader
Sansar Capital Management - Trader
MSc, Management, Finance - ESCP Europe Business School

CONFIDENTIAL INFORMATION
DISSEMINATION, DISTRIBUTION OR COPYING OF THIS REPORT IS STRICTLY PROHIBITED

**Visium**
**Operational Due Diligence review**
Date: May 14, 2010
Authors: Barry

The following report is based on a meeting with Stephen Ku (CCO/CFO) in Visium's Office.

**Conclusions:**
> Visium maintains a good framework of operational controls and regulatory compliance to provide comfort to investors. There were no significant operational issues noted during my review that would prevent us from making a full allocation to the fund.

**Concerns:**
> There are some issues with Visium's subscription terms.

1.      The documents provide for a gate if redemptions exceed 20% of NAV. They have a similar gate on the Balanced Fund but didn't impose it in 2008 even through redemptions exceeded 20%. There is an addiitonal concern on the Credit Fund since, currently, employee money accounts for over 50% of the assets, so redemptions by employees could trigger the gate. Steve said he will follow up with Jacob to see if Visium would agree not to impose the gate based upon employee withdrawals. **Visium has agreed to provide a side-letter that would exclude employee redemptions from triggering a gate.**

2.      In addition, payments for redemptions are not paid for 45 days. While we can draw down the line of credit to cover this shortfall, this is the longest time frame of any fund we currently invest with. Steve confirmed they their normal time-frame for paying redemptions is within 30 days.

3.      The offering documents provide for special investments of up to 10% that made be side-pocketed at either the time of investment or any future date. Although the fund doesn't currently hold special investments, we would prefer the ability to opt-out of any special investments if the fund decides to make an investment with the intention of sidepocketing the security. Although there is some flexibility that could be provided based on the fund's offering documents, Steven confirmed that it is <u>not</u> the firm's intention to allow investors to opt-out of special investments.

**Materials Reviewed**

- Visium Due Diligence Questionnaire
- 2010 Audit report
- Offering documents
- Pricing Policy
- Back office questionnaire

GOVERNMENT
EXHIBIT
767
16 Cr. 483 (JSR)

- 1 -

GUIDANCE CAPITAL LLC

A 219   p1-5

CONFIDENTIAL INFORMATION
DISSEMINATION, DISTRIBUTION OR COPYING OF THIS REPORT IS STRICTLY PROHIBITED

**Summary of terms**

Below is a summary of the terms

1. Fund – Visium Credit Opportunities Fund, LP is a Delaware limited partnership. The partnership will invest substantially all of its assets in Visium Credit Opportunities Master Fund, LTD.

2. Subscriptions – $2,000,000 minimum initial subscription and a minimum subsequent investment of $1,000,000

3. Management Fee – Series A – 1.5%; Series B – 2% payable monthly in advance.

4. Withdrawals/Notice – Quarterly on 90 days notice subject to 1 year lockup based on capital contribution.

5. Gate – 20%. Withdrawal requests not met will be carried over to next quarter but will not have a priority over new withdrawal requests. Withdrawal request may be carried over for up to two years.

6. Withdrawal Fee – 5% if withdrawal is in 1st year.

7. Payment of Redemption Proceeds – 45 days after withdrawal date subject to 10% holdback on full withdrawal. Holdbacks will be paid, with interest, after audit.

8. Incentive Allocation – Series A – 15%; Series B – 20%

9. High Water Mark – Yes

10. Administrator – Morgan Stanley Fund Services

11. Auditor – Ernst & Young

12. Legal Counsel – Seward & Kissel

13. Prime Broker – JPMorgan Chase Bank

14. Special Investments – The General Partner will designate and investment as a Special Investment at or shortly after the time of purchase. The Partnership expects to hold such Special Investment longer than a year but less than five years. Special Investments will not comprise more than 10% of the Master Fund's assets (measured at time of designation). Such investments may be more than 10% of the value of a particular Limited Partner's capital account.

15. Series – There will be two series (A and B). The only distinction will be the Management Fee and Incentive Allocation. Series A will be issued in connection with the first $100 million contributed to the Partnership.

**Service Providers**
I confirmed with each of these service providers that Visium is a client. Most of the service providers would not provide any additional information. Responses from each of the service providers was saved on the server.

Key Service Providers
    Administrator
    Morgan Stanley Fund Service USA LLC
    2000 Westchester Ave
    Purchase, NY 10577

GUIDANCE CAPITAL LLC

CONFIDENTIAL INFORMATION
DISSEMINATION, DISTRIBUTION OR COPYING OF THIS REPORT IS STRICTLY PROHIBITED

Telephone 914-225-8885
Fax 914-750-0122
fs-investor-services@morganstanley.com
Erik Forssman
(914) 225-4906

Prime Broker
J.P. Morgan Clearing Corp.
383 Madison Avenue
New York, NY 10179
Relationship Manager:
Phillip Brill-Edwards
(212) 272-3650
Phillip.Brill-Edwards@jpmorgan.com

Auditor
Ernst & Young LLP
5 Times Square
New York, New York 10036
Brian Byrne
Phone: (212) 773-8857
brian.byrne@ey.com

**Staffing**

Stephen Ku heads up the operations team and is supported by a controller, operations manager and two operations staff. The operations manager and staff sit on the trading desk. Stephen was the controller at Balyasny Asset Manager as well as other asset management firms. He is a CPA and previously was with Ernst & Young. Operations are also supported by Mark Gottlieb who is Jacob's brother and was also previously with Balyasny and holds an MBA from Cornell.

Steve serves as the CCO although the firm de-registered with the SEC in 2006 and he is supported by Mark as well.

**Steve Ku, CPA – Chief Financial Officer**
Balyasny Asset Management – Controller, Caxton Associates – Asst Controller/FinOp Principal, Moore Capital Management – Accounting Manager, Ernst & Young – Audit/Consulting, BS, Accounting – Pace University

**Mark Gottlieb, MBA – Business Operations**
Balyasny Asset Management – Business Operations, UBS – Corporate Finance Analyst, MBA, Cornell University; BA, Economics - Vassar College

**Steven Gilson – Operations Manager**
Balyasny Asset Management - Associate, Euroclear Bank – Analyst – client support, HSBC Securities – Euroclear Operations, BS, Finance – Lehigh University

1. **Controls to prevent operational errors**

   **Backup**

- 3 -

GUIDANCE CAPITAL LLC

CONFIDENTIAL INFORMATION
DISSEMINATION, DISTRIBUTION OR COPYING OF THIS REPORT IS STRICTLY PROHIBITED

The firm has a remote disaster recovery site in upstate New York that is equipped with redundant servers and workstations for several employees. They can also rebuild using the daily/weekly backup tapes. If the building is inaccessible, the firm has VPN for full access by most employees.

### Trading

Trades are communicated by each investment team to the head trader either verbally or through e-mail and IM.  Jacob is involved in any trades > 1%.  The head trader than stages the order through EZE Castle, the firms order management system.  Once the order is filled, the positions are automatically posted into the EZE Castle PM system and for all the PMs to review.  At the end of the day, the operations team gets a blotter from EZE and transmits the trade file via FTP to the Prime Brokers (Morgan Stanley & JP Morgan) and the administrator (Morgan Fund Services).  The trades are segregated between the PBs based on which team originated the idea with 65% currently at Morgan.  All trades in the Credit Opportunities fund are primed at JPMorgan.  The firm added JPMorgan as a prime in October, 2008.

Before the end of the day, confirms are received via Bloomberg and e-mail and are input into EZE and confirmed.  Trade allocations between the two funds are done manually by the portfolio managers.

The firm has ISDAs with most of the major firms.  They did some minor tweaking on the terms in 2008 but haven't significantly changed the contracts.  There were some Nav Triggers that were breached in 2008 but these were all waived.  Stephen and Mark monitor the terms of the ISDAs.  All of the ISDAs are structured so Visium can recall collateral if there are unrealized gains on the trades.  Although contracts call for bi-lateral collateral posting, they haven't had instances where the trade was sufficiently in the money to require the counterparty to post collateral.

The firm's trade error policy requires losses to be born by the manager and gains to be posted to the funds but there haven't been any trading errors.

## 2. Controls to ensure the accuracy of client reporting

### Valuations

Visium review all pricing on a line by line basis at month-end.  They provide a detailed valuation policy by security type in their due diligence questionnaire that is on the server. Only 20% of the Credit Fund can be valued through databases, the balance of their portfolio is level 2 securities which rely on broker quotes.  For CDS they use the counterparties as valuation agent.  They attempt to get multiple quotes, but for HYs and converts, this depends on the issue.  If multiple quotes are received, they use the most active dealer and take the average of the bid/ask.

MSFS obtains independent verification of all valuations, or is copied on communications directly from b/ds and compares their valuation to Visiums.  Any differences greater than 2% are researched or if the total portfolio's valuation differs by 50bp.

### Fund accounting

At month end, the operations team reviews the preliminary reports provided by MSFS to ensure that all accruals are booked and valuations are in-line with their own calculations.

- 4 -

CONFIDENTIAL INFORMATION
DISSEMINATION, DISTRIBUTION OR COPYING OF THIS REPORT IS STRICTLY PROHIBITED

After Visium releases the financials, MSFS reports directly to investors.  The firm has never had to restate an NAV.

## 3. Prevention of theft

### Cash movements

All wire authorizations require two tiers of signatures.  Either Jacob or Mark Gottlieb and either Steve Ku or Steve Gilson (operations manager).  Wires are processed by MSFS. Redemptions are wired in bulk from the MSFS operating account to a redemption account so individual redemptions don't require Visium's signature.

## 4. Compliance

### Registrations

Visium de-registered with the SEC in 2006 but continues to maintain a complete compliance manual and a culture of compliance.  Stephen and Mark provide annual compliance training and the firm has brought in outside legal counsel to supplement this training.  Employees are prohibited from trading in single names and new employees are required to wind down any existing portfolios.  Mark review copies of all employee brokerage statements.

GUIDANCE CAPITAL LLC

| | |
|---|---|
| **From:** | Chris Plaford <cplaford@visiumfunds.com> |
| **Sent:** | Fri, 7 Jun 2013 17:32:52 -0400 (EDT) |
| **To:** | Stevenson Jacobs <sjacobs@visiumfunds.com> |
| **Cc:** | Robert Stockton <rstockton@visiumfunds.com>, Jacob Gottlieb<jgottlieb@visiumfunds.com> |
| **Subject:** | Re: Morgan Stanley Follow up - ATI |

A number of these we have already answered in our last response.

Please have accounting provide the ones in their domain

I can do another call with them next week to give color on the rest.

Sent from my iPad

On Jun 7, 2013, at 5:05 PM, "Stevenson Jacobs" <sjacobs@visiumfunds.com> wrote:

> Chris,
> Below are more MSAIP questions re ATI. Jake and I chatted and we think it would be a good idea to have answers to these by
> Monday, since they've been pressing us hard to wrap this up asap. Bob is running point on the MSAIP dialogue so please coordinate
> with him on Monday.
> Thanks.

---

**From:** Ondish, Sean [mailto:Sean.Ondish@morganstanley.com]
**Sent:** Friday, June 07, 2013 2:42 PM
**To:** Stevenson Jacobs; Robert Stockton
**Cc:** Berner, Lawrence; Scott, Jeff; Vasiliadis, Peter
**Subject:** Morgan Stanley Follow up - ATI

Stevenson and Bob,

I have been working with Larry Berner, Jeff Scott and Pete Vasiliadis on the Credit Fund's investment in ATI. We would like further information to gain clarity into acquisition timeframe, credit structure of the Fund's holding and the fair value of the ATI position while holding the position the past few years. Our questions are described below. We would like to set up a call with the appropriate individuals to discuss the responses for those answers where it is not a straightforward response and also to discuss valuation process and methodology.

- Why are the ATI securities held within Ability Acquisition? Who owns Ability Acquisition besides the Credit Fund? Is this position held in the Visium Balance Fund?
- Why is Visium restricted from disclosing information about ATI when this is a privately held company?
- ATI debt is privately owned by a few others, including Apollo Investment Corporation (listed under ticker "AINV"). This is a small issue and appear to be held by only a few funds. Please provide the name of the other owners of the debt besides Apollo, New Mountain, Columbia? How many total owners? Who else participated in the Letter of Credit and the Bidco Preferred? Who is involved in the restructuring process?
- Please describe the Fund's Letter of Credit and Bidco Preferred? How much money was given to the company in total to obtain these positions? What is the Fund's acquisition cost, market value, interest rate, additional terms in preference of liquidation of assets, etc? What is the date when these facilities acquired? How were these obtained as the 2012 purchases of ATI were only $2 million?
- Does the Credit Fund hold any of the $39 million Credit Facility issued in October 2011 with a maturity of June 2012? What is the notional of holding, market value, and cost along with the acquisition date?
- Please provide the name of the broker or brokers that priced this debt across the structure prior to moving to Level 3. How many broker quotes were available for the year ended 2010 and 2011, and also June 2012? Please provide the name of the broker and the actual price quote for August 2011 and October 2012. How many broker quotes for each month? Could the Fund have sold at that price level?
- Apollo Investment Corporation (disclosed on their publicly available quarterly financial statements) holds three tranches of the debt. 1st and 2nd liens, and price at zero. The Credit facility, issued in October 2011, is held at 11% of par as of March 31, 2013 regulatory filings. They have consistently written down the value of the securities since July 2011 through September 2012, which appear in line with the regulatory issues at the company. In your previous email, the Fund holds $20.7 million of First Lien and

A220 P1-2

Second Lien. Please provide the specific acquisition dates and cost to acquire these positions. Please explain the timeline of the write downs of the Fund's investment in the 1st and 2nd lien mentioned above.
• How much does the Fund own of the Credit Facility? How is the Credit Facility valued as a percentage of par?
• ATI had two separate negative events impacting the business-- June 2011 (suspension of their license to operate several schools or programs by a Texas Regulator) and August 30, 2012 (civil suit against ATI by the Department of Justice). Media articles stated the company is liquidating assets and debtors will receive pennies on the dollar (according to a Forbes article). The entire investment was only written down by 6-7% in 2012 by the Credit Fund. The audited financial statements describe the valuation methodology as Market Comparables using valuation multiples of EBITDA. Would Recovery / Liquidation Value be more appropriate as the company is closing a significant amount of schools / career centers and liquidating assets? Does the company have positive EBITDA? Does the company have positive cash flows from operations?
• Who is responsible for preparing the valuation models? Who is reviewing the models as to whether the models are indicative of the company's valuation?
• Please describe the analysis performed when moving investments between Level 2 and Level 3. How many quotes must be available to keep in Level 2?

Please let me know if you have any further questions or would like to schedule a conference call.

Regards,
Sean

Sean Ondish, Vice President
**Morgan Stanley Alternative Investment Partners | AIP**
100 Front Street, 4th Floor | West Conshohocken, US-PA 19428
Phone: +1 610 260-7018
Sean.Ondish@morganstanley.com
www.morganstanleyaip.com

Be carbon conscious. Please consider our environment before printing this email.

NOTICE: If you have received this communication in error, please destroy all electronic and paper copies and notify the sender immediately. Mistransmission is not intended to waive confidentiality or privilege. Morgan Stanley reserves the right, to the extent permitted under applicable law, to monitor electronic communications. This message is subject to terms available at the following link: http://www.morganstanley.com/disclaimers. If you cannot access these links, please notify us by reply message and we will send the contents to you. By messaging with Morgan Stanley you consent to the foregoing.

                    VAM 000167229

**Visium Credit Call**

Chris Plaford, Bob Stockton

September 19, 2013

Visium Credit called today to report that they are having additional liquidity issues with the Fund. There are three positions that have liquidity issues, which accounts for approximately 30% of the remaining NAV. As such, Visium will not be able to fully liquidate the Fund by September 30. This is in addition to the two positions in the SPV (ATI, Chinamed). AIP has $25 M invested in Visium as of September 2013. Visium believes that they will be able to liquidate two of the three positions by year end, which they say is the majority of the capital.

Visium refused to disclose the names of the positions as they claim they are subject to NDAs. Of the three illiquid positions, two had become restricted in the last few weeks.

Visium is seeking AIP's input on how they should treat this illiquid pool of assets. They suggested four options to AIP: SPV, gate for a quarter, sell the positions at a steep discount, AIP rescind part of the redemption.

Visium supplied us with the following information on the three positions:

1) The company is currently undergoing a sales process and will return back to level two. The sales process ends in November. (363 sales process?)
2) The company just did an acquisition and is in the midst of completing its acquisition financing. The bond is trading near par.
3) The company went through a restructuring and will probably will emerge late in the fourth quarter. Liquidity is challenged in the position. Though the company is fundamentally in good shape.

AIP: What is the timing of asset sales for the remaining positions in the portfolio? What is the estimated sell date? Please specify by position.

o   Position A – November/December
o   Position B – we are making sales now – could finish today or 2 months from now
o   Position C – too many moving parts still

AIP: How much of a haircut per asset to sell each position?

o   We don't know exactly – we are hoping to get some parameters for you – it will probably be significant if we could sell at all if we chose to hit a liquidity bid next week

AIP: What is the estimated timing of the ATI distributions and final sale date?

o   No change since last discussion

AIP: What is the estimated timing of the China Med distributions and final sale?

FOIA Confidential Treatment Requested by Morgan Stanley
Confidential Treatment is requested by Morgan Stanley pursuant to 17 C.F.R. 200.83          MS-NY-09015AIP-00002768

A 22 p1-2

    o   No change since last discussion

AIP:  Has any new capital been invested in these positions size July?  Does any new capital need to be provided in the future?

    o   No just legal fees
    o   For position C new capital may be required

AIP:  How much capital should we expect to raise for our September 30th redemption?

    o   Should know more next week

FOIA Confidential Treatment Requested by Morgan Stanley
Confidential Treatment is requested by Morgan Stanley pursuant to 17 C.F.R. 200.83        MS-NY-09015AIP-00002769

# STEFAN LUMIERE

StefanLumiere@gmail.com / Tel: (212) 397-8059

## DEMAND LETTER
## Client Demanding All Case Files and Reimbursement of Funds Due

VIA CERTIFIED RETURN RECEIPT MAIL & EMAIL (Ecreizman@piercebainbridge.com)

Eric M. Creizman, Esq
Partner
Pierce Brainbridge Beck Price & Hecht LLP/Creizman LLC
277 Park Avenue, 45th Floor
New York, NY 10172

8/23/19

Mr. Creizman,

As you are well aware, on or about March 31, 2016, I formally engaged your firm, Creizman LLC, to represent me during the Government's ongoing investigation of Visium Asset Management and its related funds (hereafter "Visium"). On or about September 13, 2016 we then entered into an amended agreement which stated that you would represent me at trial and through sentencing, if necessary, and set forth the terms of your representation. Since March 7, 2019, I have made multiple requests for the entirety of my case files which would include, among other things, all discovery (post-trial counsel, Foley & Lardner, never received all of the discovery from you or the passwords for discovery they did receive), all associated passwords, work product and communications by and between you, your associates, co-counsel, partners, support staff and/or other parties whether associated and/or employed by you individually or by your firm, Creizman LLC and/or any subsequent firms that Creizman LLC has been associated with since March 31, 2016 (hereafter referred to as "Your Firm") and the Government, Visium and/or third parties related to my case.

I have repeatedly restated my requests to you, however, you have failed to fully comply. See emails from me dated March 7, 2019, April 18, 2019, May 1, 2019, and May 17, 2019.

I will also note that I read your Declaration, and it is obvious that you were not being truthful and were purposely misleading the Court in your statements. I will not go into all of it at this time, but as you have agreed that you will not delete any files or communications, I assume you know and to be explicit that you have and will remain on notice to preserve all files and communications of your Firm as defined above, of which I do expect you to send me a complete

1

A 22 p 1-6

STEFAN LUMIERE

StefanLumiere@gmail.com / Tel: (212) 397-8059

unaltered copy immediately as you have had more than ample time to provide such information as per my long lists of requests dated in emails stated above. I also note that you said that you and/or your Firm received much useful information from Visium for defense, I would ask that you provide me with documentation of such in the format you received it as well as in electronic form without making any attempt to backdate documents, notes or work product.

## DEMAND FOR FILE

Accordingly, I am again requesting that you immediately send me the following documents and/or information which are surely a part of my client file with Your Firm, and which you have been put on notice to preserve:

1   My entire case file including all work product that you/your firm associates, partners and outside vendors performed which would include, without limitation, notes of meetings, research, notes of conversations, discovery review, investigations, communications with third party vendors or anyone not associated with Your Firm directly;

2   All communications and notes whether electronic or written concerning my case between Your Firm with anyone but myself including, but not limited to, the Government, outside vendors, experts, advisors, counsel, and/or members, agents, employees or former employees of Visium, or counsel of Visium;

3   Identify "all" missing discovery and missing passwords that you received from the Government (or should have received) not yet turned over to myself or counsel acting on my behalf including, without limitation, Jonathan Halpern, Esq. at Foley & Lardner ("Foley"). Please provide a copy of the same in the format such documents were received by Your Firm;

4   Provide a list of any and all documents that Your firm received from any individual, entity or otherwise pertaining to my case, and further identify which documents, if any, Your Firm (or anyone else acting on your behalf) downloaded onto a separate hard drive and/or or cloud device/platform. Please provide a copy of the same in the format such documents were received by Your Firm;

5   Identify what files you simply kept on the original physical device whether such device was provided by the Government, Visium and/or other parties, and which were never saved in an alternate form for review. Please provide a copy of the same in the format such documents were received by Your Firm;

6   Identify anything that you do not have, lost, never received, or failed to inspect and thoroughly review. I would ask that you identify as such.

STEFAN LUMIERE

StefanLumiere@gmail.com / Tel: (212) 397-8059

7.    Provide a copy of any and all documents and/or files Your Firm received from the
      Government.

9.    Provide a copy of any and all documents and/or files and communications Your Firm
      received from Visium either by Subpoena or otherwise including, without limitation, all
      files related Visium which would include documents related to all alleged co-conspirators
      named by the Government, all members of the Credit Fund, all members of the Valuation
      Committee and its attendees and/or advisors, Risk Committee and Pricing Committee,
      executive committee, third party valuation companies, auditors, administrators, prime
      brokers   Some of the items I would expect would and should have been included in its
      entirety from Visium as it pertains to all of the above named parties are as follows. a)
      Compliance files including all communications referencing such, b) Emails, Bloomberg
      messages and chats and telephone records ( Landline and Conference room and cell
      phone) from January 2010 through person's departure from Visium, c) Work Files, d)
      Valuation Committee e) Valuation and Pricing Processes and Procedures followed by
      Visium at all points in time and discussions with Administrators, Auditors and Investors
      f) All audits performed for Visium, g) Dates, recordings, speakers and transcripts of all
      investor calls and presentations when Christopher Plaford or anyone discussed the Credit
      Fund performance, h) Thorell's internal filed complaint, subsequent settlement and
      complaint with the SEC and the DOJ, i) Plaford's settlement agreement with Visium, j)
      All audits performed for Visium, k) Whether you requested and if this was received that
      Visium confirm by Declaration, documentation, statement, that Lumiere was not a
      Portfolio Manager in the Credit Fund and did not have trading, pricing authority or
      investment discretion over any part of the Credit Fund l) List all members of Visium who
      had a subscription to Markit, IDC, Reuters. m) all data you received and analysis done on
      the securities from the bill of particulars that you received n) Any analysis performed by
      Your Firm on all the phone calls landline and cell between all Visium phones, personal
      cell phones and Princeridge and Janney and analysis of the times of calls versus timing of
      return by email of quotes and location analysis of callers.

10.   Provide a copy of any and all documents and/or files Your Firm received from any third
      party other than myself in connection with my case. Copies of All Compensation records
      for All members of the Credit Fund, all limited partners and partners at Visium,
      Recordings of all investor calls surrounding the Credit Fund, and all investor meetings
      and presenters representing the Visium Credit Fund

11.   Provide a copy of any and all subpoenas prepared by your firm, whether or not such
      subpoenas were actually served, including, without limitation, any and all documents
      received in response to such subpoenas; and any communications, subpoena issued and
      requests to appear as witness for any of the people or companies that I had given told you
      to call and subpoena to appear as witness.

3

STEFAN LUMIERE

████████████████████████████

StefanLumiere@gmail.com / Tel: (212) 397-8059

12.    Provide copies of all invoices related to my case and a breakdown of all payments made
       to Your Firm in connection with my case, whether paid by myself and/or any third party,
       including but not limited to, Visium, Jacob Gottlieb and/or their associates,
       representatives or anyone acting on their behalf.

## DEMAND FOR REIMBURSEMENT OF ALL PAYMENTS

       While I believe many of statements in your declaration about the circumstances and
hiring of your firm and interaction are grossly incomplete, inaccurate, misleading, and false, I
will stick to the immediate request for this matter.  On or about March 31, 2016, I engaged your
firm, Creizman LLC, to represent me during the Government's ongoing investigation of Visium
for which I paid you a retainer of fifteen thousand dollars ($15,000).

       After a complaint was filed against me in or about June 2016, based on our
communications, I understood that you would continue to represent me for an arrangement with
a $250,000 Cap on fees to cover all legal proceedings related to the matter.  When I was
arraigned in June 2016, you told me that Visium's counsel approached you and said that Visium
"really wanted to help Stefan and indemnify him" and that you were excited about that because
as you stated that "it would be very good for [you] as [you] would make a lot more money.  Oh,
good for [me] too, but better for [you]".  You further stated that if I accepted Visium's
indemnification and advancement, you would then be comfortable assuming the risk of non-
payment by Visium even if they ultimately did not pay you as you would simply sue them.  Soon
after this, you aggressively pushed me into a retainer with no capped amount as you had
originally agreed.  You then threatened to call Judge Rakoff stating that you had a call scheduled
with him and that you would tell him that you were withdrawing from the case citing that I was
not honoring our agreement.  You further harassed me throughout the day using this overhanging
deadline, unless I wired $250,000 into you operating account as (as opposed to escrow account) by
that afternoon and entered into a new retainer agreement that was not in-line with our original
agreement and that was not acceptable.  These threats to me and coercive tactics while I was in
an obvious weakened state due to my circumstances were extremely unprofessional and
continued throughout your representation of me.

       Without going into all the details of what transpired afterwards, although you do know I
did seek other counsel to replace you for many reasons, we did finally agree and entered into an
amended agreement on September 13, 2016, which included a $250,000 retainer and a $300,000
cap on fees that would be reimbursed immediately upon advances made by Visium.

       Further, as a precondition to my finally accepting Visium's advancement and
indemnification which you did aggressively push me to accept, you agreed to reimburse
everything that I paid to you and to other attorneys in connection with the Visium Investigation
and the Shah dismissed case.

       As per our written agreement, side-letter and oral agreement and as a matter of principle,
all funds are due back that we had agreed on and you recognized, since I did ultimately agree to

4

## STEFAN LUMIERE

████████████████████████

StefanLumiere@gmail.com / Tel: (212) 397-8059

accept Visium's indemnification and advancement which included that as a precondition of my accepting the advancement and indemnification, that Visium would reimburse all my expenses, experts, vendors, and prior legal bills tied to Visium case and Shah case. You agreed and at your request, I did send you the invoices and proof of payment for all of these for submission. You had also previously stated to me that you were comfortable taking the risk that Visium did not pay the indemnification if I would just accept the indemnification and advancement. You stated that due to your confidence that they would pay you or that you would have no problem simply suing them to receive the funds back.

When you made an initial reimbursement installment to my family that I recall as being $203,356.01 on December 18th, 2016, you indicated that this was the first installment from Visium's advancement which they delayed and stalled and refused to complete or advance until November 2016. At that time, you then asked me if I wanted all my prior legal fees paid back at that time. In good faith, I told you that you could collect from Visium the amounts up to our agreed amount, then pay me from disbursements after that. I did so in order not to hamper your defense budget, but still expected to be reimbursed for these.

Since I dismissed you as counsel after trial for obvious reasons that I will not go into here, I and/or my family have made multiple subsequent requests to you for reimbursement of the balance of funds due back to me as per our agreement which should have all been maintained or moved back into my escrow account at you firm. You have repeatedly rejected my claim that I was due anything back. The reason you gave to me was that you had to settle with Visium for half of what you were owed by them. Your argument is without merit and has nothing to do with our agreement. Whether you believe Visium paid you all you allege is inconsequential. I have also made multiple requests for documentation of monies received by you from Visium and their related parties. I have repeatedly restated my claim to you; however, you have failed to comply with my requests or even to further respond to my demands. See emails from me or my family dated September 12, 2017, January 22, 2018, March 7, 2019, April 18, 2019, May 1, 2019, and May 17, 2019.

**Following is a list of the financial disbursements made to your firm and from your firm and to and from other law firms tied to the Visium Investigation and/or Shah dismissed case which I believe you have as I had sent these to you as mentioned above.**

| | | |
|---|---|---|
| 3/31/16 | $ 15,000 | (Creizman Retainer) |
| 8/26/16 | $ 25,195 | (Creizman Pllc Retainer) |
| 9/14/16 | $ 224,805 | (Creizman Pllc Retainer) |
| 12/8/16 | -$ 203,356.01 | (1st Reimbursement from Creizman) |

5

STEFAN LUMIERE

███████████████████████████

StefanLumiere@gmail.com / Tel: (212) 397-8059

I have also sent you invoices and proof of payment to prior attorneys for legal services in connection with the Visium investigation and Shah dismissed lawsuit:

| | | |
|---|---|---|
| 3/21/16 | $ 15,000 | (Walden Macht & Haran LLP-Retainer) |
| 3/3/16 | $ 15,000 | (Sher Tremonte-Retainer) |
| 5/3/16 | -$ 11,960 | (Sher Tremonte Reimbursement) |
| 5/15/14 | $ 15,000 | (Abramson & Morak-Retainer) |
| 6/27/14 | -$ 16,314.86 | (Olshan Frome Wolosky, LLP Adjustment) |
| 3/20/14 | $ 25,000 | (Olshan Frome Wolosky, Llp-Retainer) |
| 3/12/14 | $ 40,000 | (Olshan Frome Wolosky Llp-Retainer) |
| 3/4/14 | $ 7,080 | (Park & Jensen-Payment for legal Services) |

Accordingly, the balance of $150,449.13 remains due and owed to me, by you, as of this writing. Per our agreement, please immediately remit payment to me in the amount of $150,449.13

I am fully prepared to bring legal action against you unless reimbursement is not made or arranged to be paid immediately. I am also demanding the entirety of my case files be delivered to me as I have asked repeatedly and which bear on my current court case. Please send these files to me at my address listed in the header and feel free to remit payment by company check or bank check. If you have any questions, please feel free to contact me by email at ███████████████████ or courier to my address listed in the header

Yours truly,

Stefan Lumiere

6



RECEIVED
NOV 18 2019
PRO SE OFFICE

Pro Se Intake Unit

SCO (Paul) Sheet

Docket # 18cv A170 (SSR/R

Appendix Part II & II

Submitted with Petitioner's

Surreply

To be Filed Under Seal

Protective Order in Place