```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:_____                    │
│ DATE FILED: _01/18/2022_             │
└─────────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEFAN LUMIERE, | |
|            Petitioner, | 18-CV-09170 (JSR) (BCM) |
| -against- | 16-CR-483 (JSR) |
| UNITED STATES OF AMERICA, | **REPORT AND RECOMMENDATION** |
|            Respondent. | **TO THE HON. JED S. RAKOFF** |

**BARBARA MOSES, United States Magistrate Judge.**

Petitioner Stefan Lumiere, who was convicted by a jury in this Court of wire fraud, securities fraud, and conspiracy to commit those offenses, moves pursuant to 28 U.S.C. § 2255 to vacate, set aside or correct his resulting sentence, imposed on June 14, 2017. *See* 2d Amended § 2255 Petition (Pet.) (Dkt. No. 23) at 3-4; Judgment (16-CR-483 Dkt. No. 112) at 2.[1] Although petitioner filed a timely notice of appeal from the judgment of conviction (16-CR-483 Dkt. No. 113), he later withdrew the appeal (16-CR-483 Dkt. No. 121).

Lumiere principally asserts that he was denied his Sixth Amendment right to the effective assistance of counsel. He claims that his trial counsel: (1) operated under a conflict of interest, because petitioner's former employer Visium Asset Management LP (Visium) paid his fees under an indemnification agreement, Pet. at 4-18; (2) failed to use "all the evidence at his disposal" to establish that petitioner acted in "good faith," *id.* at 19-24; (3) failed to call an expert witness at trial after failing personally to attend the *Daubert* hearing at which the government sought to exclude certain testimony by that expert, *id.* at 24-29; (4) failed to object to multiple instances of prosecutorial misconduct at trial, including the presentation of perjured testimony, *id.* at 29-49; and (5) failed adequately to prepare for trial and present a defense "at all stages." *Id.* at 50.

---

[1] Citations to "Dkt. No. __" are to filings in No. 18-CV-09170. Citations to "16-CR-483 Dkt. No. __" are to filings in the underlying criminal case, No. 16-CR-483.

For the reasons that follow, I recommend, respectfully, that the petition be denied.

## I.    BACKGROUND

### A.    The Scheme

Visium was a New York-based hedge fund manager and investment adviser, incorporated in Delaware, that operated several different funds and – at its peak – had $8 billion under management. Trial Transcript (Tr.) (16-CR-483 Dkt. Nos. 66, 68, 70, 74, 78, 82) at 40, 42, 52. Jacob Gottlieb (J. Gottlieb), who was married to Lumiere's sister Alexandra Gottlieb (A. Gottlieb), was Visium's founder and Chief Investment Officer (CIO). Tr. at 41, 101, 224, 243, 631; Pet. at iv. On May 1, 2009, Visium launched the Visium Credit Opportunities Fund (Credit Fund or Fund), which invested principally in higher-risk bonds, bank debt and other credit instruments, at one point managing "close to $480 million." Tr. at 42-43, 630-31. Petitioner was employed by Visium as a senior analyst and – according to multiple witnesses – as a portfolio manager with respect to a portion of the Fund. Tr. at 146-47, 244-46, 651, 664-65. He reported directly to Christopher Plaford, the overall portfolio manager for the Fund. Tr. at 243, 630-31, 651-52. Plaford and petitioner both worked with Jason Thorell, the Visium credit trader, who executed trades for the Fund at the instruction of Plaford, Lumiere, and others. Tr. at 241, 652-53. The Fund did well through 2010, but its performance declined in 2011, and by early 2013 it showed negative returns. Tr. at 248-49.

When the performance of the Fund started to suffer in 2011, Plaford and Lumiere, with assistance from Thorell, "hatched a scheme to defraud investors . . . into believing it was still performing well." *United States v. Lumiere*, 249 F. Supp. 3d 748, 752 (S.D.N.Y. 2017) (denying petitioner's new trial motion), *appeal withdrawn*, 2017 WL 9732075 (2d Cir. Oct. 11, 2017). The scheme involved mismarking securities in the Fund over a period of years by, among other things,

obtaining sham market quotations from outside brokers, *id.* at 752-55, 758, and "painting the tape," that is, purchasing securities held by the Fund at inflated prices and using those transactions as additional sham data points. *Id.* at 753-54; Tr. at 634-35.

Before joining Visium, petitioner obtained numerous professional certifications, including his Series 7, 16, and 55 licenses, and was a Chartered Financial Analyst. Tr. at 345, 547-48. In obtaining these credentials, petitioner learned that mismarking securities, including by obtaining sham broker quotations and painting the tape, was prohibited. Tr. at 546-54. Further, Visium's internal policies (to which petitioner certified he would adhere), assured investors that it would "accurately value" the securities in the funds it managed and that its pricing practices were "fair," "consistent," and "verifiable" by independent third parties. Tr. at 55-62, 66-68.

The key metric by which Visium reported the Credit Fund's performance to investors was its net asset value (NAV), representing the aggregate fair market value of all investments and cash held by the Fund. Tr. at 60, 662-63. Visium reported the Credit Fund's NAV, as well as its liquidity, to investors on a monthly basis. Tr. at 661. Plaford and Lumiere had an interest in the Fund's reported NAV because a strong performance by the Fund could lead to higher compensation for them, whereas poor performance could result in their termination. Tr. at 248, 664.

Plaford and Lumiere did not directly control the reported NAV of the Credit Fund, because it was calculated by Visium's back-office Operations group. Tr. at 254. However, to make the calculation, Operations relied to a significant degree on securities prices reported by the investment team, including Plaford and Lumiere. At the end of each month, the investment team sent Operations a list of prices for each security held by the Fund. Tr. at 560-61. The next business day, Operations compared the prices provided by the investment team to prices received from the Fund's administrator Morgan Stanley Fund Services (which in turn relied on neutral third parties

like Markit, which provided prices for securities such as corporate bonds), and then sent the investment team a spreadsheet comparing their in-house prices to the third-party prices. Tr. at 73, 561-63.[2] In order to "override" the third-party price for a security – that is, to cause Operations to accept the in-house price for purposes of calculating NAV – the investment team was required to provide independent verification that the in-house price was fair and accurate. Tr. at 563-65, 667-68. A quote from an outside broker, indicating that it would transact in a security at the investment team's in-house price, could be sufficient to override a third-party price. Tr. at 136-37, 564-65.

In order to persuade investors that the Credit Fund was performing better than it actually was, Plaford and Lumiere, toward the end of each month, obtained inflated price quotes for poorly performing debt securities from hand-picked brokers. Tr. at 668, 674-75, 684-91. It was petitioner's primary responsibility to tell these brokers what prices he wanted them to quote. Tr. at 633-34. Petitioner personally selected two of the brokers used for this purpose: Scott Vandersnow of Princeridge and Jonathan Brook of Janney Montgomery Scott (Janney). Tr. at 285, 293-94, 305, 483, 680-81. Later, at petitioner's suggestion, Thorell located a third "friendly" broker, Matthew O'Callaghan of Odeon Capital Management (Odeon). Tr. at 306-09, 351-52.

Each month, Lumiere contacted Vandersnow, Brook, or (later in the scheme) O'Callaghan, and dictated the prices he wanted the broker to quote back to him. Tr. at 489, 679. The brokers (sometimes while still on the phone with petitioner) then sent him "verifications" of the demanded prices, without in fact doing anything to verify them. Tr. at 286, 354-58, 361-62, 490-98, 679-80. For example, Vandersnow testified that he gave petitioner "the prices that he gave me," and "just

---

[2] As noted above, the Credit Fund invested primarily in higher-risk bonds, bank debt, and other credit instruments, including "distressed debt." Tr. at 570. These securities, many of which were thinly traded and some of which were illiquid, were "not generally sold on an exchange," meaning that "the market price [was] not always clear." Tr. at 571, 659.

sent back what he told me," without doing "any due diligence or research on the prices." Tr. at 484, 490-91, 494, 501-08. Vandersnow understood that Lumiere was using his quotes "for month-end marks," to "help prices – price the securities in his portfolio." Tr. at 484, 491.

The difference between the prices provided by Morgan Stanley Fund Services and the in-house "override" prices, backed by sham quotes, could be substantial.[3] The investment team also used the manufactured broker quotes to value thinly-traded debt securities (including ATI, Sevan Marine, Nebraska Book, and C-Med) that should have been classified as "level 3" ("very illiquid") assets, but were not – because level 3 assets were "problematic" for investors in the Fund. Tr. at 64-65, 693, 703-06, 740.[4] In return for providing the sham prices, petitioner steered business to the compliant brokers. Tr. at 285-86, 294.

To avoid detection, Lumiere, Vandersnow, and Brook frequently communicated via their personal cellphones, avoiding landlines that might be recorded by their employers. Tr. at 360-62, 526. Additionally, petitioner couriered thumb drives containing lists of requested price quotes for hundreds of securities to Vandersnow and O'Callaghan. Tr. at 365-66, 506-07.

From time to time, rather than rely on a sham broker quote to back up their in-house prices, Plaford and Lumiere resorted to painting the tape. On one occasion petitioner himself purchased a

---

[3] For example, at the end of September 2011, the investment team boosted the reported value of the Credit Fund's position in ATI senior debt by $11.1 million, by overriding the price supplied by Morgan Stanley Fund Services (32.50) with an in-house value of 88.50 – 172% higher than the third-party price – backed by a quote from Vandersnow. Tr. at 560-68. Petitioner, who supplied the quote, was also "responsible" for the Fund's investment in ATI. Tr. at 238, 297. Nine months later, in July 2012, when "Markit reported a price of $4.50" for ATI, Visium valued the security at 78 – roughly 1600% higher than Markit's price – backed by quotes obtained by Lumiere from Brook and Vandersnow. Tr. at 915-16.

[4] As Plaford explained, "C-Med and ATI and Sevan [Marine] and Nebraska, all those positions we were saying it was a Level 2 position. . . . Stefan was, you know, getting the broker quotes. We were saying it was a Level 2. But it wasn't a Level 2." Tr. at 740. According to Thorell, petitioner also "covered" Sevan Marine, meaning that he was "responsible" for the position. Tr. at 264.

security held by the Credit Fund, at a significantly above-market price, through Brook. Tr. at 638-39, 708-13. He and Plaford then used that transaction to back up their month-end pricing. Tr. at 714-15.

In April 2013, Lumiere left Visium. Tr. at 679.[5] Thereafter, the remaining members of the investment team were removed from the pricing process, and the scheme collapsed. Tr. at 758-60. In the middle of 2013, the Credit Fund received a string of redemption requests from investors, and Visium began to liquidate its assets. Tr. at 43-44. By the time the Fund collapsed, investors had overpaid more than $3 million in fees as a result of the mismarking scheme. Tr. at 928. The Credit Fund was shut down as of September 30, 2013. Tr. at 250.

**B.       The Investigation**

Beginning in May 2013, shortly after his employment at Visium came to an end, petitioner consulted attorneys Douglas Jensen and Robert Knuts of Park and Jensen (P&J) for advice regarding various matters, including "valuation concerns at Visium." Pet. at v. In late 2013 petitioner asked P&J about the advisability of "whistleblowing" to the Securities and Exchange Commission (SEC). *See* A.75 (Dkt. No. 1-8, at ECF page 156).[6] However, he never contacted the SEC, or any other law enforcement agency, for that purpose.

---

[5] According to Plaford, Lumiere's departure was due to "[p]oor performance." Tr. at 658. According to petitioner, he was unhappy at Visium and planning to resign when, on April 29, 2013, he was "locked out" of Visium's offices, after which his departure was "[d]eemed" a "resignation due to dissatisfaction." Pet. at iv-v. Visium's Chief Compliance Officer (CCO), David Keily, confirmed that Lumiere was locked out, Tr. at 163, after which Visium characterized his departure as a resignation in light of his "expressed desire to depart the firm." Tr. at 103-05.

[6] References to "A. __" are to the documents contained within the voluminous appendices and supplemental appendices submitted by petitioner in this action and described in more detail below. The appendices are sequentially numbered (for the most part) but are scattered throughout many different docket entries.

On February 26, 2014, federal agents executed a search warrant at petitioner's apartment and seized numerous electronic devices, many of them containing recordings, made by Lumiere himself, of conversations with his co-workers at Visium. The next day, P&J offered to represent him in connection with the criminal investigation, *see* A.77-78 (Dkt. No. 1-8, at ECF pages 159-60, 166-67), but Lumiere, who blamed P&J in part for his predicament, *see id.* at ECF page 160 ("I . . . cannot help but consider that my situation would have been drastically different had I been put in touch with [the] SEC immediately"), instead retained attorney Jeffrey A. Udell of Olshan Frome Wolosky (OFW). *See* Udell Decl. (16-CR-483 Dkt. No. 37) ¶ 2.

On March 12, 2014, Udell attended a meeting at the United States Attorney's Office (USAO), during which (according to OFW's meeting memo) Assistant United States Attorney (AUSA) Zachary Feingold informed him that the government "will work towards charging Stefan," but that this did not "preclude [petitioner] from coming in to provide information," which could have "a favorable result" for him. A.212 (Dkt. No. 44-4, at ECF page 34).

On March 17, 2014, petitioner attended a proffer session at the USAO, accompanied by Udell. *See* A.80 (Dkt. No. 1-8, at ECF pages 173-183). During the session (according to OFW's meeting memo) Lumiere stated that he did not know what the valuation process was at Visium; that it was Plaford who asked him to get month-end broker quotes and supplied him with "guiding numbers"; and that he had "no idea" how the broker quotes he obtained were actually used. *Id.* at ECF pages 177-79. He then told AUSA Feingold that he first had "concerns" about the process, and "started making recordings," in April 2013, when he got a call from the CFO of ATI, telling him that "projections from the company were down," but Plaford told him "not to say anything to

accounting." *Id.* at ECF pages 180-81.[7] At the end of the session, petitioner confirmed that the USAO did not have all of his Visium recordings, as some were on an external hard drive that the agents did not take. *Id.* at ECF page 182. Thereafter, petitioner turned over several additional electronic devices for search. Udell Decl. ¶ 3 & Ex. B.

On March 20, 2014, Udell met again with the USAO. *See* A.81-82 (Dkt. No. 1-8, at ECF pages 184-88). According to OFW's meeting memo, AUSA Feingold told attorney Udell that petitioner's proffer "doesn't add up," in that other evidence showed that Lumiere knew "where [the] quotes are going" and knew that Visium had been "egregiously mismarking things since the beginning." *Id.* at ECF page 184. Feingold then played several audio recordings for Udell, including one in which Lumiere stated to Thorell that "[C]hris [Plaford] has been mismarking from the beginning" and another in which Lumiere told Thorell that they had been mismarking "egregiously." *Id.* at ECF pages 184-85. Udell reported these developments to Lumiere, who told his lawyer that he probably "exaggerated" or "[o]verstat[ed]" what he told Thorell in order to get Thorell "juiced up to doing it [whistleblowing to the SEC] with Stefan." *Id.* at ECF pages 187-88.

Shortly thereafter, petitioner fired attorney Udell and replaced him with Glenn Morak of Abramson & Morak (A&M). Pet. at v. On October 15, 2014, attorney Morak cancelled a planned proffer session with the government. A.99 (Dkt. No. 1-8, at ECF page 252). On February 23, 2016, Morak reminded petitioner that the government "intend[s] to prosecute you." *Id.* at ECF page 253.

---

[7] In this action, petitioner alleges that he started recording several months earlier – after a January 8, 2013 meeting with his sister A. Gottlieb and her attorney, who told petitioner that J. Gottlieb (who was by then in the midst of an acrimonious divorce from A. Gottlieb) was "trying [to] ruin" him, and advised him to "document all processes and functions" at Visium. Pet. at iv; *see also* Pet. Aff. (Dkt. No. 50) ¶ 4 (attesting that he made the recordings based on "the advice of an attorney" and in order to protect himself from "threats of slander" by J. Gottlieb).

On March 4, 2016, petitioner fired Morak, advising him in an email that he had replaced him with the firm of Sher Tremonte (ST). *Id.* at ECF page 254.

It is not clear from the record now before the Court whether (and if so for how long) ST actually represented petitioner in connection with the criminal investigation. It is clear that in March 2016 petitioner was considering several different criminal defense lawyers, including Jason Halperin of Gibson Dunn & Crutcher (Gibson Dunn) and Eric Creizman of Creizman LLP. Pet. at vi; Pet. Aff. ¶ 5. At the same time, acting through civil litigator Hunter Winstead of Gilbert LLP, petitioner was pressing Visium to "acknowledge its unconditional obligation to furnish [him] with a defense." A.148 (Dkt. No. 25, at ECF page 101). Visium, however, maintained that it had no such obligation, *see id.* at ECF page 100, and informed Winstead that its willingness to advance petitioner's defense costs would be "tied to certain conditions," including that Lumiere "consider using an attorney that Visium would recommend" and "talk with the company" about the case. *Id.*[8]

---

[8] "[A]dvancement 'is a right whereby a potential indemnitee has the ability to force the [potential indemnitor] to pay his litigation expenses as they are incurred regardless of whether he will ultimately be entitled to indemnification.'" *In re Platinum-Beechwood Litig.*, 378 F. Supp. 3d 318, 330 (S.D.N.Y. 2019) (Rakoff, J.) (quoting *Suk Joon Ryu v. Hope Bancorp, Inc.*, 2018 WL 1989591, at *3 (S.D.N.Y. Apr. 26, 2018) (Rakoff, J.)), *reconsideration denied,* 390 F. Supp. 3d 483 (S.D.N.Y. 2019), *reconsideration denied,* 2019 WL 3759171 (S.D.N.Y. July 23, 2019), and *appeal withdrawn sub nom. B Asset Manager, L.P. v. Senior Health Ins. Co. of Pennsylvania*, 2020 WL 1479854 (2d Cir. Jan. 6, 2020). Delaware law generally permits but does not require the advancement of litigation expenses to a present or former officer, director, or employee during the pendency of a civil or criminal case. *See* 8 Del. Code § 145 (corporations); 6 Del. Code § 15-110 (partnerships). Permissive advancement may be offered "upon such terms and conditions, if any, as the corporation deems appropriate." 8 Del. Code § 145(e); *see also* William D. Johnston, *Flexibility Under Delaware Law in Drafting Advancement Provisions on A "Clear Day," and Potential Surprises for Those Who Do Not Take Advantage of That Flexibility*, 13 Del. L. Rev. 21, 23 (2011) (noting that the Delaware courts have "embraced conditions on advancement such as (i) providing security or (ii) providing an affirmation that the claimant's underlying conduct would satisfy the requirements for indemnification"). However, if at the end of the case the potential indemnitee "is found to have engaged in intentional wrongdoing, then indemnification for his conduct will of course be forbidden" and – at least in theory – any sums previously advanced are subject to repayment. *Platinum-Beechwood*, 378 F. Supp. 3d at 330.

These conditions were apparently unacceptable to petitioner, who retained attorney Creizman on or about March 31, 2016, paying an initial retainer of $15,000 without Visium's assistance. *See* Pet. at vi; Creizman Decl. (Dkt. No. 35-1) ¶ 2; A.222 (Dkt. No. 53-4, at ECF page 26).[9] By letter dated April 22, 2016, Visium offered to advance "fifty percent of the amount required to pay invoices submitted by your defense counsel (who must be acceptable to Visium)," up to a cap of $100,000, *see* A.63 (Dkt. No. 1-8, at ECF pages 100-01), which in petitioner's view was an "insufficient amount for this type of matter." Pet. Aff. ¶ 5. Lumiere did not countersign the April 22, 2016 letter.

### C.    The Prosecution and the Trial

Petitioner was arrested on June 15, 2016, and indicted on July 14, 2016. (16-CR-483 Dkt. Nos. 1, 6.) The Indictment charged him in three counts with: (1) conspiracy to commit securities fraud and wire fraud in violation of 18 U.S.C. § 371; (2) securities fraud in violation of 15 U.S.C. §§ 78j(b), 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2; and (3) wire fraud in violation of 18 U.S.C. §§ 2, 1343. The case was assigned to the Hon. Jed S. Rakoff, United States District Judge.

### 1.    Trial Preparations

Once petitioner was criminally charged, Creizman proposed a capped fee arrangement with a $250,000 retainer, *see* A.222 (Dkt. No. 53-4, at ECF page 26), but did not immediately require Lumiere to pay that sum or sign an engagement letter.

On June 27 and 28, 2016, petitioner and his counsel discussed (by email) whether Creizman should keep a planned meeting with Visium's counsel. Petitioner wanted to cancel the meeting and

---

[9] Petitioner now claims that he was not a target of the investigation when he hired Creizman to represent him. *See* Pet. Aff. ¶ 2 (attesting that he retained Creizman "as the government pursued their investigation of Visium (not an investigation into *my* conduct)") (emphasis in the original). A month earlier, however, his former attorney Morak pointedly told him, in an email, that the government "intend[s] to prosecute you."A.99 (Dkt. No. 1-8, at ECF page 253).

"halt communications with them for now," because "we need to think about conflicts as well as think about how the discussions with them put me at risk." A.194 (Dkt. No. 44-3, at ECF page 36). In response, Creizman noted that Visium's bylaws did not appear to make advancement mandatory, meaning that if Lumiere wanted advancement, "we're going to need to deal with these people in sit-down meetings." A.195 (Dkt. No. 44-3, at ECF page 37). Counsel went on to state that he would defend the case zealously regardless of whether his fees were paid by Lumiere ("in which case we don't need to be indemnified") or by Visium (in which case "it's going to be at a higher amount than we agreed to because there won't be caps or flat fees"), adding, "I don't really care if you pay or they pay. But if you want them to pay, we're going to have to have this meeting, which is why we should spend tomorrow discussing strategy for the meeting as well as defense strategy for the case." *Id.* Lumiere was unconvinced, writing that he was "just way too uncomfortable" to have his counsel meet with counsel for J. Gottlieb, Visium, or Visium's other employees, at least "not now." A.196 (Dkt. No. 44-3, at ECF page 39). He then cancelled his planned strategy meeting with Creizman (explaining that he was going to take a "mini vacation") and instructed Creizman to cancel the meeting with Visium. *Id.*

On July 18, 2016, Judge Rakoff arraigned petitioner and scheduled the case for trial on December 19, 2016. (16-CR-483 Dkt. No. 10, at 4-5.) Concerned about the tight schedule, Creizman, petitioner, and petitioner's sister A. Gottlieb (who was actively involved in his defense) agreed that an adjournment should be sought. A.181 (Dkt. No. 44-3, at ECF pages 11-15).[10] On August 11, 2016, after making the request, Creizman reported that "the judge will agree to move

---

[10] Both Lumiere and A. Gottlieb suggested that counsel ask Judge Rakoff to "order[] Visium to advance funds for Stefan's defence." A.181 (Dkt. No. 44-3, at ECF pages 13-14) (spelling in the original). Such an order would have been beyond this Court's ancillary jurisdiction. *See Stein v. KPMG, LLP*, 486 F.3d 753, 760-64 (2d Cir. 2007).

the trial date to January 9," but only if the parties "agree to submit by tomorrow afternoon affidavits that neither side will ask for a further extension." *Id.* at ECF page 13.

After considering the options – none of them ideal – Creizman advised taking "the extra three weeks," but told his client, "it's your call." A.181 (Dkt. No. 44-3, at ECF pages 11-12). Counsel added: "It's also your call as to whether to pay me yourselves or whether you want me to get advancement from Visium." *Id.* at ECF page 12. Creizman explained that he would "do whatever you guys decide on this," but added, "I need the retainer – from either you or Visium," because "I can't do this for free" and "Judge Rakoff won't let me out if it goes on much longer." *Id.*

On Friday morning, August 12, 2016, petitioner – seemingly reluctant to believe that the Court's deadline was a real one – told his counsel in an email that he intended to spend the weekend doing research, "to see if we can formally come up with an argument for an [sic] greater extension than several weeks." A.182 (Dkt. No. 44-3, at ECF page 16). Creizman explained that the deadline was real: "yo[u] need to decide today on me." *Id.* He wrote that he did not want to withdraw from the case, but his bills had not been paid "since the complaint," two months earlier, and he feared that "[t]he judge will keep me in this case if I don't get out today[.]" *Id.* at ECF page 17. Creizman reminded Lumiere that, as an alternative to paying the retainer personally, he could authorize counsel to "pursue Visium" and "get paid by the company," which would mean "sharing discovery with them under a joint defense agreement." *Id.* at ECF page 19. Creizman also pointed out that if he withdrew, requiring a change of counsel, Lumiere would likely be able to obtain a longer adjournment. A.183 (Dkt. No. 44-3, at ECF page 20) ("That will likely work.").

Creizman did not move to withdraw. By order dated August 15, 2016, Judge Rakoff adjourned the trial to January 9, 2017 "[a]t the request of defense counsel and with the consent of the Government." (16-CR-483 Dkt. No. 9.) Creizman never filed an affidavit promising not to seek

any further extensions.[11] However, the adjournment order itself advised: "No further extensions will be granted on any grounds whatsoever." (*Id.*)

On September 1, 2016 – four and a half months before trial – Lumiere instructed his counsel to put together a list of potential trial subpoenas but, in the same email, told him not to review any of the discovery produced by the government "until I have the chance to give you context and explain what you are looking at." A.100 (Dkt. No. 1-8, at ECF page 263.)[12] Petitioner added that he was still reviewing Creizman LLP's written engagement letter and wanted to discuss the hourly rate of one of the firm's lawyers, as well as "indemnification" and "how to include [it] in this agreement." *Id.* In response, Creizman expressed frustration, writing, "What more do you want to change[?] What's wrong with it? I gave in to every demand of yours. I can't do this over and over. You're making me nuts." *Id.* at ECF page 266.

On September 8, 2016, Creizman met with AUSA Joshua Naftalis. A.69 (Dkt. No. 1-8, at ECF pages 138-45). After a discussion about petitioner's recently-filed motion to suppress the evidence obtained from his electronic devices, Naftalis asked, "Why doesn't Stefan come in here and help us make a case here. He could plead guilty." *Id.* at ECF page 142. Creizman responded that Lumiere could not plead guilty because "he does not think that he did anything wrong." *Id.* Naftalis raised the possibility that Lumiere could plead guilty to "some sort of minor felony" and said that the USAO was "interested in Jake Gottlieb." *Id.* at ECF page 142-43. He added that "the recorded conversations are devastating" to Lumiere, *id.* at ECF page 144, thus suggesting that a

---

[11] *Cf.* Pet. Aff. ¶ 7 (claiming that "Creizman filed the Affidavit against my explicit orders").

[12] The discovery, which was voluminous, included numerous audio recordings of Lumiere and other Visium personnel, some of them made by Thorell, who – unlike Lumiere – did "blow[] the whistle to the SEC," first reporting the mismarking scheme in September 2013. Tr. at 225, 228-29. Thereafter, at the request of the FBI, Thorell recorded a number of conversations with Lumiere. Tr. at 225, 229. These recordings (some of which the USAO played for attorney Udell on March 20, 2014) later featured prominently at trial.

negotiated guilty plea would be a good outcome for him. Creizman acknowledged that "parts of the tapes sound bad," but argued that his client's conduct, as a whole, was not "consistent with someone who thought he did anything wrong." *Id.* at ECF pages 144-45. Creizman's detailed memo describing this meeting, dated September 12, 2016, was addressed to "Friends and Family of Stefan Lumiere," *id.* at ECF page 138, and was submitted in this *habeas* action by Lumiere.

### 2.     Engagement Letter

On September 13, 2016 – less than four months before trial – petitioner signed a written engagement letter with Creizman LLC, together with a "side letter." A.200-01 (Dkt. No. 44-3, at ECF page 44, through Dkt. No. 44-4, at ECF page 5). The engagement letter required Lumiere to pay a $250,000 retainer, to be applied against the firm's monthly invoices as incurred, and contained no express cap. The side letter capped petitioner's personal liability at $300,000, whether or not Visium "provides advancement of fees." A.200 (Dkt. No. 44-3, at ECF page 44; Dkt. No. 44-4, at ECF page 1). The side letter also noted that petitioner had paid $25,195 towards the retainer thus far, and still owed $224,805. A.200 (Dkt. No. 44-4, at ECF page 1).

### 3.     Joint Defense and Common Interest Communications

Prior to September 2016, Creizman's detailed monthly invoices to his client reflected only occasional contact with Visium's outside counsel, Rita Glavin of Seward & Kissel. *See, e.g.*, A.65 (Dkt. No 1-8, at ECF page 119). Beginning in September, however, the contacts increased, and Creizman began describing them expressly as "joint defense" or "common interest defense" communications. *See, e.g.*, A.4.13 (Dkt. No. 14, at ECF pages 58-60) (invoice dated October 4, 2016, reflecting eleven calls or meetings with Glavin, and one with J. Gottlieb's attorney Roberto Finzi of Paul Weiss)

On September 30, 2016, petitioner and his counsel exchanged friendly emails about a recent meeting with Glavin, during which Visium "provided us with some substantial

information," and an upcoming call with "Jake's lawyer." A.65.1 (Dkt. No. 1-8, at ECF page 123). Petitioner asked if there was anything Creizman needed "ahead of" that call. *Id.* Later that afternoon, Creizman told his client that he was "approaching the conversation cautiously and will say that we will be cooperative as long as it's a two-way street and Stefan gets advancement in a substantially sufficient amount to make sure we are covered through trial." *Id.* at ECF page 121. He added that he also wanted to talk about calling the lawyers for two other Visium employees, who are "going to have a lot of useful info for us." *Id.* Petitioner replied, "OK." *Id.*

### 4.    Indemnification Agreement

On November 1, 2016 – two and a half months before trial – Creizman and his client executed a written agreement with Visium (Agreement) governing both indemnification and advancement of his criminal defense costs. A.64 (Dkt. No. 1-8, at ECF pages 102-03). Visium agreed to indemnify Lumiere for the reasonable fees and costs incurred in connection with the pending criminal case, as well as a related SEC action, so long as "your actions on behalf of Visium were believed by you to be within the scope of your authority to act for Visium, provided your actions were not the result of gross negligence or intentional misconduct." *Id.* at ECF page 102. The company also agreed to advance up to $1,557,250 "at this time," subject only to an undertaking to "repay such amounts if it is ultimately determined by a Court of competent jurisdiction that you were not entitled to indemnification as provided hereunder." *Id.* Unlike the April 22 draft, the Agreement contained no requirement that Lumiere pay any portion of his own defense costs, and no requirement that his counsel be "acceptable" to Visium. *Id.*

### 5.    Pretrial Motions

On November 29, 2016, after extensive briefing, an evidentiary hearing, and an *in camera* document review, Judge Rakoff denied petitioner's motion to suppress the evidence obtained from his electronic devices, without prejudice to his ability to assert privilege as to "individual

documents." (16-CR-483 Dkt. No. 43 at 18.) The Court explained that petitioner had made no showing of "bad faith," as required for a blanket suppression order, and noted that when he consented to the search of his voluntarily produced devices (prior to retaining Creizman), he agreed, in writing, "not to seek suppression, save only for individual documents subject to the attorney-client privilege." *Id.* at 14.

On December 15, 2016, petitioner identified David Tawil, the president of a hedge fund called Maglan Capital, as a potential expert trial witness. (16-CR 483 Dkt. No. 44-1.) Tawil was expected to offer testimony concerning, among other things, "the general practice and different purposes for hedge funds to request broker quotes" and the process of classifying securities as Level 1, 2, or 3. *Id.* The government moved to exclude Tawil's testimony as to these topics. (16-CR-483 Dkt. No. 44.)  During a *Daubert* hearing on January 12, 2017, at which Tawil appeared and testified, Creizman's colleague Melissa Madrigal agreed that Tawil would not testify about the custom and practice in the industry regarding classifying securities as Level 1, 2, or 3. Tr. at 324-25. Additionally, after Judge Rakoff noted that "the question in this case is not how hedge funds in general are," but rather "how this hedge fund operated," counsel agreed to exclude "how, in general, hedge funds operate" from Tawil's testimony. Tr. at 327.

On January 4, 2017, the government moved to preclude Lumiere from offering evidence at trial as to his "efforts to cooperate with the Government," including his attendance at the proffer session on March 17, 2014, the statements he made during that session, and his voluntary production of additional electronic devices thereafter. (16-CR-483 Dkt. No. 47.) At a conference on January 6, 2017, Judge Rakoff excluded the evidence, explaining: (i) that it was hearsay; (ii) that the jury would not be in a "position to evaluate his action in that regard without his taking the stand and being subject to cross-examination"; and (iii) that in any event the evidence was "of very

limited probative value that's more than outweighed by the possibilities of confusion under [Fed. R. Evid.] 403." Jan. 6, 2017 Tr. (16-CR-483 Dkt. No. 62) at 10-11.

### 6. Trial

The case against petitioner was tried to a jury over six days, from January 11 through January 19, 2017. The government's witnesses included Plaford, who had by then pleaded guilty to various charges in connection with the Visium mismarking scheme and testified under a cooperation agreement, *see* Tr. at 632, 640-41;[13] Thorell, who testified under a compulsion and immunity order, *see* Tr. at 219-20, 222-23; and Vandersnow, one of the friendly brokers, who testified after he entered into a non-prosecution agreement. *See* Tr. at 485-86. Both Thorell and Plaford admitted to participating in an unlawful scheme to mismark securities in the Credit Fund, and both testified that Lumiere was a knowing participant in the scheme. *See* Tr. at 223-24 (Thorell), 632-32, 676 (Plaford). Similarly, Vandersnow admitted to providing "unverified levels at month end to Stefan" for two years, to be used for "month-end marks" at Visium. Tr. at 484.

The jury also heard Lumiere – on tape – carrying out and discussing the scheme. For example, it heard an audio recording of Lumiere, on the phone with Vandersnow in January 2013, listing the "levels" (prices) he expected Vandersnow to quote back to him. Tr. at 496-97; GX 1209-A. Vandersnow immediately obliged, sending the same prices back to Visium, through the Bloomberg message system, without doing any research on the securities. Tr. at 497-98; GX 658. Vandersnow could not recall ever "refusing to give Stefan a price" that he requested. Tr. at 502. The jury also heard a January 17, 2014, conversation between petitioner and Thorell during which Lumiere (who was sounding out Thorell about becoming an SEC whistleblower, unaware that he

---

[13] On February 20, 2019, Plaford was sentenced to time served, followed by three years of supervised release. *See* Judgment, *United States v. Plaford*, 16-CR-400 (JSR), ECF No. 23 (S.D.N.Y. Feb. 22, 2019).

had already done so) stated, "Chris [Plaford] has been mismarking shit since the beginning," adding, "[h]e's been mismarking shit egregiously." Tr. at 237-38, 297-98; GX 1223-A.

Anticipating Lumiere's "good faith belief" defense, the government called Andrew Milgram, the CIO of a hedge fund known as Marblegate, and Gerald Girardi, the managing director of an asset management firm called Apollo. Both Marblegate and Apollo – like Visium – invested heavily in ATI senior debt, and Milgram, like Lumiere, was "very involved" in trying to "stabiliz[e] ATI's financial health." Tr. at 794-95, 801. However, as the company's troubles mounted, Marblegate *reduced* its ATI valuation, from 35 to 24 (cents on the dollar) by year-end 2012, and to 14 by the summer of 2013. Tr. at 801. Marblegate's valuation was performed by its third-party administrator, based on "independent, third-party marketing service[s]." Tr. at 789, 802. When Milgram was shown the significantly higher ATI quotes that Lumiere obtained from the friendly brokers during the same period – and that formed the basis of Visium's ATI valuations – he testified that no-one in the marketplace was "paying that much for ATI." Tr. at 802-03. Similarly, Apollo reduced its ATI valuation to 33 in September 2011, marked it down to zero in March 2012, and publicly disclosed that valuation in its SEC filings. Tr. at 824-35. When Gerardi was shown the ATI quote that Lumiere obtained from Janney in April 2012 (75 to 83), he too testified that he was not aware of anyone willing to transact in ATI senior debt at those levels. Tr. at 837-38.

The government's final witness was Jan Jindra, a financial economist at the SEC. Jindra compared the quotes provided by friendly brokers Vandersnow, Brook, and O'Callaghan to "established" third-party pricing sources, and explained that Visium's reliance on the broker quotes allowed it to value the Credit Fund, as a whole, $10 million to $26 million higher (depending on the date) than if the NAV were based on the established pricing sources. *Id.* 911-12, 925. He then

calculated that the inflated valuations cost investors in the Fund $3,156,409 in performance fees that they otherwise would not have been charged. Tr. at 927-28.

On January 18, 2017, after recalling one of the government's witnesses for brief questioning, the defense rested. Tr. at 952-54. Judge Rakoff then allocuted petitioner as follows:

| | |
|---|---|
| THE COURT: | Mr. Lumiere, you understand that the decision whether or not to testify is yours, yes? |
| THE DEFENDANT: | Yes, I do. |
| THE COURT: | And you've discussed it with your counsel, yes? |
| THE DEFENDANT: | I have. |
| THE COURT: | And you have decided not to testify; is that correct? |
| THE DEFENDANT: | Correct. |

Tr. at 956.

On January 19, 2017, petitioner was convicted on all counts. (16-CR-483 Dkt. No. 65.) After the jury was excused, Judge Rakoff complimented the lawyers on both sides, noting that it was a "very well tried case" with "very high professionalism on the part of all involved," and that "the issues were fairly presented, well presented by both sides." Tr. at 1107.

### 7.    Motion for Extension of Time to File New Trial Motion

Creizman began immediately to plan a new trial motion on petitioner's behalf. A.101 (Dkt. No. 1-8, at ECF pages 276-77). However, on January 27, 2017, petitioner replaced Creizman with new counsel, Jonathan Halpern of Foley & Lardner (F&L). Halpern Decl. (16-CR-483 Dkt. No. 87-1) ¶ 2. On February 6, 2017, petitioner moved to extend his time to file post-trial motions, explaining that he was considering arguing that his trial counsel was constitutionally ineffective. (16-CR-483 Dkt. 87.) On February 7, 2017, the Court denied the motion, finding that petitioner failed to show "good cause" for an extension because (among other things) "Lumiere does no more

than cite a litany of garden-variety tactical decisions made at trial, which, even when considered together, do not even approach constitutional error." (16-CR-483 Dkt. 89 at 2.)

### 8.    New Trial Motion

On February 17, 2017, through attorney Halpern, petitioner moved for a new trial pursuant to Fed. R. Crim. P. 33(a). (16-CR-483 Dkt. No. 91.) He argued that a combination of evidentiary errors, prosecutorial misconduct, and flawed jury instructions resulted in an unfair trial. (16-CR-483 Dkt. No. 92.) He did not argue that his trial counsel was ineffective.

On April 18, 2017, Judge Rakoff denied the Rule 33(a) motion, finding among other things that "[t]he evidence of the [mismarking] scheme introduced at trial was little short of overwhelming. It included a mass of documents (electronic and otherwise); audio recordings of the conspirators in action; and credible testimony from three of the conspirators (Plaford, Thorell, and Vandersnow)." *Lumiere*, 249 F. Supp. 3d at 754. In Judge Rakoff's view, "the only real issue for trial was whether, as Lumiere maintained, he had a good-faith belief in the securities prices he obtained to boost the NAV." *Id.* As to that issue, the trial judge found – again – that the evidence was "overwhelming," noting in particular that Lumiere, a highly trained securities professional, "knew that mismarking securities was wrong," "knew that he was mismarking securities," and "tried to cover his tracks." *Id.* at 764-65.

### 9.    Sentence

On June 14, 2017, petitioner was sentenced to 18 months incarceration and three years of supervised release, and ordered to pay a fine of $1,000,000. *See* June 14, 2017 Tr. at (16-CR-483 Dkt. No. 115) at 30; Judgment at 2-3, 6.

### D.    Post-Conviction Proceedings

### 1.    Petitioner's Direct Appeal

On June 26, 2017, acting through yet another lawyer, Jeffrey Einhorn, of the Law Offices

of Jeffrey Lichtman (LOJL), petitioner filed a Notice of Appeal from his judgment of conviction. (16-CR-483 Dkt. No. 113.) But on October 10, 2017, petitioner moved to voluntarily dismiss his appeal, and on October 11, 2017, the Court of Appeals granted the motion and dismissed the appeal. (16-CR-483 Dkt. No. 121.)[14]

### 2.   § 2255 Petition

On October 5, 2018, while incarcerated at the FCI Otisville satellite camp, petitioner initiated this action, *pro se*, by filing a 272-page petition (Dkt. No. 1), accompanied by a 1,295-page appendix (Dkt. Nos. 1-1 through 1-8), for a total filing of 1,567 pages. On October 10, 2018, Judge Rakoff referred the § 2255 proceeding to me. (Dkt. No. 2.) The same day, petitioner filed a 412-page "First Amended 2255" (Dkt. No. 4), along with a five-page supplemental appendix (Dkt. No. 5) and a motion (Dkt. No. 3) asking, in relevant part, for leave to file a further amended petition and 90 days within which to do so – because he expected to be transferred to a halfway house, where he could "put together a cleaner and more streamlined 2255 Petition." On October 26, 2018, I granted the motion in part, directing petitioner to file his second amended petition no later than November 26, 2018, and to limit it to 50 typed, double-spaced pages. (Dkt. No. 12.)

On November 26, 2018, petitioner filed a motion seeking relief from the 50-page limit and an additional 90 days to prepare his second amended petition. (Dkt. Nos. 13, 14.) On November

---

[14] In a related civil action brought against him by the SEC, Lumiere consented to the entry of a judgment enjoining him from violating the federal securities laws. Judgment, *SEC v. Lumiere*, No. 16-CV-4513 (KPF), ECF No. 24 (S.D.N.Y. Feb. 20, 2018). A few months later, Visium and its Chief Financial Officer (CFO) Steven Ku settled administrative proceedings brought by the SEC. Visium disgorged over $4.7 million and additionally paid an over $4.7 million penalty. *In re Visium Asset Mgmt. LP*, Rel. No. 33-10494 (SEC May 8, 2018). Ku was suspended for 12 months and paid a $100,000 penalty for, among other things, failing adequately to supervise Lumiere and Plaford. *In re Ku*, Rel. No. IA-4910 (SEC May 8, 2018).

30, 3018, I granted the motion in part, extended petitioner's amendment deadline to January 31, 2019, but kept the page limit in place. (Dkt. No. 18.)

On January 31, 2019, Lumiere filed the 50-page petition now before the Court, accompanied by an updated index to (and another installment of) his appendix. (Dkt. Nos. 23-25.) On August 6, 2019, the government filed its opposition brief (Opp. Mem.) (Dkt. No. 35), accompanied by the Creizman declaration. On November 18, 22, and 26, 2019, petitioner filed (and then refiled, due to organizational issues) his reply papers, including a brief (Pet. Reply) (Dkt. No. 47); his own affidavit; a 319-page reply appendix (Dkt. Nos. 51-53); and the affidavits of eight nonparties who were not called as witnesses but, according to petitioner, could have been (or could be called now as *habeas* witnesses): his proposed expert witness David Tawil; his sister A. Gottlieb; his brother Justin Lumiere (J. Lumiere); his former employment lawyer Lawrence S. Moy; bankruptcy attorney Steven D. Pohl; linguistics professor Robert Leonard, Ph.D.; handwriting expert Curt Baggett; and "expert witness" Dennis Wurst, who describes himself somewhat opaquely as "embedded in high yield, distressed and workout scenarios up and down the capital structure." (Dkt. Nos. 54-55, 58.)[15]

## II.     DISCUSSION

### A.     Timeliness

Subject to certain exceptions not applicable here, claims raised in a § 2255 motion must be brought within one year from the date on which the judgment of conviction becomes final. 28 U.S.C. § 2255(f). If the defendant pursues a direct appeal, his "judgment of conviction becomes final when the time expires for filing a petition for certiorari contesting the appellate court's

---

[15] An earlier-dated Pohl affidavit, as well as an affidavit from restructuring advisor Paul Leand, Jr., were submitted along with Lumiere's original petition, as part of the appendix. *See* A.134-35 (Dkt. No. 5, at ECF pages 2-5).

affirmation of the conviction." *Clay v. United States*, 537 U.S. 522, 525 (2003). If the defendant files an appeal but does not pursue it, his conviction becomes final when the appeal is withdrawn or dismissed. *See, e.g.*, *Caro v. United States*, 2009 WL 3273847, at *3 (S.D.N.Y. Oct. 14, 2009) ("[T]he latest possible date that [petitioner's] conviction became final is the date on which the mandate issued from the Second Circuit dismissing his appeal[.]"), *report and recommendation adopted*, 2010 WL 935281 (Mar. 11, 2010); *Rosario v. United States*, 625 F. Supp. 2d 123, 127 (S.D.N.Y.2008) ("[T]he one-year statute of limitations began . . . when the Circuit granted petitioner's motion to withdraw his appeal and his conviction therefore became final.").

Here, petitioner filed a notice of appeal but did not pursue it. The Second Circuit's mandate, granting his motion to withdraw the appeal, issued on October 11, 2017. (16-CR-483 Dkt. No. 121.) Petitioner's time to file his § 2255 motion expired one year later, on October 11, 2018. His original petition was timely filed on October 5, 2018. However, his operative pleading – the second amended petition – was filed more than 15 months after his conviction became final. Thus, when granting permission for the amendment, I instructed petitioner that he could not "assert new or different grounds for relief from those previously pleaded." Order dated Oct. 26, 2018 (Dkt. No. 12) at 6. Because Lumiere substantially complied with that instruction – boiling down his § 2255 claims rather than raising new grounds for relief – the petition now before the Court "relates back" to his original filing on October 5, 2018, for statute of limitations purposes. *See Mayle v. Felix*, 545 U.S. 644, 664 (2005) ("So long as the original and amended petitions state claims that are tied to a common core of operative facts, relation back will be in order."), *reh'g denied*, 545 U.S. 1158.

### B.    Mootness

Although petitioner was incarcerated when he initiated this action, thereby satisfying the jurisdictional "in custody" requirement, *see* 28 U.S.C. § 2255(a); *United States v. Rutigliano*, 887

F.3d 98, 104 (2d Cir. 2018), he was on supervised release by the time he filed his operative petition, and the Court is informed that his term of supervised released concluded on December 27, 2021. I must therefore consider whether his § 2255 petition has become moot.

"Unlike the 'in custody' requirement, mootness is not fixed at the time of filing but must be considered at every stage of the habeas proceeding." *Nowakowski v. New York*, 835 F.3d 210, 217 (2d Cir. 2016). Once a petitioner's sentence (including a term of supervised release) has expired, "some concrete and continuing injury other than the now-ended incarceration or [supervised release] – some 'collateral consequence' of the conviction – must exist if the suit is to be maintained." *Id.* at 217-18 (quoting *Spencer v. Kemna*, 523 U.S. 1, 7 (1998)). However, a petitioner challenging a felony conviction, as Lumiere does here, need not strain unduly to identify jurisdictionally sufficient collateral consequences, because the courts "have been willing to presume that a wrongful criminal conviction has continuing collateral consequences," *Spencer*, 523 U.S. at 8 (citing *Sibron v. New York*, 392 U.S. 40, 55-56 (1968)), including "civil disabilities" such as "being 'barred from holding certain offices, voting in state elections, and serving as a juror.'" *United States v. Mercurris*, 192 F.3d 290, 293 (2d Cir. 1999) (quoting *Lane v. Williams*, 455 U.S. 624, 632 n.13 (1982)). Lumiere remains subject to such disabilities. *See, e.g.*, N.Y. Jud. Law § 510 (convicted felons may not serve on New York juries). In addition, he remains a criminal judgment debtor subject to garnishment. *See* Final Order of Garnishment (16-CR-483 Dkt. No. 161) at 1 (noting that as of January 3, 2022, petitioner owed $996,550 on his criminal fine). Thus, his petition is not moot.

### C.     Merits - Standards

#### 1.     Section 2255

Pursuant to § 2255, a prisoner sentenced in federal court "may move the court which imposed the sentence to vacate, set aside or correct the sentence" on the ground "that the sentence

was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 USC § 2255(a). Relief under § 2255 is only available "for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)) (internal quotation marks omitted).

"A § 2255 petition may not be used as a substitute for direct appeal." *Marone v. United States*, 10 F.3d 65, 67 (2d Cir. 1993) (per curiam). Claims that could have been raised on direct appeal, but were not, are deemed procedurally defaulted, and consequently barred under § 2255, unless the petitioner shows: (1) "cause for failing to raise the claim at the appropriate time and prejudice from the alleged error," *Marone*, 10 F.3d at 67; or (2) "actual innocence." *Zhang v. United States*, 506 F.3d 162, 166 (2d Cir. 2007). "Cause," for purposes of the cause-and-prejudice test, must be "something *external* to the petitioner, something that cannot fairly be attributed to him" *Coleman v. Thompson*, 501 U.S. 722, 753 (1991) (emphasis in the original), *reh'g denied*, 501 U.S. 1277. "Attorney ignorance or inadvertence is not 'cause' because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must 'bear the risk of attorney error.'" *Id.* (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). However, "an ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal." *Massaro v. United States*, 538 U.S. 500, 504 (2003); *see also Zhang*, 506 F.3d at 166 (the procedural bar rule "does not generally apply to claims of ineffective assistance of counsel").

### 2.      Ineffective Assistance of Counsel

To establish that he was deprived of his Sixth Amendment right to the effective assistance of counsel at trial, a petitioner must show: (1) that his attorney's representation fell below an objective standard of reasonableness under prevailing professional norms; and (2) that he was prejudiced as a result of the purportedly defective conduct. *Strickland v. Washington*, 466 U.S. 668, 687-88, 693 (1984), *reh'g denied*, 467 U.S. 1267. In evaluating the first *Strickland* prong – whether a counsel's performance fell below an objective standard of reasonableness – judicial scrutiny is "highly deferential," *Strickland*, 466 U.S. at 689, and the petitioner must overcome the "presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Bell v. Cone*, 535 U.S. 685, 698 (2002) (internal quotation marks and citation omitted), *reh'g denied*, 536 U.S. 976. "The record must demonstrate that 'counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *Wilson v. Mazzuca*, 570 F.3d 490, 502 (2d Cir. 2009) (quoting *Strickland*, 466 U.S. at 687).

To satisfy the second *Strickland* prong – the prejudice requirement – the petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability means a '"substantial," not just "conceivable," likelihood of a different result.'" *Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011). Courts in the Second Circuit generally "require[] some objective evidence other than defendant's assertions to establish prejudice." *Pham v. United States*, 317 F.3d 178, 182 (2d Cir. 2003) (quoting *United States v. Gordon*, 156 F.3d 376, 380-81 (2d Cir. 1998) (per curiam)). Noting that "[t]he object of an ineffectiveness claim is not to grade counsel's performance," *Strickland*, 466 U.S. at 697, the Court has made it clear that an ineffectiveness claim may be rejected for lack of prejudice alone, regardless of the quality of counsel's performance: "If it is easier to dispose of an ineffectiveness

claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.*

A criminal defendant's Sixth Amendment right includes the right to representation by conflict-free counsel. *United States v. Schwarz*, 283 F.3d 76, 90 (2d Cir. 2002). If defense counsel was burdened by an "actual" conflict of interest, the petitioner need not separately demonstrate prejudice. *Strickland*, 466 U.S. at 692; *United States v. Malpiedi*, 62 F.3d 465, 469 (2d Cir. 1995); *United States v. Iorizzo*, 786 F.2d 52, 58 (2d Cir. 1986). However, he must show that the conflict "adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348, 350 (1980); *United States v. Williams*, 372 F.3d 96, 102 (2d Cir. 2004); *Schwarz*, 283 F.3d at 91.

Counsel has an actual conflict if the interests of the attorney and the client "diverge with respect to a material factual or legal issue or to a course of action." *Williams*, 372 F.3d at 102; *Schwarz*, 283 F.3d at 91; *Winkler v. Keane*, 7 F.3d 304, 307 (2d Cir. 1993), *cert. denied*, 511 U.S. 1022 (1994). The conflict adversely affects counsel's performance if the divergence in interests results in an "actual lapse in representation." *Cuyler*, 446 U.S. at 349; *United States v. O'Neil*, 118 F.3d 65, 71 (2d Cir. 1997), *cert. denied*, 522 U.S. 1064 (1998); *United States v. Stantini*, 85 F.3d 9, 16 (2d Cir. 1996), *cert. denied*, 519 U.S. 1000. "Such a lapse of representation occurs when counsel, acting under a divided loyalty, forgoes some plausible alternative strategy of defense." *Triana v. United States*, 205 F.3d 36, 41 (2d Cir. 2000), *cert. denied*, 531 U.S. 956.

The movant need not demonstrate that the outcome of his trial would have been different had the alternative strategy been employed. *Winkler*, 7 F.3d at 309; *Schwarz*, 283 F.3d at 92. However, he must show that the alternative strategy was "plausible" and that it was foregone "due to the attorney's other loyalties or interests," rather than for sound strategic reasons. *Williams*, 372 F.3d at 106 (quoting *United States v. Levy*, 25 F.3d 146, 157 (2d Cir. 1994)); *Schwarz*, 283 F.3d

at 93. As the Court explained in *Mickens v. Taylor*, an "actual conflict of interest" means "a conflict that affected counsel's performance," not "a mere theoretical division of loyalties." 535 U.S. 162, 163 (2002), *reh'g denied*, 535 U.S. 1074.

It is the movant's burden to establish both elements of the claim. *Cuyler*, 446 U.S. at 350 ("[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance."). That burden cannot be met with speculative assertions of bias or prejudice. *Triana*, 205 F.3d at 40-41.

Where a petitioner succeeds only in demonstrating a "potential conflict" – that is, that "the interests of the defendant may place the attorney under inconsistent duties at some time in the future," *United States v. Kliti,* 156 F.3d 150, 153 n.3 (2d Cir. 1998) – he has no Sixth Amendment claim unless he can show, in accordance with the second prong of *Strickland*, that the potential conflict resulted in "prejudice." *Williams*, 372 F.3d at 102; *Levy*, 25 F.3d at 152.

**D.      Merits - Analysis**

**1.      Trial Counsel Did Not Operate Under an Actual Conflict of Interest**

Petitioner alleges that attorney Creizman was subject to an "egregious conflict of interest," Pet. at 5, because his fees were paid by Visium, which was controlled by J. Gottlieb, who had "an ulterior motive to frame Petitioner" and to make him the "fall guy" for "Visium's internal accounting decisions." *Id.* He further argues that Creizman "took the relationship with Visium to another level," *id.* at 4, by "entering into a Joint Defense Agreement and Common Interest Agreement" with Visium and J. Gottlieb, even though Lumiere gave him "strict instructions not to share any information or discovery or files with Visium." *Id.* at 5. This in turn prejudiced petitioner by giving Visium and Gottlieb (unspecified) information "that they could now use to further frame Petitioner . . . and halt payments for legal fees." *Id.* at 9.

In response, the government argues that Lumiere "procedurally defaulted this claim by failing to raise it on direct appeal," Opp. Mem. at 17; that there was no lapse in representation, *id.* at 17-19; and that Creizman did not operate under an actual conflict of interest, because Lumiere "sanctioned Creizman's fee arrangement with Visium," was aware of his joint defense communications, and did not forgo any "viable defenses as a result of this arrangement." *Id.* at 19.

There was no procedural default. An ineffective-assistance claim may be brought for the first time under § 2255 whether or not it could have been raised on direct appeal. *Massaro*, 538 U.S. at 504; (2003); *Zhang*, 506 F.3d at 166. Respondent is correct, however, that Creizman was not burdened with an actual conflict. Nor has petitioner shown that his trial counsel rejected a plausible "alternative strategy" due to conflicting "loyalties or interests." *Williams*, 372 F.3d at 106.

a.    No Actual Conflict

A criminal defense attorney does not acquire a constitutionally disabling conflict of interest merely by accepting payment from a third party – here, his client's former employer – whose interests diverge from the interests of the client. As the Second Circuit observed in *Triana*, employer funding of defense costs is a well-recognized "job benefit" in many fields where prosecution is a risk of doing business. 205 F.3d at 42. In a narcotics case, like *Triana*, the funds may be wired from an anonymous payor in Colombia. *Id*. at 39. In a securities fraud case, like this one, the funds are more commonly advanced pursuant to a written agreement. *See, e.g*., *Hoffenberg v. United States*, 436 F. Supp. 2d 609, 612-13 (2006) (former CEO of TFC, charged with securities fraud after TFC's collapse, secured $450,000 to pay his criminal defense attorney through negotiations with TFC's bankruptcy trustee), *aff'd,* 333 Fed. App'x 625 (2d Cir. 2009). In many cases the agreement is heavily negotiated, and in some cases it is signed only after the employee sues, or threatens to sue, to obtain that benefit. *See, e.g*., *Ryu*, 2018 WL 1989591, at *12 (ruling that former bank executive, accused of embezzlement from bank, was entitled to advancement of

his attorney fees and costs incurred in connection with a criminal embezzlement investigation and a related civil suit brought against him by the bank).

Regardless of how the advancement agreement came about, the interests of the employer-payor frequently conflict with the interests of the individual employee-defendant.[16] However, this common scenario does not – standing alone – present an actual conflict for the employee's counsel, nor provide the employee with a Sixth Amendment claim in the event of an adverse result. *See, e.g.*, *Triana*, 205 F.3d at 39-40 (although defense counsel "may have been paid by some party . . . who had in mind some interests other than Triana's," that did not render him actually conflicted, nor call into question his sound advice that Triana not testify in his own defense); *Hoffenberg*, 436 F. Supp. 2d at 613-14 (finding no actual conflict where attorney for former CEO of TFC accepted payment from TFC's bankruptcy trustee, notwithstanding CEO's contention that trustee wanted him to plead guilty so as to prevent him from showing at trial that trustee, not CEO, caused TFC's collapse). Even where the payor and payee are co-defendants, "[t]he mere fact of payment . . . does not, by itself, constitute a Sixth Amendment violation." *Douglas*, 2009 WL 1322328, at *2 (collecting cases).[17] Thus, the fact that Visium's interests were not necessarily aligned with

---

[16] At the most basic level, there is an inherent conflict whenever an employer advances funds to pay for an employee's criminal defense, because its obligation to do so will cease if and when the employee is convicted of un-indemnifiable conduct. *See Platinum-Beechwood*, 378 F. Supp. 3d at 330 (indemnification will be "forbidden" if former employee is found to have engaged in "intentional wrongdoing"); *United States v. Weissman*, 1997 WL 334966, at *16, 18 (S.D.N.Y. June 16, 1997) (because former employee was convicted of perjury and obstruction of justice, employer's advancement obligation "will terminate upon an adverse resolution of his post-trial motions challenging the jury's verdict," at which point the employer "may seek reimbursement" of the money previously advanced), *supplemented on other grounds*, 1997 WL 539774 (S.D.N.Y. Aug. 28, 1997). In some cases the conflict is even sharper. For example, in *Ryu*, the former employee faced both a federal criminal investigation and a civil embezzlement action – brought by the same former employer from which he sought advancement. 2018 WL 1989591, at *2-3.

[17] *Cf. Amiel v. United States*, 209 F.3d 195, 197 n.1 (2d Cir. 2000) (holding that petitioner adequately alleged an actual conflict where her co-defendant, who was also her mother, chose and

Lumiere's – as evidenced by the government's identification of CIO J. Gottlieb on its list of "co-conspirators in the charged conspiracy," *see* A.66 (Dkt. No. 1-8, at ECF page 124), and its reported interest in pursuing criminal charges against him, *see* A.69 (Dkt. No. 108, at ECF page 143) – cannot, standing alone, furnish Lumiere with a Sixth Amendment claim predicated on his decision to accept Visium's money to pay his lawyer.

In this case, moreover, petitioner fails to allege any facts suggesting that Creizman's interests (as opposed to Visium's) were adverse to his. Here, as in *Hoffenberg*, petitioner himself chose (and initially paid) his trial counsel. There is no suggestion that Creizman had any prior relationship with Visium, much less an attorney-client relationship that would impose upon him a corresponding duty of loyalty.[18] Moreover, Lumiere does not allege that Visium limited his choice of counsel,[19] nor that he "objected to the payment arrangement" or had it forced upon him in some way,[20] nor that "the payment was in any way contingent on a particular result." *Hoffenberg*, 436 F. Supp. 2d at 613. Instead, he argues: (1) that Creizman stood to "make a lot more money" if Visium paid his fees, Pet. at 4, and therefore must have been motivated to do Visium's bidding

---

paid for her counsel, who advised petitioner not to testify because if she did, "you won't be convicted," but "your mother will go to jail," and "I . . . have to think of your mother").

[18] *Cf. Wood v. Georgia*, 450 U.S. 261, 271-72 (1981) (remanding for further proceedings to determine whether an actual conflict existed where defendants were represented by "their employer's lawyer," who may have been "influenced in his basic strategic decisions by the interests of the employer who hired him"); *Schwarz*, 283 F.3d at 91 (attorney Worth had an actual conflict when representing NYPD Officer Schwarz in the Abner Louima trial because Worth also had "an unalloyed duty" to his long-time client, the Police Benevolent Association, which was paying his fees to defend Schwartz and simultaneously facing a civil suit by the Louima family).

[19] To the contrary: the Agreement that he signed with Visium in November 2016 (unlike the version he refused to sign in April of that year) did not require that his counsel be "acceptable to Visium." *Compare* A.63 *with* A.64 (Dkt. No. 1-8, at ECF pages 100-03).

[20] To the contrary: Lumiere actively sought to secure funding from Visium for months before finally obtaining it on terms he deemed acceptable. *See* Pet. at 4; Pet. Aff. ¶ 5; A.100 (Dkt. No. 1-8, at ECF page 263); A.148 (Dkt. No. 25, at ECF page 101); A.181 (Dkt. No. 44-3, at ECF pages 13-14).

upon securing that funding; and (2) that Creizman shared information with Visium and J. Gottlieb pursuant to an informal joint defense (or "common interest") agreement, in violation of petitioner's "strict instructions," which petitioner did not "uncover[]" until after trial and which "created" another "clear prejudicial conflict of interest." Pet. at 4-5; *see also* Pet. Aff. ¶ 11 ("I never approved any joint defense and/or common interest arrangement – in fact, I prohibited them.").

Petitioner's first argument proves too much. Corporate advancement almost always provides a defense attorney with a bigger budget (and better guarantees of payment) than an individual client could furnish. That is often the point of advancement. *See Weissman*, 1997 WL 334966, at *16 (advancement protects the employee's ability to mount an effective defense by allowing him "to meet his expenses at the time they arise" and "to secure counsel on the basis of such an assurance").[21] Thus, when Creizman explained to Lumiere that if Visium advanced his fees "it's going to be at a higher amount," A.195 (Dkt. No. 44-3, at ECF page 37), he was not confessing to a disabling conflict, as petitioner contends, *see* Pet. at 4; he was simply pointing out to his client one of the consequences of the decision that he was required to make. *See* A.181 (Dkt. No. 44-3, at ECF page 12) ("[I]t's your call[.]"). Nor, of course, is counsel's desire to be paid for his work (particularly as trial approaches) evidence of a conflict. *See, e.g.*, *United States v. O'Neil*, 118 F.3d 65, 68, 71 (2d Cir. 1997) (counsel's pending lawsuit to recover unpaid legal fees from client did not create actual conflict), *cert. denied*, 522 U.S. 1064 (1998).

Petitioner's second argument is undercut by the record. It is true that on June 27, 2016, Lumiere directed Creizman to "halt communications with them *for now*." *See* A.194 (Dkt. No. 44-

---

[21] Petitioner himself illustrates this point when he attests that, before he hired Creizman, he "sought to engage Gibson Dunn," but could not afford to do so without generous advancement from Visium (which was not, at that time, offering such terms), because "Gibson Dunn had asked for a retainer of $3 million." Pet. Aff. ¶ 5.

3, at ECF page 36) (emphasis added.). By September, however (with a January 2017 trial date looming), Creizman began communicating frequently with Visium's counsel. Rather than hide those calls and meetings, he described them in his itemized monthly invoices, *see, e.g.*, A.4.1.3 (Dkt. No. 14, at ECF pages 58-60),[22] and discussed them with his client via email. For example, on September 30, 2016, Creizman emailed Lumiere to say that he had just met with Visium's lawyer; that "Jake's lawyer has reached out to me," and that he planned to speak with J. Gottlieb's lawyer that day; and that he would tell J. Gottlieb's lawyer that "we will be cooperative so long as it's a two way street[.]" A.65.1 (Dkt. No. 1-8, at ECF pages 121, 123). Petitioner responded by asking whether Creizman needed anything "ahead of [the] call with [J]ake['s] attorney." *Id.* at ECF page 123. These communications are consistent with counsel's attestation that he "apprised Mr. Lumiere of each and every such communication and each and every exchange of information or documents." Creizman Aff. ¶ 11. The fact that Creizman shared information with Visium and its personnel, therefore, was neither an act of disloyalty nor evidence of a hidden conflict.

b.      No Lapse in Representation

In addition to objecting to the fact of Creizman's joint defense communications with Visium, petitioner claims that during or as a result of those communications Creizman ceded "control over [the] Defense" to J. Gottlieb, Pet. at 9, which is why, at trial, he "avoided the mention or any involvement of Gottlieb and Ku in any valuation [or] pricing of securities." Pet. at 6. This argument is also undercut by the record.

For example, when cross-examining Keily, Creizman brought out that the "valuation process" for the Credit Fund was controlled by the Valuation Committee, not by Lumiere; that Ku

---

[22] Under the side letter, Lumiere was required to review and "approve" those invoices "within 3 business days." A.200 (Dkt. No. 44-3, at ECF page 44).

sat on the Valuation Committee; and that Ku twice refused to permit Keily to join the Valuation Committee or give him any "visibility into the valuation process." Tr. at 144-45, 148. He then vigorously cross-examined Thorell about what Creizman portrayed as senior management's tacit encouragement of the mismarking scheme, eliciting testimony that when Thorell reported his concerns to J. Gottlieb, "Visium did not take them seriously," Tr. at 457; that J. Gottlieb himself "didn't seem to address that it was an issue," *id.*; and that when he "presented the facts" about the broker overrides to the CFO, Ku "preemptively" told him that he had "nothing to worry about" and that he – Thorell – had "done nothing wrong." Tr. at 459-60. Later, during his cross-examination of Plaford, counsel highlighted that when Plaford was "disguising Level 3 assets as Level 2 assets to investors," he did it because J. Gottlieb was "pressuring" him. Tr. at 751.

In his summation, Creizman tied these themes together, arguing explicitly that Lumiere was being unfairly prosecuted for pricing policies devised and largely carried out by others: "What it really boils down to, though, is that the government wants to hold Stefan Lumiere responsible for the conduct of other people." Tr. at 1013. Counsel argued that petitioner subjectively believed in the price quotes he obtained, Tr. at 1016-17; pointed out that he made no money from the mismarking scheme (he was paid "his base salary and nothing more" for 2011 and thereafter), whereas Plaford and Thorell were rewarded with bonuses, severance, and/or deferred compensation, Tr. at 1018-19;[23] and reiterated that when the issue of the broker quotes was raised to the CFO, Ku told Thorell not to "worry about that." Tr. at 1035. Nor did Creizman shy away

---

[23] Thorell also stood to gain from his whistleblower status. Creizman point this out in his opening statement, *see* Tr. at 19 (Thorell "stands to make six figures, maybe more, from each and every successful criminal and civil prosecution, based on his story, in which the government collects over $1 million, he gets a percentage"), and again in his closing argument. Tr. at 1022 (Thorell will "make a lot of money if the SEC prosecutes and continues to investigate Visium, collect fines").

from mentioning J. Gottlieb, who – he reminded the jury – was "in the middle of a divorce" with Lumiere's sister and "took [Lumiere's] portfolio away." Tr. at 1017-18.[24]

A *habeas* petitioner who accuses his trial counsel of an "actual lapse in representation," *Cuyler*, 446 U.S.at 349, must demonstrate two things: the existence of some "plausible alternative defense strategy not taken up by counsel," *United States v. Moree*, 220 F.3d 65, 69 (2d Cir. 2000) (internal quotation marks omitted), and that "trial counsel chose not to undertake" that strategy "because of his conflict." *Winkler*, 7 F.3d at 309. Here, petitioner fails to satisfy either prong of the test, because Creizman did in fact argue – doggedly, if unsuccessfully – that the prosecution was unjustly attempting to take a complex scheme orchestrated by other people and "place it all at the feet of Stefan Lumiere," who was the "low man on the totem pole" at Visium and out of favor with his soon-to-be-ex brother-in-law, J. Gottlieb. Tr. at 1013, 1017-18. Thus, even if petitioner could show that Creizman had "other loyalties or interests," *Moree*, 220 F.3d at 69, he could not meet his burden of demonstrating that "his counsel actively represented conflicting interests," and therefore "has not established the constitutional predicate for his claim of ineffective assistance." *Cuyler*, 446 U.S. at 350.

## 2.    Trial Counsel Was Not Constitutionally Ineffective

The *Strickland* standard is intentionally difficult to meet. As our Circuit explained in *Yick Man Mui v. United States*, 614 F.3d 50 (2d Cir. 2010), claims of ineffective assistance of counsel

---

[24] Petitioner argues that both the government attorneys and Creizman violated a court order by failing to inform the jury that J. Gottlieb and Ku were listed as co-conspirators in the government's bill of particulars. Pet. at 6; Pet. Aff. ¶ 4. There was no such order. *See* Tr. at of Aug. 31, 2016 Conf. (16-CR-483 Dkt. No. 20) 6, 8, 18. In any event, a bill of particulars "is not evidence of itself; it is merely a statement of what the government will or will not claim," *United States v. Murray*, 297 F.2d 812, 819 (2d Cir. 1962), *cert. denied*, 369 U.S. 828, and consequently is "generally not admissible as evidence." *United States v. Johnson*, 2017 WL 11490478, at *1 (E.D.N.Y. Oct. 26, 2017) (collecting cases).

"are quite often the law's equivalent of 'buyer's remorse' or 'Monday morning quarterbacking' and can be quickly resolved. Decisions by criminal defense counsel are often choices among bad alternatives that are only rarely shown to be: (1) errors so serious that the defendant was deprived of reasonably competent representation, (2) which cause prejudice to the defense." *Id.* at 57 (citing *Strickland*, 466 U.S. at 687-91); *see also United States v. Huggins*, 2019 WL 697293, at *5 (S.D.N.Y. Feb. 20, 2019) (concluding that counsel's complained-of conduct "does not overcome the strong presumption that trial counsel acted reasonably in the moment" and that "[t]o hold otherwise would be impermissible 'Monday morning quarterbacking'"), *certificate of appealability denied*, 2019 WL 4784822 (2d Cir. Sept. 4, 2019).

Given Lumiere's history of hiring, firing, and blaming a series of lawyers for his reversals of fortune at the hands of the criminal justice system,[25] it is perhaps not surprising that where Judge Rakoff saw a "very well tried case," with "very high professionalism on the part of all involved," Tr. at 1107, petitioner – with 20-20 hindsight – sees "utter incompetence" on the part of his trial counsel. Pet. Reply Mem. at 9. The record, however, is once again at odds with petitioner's characterization. In his *habeas* petition, as in his post-trial application, "Lumiere does no more than cite a litany of garden-variety tactical decisions made at trial, which, even when considered together, do not even approach constitutional error." (16-CR-483 Dkt. No. 89 at 2.) Nor has he

---

[25] Before he retained Creizman, plaintiff hired and fired attorneys from at least three firms – P&J, OFW, and A&M – in connection with the Government's investigation. After he discharged Creizman, he went through at least two additional firms – F&L, for the new trial motion, and LOJL, for what was to be petitioner's direct appeal. In the end, petitioner came to believe (according to his brother) that his LOJL attorney "was not being truthful with him" and "was not advocating for him," J. Lumiere Aff. (Dkt. No. 58, at ECF pages 5-16) ¶¶ 11-12, 24. Petitioner then instructed his brother to "notify" the LOJL attorney that "he was not authorized to submit anything on Stefan's behalf[.]" *Id.* ¶ 27.

established, as required, a "reasonable probability" that the result would have been different, *Strickland*, 466 U.S. at 694, had counsel tried the case the way petitioner now says he should have.

### a. Failure to Establish Lumiere's Good Faith

According to petitioner, his trial counsel "failed to . . . establish the good faith and integrity" behind the security prices he supplied. Pet. at 19. To the extent the claim is that counsel neglected to *argue* that petitioner believed the prices he obtained were defensible, it fails, because Creizman made precisely that argument, including in his opening statement, *see* Tr. at 20-21 ("[T]he evidence will show [that] Mr. Lumiere believed, in good faith, that those prices that he went to the brokers to confirm were accurate, reasonable, and justifiable[.]"), and in his summation. *See* Tr. at 1016 ("Stefan believed in the values that Chris [Plaford] set for those prices."). Indeed, when denying the new trial motion, Judge Rakoff acknowledged that this was the central theme of the defense: "[T]the only real issue for trial was whether, *as Lumiere maintained*, he had a good-faith belief in the securities prices he obtained[.]" *Lumiere*, 249 F. Supp. 3d at 754 (emphasis added).

To the extent the claim is that Creizman neglected to seek out, assemble, and present "all the evidence at his disposal" to prove his client's good faith, Pet. at 19, it fails because counsel made vigorous efforts to seek out such evidence and reasonable tactical decisions as to what evidence to use. For example, Creizman successfully moved, *ex parte*, for leave to serve two dozen pretrial subpoenas pursuant to Fed. R. Crim. P. 17(c), including subpoenas:

(1)    to the "established pricing sources" on which the government relied, seeking not only their pricing but their "methodology and supporting data";

(2)    to various hedge funds and other third party-advisors "in similar positions to Visium," seeking their pricing for the securities at issue;

(3)    to Visium, and to the firms employing the friendly brokers (Janney, Princeridge, and Odeon), seeking telephone records showing calls placed to and from the office (landline) phones of the alleged conspirators, as well as "recorded conversations from the brokers' lines" that "we believe will be exculpatory"; and

(4)     to Visium, seeking "communications, summaries and models provided to the Valuation Committee at Visium supporting the month-end values assigned by Visium for the securities listed in the bill of particulars."

*See* Creizman Aff. ¶ 14 & Ex. A. The goal, in each case, was to obtain evidence in support of petitioner's "good faith belief" defense. *See id*. Ex. A at 4-11. Counsel also fought hard (though ultimately unsuccessfully) against the government's motion to preclude his "consciousness of innocence" evidence. Jan. 6, 2017 Tr. at 4-13.

Petitioner's Monday-morning complaint that Creizman subpoenaed the wrong documents, "resulting in incomplete or limited subpoena returns," Pet. Aff. ¶ 14, falls far from the mark under *Strickland*. It is "well within an objective standard of reasonableness for an attorney to decline to engage in rote adherence" to his client's tactical preferences. *Rios v. United States*, 2016 WL 3702966, at *7 (E.D.N.Y. July 7, 2016) (denying ineffective assistance claim based on petitioner's allegations that his trial counsel failed to subpoena the right documents, failed to ask the right questions on cross-examination, and failed to retain the right expert witnesses), *appeal dismissed*, 2016 WL 10644795 (2d Cir. June 8, 2016). In this instance, moreover, Creizman did in fact subpoena many of the documents that petitioner now claims he overlooked.[26] To the extent that Creizman did not introduce the resulting documents at trial,[27] those decisions are also "precisely the sort generally left to a defense attorney's discretion." *Id.* It is petitioner's burden – which he has not discharged – to show not only that they would have been helpful but also that, had they been

---

[26] For example, petitioner attests that he asked his counsel to obtain "landline records for conference rooms and desk lines" at Visium and "for the alleged broker co-conspirators," as well as "Visium and Broker recorded lines." Pet. Aff. ¶ 14. Counsel subpoenaed those records. Creizman Aff. Ex. A at 8-10.

[27] Creizman only introduced one defense exhibit at trial: Thorell's settlement agreement with Visium, which he used to show that the witness received a "payout" when he left the company. Tr. at 453-55. The authenticity and admissibility of many other trial exhibits were stipulated to, *see, e.g.*, Tr. at 48, and the transcript does not, in most instances, reflect the source of those exhibits.

introduced, it is "reasonably likely the jury would have reached a different result." *United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir. 1997), *cert. denied*, 522 U.S. 846.

The same is true with respect to counsel's decision not to call "the multitude of witnesses from Visium, restructuring advisors, auditors and valuation research companies" who (petitioner now contends) could have helped show that he had a "good faith basis for believing the values that his boss [Plaford] gave him." Pet. at 22. Petitioner does indeed list a "multitude" of potential witnesses, including half a dozen individuals who worked for nonparty "restructuring advisors, auditors, and valuation research companies," nine Visium employees, including CFO Ku, and his retained expert, Tawil. *Id.* at 22-24. However, only three of them (Tawil, bankruptcy attorney Pohl, and restructuring advisor Leand) signed affidavits that are now before the Court.[28] The others apparently rebuffed petitioner's post-conviction overtures.[29]

A trial lawyer's tactical decisions regarding "whether to call specific witnesses," *United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir. 1997), *cert. denied*, 522 U.S. 846, "fall squarely within the ambit of trial strategy," *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987), *cert. denied*, 484 U.S. 958, and if "reasonably made, will not constitute a basis for an ineffective

---

[28] Petitioner also submitted an unsworn letter signed by Mark Gottlieb, an "Authorized Signatory" for Visium, which states that Lumiere worked at the firm from September 2007 to April 2013, had a "last title" of "Analyst," and "[w]as not an executive member of the Company at any time." (Dkt. No. 54, at ECF page 22.) The government never contended that petitioner was an "executive member" of Visium. There was a dispute at trial as to whether he was merely an "analyst" in the Credit Fund, as he contended, or also a "portfolio manager," as several witnesses testified. Creizman addressed this issue when cross-examining those witnesses by highlighting various documents listing Lumiere as an "analyst." *See, e.g.*, Tr. at 468, 753, 756. He also obtained a concession from Keily that petitioner was "an analyst in the credit fund," Tr. at 147, and reminded the jury of this evidence during summation, arguing that, in the Credit Fund, Lumiere was "an analyst, not a portfolio manager." Tr. at 1037.

[29] J. Lumiere attests that he contacted "several" potential witnesses while working on petitioner's would-be appeal, but most of them either failed to respond, "claimed to have no knowledge," or, "for diverse reasons stated in substance that they would not be willing or . . . able to provide an affidavit." J. Lumiere Aff. ¶ 28.

assistance claim," *id.*, "whether wise in retrospect or not." *Baran v. United States*, 160 F. Supp. 3d 591, 598 (S.D.N.Y. 2016). *See also United States v. DeJesus*, 57 Fed. App'x 474, 478 (2d Cir. 2003) ("Because of [its] inherently tactical nature, the decision not to call a particular witness generally should not be disturbed."), *cert. denied*, 538 U.S. 1047; *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998) ("The decision not to call a particular witness is typically a question of trial strategy that appellate courts are ill-suited to second-guess."), *cert. denied*, 526 U.S. 1164 (1999); *Rios*, 2016 WL 3702966, at *7 ("'[s]trategic and tactical decision,' such as 'what witnesses to call,' 'what motions and objections should be made,' and 'what and how evidence should be introduced,' are generally left to defense counsel's discretion") (quoting ABA Criminal Justice Standards for the Defense Function, Standard 4-5.2(d) (4th ed. 2015)).

At the outset, a *habeas* petitioner claiming that his lawyer was ineffective because he failed to call helpful witnesses "'must establish what these . . . witnesses would have testified to, and, equally as important, that they would in fact have testified.'" *Yik Man Mui v. United States*, 2013 WL 6330661, at *9 (E.D.N.Y. Dec. 5, 2013) (quoting *Carneglia v. United States*, 2006 WL 148908, at *4 (E.D.N.Y. Jan. 18, 2006)), *certificate of appealability denied*, No. 13-4862 (2d Cir. Aug. 5, 2014); *see also Muhammad v. Bennett*, 1998 WL 214884, at *1 (S.D.N.Y. Apr. 29, 1998) (Rakoff, J.) ("[A] petitioner's speculative claim about the testimony of an uncalled witness is accorded little weight in federal habeas review."). The petitioner must also overcome the "highly deferential" presumption that the decision not to call a particular witness (evaluated as of the time it was made) "might be considered sound trial strategy." *Bell*, 535 U.S. at 698. Finally, as is true of all ineffective-assistance claims, the petitioner must present "objective evidence" to establish "prejudice," *Pham*, 317 F.3d at 182; that is, a "substantial" likelihood "of a different result" had the uncalled witness testified. *Shinn*, 141 S. Ct. at 523.

Here, petitioner cannot clear the first hurdle, because his claim is almost entirely speculative. He admits that most of the individuals he lists as potentially helpful witnesses were "not responsive" or offered "resistance" to his overtures. Pet. at 23. He further admits that the Visium personnel would have refused to testify even if subpoenaed. *Id*. at 10 (when Creizman called the law firm representing "all other employees from Visium, he was told that if he called anyone from Visium as a witness, they would be instructed to plead the Fifth Amendment"). His counsel therefore cannot be faulted for failing to call them. *See Campbell v. United States*, 2015 WL 1062176, at *10 (S.D.N.Y. Mar. 9, 2015) (rejecting ineffectiveassistance claim based on counsel's failure to call a potential witness who, if subpoenaed, "would almost surely have asserted his Fifth Amendment privilege against self-incrimination"); *Tucker v. United States*, 2012 WL 4354806, at *7 (S.D.N.Y. Sept. 24, 2012) (rejecting similar claim in the absence of evidence showing "whether the witnesses would have testified or invoked their Fifth Amendment privilege against self-incrimination"). Moreover, petitioner provides no non-speculative evidence as to what any of the non-responsive individuals "would have testified to." *Yik Man Mui*, 2013 WL 6330661, at *9. Nor does he offer any reason to believe that the Visium personnel on his list would have fallen on their swords to assist him. Thus, as in *Eisemann v. Herbert,* 401 F.3d 102 (2d Cir. 2005), the absence of "any evidence to show that [they] would have testified helpfully" for petitioner "precludes any claim that calling [them] was a viable defense strategy." *Id.* at 109.

While plaintiff did secure testimony from three potential witnesses (including Tawil, discussed separately below), their affidavits are distinctly underwhelming. For example, attorney Pohl, whose firm provided services to Visium in connection with the ATI restructuring, explains that the ATI transaction was "complex" and that it ultimately resulted in Visium and Marblegate purchasing ATI's assets through a new entity that they jointly owned. *See* Pohl Aff. dated Nov. 11,

2019 (Dkt. No 54 at ECF pages 15-21) ¶¶ 7, 11, 17-19, 24. Pohl does not discuss, much less defend,

Visium's inflated valuation of its ATI position in 2011 and 2012, which was based upon the sham

quotes that Lumiere dictated to Brook and Vandersnow and far exceeded both the available third-

party prices and the valuations assigned to the same security by other sophisticated hedge funds –

including Marblegate, whose CIO testified that no one in the marketplace was "paying that much

for ATI." Tr. at 802-03.  The remaining witness affidavits suffer from similar weaknesses.[30]

Since petitioner "has failed to identify any witnesses that his counsel should have called

who would have been helpful" to show his good faith belief, he cannot rebut the presumption that

Creizman's failure to call them fell "within the wide range of reasonable professional

representation." *Nersesian*, 824 F.2d at 1321. Even if I were to assume that petitioner would have

derived *some* benefit from general testimony to the effect that the ATI, Nebraska Book, and Sevan

Marine restructurings were complicated, and that insiders like Lumiere sometimes had access to

information not generally known to the market, I could not conclude, given the strength of the

government's case, that there was any reasonable probability of such testimony affecting the

outcome of the case.

---

[30] In a separate affidavit, attorney Pohl describes certain events that took place during the Nebraska Book bankruptcy, including a favorable equity purchase proposal and the identification of some "vendor credits" that in the view of "some of the bondholders" might have increased its "overall enterprise value." *See* Pohl Aff. dated Feb. 24, 2018 (Dkt. No. 5, at ECF pages 4-5) ¶¶ 3-4. Once again, Pohl does not discuss, much less defend, Visium's actual valuation of Nebraska Book. Paul Leand, the CEO of AMA Capital, attests that he advised the Sevan Marine bondholders during its insolvency proceedings. Leand Aff. (Dkt. No. 5, at ECF pages 2-3) ¶ 3. Leand suggests that Lumiere, who sat on the bondholders' steering committee, had advance knowledge of an offer made by "a publicly traded company" in October 2011 to purchase certain of Sevan Marine's assets, which in turn would benefit the bondholders. *Id.* ¶¶ 4-5. However, Leand says nothing about Visium's valuation of Sevan Marine (in October 2011 or otherwise) and makes no effort to defend the price quotes obtained by Lumiere for that purpose.

b.      Failure to Call Expert Witness

Petitioner tells this Court that his expert, Tawil, "would have contradicted every argument the prosecution had against the Petitioner, and [explained] that all of Petitioner Lumiere's actions conformed legitimately to within [sic] industry standards." Pet. at 24. Indeed, "If Tawil testified, it would have been devastating to the prosecution's case, and the indictment may have shifted to Jake Gottlieb[.]" *Id.* at 26; *see also* Pet. Reply at 27 (Tawil was the single witness "most essential to the defense"). However, petitioner offers only his own speculation as to the content of Tawil's "devastating" testimony – some of which he clearly could not have delivered.[31] And although Tawil signed an affidavit, it states only that he was "prepared to testify for [the] defense" but was told at the last minute that his testimony "was not needed." Tawil Aff. (Dkt. No. 54, at ECF pages 11-12) at ECF page 11. Tawil says nothing about the substance of his planned testimony. Petitioner has therefore failed, again, to establish what this "essential" witness "would have testified to." *Yik Man Mui*, 2013 WL 6330661, at *9.

Creizman, on the other hand, attests that he did not call Tawil to the stand as a matter of sound trial strategy. He explains that, after discussing the case at length, both with Tawil and with the (unnamed) consulting expert retained by the defense team, "we determined that calling the testifying expert witness at trial would be extremely harmful to Mr. Lumiere's chances of an acquittal," because the government could "transform our expert witness into a favorable witness

---

[31] For example, Lumiere states that Tawil would have "testified about general practice and [the] many different purposes for hedge funds to request broker quotes," Pet. at 24, and would have explained the "whole process" of valuing a distressed security in a hedge fund, including the role of the portfolio manager, operations, accounting, the valuation committees, investment managers, the administrator, and the auditor. *Id.* at 28. In fact, Tawil could not have testified about any of this, because the government moved *in limine* to exclude his testimony regarding "general practices at large hedge funds," Tr. at 326, and Judge Rakoff agreed, noting that "[t]he question in this case is not how hedge funds in general are," but rather "how this hedge fund operated," which was not within Tawil's knowledge or expertise. Tr. at 327.

for the government." Creizman Decl. ¶ 15. Counsel provides excerpts from his notes of a

conversation with the consultant on January 10, 2017, including the following observations:

> "Only defense here is that Stefan believed in marks. Can't get into whether they
> were valued correctly because pretty obvious that most were marked wrong."

> "If 99% of time price gets spit back from broker, Stefan SHOULD have known
> what he was doing was wrong[.]"

> "Impossible that broker never, not once came back with different price on a
> security."

> "October 2012 marking CMED at 34 and everyone else is marking at 5 – big, big
> problem."

*Id.* ¶ 18. Had Tawil been forced to concede any of these points on the stand, it would indeed have

been devastating – but for the defense, not the prosecution.

On this record, the Court has no reason to "second-guess" counsel's tactical choice. *Luciano*,

158 F.3d at 660. "The decision to call an expert witness," like the decision to call a lay witness, "is

a strategic decision for the defense counsel, and generally should not be disturbed." *Mazique v.*

*Ercole,* 2008 WL 2884370, at *9 (E.D.N.Y. July 23, 2008); *accord Savinon v. Mazucca*, 2005 WL

2548032, at *33 (S.D.N.Y. Oct. 12, 2005) (collecting cases), *report and recommendation adopted,*

2006 WL 2669331 (S.D.N.Y. Sept. 18, 2006), *aff'd,* 318 Fed. App'x 41 (2d Cir. 2009); *Mohsin v.*

*Ebert*, 626 F. Supp. 2d 280, 312 (E.D.N.Y. 2009) (denying *habeas* claim where defense counsel

"determined that the testimony of the experts that they had consulted would not be beneficial to

the defense"). Here, as in *Baran*, 160 F. Supp. 3d at 598, it is clear that the decision not to call

Tawil was "strategic," and therefore "'unchallengeable' under *Strickland*, 466 U.S. at 690." *Id.*

Additionally, petitioner has failed to show any probability, much less a "substantial" likelihood,

*Shinn*, 141 S. Ct. at 523, that "the jury would have reached a different result" had Tawil testified. *Schmidt*, 105 F.3d at 90.[32]

### c.   Failure to Counter Alleged Prosecutorial Misconduct

In his new trial motion, petitioner argued that the government engaged in prosecutorial misconduct, particularly during summation, when the AUSA repeatedly told the jury that there was no evidence of Lumiere's good faith. Judge Rakoff rejected that claim, calling it "frivolous," because "the Government's comments, far from constituting misconduct, were right on target." *Lumiere*, 249 F. Supp. 3d at 762-63. As noted above, Lumiere did not appeal.

Instead, he now expands his prosecutorial misconduct claim. He complains again that it was improper for the government to argue that there was no evidence "that shows the defendant had a good faith belief in these prices." Pet. at 37 (quoting Tr. at 1059). He further contends that the government (i) made other misleading and improper statements during opening and closing statements; (ii) submitted inaccurate transcripts of the recorded statements between Lumiere and other witnesses; and (iii) presented perjured testimony from multiple witnesses throughout the trial.

---

[32] Petitioner separately claims that Creizman was "incredibly ineffective" when he failed to attend the mid-trial *Daubert* hearing, which was handled by his more junior colleague, attorney Madrigal. Pet. at 26. However, Lumiere makes no showing that Madrigal, a 2011 law school graduate, *see* A.203 (Dkt. No. 44-4, at ECF page 16), was unqualified for such a task. Rather, he argues that Creizman must have been ineffective because the result of the hearing was a "disaster." Pet. at 26. In particular, petitioner complains about Madrigal's statement during the hearing that "Mr. Tawil will not be rendering any opinion about whether or not any security in the credit fund was properly valued." *Id.* (quoting Tr. at 325). He argues that "there is no reason why an expert should not have been allowed to analyze and review the securities in question" to show that they were properly valued. *Id.* at 27. Madrigal's statement, however, was a clarification, not a concession. Tawil was *never* prepared to testify that the debt securities at issue were properly valued. At best – according to the December 15, 2016 letter summarizing his anticipated testimony – Tawil could have explained "the possibility of differing views among market participants as to accurate values for the same distressed security[.]" (16-CR-483 Dkt. No. 44-1, at 3.) Petitioner has therefore failed to show either that Madrigal was ineffective during the hearing or that Creizman was ineffective for failing to conduct it himself.

Pet. at 29-49. He adds that his counsel was ineffective in that he failed to make independent transcripts of the tapes; "failed miserably" to impeach Thorell, Vandersnow, and Plaford; and generally failed to "protect[] defendant" from the "extreme and erroneous prejudice" caused by the government's misconduct. Pet. at 36, 42, 44, 49.

Petitioner's prosecutorial misconduct claims are procedurally barred. *See Blake v. United States*, 2012 WL 3154989, at *5 (S.D.N.Y. Aug. 3, 2012) ("[A] claim of perjury or prosecutorial misconduct is subject to the procedural default rule."). He did not raise them on direct appeal and "fails to show both cause for his failure to raise these claims on appeal and actual prejudice suffered due to the alleged misconduct." *Abad v. United States*, 2011 WL 666361, at *4 (S.D.N.Y. Feb. 7, 2011), *motion to amend denied*, 2011 WL 1886456 (S.D.N.Y. May 13, 2011), *motion for relief from judgment denied*, 2014 WL 521541 (S.D.N.Y. Feb. 6, 2014), 2018 WL 2021698 (S.D.N.Y. Apr. 12, 2018); *see also Hammouda v. United States*, 2006 WL 941759, at *3 (E.D.N.Y. Apr. 10, 2006) (denying prosecutorial misconduct claim as procedurally barred where petitioner failed to raise it on direct appeal and offered "no explanation that might establish 'cause' and 'prejudice' for the failure to raise this claim prior to seeking collateral relief"). Given the "overwhelming" evidence of guilt presented at his trial, *see Lumiere*, 249 F. Supp. 3d at 764-65, he also fails to demonstrate "prejudice from the alleged error," *Marone*, 10 F.3d at 67, or "actual innocence." *Zhang*, 506 F.3d at 166.

Petitioner's ineffective assistance claims arising out of the alleged prosecutorial misconduct are not procedurally barred, *see Massaro*, 538 U.S. at 504, but fail on the merits.

### i.    *Opening and Closing Argument*

The portions of the opening and closing arguments that petitioner now characterizes as improper were all squarely based on the testimony and exhibits admitted at trial (in some cases over objections from petitioner's counsel), or reasonable interpretations of that evidence. That

petitioner disputed the evidence, or disagreed with the government's interpretation, did not make the argument legally objectionable. Consequently, Creizman's failure to object was not constitutionally ineffective. *See Aparicio v. Artuz,* 269 F.3d 78, 99 (2d Cir. 2001) ("The failure to include a meritless argument does not fall outside the wide range of professionally competent assistance to which Petitioner [i]s entitled.") (internal quotation marks omitted); *Hicks v. Ercole,* 2015 WL 1266800, at *23 (S.D.N.Y. Mar. 18, 2015) ("The failure of a lawyer to invoke meritless objections cannot constitute constitutionally deficient performance."); *accord Parks v. Sheahan,* 104 F. Supp. 3d 271, 285 (E.D.N.Y. 2015) (collecting cases).

        *ii.*     *Transcripts*

The transcripts that petitioner now describes as inaccurate were prepared by the government, authenticated as fair and accurate by the witnesses whose conversations were recorded, *see* Tr. at 227, 495-96, 682-83, 796, and offered as "aids to the jury" to accompany the underlying audio recordings, which were played in open court. *E.g.*, Tr. at 227. Judge Rakoff instructed the jury at that point that the transcripts were "not the evidence. The ultimate evidence is the tape itself." Tr. at 228. After summations, Judge Rakoff instructed them again: "[P]lease remember that the transcripts are just an aid, and it is the recordings themselves that are in evidence." Tr. at 1098. During deliberations, the jurors were given both the transcripts and the tapes, along with "a recording device so they can play [the tapes], if they want to." Tr. at 965.

Petitioner now asserts – for the first time – that five of the transcripts were inaccurate, including, most significantly, the transcript of a conversation in which he and Thorell discussed using their knowledge of the mismarking scheme to extort J. Gottlieb and Plaford. Pet. at 36. That transcript, as used at trial, was authenticated by Thorell, *see* Tr. at 227, and reads as follows:

LUMIERE:    You got a lot of fucking shit to put him, put him out of business.

THORELL:    I think.

> LUMIERE:   *Well, first we can extort him. I'd love to be able to go to him and say listen, Jake, Chris, give us $100 million between the both of you.*
>
> THORELL:   Personally I'm just interested in prison time. I mean, I –
>
> LUMIERE:   Yeah.

GX 1222-T (emphasis added); *see also Lumiere*, 249 F. Supp. 3d at 760. When the tape was played

at trial, Thorell testified that he understood Lumiere to be suggesting that they blackmail Jake

Gottlieb and Chris Plaford. Tr. at 398-99.

In his Petition, Lumiere claims that this conversation was "incorrectly transcribed," Pet. at

26, and supplies a "corrected transcript" that reads somewhat differently:

> LUMIERE:   [Unintelligible] a lot of [unintelligible] out of the business.
>
> THORELL:   I think.
>
> LUMIERE:   *Of course we can't extort, but I'd love to go to them and say, listen; Jake, Chris, give us $100 million –*
>
> THORELL:   Personally I'm just interested in prison time. I mean –
>
> LUMIERE:   Yeah.

Pet. at 36; A.138 (Dkt. No. 25, at ECF page 3) (emphasis added).[33] Petitioner adds that it is "clear"

from the corrected transcript that there was "beyond zero intent" for him to actually engage in any

extortion, Pet. at 36, and thus the "manipulated" transcript prepared by the government must have

"caused material prejudice." *Id.* Further, petitioner argues, his trial counsel was ineffective because

he "failed to go over and independently transcribe [the] recordings." *Id.*

Ten months later, along with his reply papers, petitioner submitted yet another "corrected"

transcript of the same conversation, this one prepared by Hofstra linguistics professor Dr. Leonard,

who attests that he was retained in August 2019 to "forensically analyze" certain recordings.

---

[33] The "corrected transcript" is unauthenticated but bears a logo, in the upper-right-hand corner, indicating that it was prepared by an online transcription service called "Transcript Divas."

Leonard Aff. (Dkt. No. 54, at ECF pages 23-33) at 6. The witness does not further describe his "analysis," except to say that it "showed that there were a number of mis-transcriptions," including to the key portion of the "extortion" transcript, which according to Dr. Leonard should read:

> LUMIERE:     *Well of course we can't extort them.*
>
> THORELL:     [Laugh].
>
> LUMIERE:     *I'd love to be able to go to them and say: Listen; Jake, Chris, give us $100 million between the both of you.*

*Id*. In his reply brief, petitioner argues that Creizman would have realized that the transcripts were "widely [sic] inaccurate" if "he had properly and adequately done his job as defense counsel, or even just listed [sic] to the recordings with the focus and intention necessary[.]" Pet. Reply at 26.

Petitioner's ineffective assistance claim based on the transcripts fails for four reasons. *First*, it was petitioner himself who interfered with his counsel's efforts to listen to the tapes. As late as September 1, 2016, approximately three months before trial, Lumiere told his lawyer: "I do not want you looking through copies of emails *or listening to recordings* until I have a chance to give you context[.]" A.100, at ECF page 263 (emphasis added). Having instructed his counsel not to do precisely that which he now faults his counsel for failing to do, plaintiff cannot, as a matter of law, show that this aspect of his attorney's representation fell below an objective standard of reasonableness under "prevailing professional norms." *Strickland*, 466 U.S. at 690.

*Second*, there is no evidence that petitioner's defense counsel spent an inadequate amount of time with the tapes or the transcripts. To the contrary: their timesheets show that in December 2016 alone (by which time, presumably, petitioner was no longer objecting to the work), Creizman and his colleagues spent more than 42 hours reviewing the tapes and (when provided by the government) the transcripts. A.65 (Dkt. No. 1-8, at ECF pages 108-13).

*Third*, petitioner was in a far better position than his lawyer to know if any of the transcripts were inaccurate. His voice was on every tape, and he made many of them himself. Moreover, it was Lumiere himself who uttered the key phrase, telling Thorell either that "we can" or "we can't" extort J. Gottlieb and Plaford. Yet there is no indication in the record now before the Court that petitioner so much as suggested, prior to or during trial, that there were any discrepancies between the tapes and the transcripts.

Nor did he make the argument in his new trial motion. To the contrary: in that motion he *relied* on the transcript to argue that the "extortion" conversation should have been excluded altogether under Fed. R. Evid. 404(b) as "inadmissible propensity evidence" or under Fed. R. Evid. 403(b) because it was unduly prejudicial. (16-CR-483 Dkt. No. 92, at 15-19.)[34] Even assuming, *arguendo*, that Lumiere could now make a colorable claim that the "extortion" conversation was mis-transcribed,[35] the fact that he himself did not notice the alleged error until sometime after his new trial motion was denied (or chose to ignore it for strategic reasons) is fatal to his claim that his counsel was constitutionally ineffective for overlooking the same issue.

---

[34] Judge Rakoff disagreed, ruling that the tape was properly introduced to rebut Lumiere's argument (articulated during his counsel's opening statement, *see* Tr. at 30) that his habit of recording himself discussing price quotations with Plaford and others was evidence of his innocence, "because the last thing a knowing fraudster would do is keep meticulous records of the fraud." *Lumiere*, 249 F. Supp. 3d at 761. The challenged recording, he explained, showed that "the opposite inference is also possible: that [Lumiere] recorded the conspiracy to use as a weapon against his coconspirators because he knew what they were doing was wrong." *Id.* Judge Rakoff added that the tape was not unduly prejudicial, particularly since "[t]he Government made only passing use of it in its own summations, again to rebut the defense's inference that Lumiere's recordings were evidence of his good faith." *Id.* (citing Tr. at 1006-07).

[35] The transcript submitted with his Petition, labelled "Transcript Divas," is wholly unauthenticated. Dr. Leonard's affidavit, although submitted under oath, fails to explain what the witness actually did to "forensically analyze" the underlying records – other than listen to them – or what in his background as a Professor of Linguistics qualifies him to transcribe audio recordings.

*Fourth*, petitioner cannot establish that he was prejudiced, under the *Strickland* standard, because of the allegedly inaccurate transcript. As noted above, the jury was clearly instructed that only the tapes, not the transcripts, were evidence. Tr. at 228, 1098. Moreover, as petitioner pointed out in his new trial motion, "no extortion charges were ever filed – or even contemplated." (16-CR-483 Dkt. No. 92, at 16.) The government used the tape (and the transcript) to argue a fairly narrow point: that petitioner's habit of recording conversations with his co-conspirators could be interpreted as consciousness of guilt, rather than innocence, insofar as he viewed those recordings as "fodder for blackmail." *Lumiere*, 249 F. Supp. 3d at 761. That same point could have been made with the "corrected" transcript, which still had Lumiere saying to Thorell, "I'd love to be able to go to them and say: Listen; Jake, Chris, give us $100 million," and Thorell replying that he was more interested in "prison time" for them. Plaintiff has thus failed to present any objective evidence to establish prejudice. *Pham*, 317 F.3d at 182.

### iii.    *Perjury*

Petitioner next claims that the government's key witnesses perjured themselves, including Thorell, Plaford, Vandersnow, Keily, and even SEC economist Jindra. Pet. at 43-49. He further contends that his trial counsel was ineffective in that he "allowed the prosecutor" to use false testimony at trial. *Id.* at 29.

Although any claims based on the alleged perjury are procedurally barred, it is useful to review the standard applicable to such claims, because if petitioner cannot meet it, neither can he seek *habeas* relief based on his counsel's allegedly inadequate response to the challenged testimony. *Seabrook v. United States*, 2019 WL 580014, at *9 (S.D.N.Y. Feb. 13, 2019), *report and recommendation adopted,* 2020 WL 5764370 (S.D.N.Y. Sept. 27, 2020); *Louis v. Fischer*, 2007 WL 4198255, at *23 (E.D.N.Y. June 25, 2007); *Trubin v. Mazzuca*, 2006 WL 1876669, at *11-12 (S.D.N.Y. July 6, 2006). To challenge a conviction based on the government's  use of allegedly

false testimony, a petitioner must prove that: (1) "false testimony was introduced," (2) "[the] testimony either was or should have been known to the prosecution to be false," (3) "the testimony went uncorrected," and (4) "the false testimony was prejudicial." *Shih Wei Su v. Filion*, 335 F.3d 119, 127 (2d Cir. 2003) (citing *United States v. Agurs,* 427 U.S. 97, 103 (1976)).

Plaintiff cannot meet this standard as to any of the witnesses whose testimony he attacks. As to Vandersnow, Keily, and Jindra, petitioner lacks even a colorable argument that their testimony was "false." As to Thorell and Plaford, petitioner does nothing more than recapitulate the attacks on their credibility that his counsel made – vigorously, albeit unsuccessfully – at trial. Petitioner offers no evidence that the government knowingly presented false testimony, and makes no showing that the testimony of which he complains (false or not) "went uncorrected." To the contrary: he relies heavily on his counsel's effective cross-examinations to demonstrate the flaws in the witnesses' direct testimony, thus defeating any related Sixth Amendment claim.

According to petitioner, Vandersnow committed "material perjury" when he referred to "Petitioner's role as a portfolio manager" without "foundation." Pet. at 47. It is true that the government neglected to lay an express foundation for Vandersnow's initial testimony that Lumiere had a "portfolio" (which he was using Vandersnow's quotes to prop up). Tr. at 491. But that gap was filled moments later, when Vandersnow was shown an email that he received from petitioner himself, giving his title as CFA (chartered financial analysist) and PM (portfolio manager) – not "analyst." Tr. at 500. Petitioner has therefore failed to identify anything remotely resembling perjury by Vandersnow or misconduct by the government. I note as well that attorney Creizman objected to the use of the email, but was overruled, *id.*, thereby discharging any conceivable obligation he had to "counter" the damaging testimony.

Keily also committed "material perjury," according to petitioner, by testifying that Lumiere's "title was both portfolio manager and analyst," Pet. at 47, and lied again, "on likely the most material issue of the trial," when he answered "no" to a question that came "right out of the compliance manual," namely: "[I]f there are circumstances where a portfolio manager believes that fair value would not produce an accurate or fair valuation for a given instrument, it may produce alternative means to value an instrument? Is that fair?" *Id.* at 48. In fact, petitioner *did* carry two titles, and *was* a portfolio manager (as his email signature block reflected) at least with respect to certain Visium funds. *See id.* at 32 (conceding that he "was portfolio manager in Global Fund and Balanced"). Whether he also managed a portion of the Credit Fund portfolio was hotly debated at trial and – as relevant here – vigorously litigated by Creizman, who cross-examined Keily on the point and obtained the concession that petitioner was "an analyst in the credit fund." Tr. at 147. Thus, the challenged testimony was not false, much less knowingly presented as such by the government, and in any event was "corrected," to the extent possible, by defense counsel.

The same is true for Keily's response to the question concerning the compliance manual, which is only partially (and misleadingly) quoted by petitioner. In fact, Creizman successfully established, on cross-examination, that Visium did not prohibit its credit team from providing pricing input for valuation purposes, and that this was disclosed to its investors. He began by reading aloud – without objection – the key language from the compliance manual: "However, if there are circumstances where a hedge fund manager believes that the application of fair value would not produce an accurate or fair valuation for a given instrument, it may employ alternative means to value an instrument as permitted by agreement." Tr. at 196-97. He then asked Keily a more complicated question about what Visium's investors *understood* about its valuation processes:

> Now, is it fair to say that investors, sophisticated investors who read Visium's disclosures, understand that if there are circumstances where a portfolio manager

> believes that fair value would not produce an accurate or fair valuation for a given
> instrument, it may produce alternative means to value an instrument? Is that fair?

Tr. at 197. That question drew an objection from the government, which Judge Rakoff termed "well taken" (likely because the question called for speculation as to what the unnamed investors understood) and, simultaneously, the beginning of an answer ("No –") from the witness. *Id.* However, Creizman made the point another way, eliciting testimony that Visium's investors were given a report that "indicated what percentage of [the] firm's net asset value was calculated in reliance on manager-supplied prices," and that at least "certain investors" reviewed that report. Tr. at 199. Once again, petitioner has failed to identify any perjury by the witness, any misconduct by the government, or any failure by petitioner's counsel.

Jindra, the SEC economist, allegedly perjured himself by testifying that Lumiere was "responsible for" ATI, Nebraska Book, and several other mismarked securities, when in fact – petitioner argues – he "had no foundation to know which securities Petitioner was responsible for." Pet. at 48 (quoting Tr. at 912, 917, 919, 922). This was not perjury. Nor was Jindra's testimony misleading in any way. There was a wealth of evidence in this action, both documentary and testimonial, that plaintiff was in fact responsible for ("covered") the Credit Fund's positions in those securities. *See, e.g.*, Tr. at 238, 264, 296 (Thorell), 655 (Plaford), GX 1113 (Lumiere's 2012 self-assessment, prepared for performance review purposes, in which he stated, "I'm responsible for ATI and C-Med").[36] Moreover, Jindra made it clear, from the outset, that his testimony was based on his "review of documents in this case," Tr. at 912, and attorney Madrigal reinforced the

---

[36] *See also* A.141 (Dkt. No. 25, at ECF pages 14-63) at 11-18 (transcript of Lumiere's 2013 "bonus review" meeting with Plaford, during which Lumiere acknowledged, "I am the primary on ATI," and further conceded that he "had two years of down P&L," including Sevan Marine and Nebraska Book, but argued that his performance should nonetheless be considered "good" because they were all "unique situations" and because Plaford directed him to "just work on CMED" for six months).

point on cross-examination, obtaining a concession from the witness that he was given "a document" concerning petitioner's positions but otherwise had "no knowledge" of whether petitioner was actually "in charge of" those positions. Tr. at 928-29. There was no perjury, no government misconduct, and no basis for any complaint about counsel's performance.

Petitioner argues heatedly that Thorell (whose testimony was "riddled with perjury," Pet. at 39) and Plaford (who "lied incessantly," *id.* at 43) were "manipulative witnesses looking to make a deal for themselves and implicate the one person who consistently acted in good faith." *Id.* at 46-47. Strikingly, however, virtually every instance of "perjury" that he attributes to these two witnesses consists of a statement made (or implied) on direct examination that – according to petitioner – was "refuted," or shown to be misleading, by admissions elicited from the same witness, or from another witness, by defense counsel on cross-examination. For example, on the issue of whether petitioner was or was not a portfolio manager in the Credit Fund, he claims that both Thorell and Plaford lied,[37] but that the truth was revealed through his counsel's cross-examinations of Plaford and Keily.[38] Similarly, on the issue of whether it was petitioner or Plaford who decided what prices to ask the friendly brokers to quote, petitioner claims that Thorell falsely

---

[37] *See* Pet. at 39 (charging that Thorell committed "blatant perjury" when he testified, "It was my *understanding* that [petitioner] was a portfolio manager in charge of a section or a subsection of the credit fund") (quoting Tr. at 244) (emphasis added by petitioner); Pet. at 43 (charging that Plaford lied when he testified that petitioner was "a senior analyst/portfolio manager") (quoting Tr. at 651).

[38] *See* Pet. at 40 (asserting that the Credit Fund "had only one portfolio manager (Plaford) which was evident throughout every document and other piece of testimony," including Creizman's cross-examinations of Keily and Plaford) (citing Tr. at 147-48, 154, 756); Pet. at 43 (pointing out that Plaford "later on cross admits" that petitioner "was not a portfolio manager in the Credit . . . Fund") (quoting Tr. at 756).

ascribed this function to him,[39] but Creizman exposed the truth – that it was Plaford who told Lumiere what prices to ask for – during his cross-examination of Plaford himself.[40]

The same is true with respect to petitioner's overarching claim that these witnesses were "looking to make a deal for themselves." Pet. at 47. As is frequently the case when co-conspirators testify under a grant of immunity (Thorell) or a cooperation agreement (Plaford), both were vulnerable to impeachment on the ground that they had a motive to save their own skins by throwing the uncooperative co-conspirator (here, Lumiere) under the bus. In his petition, Lumiere vigorously argues this point in support of his perjury claim.[41] At trial, relying on the same evidence, Creizman made the same point.[42] To be sure, neither Thorell nor Plaford was a paragon of virtue. But petitioner's reprise of his attorney's closing argument does not begin to show that the government suborned perjury. Nor, of course, has petitioner shown that the allegedly false testimony "went uncorrected," *Shih Wei Su*, 335 F.3d at 127, which in turn is fatal to his claim that Creizman's response to that testimony was constitutionally ineffective.

---

[39] *See* Pet. at 41 (alleging that Thorell "fabricated" his testimony that it was his "understanding . . . that Stefan was communicating to the brokers that these are the levels and giving the brokers guidance on behalf of himself") (quoting Tr. at 357).

[40] *See* Pet. at 41, 46 (arguing that "Thorell's 'understanding' is a cloaked lie" which was "reveal[ed]" when Plaford admitted, on cross, that he "told Mr. Lumiere what prices to ask the brokers for") (quoting Tr. at 732).

[41] *See, e.g.*, Pet. at 41 (alleging that Thorell's testimony was fabricated for the "sole motive of a big payday whistleblower fee"); Pet. at 43 (noting that Plaford was "brought up on charges of insider trading" as well as mismarking, and arguing that because of this he would likely "admit to something smaller to avoid further charges").

[42] *See, e.g.*, Tr. at 1023 (Creizman, arguing in summation that Thorell was "trying to find a crime wherever he can find it . . . [s]o he could go to the Securities and Exchange Commission and get his whistleblower fees"); Tr. at 1046-47 (Creizman, reminding the jurors that Plaford is facing jail time for insider trading, calling him a "walking crime wave," and arguing that he "will lie and do whatever he can" to stay out of prison).

d.      Miscellaneous Failures

In addition to the claims outlined above, petitioner argues that his counsel improperly failed to prepare his sister A. Gottlieb – or himself – to testify. Pet. at 13; *see also* Pet. Aff. ¶ 20 (attesting that he "did not make any decision not to testify" and was "completely unprepared" when Judge Rakoff asked him that question during trial). In her affidavit, A. Gottlieb attests that she was willing to testify but was disabled from doing so because Creizman invited her to attend the trial, which barred her from being a testifying witness. A. Gottlieb Decl. (Dkt. No. 54, at ECF pages 3-9) ¶ 5. But she never reveals what testimony she could have offered that would have been both admissible and helpful to the defense.[43] Creizman, on the other hand, explains that "most, if not all, of what she had expressed – i.e., that she knew her ex-husband, Jacob Gottlieb, with whom she was embroiled in a bitter and nasty matrimonial litigation, had sought to 'frame' Mr. Lumiere – was inconsistent with the evidence and, in any event, did not undermine the evidence of Mr. Lumiere's conduct." Creizman Decl. ¶ 19. Given both siblings' penchant for attributing the prosecution (as well as Lumiere's previous difficulties at Visium) to the machinations of J. Gottlieb,[44] counsel's "tactical decision" not to call A. Gottlieb as a witness was unquestionably

---

[43] In her affidavit, A. Gottlieb claims to have "knowledge of some of the key players and some of the relevant and shifting structures in place at Visium," A. Gottlieb Aff. ¶ 3. but concedes that she acquired that knowledge as a result of her "unique position as Jake's wife and Stefan's sister," *id.*, meaning that her testimony as to these vaguely-described matters would be inadmissible hearsay. She also states, mysteriously, that she was "privy to numerous conversations unique to [her] situation," as a result of which she acquired "information that would have completely discredited Jason Thorell." *Id.* ¶ 16. However, she does not identify that information. Nor does she suggest that it could have been introduced through her testimony.

[44] *See, e.g.*, Pet. at 13 (reporting that A. Gottlieb and her attorney "reveal[ed]" to petitioner in January 2013 that J. Gottlieb "threatened to ruin Petitioner Lumiere and make sure he never works again"); Pet. Reply at 8 ("The truth is that Petitioner was . . . simply set up as a fall guy, a casualty of the acrimonious divorce proceedings between Jacob Gottlieb and Petitioner's sister[.]").

"within the wide range of reasonable professional representation," *Nersesian*, 824 F.2d at 1321, and thus did not constitute ineffective assistance.

Petitioner's claim that he was denied the opportunity to testify in his own defense fails as well. Not only does Creizman attest that his client "made the decision not to testify," Creizman Decl. ¶ 20; that is what Lumiere himself told Judge Rakoff, in open court, on January 18, 2017. Tr. at 956. As against this "knowing waiver," *Chang v. United States,* 250 F.3d 79, 84 (2d Cir. 2001), petitioner's after-the fact assertion that he was surprised by the question and therefore answered it dishonestly, *see* Pet. Aff. ¶ 20, is "insufficient to justify any action on Petitioner's claim that [his] right to testify in [his] own defense was denied[.]" *Hammouda*, 2006 WL 941759, at *5; *see also Pettaway v. Brown*, 2010 WL 7800939, at *8 (S.D.N.Y. May 3, 2010) (because "any nontestifying defendant may claim after the trial that he was denied his right to testify, a defendant bears the burden of proving his claim with detailed allegations"), *report and recommendation adopted,* 2011 WL 5104623 (S.D.N.Y. Oct. 26, 2011). Moreover, petitioner "has failed to show prejudice, as he has not set forth what he would have said had he testified and how that would have changed his trial's outcome." *Id.*

Finally, petitioner contends in sweeping terms that his trial counsel was ineffective "at all stages" of the trial, and did "none of the things a minimally effective counsel would do to prepare for trial and present a defense[.]" Pet. at 50. That claim is robustly refuted by the extensive record now before this Court, which shows not only that Creizman performed adequately in court – objecting when necessary, competently cross-examining the government's witnesses, obtaining helpful admissions, and using them to make a cogent closing argument – but also that he prepared extensively (once his client permitted him to do so), pursued exculpatory evidence, retained both a consulting and a testifying expert, and appropriately exercised his professional judgment in

determining what evidence to use at trial. None of petitioner's after-the fact complaints, whether considered singly or in the aggregate, demonstrates that his trial counsel's performance fell below "an objective standard of reasonableness" under "prevailing professional norms." *Strickland*, 466 U.S. at 687-89, 693-94. Nor, given the overwhelming evidence against him, has he demonstrated a "reasonable probability" that, had his counsel tried the case differently, "the result of the proceeding would have been different." *Id.* 694.

## III.   CONCLUSION

"'[I]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the [§ 2255] motion' without holding an evidentiary hearing." *Lasher v. United States*, 2018 WL 3979596, at *10 (S.D.N.Y. Aug. 20, 2018) (quoting *Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009)), *appeal dismissed*, 2020 WL 1170173 (2d Cir. Jan. 15, 2020). Having carefully reviewed petitioner's motion, appendices, affidavits, reply papers, and exhibits, as well as the underlying records from his criminal case, I conclude that no relief is warranted in this action. I therefore recommend, respectfully, that the petition be DENIED.

The Clerk of Court is respectfully directed to mail a copy of this Report and Recommendation to petitioner.

Dated: New York, New York
       January 18, 2022

**BARBARA MOSES**
**United States Magistrate Judge**

59

## <u>NOTICE OF PROCEDURE FOR FILING OF OBJECTIONS</u>
## <u>TO THIS REPORT AND RECOMMENDATION</u>

The parties shall have fourteen days from this date to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). *See also* Fed. R. Civ. P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the Hon. Jed S. Rakoff at 500 Pearl Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Rakoff. **Failure to file timely objections will result in a waiver of such objections and will preclude appellate review.** *See Thomas v. Arn*, 474 U.S. 140 (1985); *Frydman v. Experian Info. Sols., Inc*., 743 Fed. App'x 486, 487 (2d Cir. 2018); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).